## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FRICTIONLESS WORLD, LLC | ) | Case No. 19-18459 MER |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| FRICTIONLESS WORLD LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 19-_____ MER |
| | ) | |
| FRICTIONLESS LLC, CHANGZHOU | ) | |
| INTER UNIVERSAL MACHINE & | ) | |
| EQUIPMENT CO., LTD, LI ZHIXIANG, | ) | |
| CHANGZHOU ZHONG LIAN | ) | |
| INVESTMENT CO. LTD., SERENA LI, | ) | |
| AND FRANK LI, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S COMPLAINT FOR TURNOVER OF PROPERTY OF THE ESTATE, CLAIM DISALLOWANCE, AVOIDANCE, DAMAGES AND INJUNCTIVE RELIEF

---

Frictionless World, LLC ("FW") brings the following claims against Defendants Changzhou Inter Universal Machine & Equipment Co., Ltd. ("CIU"), Li Zhixiang ("Li"), Changzhou Zhong Lian Investment Co. LTD. ("ZL Investment"), Serena Li, and Frank Li (collectively "Li Defendants"), as well as against Defendant Frictionless, LLC, with knowledge as to FW's own acts and those of Defendants, and on information and belief as to all other matters, as follows:

## INTRODUCTION

FW was created in 2012 by its CEO and sole owner Dan Banjo, an engineer with years of experience in the industry, to manufacture and distribute to retailers professional grade outdoor equipment for household and agricultural use.  Because Banjo had known the Li family and CIU since 2007, he used CIU to manufacture parts and products for FW, per FW's direction.  The parties also began negotiating a joint investment venture intended to quickly expand FW's number of retail clients and total sales, thereby assisting all involved.  The other parties in this venture were Li, his company CIU, an investment company Li created in 2013 called ZL Investment, and a pass-through entity jointly created by ZL Investment and Banjo to handle revenue transfers between FW and CIU called Frictionless LLC.  The Operating Agreement for Frictionless LLC was entered into on April 11, 2013.  Schedule B to the Operating Agreement, repeatedly referenced in the same, provides a detailed description of how the joint venture operated.

The parties operated under the clear provisions of that agreement for six years.  By late 2018, FW had registered steadily increasing sales numbers since 2012 and was projecting 2019-2020 to be its best year ever, with almost $50 million in sales.

Now, 10 months later, FW finds itself in a chapter 11 bankruptcy case as a direct result of Defendants' actions.  Per Defendants' requests, FW in good faith made accelerated payments to Defendants in early 2019 totaling over $4.5 million.  Upon receipt of the same, Defendants breached over 250 purchase orders and ceased all shipments. Defendants' failure to ship directly resulted in FW's loss of multiple major clients it had taken years to obtain, including Lowes and Home Depot.  Defendants' actions reflect an intentional effort to destroy FW as a competitor and obtain FW's clients and intellectual property.

FW now brings this action to (a) compel turnover of all property of the estate currently in the possession of Defendants, including all intellectual property, all patented product designs, all patented products, all trademarked products and all other parts and products; (b) disallow or equitably subordinate Frictionless LCC's claim; (c) avoid obligations owed and transfers made to Frictionless LLC; (d) obtain damages arising from Defendants' ongoing breaches of contract, fraud, negligent misrepresentation, and other claims; and (e) to obtain injunctive relief to (1) compel turnover as set forth above; (2) enjoin Defendants' sale, distribution, licensing or distribution, in any form, of FW's patented and trademarked property remaining in their possession as a result of their failure to ship, as contracted; and (3) stay the arbitration filed by Defendants against FW and its CEO and sole owner Daniel Banjo.

## THE PARTIES

1.      Plaintiff FW is a limited liability company organized and in good standing under the laws of the State of Colorado, with its principal place of business at 1100 West 120th Avenue, Suite 600, Westminster, Colorado.  FW is a chapter 11 debtor-in-possession in the underlying bankruptcy case.  Banjo is FW's sole member, founder, and CEO.

2.      On April 1, 2019, FW had almost 80 employees working to provide retailers all over the world with FW's outstanding professional-grade outdoor power equipment; high-quality affordable replacement parts for tractors, hitches and agricultural implements; gate and fence equipment; lithium-ion powered tools; and ice fishing equipment.   At this time, FW has approximately 20 employees.

3.      Defendant Li, a natural person, is a Chinese citizen and billionaire. Li owns and operates CIU and ZL Investment.  Li is a party to the Frictionless LLC Operating Agreement (hereinafter the "FOA"). *See* Exhibit 1.  During 2013-2018, Li and members of his immediate

3

and extended family visited FW's facility in Colorado several times per year.  Li has two children: (1) Tracey Li; and (2) Frank Li.  Both offsprings and their spouses are heavily involved in Li's business affairs.

4.      Defendant CIU is a company organized under the laws of China. Its business address is Zhaiqiao Town, Wujin, Chiangzhou, Jiangsu 21337, P.R. China. CIU has been assembling components for log splitters, post hole diggers, trimmers, and general farm equipment parts for FW since 2012, long before the joint venture involving Frictionless LLC was established. CIU never assembled such products prior to working with FW.  Li is the majority owner and president of CIU.

5.      Defendant Serena Li is a natural person and citizen of China.  Serena Li at one-time was a resident of the State of California. She is married to Frank Li and is therefore Li's daughter-in-law. Defendant Serena Li is believed to be a member of both ZL Investment and CIU.  Serena is the Chief Financial Officer ("CFO") of CIU and on May 1, 2015 was also made the CFO of Frictionless LLC.  Serena was appointed Frictionless LLC's Manager in May 2019 after Banjo resigned from the same position on May 3, 2019.

6.      Starting in 2015, Serena frequently communicated with FW through Banjo's email at dbanjo@frictionlessworld.com.  Serena also personally visited FW's business office in Westminster, Colorado to meet with FW's employees over business dealings involving FW and the Li Defendants.  See Exhibit 2 (photographs of Serena's visit).

7.      Defendant Frank Li is a natural person and citizen of China.  Frank Li is married to Serena Li and the parties once jointly resided in California.  Frank Li signed the FOA as ZL Investment's General Manager.  Frank Li is an owner of ZL Investment.  Frank Li has been familiar with the business dealings between FW and the Li Defendants since 2013, but did not

4

actively participate in the same until approximately 2015.

8.      Defendant ZL Investment is a Chinese company that was created by Li in 2013. ZL Investment is a member of, and owns 90% of the membership interests in, Frictionless LLC.  ZL Investment is a signatory to the FOA.  *See* Exhibit 1, in particular, Schedule A.  Upon information and belief, the ownership of ZL Investment is divided among Mr. Li, his two children, and their two spouses.

9.      Defendant Frictionless LLC is a Colorado limited liability company separate and apart from FW.   Its FEIN is 46-2674896, compared to FW's FEIN, which is 45-5285986. Frictionless LLC was formed in April 2013 to act as a pass-through vehicle for revenues arising from a sales and marketing venture between FW and CIU, both of which already existed at the time Frictionless LLC was formed and already had a long-standing business relationship.

10.      At all relevant times, Frictionless LLC had no physical location of its own, no website, no email address, and no telephone.   Up until 2015, Frictionless LLC also had no employees.  On May 1, 2015, pursuant to the terms of the FOA, Schedule B, p.11, Serena Li was designated as the CFO of Frictionless LLC.  No other party was subsequently made an officer or director of Frictionless LLC.

## RELEVANT PERSONS/NON-PARTIES

11.      Banjo, a natural person, is a Colorado citizen and the owner and operator of FW. At all relevant times, Banjo was and remains the Chief Executive Officer ("CEO") of FW.  Banjo established FW on May 14, 2012.  *See* Exhibit 3 (FW Art. of Organization).  After establishing FW, Banjo authored multiple design and utility patents for the company.  *See* Exhibit 4 (listing of patents and patent applications).  Banjo is also a member of Frictionless LLC and owns 10% of Frictionless LLC's membership interests. *See* Exhibit 1 at Schedule A.  Banjo was the Manager

5

of Frictionless LLC from March 1, 2013 through May 3, 2019. *See* Exhibit 5.  Banjo is a signatory

to the April 11, 2013 FOA between Frictionless LLC, Li, ZL Investment, and Banjo.  *See* Exhibit

1 at Schedule A.  Banjo's email address, business card, LinkedIn information, and all websites

related to Banjo all prominently displayed information evincing his long-standing use and

operation of FW, including the use and ownership of FW's email address

dbanjo@frictionlessworld.com.

    12.    Yin Gelei ("Allen Yin"), a natural person, is a citizen of China.  Allen is married to

Li's daughter, Tracey Li, (now Tracy Yin) and is therefore Li's son-in-law. Since its creation in

2013, Allen Yin is believed to have been a member of ZL Investment.

    13.    Between 2012 and 2015, Allen Yin was deeply involved in Li's business affairs

and was the general manager of CIU. Starting in 2012, Allen regularly communicated with FW,

both its CEO and employees, regarding assembly and shipping issues associated with CIU's

manufacture of goods for FW. Some of the issues Allen Yin routinely discussed include the

placement of shipping labels bearing FW's trademarked name on every product, the placement

of decals bearing FW's name on all products, purchase orders from FW, FW's directions for the

proper assembly of its products, and the shipping and delivery of products assembled by CIU,

using specific directions from emails sent to CIU by FW's engineers and employees. Allen is

believed to have managed CIU until he was replaced as its manager sometime in 2015 or 2016.

## JURISDICTION AND VENUE

    14.    The Court has exclusive jurisdiction of this proceeding pursuant to 28 U.S.C. §

1334(a) and (e)(1).  The Court also has jurisdiction of this proceeding pursuant to 28 U.S.C. §

1334(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H) and (O).

    15.    Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND OF CLAIMS

### *FW's Establishment of Its Operations Since 2012*

16.     FW's owner, founder, and CEO, Daniel Banjo, is a mechanical engineer with multiple engineering degrees from among others, Purdue University, Michigan Technological University, Stanford, and the Massachusetts Institute of Technology (M.I.T.).  In early 2012, Banjo established FW after previously working as the head of engineering for SpeeCo, an engineering company in Golden, Colorado. When Banjo worked for SpeeCo, CIU was a SpeeCo supplier.  At that time, CIU had no other customers in the USA.

17.     As SpeeCo's lead engineer, Banjo frequently traveled to China to interact with CIU and to carry out various assignments and projects on SpeeCo's behalf.  While engaged in those efforts, Banjo met and became close acquaintances with Li and his business circle, i.e., Allen Yin, Serena Li and Frank Li.  Li and his inner circle also traveled to Colorado to observe SpeeCo's business practices, because at that time CIU did not produce a whole good or a complete product. It was merely a producer of parts.

18.     Because Banjo worked primarily in the final assembly and manufacture of products for SpeeCo, his work caused him to work closely with Li and his family members.

19.     Banjo left SpeeCo in early 2012 after Blount International ("Blount") purchased SpeeCo.  Blount's purchase of SpeeCo created issues for Li and his inner business circle, as Blount could order its supplies from a different company.

20.     After its creation and registration with the Colorado Secretary of State on May 14, 2012, FW began creating, using and registering multiple trademarks bearing its name, as well as other names that it started using in interstate commerce.

21.     FW began using the trademark "FRICTIONLESS WORLD" in interstate

7

commerce on May 1, 2012, and it federally registered that mark with the USPTO on November 8, 2016. *See* Exhibit 6.

22.     Since 2012, FW has obtained and registered over two dozen trademarks, including "FRICTIONLESS WORLD", "DIRTY HAND TOOLS", "TROPHY STRIKE", "VINSETTA TOOLS" and "RANCHEX." *See* Exhibits 6, 7. Its trademark applications are public and identify FW as the owner of each application. Those trademarks are placed on decals attached to FW products, on hang tags attached to the same, and on the owners' manuals that accompany all products.

23.     In addition to trademark registrations, since 2012 FW has also filed and obtained at least fifteen patents. *See* Exhibit 4. FW also has at least eight pending patent applications. *Id*. FW's patents and patent applications began being published in 2013 when the first of these applications was published. The earliest patent (D681,701) was issued on May 7, 2013, and the earliest patent application (2014/0124097) was published on May 8, 2014. *See* Exhibits 8, 9.

24.     FW operates multiple websites, each of which promote FW as the sole source of the products it sells. *See* Exhibits 10, 11. Its websites list all the brands of products FW owns and sells, including Dirty Hand Tools, Redback, Vinsetta Tools, Trophy Strike, and RanchEx. *Id.*

### *FW Began Transacting Business with The Li Defendants in 2012*

25.     In 2012 FW entered a lease for an office space and warehouse that spanned no less than 18,335 square feet, in Louisville, Colorado. FW used that office space for all of its business purposes, including the manufacture, distribution, and sale of "Dirty Hand Tools" and "Ranchex" products. As business grew, FW in 2014 entered a new lease for a 151,000 square foot facility in Westminster, Colorado. These leases were signed by FW and all payments were made solely by FW.

26.    Shortly after FW was created, Banjo visited China and interacted with Li and members of his inner business circle.  Li and his business circle expressed significant concern about CIU's long term future given the new ownership of SpeeCo, as well as disappointment that Banjo had left Blount/SpeeCo.  Banjo advised them about "Frictionless World LLC" and explained that it would be selling outdoor power equipment to retailers.  *See, e.g.*, Exhibit 1, Schedule B at pp. 11-13 (naming FW and detailing its relationship to other entities); *see also* Exhibit 12 (email from Allen Yin to FW, Jan. 21, 2013 (inquiring about FW's structural details on Li's behalf)).

27.    On FW's behalf, Banjo conferred with the Li Parties regarding CIU assembling products under FW's direction.  Banjo and Li agreed that CIU would assemble products pursuant to FW's directions, using FW's patented drawings as guidelines and inserting or attaching hang tags, decals and instruction manuals bearing FW trademarks and created by FW. *See, e.g.*, Exhibits 13, 14 (showing history of correspondence related to use of FW documentation and technology).

28.    Crucially, CIU had never previously done this type of assembly.  All direction came from FW.  Thus, the parties considered it a remarkable step in their relationship when in November 2012, CIU began assembling products for FW using FW's drawings, labeling, and instructions from FW's engineers.  *See*, *e.g.* Exhibit 15 (email from FW to LiShan/Allen of at CIU to FW, Nov. 7, 2012 (regarding orders)); Exhibit 16 (email chain between FW, Allen for CIU, and vendors, Dec. 10, 2012, (discussing parts and production)).  Contemporaneous with shipping products to FW, CIU began invoicing FW for the products it shipped. *See* Exhibit 17; *see also* Exhibit 18.

29.    At the same time FW and CIU's product and supply relationship officially

began, FW successfully began marketing its products to major retailers in the US and worldwide, including Lowes, Home Depot, Menards, Mid-States, and TSC.  *See* Exhibit 20 (FW email to Allen of CIU, Mar. 1, 2013 (providing update on FW sales efforts)).

30.     FW's marketing efforts with large retailers achieved rapid success because of FW CEO Banjo's recognized engineering expertise, his rapid development of new, cutting-edge, patented FW product designs, and his connections developed over years throughout the relevant industry.

31.     CIU relied on FW drawings and the regular instructions from FW's engineers to assemble products for FW.  FW's engineers provided detailed instructions to CIU regarding: (a) the assembly, packaging, labeling and shipping of FW's products; (b) the FW trademark to be used and properly placed; (c) FW's identifying decals to be used; (d) handbooks from FW to be included in the shipping boxes.  *See*, *e.g.*, Exhibit 21.

32.     CIU invoiced FW at its US address for its product assembly services. *See e.g.*, Exhibits 17, 18.

33.     As CIU became the primary product assembly provider for FW between 2012-2013, FW and CIU employees communicated directly on an almost a daily basis regarding the assembly and shipment of the significant and increasing numbers of products that FW designed, patented, and sold to the increasing number of major US retailers to whom FW sold.

### FW, Banjo, Li and CIU Engage in Discussions and Negotiations Regarding Joint Investment Venture

34.     While the business alliance between FW and CIU continued in the latter stages of 2012, Banjo, on FW's behalf, and Li on CIU's behalf, began discussing a joint investment venture.  *See, e.g.,* Exhibits 22, 23 (early 2012 project proposals for Li-Banjo investment); Exhibits 24, 25 (email chain between Allen of CIU to FW, Dec. 16, 2012 (discussing proposed

venture); Exhibit 26 (email from Allen Li of CIU to FW, Jan. 7, 2013 (regarding Frictionless LLC investment agreement)).

35.     The reasons for the new and proposed joint venture were multiple.  While CIU assembled FW's products in 2012 and 2013, Li witnessed, on a first-hand basis, FW's marketing acumen with American retail giants such as Lowes and Home Depot.  Li became interested in a joint investment venture that would result in an increase in the number of products that CIU assembled and supplied for FW.  Li also desired CIU to obtain an agreement that protected CIU against incurring any liability risks, specifically employee claims, product liability lawsuits and intellectual property infringement lawsuits – all of which were potential pitfalls to selling products in the US market.  Finally, Li was interested in exploring a legal vehicle through which his family members could obtain US green cards or long-term business or resident visas, through membership interests or employment in an American LLC.

36.     Banjo explained to Li that in order to rapidly build FW's business and obtain major clients, the parties would need to make a joint initial investment of capital to manufacture and stock a variety of products in an increased inventory, so that FW could effectively compete against its large competitors.  Under the plans discussed, CIU would transfer the product to a pass-through company until sales occurred, at which time that company would transfer the product to FW and the product would ship to the retailer.  This plan would permit for a large inventory to exist in the US, thereby allowing immediate delivery to retailers and a large offering of products, without requiring FW to make large cash outlays for standing inventory prior to selling product.

37.     This third-party pass through arrangement was further intended to shield Li, CIU and the other Li Defendants from any potential personal or business liability arising from their sale of products to FW and from the sale of products by FW to retailers.  *See, e.g.,* Exhibit 27

(email from Allen Yin of CIU to FW, Mar. 26, 2013 (identifying Li's creation of separate company to conduct the purchases from CIU and himself to remain silent partner)).  FW would undertake all the risks associated with being a US employer and wholesale retailer, including the risk of product liability and intellectual property lawsuits, while sharing revenues from the same with CIU through the pass-through company.

38.     In September 2012, Banjo provided Li with three initial variations of a proposal for this pass-through company proposal.  The company would be majority-owned by Li and called "LiBanjo."  The proposals set forth several alternative concepts for the "LiBanjo" pass-through company, pursuant to which a separate front-facing company would manage all designs, patents, sales, marketing and insurance, and pass revenues after expenses back through "LiBanjo."  *See, e.g.*, Exhibits 25, 28, 29.  All of the three presentations Banjo presented to Li envisioned using such a front-facing company: two of the presentations named FW as that company, the third outline used the words "shell company." *See id.*  None of the presentations suggested operating "LiBanjo" as the front-facing company.  *See id*.

39.     The most complete presentation that Banjo gave Li is a presentation dated September 20, 2012.  That presentation contains a cover page, describes marketing and initial product offering strategies, and requests feedback from Li on the same. *See* Exhibit 25.  Sections of each of the "LiBanjo" proposals again appear in Schedule B to the FOA.  *Compare* Exhibit 25 *with* Exhibit 1, Schedule B.  Those sections identify FW as the front-facing company that would sell the products from the expanded joint venture, retain a small percentage (5%-10%) of the sales price, and pass on certain costs to the pass-through company, Frictionless LLC.  This multi-tiered operating concept, with CIU in the center protected by two other companies, was detailed and made explicit in the FOA that the parties executed on April 11, 2013.  Page 12 of Schedule B

provides a diagram of the same.  *See*, Exhibit 1, Schedule B at p. 12.[1]



40.     The name "LiBanjo" was eventually rejected as the suggested name for the pass-through company because it contained Li's name.  Instead, the parties went with "Frictionless LLC," which was favored because it was a direct derivative of FW's recognized trademarked name – "Frictionless World".

41.     The idea of Frictionless LLC as the pass-through company, and FW as the front-facing company responsible for all potential liabilities associated with the joint venture, was appealing to Li for reasons other than just the avoidance of liability. First, as a newly created LLC with no intellectual property and no track record with retailers, Frictionless LLC would find it extremely difficult to obtain retail sales contracts in the US with large retailers who already had

---

[1] As part of their ongoing discussions for the expanded joint venture, Banjo and Li even discussed the concept of an EB-5 visa. The EB-5 visa program provides a method for obtaining a green card for foreign nationals who invest in a company in the US. *See, e.g.,* Exhibits 24 (email chain between Allen Yin and Dan Banjo, Dec. 27, 2012 (discussing EB-5 status) and Exhibits 28, 29. Banjo and Li initially explored having Li invest the required one million dollars in the new pass-through company. Li rejected the idea of the EB-5 visa program because it would require his name to be extensively associated with the paperwork required for such an immigration process. *See id.* He was determined to remain a silent party to the expanded joint venture, hence the need for a pass-through company.  *See* Exhibit 24 (email from Allen Yin to Dan Banjo, Jan. 7, 2013) and Exhibit 31 (email from Allen Yin to Dan Banjo, Mar. 27, 2013 (identifying name to be used for ownership)).

created a relationship with FW.  Second, as a 90% foreign-owned company, Frictionless LLC would have encountered significant difficulty obtaining liability insurance from US insurers, and such insurance is a requirement for obtaining contracts to sell with US retailers.  This issue would have been aggravated by the fact that ZL Investments, the entity Li created to own his equity in Frictionless LLC, is a Chinese shell company with no known business record.

42.     Finally, FW had already been in business since May 2012 and had signed property leases, obtained US lines of credit, and had hired (and continued to hire) top-notch technicians and sales employees – all of which created obligations and risks.  Given these multiple issues, Li pushed for FW to be the front-facing company, with Frictionless LLC acting only as a pass-through company.  In essence, Frictionless LLC would receive the revenue, but take no risk.

43.     As the parties worked to finalize the FOA for Frictionless LLC, and Li learned more about the legal risks involved in US investments, he not only desired for FW to be the front-facing company, he also decided that his portion of Frictionless LLC would be owned neither by him nor CIU, but rather by a completely new Chinese pass-through company, ZL Investment, as an "investment company".  *See* Exhibit 31.

44.     During the parties' negotiations and discussions, Banjo frequently communicated with Allen Yin and members of the Li Defendants over the new joint venture.  Several weeks before the deal was finalized Allen informed Banjo about "ZL Investment" and stated that it would consist of "Frank, Selina, Tracy [Li's daughter, married to Allen] and [Allen]" as its members.  *Id.*

45.     Allen emphasized that Li wanted to keep Li and CIU as silent partners on the joint venture, and reiterated that the expanded venture between FW and CIU should operate to "keep sale products to customer but *never mention CIU's name*." Exhibit 32 (email Allen Yin to FW,

Dec. 16, 2012, 7:29 PM).

46.    While the discussions for the expanded joint venture were ongoing, FW and CIU carried on business as usual.    CIU regularly fulfilled FW's orders and its employees communicated with FW's on a range of crucial matters via phone, email and in-person communications over the assembly and shipping of FW's products.  CIU assembled products for FW starting in November 2012, and began invoicing FW for products shipped in February 2013, months before Frictionless LLC's creation.  *See* Exhibit 17.  CIU continued invoicing FW directly for over a year after Frictionless' creation.  *See* Exhibit 18.  All emails to CIU from FW from 2012   through   2019   were   sent   and   received   through   email   addresses   with   the @frictionlessworld.com affixation.

### *The Parties Execute the Frictionless LLC FOA*

47.    Banjo, on FW's behalf, met with Li and members of his business circle in China on April 8, 2013 to review the FOA and Exhibits to the same.

48.    In the days leading up to that meeting, Banjo as Manager for Frictionless LLC prepared the Operating Plan per the negotiations of the Parties and the proposed terms of the FOA.  *See* Exhibit 1 at ¶5.4.

49.    Pursuant to the FOA, ¶5.4, "The Manager is responsible for implementing the Annual Operating Plan".  *Id*.

50.    Pursuant to the FOA, ¶6.5, "At the Members annual meeting, the Members and Li shall review the Operating Plan, prepared by the Manager."  *Id*.

51.    Pursuant to the FOA, ¶6.5, "The Annual Operating Plan for 2013 is attached hereto as Schedule B".  *Id*.

52.    Li and the members of ZL Investment reviewed the FOA for Frictionless LLC in its totality, including the attached Schedule B as per the FOA. *Id*., ¶ 6.5.

53.    On April 11, 2019 the parties executed the FOA.   *See* Exhibit 1 (executed agreement).

54.    The FOA executed by the parties accommodates the structure of FW as the front-facing entity. It states that the company's purpose includes "***the manufacture and distribution of tools and power equipment***" and that said business can be conducted "***indirectly through another company, joint venture, or other arrangement***" (***emphasis added***). *Id*. at ¶2.5.

55.    Pursuant to the FOA, Schedule B, CIU manufactures products in response to purchase orders issued by FW through the pass-through company Frictionless, LLC.  *See* Exhibit 1 at Schedule B, p. 11-13. CIU then sells the products to Frictionless, LLC which then sells them to FW.  *Id*.  FW acts as the front-facing company dealing with retail and consumer customers worldwide, product marketing, US credit and banking relationships, leases, employees, liability and employee insurance, legal issues, and retaining and obtaining all business.  *Id*.  FW, to expand its client base and grow the business, retains 5-10 percent of revenue and charges a five percent fee on expense costs.  *Id*.  All remaining revenues are passed back through Frictionless LLC to CIU.  *Id*.

56.    Pursuant to the FOA, FW retained all ownership over FW intellectual property.  *Id*. FW provided a perpetual, limited non-exclusive patent license to CIU for the purpose of manufacturing products per its direction for Frictionless, for delivery to FW or its retailers.

57.    The FOA contains a non-competition covenant. Under that covenant, each member of Frictionless LLC and Li agreed that he or she:

> "shall cause his, her, ***or its Affiliates***, to not compete with the Company, directly, or indirectly, in a business substantially similar to the business of the Company of its subsidiaries anywhere where the Company does business, ***or the distribution of any products distributed by the Company*** or any of its subsidiaries anywhere in the World."

16

(***Emphasis added***).  <u>Exhibit 1</u> at ¶4.4. Under this definition, "Affiliates" would include CIU or any

other company owned by Li, preventing them from competing with Frictionless LLC.

58.    The non-competition covenant further states that direct and indirect competition

under its auspices shall include but is not limited to:

> "having any business or employment relationship with any past or present
> client, supplier, or employee of the Company, and any competition as a sole
> proprietor, partner, corporate officer, director, shareholder, member,
> manager, employee, agent, independent contractor, trustee, or in any other
> manner in which such Member or Li, ***or its or his Affiliates***, holds any
> beneficial interest in a competitive business, derives any income from such
> business, ***or provides any service, including the benefit of his, her or its
> reputation or knowhow, to such business***. For purposes of clarification, the
> sale of parts and products that are materially different from parts and
> products that the Company sells or intends to sell shall not be considered to
> be competing with the Company."

(***Emphasis added***).  *Id.*  Based on these provisions, direct sales to competitors of Frictionless LLC

and FW by Li and his affiliates – that is the Li Defendants – constitute a direct breach of this

clause, and are a severe detriment to Frictionless LLC and to FW.

59.    Under the FOA, Frictionless LLC's members unambiguously agreed to indemnify

and hold harmless each other and their successor's and assigns:

> "from and against ***any and all claims … of every kind and nature*** arising
> out of, resulting from, or in connection with ***any breach*** of a representation
> and warranty or covenant set forth in this ARTICLE 4."

(***Emphasis added***).  *Id.* at ¶4.6.  The FOA provides broad limitations of liability for the Manager

in the execution of his duties to the company.  Under the agreement, Banjo as the Manager could

not be liable to Frictionless LLC, or to any other member of the company, for actions or failures

to act, or errors of judgment, or for any act or omission "believed in good faith to be within the

scope of authority conferred by this Agreement."  *Id.* at ¶5.9.1.  The FOA also insulates Banjo

from personal liability in the event Frictionless LLC as a company is adjudged liable "under any

17

judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company,

whether that liability or obligation arises in contract, tort, or otherwise….” *Id*. at ¶5.9.3.

60.     Finally, the FOA states that Frictionless LLC will indemnify and hold Banjo, <u>his</u>

<u>affiliates</u>, and any officer or employee harmless:

> “from and against any loss, liability, judgment, damages, amounts paid in
> settlement or expense, including without limitation, reasonable attorneys’
> and accountants’ fees and disbursements, arising from or in connection with
> any threatened or actual claim, action, suit or proceeding and any appeal
> therein, including any brought by or in the right of the Company, if the
> Manager, or any such Affiliate, Officer, or employee acted in good faith and
> in a manner reasonably believed to be in or not opposed to the best interests
> of the Company, and provided that his or her conduct is not adjudged to
> have constituted gross negligence, willful misconduct, or an intentional
> breach of his, her, or its fiduciary obligations in the performance of his, her,
> or its duties to the Company.”

<u>Exhibit 1</u> at ¶5.9.4.

61.     FW, as a company wholly owned and operated by Banjo through which the

operations of Frictionless LLC were conducted from April 11, 2013 through April 29, 2019

pursuant to the terms of the FOA, comprised an affiliate of Frictionless LLC.

### *Schedule B of The FOA Explicitly Identifies FW’s Role in the Expanded Joint Venture*

62.     The FOA, Schedule B sets forth the basic operating terms that the parties then

operated under for the next six years. Those terms include conditions detailing the parties’

obligations under the proposed joint venture as follows:

- FW would remain the forward-facing company to customers. In
  doing so, it would continue to be the named entity for all business-
  related matters, including leases, employees, insurance, and all sales
  and marketing.

- CIU would be the first manufacturer of choice for all of FW’s
  products.  Only if CIU could not manufacture a product would FW
  be allowed to have the same product manufactured elsewhere. The
  goal was to both provide additional business to CIU and broaden the
  product base being offered to retailers.

- FW would remain an independent company but would also be utilized as a means to significantly increase CIU's product base and US product sales. That would happen by increasing the number of products assembled on FW's behalf by CIU and increasing the number of retailers selling FW products assembled by CIU.

- FW would issue purchase orders to CIU through Frictionless, and CIU would assemble and ship those products directly to FW or to FW's contracted retailers, as directed.

- FW would license CIU the right to use patents developed by FW for the purpose of assembling and shipping products developed and patented by FW to FW, so long as Banjo remains a member of Frictionless.

- That license of intellectual property did not include trademarks or other intellectual property developed by and/or registered to FW. No such licenses have ever been issued to CIU.

- When FW sold products pursuant to the joint venture, FW would: (a) retain and use 5-10% of the revenue realized from those sales to help grow the parties' collective business; and (b) retain and use a 5% markup on some overhead costs for purposes of expanding FW's and CIU's marketplace reach.

- FW would remit all monies left over after the deduction of its overhead costs, labor, and expenses ("Operating Costs") and the aforementioned percentages to Frictionless LLC, which would in turn remit payments to CIU for products assembled by CIU and sold by FW.

- Where FW sold products strictly assembled by FW and/or not assembled by CIU, FW would keep 100% of the revenues associated with any such product.

Exhibit 1 at Schedule B, pp. 11-14.

### FW and CIU Conduct Business in Accordance with Schedule B of the FOA

63.     After the execution of the FOA, FW moved forward in reliance on the contractual

representations made by ZL Investment and Li.  FW continued handling all property leases, loans,

liability insurance, handling all employees, managing all advertising and client relations, and

entering into all third- party business agreements.  All communications from the Li Defendants

continued to be conducted via the _@frictionlessworld.com domain, and all products assembled by CIU for FW continued to be assembled using FW patent designs and bearing FW's company decals and hang tags. *See*, *e.g.*, <u>Exhibit 21</u>. Frictionless LLC never obtained any lease, liability insurance, hired any employees, created or owned an email address, obtained any phone number, or obtained any domain and website. It existed solely as a pass-through LLC between FW and CIU.

64.     Per the terms of the FOA and Section 2.5 of the FOA's Schedule B, CIU continued conducting business directly with FW on a nearly daily basis. CIU continued to invoice FW for products shipped from CIU to FW. *See, e.g.,* <u>Exhibit 18</u>. From 2013 to April 2019, CIU delivered tens of millions worth of products to FW for FW's distribution and sales. The parties exchanged <u>thousands</u> of emails pertaining to their business operations. This pattern and practice continued consistently for over seven years, with both sides fully aware of their nature and course of performance, and importantly without any objection <u>ever</u> raised to the course of conduct between them or by any of the Li Defendants.

65.     The expanded joint venture <u>required</u> constant contact between FW and CIU, as prior to doing business with FW, CIU did not manufacture whole products. It had previously had no assembly lines. It had never before assembled outdoor power equipment products, including the log splitters or tillers it was assembling under FW's guidance and direction. It had solely been a parts supplier. Subsequent to November 1, 2012, CIU became able to assemble and produce products as well as specialized parts for FW, all of which were patented by FW, through the diligent efforts and expertise of FW's designers and engineers. Based on these efforts, FW arranged for approximately 90% of its production to be performed by CIU. FW employees contacted, visited, and consulted CIU multiple times a year between 2012 and early 2019.

66.     Relying on this seven-year course of conduct, FW, through Frictionless LLC, continued placing purchase orders with CIU in 2018 and 2019.  Those products were to be assembled in accordance with FW's patented designs, labeled with FW's trademarks, and delivered either to FW or directly to the retailers with which FW contracted.  *See, e.g.,* Exhibit 33 (email summary of order statuses).

67.     Pursuant to the FOA, FW absorbed all risks associated with the joint venture. Reflecting these realities, FW has unilaterally litigated several business-related disputes which would otherwise have implicated Frictionless LLC and Li, including two matters involving claims of patent infringement against third parties. FW alone resolved each dispute.

68.     The arrangement described in the FOA and in Schedule B is a true and correct reflection of how FW, CIU and Frictionless LLC performed pursuant to the joint venture for seven years.  FW ordered products from CIU through Frictionless.  CIU manufactured the products and delivered the same directly to FW or its contracted retailers, consistent with Exhibit 1, Schedule B at pp. 11-13.  Products transferred from Frictionless to FW at the time of sale.  The business goal was always to increase the number of products being manufactured by CIU and sold by FW. FW at all times acted as the forward-facing company. *Id*.

69.     Following the mandate in Schedule B, Li appointed a CFO for Frictionless by appointing Serena Li, his daughter-in-law.  *Id*. at p. 11.

### *Defendants Act in Repeated Breach of the FOA, Intentionally Defraud FW and Halt Product Delivery to FW, Causing Irreconcilable Injury to the Same*

70.     At all times since the April 2013 signing of the FOA, FW, and Banjo operated in good faith to increase sales and jointly achieve the parties' goals. Unbeknownst to FW and Banjo, however, from 2014 through 2018 the Li Defendants were significantly overcharging Frictionless LLC for the cost of assembling the products CIU delivered to FW. After discovering

this issue, FW confronted Li and members of his inner circle in a meeting in January 2019. Li conceded CIU had been overcharging Frictionless LLC for certain products assembled for delivery to FW under the joint venture agreement and corrected CIU's pricing in early 2019. CIU's overcharging from 2014 – 2018 cost FW <u>over seven million dollars</u> in lost profits. *See* <u>Exhibit 34</u>.

71.    In addition, Li contractually agreed pursuant to the FOA, Section 4.4, and the attached Operating Plan, that his affiliate CIU would <u>immediately</u> cease selling products to competitors of Frictionless LLC and its operating affiliate FW. *See* <u>Exhibit 1</u>, § 4 and Schedule B at p. 11. Contrary to the same, between April 12, 2012 and the present, the Li Defendants sent nearly 400 separate shipments of CIU products to direct competitors of Frictionless LLC and FW. *See* <u>Exhibit 35</u>. Those competitors include Blount and Tooltuff LLC, to which Li and CIU expressly represented they would cease such sales. *See* <u>Exhibit 36</u> (email chain between Allen Yin of CIU to FW, Sep. 29, 2013). Upon information and belief, these shipments alone total *over $50 million dollars* in goods, and constitute a direct violation of the FOA. Upon information and belief, CIU <u>never</u> ceased shipping products to companies directly competing with Frictionless LLC and FW.

### *Banjo Modified the FOA in Reliance on False Representations from the Li Defendants*

72.    Serena Li, acting on the behalf of Li and CIU, repeatedly represented to FW in late 2018 and early 2019 that CIU was running low on operating funds and needed to receive additional payments from Frictionless LLC.[2]  *See* <u>Exhibits 37-39</u>. In response to Serena and

_____

[2] No evidence supporting said representations has been produced to date.

22

Frank Li's representations, Banjo agreed on behalf of FW to obtain a company loan and make accelerated payments in order to assist CIU in fulfilling its shipment obligations to FW. *See, e.g.,* Exhibit 40 (email chain between Frank Li and FW, Feb. 20, 2019).

73.     Towards that end, and in reliance upon Serena Li's representations regarding CIU's cash needs, FW agreed to the assignment of all Frictionless LLC inventory to FW (totaling $6,611,227.00) and a long-term loan from FW back to Frictionless for that amount, followed by the use of that assigned inventory as collateral to obtain a bank loan for an additional $1.5 million paid directly to Frictionless and then to CIU.  FW further agreed to the acceleration of FW's payments to Frictionless prior to their due dates.  All of those funds were immediately passed on to CIU.

74.     FW took these actions in early 2019 based on the understanding that CIU was going to ship products as ordered by FW through Frictionless LLC.  During this period FW was repeatedly being assured by CIU that products were being assembled and shipped. *See e.g.*, Exhibits 41-43; *see also* Exhibit 33.

75.     FW also believed that the products it was agreeing to accept were of suitable quality consistent with CIU's historic production.  FW soon learned, however, that beginning in late 2018, CIU started shipping substantially substandard products, thereby causing a marked increase in FW's warranty obligations to retailers.  FW is informed and believes that CIU knew of the quality issues and either intentionally or negligently concealed those issues from FW.  After FW discovered the quality issues, inventory was either sold at substantially reduced prices or could not be sold at all.

76.     On February 1, 2019 Banjo signed a long-term Loan Agreement on the behalf of FW for the purchase of all Frictionless LLC inventory.  *See* Exhibits 44-46. FW then borrowed

$1.5 million dollars from Chase Bank and paid the entire amount to Frictionless, for payment to CIU.  The Frictionless LLC inventory was not used as collateral for this loan or to induce Chase Bank to make the loan.  In addition to the Chase Bank loan, FW began making accelerated payments to Frictionless LLC starting in January 2019.  Between January 1, 2019 and the time that ZL Investments' arbitration action was filed in April 2019, FW had paid Frictionless LLC an astonishing $4,460,265.84.

77.     Heading into March – April 2019, FW repeatedly asked Frank Li for confirmation of outstanding shipping orders.  Frank Li or his employees at CIU repeatedly and fraudulently responded that CIU was about to ship, stating falsely in March and April that shipping was occurring. *See* Exhibit 47 (April 2, 2019 email from Frank Li to FW saying shipping was occurring "this week."); Exhibit 48 (March 6, 2019 email from Janice Jia at CIU to FW, copying Frank Li, saying "CIU is producing them in a hurry now, CIU really does not want to delay the delivery for these POs").

78.     The facts show that while Serena and Frank Li, on behalf of Li and CIU, urged FW to take on millions of dollars in additional liability and repeatedly promised to ship products, they were simultaneously conspiring to halt all shipments to FW and Frictionless LLC under the joint venture with the foreseeable goal of causing irreconcilable injury to FW.

79.     On April 15, 2019, the Li Defendants, through ZL Investments, filed a factually and legally unsupported arbitration demand against FW and its CEO, Daniel Banjo.  FW was not a party to an arbitration agreement with the Li Defendants. The claims asserted in the arbitration were based on the incredible contention, contrary to the 7 year history of transactions detailed above, that the Li Defendants did not learn of the existence of FW until late 2018 and believed at all times that its business was being solely conducted through Frictionless LLC, the pass-through

24

entity jointly created by FW, Banjo, CIU and Li that had no physical location of its own, no website, no email address, no telephone and no employees other than Serena Li.

80.    Upon receiving the arbitration demand, FW and Banjo, through counsel, immediately asked CIU and counsel for ZL Investments whether shipments would be provided, per contract and as had been repeatedly represented.  The next day, on April 16, 2019, the Li Defendants, **via counsel,** assured counsel for FW that regardless of the arbitration, CIU would continue to fulfill the purchase orders. *See* Exhibit 49.

81.    On April 29, 2019, after making misleading promises for over six months, Frank Li reversed his representations and advised FW that CIU was ceasing shipments.  In response to a text from FW asking whether or not CIU would again start shipping, he stated it "depends on your attitude."  Exhibit 50.  Other than the vindictive text message, Frank Li made no mention of any issue causing CIU not to ship, nor did he mention any of the alleged logistical issues CIU had offered previously as a reason for delays.  This abrupt reversal of the representations made for months took place at the beginning of the 2019 summer sales season, just as retail stores were being stocked with goods, and well after third-party contracts for the delivery of millions of dollars in goods had been executed by FW with multiple third-party retailers.

82.    By these acts, the Li Defendants overtly breached a total of $20,814,091 in purchase orders issued by FW through Frictionless LLC for delivery to FW or to FW's contracted retailers. *See* Exhibit 51 (aggregate amount of existing and unfulfilled purchase orders as of April 29, 2019).

83.    The breaches were knowingly committed to undermine FW's relationships with its multiple major retailers, and to leave FW – a Colorado employer of almost 80 people – unable to operate in 2019.

84.     By leaving FW and by extension Frictionless LLC with no products to sell in the 2019 season, the Li Defendants' actions caused irreconcilable harm to FW, as well as to Frictionless LLC.  As a direct result of the Li Defendants' breaches of contract, multiple retailers who had contracted with FW for years have been forced to abandon FW.  *See, e.g.,* Exhibits 52-55.  The retailers, among them Lowes, Costco, Menards, Mid-States, and Fleet Farm, have been forced to switch to alternative suppliers due to FW's ongoing failure to deliver.  *Id.*

85.     These same retailers also began penalizing FW for its contractual failure.  *See, e.g.*, Exhibit 56 (almost $397,000 dollars of charges assessed by Mid-States against FW for unfulfilled orders).  Moreover, these retailers will not contract with FW again at any time in the foreseeable future.  CIU's actions caused irreconcilable harm to FW's reputation and earnings ability.

86.     On May 3, 2019, due to the actions of Li and his associates, Banjo became unable to manage Frictionless LLC and resigned his position as Manager of Frictionless LLC.  *See* Exhibit 5 (email chain between counsel).

87.     As stated, CIU has breached a total of $20,814,091 in purchase orders to FW and Frictionless LLC.  *See* Exhibit 51.  FW has been unable to find alternative sources for that production, primarily because CIU intentionally mislead FW for months regarding its alleged intentions to ship the products, only to disclose its intention not to ship and breach the purchase orders on April 29, 2019, well into the sales season.

88.     Subsequent to the breach, CIU for the first time alleged its reason for breach was financial constraints.  CIU has never produced evidence to support this assertion.  To the contrary, the evidence demonstrates Serena and Frank Li, from December 2018 through April 29, 2019, repeatedly promised on behalf of CIU to ship FW's product while making false statements regarding delays and other false excuses.  *E.g.*, Exhibits 41-43, 47-48.  The evidence also

demonstrates that, during the same time period, CIU pressed for accelerated payments from FW – allegedly to assist in faster assembly and shipment. *See id.*; *see also* <u>Exhibit 37-39</u>. In reliance on the same, FW borrowed and paid a total of $4,460,265.84 to CIU between January and April 2019. FW further agreed to modify Schedule B of the FOA to release Frictionless LLC from any obligation to pay FW operating expenses. *See* <u>Exhibits 44-46</u>. FW took these multiple costly actions ***in direct reliance on the fraudulent representations made by both the Li Defendants and Li's counsel that CIU would continue to fulfill its purchase orders***. The evidence now shows that the Li Defendants at no time had any intent to ship. They were at all times acting with fraudulent intent to cause severe and irreconcilable harm to FW, as well as to Frictionless LLC.

89.     Confirming the false nature of CIU's post-breach explanation for its failure to ship, the Li Defendants refused FW's offer to make <u>immediate</u> on-delivery payment to CIU for every shipment made.[3] This stop-gap solution would have ensured that FW would be able to meet its obligations to its retailers and customers, thereby mitigating monetary damages to FW. The Li Defendants rejected the offer and still refused to ship, in direct breach of contract and further evidencing their bad faith, fraudulent intent to cause harm to FW.

90.     CIU's breach of over 250 purchase orders and failure to ship products to FW triggered a cascade of losses for FW: (a) a staggering reduction of revenue due to inability to deliver/sell products; (b) it caused what was expected to be FW's most profitable year to instead reflect extreme losses, resulting in the filing of bankruptcy; (c) it caused a reduction of the FW workforce by over 90%, and growing; (d) it forced the process of abandoning FW's 151,000 square feet warehouse in Westminster, Colorado; (e) it caused FW's loss of long-standing

---

[3] Pursuant to the agreement between Frictionless and

contracts with mammoth retailers such as Lowes, Home Depot, Costco, Menards and others, which in turn resulted in the removal of FW products from hundreds of stores both inside and outside of the US; and (f) it caused an over 90% loss in the value of FW as a business, which immediately prior to breach was valued at over $50 million. All of the above-stated damages increase daily.

91.     Because of its sharp drop in income and daily operating losses, FW filed a chapter 11 bankruptcy petition on September 30, 2019.  That filing occurred as a direct result of the intentional and ongoing actions of the Li Defendants.

92.     Finally, the actions of the Li Defendants reflect an overt effort to halt the business of Frictionless LLC, to the detriment of FW, as they ceased to deliver to Frictionless.  That action constitutes a breach of the FOA.  The FOA requires that "[d]uring the period before and during any arbitration... the Parties shall continue to fulfill their duties under this Agreement."  Exhibit 1 at ¶14.6.8.  By breaching the purchase orders and failing to ship immediately after filing this action, the Li Defendants intentionally acted in direct breach of the FOA.

***The Li Defendants' Actions Comprise Unlicensed and Infringing Use and Possession of FW Intellectual Property***

93.     Pursuant to the FOA, CIU was provided a limited license by FW to use FW patents for the purpose of assembling products for the pass-through company Frictionless, "to be sold through F to FW".  Exhibit 1, Schedule B, p.11.  All products manufactured by CIU between 2012 and 2019 for Frictionless LLC were done so at the direction of FW, in reliance on FW's patented designs, with the support of FW engineers and pursuant to the limited patent license provided to CIU under the FOA. *Id.*, *see, e.g.*, Exhibit 21.

94.     Upon reasonable information and belief, CIU between December 2018 and April 2019 assembled multiple products pursuant to the direction of FW and in reliance on FW patents.

28

95.     CIU failed to deliver said products to FW (in breach of over 250 purchase orders).

96.     On reasonable information and belief, CIU is now using, distributing, selling and manufacturing FW's patented products, or sublicensing the right to use, distribute, sell and manufacture FW's patented products to third-parties, or attempting to use, sell, distribute and/or license or sublicense FW's patented products, without license or permission, to the direct detriment of FW.

97.     CIU has possession of 7 years of protected patent designs provided by FW for its product assembly.

98.     On reasonable information and belief, CIU is using those protected patent designs to manufacture FW's patented products, without license or permission, to the direct detriment of FW.

99.     In addition, CIU has at no time been provided any license to use FW trademarks. FW's trademarked names and designs were prepared by FW and sent in decal, hang tag and user manual format for CIU to place on or insert with the products assembled per the direction of FW, for shipment to FW and FW retailers.

100.    Upon reasonable information and belief, CIU between December 2018 and April 2019 assembled multiple products pursuant to the direction of FW bearing FW registered trademarks in decal and hang tag format and packaged with FW manuals bearing FW trademarks.

101.    CIU failed to deliver said products to FW in breach of over 250 POs issued to CIU.

102.    Upon information and belief, CIU is now using, distributing, selling and/or licensing, or attempting to use, sell, distribute and/or license FW's trademarked products, without license or permission, to the detriment of FW.

***Injury to Frictionless World, LLC***

103.   FW believes that unless enjoined by the Court, the Li Defendants will continue their course of wrongful conduct and, based on 7 years of access and non-stop training from FW, use, sell, distribute, manufacture and infringe upon and/or otherwise profit from FW's patented designs and trademarks.

104.   As a direct and proximate result of the Li Defendants' wrongful acts, FW has already suffered irreconcilable injury and been forced to file the underlying bankruptcy case.

105.   FW has no adequate remedy at law to redress the injuries that Li Defendants have caused, are causing and are likely to continue to cause by their conduct.  FW will continue to suffer irreconcilable injury until the Li Defendants wrongful actions are enjoined by this Court.

**FIRST CLAIM FOR RELIEF**
**TURNOVER OF PROPERTY OF THE ESTATE – 11 U.S.C. § 542(a)**
**(All Defendants)**

106.   FW incorporates by reference the allegations above, as though fully set forth herein.

107.   11 U.S.C. § 542(a) requires an entity in possession of property of the estate that the debtor-in-possession may use, sell or lease to turnover and account for such property, or the value of such property.

108.   One or more of the Li Defendants and/or Frictionless LLC are in possession of the following property of the estate:

A.   Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and control and using FW's patented product designs;

B.   Communications from FW to CIU, CIU employees and/or the Li Defendants containing product assembly instructions, including but not limited to written assembly instructions and/or patented product designs.

C.   Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and

control bearing FW trademarks on the product and/or packaging;

D.   Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and
control that previously bore FW trademarks, which have been altered to remove the
same;

E.   Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and
control that have not had FW trademarks attached, as required.

(the "Property").

109.   The Property has significant value and is property that FW may use, sell or lease
pursuant to 11 U.S.C. § 363(b).

110.   Accordingly, Defendants must account for and turnover the Property to FW.

**SECOND CLAIM FOR RELIEF**
**PERMANENT INJUNCTION – 11 U.S.C. § 105(a)**
**(All Defendants)**

111.   FW incorporates by reference the allegations above, as though fully set forth herein.

112.   Defendants' use of FW's intellectual property and competition with FW in violation
of the non-competition covenant in the FOA violate the automatic stay provided for in 11 U.S.C.
§ 362(a), as they are exercising control over property of the estate, as detailed above.

113.   If an injunction does not issue enjoining Defendants from in any way using FW's
intellectual property in their possession and violating the non-competition covenant in the FOA,
FW will, upon reasonable information and belief, suffer irreparable injury through the loss of its
intellectual property and the importation, sale, distribution to retailers and/or licensing of
infringing products in the US.   Moreover, the infringing products remaining in Defendants'
possession may be sold, distributed to retailers and/or licensed for use using one or more of FW's
marks, which have become famous through the sale of tens of millions of dollars' worth of FW

products in major retailers nationwide over the past 7 years.  Such actions would cause severe

consumer confusion and irreconcilable harm to FW that could not rectified via a damages award.

114.    Defendants will suffer no damage to any legal right or interest through the issuance

of such an order because they have no right to the intellectual property at issue.

115.    The injunction sought will not be adverse to the public interest.

### THIRD CLAIM FOR RELIEF
### DECLARATION THAT THE STAY APPLIES TO THE
### ARBITRATION – 11 U.S.C. § 105(a)
### (All Defendants)

116.    FW incorporates by reference the allegations above, as though fully set forth herein.

117.    11 U.S.C. § 362(a) operates as a stay of, among other actions: (1) the

commencement of litigation against the debtor and (2) any act to obtain possession of property of

the estate and exercise control over property of the estate.

118.    Through the arbitration, Defendants seek relief against FW and Banjo.

119.    FW and Banjo are bound by contract in such a way that (a) FW is obligated to fund

the cost of Banjo's legal defense and (b) the liability of Banjo, if any, in the arbitration may be

imputed to FW.

120.    Accordingly, the Court should declare that the stay set forth in 11 U.S.C. § 362

applies to the arbitration to prevent irreparable damage to FW and its bankruptcy estate.

### FOURTH CLAIM FOR RELIEF
### PERMANENT INJUNCTION – 11 U.S.C. § 105(a)
### (All Defendants)

121.    FW incorporates by reference the allegations above, as though fully set forth herein.

122.    Defendants' continued prosecution of the arbitration violates the automatic stay set

forth in 11 U.S.C. § 362.

123.    If an injunction does not issue enjoining Defendants from continuing to prosecute

the arbitration, FW will suffer irreparable injury, including, without limitation, the following: (a) the obligation to fund the defenses of Banjo; (b) the obligation to indemnify Banjo; (c) the potential collateral estoppel effect against FW of any judgment entered against Banjo; and (d) the potential of conflicting rulings arising against Banjo and FW in separate forums.

124.    Defendants will suffer no damage to any legal right or interest since the claims against Banjo can be stayed until after the completion of this proceeding.

125.    The injunction sought will not be adverse to the public interest.

**FIFTH CLAIM FOR RELIEF**
**OBJECTION TO CLAIM – 11 U.S.C. § 502**
**(Against Frictionless LLC)**

126.    FW incorporates by reference the allegations above, as though fully set forth herein.

127.    Frictionless LLC is scheduled by FW as a creditor holding a disputed, unliquidated, and contingent claim in the amount of $12,645,740.62.

128.    The disputed claim is comprised of two components: approximately 50% consists of the long-term loan executed on February 1, 2019 and the remaining approximately 50% consists of a 360-day payable purportedly due Frictionless LLC for products sold to FW.

129.    As set forth in the Fourth Claim for Relief below, the long-term loan obligation is avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) and Frictionless LLC's claim in the bankruptcy case should be reduced by the amount of the avoidable loan.

130.    In addition, Frictionless LLC, by (a) wrongfully breaching purchase orders submitted by FW to CIU through Frictionless in 2019 in excess of $20 million and (b) delivering substandard product resulting in numerous warranty claims, substantially reduced sale prices, and in many instances, unsellable inventory, has caused damages to FW far exceeding the remaining approximately $6 million purportedly due Frictionless LLC.

131.   Accordingly, Frictionless LLC should be deemed to have no claim in the bankruptcy case.

## SIXTH CLAIM FOR RELIEF
## EQUITABLE SUBORDINATION – 11 U.S.C. § 510(c)
### (Against Frictionless LLC)

132.   FW incorporates by reference the allegations above, as though fully set forth herein.

133.   Frictionless LLC is scheduled by FW as a creditor holding a disputed, unliquidated, and contingent claim in the amount of $12,645,740.62.

134.   Frictionless LLC is an insider of FW.

135.   The Li Defendants engaged in a fraudulent scheme to convince Banjo, through FW, to execute a long term loan agreement with Frictionless, to borrow $1.5 million from Chase Bank and pay it to Frictionless, and to have FW accelerate payments to Frictionless. All said funds then transferred to CIU.

136.   FW took these actions in reliance on repeated fraudulent representations of the Li Defendants that CIU was assembling and would be shipping products.

137.   The scheme culminated in the commencement of a groundless arbitration proceeding against Banjo premised on the incredible assertions that the Li Defendants had no knowledge until late 2018 of the existence of FW – a company with whom the Li Defendants had conducted business nonstop since 2012.

138.   Despite receiving inflated sums from FW, Frictionless and CIU failed to provide fair value in return.  On April 29, 2019, subsequent to the filing of the arbitration, the Li Defendants advised FW that no shipments would be issued.

139.   As a result of the foregoing fraud and unfair conduct, to the extent Frictionless,

LLC's claim is allowed, the claim should be equitably subordinated pursuant to 11 U.S.C. § 510(c).

**SEVENTH CLAIM FOR RELIEF**
**FRAUDULENT CONVEYANCE – 11 U.S.C. § 548(a)(1)(B))**
**(Against Frictionless LLC)**

140.   FW incorporates by reference the allegations above, as though fully set forth herein.

141.   Under 11 U.S.C. § 548(a)(1)(B), the debtor-in-possession may avoid any obligation incurred by the debtor that was incurred on or within two years of the bankruptcy filing date, if the debtor received less than a reasonably equivalent value in exchange for the obligation and (i) became insolvent as a result of the obligation, (ii) was engaged in business or about to engage in business for which any property remaining with the debtor was an unreasonably small capital, or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

142.   The long-term loan in the amount of $6,611,227.00 from FW back to Frictionless LLC (the "Obligation") was an obligation of FW.

143.   The Obligation was incurred on February 1, 2019, on or within two years of the Petition Date.

144.   FW did not receive reasonably equivalent value for the Obligation.  Rather, FW was induced into incurring the Obligation by the Li Defendants in furtherance of their fraudulent scheme to ruin FW more fully described above.

145.   FW historically did not purchase products from Frictionless LLC until entering agreements to sell such products to third parties.

146.   By altering this arrangement, the inventory received from Frictionless in exchange

for the Obligation would only have "reasonably equivalent value" to FW if CIU intended to and, in fact, did continue to fulfill purchase orders.

147.   Because CIU never intended to and, in fact, did not fulfill purchase orders going forward, FW was fraudulently induced to incur the Obligation. Due to CIU's failure to deliver products, FW lost the very contracts (with retailers like Lowes and Home Depot), necessary to sell the inventory at fair market value.

148.   CIU also refused to ship the parts necessary for FW to complete the US manufacture of the products delivered in incomplete form.  FW was thus left with partial products that it could not manufacture and sell.

149.   Further, the complete products received were of extremely poor quality and many were returned by retailers.  What could be sold was sold at drastically reduced prices and FW received numerous warranty claims.  Much of the inventory cannot be sold.

150.   Accordingly, FW did not receive reasonably equivalent value in exchange for the Obligation.

151.   As a result of the fraudulent scheme of which the Obligation was a central component, FW became insolvent.

152.   In addition, as a result of the fraudulent scheme of which the Obligation was a central component, FW engaged in business in 2019 for which its remaining capital was an unreasonably small capital.

153.   As a result of the foregoing, the Obligation is avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

## EIGHTH CLAIM FOR RELIEF
## FRAUDULENT CONVEYANCE – 11 U.S.C. §§ 548(a)(1)(B) and 550(a))
### (Against Frictionless LLC and the Li Defendants)

154.   FW incorporates by reference the allegations above, as though fully set forth herein.

155.   Under 11 U.S.C. § 548(a)(1)(B), the debtor-in-possession may avoid any transfer made by the debtor on or within two years of the bankruptcy filing date, if the debtor received less than a reasonably equivalent value in exchange for the transfer and (i) became insolvent as a result of the transfer, (ii) was engaged in business or about to engage in business for which any property remaining with the debtor was an unreasonably small capital, or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

156.   Between January 1, 2019 and April 29, 2019, FW pre-paid invoices to Frictionless LLC in the amount of $4,460,265.84 (the "Transfers").

157.   The Li Defendants induced FW to make the Transfers in furtherance of their fraudulent scheme to cripple FW by depleting its cash reserves and fraudulently promising to fulfill purchase orders that it had no intention of fulfilling.

158.   FW did not receive reasonably equivalent value for the Transfers as a significant portion of the Transfers were not made on account of any antecedent debt.

159.   Further, a number of the Transfers were made to pre-purchase product of substandard quality that could not be sold at historic prices.

160.   As a result of the fraudulent scheme of which the Transfers were a central component, FW became insolvent.

161.   In addition, as a result of the fraudulent scheme of which the Transfers were a central component, FW engaged in business in 2019 for which its remaining capital was an unreasonably small capital.

162.   As a result of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. §

548(a)(1)(B).

163.   CIU was the initial transferee of the Transfers because Frictionless LLC, the pass-through entity, acted as a mere conduit.

164.   Alternatively, CIU was an immediate or mediate transferee of the Transfers and CIU did not take the Transfer in good faith.

165.   Under either scenario, CIU and/or Li were immediate or mediate transferees of the Transfers and CIU and/or Li did not take the Transfers in good faith

166.   The Transfers are therefore recoverable from the Li Defendants pursuant to either 11 U.S.C. § 550(a)(1) or (a)(2).

**NINTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT—PURCHASE ORDER**
**(FW as Third-Party Beneficiary Against CIU)**

167.   FW incorporates by reference the allegations above, as though fully set forth herein.

168.   FW through the pass-through entity Frictionless LLC issued purchase orders to CIU from late 2018 through April 2019.  *See* Exhibit 51.

169.   Over 250 purchase orders were provided to CIU.  *See* Exhibit 57 (sample of March 2019 orders).

170.   The parties intended FW to be a third-party beneficiary of all such purchase orders, as reflected by the location for delivery of goods on each purchase order and as reflected in the FOA.  *See* Exhibit 1 at Schedule B.

171.   All products ordered through the Frictionless LLC purchase orders were to be shipped directly to FW or to contractual customers of FW.

172.   FW is a third-party beneficiary of the purchase orders.

173.   CIU accepted each of these purchase orders.

174.   Each of these purchase orders placed by Frictionless LLC and accepted by CIU

constitutes a valid and binding contract to which FW was the intended third-party beneficiary.

175.   All parties knew that the purchase orders were placed by Frictionless LLC and accepted by CIU for the benefit of FW.

176.   According to the terms of each purchase order, CIU was required to ship the specified number of specified products by the ship date identified on each order.

177.   Shipping the ordered product is a material term.

178.   CIU failed to ship the products.

179.   CIU has refused to ship the products.

180.   CIU's failure to ship constitutes a breach of each purchase order.

181.   FW has been severely harmed by the breach of each purchase order and has suffered damages to be proven at trial.

**TENTH CLAIM FOR RELIEF**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR**
**DEALING WITH RESPECT TO PURCHASE ORDERS**
**(FW as Third-Party Beneficiary Against CIU)**

182.   FW incorporates by reference the allegations above, as though fully set forth herein.

183.   FW through the pass-through entity Frictionless LLC issued purchase orders to CIU from late 2018 through April 2019.  *See* Exhibit 51.

184.   Over 250 purchase orders were provided and accepted by CIU between August 2018 and April 2019.  *See* Exhibit 57 (sample of March 2019 orders).

185.   These orders were for the benefit of FW as reflected by the location for delivery of goods pursuant to the purchase orders and as reflected in the FOA.  *See* Exhibit 1 at Schedule B.

186.   The product ordered by the purchase orders was to be shipped directly to FW or to customers of FW.

187.   FW is a third-party beneficiary of the purchase orders.

188.  CIU accepted each of these purchase orders.

189.  Each of these purchase orders placed by Frictionless LLC and accepted by CIU constitutes a valid and binding contract to which FW was the intended third-party beneficiary.

190.  All parties knew that the purchase orders were placed by Frictionless LLC and accepted by CIU for the benefit of FW.

191.  The purpose of the purchase orders was for FW to receive shipments from CIU and the benefit of that bargain was to receive the products identified on the purchase order by the ship date.

192.  CIU unreasonably and in bad faith refused to ship the majority of the products ordered.

193.  In fact, correspondences from the Li Defendants and CIU managers reveal that CIU never intended to ship said products despite entering into contract to do so by accepting the purchase orders.

194.  CIU's actions in accepting the purchase orders but not intending to fill them deprived FW of the benefit of its bargain and constitutes a breach of the covenant of good faith and fair dealing.

195.  FW has been harmed by said breach and has suffered damages to be proven at trial.

### ELEVENTH CLAIM FOR RELIEF
### COMMON LAW FRAUDULENT MISREPRESENTATION
### (FW Against Li, Serena Li, Frank Li, ZL Investments, and CIU)

196.  FW incorporates by reference the allegations above, as though fully set forth.

197.  The Li Defendants, including ZL Investment, CIU, Li, Frank Li and Serena Li, owed a duty to not make or cause to be made false and misleading statements, representations, and warranties to FW concerning, among other things, CIU's cessation of shipping to competing companies and the price CIU would charge.

198.   Li and his affiliates, including representatives and agents of ZL Investment and CIU, recklessly or knowingly, and with the intent to mislead, made false representations to Banjo and FW concerning their intent to ship, sales to competition, and pricing on products shipped to FW.

199.   Li and his affiliates, including representatives and agents of ZL Investment and CIU, knowingly made materially false statements, representations, and warranties to FW.

200.   From 2013 – 2018, products were ordered by FW through Frictionless LLC and shipped directly to FW or its retailers.

201.   From 2013 – 2018, the Li Defendants fraudulently represented to FW, with the intent to mislead, that CIU was charging Frictionless LLC a reasonable rate for the products that were ordered through Frictionless then shipped to FW.

202.   In January 2019 the Li Defendants admitted to FW that they had been overcharging for products and dropped their rates, resulting in significantly lower rates to FW.

203.   The Li Defendants, as co-operators in a joint business venture with FW, had a duty to speak the truth to FW.

204.   The fraudulent representations of the Li Defendants on pricing between 2013 and 2018 cost FW over $7 million in lost profits.

205.   From April 2013 through April 2019, the Li Defendants, including their agents and representatives, knowingly, and with the intent to mislead, repeatedly represented that they were not selling to competitors of Frictionless LLC or its affiliates.  FW is an affiliate of Frictionless LLC.

206.   The evidence demonstrates that the Li Defendants, contrary to their representations, have been selling to competitors of Frictionless or its affiliates.  Upon information and belief, the

Li Defendants are continuing to sell to competitors of Frictionless LLC and its affiliate FW.

207.   From August 27, 2018 through April 2019, the Li Defendants, including their agents and representatives, knowingly, and with the intent to mislead, repeatedly and explicitly represented the intent to ship to FW and its retailers.

208.   The Li Defendants, including their agents and representatives, were knowingly making materially false statements, representations, and warranties concerning shipments of goods.

209.   FW relied on the representations being made by the Li Defendants well into the 2019 sales season.  Those representations were false.  Based on that reliance FW did not seek an alternative source for products.

210.   The Li Defendants, including their agents and representatives, breached their duty of honesty.

211.   The false statements made by, for, or on behalf of ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, were made by, for, or on behalf of one another and are imputed to each of them.

212.   ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, made false statements to, *inter alia*, induce Banjo and FW to release the joint venture from any financial obligation to FW, induce payment of almost $4.5 million dollars to Frictionless LLC for pass-through to CIU, and to induce FW to take on an over 6 million dollar loan for poorly made and partially built products that would be difficult or impossible to sell.

213.   FW justifiably and reasonably relied on the false, incomplete, and misleading statements and assurances from the Li Defendants, including their agents and representatives, believed them to be true, and relied on the same, to its severe and ongoing detriment.

214.   The false statements and representations of the Li Defendants, including their agents and representatives, have caused significant injury and damage to FW.

215.   FW has suffered damages in an amount to be proven at trial.

**TWELFTH CLAIM FOR RELIEF**
**NEGLIGENT MISREPRESENTATION**
**(FW Against Li, Serena Li, Frank Li, ZL Investments, and CIU)**

216.   FW incorporates by reference the allegations above, as though fully set forth.

217.   Li and his affiliates, including representatives and agents of ZL Investment and CIU, had a duty to speak the truth to Banjo and FW concerning, among other things, CIU's cessation business with competing companies and accurate pricing to FW.

218.   Li and his affiliates, including representatives and agents of ZL Investment and CIU, negligently misrepresented their business with competitors and pricing information to Banjo and FW.

219.    ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, had a duty to Banjo and FW speak the truth concerning CIU's cessation of business with competitors and accurate pricing to FW.

220.   Li and his affiliates, including representatives and agents of ZL Investment and CIU, knowingly made and warranties to FW.

221.   From 2013 – 2018, products were ordered by FW through Frictionless and shipped directly to FW or its retailers.

222.   From 2013 – 2018, the Li Defendants negligent misrepresented that CIU was charging Frictionless a reasonable rate for the products that were ordered through Frictionless then shipped to FW.

223.   In January 2019 the Li Defendants admitted to FW that they had been overcharging for products and dropped their rates, resulting in significantly lower rates to FW.

43

224.    The Li Defendants, as co-operators in a joint business venture with FW, had a duty to speak the truth to FW.

225.    The negligent misrepresentations of the Li Defendants on pricing between 2013 and 2018 cost FW over $7 million in lost profits.

226.    From April 2013 through April 2019, the Li Defendants, including their agents and representatives, negligent misrepresented that they were not selling to competitors of Frictionless or its affiliates.  FW is an affiliate of Frictionless LLC.

227.    The evidence demonstrates that the Li Defendants, contrary to their representations, have been selling to competitors of Frictionless or its affiliates.  Upon information and belief, the Li Defendants are continuing to sell to competitors of Frictionless and its affiliate FW.

228.    From August 27, 2018 through April 2019, ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, negligently misrepresented to FW and Banjo that CIU intended to ship products to FW and its retailers.

229.    ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, made materially false statements, representations, and warranties concerning shipments of goods to Banjo and FW.

230.    Banjo and FW relied on the negligent misrepresentations made by ZL Investments, Li, CIU, Serena Li, and Frank Li.  Based on that reliance, at no time between August 2018 and April 2019 did FW and Banjo seek alternative sources for products.

231.    ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, breached their duty of honesty to Banjo and FW.

232.    The false statements made by, for, or on behalf of ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, were made by, for, or on behalf of

one another and are imputed to each of them.

233.   ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, made negligent misrepresentations to, among other things, induce FW to release the joint venture from financial obligations to FW, and to induce FW to pay almost $4.5 million dollars for pass-through to CIU.

234.   FW justifiably and reasonably relied on the negligent misrepresentations from ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, believed them to be true, and relied on the same, to its severe and ongoing detriment.

235.   The negligent misrepresentations from ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, have caused significant injury and damage to FW.

236.   Banjo and FW have suffered damages in an amount to be proven at trial.

### THIRTEENTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (FW Against ZL Investment, Li, and CIU)

237.   FW incorporates by reference the allegations above, as though fully set forth.

238.   ZL Investment, Li, CIU, Serena Li, and Frank Li agreed, by words and conduct, to accomplish an unlawful goal or accomplish a goal through unlawful means.

239.   ZL Investment, Li, CIU, Serena Li, and Frank Li engaged in multiple overt acts to accomplish their unlawful goals, including making false representations to FW.

240.   ZL Investment, Li, CIU, Serena Li, and Frank Li intentionally engaged in the malicious, willful, and fraudulent commission of wrongful acts for the purpose of causing FW harm, including significant pecuniary, reputational, and other damages.

241.   FW is entitled to actual and consequential damages as well as costs, including witness fees, attorneys' fees, pre-judgment and post-judgment interest, and other appropriate

equitable and legal relief, in an amount to be proven at trial, imposed jointly and severally, on ZL

Investment, Li, CIU, Serena Li, and Frank Li arising from their conspiratorial acts.

### FOURTEENTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (FW Against the Li Defendants)

242.   FW incorporates by reference the allegations above, as though fully set forth.

243.   Each of Li, ZL Investment, and CIU agreed to be bound by certain agreements

governing their relationship with FW and Banjo and the distribution of profits amongst them

based on the parties' joint efforts.

244.   As a result of entering into the aforementioned agreements, FW expended

significant efforts and conferred substantial monetary benefits on each of the Li Defendants, as

described above.

245.   As a result of entering into the aforementioned agreements, FW expected certain

pecuniary and reputational benefits to accrue to them.

246.   Each of the Li Defendants unlawfully diverted funds from FW, refused to perform

their obligations under the agreements described herein, and unjustly enriched themselves to the

detriment of FW.

247.   The Li Defendants received benefits in the form of profits and other advantages at

the expense of FW under circumstances that make it unjust for the Li Defendants to retain the

profits and other moneys paid without compensating FW.

248.   FW and Banjo have suffered, and will continue to suffer, expense and detriment to

the benefit of all of the Li Defendants, making it inequitable for them to retain the benefit FW

conferred on them without payment, in an amount to be proven at trial.

### I.   PRAYER FOR RELIEF

FW seeks an award in its favor on each of the above-cited claims, as follows:

- Finding each of Li Defendants jointly and severally liable on each Claim for Relief set forth against the same above;

- Finding Defendant Frictionless, LLC liable on each Claim for Relief against Frictionless, LLC set forth above;

- Ordering Defendants to turnover and account for all estate property pursuant to 11 U.S.C. § 542;

- Enjoining Defendants from infringing on FW's intellectual property;

- Declaring the arbitration is subject to automatic stay set forth in 11 U.S.C. § 362(a) and enjoining Defendants from continued prosecution of the arbitration against Banjo;

- Disallowing or, in the alternative, equitably subordinating Frictionless LLC's claim against the estate;

- Avoiding the Obligation and the Transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and awarding FW the Transfers or the value thereof from CIU pursuant to 11 U.S.C. § 550(a);

- Awarding damages sufficient and adequate to compensate FW for the injuries and damage caused by the Li Defendants and Frictionless, LLC, in an amount to be determined, including, without limitation, compensatory damages, recessionary damages, and/or equitable disgorgement;

- Ordering a full accounting of the Li Defendants' affairs, including, without limitation, an accounting of all transactions between FW and CIU, CIU and each of the other Li Defendants, and CIU and any competitor of FW from 2013 to the present;

- Awarding pre-judgment and post-judgment interest, as allowed by law, and awarding Banjo his attorneys' fees and costs, and other legal and/or equitable relief as is fair and just as mandated under the LLC Agreement and/or allowed by law.

Dated this 9th day of October, 2019.

Respectfully submitted,

WADSWORTH GARBER WARNER CONRARDY, P.C.

*/s/ David V. Wadsworth*
David V. Wadsworth, #32066
Aaron J. Conrardy, #40030
2580 West Main Street, Suite 200
Littleton, Colorado 80120
303-296-1999 / 303-296-7600 FAX
dwadsworth@wgwc-law.com
aconrardy@wgwc-legal.com

THOMAS P. HOWARD, LLC

*/s/Thomas P. Howard*
Thomas P. Howard, No. 31684
Olayinka L. Hamza, No. 44523
842 W. South Boulder Rd., Ste. 100
Louisville, CO  80027
303-665-9845 / 303-665-9847 FAX
thoward@thowardlaw.com
ohamza@thowardlaw.com

Co-Counsel for Frictionless Word, LLC