IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | Case No. 19-18459 MER |
| | ) | |
| Frictionless World, LLC | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| Frictionless World, LLC, | ) | |
| | ) | Adversary Proceeding No. 19-01282 MER |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Frictionless, LLC; Changzhou Inter Universal | ) | |
| Machine & Equipment Co., Ltd.; Li Zhixiang; | ) | |
| Changzhou Zhong Lian Investment Co., Ltd.; | ) | |
| Serena Li; and Frank Li, | ) | |
| | ) | |
| Defendants. | ) | |

---

**ARBITRATION PARTICIPANTS' CONSOLIDATED MEMORANDUM OF LAW:**

**(A) IN SUPPORT OF THEIR MOTIONS TO COMPEL THE DEBTOR TO ARBITRATE PURSUANT TO THE FEDERAL ARBITRATION ACT,
FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW ARBITRATION
TO PROCEED, AND TO DISMISS UNDER FED. R. CIV. P. 12(b)(1),
OR STAY, ADVERSARY PROCEEDING PENDING
ARBITRATION;**

**AND**

**(B) IN OPPOSITION TO THE DEBTOR'S MOTION FOR PRELIMINARY
INJUNCTION STAYING THE ARBITRATION IN FAVOR OF THE ADVERSARY
PROCEEDING AND EXTENDING THE AUTOMATIC STAY TO THE DEBTOR'S
PRINCIPAL, DANIEL BANJO**

---

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................2

FACTUAL BACKGROUND ....................................................................................4

    A.  The Parties Agreed to Arbitrate. .....................................................................4

    B.  A Capsule Summary of the Parties' Dispute. .................................................10

    C.  CIU and Mr. Li Seek To Expand Their Presence in the United States...........11

    D.  The Parties Sign the Frictionless Agreements and Provide for Broad Arbitration of Any Disputes, Including Any Threshold Arbitrability Issues. ............................................12

    E.  How Banjo Operated Frictionless From April 2013 – April 2019. ..................13

    F.  **Z.L. Investment, CIU, and Mr. Li Discover Banjo's Fraud, Banjo and the Debtor Stonewall, and Z.L. Investment Files Its Arbitration Demand.** .........................................15

    G.  **Z.L. Investment Initiates the Arbitration; After It Starts, Additional Evidence of Misconduct Emerges.**..........................................................................................16

    H.  The Debtor Files for Bankruptcy, Files the Adversary Proceeding Asserting the Same Pre-Petition Claims It Planned to Assert in the Arbitration, and Files the Injunction Motion to Stay the Arbitration Against Itself and Non-Debtor Banjo............................18

ARGUMENT .......................................................................................................22

    A.  The Arbitration Participants' Motion to Compel Arbitration Should Be Granted. ...........22

        1.  The FAA Governs Here .............................................................................23

        2.  The Parties Have a Valid Agreement to Arbitrate Under the FAA ..............24

        3.  The Parties Expressly Agreed That Any Issues of Arbitrability Must Be Decided by the Tribunal; That Agreement Must Be Honored Under the Supreme Court's Recent Decision in *Henry Schein* ...........................................................31

        4.  Nothing in the Bankruptcy Code Supersedes the FAA's Mandate to Enforce the Parties' Valid and Binding Arbitration Agreement; That Agreement Must Be Honored Under the Supreme Court's Recent *Epic* Decision......................................34

        5.  Not Only Does the FAA Mandate Arbitration Here, But the Relevant Discretionary Factors in the Absence of that Mandate Support Compelling the Debtor to Arbitrate its Dispute with the Arbitration Participants ..............................37

- i -

B.  Because the Court Must Compel Arbitration, Including of the Debtor's Claims in its Adversary Complaint, the Automatic Stay Should Be Lifted As Against the Debtor and Should Not Be Extended to Banjo. ..............................................................45

    1.  The Automatic Stay Should Be Lifted to Permit the Arbitration to Proceed Against the Debtor ...........................................................................................45

    2.  In Any Event, There is No Justification for Extending the Automatic Stay to Banjo ...................................................................................................................48

C.  The TRO Should Be Dissolved and the Injunction Motion Should Be Denied Because the Debtor's Request to Enjoin the Arbitration Violates the FAA and Contradicts the Supreme Court's Binding Precedent....................................................................54

D.  The Adversary Proceeding Should be Dismissed Under Fed. R. Civ. P. 12(b)(1) or, At a Minimum, Stayed Pending the Outcome of the Arbitration. .....................................57

CONCLUSION ...............................................................................................................59

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agrawal v. Ogden*,
 753 F. App'x. 644 (10th Cir. 2018) ........................................................49

*Ahluwalia v. QFA Royalties, L.L.C.*,
 226 P.3d 1093 (Colo. App. 2009) ...........................................................33

*In re Amfesco Industries, Inc.*,
 81 B.R. 777 (Bankr. E.D.N.Y 1988)........................................................51

*Barnett v. Elite Properties of Am., Inc.*,
 252 P.3d 14 (Colo. App. 2010) ...............................................................58

*Beattie v. TTEC Healthcare Sols., Inc.*,
 2019 WL 2189481 (D. Colo. May 21, 2019).........................................23

*Belnap v. Iasis Healthcare*,
 844 F.3d 1272 (10th Cir. 2017) ..............................................................33

*In re Bidermann Indus. U.S.A., Inc.*,
 200 B.R. 779 (Bankr. S.D.N.Y. 1996).....................................................53

*Bohrer v. Church Mut. Ins. Co.*,
 12 P. 3d 854 (Colo. App. 2000) ..............................................................50

*Busch v. Busch (In re Busch)*,
 294 B.R. 137 (B.A.P. 10th Cir. 2003) .....................................................45

*C.H. Robinson Co., v. Paris & Sons, Inc.*,
 180 F.Supp.2d 1002 (N.D. Iowa 2001)....................................................53

*CEEG (Shanghai) Solar Science & Technology Co., Ltd v. LUMOS LLC*,
 829 F.3d 1201 (10th Cir. 2016) ..............................................................24

*Chelsea Family Pharmacy, PLLC v. Medco Health Sols., Inc.*,
 567 F.3d 1191 (10th Cir. 2009) ..............................................................58

*In re Curtis*,
 40 B.R. 795 (Bankr. D. Utah 1984) ................................................ *passim*

*Dean Witter Reynolds, Inc. v. Byrd*,
 470 U.S. 213 (1985).............................................................................37, 46

*Dish Network L.L.C. v. Ray*,
    900 F.3d 1240 (10th Cir. 2018) ...................................................................25, 33

*Dominion Video Satellite v. Echostar Satellite Corp.*,
    356 F.3d 1256 (10th Cir. 2004) ...............................................................................55

*In re Elec. Mach. Enterprises, Inc.*,
    479 F.3d 791 (11th Cir. 2007) ................................................................................40

*Epic Systems Corp. v. Lewis*,
    138 S.Ct. 1612 (2018).................................................................................. *passim*

*Equitex Inc. v. Ungar*,
    60 P.3d 746 (Colo. App. 2002)................................................................................50

*Escobar v. Reid*,
    348 F. App'x 387 (10th Cir. 2009) .........................................................................55

*In re Farmland Industries, Inc.*,
    309 B.R. 14 (Bankr.W.D.Mo.2004)........................................................................40

*Fisher Sand & Gravel v. Western Surety Co.*,
    2009 WL 4099768 (D.N.M. Oct. 20, 2009)............................................................49

*Fortier v. Dona Anna Plaza Partners*,
    747 F.2d 1324 (10th Cir. 1984) ..............................................................................49

*Fortune, Alsweet & Eldridge, Inc. v. Daniel*,
    724 F.2d 1355 (9th Cir. 1983) ................................................................................29

*In re Gandy*,
    299 F.3d 489 (5th Cir. 2002) ..................................................................................46

*Geographic Expeditions, Inc. v. Estate of Lhotka*,
    599 F.3d. 1102 (9th Cir. 2010) ...............................................................................57

*Getzelman v. Trustwave Holdings, Inc.*,
    No. 13-CV-02987-CMA-KMT, 2014 WL 3809736 (D. Colo. Aug. 1, 2014) .......58

*Giles v. Alito Partners, LLP*,
    762 F. App'x. 505 (10th Cir. 2019) ........................................................................55

*Globe Constr. Co. v. Oklahoma City Hous. Auth.*,
    571 F.2d 1140 (10th Cir. 1978) ..............................................................................52

*Gonzalez v. Brinker Intl Payment Co.*,
    2016 WL 9818324 (D. N.M. 2016) ........................................................................27

- iv -

*Gvozdenovic v. United Air Lines, Inc.*,
   933 F.2d 1100 (2d Cir.1991) ....................................................................... 28, 29

*Harris v. United States*,
   841 F.2d 1097 (Fed. Cir. 1988) ...................................................................... 57

*In re Harrison*,
   82 B.R. 557 (Bankr. D. Colo. 1987) ............................................................... 53

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,
   139 S.Ct. 524 (2019) ............................................................................... *passim*

*Hicks v. Cadle Co.*,
   2005 WL 8172197 (D. Colo. Oct. 26, 2005) .................................................. 29

*Holly Sugar Corp. v. Goshen Co. Coop. Beet Growers Assn.*,
   725 F.2d 564 (10th Cir. 1984) ........................................................................ 56

*I.M.A., Inc. v. Rocky Mountain Airways, Inc.*,
   713 P.2d 882 (Colo. 1986) .............................................................................. 25

*International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,
   206 F.3d 411 (4th Cir. 2000) .......................................................................... 30

*U.S. ex rel. Lighting & Power Servs., Inc. v. Inferface Constr. Corp.*,
   553 F.3d 1150 (8th Cir. 2009) ........................................................................ 57

*Lynch v. Johns-Manville Sales Corp.*,
   710 F.2d 1194 (6th Cir. 1983) ........................................................................ 49

*Mantooth v. Bavaria Inn Rest., Inc.*,
   2018 WL 2241130 (D. Colo. May 16, 2018) .................................................. 32

*McDonnell v. City & Cty. of Denver*,
   878 F.3d 1247 (10th Cir. 2018) ...................................................................... 55

*In re MCSi Inc., Sec. Litig.*,
   371 B.R. 270 (S.D. Ohio 2004) ...................................................................... 53

*MRI Scan Ctr., L.L.C. v. Nat'l Imaging Assocs., Inc.*,
   No. 13–60051–CIV, 2013 WL 1899689 (S.D. Fla. May 7, 2013) ................. 57

*Multiband Corp. v. Block*,
   No. 11–15006, 2012 WL 1843261 (E.D. Mich. May 21, 2012) ..................... 57

*In re Murall, Inc.*,
   118 B.R. 400 (Bankr. D.S.C. 1989) ................................................................ 53

*Oklahoma Federated Gold and Numismatics, Inc. v. Blodgett*,
  24 F.3d 136 (10th Cir. 1994) .................................................................50, 52

*Orange Cnty. Choppers, Inc. v. Goen Techs. Corp.*,
  374 F. Supp. 2d 372 (S.D.N.Y. 2005)..................................................................57

*Otoe Cnty Nat'l Bank v. W&P Trucking, Inc.*,
  754 F.2d 881 (10th Cir. 1985) .............................................................................48

*Owen–Williams v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  907 F. Supp. 134 (D. Md. 1995), *aff'd*, No. 96–1442, 1996 WL 688219 (4th
  Cir. Dec. 2, 1996) (*per curiam*) ..........................................................................29

*Parker v. Ctr. for Creative Leadership*,
  15 P.3d 297 (Colo. Ct. App. 2000) ......................................................................31

*Pelikan Holding AG v. Nu–Kote Holding, Inc. (In re Nu–Kote Holding, Inc.)*,
  257 B.R. 855 (Bankr. M.D. Tenn. 2001) .............................................................40

*Pikes Peak Nephrology Assocs., P.C. v. Total Renal Care, Inc.*,
  2010 WL 1348326 (D. Colo. March 30, 2010)....................................................31

*In re Pinnacle Brands, Inc.*,
  259 B.R. 46 (Bankr. D. Del. 2001) ......................................................................51

*Rent-A-Ctr., W., Inc. v. Jackson*,
  561 U.S. 63 (2010)................................................................................................32

*Riley v. Kingsley Underwriting Agencies, Ltd.*,
  969 F.2d 953 (10th Cir. 1992) .............................................................................24

*In re Rouse*,
  301 B.R. 86 (Bankr. D. Colo. 2003) ....................................................................45

*Santich v. VCG Holding Corp.*,
  443 P.3d 62 (Colo. 2019)......................................................................................28

*Shearson/American Express, Inc. v. McMahon*,
  482 U.S. 220 (1987)........................................................................................23, 34

*In re Shores of Panama, Inc.*,
  387 B.R. 864 (Bankr. N.D. Fla. 2008) .................................................................40

*Smith v. Multi–Fin. Sec. Corp.*,
  171 P.3d 1267 (Colo. Ct. App. 2007) ..................................................................31

*Sopko v. Clear Channel Satellite Servs., Inc.*,
  151 P.3d 663 (Colo. App. 2006)...........................................................................27

*In re Touchstone Home Health LLC*,
  572 B.R. 255 (Bankr. D. Colo. 2017) ............................................................. *passim*

*Utah Licensed Beverage Ass'n v. Leavitt*,
  256 F.3d 1061 (10th Cir. 2001) ...................................................................55

*Vernon v. Qwest Commc'ns Int'l, Inc.*,
  857 F. Supp. 2d 1135 (D. Colo. 2012), *aff'd,* 925 F. Supp. 2d 1185 (D. Colo.
  2013) ...............................................................................................23

*In re VidAngel, Inc.*,
  593 B.R. 340 (Bankr. D. Utah 2018) ..............................................................45

*Willett v. Vitek, Inc.*,
  139 B.R. 723 (D. Nev. 1992) ......................................................................53

*In re Xtra Petroleum Transp., Inc.*,
  473 B.R. 430 (Bankr. D.N.M. 2012) ..............................................................53

**Statutes**

9 U.S.C. § 2 ......................................................................23, 24, 27, 28

9 U.S.C. § 3 ........................................................................................58

9 U.S.C. § 201 ......................................................................................1

11 U.S.C. § 105 .....................................................................................1

11 U.S.C. § 362(a) .......................................................................... *passim*

11 U.S.C. § 362(d) ...............................................................................46

Colo. Rev. Stat. Ann. § 7-80-408 .................................................................15

**Other Authorities**

AAA Rule 7(a) .....................................................................................32

Fed. R. Bankr. P. 7012(b) ..............................................................1, 4, 22, 58

Fed. R. Civ. P. 12(b)(1) ................................................................... *passim*

Fed. R. Civ. P. 12(b)(3) ..........................................................................57

Fed. R. Civ. P. 12(b)(6) .......................................................................21, 57

New York Convention Art. II(2) ..................................................................27

1.      Changzhou Zhong Lian Investment Co., Ltd. ("Z.L. Investment"), Changzhou Inter Universal Machine & Equipment Co., Ltd. ("CIU"), and Frictionless, LLC ("Frictionless")—creditors of the Debtor, Frictionless World, LLC (the "Debtor" or "World")—and Li Zhixiang ("Mr. Li," and collectively with Z.L. Investment, CIU, and Frictionless, the "Arbitration Participants"), respectfully submit this consolidated memorandum of law:

- In support of their motion, pursuant to the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.* (the "FAA"), to compel the Debtor to arbitrate—in the arbitration proceeding pending since April 15, 2019 captioned *Changzhou Zhong Lian Investment Co., Ltd. (a/k/a Z.L. Investment), Claimant v. Daniel Banjo and Frictionless World, LLC, Respondents v. Li Zhixiang, Z.L. Investment, and Changzhou Inter Universal Machine and Equipment Co., Ltd.*, Counterclaim and Third-Party Respondents, American Arbitration Association Case No. 01-19-0001-1748 (the "Arbitration")—the substantially similar claims (the "Debtor's Claims") that the Debtor recently asserted against the Arbitration Participants in the adversary proceeding captioned *Frictionless World, LLC v. Frictionless, LLC et al.*, Adv. Proc. No. 19-01282 (the "Adversary Proceeding"), which the Debtor filed against the Arbitration Participants on October 9, 2019;

- In support of their motion, pursuant to 11 U.S.C. §§ 105 and 362(d), for relief from the automatic stay (the "Automatic Stay") to permit the Arbitration Participants to continue pursuing their claims against the Debtor and the Debtor's principal, Daniel Banjo ("Banjo"), in the Arbitration;

- In support of their motion, pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(1), to dismiss the Adversary Proceeding for lack of subject matter jurisdiction or, in the alternative, stay the Adversary Proceeding pending the outcome of the Arbitration; and

- In opposition to the Debtor's pending motion, pursuant to 11 U.S.C. §§ 105 and 362(a)(1), to expand the scope of the Automatic Stay to preclude the Arbitration from continuing against Banjo and for a preliminary injunction enjoining further proceedings in the Arbitration indefinitely pending the outcome of the Adversary Proceeding.  *See generally* Adv. Pro. No. 19-01282, ECF No. 4 (the "Injunction Motion").

Active/50851923.1

2.     The underlying documents related to the Arbitration necessary for the Court's consideration of the Arbitration Participants' motions and opposition summarized above are attached as exhibits to the accompanying Declaration of Brian D. Koosed, Esq. ("Koosed Dec.").

## PRELIMINARY STATEMENT

3.     Under the Federal Arbitration Act, the only relevant, and dispositive, question for the Court is whether the Arbitration Participants, the Debtor, and Banjo (collectively, the "Parties"), have a binding agreement to arbitrate their dispute.  The incontrovertible answer is that they have multiple, express, written and binding arbitration agreements.

4.     Based on those agreements, for nearly six months the Parties conducted an extensive and vigorous Arbitration—covering nearly identical claims, facts, transactions, and disputes as the Adversary Proceeding—before the American Arbitration Association (the "AAA"), right up until the Debtor filed its bankruptcy petition.  As detailed below, the FAA mandates that the Parties' multiple, valid, and binding arbitration agreements—which they performed continuously for nearly six months—be honored here.  In fact, the FAA and recent Supreme Court precedent further mandate that, per the Parties' arbitration agreement, this Court refer even the issue of arbitrability to the Parties' chosen panel of three arbitrators (the "Tribunal") for decision.

5.     As set forth below, the Debtor's new Adversary Proceeding is redundant of the Parties' claims asserted in the Arbitration.  Indeed, the Debtor is not even subtle about its naked forum-shopping; the Debtor flatly admits that it seeks to have the same dispute with the Arbitration Participants at issue in the Arbitration resolved in this Court, repeatedly stating:

> The facts and circumstances giving rise to [the Debtor]'s claims in this [A]dversary [P]roceeding are **nearly identical** to the counterclaims [the Debtor] and Banjo **would have asserted in the Arbitration.**

> [T]he facts and circumstances of this [A]dversary [P]roceeding and the Arbitration [] are **nearly identical**.
>
> Banjo and FW both have claims against Defendants arising out of **the same facts and circumstances** . . . .

Injunction Motion, ¶¶ 14, 28, 34(e), respectively (emphasis added).

6.      Based on binding Supreme Court precedent, courts across the country, including Bankruptcy Judge McNamara in this Court, don't allow a litigant to evade an arbitration agreement, as the Debtor seeks to do here. Further, where, as here, parties agree to allow arbitrators to decide whether their dispute is subject to arbitration, the Supreme Court unanimously confirmed just a few months ago that federal courts lack jurisdiction to decide even the arbitrability of those claims, let alone decide their merits. Accordingly, the Debtor must pursue its claims against the Arbitration Participants, if at all, in the Arbitration. Similarly, the Court must allow the Arbitration Participants to proceed on their claims against the Debtor and Banjo in the Arbitration.

7.      The fact that certain of the Debtor's Claims purport to arise under bankruptcy law does not change this fact; as set forth below, the Debtor's attempt to cover its Claims with a Bankruptcy Code veneer fails because those purported bankruptcy Claims arise from the same pre-petition events, transactions, and disputes that are already being arbitrated in the Arbitration.

8.      Here, the FAA and Bankruptcy Code, binding precedent, the operative nucleus of fact and law applicable to both the Arbitration and the Adversary Proceeding, and all considerations of equity and efficiency mandate allowing the Arbitration to proceed, as it was for nearly six months before the Debtor filed for bankruptcy on September 30 (the "Petition Date").

9.      Accordingly, for these reasons and the others detailed below, the Court should compel arbitration of the Debtor's complaint in the Adversary Proceeding (the "Adversary Complaint") under the FAA, and grant the Arbitration Participants relief from the Automatic Stay

to allow the Arbitration to proceed against the Debtor.  This will allow the Parties to resolve all their claims in a single, efficient forum.  Further, because the Arbitration must be allowed to proceed, there is no basis for continuing to extend the Debtor's Automatic Stay to Banjo, given his own agreement to arbitrate his claims with the Arbitration Participants.  The Debtor's Injunction Motion should therefore be denied in full.  Finally, the Adversary Proceeding should either be dismissed pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(1) or, at a minimum, stayed pending the Arbitration's outcome.

## FACTUAL BACKGROUND

10.     The dispositive issue before the Court is whether the Debtor agreed to arbitrate the claims it now includes in the Adversary Complaint, as well as the claims of the Arbitration Participants against it.  The answer is it did—expressly, in writing, and repeatedly.  The LLC Agreement (as defined below) and a brief history of the Arbitration confirm this.

**A.     The Parties Agreed to Arbitrate.**

11.     Z.L. Investment, Banjo, and Mr. Li are parties to the Operating Agreement for Frictionless, LLC, dated April 11, 2013 (the "LLC Agreement").  *See* Koosed Dec., Ex. 1, and Ex. C-1 thereto.    Section 14.6 of the LLC Agreement, entitled "**Arbitration; Consent to Jurisdiction**," provides as follows:

> 14.6.1. <u>Arbitration</u>.  Each Member [Banjo and Z.L. Investment] and Li, on his, her, or its own behalf and on behalf of the Company, **hereby agrees to submit all controversies, claims and matters of difference arising under or relating to this Agreement or the Company**, which cannot be resolved between the Members and Li, **to arbitration in accordance with the provisions and procedures set forth herein** . . . .  Without limiting the generality of the foregoing, the following shall be considered controversies for this purpose: (a) **all questions relating to the interpretation or breach of this [LLC] Agreement**, (b) all questions relating to any representations, negotiations and other proceedings leading to the execution of this Agreement, the formation of the Company, or the

issuance of Membership Interests, and (c) **all questions as to whether the right to arbitrate any such question exists**. . . .

*See* Koosed Dec., Ex. 1, and Ex. C-1 thereto, pp. 22-23 (emphasis added).

12.     A brief history of the Arbitration also confirms that the Parties agreed to arbitrate their disputes.

13.     April 15, 2019:  Pursuant to the arbitration agreement in Section 14.6 of the LLC Agreement, Z.L. Investment filed its initial demand for arbitration (the "Arbitration Demand") against Banjo and the Debtor, asserting claims under Colorado state law for, among other things, fraud, breaches of fiduciary duty, civil theft, conversion, breaches of contract, etc.  *See* Koosed Dec., Ex. 1.  The Arbitration Demand further designated Lawrence Schaner as Z.L. Investment's party-appointed arbitrator per the arbitration procedures in Section 14.3 of the LLC Agreement. *See id.* at ¶ 83

14.     May 8, 2019:  Banjo and the Debtor filed their "Response, Counterclaims, and Third-Party Claims."  *See* Koosed Dec., Ex. 3 (the "Arbitration Counterclaims").  Because Banjo was a party to the LLC Agreement, he "admit[ted] that it is the jurisdiction of the AAA to hear disputes arising out of the LLC Agreement."  *Id.* at ¶ 16.  But, stressing that "it would not be cost effective to litigate this matter in two forums," Banjo and the Debtor noted that the Debtor was *not* a party to the LLC Agreement.  *See id.* at ¶¶ 16-17.  Rather than contest the AAA's jurisdiction to hear the Parties' dispute, however, the Debtor expressly stated:

> **[The Debtor] will agree to have this heard under by [sic] the AAA pursuant to this [LLC] Agreement if counterclaim defendant Changzhou Inter Universal, Machine & Equipment Co., Ltd. ("CIU") also agrees to have the claims against it heard under this Agreement.**  Should CIU refuse to appear in this forum than [sic] [the Debtor] will refuse the same.

*See id.* at ¶ 17 (emphasis added).

15.     <u>May 13, 2019</u>:  Five days later, CIU accepted the Debtor's written offer to arbitrate the Parties' dispute, via correspondence sent to the AAA and Banjo's and the Debtor's Arbitration counsel:

> CIU has accepted Respondent Frictionless World LLC's proposal that ***CIU and Frictionless World LLC jointly consent to arbitration before the AAA***.

*See* Koosed Dec., Ex. 7 (email to AAA) (emphasis added).

16.     <u>June 10, 2019</u>:  Z.L. Investment, Mr. Li, and CIU submitted their joint answer and reply to Banjo's and the Debtor's Arbitration Counterclaims.  *See* Koosed Dec., Ex. 8.

17.     <u>June 18, 2019</u>:  Invoking Rule 38 of the AAA's Commercial Arbitration Rules, which governs emergency requests for relief before an arbitral tribunal has been empaneled, the Debtor and Banjo filed an "Emergency Motion for Preliminary Injunction" with the AAA.  *See* Koosed Dec., Ex. 9 (the "Emergency Arbitration Motion"); *see also id.* at Ex. 10 (Commercial Arbitration Rules).  Noting the "Grounds for Injunctive Relief Under the [Parties'] Arbitration Agreement," the Emergency Arbitration Motion filed by the Debtor and Banjo sought an order directing CIU to continue shipping product to the Debtor for the balance of the Arbitration.  *See id.* at p. 18 (citing Section 14.6 of the LLC Agreement).

18.     <u>June 20, 2019</u>:  Pursuant to Rule 38 of the AAA's Commercial Arbitration Rules, the AAA appointed Ann Ryan Robertson of the Houston office of Locke Lord LLP as "Emergency Arbitrator" to consider the Debtor's and Banjo's Emergency Arbitration Motion.  *See* Koosed Dec., Ex. 11 (June 20, 2019 correspondence from AAA).

19.     <u>June 21, 2019</u>:  Emergency Arbitrator Robertson held a telephonic hearing attended by Arbitration counsel to all Parties, including the Debtor.  *See* Koosed Dec., Ex. 12 (Emergency Order), p. 1.  Later that day, Emergency Arbitrator Robertson issued "Emergency Arbitrator's

Procedural Order No. 1" to govern the Debtor's and Banjo's Emergency Arbitration Motion.  *See id.*  Paragraph 1.A of that Order established a deadline of June 24, 2019 for the following:

> **All parties shall file a submission agreement submitting all claims and disputes to arbitration.**

*See id.* (emphasis added).

20.    <u>June 24, 2019</u>:  The Debtor's and Banjo's Arbitration counsel sent to all Parties, plus the AAA and Emergency Arbitrator Robertson, an email bearing the subject line "ICDR Submission to Dispute Resolution."   *See* Koosed Dec., Ex. 13.   That email attached the AAA's/ICDR's "Submission to Dispute Resolution" form, signed by Thomas P. Howard as Arbitration counsel to both the Debtor and Banjo.  *See id.* at p. 2 (the "Submission Agreement"). On that Submission Agreement, the Debtor and Banjo both checked the box confirming that they were agreeing to "binding arbitration" of their dispute with the Arbitration Participants.  *See id.*

21.    <u>June 25, 2019</u>:  Z.L. Investment, CIU, and Mr. Li filed their opposition to the Emergency Arbitration Motion, raising, among other things, questions about the authenticity of certain evidence submitted by the Debtor and Banjo in their Motion.  *See* Koosed Dec., Ex. 14.

22.    <u>July 3, 2019</u>:  Per the arbitration procedures in Section 14.3 of the LLC Agreement, the Debtor and Banjo appointed Steven Choquette, Esq., as their party-appointed arbitrator in the Arbitration.  *See* Koosed Dec., Ex. 15.

23.    <u>July 8, 2019</u>:  The Debtor and Banjo filed their reply in support of their Emergency Arbitration Motion, arguing, among other things, that the Debtor "has standing to move this Arbitrator for an order directing CIU to . . . fulfill the purchase orders."  *Id.* at Ex. 14, Ex. 16, p. 7.

24.    <u>July 19, 2019</u>:  Emergency Arbitrator Robertson denied the Emergency Arbitration Motion.  *See* Koosed Dec., Ex. 17.  In doing so, Emergency Arbitrator Robertson found that:

- 7 -

> Not all parties to this arbitration were signatories to the arbitration agreement although **each had appeared voluntarily in the arbitration and joined all issues raised**.  [O]n June 24, 2019, **all parties filed submission agreements with the [AAA's International Centre for Dispute Resolution] submitting this dispute to arbitration.**

*See id.* at ¶ 7 (emphasis added).

25.     <u>July 23, 2019</u>:   Per the arbitration procedures in Section 14.3 of the LLC Agreement, the Parties' two party-appointed arbitrators appointed Ambassador (Ret.) David Huebner as Chair of the Tribunal in the Arbitration.[1]  *See* Koosed Dec., Ex. 18.

26.     <u>August 18, 2019</u>:  The Tribunal issued Procedural Order No. 1, directing counsel to meet and confer on various issues, including "[a]ny dispute with respect to jurisdiction or arbitrability," and appear for a telephonic hearing on September 6, 2019.  *See id.* at Ex. 20, ¶ 1(h).

27.     <u>September 6, 2019</u>:  The Tribunal conducted a preliminary hearing, with counsel for all Parties present, including Thomas P. Howard for the Debtor and Banjo.  *See* Koosed Dec., Ex. 21 ("Procedural Order No. 2").  The preliminary hearing lasted nearly two hours and covered the full range of meet and confer topics listed on Procedural Order No. 1.

28.     <u>September 9, 2019</u>:  The Tribunal issued Procedural Order No. 2 in the Arbitration.  Among other things, Procedural Order No. 2 states as follows:

> <u>*The Tribunal hereby confirms the agreements of the Parties at the preliminary hearing and/or orders as follows:*</u>
>
> 1.     **Hearing**:
>
> > <u>*The Parties agreed*</u> that the final hearing . . . in this Arbitration . . . should be scheduled for July 13-17, 2020 . . . .

---

[1]     The Debtor and Banjo initially objected to the appointment of Ambassador Huebner as Chair; however, the AAA overruled that objection and affirmed his appointment on August 13, 2019.  *See* Koosed Dec., Ex. 19.

- 8 -

2.      **Arbitration Agreement**:

The applicable arbitration agreement in this matter is § 14.6 of the [LLC] Agreement.

3.      **Applicable Law**:

The laws of the State of Colorado . . . apply in this matter.  *With respect to procedural matters, the Federal Arbitration Act, Colorado Revised Uniform Arbitration Act, and AAA Rules apply* . . . .

4.      **Parties/Changes of Claims/Related Proceedings**:

*The Parties confirmed that all necessary parties are already named herein* and that they do not intend to seek leave to join additional necessary parties in these proceedings . . . .

5.      **Jurisdiction/Arbitrability**:

*The Parties stated no challenge and no intent to challenge the formation, existence, or validity of the arbitration agreement, the jurisdiction of the Tribunal, or the arbitrability of any claim, defense, or counterclaim . . . .*

*Id.* at pp. 1-3 (bold emphasis in original; emphasis that is both italicized and underlined added).

29.     September 26, 2019:  After meeting and conferring on various pre-Hearing issues as required under Procedural Order No. 2, counsel for all Parties—including the Debtor and Banjo—submitted a joint letter to the Tribunal agreeing on a discovery schedule and pre-Hearing procedures leading up to the Parties' July 2020 trial in the Arbitration.  Koosed Dec., Ex. 22.

30.     September 29, 2019:  The Tribunal issued Procedural Order No. 3, directing that the Parties complete document production by January 2020, depositions by April 2020, and submit pre-Hearing briefs and evidence in May/June 2020, leading up to a July 2020 trial.  *Id.* at Ex. 23.[2]

---

[2]     To date, each side in the Arbitration has incurred approximately $38,000 in Arbitration fees, approximately $10,000 of which is attributable to the Debtor's Emergency Arbitration Motion.  The AAA has advised that it will cost each side approximately $25,000 in additional fees and expenses between now and the anticipated end of discovery.  *See* Koosed Dec., Exs. 27-28.

31.     Based on this long history of regular and repeated agreement to, and participation in, every stage of the Arbitration, it is perplexing that the Debtor now alleges it "was not a party to an arbitration agreement with the [Arbitration Participants]."  Adversary Complaint, ¶ 79; Injunction Motion, ¶ 12.

32.     Simply put, the Debtor agreed to arbitrate its disputes with the Arbitration Participants in the Arbitration.  That is – or should be – the end of the story, full stop.  Nevertheless, to provide context for the Court and to refute the Debtor's and Banjo's baseless allegations against them, the Arbitration Participants provide the following brief background concerning their underlying disputes with the Debtor and Banjo.

**B.      A Capsule Summary of the Parties' Dispute.**

33.     The business dispute among the Arbitration Participants, on the one hand, and the Debtor and Banjo, on the other hand, is summarized as follows:

> a)      In April 2013, Arbitration Participants Z.L. Investment and Mr. Li contracted with Banjo to form a Colorado limited liability company, Frictionless, with Z.L. Investment (owned by certain of Mr. Li's family members) owning 90% of Frictionless and Banjo owning the other 10%.
>
> b)      From April 2013 until April 2019, Banjo ran Frictionless' day-to-day operations as its Manager operating in the U.S.; the other Arbitration Participants—Mr. Li, CIU (owned and operated by Mr. Li and his family members), and Z.L. Investment—are all based in China.
>
> c)      While serving as its Manager, Banjo ran Frictionless's business through the following fraudulent scheme:
>
>> (1)      Frictionless purchased products from Arbitration Participant CIU, which manufactured the products in China and delivered them to the U.S. for distribution to retailers.
>>
>> (2)      Instead of Frictionless selling those products to U.S. retailers like Home Depot and Lowe's (the "Retailers"), Banjo directed Frictionless to sell those products at either no or, upon information

and belief, a small mark-up to the Debtor, which Banjo exclusively owns himself.

(3)     The Debtor then sold those products to U.S. retailers at a substantial mark-up over the purchase price from Frictionless, with the Debtor, wholly owned by Banjo, pocketing the margin.

(4)     Banjo further directed Frictionless to reimburse the Debtor for substantially all of the Debtor's operating expenses.

34.     The Debtor and Banjo don't dispute that this is how Banjo ran Frictionless and the Debtor from April 2013 until April 2019.  Instead the Parties' dispute boils down to whether the Arbitration Participants ever agreed to such an improbable arrangement—whereby Frictionless bore all of the costs of the Debtor's business, while the Debtor captured most, if not all, of the profit.  That is what the Parties have been arbitrating in the Arbitration since April 2019.

**C.      CIU and Mr. Li Seek To Expand Their Presence in the United States.**

35.     In 2011-2012, CIU served the U.S. market solely as a behind-the-scenes contract manufacturer for other equipment brands.  But Mr. Li and his family, which owned and operated CIU, wanted more direct access to the U.S. market for CIU's products and, accordingly, decided that they wanted to create:  (a) their own brand for the U.S. market for products manufactured by CIU; and (b) their own U.S. affiliate that would sell this new brand's products directly to U.S. Retailers including, among others, Wal-Mart, Home Depot, Lowe's, and Tractor Supply Company.

36.     Toward that end, Mr. Li took steps in spring 2012 to start a U.S.-based business with Banjo, whom Mr. Li knew while the latter was employed by a distributor for CIU.  These steps included:  (a) investing substantial sums with Banjo to create a new U.S.-based company and accompanying brand for the U.S. market; and (b) forming Z.L. Investment as an investment entity to invest in that new company, which would eventually be called Frictionless, LLC.

**D.**     **The Parties Sign the Frictionless Agreements and Provide for Broad Arbitration of Any Disputes, Including Any Threshold Arbitrability Issues.**

37.     After negotiating for over a year, Z.L. Investment and Banjo formed a Colorado limited liability company, Frictionless, LLC, on or about March 1, 2013.

38.     Then, on or about April 11, 2013, Z.L. Investment, Mr. Li, and Banjo signed three agreements:  (a) the LLC Agreement; (b) a "Funding Agreement," memorializing the Members' capital contributions to Frictionless and the allocation thereof (the "Funding Agreement"); and (c) an "Employment Agreement," under which Frictionless would employ Banjo in a position to be determined by Mr. Li, as Frictionless's Chairman (the "Employment Agreement," together with the LLC Agreement and the Funding Agreement, the "Frictionless Agreements").  *See* Koosed Dec., Ex. 1 ("Arbitration Demand"), Exhibits C-1 – C-3 thereto.

39.     The Debtor is nowhere mentioned in the text of the LLC Agreement, or in any of the drafts of the LLC Agreement circulated to Z.L. Investment and Mr. Li before signing.  Indeed, upon information and belief, Banjo ***specifically instructed*** Frictionless's counsel at the time to ***delete*** any references to the Debtor in drafts of the LLC Agreement before sending those drafts to Z.L. Investment and Mr. Li.  This and other similar allegations are set forth in the Arbitration Participants' proposed Amended Demand for Arbitration, which they intend to file in the Arbitration if this Court grants their motion to compel arbitration and lifts the Automatic Stay.  *See* Koosed Dec., Ex. 2 (the "Proposed Demand"), ¶¶ 64-65.

40.     Nevertheless, Banjo and the Debtor have alleged in the Arbitration that the parties agreed to another version of the LLC Agreement, one which attached a purported "Operating Plan" that specifically referenced the Debtor's role in Frictionless's business (the "Alleged Operating Plan").  In particular, Banjo and the Debtor have claimed that:  (a) this Alleged Operating Plan was intended to be attached to the LLC Agreement as "Schedule B"; and (b) Banjo presented this

Alleged Operating Plan to Z.L. Investment and Mr. Li in person at the April 2013 meeting in China where the Frictionless Agreements were signed. *See* Koosed Dec., Ex. 3 (Arbitration Counterclaims). The Debtor similarly relies on this Alleged Operating Plan in its Adversary Complaint. *See id.* at Ex. 4 (the "Adversary Complaint"), ¶¶ 39, 55, 62.

41. The validity or authenticity of this Alleged Operating Plan is a key issue in the Arbitration. The Arbitration Participants do not concede its genuineness, or even that it was created before the Arbitration started, let alone in April 2013 as the Debtor and Banjo have alleged.

42. Although the validity and authenticity of the Alleged Operating Plan are hotly contested in the Arbitration, two aspects of the LLC Agreement are not disputed: (a) *it contains a broad and unequivocal agreement to arbitrate all disputes; and (b) it leaves to the Tribunal the decision whether claims are within the scope of the arbitration agreement*. *Supra, ¶* 11.

**E.    How Banjo Operated Frictionless From April 2013 – April 2019.**

43. From the day the Frictionless Agreements were signed in April 2013 until Z.L. Investment filed its Arbitration Demand in April 2019, Banjo ran Frictionless's day-to-day operations as its Manager. This was largely because Banjo is a Colorado resident, while Z.L. Investment, CIU, and Mr. Li are based in China.

44. The Arbitration Participants contend—and the Debtor and Banjo deny—that, until late 2018, Z.L. Investment, CIU, and Mr. Li had no knowledge of the Debtor's existence as a separate legal entity, and certainly had no expectation that the Debtor was involved in Frictionless's business operations. *See* Koosed Dec., Ex. 2, ¶¶ 9-22, 97-113. This is the heart of the Parties' dispute in both the Arbitration and the Adversary Proceeding.

45. However, there is little dispute over how Banjo *actually* ran Frictionless's business in practice while serving as its Manager from April 2013 – April 2019.

46.     *First*, from April 2013 until the Arbitration started in April 2019, Banjo, as Manager, caused Frictionless to purchase products from CIU.  *See* Koosed Dec., Ex. 2, Proposed Demand, ¶¶ 99-100.

47.     *Second*, Frictionless never sold CIU's products to Retailers; instead, at Banjo's direction, Frictionless sold CIU's products to the Debtor.  *Id.* at ¶ 103; Koosed Dec., Ex. 4, Adversary Complaint, ¶¶ 36, 68.

48.     *Third*, according to the Debtor's September 30, 2019 Chapter 11 petition, it owes Frictionless $12,645,740.62 for, among other things, products that the Debtor purchased from Frictionless.  *See* Koosed Dec., Ex. 5, at Schedule D, p. 36.[3]  *See also* Koosed Dec., Ex. 4, Adversary Complaint, ¶ 127.

49.     *Fourth*, after purchasing CIU's products from Frictionless, the Debtor sold those products to the Retailers.  *See* Koosed Dec., Ex. 2, Proposed Demand, ¶¶ 103 - 104; *see also* Koosed Dec., Ex. 4, Adversary Complaint, ¶¶ 36, 68.

50.     *Fifth,* Frictionless reimbursed the Debtor for all of its operating expenses, as the Debtor's Arbitration counsel has admitted via correspondence in the Arbitration:

> As you will recall, based on the Frictionless Operating Agreement and [the Alleged] Operating Plan . . . Banjo was to operate Frictionless LLC "directly or indirectly through another company, joint venture or other arrangement."  . . . [T]hat company was [the Debtor] Frictionless World ("FW").  **FW since the signing of the Operating Agreement has overseen all business-related matters**, including but not limited to leases, professional needs (such as legal counsel), insurance payments, and where applicable, bank service fees.  **From 2013 – 2018, these expenses were passed on to Frictionless LLC.**

---

[3]     Frictionless's actual claim is much larger.  Regardless, to the best of the Arbitration Participants' knowledge, every penny of this $12,645,740.62 scheduled figure was incurred while Banjo had day-to-day operational control of both the Debtor and Frictionless.

Koosed Dec., Ex. 2, Proposed Demand, ¶¶ 140-44 (emphasis added).

51.     Thus, how Banjo ran Frictionless and the Debtor on a day-to-day basis is clear: Frictionless financed virtually all of the Debtor's business expenses (what the Arbitration Participants have called the "expense-side fraud" in the Arbitration), while the Debtor captured most, if not all, of the revenue and profits from the sale of CIU's products to the Retailers (what the Arbitration Participants have called the "revenue-side fraud").

52.     In October/November 2018, the Arbitration Participants first became suspicious due to certain discrepancies in Frictionless's financials.  These discrepancies led Z.L. Investment's representatives to make an in-person visit to Colorado.  During that visit, Rob Germundson—who is the Debtor's Chief Financial Officer—refused to provide Z.L. Investment's representatives with any of *Frictionless's* own bank statements.  This led to further investigation, and to Z.L. Investment's ultimate discovery of the Debtor's existence as a separate legal entity in late November 2018.  *See* Koosed Dec., Ex. 2, Proposed Demand, ¶¶ 111-13.

**F.     Z.L. Investment, CIU, and Mr. Li Discover Banjo's Fraud, Banjo and the Debtor Stonewall, and Z.L. Investment Files Its Arbitration Demand.**

53.     Over the next few months, Z.L. Investment continued its investigation, including hiring auditors who conducted a site visit to Colorado in February 2019.  Throughout that site visit, however, Banjo and his subordinates at the Debtor stonewalled.  *See id.* at ¶¶ 114-23.

54.     For example, Z.L. Investment, as a Member of Frictionless, had an absolute right to obtain basic information about Frictionless's business relationships.  *See* Koosed Dec., Ex. 1 & Ex. C-1 thereto at § 10.3; *see also* Colo. Rev. Stat. Ann. § 7-80-408.  But, despite admitting by this point that the Debtor was Frictionless's *only* customer, Banjo took the incredible position that *any* information about the Debtor – including, for example, how much the Debtor paid Frictionless for CIU's products – was "outside the scope" of Z.L. Investment's rights.  *See id.* at ¶¶ 115-19.

55.     Of course, Banjo and the Debtor have subsequently claimed in the Arbitration—and the Debtor now claims before this Court—that the Arbitration Participants agreed, in 2013, that Frictionless would only sell products to the Debtor, and the Debtor would then sell those products to the Retailers.  *See* Koosed Dec., Ex. 3, Arbitration Counterclaims, ¶¶ 8, 26, 29-30, 36; Koosed Dec., Ex. 4, Adversary Complaint, ¶¶ 36, 55, 62, 68.  But Banjo and the Debtor notably refused to provide *any* information about the supposedly above-board business relationship between Frictionless and the Debtor during these February 2019 site visits.  Indeed, despite subsequently claiming that Z.L. Investment and Mr. Li agreed to the Alleged Operating Plan in April 2013, neither Banjo nor anyone at the Debtor *ever once* mentioned the existence of this purportedly dispositive document to Z.L. Investment's auditors.  In fact, neither Banjo nor the Debtor provided a copy of the Alleged Operating Plan to anyone associated with Z.L. Investment, CIU, or Mr. Li until late April 2019.  *See* Koosed Dec., Ex. 2, Proposed Demand, ¶¶ 111-21.

56.     As a result of this repeated stonewalling in the face of its clear legal right to information, Z.L. Investment initiated the Arbitration.

**G.     Z.L. Investment Initiates the Arbitration; After It Starts, Additional Evidence of Misconduct Emerges.**

57.     Based on the arbitration agreement in Section 14.6 of the LLC Agreement, Z.L. Investment filed the Arbitration Demand against the Debtor and Banjo with the AAA on April 15, 2019.  *See* Koosed Dec., Ex. 1.  As summarized above, the Debtor was a ready, willing, and able participant in the Arbitration for five and a half months before the Petition Date.  *Supra*, ¶¶ 12-32.

58.     On September 30, 2019—four days before amended Arbitration claims were due and one day after the Tribunal directed the Parties to start discovery—the Debtor filed its Chapter 11 petition.  *See* Koosed Dec., Exs. 21, 23.

- 16 -

59.     After the Arbitration started, Banjo remained the Manager of Frictionless for several weeks.  During this time, Z.L. Investment received Frictionless's Profit & Loss ("P&L") statements for the first quarter of 2019.  The P&L revealed that Banjo had directed Frictionless to sell CIU's products to the Debtor *at cost* for the entire first quarter, which starved Frictionless of cash.  *See* Koosed Dec., Ex. 2, Proposed Demand, ¶¶ 127-28.  By this point, Frictionless owed CIU *over $22.6 million* for products that had been delivered to Frictionless.  *See id*. at ¶ 102.  A substantial portion of this receivable was overdue beyond CIU's 360-day payment terms with Frictionless.  *See id*.  This outstanding receivable caused CIU significant difficulties with its lenders in China, who precluded CIU from shipping further product to Frictionless until Frictionless paid down its outstanding debt to CIU.  *See id.* at ¶¶ 124-33.

60.     In April 2019, CIU's lenders permitted CIU to send four shipments to Frictionless pursuant to purchase orders that Frictionless had sent to CIU, and CIU had accepted (the "April 2019 Shipments").  One of these Shipments arrived in the U.S. on May 3, 2019; the other three Shipments arrived on May 12, 2019.  *See* Koosed Dec., Ex. 2, Proposed Demand, ¶¶ 135-36.

61.     On May 3, 2019, however, Z.L. Investment repeated its request to Banjo—in his capacity as Frictionless's Manager—that he collect some or all of the substantial sums that the Debtor owed Frictionless.  Banjo responded on May 3, 2019 by simply resigning as Frictionless' Manager, through counsel.  *See id.* at ¶¶ 132-33.

62.     Upon his resignation as its Manager, Banjo had no authority to conduct further business on behalf of Frictionless.  Nevertheless, on May 14—ten days after he resigned from Frictionless—Banjo directed that three of the April 2019 Shipments destined for Frictionless instead be sent to the Debtor.  Neither Frictionless nor CIU has been paid for any of the four April 2019 Shipments, which the Debtor presumably already sold to Retailers.  *See id.* at ¶¶ 137-38.

- 17 -

**H.     The Debtor Files for Bankruptcy, Files the Adversary Proceeding Asserting the Same Pre-Petition Claims It Planned to Assert in the Arbitration, and Files the Injunction Motion to Stay the Arbitration Against Itself and Non-Debtor Banjo.**

63.     The day after the Tribunal issued Procedural Order No. 3 directing the Parties to begin discovery, the Debtor filed its Chapter 11 petition in this Court.

64.     To be sure, filing for bankruptcy was the Debtor's right.  But, under binding precedent, the Court should not and cannot countenance what the Debtor did next:  assert in the Adversary Proceeding substantially the same claims that it asserted, or could assert, in the Arbitration, based on the same facts, transactions, and disputes that it agreed to arbitrate.

65.     Specifically, on October 9, 2019, the Debtor filed its Adversary Complaint.  Even a cursory comparison of the Complaint to the Arbitration filings to date demonstrates they are based on the same pre-petition conduct, as just a few examples demonstrate:

| **Arbitration Filing** | **Adversary Complaint** |
|---|---|
| "The evidence demonstrates that from April 2013 through 2018, CIU . . . significantly overcharged its 90 percent owned company Frictionless for its CIU Products."<br><br>Arbitration Counterclaims, ¶ 47. | "Unbeknownst to FW and Banjo, however, from 2014 through 2018 the Li Defendants were significantly overcharging Frictionless LLC for the cost of assembling the products CIU delivered to FW."<br><br>Adversary Complaint, ¶ 70. |
| "The facts demonstrate that, between April 12, 2012 and January 8, 2019, CIU, an affiliate of Li under the control of Li, has shipped nearly *400 separate orders* of CIU products to direct competitors of Frictionless."<br><br><br><br><br><br>Arbitration Counterclaims, ¶ 56. | "[Mr.] Li contractually agreed pursuant to the [LLC Agreement] . . . that his affiliate CIU would immediately cease selling products to competitors of Frictionless LLC and its operating affiliate FW . . . .  Contrary to the same, between April 12, 2012 and the present, the Li Defendants sent nearly 400 separate shipments of CIU products to direct competitors of Frictionless LLC and FW."<br><br>Adversary Complaint, ¶ 71. |

| "Li and his affiliates made repeated false representations – even to their counsel – about CIU's continued shipping of outstanding purchase orders." | "Li and his affiliates, including representatives and agents of ZL Investment and CIU, recklessly or knowingly, and with the intent to mislead, made false representations to Banjo and FW concerning their intent to ship . . . ." |
|---|---|
| Emergency Arbitration Motion, p. 27. | Adversary Complaint, ¶ 198. |

66.     The Debtor's claims in the Adversary Proceeding fall into two categories.

67.     *First*, Claims 9-14 in the Adversary Proceeding allege pre-petition tort and contract claims under Colorado law that are, by the Debtor's own admission in its Injunction Motion, "duplicative" of the claims that Banjo and the Debtor would assert in the Arbitration (the "Pre-Petition State Law Claims").  *See* Koosed Dec., Ex.4, Adversary Complaint, ¶¶ 167-248 and "Prayer for Relief"; *see also* Injunction Motion, ¶ 3.

68.     *Second*, Claims 1-8 in the Adversary Proceeding assert various claims that the Debtor contends arise under the Bankruptcy Code (the "Purported Bankruptcy Claims").  *See* Adversary Complaint, ¶¶ 14, 106-66.  These Purported Bankruptcy Claims further break down as follows:

69.     <u>Claims 1 and 2:</u>  These Purported Bankruptcy Claims seek to:  (a) require the Arbitration Participants to "turn over" property of the Debtor's estate, namely products that CIU allegedly produced bearing the Debtor's intellectual property, but never shipped to the Debtor (*see id.* at ¶¶ 106-10); and (b) enjoin the Arbitration Participants from using the Debtor's patents and trademarks because "they have no right to the intellectual property" (*see id.* at ¶¶ 111-15).  But Frictionless's and CIU's legal right to intellectual property here turns on Section 9.1 of the LLC Agreement, which expressly grants Frictionless "the right to use freely[] any patents that relate to CIU products that are within [Banjo's] control, and any new patents that relate to CIU products which are in his control while he is a Member of [Frictionless]."  *See* Koosed Dec., Ex. 1,

Arbitration Demand, Ex. C-1, § 9.1.  As noted, that LLC Agreement requires that any disputes thereunder be resolved in the Arbitration.  *See id.* at § 14.6.

70.  <u>Claims 3 and 4</u>:  These Purported Bankruptcy Claims seek the same relief that the Injunction Motion now seeks—namely, to stay the Arbitration as to Banjo and to permanently enjoin it pending the outcome of the Adversary Proceeding.  *See* Koosed Dec., Ex. 4, Adversary Complaint, ¶¶ 116-125.  These claims therefore add nothing that is unique to bankruptcy and will further become moot once this Court resolves the Debtor's Injunction Motion.

71.  <u>Claims 5 and 6</u>:  These Purported Bankruptcy Claims seek to disallow or equitably subordinate Frictionless's anticipated creditor claim against the Debtor.  *See id.* at ¶¶ 126-39.  But even a cursory review reveals that these Purported Bankruptcy Claims are based on the underlying pre-petition dispute between the Parties that is being decided in the Arbitration.  *See id.* at ¶ 130 (arguing "Frictionless should be deemed to have no claim in the [Debtor's] bankruptcy case" based on its "wrongfully breaching purchase orders" and "delivering substandard product"); *id.* at ¶¶ 135-139 (arguing Frictionless' claim should be subordinated based solely on Frictionless's alleged pre-petition "fraud and unfair conduct").[4]

72.  <u>Claims 7 and 8</u>:  These Purported Bankruptcy Claims assert that the Debtor's incurring of a loan obligation with Frictionless in February 2019 (the "Obligation"), and the Debtor's pre-petition payments to Frictionless from January-April 2019 (the "Transfers"), were constructive fraudulent transfers.  *See* Koosed Dec., Ex. 4, Adversary Complaint, ¶¶ 140-66.  But, again, these Purported Bankruptcy Claims directly arise from, and turn on, the pre-petition dispute

---

[4]  While it is ultimately an issue for the Tribunal as set forth below, the Arbitration Participants note that these Claims make little sense.  During the applicable time period (April 2013 – April 2019), Banjo had sole operational control of both Frictionless and the Debtor.  Any debt owed by the Debtor to Frictionless thus cannot be the result of any "fraud" or "wrongful breaches" unless Banjo himself was the fraudster or wrongdoer.

currently being liquidated in the Arbitration. Indeed, the Debtor's allegations acknowledge as much, premising the Debtor's fraudulent transfer claims on its overarching theory that the Arbitration Participants defrauded the Debtor. *See id.* at ¶ 147 (stating the Debtor "was fraudulently induced to incur the Obligation"); *id.* at ¶ 157 (alleging the Debtor was "induced [] to make the Transfers" based on the Arbitration Participants' allegedly "fraudulent scheme").[5]

73.     Contending that the Arbitration conflicted with its bankruptcy case, the Debtor filed its Injunction Motion on October 11, 2019. Among other things, the Debtor argued the Arbitration "is a significant and very expensive distraction" for Banjo "at a time when he should focus his efforts on operations" and thus the Automatic Stay should be extended to enjoin the Arbitration against Banjo. Injunction Motion, ¶ 6.

74.     This Court granted a temporary restraining order ("TRO") on October 11, 2019, which extended the Debtor's Automatic Stay to Banjo and enjoined the Arbitration pending further ruling. Per the Parties' agreement, these Motions and Objection followed. Adv. Pro. ECF No. 13.

---

[5]     Again, setting aside the issue of where they should be decided, these constructive fraudulent transfer claims make no sense. Set aside for the moment that the Obligation is documented by a loan agreement that is signed by Banjo on behalf of both Frictionless and the Debtor because, again, Banjo had sole operational control of both companies when the Obligation was incurred in February 2019. *See* Koosed Dec., Ex. 4, Adversary Complaint, ¶ 76; Koosed Dec., Ex. 6. A close reading shows that both Claims fail to specify elements of a constructive fraudulent transfer – i.e., the failure to provide reasonably equivalent value to the Debtor, while it was (or was left) insolvent or undercapitalized – but instead primarily complain of an alleged pattern of *behavior* by the Arbitration Participants and others: specifically, a supposedly "fraudulent scheme" and failure to fulfill purchase orders and deliver products of a certain quality. *See* Koosed Dec., Ex. 4, Adversary Complaint, ¶¶ 140-66.

These are, at base, state law breach of contract and common law claims, not bankruptcy claims. It thus appears that these exist solely as a predicate to assert that this Court has jurisdiction over the Parties' dispute. As set forth below, such forum shopping by the Debtor should not be countenanced. *See infra*, ¶¶ 139-40, 147, 169. In any event, the Arbitration Participants expressly reserve the right to move to dismiss these Purported Bankruptcy Claims asserting constructive fraudulent transfer pursuant to Fed. R. Civ. P. 12(b)(6) if the Court retains jurisdiction over them.

## ARGUMENT

75.     This Court's task is to decide where the Parties' dispute should proceed.  That decision is straightforward, because the FAA and binding precedent mandate that the Court enforce the Parties' arbitration agreement.  This includes allowing the Tribunal to decide whether any of the Parties' claims are arbitrable.  The Arbitration should therefore proceed on all counts against the Debtor.  Further, the equities and efficiency considerations also favor allowing the Arbitration to proceed and dismissing, or staying, the Adversary Proceeding.

76.     For two reasons, there also is no basis for continuing to extend the Debtor's Automatic Stay to Banjo.  First, because the Court must allow the Arbitration to proceed as to the Debtor, the Arbitration also should proceed as to Banjo.  Second, the Debtor has not demonstrated the extraordinary circumstances necessary to justify extending the Automatic Stay to Banjo.

77.     Accordingly, the Arbitration Participants' motion to compel arbitration under the FAA should be granted, and the Automatic Stay should be lifted to allow the Arbitration to proceed against the Debtor.  In addition, the Debtor's Injunction Motion should be denied.  Finally, the Adversary Proceeding should either be dismissed pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(1) or, at a minimum, stayed pending the Arbitration's outcome.

**A.     The Arbitration Participants' Motion to Compel Arbitration Should Be Granted.**

78.     The broad scope and clear mandate of the FAA require arbitration of the Parties' dispute because the Debtor and Banjo expressly and repeatedly agreed to arbitrate all of their disputes with the Arbitration Participants.  Filing for bankruptcy does not require, or permit, a different result.

79.     The Arbitration Participants, as the parties seeking to compel arbitration, bear the initial burden to present "evidence sufficient to demonstrate an enforceable arbitration agreement."

*Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1148 (D. Colo. 2012), *aff'd,* 925 F. Supp. 2d 1185 (D. Colo. 2013) (quotations omitted) (noting that to sustain its prima facie burden, the party seeking to compel arbitration need only show that an arbitration exists, not necessarily that it would be enforceable).   The burden then shifts to Debtor to "rebut that showing with evidence establishing a genuine dispute as to whether the agreement applies."  *Beattie v. TTEC Healthcare Sols., Inc.,* 2019 WL 2189481, at *1 (D. Colo. May 21, 2019).

80.   Where, as here, the Debtor seeks to avoid arbitration under the FAA by virtue of its bankruptcy filing, the Debtor bears the burden to show that, through the Bankruptcy Code, "Congress intended to preclude" the Debtor from waiving its right to judicial remedies in favor of arbitration.  *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226-27 (1987) (holding that securities fraud claims under the Securities and Exchange Act of 1934 were arbitrable, even though federal courts have exclusive jurisdiction over such claims); *In re Touchstone Home Health LLC*, 572 B.R. 255, 272 (Bankr. D. Colo. 2017) (McNamara, Bankr. J.) ("*Touchstone*") (confirming that the *McMahon* framework applies to FAA arbitration issues arising in bankruptcy cases).

### 1.   The FAA Governs Here.

81.   As the Tribunal noted, the Parties confirmed in the Arbitration that their arbitration agreement is reflected in Section 14.6 of the LLC Agreement.  *See* Koosed Dec., Ex. 21, p. 2.  The FAA applies to that arbitration agreement.  Specifically, the FAA provides:

> **A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy** thereafter arising out of such contract . . . **shall be valid, irrevocable, and enforceable . . .**

9 U.S.C. § 2 (emphasis added).

82.     The FAA further defines "commerce" to mean "commerce among the several States or with foreign nations."  *Id.* at § 1; *see also Touchstone*, 572 B.R. at 267.

83.     Here, the LLC Agreement easily falls within this definition of "commerce" because it is a contract between two foreign parties—Z.L. Investment and Mr. Li, both of which are Chinese—and a U.S. resident, Banjo, to form a Colorado limited liability company, Frictionless. *See generally* LLC Agreement; Adversary Complaint, ¶¶ 3, 8, 9, 11.  The LLC Agreement's arbitration agreement thus falls within the FAA.  9 U.S.C. § 2; *see, e.g., CEEG (Shanghai) Solar Science & Technology Co., Ltd v. LUMOS LLC*, 829 F.3d 1201, 1205 (10th Cir. 2016) (finding enforcement of an arbitral award arising from a dispute between a Chinese company and a U.S. company was subject to the FAA and the New York Convention thereunder); *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 958–59 (10th Cir. 1992) (enforcing arbitration agreement between U.S. companies and individuals on the one hand, and British companies and individuals, on the other, under the New York Convention).

84.     Finally, lest there be any doubt on the topic, the Parties' Arbitration counsel—including Thomas P. Howard, on behalf of the Debtor and Banjo—expressly admitted in the Arbitration that the FAA applies to the Parties' arbitration agreement here.  *See* Koosed Dec., Ex. 21, p. 2 (confirming that the Parties agreed that, "[w]ith respect to procedural matters, the Federal Arbitration Act . . . and AAA Rules apply").

## 2.     The Parties Have a Valid Agreement to Arbitrate Under the FAA.

85.     As the Supreme Court confirmed unanimously earlier this year, "[u]nder the [FAA], arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms."  *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S.Ct. 524, 529 (2019).  But,

"before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists" under the FAA. *Id.*[6]

86.     Accordingly, this Court's first task is to determine whether the Debtor has a valid agreement to arbitrate with the Arbitration Participants. *Id.*; *see also Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1243 (10th Cir. 2018). Ordinary principles of Colorado contract law govern this issue. *See Dish Network*, 900 F.3d at 1246 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Here, the Debtor's agreement to arbitrate with the Arbitration Participants under Colorado law is manifested unequivocally, based both on its express agreement to arbitrate, as well as its continuous conduct in pursuing the Arbitration for nearly six months.

>           a.     *The Debtor Twice Explicitly Agreed in Writing to Arbitrate its Disputes With the Arbitration Participants, and Repeatedly Confirmed That Agreement to the Tribunal.*

87.     The Debtor contends that it "***was not a party to an arbitration agreement.***" Adversary Complaint, ¶ 79 (emphasis added); Injunction Motion, ¶ 12 (same). This is demonstrably untrue. In fact, the Debtor agreed—twice, in writing—to arbitrate all of its disputes with the Arbitration Participants. Under Colorado law, whether a valid contract to arbitrate has been formed "requires a bargain in which there is a manifestation of mutual assent to the exchange." *I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 713 P.2d 882, 888 (Colo. 1986). Such "mutual assent" is determined by, among other things, "the parties' conduct, their oral statements and their writings." *Id.*

---

[6]     As set forth below, the Parties' arbitration agreement unmistakably delegates all issues of arbitrability to the Tribunal. *See infra*, ¶¶ 107-113. Thus, the only inquiry for this Court is whether the Parties agreed to arbitrate. The undisputed evidence before the Court is that all of the Parties agreed to the Arbitration, and reaffirmed that agreement many times before the Petition Date. *See infra*, ¶¶ 87-95.

88.     Here, the Debtor's conduct, oral statements, and writings unequivocally demonstrate the Debtor's "manifestation" of "mutual assent" with the Arbitration Participants to resolve the Parties' disputes in the Arbitration.

89.     The process started back on April 11, 2013, when Z.L. Investment, Banjo, Mr. Li, and Frictionless entered into the LLC Agreement, Section 14.6 of which expressly requires the parties to arbitrate their disputes. *See* Koosed Dec., Ex. 1, at Ex. C-1, § 14.6.

90.     Next, after Z.L. Investment initiated the Arbitration, Banjo conceded he agreed to arbitrate under the LLC Agreement, while the Debtor stated in writing that it "**will agree to have this heard** [] by the AAA **pursuant to this [LLC] Agreement** if [CIU] also agrees to have the claims against it heard under this [LLC] Agreement."   Koosed Dec., Ex. 3, Arbitration Counterclaims, ¶ 17 (emphasis added).  CIU accepted the Debtor's offer in writing, stating:  "**CIU has accepted Respondent Frictionless World LLC's proposal that CIU and Frictionless World LLC jointly consent to arbitration before the AAA.**"  *See* Koosed Dec., Ex. 7, p.1 (emphasis added).

91.     Next, on June 24, 2019, Banjo and the Debtor filed their Submission Agreement "submitting all claims and disputes to arbitration."  Banjo and the Debtor further acknowledged that such arbitration would be "binding."  *See id.* at Exs. 14 (Emergency Arbitrator's Procedural Order) & 15 (Submission Agreement).  CIU, Z.L. Investment, and Mr. Li similarly submitted their respective agreements to submit to binding arbitration.  *See* Koosed Dec., Ex. 24.

92.     Later, on September 6, 2019, during the Tribunal's preliminary hearing, the Debtor and Banjo confirmed, through their Arbitration counsel, that they agreed to arbitrate their disputes with the Arbitration Participants.  *See* Koosed Dec., Ex. 21.  Three days later, the Tribunal memorialized this agreement in its Procedural Order No. 2, confirming that "**[t]he Parties stated**

- 26 -

**no challenge and no intent to challenge the formation, existence, or validity of the arbitration agreement,** the jurisdiction of the Tribunal **or the arbitrability of any claim, defense, or counterclaim** stated in this matter." *See id.* (emphasis added).

93.     Simply put, at every moment from April 2019 through September 2019 and right up until the Petition Date, the Debtor consistently, expressly, and repeatedly agreed—through its words (written and oral) and its conduct—to arbitrate its disputes with the Arbitration Participants. At no point prior to the Petition Date did the Debtor ever contest, recant, or attempt to claw back any of these express statements, agreements, and representations to the Tribunal, the AAA, and the Arbitration Participants.  The mere filing of its bankruptcy case does not allow the Debtor to go back in time and change history.

94.     As a matter of law, the Debtor's agreement to arbitrate *all* of its claims with the Arbitration Participants in the Arbitration is binding, valid, and enforceable.  *See* 9 USC § 2 ("[A]n agreement in writing to submit to arbitration an existing controversy . . . shall be valid, irrevocable, and enforceable . . . .); New York Convention Art. II(2) ("The term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams."); *see also Gonzalez v. Brinker Intl Payment Co.*, 2016 WL 9818324, at *2-*4 (D. N.M. 2016) ("The Court finds that Plaintiff agreed to arbitrate any employment disputes he had with Defendant, as evidenced by answering "Yes" to question six on his [employment] application, and as evidenced by his electronic signature on the [form] "Agreement to Arbitrate."); *Sopko v. Clear Channel Satellite Servs., Inc.*, 151 P.3d 663, 667 (Colo. App. 2006) ("Once a controversy is so submitted [to an arbitrator], it remains before the arbitrator until an award is rendered unless the parties mutually agree to withdraw it.") (quotations and citation omitted).

- 27 -

95.     Thus, the Debtor, Banjo, and the Arbitration Participants have a valid and binding agreement to arbitrate their disputes.  This Court must enforce that agreement.

> b.     *The Debtor Further Assumed the Obligation to Arbitrate by Voluntarily Participating in the Arbitration and Seeking Affirmative Relief from the AAA.*

96.     In addition to the Debtor's express written agreement to arbitrate its disputes with the Arbitration Participants, the Debtor further assumed the obligation to arbitrate under the LLC Agreement through its conduct in the Arbitration, as a matter of law.  Under Colorado law, a signatory to an arbitration agreement may compel a non-signatory to arbitrate under certain circumstances, including "assumption of the arbitration obligation by the nonsignatory" and "estoppel."  *Santich v. VCG Holding Corp.*, 443 P.3d 62, 65 (Colo. 2019).  Colorado law provides that "an agreement may be implied from the party's conduct" and a non-signatory may be bound if its subsequent conduct indicates that it is assuming the obligation to arbitrate.  *Id.*; *see also Gvozdenovic v. United Air Lines, Inc.,* 933 F.2d 1100, 1105 (2d Cir.1991).

97.     Here, the Debtor's conduct throughout the Arbitration reasonably allows only one conclusion:  the Debtor agreed to arbitrate its disputes with the Arbitration Participants.

98.     *First*, as shown above, the Debtor repeatedly stated—in writing, in its Arbitration Counterclaims and signed written Submission Agreement—and otherwise represented to the AAA, the Tribunal, and to the Arbitration Participants that the Debtor agreed to have *all* of its claims arbitrated as part of the Arbitration.  *See supra*, ¶¶ 87-95.  Such conduct "manifest[s] a clear intent to arbitrate the dispute" with the Arbitration Participants.  *See, e.g.*, *Gvozdenovic*, 933 F.2d at 1105 (flight attendants manifested a clear intention to arbitrate by sending a representative to act on their behalf in arbitration process); *see also* 9 USC § 2 ("[A]n agreement in writing to submit to arbitration an existing controversy . . . shall be valid, irrevocable, and enforceable . . . .).

- 28 -

99.     *Second*, the Debtor actively and voluntarily participated in the Arbitration Proceeding for nearly six months.  During this time, the Debtor:

- Retained counsel to represent it in the Arbitration;

- Filed Counterclaims against Z.L. Investment and Third-Party Claims against Mr. Li and CIU;

- Filed the Emergency Arbitration Motion, by which the Debtor expressly invoked the AAA's Commercial Rules and the "grounds for injunctive relief" under Section 14.6 of the LLC Agreement to seek affirmative relief from CIU in the Arbitration;

- Appointed its own chosen arbitrator to the Tribunal;

- Participated, through counsel, in multiple conferences with the Emergency Arbitrator and the Tribunal; and

- Agreed, with the Arbitration Participants, on a procedural schedule and trial date for the Arbitration, which was subsequently submitted to, and approved by, the Tribunal.

100.     The Debtor's active and voluntary participation in the Arbitration again manifests its agreement to arbitrate its dispute with the Arbitration Participants.  *See Gvozdenovic*, 933 F.2d at 1105; *see also Hicks v. Cadle Co.*, 2005 WL 8172197, at *2 (D. Colo. Oct. 26, 2005) (party waived the ability to challenge arbitration where "it fully participated in the arbitration and indeed filed a counterclaim"); *Fortune, Alsweet & Eldridge, Inc. v. Daniel,* 724 F.2d 1355, 1357 (9th Cir. 1983) (unjust to permit appellant to challenge arbitration, after voluntary participation for several months, shortly before arbitrator's decision); *Owen–Williams v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 907 F. Supp. 134, 137 (D. Md. 1995) (plaintiff's willing submission of claims to arbitration without protest during 19 days of arbitration proceedings waived any right to contest arbitration of claims), *aff'd,* No. 96–1442, 1996 WL 688219 (4th Cir. Dec. 2, 1996) (*per curiam*).

101.     Accordingly, in addition to expressly agreeing to arbitrate its disputes, the Debtor assumed the obligation to arbitrate by its conduct in the Arbitration under Colorado law.  The Court should reject the Debtor's attempt to evade its obligation to arbitrate.

> c.     *The Debtor is Estopped From Claiming That it is Not Bound by the Arbitration Agreement in Section 14.6 of the LLC Agreement.*

102.     Finally, as noted above, Colorado law recognizes that a non-signatory may be equitably estopped by its conduct from refusing to comply with an arbitration agreement.  *See supra*, ¶ 96.  Specifically, "the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.  To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the [FAA]."  *International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 418 (4th Cir. 2000) (internal citation and quotations omitted).

103.     All of the Debtor's claims in the Adversary Proceeding turn on the Debtor's attempt to enforce its alleged rights against the Arbitration Participants in connection with the joint venture created by the LLC Agreement.  Indeed, the Debtor's entire theory of its case—in both the Arbitration and the Adversary Proceeding—is that the Alleged Operating Plan was part of the LLC Agreement and reflects the parties' agreement that Frictionless was to merely serve as a "pass-through company" that "would exist to support the work of [the Debtor]."  *See* Koosed Dec., Ex. 9, Arbitration Emergency Motion, pp. 8, 11, 12 (internal quotations omitted); Koosed Dec., Ex. 3, Arbitration Counterclaims, ¶ 8; *see also* Adversary Complaint, ¶¶ 57-61, 226-27 (claiming that the LLC Agreement's non-competition clause benefits the Debtor as well as Frictionless).

104.     The Debtor's claims thus depend on the LLC Agreement.  But equitable estoppel precludes the Debtor from claiming it has rights under the LLC Agreement while simultaneously avoiding the express arbitration agreement set forth in Section 14.6 of that very same LLC Agreement.  *See, e.g., Pikes Peak Nephrology Assocs., P.C. v. Total Renal Care, Inc.*, 2010 WL 1348326, at *8 (D. Colo. March 30, 2010) (finding that plaintiff was bound by unsigned arbitration agreement where plaintiff received benefits from the contract and sought to enforce his rights under the terms of the contract); *see also Smith v. Multi–Fin. Sec. Corp.*, 171 P.3d 1267, 1274 (Colo. Ct. App. 2007) (finding that the non-signatory plaintiffs were estopped from avoiding the arbitration provisions in the agreements whose benefits they sought to enforce); *Parker v. Ctr. for Creative Leadership*, 15 P.3d 297, 298 (Colo. Ct. App. 2000) (plaintiff who alleged he was a third-party beneficiary of an agreement that contained an arbitration agreement must arbitrate his claims).

105.     Simply put, the Debtor cannot have it both ways.

106.     For all these reasons, a valid agreement exists between the Debtor and the Arbitration Participants to arbitrate what the Debtor admits are its "nearly identical" claims in both the Adversary Proceeding and the Arbitration.  The Debtor must honor its promise to arbitrate.

   3.     The Parties Expressly Agreed That Any Issues of Arbitrability Must Be Decided by the Tribunal; That Agreement Must Be Honored Under the Supreme Court's Recent Decision in *Henry Schein*.

107.     Earlier this year, the Supreme Court held unanimously in *Henry Schein* that:

> [B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists. . . .  ***But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue***.

*Henry Schein*, 139 S.Ct. at 529-31 (further noting that a party must provide "clear and unmistakable evidence" that the parties agreed to delegate issues of arbitrability to an arbitrator).

- 31 -

108.     Here, the Parties have a valid agreement to arbitrate their disputes in the Arbitration,

pursuant to Section 14.6 of the LLC Agreement.  *Supra*, ¶¶ 11-32, 87-106.  And that arbitration

agreement clearly and unmistakably delegates any issues of arbitrability to the Tribunal in two

separate ways, each of which requires this Court to compel arbitration of any arbitrability issues.

109.     *First*, the Parties' arbitration agreement expressly delegates any predicate questions

of arbitrability to the Tribunal:

> 14.6.1. <u>Arbitration</u>.  Each Member [Banjo and Z.L. Investment] and
> Li, . . . **hereby agrees to submit all controversies . . . to arbitration
> . . . .   the following shall be considered controversies for this
> purpose**: . . . **all questions as to whether the right to arbitrate
> any such question exists**.

*See* LLC Agreement, § 14.6.1 (emphasis added).  This alone is sufficient to find that the Debtor,

Banjo, and the Arbitration Participants removed from the courts, including this Court, and reserved

for the Tribunal, any issues of arbitrability as a matter of law.  *See, e.g., Henry Schein*, 139 S.Ct.

at 529-30; *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69-70 (2010); *Mantooth v. Bavaria Inn

Rest., Inc.*, 2018 WL 2241130, at *4 (D. Colo. May 16, 2018).

110.     *Second*, the Parties unmistakably delegated any arbitrability determinations to the

Tribunal by incorporating the AAA's Commercial Arbitration Rules:

> 14.6.3. <u>Procedures</u>.  Such arbitration procedures shall be conducted
> before a **panel of three arbitrators** . . . **in accordance with the
> rules for commercial arbitration of the American Arbitration
> Association then in effect** . . . .

*See* Koosed Dec., Ex. A, and Ex. C-1 thereto, p. 23 (emphasis added).

111.     The AAA's Commercial Arbitration Rules reserve the issue of arbitrability to the

Tribunal.  *See* AAA Rule 7(a) ("The arbitrator shall have the power to rule on his or her own

jurisdiction, including any objections . . . to the arbitrability of any claim or counterclaim.").  As

the Tenth Circuit recently held, "incorporation of the AAA Rules provides clear and unmistakable

evidence that the parties intended to delegate matters of arbitrability to the arbitrator." *Dish Network, L.L.C.*, 900 F.3d at 1247-48; *see also Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th Cir. 2017) (same, where the parties' agreement incorporates JAMS rules). Colorado state courts have reached the same conclusion. *See, e.g., Ahluwalia v. QFA Royalties, L.L.C.*, 226 P.3d 1093, 1099 (Colo. App. 2009) ("[B]y incorporating the AAA Commercial Arbitration Rules into their agreement, the parties authorized the arbitrator to decide arbitrability issues.").

112.    It may seem odd, in the context of a bankruptcy case, to let another adjudicative body decide whether to hear the Debtor's claims, including, among other things, the Purported Bankruptcy Claims. But the Supreme Court's recent instruction on this issue is crystal-clear: where, as here, the Parties clearly delegated arbitrability issues to the arbitrators, any court— whether a District Court, a Bankruptcy Court, or a Circuit Court—must let the arbitrators decide arbitrability, even if that court thinks there is no basis at all for arbitrating the dispute at hand. As the Supreme Court unanimously put it:

> We must interpret the [FAA] as written, and the [FAA] in turn requires that we interpret the contract as written. ***When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.*** In those circumstances, a court possesses ***no power*** to decide the arbitrability issue. ***That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.***

*Henry Schein*, 139 S.Ct. at 529 (emphasis added).[7]

---

[7]    The Debtor's whole case—in the Arbitration or in the Adversary Proceeding—depends on whether the Arbitration Participants were aware of, and agreed to, the Alleged Operating Plan. But, by the Debtor's own admission, that Alleged Operating Plan is part of the LLC Agreement, which requires arbitration of any dispute thereunder and expressly delegates any questions of arbitrability to the arbitrators. *See* Koosed Dec., Ex. 1, at Ex. C-1, § 14.6. Clearly then, even under the Debtor's theory, the Arbitration Participants' contention that the Parties' arbitration agreement applies to all aspects of the current dispute is not "wholly groundless." But, **even if it were**, the Supreme Court's decision in *Henry Schein* is binding here and requires that the Tribunal decide arbitrability issues, not this or any other court.

113.     Accordingly, this Court is required to direct that the Arbitration proceed against the Debtor and Banjo.  The Tribunal can then decide, as required by *Henry Schein*, which of the Parties' claims are arbitrable.

        4.     <u>Nothing in the Bankruptcy Code Supersedes the FAA's Mandate to Enforce the Parties' Valid and Binding Arbitration Agreement; That Agreement Must Be Honored Under the Supreme Court's Recent *Epic* Decision.</u>

114.     The Debtor's recent bankruptcy filing does nothing to overturn the outcome mandated by the FAA's plain language and the Supreme Court's recent precedent.  Moreover, nothing in the Bankruptcy Code compels a different result, let alone permits the Debtor to avoid its binding agreement to arbitrate its dispute with the Arbitration Participants in the Arbitration.

115.     "[T]he burden is on the party opposing arbitration [under the FAA] to show that Congress intended to preclude" parties from waiving their right to judicial remedies in favor of arbitration.  *McMahon*, 482 U.S. at 226-27.  Such congressional intent can be gleaned in two ways: (a) from the statute's text or legislative history; or (b) from "an inherent conflict between arbitration and the statute's underlying purposes."  *Id.*

116.     Two years ago, Judge McNamara addressed the intersection of the Bankruptcy Code and the FAA under the Supreme Court's *McMahon* analysis.  *Touchstone*, 572 B.R. at 255.  Judge McNamara found that "[t]he word 'arbitration' does not appear anywhere in the Bankruptcy Code.  Neither does the FAA. . . ."  *Id.* at 273.  Therefore, Judge McNamara held that "neither the text nor the legislative history of the Bankruptcy Code evidences congressional intent to override the FAA."  *Id.* (noting the "appellate precedent uniformly rejects overriding the FAA based on the text or the legislative history of the Bankruptcy Code").

117.     Judge McNamara then addressed whether arbitration under the FAA "inherently conflict[ed]" with the Bankruptcy Code.  *Id.* at 274-81.  After a detailed analysis, the Court

concluded that there was no "inherent conflict" in arbitrating the parties' claim objection dispute, even though that dispute involved the core matter of "allowance or disallowance of claims against the estate." *Id.* at 277. The Court reasoned that liquidating a creditor's claim in arbitration was the kind of "quick, economical, and fair dispute resolution" that was consistent with the objectives of the Bankruptcy Code. *Id.* Finding no inherent conflict between an FAA arbitration agreement and the Bankruptcy Code, Judge McNamara compelled arbitration of the parties' dispute. *Id.* at 281 ("[T]he lack of an inherent conflict between arbitration and the Bankruptcy Code in this case dictates that the Court *must* order arbitration under the FAA.") (emphasis in original).

118. Since Judge McNamara's decision, the Supreme Court further clarified the rubric for determining whether a conflict exists between the FAA and another federal statute. In *Epic Systems Corp. v. Lewis*, the Supreme Court considered an alleged conflict between the FAA and the National Labor Relations Act ("NLRA"). 138 S.Ct. 1612 (2018). There, Justice Gorsuch wrote for the Court:

> A party seeking to suggest that two [federal] statutes cannot be harmonized, and that one displaces the other, bears the **heavy burden** of showing a **clearly expressed congressional intention** that such a result should follow. . . . **The intention must be clear and manifest.** And in approaching a claimed conflict, we come armed with **the strong presumption that repeals by implication are disfavored** and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute.

*Epic*, 138 S.Ct. at 1624 (emphasis added).

119. Applying this standard, the Supreme Court found that the NLRA "does not even hint at a wish to displace the [FAA]—let alone accomplish that much clearly and manifestly, as our precedents demand." *Id.* at 1624. Further "stress[ing] that the absence of any specific statutory discussions of arbitration or class actions is an important and telling clue that Congress has not

displaced the [FAA]," the Supreme Court rejected the notion of any conflict between the statutes and directed the parties to arbitrate their class action labor disputes. *Id.*

120.    As part of his reasoning in *Epic*, Justice Gorsuch noted that claims under numerous other federal statutes—which, like the Bankruptcy Code, provide for original, and in some cases exclusive, federal jurisdiction—are still susceptible to arbitration under the FAA:

> In many cases over many years, this Court has heard and rejected efforts to conjure conflicts between the [FAA] and other federal statutes.  In fact, this Court has rejected *every* such effort to date (save one temporary exception since overruled), with statutes ranging from the Sherman and Clayton Acts to the Age Discrimination in Employment Act, the Credit Repair Organizations Act, the Securities Act of 1933, the Securities Exchange Act of 1934, and the Racketeer Influenced and Corrupt Organizations Act.

*Epic*, 138 S.Ct. at 1627 (emphasis in original).

121.    Applying *Epic*'s standard here, the Debtor can't carry its "heavy burden" of proving Judge McNamara incorrect and showing that Congress "manifested a clear intention to displace the [FAA]" in the Bankruptcy Code.  *Epic*, 138 S.Ct. at 1624, 1632.  As Judge McNamara aptly noted, "neither the text nor the legislative history of the Bankruptcy Code evidences [any] congressional intent to override the FAA," let alone expresses the "clear and manifest language" that *Epic* requires.  *Touchstone*, 572 B.R. at 265.  Indeed, the Bankruptcy Code does not even mention arbitration or the FAA ***at all***.  Because "no inherent conflict has been shown" under *Epic*, "arbitration of the [Debtor's] claim[s] is mandatory" under the FAA.  *Id*. at 281.

122.    To summarize, the Debtor, Banjo, and the Arbitration Participants have a valid agreement to arbitrate all of their disputes in the Arbitration.  *See supra*, ¶¶ 11-32, 87-106.  That valid agreement to arbitrate falls within the FAA.  *Id*. at ¶¶ 81-84.  The Parties' arbitration agreement unmistakably delegates any issues of arbitrability to the Tribunal, which means, under *Henry Schein*, that the Tribunal must determine whether the Debtor's Claims are arbitrable here.

- 36 -

*Id.* at ¶¶ 107-13.  And, finally, under *Epic*, nothing in the Bankruptcy Code compels a different result or otherwise permits this Court to reject the Parties' valid and binding arbitration under the FAA.  *Id.* at ¶¶ 114-21.

123.    Accordingly, and for all these reasons, the Arbitration Participants' motion to compel arbitration under the FAA should be granted.  The Tribunal can then decide, pursuant to *Henry Schein*, whether the Debtor's Claims are arbitrable.  *Cf. Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) (holding that federal courts must "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation").

>    5.    <u>Not Only Does the FAA Mandate Arbitration Here, But the Relevant Discretionary Factors in the Absence of that Mandate Support Compelling the Debtor to Arbitrate its Dispute with the Arbitration Participants.</u>

124.    In *Touchstone*, Judge McNamara held that, under the Supreme Court's binding guidance, "the lack of an inherent conflict between arbitration and the Bankruptcy Code [] dictates that the Court *must* order arbitration under the FAA.  Discretionary considerations only come into play if the Debtor establishes an inherent conflict (which it has not)."  *Touchstone*, 572 B.R. at 281 (emphasis in original).  Here, the Debtor cannot show such a conflict under *Epic*.  But, even if it could, "discretionary considerations point strongly toward arbitration" here.  *Id.*

125.    For purposes of the hybrid question of whether to grant relief from the Automatic Stay in order to compel a debtor to arbitrate under the FAA, Judge McNamara first noted that:

>    [I]t is generally accepted that a bankruptcy court has *no discretion* to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings.  Put slightly differently, noncore claims in insolvency proceedings must be arbitrated if the requirements of the FAA are met.

*In re Touchstone*, 572 B.R. at 274 (emphasis in original).

126.     Judge McNamara then continued his analysis, with both a method and a conclusion applicable to this case, for potential "core" matters, focusing on "the underlying nature of the proceeding" and "whether the proceeding derives exclusively from provisions of the Bankruptcy Code." *See id.* at 275 (quoting *Ins. Co. of N. Am. v. NCG Settlement Tr. & Asbestos Claims Mgmt. Co. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1067 (5th Cir. 1997)).[8]

127.     As to such potential "core" matters, Judge McNamara employed a modified version of the traditional *Curtis* factors governing relief from the Automatic Stay to liquidate claims in a nonbankruptcy forum to determine whether to exercise discretion to compel arbitration. *Touchstone*, 572 B.R. at 281 (citing *In re Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984)). Here, those factors again favor compelling the Debtor to proceed with the Arbitration of its Purported Bankruptcy Claims, along with its non-core Pre-Petition State Law Claims that must be arbitrated.

128.     *First*, the Debtor and the Arbitration Participants have a valid and binding arbitration agreement that covers the Parties' disputes. *See supra*, ¶¶ 11-32, 87-106; *Touchstone*, 572 B.R. at 281.

129.     *Second* and *third*, the Parties were arbitrating their dispute for nearly six months before the Petition Date. Although the Arbitration had not progressed to the point of the final hearing by that time, the hearing has been scheduled for July 2020, and the Parties have agreed to an expedited discovery schedule to meet that date. *See supra*, ¶¶ 29-30; Koosed Dec., Exs. 22-23;

---

[8]     To be clear, based on the recent Supreme Court precedent described above, the Court does not have discretion to refuse to compel arbitration even of substantively core matters in the absence of a clear and manifest conflict with the Bankruptcy Code (which does not exist). Here, further, none of the Debtor's Purported Bankruptcy Claims is a substantively core matter (as opposed to the Debtor's misleading labels on those Claims). *See also supra*, ¶ 72, n.5. In addition to the absence of any core substance, all discretionary factors mandate that the Court compel arbitration of the Debtor's Claims in any event.

*see also Touchstone*, 572 B.R. at 281-82.  Moreover, the Parties have extensively briefed many of the legal issues pertinent to their dispute, and have submitted multiple witness statements from each of the key witnesses in the Arbitration, in connection with the Debtor's Emergency Arbitration Motion.  *See* Koosed Dec., Exs. 9, 14, 16.

130.    *Fourth*, the Tribunal has specialized knowledge applicable to the Parties' dispute. Specifically, Arbitration Participant Z.L. Investment chose its party-appointed arbitrator, Mr. Schaner, because of his extensive experience with international disputes, including between Asian and U.S. companies.  *See generally* Koosed Dec., Ex. 25 (https://schanerlegal.com/cases/); *Touchstone*, 572 B.R. at 282.  Similarly, the Parties' chosen arbitrators jointly selected Ambassador (Ret.) David Huebner as the Tribunal Chair.  While the Parties' appointed arbitrators did not share their reasoning behind that choice, the Arbitration Participants note that Mr. Huebner also has extensive experience in cross-border arbitrations and disputes, including, among other things, being appointed to the inaugural Sino-US Joint Panel of Arbitrators for cross-border technology disputes.  *See* Koosed Dec., Ex. 26 (http://www.huebnerarbitration.com/experience/).

131.    *Fifth*, as the Debtor admits, its Pre-Petition State Law Claims are "nearly identical to the counterclaims [the Debtor] . . . would have asserted in the Arbitration."  Injunction Motion, ¶ 14.  These are clearly non-core claims that must be arbitrated under the FAA.  *Supra*, ¶¶ 63-74. Moreover, as noted above, the Debtor's Purported Bankruptcy Claims are nothing more than the Parties' underlying claims and the Debtor's Pre-Petition State Law Claims dressed up in an illusory Bankruptcy Code wrapper.  Specifically:

a)    Purported Bankruptcy Claims 1-2:  These Claims turn on whether the Arbitration Participants have rights to the Debtor's intellectual property. But Frictionless's and CIU's legal right to use the Debtor's intellectual property itself turns on Section 9.1 of the LLC Agreement.  *See* Koosed

- 39 -

Dec., Ex. 1, at C-1, § 9.1.  And, as discussed at length, that LLC Agreement requires that any disputes be resolved in the Arbitration.  *Id.* at § 14.6.1.[9]

b)  <u>Purported Bankruptcy Claims 5-6</u>:  These Claims seek to object to, and/or equitably subordinate, Frictionless's anticipated creditor claim against the Debtor.  *See* Adversary Complaint, ¶¶ 126-139.  These Claims turn entirely on the Parties' underlying pre-petition dispute.  *See id.* at ¶ 130 (arguing Frictionless's creditor claim should be denied based on its "wrongfully breaching purchase orders"); *id.* at ¶¶ 135-139 (arguing Frictionless's claim should be subordinated because of Frictionless's alleged "fraud and unfair conduct").  Because these Claims "arise[] independently from bankruptcy law," they should be liquidated in the Arbitration, just as Judge McNamara found in *Touchstone* and numerous other cases have held.  *See Touchstone*, 572 B.R. at 282; *see also Pelikan Holding AG v. Nu–Kote Holding, Inc. (In re Nu–Kote Holding, Inc.)*, 257 B.R. 855, 863-65 (Bankr. M.D. Tenn. 2001); *In re Elec. Mach. Enterprises, Inc.*, 479 F.3d 791, 798 (11th Cir. 2007); *In re Shores of Panama, Inc.*, 387 B.R. 864, 866 (Bankr. N.D. Fla. 2008); *In re Farmland Industries, Inc.,* 309 B.R. 14, 21 (Bankr.W.D.Mo.2004).  And, just as in *Touchstone*, this Court can consider whether allowance, disallowance, or equitable subordination of Frictionless's creditor claim is appropriate *after* the Parties' claims have been determined and liquidated in the Arbitration, as the Parties agreed.  *See Touchstone*, 572 B.R. at 282.

c)  <u>Purported Bankruptcy Claims 7-8</u>:  These Claims assert that the Debtor's incurring of the Obligation and its Transfers to Frictionless were constructive fraudulent transfers.  *See* Adversary Complaint, ¶¶ 140-66. Again, these Claims directly arise from, and turn on, the Parties' underlying dispute in the Arbitration over whether the Debtor and Banjo defrauded the Arbitration Participants, or vice versa.  *See id.* at ¶ 147 (stating the Debtor "was fraudulently induced to incur the Obligation"); *id.* at ¶ 157 (alleging the Debtor was "induced [] to make the Transfers" based on the Arbitration Participants' allegedly "fraudulent scheme" to stop shipping product); *id.* at ¶¶ 149, 159 (complaining about the "extremely poor quality" and "substandard quality" of the products).

---

[9]  Purported Bankruptcy Claims 3-4 are irrelevant to this analysis because they seek the same relief that the Debtor's Injunction Motion now seeks, and will become moot once this Court resolves that Motion.

132.     Even the Debtor's purportedly "core" Bankruptcy Claims arise from the Parties' pre-petition conduct and corresponding issues of Colorado law, and thus are merely "dressed up" versions of the Parties' underlying claims in the Arbitration wearing ill-fitting bankruptcy disguises.  There is no sense in arbitrating the Pre-Petition State Law Claims, which must occur in any event, while keeping the Purported Bankruptcy Claims in this Court, particularly because the resolution of the Debtor's Pre-Petition State Law Claims will necessarily involve determining all of the underlying factual disputes dispositive of the Purported Bankruptcy Claims.  All of the Debtor's claims—even the illusory "core" Bankruptcy Claims—should be arbitrated.

133.     *Sixth*, unlike the Adversary Proceeding, the Arbitration will completely resolve the substance of the Parties' dispute, leaving the administration of Frictionless's claims to this Court as occurs typically when the Automatic Stay is lifted to allow non-bankruptcy courts to liquidate claims.  *Touchstone*, 572 B.R. at 282.  In contrast, the Adversary Proceeding cannot result in a complete resolution of the Parties' dispute because Banjo is not a party to it.  Instead, apparently by design, the Debtor seeks to force the Arbitration Participants to first litigate the Adversary Proceeding with the Debtor, and then arbitrate the Arbitration with Banjo.  The Debtor's professed concern about "inconsistent and/or conflicting adjudications" thus falls flat, because the Debtor's own desired outcome creates that precise scenario.  Injunction Motion, ¶ 47.  The Arbitration, by contrast, allows the Debtor, Banjo, and the Arbitration Participants to completely resolve all of the Parties' underlying disputes before a single Tribunal, exactly as they agreed to do and had been doing for nearly six months before the Petition Date.

134.     *Seventh*, the Arbitration will not interfere with the bankruptcy case any more than the Debtor's Adversary Proceeding would.  *Touchstone*, 572 B.R. at 282.  The Debtor claims that allowing the Arbitration to proceed "will distract [Banjo] from operating [the Debtor] and

proposing a plan of reorganization."  Injunction Motion, ¶ 32(b).  But that statement makes no sense when comparing the Arbitration to the Adversary Proceeding.  In either venue, Banjo will have to devote substantial time to "preparing for hearings and depositions, and communicating with counsel."  Injunction Motion, ¶ 32(b).  Simply put, Banjo will be "distract[ed]" no matter where the Parties' dispute proceeds.

135.    Furthermore, the claim of distraction "from proposing a plan of reorganization" is disingenuous.  According to the Debtor's KEIP Motion designed to incentivize Banjo during the bankruptcy case (ECF No. 31 at ¶ 18, Ex. A thereto), Banjo's sole benchmark for success in this case is whether he successfully sells the Debtor's assets, not whether he confirms a plan of reorganization.   And the sale process is being managed by the Debtor's expert and well-compensated professionals: Three Twenty-One Capital Partners as financial advisors (ECF No. 15), and r2 Advisors as financial advisors (ECF No. 19).  Any minuscule marginal "distraction" that Banjo faces—whether in the Arbitration or the Adversary Proceeding—is unlikely to hinder the Debtor's asset sale process.

136.    Finally on this point, far from interfering with the Debtor's bankruptcy case, permitting the Arbitration to proceed will help, rather than hinder, the Debtor's prompt reorganization.  By the Debtor's own admission, the Parties' dispute is essential to its bankruptcy case and must be resolved *somewhere*.   *See, e.g.*, Adv. Pro. No. 19-01282, ECF No. 20 (the "Motion to Employ Special Counsel"), ¶¶ 8-9.  The Arbitration Participants are unsure whether this Court shares Judge McNamara's concerns over "the Court's heavy docket" expressed in *Touchstone*.  572 B.R. at 282.  Regardless, the Adversary Proceeding will certainly be delayed at least by jurisdictional wrangling over which claims may be decided by this Court or the District Court, which may require multiple trips between the two Courts and waiting for decisions from

- 42 -

the District Court. Suffice it to say, no such jurisdictional infighting plagues the Arbitration. Under the AAA's streamlined Commercial Arbitration Rules, the Arbitration's final hearing is already scheduled to occur in July 2020 as the Debtor, Banjo, and the Arbitration Participants previously agreed in the Arbitration. Moreover, the general absence of appellate rights in arbitration and the Parties' agreement to *binding* arbitration will likely ensure that the Tribunal's final award is just that—final—rather than the first step in a potential series of appeals in the Adversary Proceeding by the Debtor or the Arbitration Participants to the District Court, the Tenth Circuit, or beyond.

137.     *Eighth*, the Arbitration will be more economical and expeditious than the Adversary Proceeding. *Touchstone*, 572 B.R. at 282-83. To be sure, the Parties will have to split the Tribunal's fees in the Arbitration. But the AAA has advised that each side will incur approximately $25,000 in additional Tribunal fees through the end of the discovery process, hardly a steep sum given the Debtor's available cash exceeding $4.5 million. *See* Koosed Dec., Exs. 27-28, & Ex. 5, p. 21. While the Parties must split the Tribunal's eventual trial fees, the Debtor ignores that the Parties have already agreed to streamlined discovery procedures in the Arbitration, as well as a streamlined trial process, all of which should help minimize costs relative to the protracted discovery and other proceedings likely in the Adversary Proceeding. *See* Koosed Dec., Ex. 23 (Procedural Order No. 3).

138.     Moreover, the Debtor's cost concerns cannot really be driving its present procedural tack, given that the Debtor's filing of the Adversary Proceeding would require the Parties to resolve their dispute twice: first in Bankruptcy Court with the Debtor, then again in the Arbitration with Banjo, whom the Debtor repeatedly claims it is obligated to indemnify. Paying

for two litigations—first in its own Adversary Proceeding, then indemnifying Banjo in the Arbitration—will certainly be more expensive for the Debtor than paying for the Arbitration alone.

139.    *Ninth*, and finally, equity favors compelling the Debtor to continue participating in the Arbitration.  *Touchstone*, 572 B.R. at 283.  CIU and the Debtor explicitly bargained for, and agreed to, arbitrate their disputes, just as Banjo, Z.L. Investment, Mr. Li and Frictionless agreed to arbitrate in the LLC Agreement.  The Debtor cannot credibly dispute that it agreed to arbitrate and was doing so for months before the Petition Date.  Indeed, the Debtor filed claims against the Arbitration Participants and sought a preliminary injunction against CIU in the Arbitration.  The mere fact that the Debtor has filed for bankruptcy does not justify permitting the Debtor to reject its agreement to arbitrate in order to shop for a more favorable forum.

140.    Indeed, the Debtor acknowledges that it has a substantial dispute with the Arbitration Participants that is essential to its reorganization.  *See, e.g.*, Motion to Employ Special Counsel, ¶¶ 8-9.  Ultimately, the Debtor's only real argument is that it wants to resolve its dispute with the Arbitration Participants in Bankruptcy Court, not in the Arbitration.  But that is forum-shopping, pure and simple.  The Court should not fall for it.  *See, e.g., Touchstone*, 572 B.R. at 283 (noting the "concern[] that the Debtor has engaged in some last-minute forum shopping" as one grounds for compelling arbitration, even if the Bankruptcy Court had discretion on that issue (which it did not under the FAA)).

141.    Simply put, the Parties agreed to arbitrate their disputes, the FAA bars the Debtor from reneging on that agreement, and there is no basis for the Court exercising any discretion other than to mandate that the Parties continue with their Arbitration here.

- 44 -

**B.     Because the Court Must Compel Arbitration, Including of the Debtor's Claims in its Adversary Complaint, the Automatic Stay Should Be Lifted As Against the Debtor and Should Not Be Extended to Banjo.**

142.    Under Section 362(d)(1) of the Bankruptcy Code, the Court has the power to grant relief from the Automatic Stay for cause, including to allow a creditor to liquidate its claim in pending litigation or arbitration.  *See, e.g.*, *Touchstone*, 572 B.R. at 283.  Given that "cause" is not defined in the Bankruptcy Code, "relief from stay for cause is a discretionary determination made on a case by case basis."  *Busch v. Busch (In re Busch)*, 294 B.R. 137, 140 (B.A.P. 10th Cir. 2003).

143.    To determine whether cause exists to lift the Automatic Stay, bankruptcy courts "must apply a balancing test to weigh the hardships suffered by the creditor under the automatic stay against those suffered by the Debtors if the stay is lifted."  *In re Rouse*, 301 B.R. 86, 89 (Bankr. D. Colo. 2003).  As demonstrated below, the Court should lift the Automatic Stay to permit the Arbitration to proceed against the Debtor, under both the FAA and the standard *Curtis* factors, which overwhelmingly favor granting the Arbitration Participants relief from the Automatic Stay to proceed in the Arbitration.  *See generally Touchstone*, 572 B.R. at 283 (granting relief from stay to proceed in pending arbitration).  Further, there is no basis for extending the Debtor's Automatic Stay to Banjo.

1.     The Automatic Stay Should Be Lifted to Permit the Arbitration to Proceed Against the Debtor.

144.    The Tenth Circuit Bankruptcy Appellate Panel has recognized that it "'will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from duties that may be handled elsewhere.'" *Busch,* 294 B.R. at 141; *see also In re VidAngel, Inc.*, 593 B.R. 340, 346 (Bankr. D. Utah 2018) ("When the causes of action are based on nonbankruptcy law, and the [proceeding] was beyond its initial stages,

- 45 -

bankruptcy courts generally grant relief from stay to allow the court with original jurisdiction to liquidate the claim for purposes of administration in the bankruptcy case."). Here, both the FAA and the standard *Curtis* factors governing relief from the Automatic Stay require such relief so the Parties can liquidate and resolve their claims in the proceeding in which they chose to resolve their dispute, namely the Arbitration.

145. *First*, the Automatic Stay should be lifted because the Debtor cannot reasonably dispute that the FAA applies to its arbitration agreement with the Arbitration Participants, nor can it point to anything in the Bankruptcy Code that might justify keeping the Parties' dispute out of arbitration. Indeed, the Debtor admits that its current Adversary Proceeding arises from the "same facts and circumstances" and involves "nearly identical claims" to those asserted in the Arbitration. Injunction Motion, ¶¶ 14, 28, 34(e). The Automatic Stay is not intended to allow the Debtor to use its bankruptcy filing as an end-run around the FAA's mandatory provisions requiring enforcement of the Parties' arbitration agreement. Thus, the mandate of the FAA alone constitutes "cause" for relief from the Automatic Stay under Bankruptcy Code § 362(d)(1). *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) (holding that federal courts must "rigorously enforce agreements to arbitrate").

146. This Court should therefore lift the Automatic Stay to allow the Arbitration to proceed against the Debtor, at the very least as to the Pre-Petition State Law Claims. *See, e.g., In re Gandy*, 299 F.3d 489, 495 (5th Cir. 2002) ("[I]t is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings."). This result is required "even if the result is 'piecemeal' litigation" between the Parties, although the Arbitration Participants have noted why no such "piecemeal" litigation need occur here. *Dean Witter Reynolds, Inc.*, 470 U.S. at 221; *supra*, ¶¶ 64-72, 131-138.

147.     *Second*, even if the Debtors could prove Judge McNamara wrong (which they can't) and establish an "inherent conflict" between the Bankruptcy Code and the FAA here (which doesn't exist), the Court should still exercise its discretion to grant the Arbitration Participants relief from the Automatic Stay under the standard *Curtis* factors so that the Arbitration can proceed.  *Curtis*, 40 B.R. at 799-800.  The *Curtis* factors support such relief:

a.     *Factor 1: Complete Resolution of the Issues*.   Nearly all of the issues relevant to the Parties' dispute would be decided in the Arbitration.  *Supra*, ¶¶ 64-72, 131-133.

b.     *Factor 2: Lack of Interference or Connection with the Bankruptcy case*. The Debtor's Pre-Petition State Law Claims—which also determine the Debtor's illusory Purported Bankruptcy Claims—are all "noncore" claims that existed and were being arbitrated before the Debtor's bankruptcy filing. They have no connection to the postpetition circumstances of the Debtor's bankruptcy case, and the risk of interference with the case is minimal. *Supra*, ¶¶ 64-72, 131-138.

c.     *Factor 4:  Specialized Tribunal with Requisite Experience*.   As noted, the Tribunal members each have years of specialized experience and are well-versed in both Colorado law and the underlying international nature of the Parties' business.   They are also already well-acquainted with the facts of the Parties' dispute.   *Supra*, ¶¶ 129-130.

d.     *Factor 7: Interests of Other Creditors*.   Allowing the Arbitration to proceed will not prejudice other creditors—in fact, it will expedite the timely administration of the Debtor's estate and, further, may reveal potential bases for estate claims if the Arbitration Participants are able to establish that Banjo's fraud and misconduct extended to the Debtor as well.[10]  *Supra*, ¶¶ 134-137.

e.     *Factor 8: Equitable Subordination*.   While the Debtor has asserted a Purported Bankruptcy Claim to disallow, or equitably subordinate, Frictionless's claim against the Debtor, this factor favors lifting the Stay to allow the expeditious liquidation of Frictionless's claim in the Arbitration, including any challenges by the Debtor to that claim, which will then allow

---

[10]     For the avoidance of doubt, if the Tribunal issues an award to the Arbitration Participants in the Arbitration (which they believe is likely), they will of course come back to the Bankruptcy Court before enforcing that award, at least as to the Debtor, to allow the Debtor's estate to be administered in the best interest of all creditors in accordance with the Bankruptcy Code.

this Court to determine the proper plan treatment of Frictionless's claim based on a full evidentiary record.  *Supra*, ¶¶ 71, 131(b).

f.    *Factor 9: Judicial Lien*.    The Arbitration Participants' success in the Arbitration will not result in a judicial lien avoidable by the Debtor.

g.    *Factor 10: Judicial Economy*.    As detailed above, the interests of judicial economy and the expeditious and economical resolution of disputes strongly favor granting relief from the Automatic Stay to allow the Arbitration to proceed.  *Supra*, ¶¶ 129-139.  The Arbitration will resolve the Parties' dispute faster than the Adversary Proceeding can, without lengthy jurisdictional or discovery disputes, as a July 2020 trial date for the Arbitration has already been set.

h.    *Factor 11: Ready for Trial*.    The Arbitration has been proceeding for nearly six months.  Substantial time and effort has been expended by all Parties, along with the Tribunal.  While the Arbitration is not on the verge of trial, a trial date has been set along with numerous other interim deadlines to ensure a streamlined discovery process that will lead to a speedy trial.  *Supra*, ¶¶ 29-30, 129.

i.    *Factor 12.  Balance of Harms*.    The impact of the Automatic Stay on the Parties and the balance of harms heavily favors granting relief from the Automatic Stay.  The Debtor expressly agreed to arbitrate its disputes with the Arbitration Participants, the FAA reflects Congress' intent to enforce that agreement, and the Debtor should not be allowed to change the Parties' chosen venue at the last minute simply because it believes that this Court will be a more favorable forum.[11]

148.    For all these reasons, both traditional and unique to arbitration, the Court should lift the Automatic Stay and allow the Arbitration to proceed against the Debtor, as the FAA requires.

    2.    <u>In Any Event, There is No Justification for Extending the Automatic Stay to Banjo.</u>

149.    It is axiomatic that the Automatic Stay applies only to the Debtor.  *Otoe Cnty Nat'l Bank v. W&P Trucking, Inc.*, 754 F.2d 881, 883 (10th Cir. 1985) ("Section 362(a) automatically

---

[11]    The third, fifth, and sixth *Curtis* factors are not applicable to this case.

stays proceedings against the debtor only and not co-debtors."); *Agrawal v. Ogden*, 753 F. App'x.

644, 648 (10th Cir. 2018) ("[T]he filing of a bankruptcy petition . . . automatically stays

proceedings *against the debtor only* and not co-debtors . . . or other non-debtor parties liable on

the debts of the debtors.") (emphasis in original) (internal quotations and citations omitted); *Fisher*

*Sand & Gravel v. Western Surety Co.*, 2009 WL 4099768, at *4 (D.N.M. Oct. 20, 2009) ("Unless

the bankruptcy court *expressly extends* the stay to others, it applies by its literal terms only to the

debtor.") (emphasis added).

150.    In other words, the Automatic Stay does not, by its terms, protect Banjo.  Nor

should it be extended to Banjo.  Instead, the TRO protecting Banjo from the Arbitration to which

he agreed and in which he participated for months should be dissolved, the Injunction Motion

should be denied, and the Court should allow the Arbitration to proceed as to Banjo.

151.    Contrary to the Debtor's arguments in its Injunction Motion, this is not the type of

"unusual situation" where the Stay should be extended to Banjo.  "It would make no sense to

extend the automatic stay protections to solvent co-defendants," such as Banjo, "because . . . it

would work a hardship on [the Arbitration Participants], by giving an unwarranted immunity from

suit to [Banjo]."  *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1330 (10th Cir. 1984); *see*

*also Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194, 1197 (6th Cir. 1983) ("[I]t would distort

congressional purpose to hold that a third party solvent co-defendant should be shielded against

his creditors by a device intended for the protection of the insolvent debtor and creditors thereof.")

(citations omitted).

152.    To be sure, the Tenth Circuit Court of Appeals has found a "*narrow* exception"

which "allows a stay to be imposed under section 362(a)(1) against a nonbankrupt party in unusual

situations." *Oklahoma Federated Gold and Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 141 (10th Cir. 1994) (emphasis added) (citing *A.H. Robins Co. v. Piccinin,* 788 F.2d 994 (4th Cir. 1986)).

153.    Here, the Debtor conveniently attempts to place Banjo within this narrow exception by pointing out that the Debtor "has indemnified Banjo, meaning that any judgment against Banjo is effectively a judgment against World."  Motion at ¶ 6;[12] *Oklahoma Federated*, 24 F.3d at 141 (noting one such "unusual situation" for extending the Stay to non-debtors includes "when there is such identity between the debtor and the third-party defendant that . . . a judgment against the third-party defendant will in effect be a judgment or finding against the debtor").  But the Debtor's effort to fit a square peg into a round hole here misses the mark for several reasons.

154.    *First*, "[t]he supreme court [of Colorado] has recognized a public policy against indemnifying a party for damages resulting from intentional or willful wrongful acts."  *Bohrer v. Church Mut. Ins. Co.*, 12 P. 3d 854, 856 (Colo. App. 2000); *see also Equitex Inc. v. Ungar*, 60 P.3d 746, 750 (Colo. App. 2002) (same, noting "a court will not enforce a contract that violates public policy even if the failure to do so is 'unfair' to one of the parties.").  Here, the Arbitration Participants' claims in the Arbitration include numerous allegations of fraud and other willful misconduct by Banjo.  *Supra*, ¶¶ 33-62.  Accordingly, whether the Debtor may be obligated to indemnify Banjo is itself tied up in the Arbitration's outcome.  In fact, the limits of the Debtor's indemnification obligation point to a potential conflict between the two in any litigation, including

---

[12]    Although the Debtor purports to quote (Injunction Motion, ¶ 15) a provision of the Debtor's supposed "Operating Declaration" which, if valid, might support an indemnification obligation of the Debtor in favor of Banjo in certain circumstances, the Debtor has not yet attached a copy of its Operating Declaration as an exhibit to any filing with this Court to substantiate its position.

the Arbitration.[13]   Using this potential indemnity obligation to stop the Arbitration from going forward is illogical and improper.

155.    *Second*, even if the Debtor is obligated to indemnify Banjo (and it may not be), that obligation will exist wherever the Parties' dispute proceeds, whether in the Adversary Proceeding or in the Arbitration.   This cannot credibly justify allowing the Debtor to proceed in this Court, rather than in the Arbitration, particularly where, as here, federal law (the FAA) requires a different result.   *Supra*, ¶¶ 78-123.   Instead, any such indemnity obligation favors resolving the Parties' disputes in one fell swoop in the Arbitration, rather than first in this Court between the Arbitration Participants and the Debtor, and then in the Arbitration between the Arbitration Participants and Banjo.

156.    *Third*, even if the Debtor must indemnify Banjo pending the outcome of any dispute, that obligation at best makes Banjo a general unsecured prepetition creditor of the Debtor, just like Frictionless, Z.L. Investment, and CIU.   *See, e.g., In re Amfesco Industries, Inc.*, 81 B.R. 777, 785 (Bankr. E.D.N.Y 1988) (denying administrative expense priority to indemnity claims deriving from pre-petition articles of incorporation and by statute and treating the debtor's current and former officers as general creditors); *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 50 (Bankr. D. Del. 2001) (holding that a contractual right to indemnification entitles officers to only general unsecured creditor status).   Banjo's pre-petition contractual right to indemnity must be determined at some point, as part of the claims procedures before this Court.   But that is a claims dispute between Banjo and the Debtor, and his purported indemnity rights do not themselves justify pulling

---

[13]    The Arbitration Participants note that the Debtor's contention that Banjo may be asserting claims in the Arbitration, in competition with the Debtor and against an alleged common debtor of the Debtor (namely, the Arbitration Participants, which they vehemently deny), points to an additional potential conflict between the litigation interests of the Debtor and Banjo.   *See* ECF Nos. 20, 58, 59.

the multiple claims of the Parties against each other out of the Arbitration and into this Court.  That is the proverbial tail wagging the dog of the Parties' business dispute—and certainly not a basis for *extending* the Debtor's Automatic Stay to Banjo.  *Supra*, ¶ 133.

157.   *Fourth*, the "other considerations" on which the Debtor relies to fit Banjo within the Tenth Circuit's "narrow exception" for extending the Automatic Stay do not hold up to scrutiny.  *See* Injunction Motion, ¶¶ 5-6.  For example, even if this Court were to extend the Automatic Stay to Banjo, that would not extinguish the Arbitration Participants' claims against him; it would merely pause them for the duration of the Debtor's bankruptcy case.  There would still be the possibility for inconsistent adjudications, as the Arbitration against Banjo would simply proceed after the Adversary Proceeding or the Debtor's bankruptcy case concludes, and the Debtor's obligation to indemnify Banjo may well remain as a long-delayed unliquidated contingent claim by Banjo against the Debtor.

158.   The law does not permit extending the Automatic Stay to Banjo simply because he might be liable under the same facts and circumstances imposing liability on the Debtor.  In contrast to the Debtor's fallacious references to the supposed "unusual situations" that exist in this case, numerous courts within and beyond the Tenth Circuit have made clear that the Automatic Stay cannot be extended to non-debtors where the non-debtor is independently liable on a claim asserted by the creditor/plaintiff.  *See, e.g., Globe Constr. Co. v. Oklahoma City Hous. Auth.*, 571 F.2d 1140, 1143 (10th Cir. 1978) (action against debtor's surety did not violate debtor's bankruptcy stay where liability of surety was joint and several to liability of the debtor); *Oklahoma Federated*, 24 F.3d at 142 (declining to extend Automatic Stay to debtor's non-debtor principal

(Blodgett) where claims asserted by Oklahoma Federated against Blodgett were separate and independent from claims asserted against the debtor).[14]

159.    A decision extending the Automatic Stay to Banjo would not only run counter to this consistent line of case law in federal courts, but would unreasonably lower the bar to allowing corporate insiders a "free pass" to bankruptcy protection without filing for bankruptcy whenever they are codefendants with their corporate debtor.

160.    Similarly, the Debtor's claim that being forced to defend the Arbitration would be a "significant and very expensive distraction [for Banjo] at a time when he should focus his efforts on operations and formulating a plan of reorganization" falls flat.  Injunction Motion, ¶ 6.  The Debtor has represented to the Court repeatedly that its exit strategy is a sale of its assets; toward that goal, the Debtor is seeking approval to retain an investment banker and financial advisor.

---

[14]    *See also In re MCSi Inc., Sec. Litig.*, 371 B.R. 270, 272-73 (S.D. Ohio 2004) (declining to stay securities litigation against non-debtor officers of debtor corporation where, under relevant securities laws, officers faced joint and several liability with debtor corporation and could, therefore, be sued independently of debtor); *C.H. Robinson Co., v. Paris & Sons, Inc.*, 180 F.Supp.2d 1002, 1017-19 (N.D. Iowa 2001) (holding that automatic stay of debtor could not be extended to non-debtor co-defendant in action to recover unpaid freight charges where, under applicable federal regulations, debtor and co- defendant were independently  liable to plaintiff); *Willett v. Vitek, Inc.*, 139 B.R. 723, 726-27 (D. Nev. 1992) (declining to extend automatic stay to products liability litigation against non-debtor co-defendant of debtor where defendants were jointly and severally liable to plaintiff); *In re Xtra Petroleum Transp., Inc.*, 473 B.R. 430, 434 (Bankr. D.N.M. 2012) (holding foreclosure sale of stock in debtor owned by non-debtor shareholder did not violate the automatic stay where lender/plaintiff held independent claims against non-debtor and debtor secured by stock); *In re Murall, Inc.*, 118 B.R. 400, 402 (Bankr. D.S.C. 1989) (holding no "unusual circumstances" were present to extend automatic stay to action against guarantors of mortgage debt owed by debtor because  guarantors' liability to lender was independent of debtor's obligations); *In re Harrison*, 82 B.R. 557, 558 (Bankr. D. Colo. 1987) (denying debtor's motion to extend automatic stay to protect non-debtor spouse from IRS collection action on tax debt for which debtor and spouse were jointly and severally liable).  *See also In re Bidermann Indus. U.S.A., Inc.*, 200 B.R. 779, 784 (Bankr. S.D.N.Y. 1996) ("unusual circumstances do not exist where the [non-debtor party] is independently liable, the right to indemnity is not absolute, and the continuation of the suit will not interfere with the bankruptcy.") (internal citations omitted).

Obviously, those experienced professionals have the expertise to conduct the sale process. While Banjo may have some role with diligence issues, it certainly will not be all-consuming.

161.   Further, as demonstrated above, Banjo will have to spend time and effort on the Parties' dispute no matter where it occurs, in this Court or in the Arbitration. *Supra*, ¶¶ 134-35. Indeed, the Debtor elsewhere admits that all of its business operations are "within the exclusive purview of" Banjo. KERP Motion, ECF No. 36 at ¶ 25. The Debtor cannot have it both ways. If Banjo is indeed the only person with knowledge and authority on the Debtor's operations and the key issues relevant to the Parties' disputes—as appears likely from the Debtor's filings in its bankruptcy case and by the Debtor's witness statements filed in the Arbitration to date—Banjo will undoubtedly be a key witness and "distracted" to some degree regardless of where the Debtor's claims are tried.

162.   For all these reasons, there is no legal, logical, or equitable basis for extending the Automatic Stay to Banjo. The TRO to that effect should therefore be dissolved and the Automatic Stay should be lifted to permit the Arbitration to proceed against both the Debtor and Banjo.

**C.    The TRO Should Be Dissolved and the Injunction Motion Should Be Denied Because the Debtor's Request to Enjoin the Arbitration Violates the FAA and Contradicts the Supreme Court's Binding Precedent.**

163.   Because the Parties' agreement to arbitrate under the FAA must be honored, the TRO should be dissolved, and the Court should deny the Debtor's Injunction Motion seeking a preliminary injunction enjoining the Arbitration indefinitely pending the outcome of the Adversary Proceeding.

164.   As Emergency Arbitrator Robertson noted in denying the Debtor's Emergency Arbitration Motion, a movant seeking a preliminary injunction must establish, among other things: (a) a substantial likelihood of prevailing on the merits; (b) that it will suffer irreparable injury if

the injunction is denied; (c) that the threatened injury to itself outweighs the injury that the opposing party will suffer under the injunction; and (d) that the injunction would not be adverse to the public interest.  *See* Koosed Dec., Ex. 17, ¶¶ 35-37; *see also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1065-66 (10th Cir. 2001).  "A preliminary injunction is an extraordinary remedy that is granted only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018).  Here, the Debtor has not met that extremely high burden as to any of the applicable elements.

165.    *First*, the Arbitration Participants do not contest that the Parties' dispute "justif[ies] litigation," but the Debtor has not and cannot come close to demonstrating a likelihood of success on the merits of whether that dispute should be resolved in the Arbitration or the Adversary Proceeding.  Injunction Motion, ¶ 44.  As noted, the FAA mandates that the Parties' dispute be arbitrated; indeed, the Debtor has no non-frivolous basis for contending that the Pre-Petition State Law Claims belong in this Court.  *Supra*, ¶¶ 71-140.  Moreover, and contrary to the Debtor's broad contentions otherwise, its conclusory statements are not sufficient to establish a likelihood of success here.  *See, e.g., Giles v. Alito Partners, LLP*, 762 F. App'x. 505, 509-10 (10th Cir. 2019) (where "only conclusory statements" were alleged and "lacking affirmative evidence," the Court could not find a likelihood of success on the merits); *Escobar v. Reid*, 348 F. App'x 387, 389 (10th Cir. 2009) ("Although [movant's] allegations … are serious, at this stage [the] conclusory statements do not demonstrate a likelihood of success on the merits of his case.").

166.    *Second*, the Debtor has not established that it will suffer irreparable harm if the Arbitration is not enjoined.  The Tenth Circuit requires that the irreparable harm suffered "be both certain and great, and that it must not be merely serious or substantial." *Dominion Video Satellite v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262-63 (10th Cir. 2004) (internal citation and

quotations omitted).  Here, the Debtor essentially concedes the uncertainty of its alleged harm, describing it in an unsubstantiated, conclusory statement as merely "incalculable."  Injunction Motion, ¶ 45.  The Debtor ignores the fact that the same harms that the Debtor falsely claims to have suffered at the hands of the Arbitration Participants would be both addressed and remedied in either the Arbitration or this Court.  In fact, any potential harm to the Debtor will be lessened if the Injunction Motion is denied and the Arbitration is permitted to continue, because the Arbitration will conclude more quickly than would litigation in this Court and the District Court.  That, in turn, would enable the Debtor to save money that can be used to pay its creditors as part of any reorganization plan.

167.    *Third*, by the Debtor's own pleadings, it has an adequate remedy at law in the form of damages.  It is well-settled that, "[i]f damages can compensate a plaintiff, an injunction will not lie."  *Holly Sugar Corp. v. Goshen Co. Coop. Beet Growers Assn.*, 725 F.2d 564, 570 (10th Cir. 1984).  The Debtor has sought an award of money damages in its Eighth through Fourteenth Claims, thus undermining its claim for injunctive relief.  Adversary Complaint, ¶¶ 154-248.

168.    *Fourth*, the Debtor again does not establish that any threatened injury to itself by being forced to arbitrate outweighs the injury that the Arbitration Participants will suffer under the injunction.  Far from it, the Arbitration Participants—including the Debtor's largest unsecured creditor—will be greatly disadvantaged if an injunction is granted.  Beyond being deprived of their bargained-for right to arbitration, the Arbitration Participants have spent substantial time, money, and effort in the Arbitration.  It will hurt them, as well as the Debtor and Banjo, to start the process over from scratch in this Court.

169.    *Fifth*, and finally, an injunction would be adverse to the public interest because it would signal that any party to an arbitration agreement under the FAA can file for bankruptcy and

avoid arbitration if they feel that the Bankruptcy Court would provide a more favorable forum. This would undoubtedly encourage forum shopping, conflicting with this Court's articulated public policy discouraging the same. *See, e.g., Touchstone*, 572 B.R. at 283 ("The Court is concerned that the Debtor has engaged in some last-minute forum shopping that raises equitable considerations. It is apparent that the Debtor filed for bankruptcy primarily to stop the Arbitration and change the decision-maker. That is not the right reason for bankruptcy.").

170.    For all these reasons, the Debtor has failed to satisfy its burden of proving all elements necessary to support an injunction against the Arbitration Participants. Therefore, the Debtor's Injunction Motion should be denied, the TRO should be dissolved, and the Arbitration should be allowed to proceed against both the Debtor and, in all events, against Banjo.

**D.    The Adversary Proceeding Should be Dismissed Under Fed. R. Civ. P. 12(b)(1) or, At a Minimum, Stayed Pending the Outcome of the Arbitration.**

171.    Because the Arbitration must be allowed to proceed under the FAA and the Supreme Court's binding precedent, the Debtor's Adversary Proceeding should be dismissed or, at a minimum, stayed pending the outcome of the Arbitration.

172.    There is currently a split among the Circuit Courts as to whether a motion to compel arbitration should be made under Federal Rule of Civil Procedure 12(b)(1), 12(b)(3), or 12(b)(6). The majority of federal circuits have treated motions to compel arbitration as motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). *See, e.g.*, *Geographic Expeditions, Inc. v. Estate of Lhotka*, 599 F.3d. 1102, 1106–07 (9th Cir. 2010); *U.S. ex rel. Lighting & Power Servs., Inc. v. Inferface Constr. Corp.*, 553 F.3d 1150, 1152 (8th Cir. 2009); *Harris v. United States*, 841 F.2d 1097, 1099 (Fed. Cir. 1988); *Multiband Corp. v. Block*, No. 11–15006, 2012 WL 1843261, at *5 (E.D. Mich. May 21, 2012); *Orange Cnty. Choppers, Inc. v. Goen Techs. Corp.*, 374 F. Supp. 2d 372, 373 (S.D.N.Y. 2005); *MRI Scan Ctr., L.L.C. v. Nat'l Imaging Assocs., Inc.*, No. 13–60051–

- 57 -

CIV, 2013 WL 1899689, at *2 (S.D. Fla. May 7, 2013).  While the Tenth Circuit does not appear to have specifically and explicitly addressed this issue, relevant precedent indicates that a motion to compel arbitration may be brought under Rule 12(b)(1).  *See Getzelman v. Trustwave Holdings, Inc.*, No. 13-CV-02987-CMA-KMT, 2014 WL 3809736, at *1 n.1 (D. Colo. Aug. 1, 2014) (noting that the Court construes the defendant's motion to compel arbitration under the FAA pursuant to Rule 12(b)(1)).  Accordingly, the Arbitration Participants bring this motion to compel arbitration under the FAA, and thereby to dismiss the Adversary Proceeding, pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(1).

173.    For the reasons discussed above, the Parties have agreed to arbitrate all disputes— including any over threshold issues of arbitrability—in the Arbitration, and that agreement must be honored under the FAA.  *Supra*, ¶¶ 71-141.  Accordingly, the Adversary Proceeding—which arises out of "the same facts and circumstances" as the Arbitration and which asserts "nearly identical" claims as the Debtor would assert in the Arbitration—should be dismissed in favor of the Arbitration, where the Parties have vested all jurisdiction to hear their disputes.

174.    In the alternative, this Court is, at a minimum, mandated to stay the Adversary Proceeding pending the Arbitration's outcome, at which point any remaining issues—including any impact on the Debtor's bankruptcy case—can be addressed by this Court.  *See, e.g., Touchstone*, 572 B.R. at 266 ("The FAA requires that federal courts *must*, upon request, stay federal litigation if the disputed issue is arbitrable under an arbitration agreement.  9 U.S.C. § 3.") (emphasis added).  Indeed, courts commonly sever arbitrable claims from non-arbitrable ones and stay an entire litigation where, as here, "the arbitrable claims predominate" and the only potentially nonarbitrable claims "are of questionable merit."  *Chelsea Family Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1200 (10th Cir. 2009); *see also Barnett v. Elite Properties of*

*Am., Inc.*, 252 P.3d 14, 18 (Colo. App. 2010) (noting that "claims that are subject to an arbitration agreement must be arbitrated regardless of their joinder with non-arbitrable claims") (internal citations and quotations omitted).

## CONCLUSION

175.     The Arbitration Participants have demonstrated that, as a matter of law, the Debtor has agreed several times to arbitrate its Claims set forth in the Adversary Complaint and, under the FAA, that agreement must be honored by compelling the Debtor and Banjo to continue asserting their claims in the Arbitration.  Accordingly, the Arbitration Participants respectfully request that this Court (a) grant their motion to compel the Debtor to continue arbitrating the Arbitration under the FAA, including the Debtor's Claims set forth in the Adversary Complaint and allowing the Tribunal to determine the arbitrability of all claims as the Parties agreed; (b) grant the Arbitration Participants relief from the Automatic Stay to allow the Arbitration to proceed against the Debtor; (c) deny the Debtor's Injunction Motion and dissolve the TRO precluding the Arbitration from going forward against the Debtor and Banjo; (d) dismiss or, at a minimum, stay the Adversary Proceeding indefinitely pending the Tribunal's issuance of an award in the Arbitration, at which point this Court can administer in the Debtor's bankruptcy case any claims determined in the Tribunal's award; and (e) grant such other and further relief as the Court deems just and proper.

DATED:  November 1, 2019.

SHERMAN & HOWARD L.L.C.

*s/ Eric E. Johnson*
Peter A. Cal
Eric E. Johnson
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Telephone:  (303) 297-2900
Facsimile:  (303) 298-0940
    E-mail:  pcal@shermanhoward.com
             ejohnson@shermanhoward.com


K&L GATES LLP

*s/ Brian D. Koosed*
Brian D. Koosed
Robert T. Honeywell
1601 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 778-9204
Facsimile:  (202) 778-9100
    E-mail:  Brian.Koosed@klgates.com
             Robert.Honeywell@klgates.com


**Attorneys for Frictionless, LLC, Changzhou Zhong Lian Investment Co. Ltd., Changzhou Inter Universal Machine & Equipment Co., Ltd., and Li Zhixiang**

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2019, I electronically filed the foregoing **ARBITRATION PARTICIPANTS' CONSOLIDATED MEMORANDUM OF LAW: (A) IN SUPPORT OF THEIR MOTIONS TO COMPEL THE DEBTOR TO ARBITRATE PURSUANT TO THE FEDERAL ARBITRATION ACT, FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW ARBITRATION TO PROCEED, AND TO DISMISS UNDER FED. R. CIV. P. 12(b)(1), OR STAY, ADVERSARY PROCEEDING PENDING ARBITRATION; AND (B) IN OPPOSITION TO THE DEBTOR'S MOTION FOR PRELIMINARY INJUNCTION STAYING THE ARBITRATION IN FAVOR OF THE ADVERSARY PROCEEDING AND EXTENDING THE AUTOMATIC STAY TO THE DEBTOR'S PRINCIPAL, DANIEL BANJO** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Aaron J. Conrardy, Esq.
David Wadsworth, Esq.
David Warner, Esq.
aconrardy@wgwc-law.com
dwadsworth@wgwc-law.com
dwarner@wgwc-law.com

Thomas P. Howard
Olayinka L. Hamza
thoward@thowardlaw.com
ohamza@thowardlaw.com

Kevin S. Neiman, Esq.
kevin@ksnpc.com

Debra Piazza
dpiazza@montgomerylittle.com

Nathan G. Osborn, Esq.
nosborn@montgomerylittle.com

Alan K. Motes, Esq.
Alan.Motes@usdoj.gov

U.S. Trustee
USTPRegion19.DV.ECF@usdoj.gov

*s/ Roberta Neal*