# Exhibit 1

IN THE MATTER OF AN ARBITRATION UNDER THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION

**CHANGZHOU ZHONG LIAN INVESTMENT CO. LTD. (A/K/A Z.L. INVESTMENT), INDIVIDUALLY AND ON BEHALF OF FRICTIONLESS, LLC,**

*Claimant*

v.

**DANIEL BANJO, INDIVIDUALLY, AND FRICTIONLESS WORLD LLC,**

*Respondents*

**and**

**FRICTIONLESS, LLC,**

*Nominal Respondent*

---

## DEMAND FOR ARBITRATION

---

April 15, 2019

**K&L GATES LLP**
Brian D. Koosed
1601 K Street, NW
Washington, D.C.

*And*

Kodey M. Haddox
599 Lexington Avenue
New York, New York

**Counsel for the Claimants**

**TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT ............................................................................1

II.    THE PARTIES.................................................................................................3

       A.     Claimant ....................................................................................................3

       B.     Respondents ..............................................................................................4

III.   ARBITRATION AGREEMENT AND GOVERNING LAW .........................5

IV.    FACTUAL BACKGROUND ...........................................................................7

       A.     The Parties Form the Company and Enter into the Frictionless Agreements..........7

       B.     Claimant and Banjo Agreed in the LLC Agreement to
              Certain Non-Compete Terms ....................................................................8

       C.     Claimant and Banjo Agreed in the LLC Agreement to Grant Claimant
              Decision-Making Authority over Certain Aspects of the Company's
              Management................................................................................................9

       D.     Claimant and Banjo Agreed in the LLC Agreement that Frictionless Owns
              Any Intellectual Property Developed by Company Officers and
              Employees................................................................................................12

       E.     Claimant and Banjo Agreed in the LLC Agreement that Books and
              Records Would Be Maintained and that Members Have an Unqualified
              Right to Inspect Them..............................................................................12

       F.     Completely Unbeknownst to Claimant, Banjo Engages in a Fraudulent
              Scheme to Siphon Revenues from the Company into Banjo's Wholly-
              Owned and Controlled Company, World ................................................13

       G.     Banjo Has Taken Various Steps to Conceal His Fraudulent Scheme Using
              World ........................................................................................................17

V.     DESCRIPTION OF CLAIMS ........................................................................19

VI.    APPOINTMENT OF ARBITRATOR.............................................................26

VII.   FURTHER SUBMISSIONS AND RESERVATION OF RIGHTS.................26

VIII.  RELIEF REQUESTED....................................................................................27

1.     In accordance with Rule 4 of the Commercial Arbitration Rules of the American Arbitration Association (the "**Commercial Rules**"), Claimant Changzhou Zhong Lian Investment Co. Ltd. (a/k/a Z.L. Investment) ("**Claimant**" or "**Z.L. Investment**"), on behalf of itself and Frictionless, LLC ("**Frictionless**" or "**the Company**"), a joint venture in which Claimant owns a 90% equity interest, hereby demands arbitration of the dispute described herein under Sections 14.6.1 and 14.6.3 of that certain Operating Agreement of Frictionless, LLC, dated April 11, 2013 (the "**LLC Agreement**")[1], against Claimant's co-owner of the Company, Daniel Banjo ("**Banjo**"), and Banjo's wholly-owned company, Frictionless World LLC ("**World**"), which Banjo used to perpetrate the fraud, breaches, and other misconduct described herein.

## I.     PRELIMINARY STATEMENT

2.     Claimant is an investment entity owned by two members of a prominent Chinese family.  That same family also owns a Chinese company affiliated with Claimant – Changzhou Inter Universal, Machine & Equipment Co., Ltd. ("**CIU**") – which manufactures parts for professional grade power tools and equipment and tractors and other agricultural implements.

3.     In early 2013, CIU sought to increase the market for its products by exploring sales in the United States.  Towards that end, Claimant took a series of steps to engage in a business relationship with Respondent Banjo, as follows.

4.     *First*, on or about March 1, 2013, Claimant and Banjo formed a Colorado limited liability company – Frictionless, LLC – to serve as a U.S. wholesaler of CIU's products to various U.S. retailers of hardware and agricultural tools, including, among others, Wal-Mart, Home Depot, Lowe's, Tractor Supply Company, and Amazon (collectively, the "**Retailers**").

---

[1]     *See* Operating Agreement for Frictionless, LLC, dated April 11, 2013 (annexed hereto as Claimant's Exhibit **C-1**).  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the LLC Agreement.

5.     *Second*, on or about April 11, 2013, Claimant and Banjo signed three agreements: (a) the LLC Agreement, to govern the Company's operations going forward and confirm that Claimant would own 900,000 Membership Interest Units in the Company (90% of the Company's equity) and Banjo would own 100,000 such Units (10% of the Company's equity); (b) a "Funding Agreement," memorializing Claimant's and Banjo's capital contributions to the Company and the allocation thereof (the "**Funding Agreement**"); and (c) an "Employment Agreement," pursuant to which the Company would employ Banjo in a position to be determined by Claimant's Affiliate, Li Zhixiang (the "**Employment Agreement**," together with the LLC Agreement and the Funding Agreement, the "**Frictionless Agreements**").[2]

6.     Since mid-April 2013, CIU has sold its products to Frictionless, with the expectation that Frictionless would then sell those products directly to the Retailers, and that Frictionless' profits would be divided between Claimant and Banjo in accordance with their respective pro rata equity interests in the Company.

7.     However, *and unbeknownst to Claimant until late 2018*, throughout this time Banjo – who ran the Company's day-to-day operations – was using a separate Colorado limited liability company that he alone owned and controlled, World, to siphon off revenues and profits to which Frictionless – and by extension Claimant – was rightfully entitled.

8.     Specifically, and as discussed further below, Banjo's fraudulent scheme has, upon information and belief, operated as follows:  As the parties always planned, CIU sells its products to Frictionless.  But, instead of Frictionless selling those CIU products directly to the Retailers, Banjo has unilaterally caused Frictionless to sell CIU's products to World.  World then

---

[2]     *See* Funding Agreement, dated April 11, 2013 (annexed hereto as Claimant's Exhibit **C-2**) & Employment Agreement, dated April 11, 2013 (annexed hereto as Claimant's Exhibit **C-3**).  No breach of the Funding Agreement is alleged in this matter.

sells CIU's products to the Retailers at an unknown price, which, Claimant believes, reflects a significant "mark-up" from the price at which World bought CIU's products from Frictionless.

9.      By inserting World as a "middleman" into the sale process between Frictionless and the Retailers, Banjo has, upon information and belief, siphoned off substantial revenues and profits from the sale of CIU's products to the Retailers into an entity that Banjo completely owns and controls – World – at the expense of Frictionless, of which Banjo owns only 10% and Claimant owns the rest.  Banjo has also taken steps to conceal his fraudulent scheme by, among other things, refusing to provide documentation to Claimant about Frictionless' sales to World and about World's sales to the Retailers, in breach of the LLC Agreement.

10.     As a direct result of this fraudulent scheme and the misconduct and breaches outlined herein, Claimant has suffered a variety of damages, in an amount to date of at least $100,000 in legal and consultant fees and other expenses, which continue to accrue.  Claimant has also suffered an undetermined amount of lost Frictionless revenue and profits that may well exceed tens of millions of dollars, all of which will be finally determined and quantified at the hearing on the merits in this matter.

## II.     THE PARTIES

### A.     Claimant

11.     Claimant Z.L. Investment is an investment entity organized under the laws of China that was formed for the purpose of investing in the Company.  As noted, pursuant to the LLC Agreement, Claimant owns 90% of Frictionless.

12.     Claimant's details are as follows:

**Name**:        Changzhou Zhong Lian Investment Co. Ltd. (a/k/a Z.L. Investment)

**Address**:     Room 102, No. 18 Xin Ya Road
                 Wujin High-Tech District

Changzhou City
Jiangsu Province, China

13.     All communications to Z.L. Investment related to this arbitration should be sent to

its legal counsel, K&L Gates LLP, whose contact details are set forth below:

Brian D. Koosed
K&L Gates LLP
1601 K Street, NW
Washington, D.C.  20006
P: +1 202 778 9204
F: +1 202 778 9100
brian.koosed@klgates.com

With copy to:

Kodey M. Haddox
K&L Gates LLP
599 Lexington Avenue
New York, NY  10022
P: +1 212 536 3920
F: +1 212 536 3901
kodey.haddox@klgates.com

**B.      Respondents**

14.     The Respondents are:  (i) Daniel Banjo; and (ii) Frictionless World LLC.

15.     Banjo is an individual residing in Colorado with a business address located at

1100 W. 120th Avenue, Suite 600, Westminster, Colorado.  As discussed, Banjo owns 10% of

the Company's equity.

16.     World is a limited liability company organized under the laws of the State of

Colorado with its registered business address at 1942 Broadway, Suite 210, Boulder, Colorado.

World sells tools under the brand names "Dirty Hand Tools," "RanchEx," and "Vinsetta" – i.e.,

the same brands sold by Frictionless, as noted below.  Upon information and belief, World also

sells other tools under additional brand lines named "Redback" and "Trophy Strike."

- 4 -

17.     Upon information and belief, Banjo owns 100% of World's membership interests.

18.     Claimant is not aware of Respondents having retained counsel in this matter. Upon information and belief, Thomas P. Howard has previously represented Banjo and World in prior litigation matters and has an address at:

> Thomas P. Howard, LLC
> 842 West South Boulder Road, Suite 100
> Louisville, CO 80027

19.     Nominal Respondent Frictionless, LLC is a Colorado limited liability company with a business address located at 1100 W. 120th Avenue, Suite 600, Westminster, Colorado. Frictionless sells professional grade outdoor power equipment, tractors and other agricultural tools and equipment under the brand names "Dirty Hand Tools," "RanchEx," and "Vinsetta."

## III.     ARBITRATION AGREEMENT AND GOVERNING LAW

20.     Section 14.6 of the LLC Agreement is entitled "**Arbitration; Consent to Jurisdiction.**" Section 14.6.1 of the LLC Agreement provides as follows:

> 14.6.1.   Arbitration.   Each Member [Banjo and Z.L. Investment] and Li, on his, her, or its own behalf and on behalf of the Company, hereby agrees to submit all controversies, claims and matters of difference arising under or relating to this Agreement or the Company, which cannot be resolved between the Members and Li, to arbitration in accordance with the provisions and procedures set forth herein, except for a suit for injunctive relief, which may be brought in any court in the State of Colorado, United States pursuant to Section 14.6.2.  Without limiting the generality of the foregoing, the following shall be considered controversies for this purpose:  (a) all questions relating to the interpretation or breach of this [LLC] Agreement, (b) all questions relating to any representations, negotiations and other proceedings leading to the execution of this Agreement, the formation of the Company, or the issuance of Membership Interests, and (c) all questions as to whether the right to arbitrate any such question exists. Notwithstanding the foregoing, each Member, Li, and the Manager shall have the right to seek and obtain such temporary or preliminary injunctive relief from a court of competent jurisdiction

to which it may be entitled pending a final determination by arbitration of the dispute to which such relief relates.

21.     Section 14.6.1 constitutes a broad arbitration agreement.

22.     Section 14.6.3 of the LLC Agreement further provides the following arbitral procedural mandate:

> 14.6.3.   <u>Procedures</u>.   Such arbitration procedures shall be conducted before a panel of three arbitrators, sitting in a location selected by mutual agreement within the City of Denver, Colorado in accordance with the rules for commercial arbitration of the American Arbitration Association then in effect – with each Party selecting one arbitrator and the two arbitrators so selected themselves selecting the third – except that:  (i) each arbitrator shall agree to treat as confidential all evidence and other information presented by the parties; (ii) the arbitrators shall have no authority to amend or modify any of the terms of this Agreement or of any related agreement; and (iii) the arbitrators shall have fourteen (14) days from the later of the closing statements or the submission of post-hearing briefs by the parties to render their decision.  The arbitration shall take place entirely in English.

23.     Accordingly, the place of arbitration is Denver, Colorado.  Pursuant to Section 14.6.3 of the LLC Agreement, arbitration "shall be conducted before a panel of three arbitrators, sitting in a location selected by mutual agreement within the City of Denver, Colorado."

24.     Also pursuant to Section 14.6.3 of the LLC Agreement, the arbitration agreement provides for resolution by a "panel of three arbitrators . . .  – with each Party selecting one arbitrator and the two arbitrators so selected themselves selecting the third."

25.     Pursuant to Section 14.7 of the LLC Agreement, the arbitration agreement further provides that, "[i]n any dispute that arises under this [LLC] Agreement, the prevailing Party shall be entitled to recover reasonable attorneys' fees and costs, including court costs and arbitration fees, from the losing Party."

26.     The governing law is Colorado law.   Section 14.5 of the LLC Agreement provides:

> 14.5   **Applicable Law**.   This Agreement shall be construed in accordance with and governed by the laws of the State of Colorado, United States, excluding its conflicts of laws rules.[3]

27.     According to the practice of the parties in their prior dealings, this Demand for Arbitration is being sent via email with a copy contemporaneously delivered by FedEx to the Respondents' addresses listed above.

## IV.   FACTUAL BACKGROUND

### A.     The Parties Form the Company and Enter into the Frictionless Agreements

28.     Claimant and Banjo formed Frictionless in March 2013 and executed the Frictionless Agreements on or about April 11, 2013.   Among other things, Section 2.5 of the LLC Agreement made clear that "the business of the Company shall include the manufacture and distribution of tools and power equipment . . . ."   And Schedule A to the LLC Agreement made clear that Claimant would own 90% of the Company's Membership Interests and Banjo would own the other 10%, consistent with each of their respective capital contributions of $1.8 million and $200,000, pursuant to the Funding Agreement.

29.     As is common, the LLC Agreement defines the rights and obligations of Claimant and Banjo with respect to the Company.   The provisions of the LLC Agreement most pertinent to the parties' present dispute are as follows.

---

[3]   Sections 6(a) of the Employment Agreement and Section 9 of the Funding Agreement similarly provide for Colorado governing law.   *See* Exhs. C-2 & C-3.

**B.** **Claimant and Banjo Agreed in the LLC Agreement to Certain Non-Compete Terms**

30. Article 4 of the LLC Agreement is entitled "Representations, Warranties, and Covenants." Pursuant to that Article, Claimant and Banjo made the following representations and warranties pertinent to this dispute.

31. *First*, pursuant to Section 4.4 of the LLC Agreement, Claimant and Banjo represented and warranted that they would not compete with the Company's business, as follows:

> 4.4. **Non-Competition**. While a Member is a member of the Company, and for Li, while Z.L. [Claimant] is a Member of the Company, except as otherwise provided herein, each Member, and Li, agrees that he, she, or it shall, and he, she, or it shall cause his, her, or its Affiliates, to ***not compete with the Company, directly or indirectly, in a business substantially similar to the business of the Company*** or any of its subsidiaries anywhere where the Company does business, or the distribution of any products distributed by the Company or any of its subsidiaries anywhere in the world. ***For purposes of this Agreement, direct and indirect competition shall include, but not be limited to,*** having any business or employment relationship with any past or present client, supplier, or employee of the Company, and ***any competition as a sole proprietor, partner, corporate officer, director, shareholder, member, manager, employee, agent, independent contractor, trustee, or in any other manner in which such Member or Li, or its or his Affiliates, holds any beneficial interest in a competitive business, derives any income from such business, or provides any service, including the benefit of his, her, or its reputation or knowhow, to such business.*** For purposes of clarification, the sale of parts and products that are materially different from parts and products that the Company sells or intends to sell shall not be considered to be competing with the Company.

32. *Second*, pursuant to Section 4.6 of the LLC Agreement, Claimant and Banjo agreed to indemnify each other for any breach of the representations or warranties set forth in Article 4 of the LLC Agreement:

4.6   **Indemnification for Breach**.  *Each Member*, and Li, on behalf of such Member (or, for Li, on behalf of himself) and his, her, or its successors and assigns, *shall defend, indemnify and hold harmless the other Members, Li, and the Company from and against any and all claims*, threats, liabilities, taxes, interest, fines, penalties, suits, actions, proceedings, demands, damages, losses, costs and expenses (*including attorneys' and experts' fees and court costs*) of every kind and nature arising out of, resulting from, or in connection with *any breach of a representation and warranty or covenant set forth in this ARTICLE 4.*

C.    **Claimant and Banjo Agreed in the LLC Agreement to Grant Claimant Decision-Making Authority over Certain Aspects of the Company's Management**

33.     Pursuant to Article 5 of the LLC Agreement, entitled "Company Management," Claimant and Banjo agreed to the following terms governing the management of Frictionless' business:

34.     *First*, under Section 5.3 of the LLC Agreement, Claimant and Banjo agreed that certain business decisions would require the approval of a Majority Voting Interest of the Company's Members:

5.3.   **Decisions that Require Member Approval**.  *Neither the Manager, nor any Member, Officer, employee, agent or representative of the Company, shall have any authority to bind or take any action on behalf of the Company with respect to any Member Decision unless such Member Decision has been approved by a Majority Voting Interest* as provided in Section 6.2 or Section 6.3.  Each of the following matters shall constitute a "Member Decision":

5.3.1   amending the Company's articles of organization or this Agreement; . . .

5.3.6   making any expenditure of the Company which is not in furtherance of the Business;

- 9 -

35.     Because, pursuant to the LLC Agreement, Claimant owns 90% of the Company's Membership Interests, by definition its approval was required for any decision that needed a Majority Voting Interest under Section 5.3 of the LLC Agreement.

36.     *Second*, under Section 5.4 of the LLC Agreement, Claimant and Banjo agreed that for certain "Major Decisions," the approval of Claimant's Affiliate, Li, would also be required:

> 5.4.   **Major Decisions that Require Li's Approval**.   *Neither the Manager, nor any Member, Officer, employee, agent or representative of the Company, shall have any authority to bind or take any action on behalf of the Company with respect to any Major Decision unless such Major Decision has been approved by Li.*   . . . .   Each of the following matters shall constitute a "Major Decision":
>
> 5.4.4   the guaranty by the Company of the obligations of any third party;
>
> 5.4.5   *the investment or use of the Company's funds outside of the ordinary course of the Company's business (such as the purchase of securities);*
>
> 5.4.6   *licensing, transferring, or otherwise providing rights to a third party in any of the Company's intellectual property, except as otherwise provided by this Agreement;*
>
> 5.4.7   *making any single expenditure of the Company in excess of $20,000 or any contract or commitment of the Company which could result in obligations of the Company that exceed $200,000 in any one year;*
>
> 5.4.8   making any loan or other incurrence of debt of the Company in excess of $50,000 (excluding trade payables or receivables in the ordinary course of business);

37.     *Third*, under Section 5.5 of the LLC Agreement, Claimant and Banjo set the scope of the Manager's and Officers' duties in operating the Company, and expressly agreed that such individuals would owe fiduciary duties to the Company, as follows:

> 5.5.   **Duties**.   ***The Manager and each Officer shall carry out his or her duties in good faith.***   The Manager shall devote such time to the business and affairs of the Company for the efficient carrying on the Company's business.   ***The Manager and Officers shall have fiduciary duties to the Company***, and the Manager's and the Officers' duties and liabilities are restricted by the provisions of this Agreement to the extent that any such provisions restrict the duties and liabilities of the Manager and the Officers otherwise existing at law or in equity.

38.   *Fourth*, under Section 5.9 of the LLC Agreement, Claimant and Banjo agreed that the Manager and Officers would have limited liability for their actions, except for certain instances of misconduct, as follows:

> 5.9   **Exculpation and Indemnification.**
>
> 5.9.1   Limitation of Liability.   ***In carrying out their respective duties hereunder, the Manager and the Officers shall not be liable to the Company nor to any Member for their good faith actions or failures to act***, nor for any errors of judgment, nor for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement, ***but shall be liable only for fraud, willful misconduct or gross negligence in the performance of their respective duties under this Agreement***.

39.   *Finally*, under Section 5.12 of the LLC Agreement, Claimant and Banjo agreed that Claimant's Affiliate, Li, would need to approve any "Affiliate Transactions," as follows:

> 5.12   **Affiliate Transactions.**   ***Upon the approval of Li***, the Manager may cause the Company to enter into transactions, agreements, contracts and undertakings with the Manager, any Member, or any of their respective Affiliates, ***so long as such transactions, agreements, contracts or undertakings are in the ordinary course of business and on commercially reasonable terms and conditions***.

**D.** **Claimant and Banjo Agreed in the LLC Agreement that Frictionless Owns Any Intellectual Property Developed by Company Officers and Employees**

40.     Article 9 of the LLC Agreement is entitled "Intellectual Property." Pursuant to Section 9.3 of that Article, Claimant and Banjo agreed that the Company would own any intellectual property created by the Company's Officers or Employees, as follows:

> 9.3     **Ownership of Company Intellectual Property.** *All intellectual property developed by the Officers, employees, or otherwise specifically for the Company shall be the property of the Company.* And the Company shall provide CIU with a worldwide, perpetual, royalty free license to all of its intellectual property once the intellectual property is developed.

**E.** **Claimant and Banjo Agreed in the LLC Agreement that Books and Records Would Be Maintained and that Members Have an Unqualified Right to Inspect Them**

41.     Pursuant to Section 10.1 of the LLC Agreement, Claimant and Banjo agreed that the Company would maintain accurate books and records, as follows:

> 10.1.     **Books**. *The Manager shall cause the Company to maintain complete and accurate books of account of the Company's affairs* at the principal office of the Company. The Company's books shall be kept *in accordance with generally accepted accounting principles, consistently applied*, and on an accrual basis method of accounting . . . .

42.     Pursuant to Section 10.3 of the LLC Agreement, Claimant and Banjo further agreed that any Member could inspect the Company's books and records upon notice, as follows:

> 10.3.     **Inspection of Documents**. Each Member, and Li, *shall have the right to inspect, review, make copies of, and audit all agreements, documents, records and reports relating to the business of the Company*, and all other items prepared by or obtained by the Manager in connection with the performance of his duties hereunder, in each case at such Member's (or Li's, as applicable) expense during reasonable business hours and with at least five (5) Business Days prior written notice to the Manager.

**F.      Completely Unbeknownst to Claimant, Banjo Engages in a Fraudulent Scheme to Siphon Revenues from the Company into Banjo's Wholly-Owned and Controlled Company, World**

43.      Since entering into the Frictionless Agreements in April 2013, Banjo has effectively served as the Company's Manager and President.  Banjo had this role largely because he is a Colorado resident, whereas Claimant is a Chinese investment fund whose representatives only visit Frictionless' Colorado offices periodically.  As a result, Claimant has generally relied on Banjo to run the Company's day-to-day operations in Colorado since April 2013.

44.      Throughout this time, Banjo and representatives of Z.L. Investment have conferred periodically about the Company's business operations and performance.  And Banjo has continued to cause Frictionless to submit purchase orders to CIU since April 2013, so that Frictionless could purchase tools and other equipment from CIU.

45.      Aside from these interactions, however, Claimant has relied on Banjo to do what he agreed to do under the LLC Agreement – run the Company in good faith, seek Claimant's approval for Major Decisions and other items requiring the approval of a Majority Voting Interest, and provide an annual presentation summarizing the Company's financial performance.  Rather than abiding by his obligations under the LLC Agreement, Banjo instead has taken a series of steps to use his company, World, to defraud the Company and, by extension, Claimant.

46.      Due to Banjo's substantial efforts to cover up his fraudulent scheme, detailed further below, Claimant did not learn of any aspect of Banjo's fraud or misconduct using World until November 2018.  Since that time, Claimant has unearthed the following information which, upon information and belief, shows that Banjo's fraudulent scheme has operated as follows from approximately April 2013 to the present:

47.    *First*, upon information and belief, Banjo formed World in May 2012, before entering into the Frictionless Agreements with Claimant.  Claimant had no knowledge of World at that time and did not learn about Banjo's creation or use of World until November 2018.

48.    *Second*, Banjo inserted World – an entity that he alone owned and controlled – as a "middleman" for the sale of CIU's products, acting in between Frictionless and the Retailers. Specifically, from the Company's inception, Claimant understood that, once Frictionless purchased machinery and other equipment from CIU, Frictionless would then sell those CIU products directly to the Retailers.  But, upon information and belief, Banjo had other plans.

49.    Using his control of Frictionless' day-to-day operations – resulting from his role effectively acting as Frictionless' Manager and President – Banjo unilaterally caused Frictionless to sell CIU's products to World, not to any of the Retailers.  In fact, to date, Banjo has apparently **never** permitted Frictionless to sell CIU's products to any of the Retailers.  Instead, completely unbeknownst to Claimant until November 2018, World is and always has been Frictionless' **only** customer, ever.

50.    *Third*, by inserting World as a "middleman," Banjo has, upon information and belief, caused World to sell CIU's products to the Retailers at a price that reflects a significant "mark-up" from the price at which World bought CIU's products from Frictionless.  Indeed, as detailed further below, the prices at which both:  (a) Frictionless sells CIU's products to World; and (b) World sells those same products to the Retailers, are unknown at this time because Banjo and those working for him – including, among others, World's Chief Financial Officer Rob Germundson ("**Germundson**") – have refused to disclose that information to Claimant or its representatives, despite repeated requests.

51.    *Fourth*, in addition to siphoning off revenues and profits from Frictionless'
financials onto World's, Banjo has also taken efforts to foist World's expenses onto Frictionless'
financials.  Specifically, Claimant discovered for the first time in February 2019 that each and
every employee currently working to sell CIU's products to the Retailers is formally employed
by World, such that the Company itself only has one employee – Claimant's designee.
Nevertheless, upon information and belief, Banjo has unilaterally allocated *all* employee
expenses to the Company, even the employee expenses associated with those products sold by
World that are not made by CIU and that are completely separate from Frictionless' business.

52.    This manipulation of the Company's financials has also extended to other costs
and expenses.  For example, even though World – and by extension Banjo – is apparently
reaping the benefit of all sales to the Retailers, Banjo has, upon information and belief, allocated
all professional fees and warehouse and administrative expenses to Frictionless' financials.

53.    The limited information to which Claimant has access – derived almost
exclusively from summaries of the Company's financials – paints a stark picture of the dramatic
increase in Frictionless' expenses since 2014, while the Company's overall business performance
has declined due to Banjo's diversion of the Company's revenues onto World's financials.
Consider:

- The Company's Payroll Expenses Have Increased:  From
  2014 to 2018, Frictionless' payroll expenses grew from
  approximately $808,000 (4.1% of 2014 revenue) to nearly
  $2.8 million (12.9% of 2018 revenue).  This was a 345%
  increase that far outpaced the growth of Frictionless'
  revenue or cost of good sold during that time.

- The Company's Warehouse Expenses Have Increased:
  From 2014 to 2018, Frictionless' warehouse expenses grew
  from approximately $260,000 (1.3% of 2014 revenue) to
  over $1.86 million (8.6% of 2018 revenue).  This was a
  715% increase.

- The Company's Professional Fees Have Increased:  From 2014 to 2018, Frictionless' professional fees grew from approximately $150,000 (.75% of 2014 revenue) to $436,000 (2.0% of 2018 revenue).   This was a 290% increase.

- The Company's Revenue Has Not Kept Pace:  From 2014 to 2018, the Company's revenue ranged from just under $20 million in 2014, to a low of $12.6 million in 2016, and then a high of $23.7 million in 2018.  In all events, revenue has been far outpaced by the dramatic increase in Frictionless' expenses due to Banjo's fraud.

- The Company is Operating at a Substantial Loss:  Despite generating record revenue in 2018, the Company still had a cumulative net operating loss as of December 31, 2018 of approximately $10.3 million.

54.    In sum, while the accounting mechanics may be complex, the end result of Banjo's fraud is quite clear:  Frictionless has completely financed World's business and paid for all of World's expenses, while World has captured most, if not all, of the revenue and profits from the sale of CIU's products to the Retailers.   In fact, Germundson has admitted, in discussions with Claimant's representatives, that Frictionless pays for World's expenses, *even for the costs associated with those products that World sells under the brand names "Redback" and "Trophy Strike,"* which are not made by CIU and which are completely separate from the Company's business.

55.    This fraud has dramatically harmed the Company's business prospects, both on the revenue side and the expense side of the Company's income statement.  Making matters worse, Banjo has taken steps to cover up this fraud by, among other things, refusing to provide documentation to which Claimant is plainly entitled.

**G.      Banjo Has Taken Various Steps to Conceal His Fraudulent Scheme Using World**

56.     As noted, Claimant did not learn of Banjo's fraudulent scheme using World until November 2018.  Upon doing so, Claimant has taken a number of steps to learn more about Banjo's fraudulent scheme, how it was perpetrated, and how much World has ultimately siphoned off from the Company and Claimant, either in the form of stolen revenue and profits or unreimbursed expenses.  At every turn in this process, Banjo and his subordinates at World have stonewalled Claimant and its designated representatives, in an effort to conceal Banjo's fraud.

57.     For example, Claimant is aware of no business justification for Banjo's use of World as a "middleman" for the sale of CIU's products.  Nor has Banjo or any of his subordinates at World – including, but not limited to, Germundson – provided such a justification to Claimant or its representatives despite repeated requests.

58.     Instead, despite admitting that World is Frictionless' *only* customer, Banjo and his subordinates at World have taken the incredible position that any information about World – including, for example, how much World pays Frictionless for CIU's products, and how that price is determined – is "outside the scope" of Claimant's information rights under the LLC Agreement, because World is wholly-owned and controlled by Banjo.  Specifically, they have told Claimant and its representatives that "if it's in [Banjo's] company, it's out of scope" for a review of the Company's books, even though such sales and other data plainly relates to, and materially impacts, the Company's financial results.

59.     In essence, then, Banjo and his subordinates at World – including, but not limited to, Germundson – have refused to provide Claimant with information about the Company's agreements with its only customer, World, in breach of Section 10.3 of the LLC Agreement, which entitles Claimant to review "***all agreements . . . relating to the business of the Company***."

- 17 -

60.     Similarly, Banjo and his subordinates at World – including, but not limited to, Germundson – have refused to provide Claimant with any payroll register information.  In other words, even though Banjo and his subordinates at World have admitted that the Company is paying for all of World's employees, they claim that the Company is not entitled to know who is employed by World or even how much the Company is paying to employ them.

61.     Finally, Banjo and his subordinates at World – including, but not limited to, Germundson – have refused to provide Claimant with any information concerning World's sales to the Retailers, claiming this, too, is "out of scope," and that the Retailers only enter into oral contracts, not written ones.  To the best of Claimant's knowledge and belief, these statements are false and contrary to standard practice in the industry.  They are further contradicted by Banjo's own recent statements to Claimant's representatives that one Retailer, Lowe's, has awarded certain business for a period of thirty (30) months, i.e., for a specific and defined contract term.

62.     To date, Claimant has incurred $100,000 in legal, consultant, and other expenses to investigate Banjo's fraudulent scheme using World.  Those expenses continue to accrue.

63.     As a result of Banjo's and his subordinates' repeated efforts to mislead Claimant and its representatives and to hide relevant information to which Claimant is entitled, however, Claimant has been unable, thus far, to determine either:  (a) the exact amount of the Company's revenue that Banjo has siphoned off into World; or (b) the exact amount of World's expenses that Banjo has fraudulently foisted onto the Company's financials.

64.     Because of Banjo's repeated and consistent efforts to cover up his fraud, and to direct his subordinates at World to do the same for him, Claimant believes that any further effort to ask Banjo to disclose the relevant information or to otherwise remedy the harm that he and his wholly owned company, World have caused to Claimant and the Company would be futile.

- 18 -

## V.     DESCRIPTION OF CLAIMS

65.     As set forth in Paragraphs 1 through 64 above, Banjo has committed a variety of fraudulent misconduct – and breached various provisions of the LLC Agreement – through his fraudulent scheme to siphon off revenues from the Company into his wholly-owned entity, World, while simultaneously foisting World's expenses onto the Company's financials. Claimant anticipates providing evidence supporting the following claims at the hearing in this matter.

66.     *Fraud (Against Banjo and World).*  Banjo, acting on behalf of himself and of World, knowingly made deceptive and material misrepresentations and omissions to Claimant and its representatives regarding the conduct of the Company's business.  Specifically, instead of selling CIU's products directly from Frictionless to the Retailers as he told Claimant would occur, Banjo devised and engaged in a fraudulent scheme using his wholly-owned and controlled entity, World, to:  (a) siphon off the Company's revenue into World, so that Banjo and World alone would profit from the sale of CIU's products to the Retailers; and (b) foist all of World's expenses, whether or not associated with the Company's business, onto the Company's financials.  Banjo and World further fraudulently concealed this scheme by, among other things, refusing to provide documentation to which Claimant is entitled.

67.     *Constructive Fraud (Against Banjo and World).*   As a Member and the Company's effective Manager, Banjo owed Frictionless and Claimant Z.L. Investment fiduciary duties.  Banjo violated his fiduciary duties by making deceptive and material misrepresentations and omissions to Claimant and its representatives regarding the conduct of the Company's business.   Specifically, instead of selling CIU's products directly from Frictionless to the Retailers as he told Claimant would occur, Banjo devised and engaged in a fraudulent scheme

using his wholly-owned and controlled entity, World, to: (a) siphon off the Company's revenue into World, so that Banjo and World alone would profit from the sales of CIU's products to the Retailers; and (b) foist all of World's expenses, whether or not associated with the Company's business, onto the Company's financials. Banjo and World further fraudulently concealed this scheme by, among other things, refusing to provide documentation to which Claimant is entitled.

68.      *Civil Theft (Against Banjo and World)*.   Through their fraudulent scheme, Banjo and World knowingly obtained, retained, and exercised control over (a) the revenues from the sales of CIU's products to the Retailers that properly belonged to the Company; and (b) the funds from the Company and/or Claimant that were used to pay all of World's expenses, all without required authorization and through other deceptive means, and with the intent to permanently deprive the Company and Claimant of those revenues and funds. Pursuant to Colorado law (C.R.S.A. § 18-4-405), the Company and Claimant are entitled to treble damages from Banjo and World for their theft from the Company.

69.      *Conversion (Against Banjo and World)*.   Through their fraudulent scheme, Banjo and World engaged in acts of ownership over (a) the revenues from the sales of CIU products to retailers that belonged to the Company; and (b) the funds from the Company and/or Claimant that were used to pay all of World's expenses, without required authorization and through other deceptive means, so as to deprive the Company and Claimant of the use of those revenues and funds.

70.      *Civil Conspiracy (Against Banjo and World)*.   Banjo and World acted in concert with the goal of committing fraud, constructive fraud, civil theft, and conversion against the Company and Claimant. Specifically, Banjo and World acted together to concoct and engage in a fraudulent scheme to (a) siphon off the Company's revenue into his wholly-owned and

controlled entity, World, and (b) foist World's expenses onto the Company's financials.  Banjo and World further fraudulently concealed this scheme by, among other things, refusing to provide documentation to which Claimant is entitled.

71.     *Breach of Contract (Against Banjo for Breach of the Non-Compete Provisions)*. Pursuant to Section 4.4 of the LLC Agreement, Banjo represented and warranted to Claimant that he would not compete in a substantially similar business with the Company while a Member. The terms of these "Non-Compete Provisions" were reasonable with respect to their duration, geographic scope, and proscription.  Banjo breached those Non-Compete Provisions by, among other things:  (a) operating World, his wholly-owned and controlled entity, to directly compete with, and convert the revenues for CIU products that belonged to, Frictionless, and (b) using the Company to pay for all of World's expenses, whether or not they were associated with the Company's business, while World captured all of the revenue from the sale of CIU's products that belonged to Frictionless.  Banjo is therefore liable to Claimant and must indemnify Claimant for his breaches pursuant to Section 4.6 of the LLC Agreement.

72.     *Breach of Contract (Against Banjo for Not Obtaining Required Approvals)*. Pursuant to Sections 5.3, 5.4, and 5.12 of the LLC Agreement, Banjo was required to obtain Claimant's and/or Li's approval prior to making certain decisions involving, among other things, using Company funds for purposes other than furthering Frictionless' business, making expenditures above certain limits, transferring or providing rights to the Company's intellectual property to a third party, and/or causing Frictionless to transact business with Banjo or one of his affiliates.  Banjo breached all of these provisions in various ways, including, but not limited to, by (a) causing Frictionless to sell CIU's products only to World, Banjo's wholly-owned and controlled entity, (b) providing World with access and rights to intellectual property properly

- 21 -

belonging to Frictionless, and (c) expending Frictionless' funds and resources to further the interests of World rather than the Company – all without obtaining the required approvals of Claimant and/or Li.

73. *Breach of Contract (Against Banjo for Failure to Account, Report, and Allow Inspection)*. Pursuant to Section 10.1 of the LLC Agreement, Banjo, who effectively served as the Company's Manager and President, was required to cause Frictionless to maintain complete and accurate books of account of the Company's affairs in accordance with generally accepted accounting principles. And, pursuant to Section 10.3 of the LLC Agreement, Claimant has the right to inspect, review, and audit all of the agreements, documents, records and reports relating to the Company's business, as well as all other items prepared or obtained by Banjo in connection with his role as the effective Manager and President of Frictionless. In an apparent effort to conceal his fraudulent scheme using World, Banjo breached these provisions of the LLC Agreement by, among other things, either not maintaining accurate books and records for the Company, or by repeatedly refusing to provide Claimant with information about: (a) the Company's agreements with its only customer, World; (b) how much World pays Frictionless for CIU's products, and how that price is determined; (c) how much Frictionless is paying for all of World's employee, warehousing, professional, and other expenses; and/or (d) World's sales of CIU's products to the Retailers, including any mark-up of the price paid by World to Frictionless for those products.

74. *Breach of Contract (Against Banjo for Misappropriation of Company Intellectual Property)*. Pursuant to Section 9.3 of the LLC Agreement, Banjo, as a Member and the Company's effective Manager and President, agreed that all intellectual property created by the Company's Officers or employees would belong to the Company. Upon information and belief,

Banjo breached that contractual obligation by, among other things:  (a) assigning all intellectual property created during the Company's business operations to World and/or otherwise giving World access to such intellectual property belonging to the Company; and (b) using World to employ all employees working on the Company's business, in order to evade the applicable provisions of the LLC Agreement governing the Company's ownership of intellectual property.

75.     *Breach of Contractual Fiduciary Duties (Against Banjo for Willful Misconduct, Fraud, and Gross Negligence and Otherwise Failing to Act in Good Faith)*.  Pursuant to Section 5.5 of the LLC Agreement, Banjo, as the Company's effective Manager and President, owed fiduciary duties to Frictionless and Claimant, including the duty to carry out his duties in good faith.  Banjo breached this duty by devising and engaging in a fraudulent scheme to (a) siphon off the Company's revenue into his wholly-owned and controlled entity, World, and (b) foist World's expenses onto the Company's financials, whether or not those expenses were associated with the Company's business.  Banjo has also taken steps to cover up this fraud by, among other things, refusing to provide documentation to which Claimant is entitled.   Banjo's conduct constitutes fraud, willful misconduct, and gross negligence; Banjo is therefore not entitled to the benefit of the limitations on liability set forth in Section 5.9.1 of the LLC Agreement.

76.     *Breach of Fiduciary Duty (Against Banjo for Breaching His Duty Not to Take LLC Property)*.  As a Member and the Company's effective Manager, Banjo had a common law fiduciary duty to account to the Company and Claimant Z.L. Investment, and hold as a trustee for the Company, any property, profit, or benefit derived by Banjo during the conduct of the Company's business.  Banjo breached that duty by, among other things, devising and engaging in a fraudulent scheme using his wholly-owned and controlled entity, World, to (a) siphon off the Company's revenue into World, and (b) foist World's expenses onto the Company's financials,

whether or not those expenses were associated with the Company's business.  Banjo has further

breached that duty by taking steps to cover up his fraudulent scheme using World.

77.    *Breach of Fiduciary Duty (Against Banjo for Usurpation of Corporate*
*Opportunity)*.  As a Member and the Company's effective Manager, Banjo had a common law

fiduciary duty not to appropriate any business opportunity of the Company.  Frictionless had an

actual and expected interest in the revenue from the sale of CIU's products to the Retailers.

Instead of Frictionless directly selling CIU's products to the Retailers, Banjo used World –

which he alone owned and controlled – to usurp this corporate opportunity from the Company,

directing Frictionless to sell CIU's products to World as a "middleman," in order to siphon

revenue from the Company and hoard it for himself and World, at the Company's and

Claimant's expense.

78.    *Breach of Fiduciary Duty (Against Banjo for Breach of the Duty of Loyalty and to*
*Avoid Conflict of Interest)*.  As a Member and the Company's effective Manager, Banjo had a

common law fiduciary duty to serve the Company's interests loyally and to refrain from acting

on behalf of a party whose interests were adverse to the Company.  Banjo breached this fiduciary

duty by causing Frictionless to use World – which Banjo alone owned and controlled – as its

only customer so that Banjo could siphon off the Company's revenue into World.  Banjo further

breached that fiduciary duty by fraudulently foisting World's expenses onto the Company's

financials, whether or not those expenses were associated with the Company's business.

79.    *Breach of Fiduciary Duty (Against Banjo for Breach of the Duty of Due Care)*.
As a Member and the Company's effective Manager, Banjo had a common law fiduciary duty to

refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or

knowing violations of law.  Banjo breached this duty by devising and engaging in a fraudulent

- 24 -

scheme using his wholly-owned and controlled entity, World, to, among other things, (a) siphon off the Company's revenue into World, (b) foist World's expenses onto the Company's financials, whether or not they were associated with the Company's business, and (c) cover up his and World's fraud by, among other things, refusing to provide documentation to Claimant.

80.     *Breach of Fiduciary Duty (Against Banjo for Breach of the Duty of Good Faith and Fair Dealing).*  As a Member and the Company's effective Manager, Banjo had a common law duty to discharge his duties consistent with the contractual obligation of good faith and fair dealing.  Banjo breached this duty by devising and engaging in a fraudulent scheme using his wholly-owned and controlled entity, World, to, among other things, (a) siphon off the Company's revenue into World, (b) foist World's expenses onto the Company's financials, whether or not those expenses were associated with the Company's business, and (c) cover up his and World's fraud by refusing to provide documentation to which Claimant is entitled.

81.     *Negligent Misrepresentation.*  As a Member and the Company's effective Manager, Banjo owed Frictionless and Claimant fiduciary duties.  Banjo breached his fiduciary duties by negligently making deceptive and material misrepresentations and omissions to the Company, and to Claimant and its representatives, regarding the conduct of the Company's business.  Specifically, instead of selling CIU products directly from Frictionless to the Retailers, Banjo devised and engaged in a fraudulent scheme using his wholly-owned and controlled entity, World, to, among other things, (a) siphon off the Company's revenue into World, (b) foist World's expenses onto the Company's financials, whether or not those expenses were associated with the Company's business, and (c) cover up his and World's fraud by refusing to provide documentation to which Claimant is entitled.

82.     As a result of the fraud, misconduct, and breaches outlined herein, the Company and/or Claimant have suffered an undetermined amount of lost revenue and profits. The Company – and, by extension, Claimant, which has been funding the Company's operations – has further been forced to expend an undetermined amount on World's expenses that were improperly foisted onto Frictionless' financials. The total of those damages may well exceed tens of millions of dollars, all of which will be finally determined and quantified at the hearing on the merits in this matter.

## VI.     APPOINTMENT OF ARBITRATOR

83.     Pursuant to Section 14.6.3 of the LLC Agreement, Claimant hereby appoints as its party-appointed arbitrator:

> Lawrence S. Schaner, Esq.
> Schaner Dispute Resolution LLC
> 150 N. Michigan Ave., Suite 2800
> Chicago, IL 60601
> Tel: +1 (312) 624-7715
> E-mail: lschaner@schanerlegal.com

## VII.     FURTHER SUBMISSIONS AND RESERVATION OF RIGHTS

84.     Claimant reserves all of its rights in this matter, including the right to amend this Demand for Arbitration, to make further submissions with respect to the facts and law, merits, costs, and any other relevant matters, and/or to expand or vary its claims and the relief it seeks up to the date of the final award.

## VIII.   RELIEF REQUESTED

85.    For all the reasons set out above, Claimant respectfully requests that the Arbitral Tribunal be constituted in this case and that it issue an award:

(i)    Declaring that Claimant Z.L. Investment was defrauded by Respondents, who further committed, among other things, civil theft, conversion, and various breaches of fiduciary duty and/or of the LLC Agreement;

(ii)    Awarding Claimant its damages to be proven at the hearing;

(iii)    Awarding Claimant the costs associated with these proceedings, including legal fees and expenses (including any expert fees and expenses), and the Arbitral Tribunal's fees and expenses, and ordering Respondents to pay same pursuant to Section 14.7 of the LLC Agreement; and

(iv)    Awarding Claimant any and all further or other relief as the Arbitral Tribunal may deem appropriate.


**Respectfully submitted for and on behalf of the Claimant**
**K&L Gates LLP**
**Counsel for the Claimant**
**April 15, 2019**

# Ex. C-1

**OPERATING AGREEMENT**
**FOR**
**FRICTIONLESS, LLC**

This Operating Agreement (this "Agreement") of Frictionless, LLC (the "Company"), dated as of April _11_, 2013 (the "Effective Date"), is between Li Zhixiang ("Li"), Z.L. Investment ("Z.L."), and Daniel Banjo ("Banjo",and with Z.L. the "Members").

In consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members and Li agree as follows:

## ARTICLE 1

## DEFINITIONS

In addition to the terms defined elsewhere in this Agreement, the following terms shall have the indicated meaning:

"Act" means the Colorado Limited Liability Company Act, as amended from time to time.

"Affiliate" means with respect to a Person, (1) any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, (2) any spouse, brother, sister, ascendant or descendant of any such Person or any Person described in clause (1) of this definition, and (3) any trust, family partnership or other entity established primarily for the benefit of such Person or any Person described in clauses (1) or (2) of this definition. As used in this definition, the word "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning specified in the introductory paragraph.

"Annual Operating Plan" has the meaning set forth in Section 6.5.

"Applicable Federal Rate" means the interest rates that are published and updated monthly by the U.S. Internal Revenue Service, broken down into three classes: short-term (3 years or less), mid-term (greater than 3 years but no greater than 9 years) and long-term (greater than 9 years). Different rates are provided for annual, semi-annual, quarterly or monthly accrual.

"Available Cash" means, for a period of time, the excess of all cash receipts of the Company (including reductions in any reserves previously established by the Manager acting reasonably to meet the business needs of the Company) over all cash disbursements of the Company (including additions to any reserves established by the Manager acting reasonably to meet the business needs of the Company).

- 1 -

"Banjo" has the meaning specified in the introductory paragraph.

"Bankruptcy" means, with respect to a Person, any of the following acts or events: (1) making an assignment for the benefit of creditors, (2) filing a voluntary petition in bankruptcy, (3) becoming the subject of an order for relief or being declared insolvent or bankrupt in any federal or state bankruptcy or insolvency proceeding, (4) filing a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, (5) filing an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in a proceeding of the type described in clause (3) or (4) of this definition, (6) making an admission in writing of an inability to pay debts as they mature, (7) giving notice to any governmental authority that insolvency has occurred, that insolvency is pending, or that operations have been suspended, (8) seeking, consenting to, or acquiescing in the appointment of a trustee, receiver, or liquidator of all or any substantial part of its properties, or (9) the expiration of ninety (90) days after the date of the commencement of a proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation if the proceeding has not been previously dismissed, or the expiration of sixty (60) days after the date of the appointment, without such Person's consent or acquiescence, of a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties, if the appointment has not previously been vacated or stayed, or the expiration of sixty (60) days after the date of expiration of a stay, if the appointment has not been previously vacated.

"Business" has the meaning specified in Section 2.5.

"Business Day" means any day other than a Saturday or Sunday or other day upon which banks are authorized or required to close in the State of Colorado.

"Capital Accounts" has the meaning specified in Section 8.1.

"Capital Contribution" means for any Member at the particular time in question the aggregate of the dollar amounts of any cash and cash equivalents contributed by such Member to the capital of the Company, plus the value, as determined by the Manager, of any property contributed by such Member to the capital of the Company.

"CIU" means Changzhou Inter Universal, Machine/Equipment, LTD, a Chinese company.

"Code" means the Internal Revenue Code of 1986, as amended from time to time. Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future Law.

"Company" has the meaning specified in the introductory paragraph.

"Confidential Information" means information concerning the properties, operations, business, trade secrets, technical know-how and other non-public information and data of or relating to the Company, its properties and any technical information with respect to any project of the Company.

- 2 -

"<u>Disability</u>" means a physical or mental illness or disability that prevents the Manager from performing his customary duties for the Company for a continuous period of six or more months.

"<u>Effective Date</u>" has the meaning specified in the introductory paragraph.

"<u>Law</u>" or "<u>Laws</u>" means all applicable federal, state, tribal and local laws (statutory or common), rules, ordinances, regulations, grants, concessions, franchises, licenses, orders, directives, judgments, decrees, restrictions and other similar requirements, whether legislative, municipal, administrative or judicial in nature.

"<u>Li</u>" has the meaning specified in the introductory paragraph. Li is an Affiliate of Z.L.

"<u>Lien</u>" means any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, charge, deposit arrangement, preference, priority, security interest, option, right of first refusal or other transfer restriction or encumbrance of any kind (including preferential purchase rights, conditional sales agreements or other title retention agreements, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable Law of any jurisdiction to evidence any of the foregoing).

"<u>Manager</u>" has the meaning specified in Section 5.1.

"<u>Major Decision</u>" has the meaning set forth in Section 5.4.

"<u>Majority Voting Interest</u>" means Members holding more than 50% of the voting power of the outstanding Units entitled to vote on a matter.

"<u>Member</u>" means a Person designated as an initial Member of the Company on <u>Schedule A</u> attached hereto by virtue of his, her, or its ownership of Units in the Company, a Person admitted as an additional Member pursuant to Section 3.4 and a Person admitted as a substituted Member pursuant to Section 11.3.

"<u>Member Decision</u>" has the meaning set forth in Section 5.3.

"<u>Membership Interest</u>" means, with respect to any Member, (1) that Member's status as a Member, (2) that Member's Capital Account and share of the Profits, Losses and other items of income, gain, loss, deduction and credits of, and the right to receive distributions (liquidating or otherwise) from, the Company under the terms of this Agreement, (3) all other rights, benefits and privileges enjoyed by that Member (under the Act or this Agreement) in his, her, or its capacity as a Member, including that Member's rights to vote, consent and approve those matters described in this Agreement, and (4) all obligations, duties and liabilities imposed on that Member under the Act or this Agreement in his, her, or its capacity as a Member.

"<u>Notified Member</u>" has the meaning specified in Section 11.5.1.

"<u>Offer Notice</u>" has the meaning specified in Section 11.5.1.

"<u>Offered Price</u>" has the meaning specified in Section 11.5.1.

- 3 -

"Offered Terms" has the meaning specified in Section 11.5.1.

"Offered Units" has the meaning specified in Section 11.5.1.

"Officer" and "Officers" are each defined in Section 5.10.

"Person" means a natural person, corporation, joint venture, partnership, limited liability partnership, limited partnership, limited liability limited partnership, Limited Liability Company, trust, estate, business trust, association, governmental authority or any other entity.

"Prime Rate" means a rate per annum equal to the *lesser of* (a) an annual rate of interest which equals the floating commercial loan rate as published in the Wall Street Journal from time to time as the "Prime Rate," adjusted in each case as of the banking day in which a change in the Prime Rate occurs, as reported in the Wall Street Journal and (b) the maximum rate permitted by applicable Law.

"Profit" or "Loss" means the income or loss of the Company as determined under the capital accounting rules of Treasury Regulation § 1.704-1(b)(2)(iv) for purposes of adjusting the Capital Accounts of Members including, without limitation, the provisions of paragraphs 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4) of those regulations relating to the computation of items of income, gain, deduction and loss.

"Proposed Purchaser" means a Person or group of Persons that a Member proposes as a purchaser of all or a portion of the Units of such Member.

"Securities Act" means the Securities Act of 1933, as amended from time to time. Any reference herein to a specific section or sections of the Securities Act shall be deemed to include a reference to any corresponding provision of future law.

"Selling Member" has the meaning specified in Section 11.5.1.

"Sharing Ratio" means, with respect to any Member, the percentage representing the ratio that the number of Units owned by such Member bears to the aggregate number of Units owned by all of the Members.

"Transfer" means, with respect to any asset, including Units, including any right to receive distributions from the Company or any other economic interest in the Company, a sale, assignment, transfer, conveyance, gift, exchange or other disposition of such asset, whether such disposition be voluntary, involuntary or by merger, exchange, consolidation or other operation of Law, including the following: (a) in the case of an asset owned by a natural person, a transfer of such asset upon the death of its owner, whether by will, intestate succession or otherwise, (b) in the case of an asset owned by a Person which is not a natural person, a distribution of such asset, including in connection with the dissolution, liquidation, winding up or termination of such Person (other than a liquidation under a deemed termination solely for tax purposes), and (c) a disposition in connection with, or in lieu of, a foreclosure of a Lien. A Transfer also shall include the transfer of a direct or indirect beneficial equity interest in a Member if the transfer, either alone or in conjunction with other such transfers made after it first became a Member, results in a change in ownership of such Member of at least 50%.

- 4 -

"Treasury Regulations" means regulations issued by the Department of Treasury under the Code. Any reference herein to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations under the Code.

"Unit" means any Unit issued by the Company.

"Z.L." has the meaning specified in the introductory paragraph.

## ARTICLE 2

### THE LIMITED LIABILITY COMPANY

2.1      **Formation**.  The Manager shall cause the formation of the Company pursuant to the Act and this Agreement.  The Members agree that the Company shall be governed by the terms and conditions set forth in this Agreement.  To the fullest extent permitted by the Act, this Agreement shall control as to any conflict between this Agreement and the Act or as to any matter provided for in this Agreement that is also provided for in the Act.

2.2      **Name**.  The name of the Company shall be Frictionless, LLC.

2.3      **Articles of Organization**.  The Manager shall cause articles of organization of the Company that comply with the requirements of the Act to be properly filed with the Colorado Secretary of State, and execute such further documents (including amendments to the articles of organization) and take such further action as shall be appropriate or necessary to comply with the requirements of Law for the formation, qualification or operation of a limited liability company in all states and countries where the Company may conduct its business.

2.4      **Registered Office and Agent; Principal Place of Business**.  The location of the registered office of the Company and the Company's registered agent at such address shall be determined by the Members.  The location of the principal place of business of the Company shall be at such location as the Members may from time to time select.

2.5      **Purpose**.  The business of the Company shall include the manufacture and distribution of tools and power equipment, and the conduct of any other business or activity that may be lawfully conducted by a limited liability company organized pursuant to the Act (collectively, the "Business").  The Business of the Company may be conducted directly by the Company or indirectly through another company, joint venture or other arrangement.

2.6      **The Members**.  The name, address and number and class of Units of each initial Member is set forth on Schedule A attached hereto.  Upon the admission of additional or substituted Members in accordance with this Agreement, the Manager shall update Schedule A attached hereto to reflect the then current ownership of Units.  Notwithstanding anything to the contrary herein, the update by the Manager of Schedule A pursuant to this Section 2.6 shall not be considered an amendment to this Agreement.

2.7      **Term**.  The Company shall have perpetual existence; *provided*, that the Company shall be dissolved upon the occurrence of an event set forth in Section 12.2.

## ARTICLE 3

### CAPITAL CONTRIBUTIONS

3.1 **Initial Capital Contributions**. Concurrently with the execution and delivery of this Agreement, or within twenty (20) Business Days thereof, each of the initial Members is making the initial Capital Contribution to the Company described opposite his or its respective name on Schedule A attached hereto. Initial Capital Contributions of additional Members shall be governed by Section 3.4.

3.2 **Capitalization**.

3.2.1 Membership Interests. All Membership Interests in the Company shall be represented by Units. Each Member shall have the number of Units as set forth opposite that Member's name on Schedule A attached hereto. Schedule A shall be amended from time to time as additional Units are issued. The Units shall not be represented by certificates. The Manager shall keep and maintain records indicating the number and Units issued to each Member and all changes, additions or reductions thereto.

3.2.2 Units. Upon the unanimous agreement of the Members, the Manager may issue additional Units from time to time as provided in this Agreement. The Units shall be capital interests in the Company for federal and state income tax purposes. The Units have voting rights as to all matters that Members may vote upon. Each Unit has one (1) vote.

3.3 **Additional Capital Contributions**. The Members may, but shall not be obligated to, make additional Capital Contributions to the Company in accordance with their Sharing Ratios or in any other manner as determined by the Li, subject to Section 5.4.10.

3.4 **Issuance of Additional Units**. Additional Units may be issued with such rights, privileges and preferences as shall be approved by Li, subject to Sections 3.2.2 and 5.4.9, and upon such issuance, this Agreement shall be deemed amended to the extent necessary to reflect the issuance of additional Units. If the issuance of additional Units has been properly approved in accordance with this Agreement, the Persons to whom such additional Units have been issued shall automatically be admitted to the Company as Members with respect to such additional Units, subject to the satisfaction or waiver of the requirements set forth in Section 11.4.

3.5 **No Third Party Right to Enforce**. No Person other than a Member shall have the right to enforce any obligation of a Member to contribute capital hereunder and specifically no lender or other third party shall have any such rights.

3.6 **Return of Contributions**. No Member shall be entitled to the return of any part of his, her, or its Capital Contributions or to be paid interest in respect of either his, her, or its Capital Account or his, her, or its Capital Contributions. No unrepaid Capital Contribution shall constitute a liability of the Company, or any Member. A Member is not required to contribute or to lend cash or property to the Company to enable the Company to return any Member's Capital Contributions. The provisions of this Section 3.6 shall not limit a Member's rights under ARTICLE 12.

3.7 **Discretionary Loans**. The Members may, if requested by the Manager, and subject to Section 5.4.8, but shall not be obligated to, advance all or any portion of such cash deficiency to the Company. If more than one Member elects to make such advance, the electing Member shall make the advance in proportion to their respective Sharing Ratios, unless such Members otherwise agree. All advances made pursuant to this Section 3.7 shall constitute a loan from the advancing Members to the Company, shall bear interest at no less than the Applicable Federal Rate and no more than the Prime Rate and shall not be considered as part of the Company's equity or Members' Capital Contributions. Any such loan shall be subordinate to any loans from any then existing third-party lender to the Company if required by such lender, and shall be repaid prior to any other distributions to the Members.

## ARTICLE 4

### REPRESENTATIONS, WARRANTIES AND COVENANTS

4.1 **General Representations and Warranties**. Each Member, and Li, represents and warrants to the other Members, Li, and the Company as follows:

(a) This Agreement constitutes his, her, or its valid and binding obligation, enforceable against him, her, or it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(b) The execution, delivery and performance by him, her, or it of this Agreement will not conflict with, result in a breach of or constitute a default under any of the terms, conditions or provisions of (1) any applicable Law, or (2) any agreement or arrangement to which he, she, or it or any of his, her, its Affiliates is a party or which is binding upon it or any of his, her, or its Affiliates or any of his, her, its or their assets.

(c) Neither Member, or Li, has provided, or will provide, to any other Member, Li, or the Company, any information that is a trade secret, or otherwise confidential to a third party, unless the Member, or Li, has the right to do so.

4.2 **Conflict and Tax Representations**. Each Member, and Li, represents and warrants to the other Members, Li, and the Company as follows:

(a) Such Member, and Li, has been advised that (1) a conflict of interest exists among the Members' individual interests, (2) this Agreement has tax consequences and (3) he, she, or it should seek independent counsel in connection with the execution of this Agreement.

(b) Such Member, and Li, has had the opportunity to seek independent counsel and independent tax advice prior to the execution of this Agreement and no Person has made any representation of any kind to it regarding the tax consequences of this Agreement.

(c) This Agreement and the language used in this Agreement is the product of all Members', and Li's, efforts and each Member, and Li, hereby irrevocably waives the benefit of any rule of contract construction which disfavors the drafter of an agreement.

4.3 **Investment Representations and Warranties**. In acquiring an interest in the Company, each Member represents and warrants to the other Members and the Company that it is acquiring such interest for his, her, or its own account for investment and not with a view to its sale or distribution. Each Member recognizes that investments such as those contemplated by this Agreement are speculative and involve substantial risk. Each Member further represents and warrants that the other Members have not made any guaranty or representation upon which he, she, or it has relied concerning the possibility or probability of profit or loss as a result of his, her, or its acquisition of an interest in the Company.

4.4 **Non-Competition**. While a Member is a member of the Company, and for Li, while Z.L. is a Member of the Company, except as otherwise provided herein, each Member, and Li, agrees that he, she, or it shall, and he, she, or it shall cause his, her, or its Affiliates, to not compete with the Company, directly or indirectly, in a business substantially similar to the business of the Company or any of its subsidiaries anywhere where the Company does business, or the distribution of any products distributed by the Company or any of its subsidiaries anywhere in the world. For purposes of this Agreement, direct and indirect competition shall include, but not be limited to, having any business or employment relationship with any past or present client, supplier, or employee of the Company, and any competition as a sole proprietor, partner, corporate officer, director, shareholder, member, manager, employee, agent, independent contractor, trustee, or in any other manner in which such Member or Li, or its or his Affiliates, holds any beneficial interest in a competitive business, derives any income from such business, or provides any service, including the benefit of his, her, or its reputation or knowhow, to such business. For purposes of clarification, the sale of parts and products that are materially different from parts and products that the Company sells or intends to sell shall not be considered to be competing with the Company.

4.4.1 Each Member, and Li, agrees that the covenants he, she, or it has made in this ARTICLE 4 are reasonable with respect to their duration, geographical area and proscription. Each Member, and Li, additionally agrees that the existence of any claim or cause of action he, she, or it has against the Company, whether or not predicated upon the terms of this Agreement, shall not constitute a defense to the enforcement by the Company of these covenants.

4.4.2 In the event of a Member's, or Li's, actual or threatened breach of the provisions of this ARTICLE 4, the Company, the Members, and Li, shall have the right to obtain injunctive relief (without necessity of posting a bond) and to seek any other remedy available to the Company.

4.5 **Survival**. The representations, warranties, and covenants set forth in this ARTICLE 4 shall survive the execution and delivery of this Agreement and any documents of Transfer provided under this Agreement, and the termination of this Agreement.

4.6 **Indemnification for Breach**. Each Member, and Li, on behalf of such Member (or, for Li, on behalf of himself) and his, her, or its successors and assigns, shall defend, indemnify and hold harmless the other Members, Li, and the Company from and against any and all claims, threats, liabilities, taxes, interest, fines, penalties, suits, actions, proceedings, demands, damages, losses, costs and expenses (including attorneys' and experts' fees and court

costs) of every kind and nature arising out of, resulting from, or in connection with any breach of a representation and warranty or covenant set forth in this ARTICLE 4.

## ARTICLE 5

### COMPANY MANAGEMENT

5.1    **Manager**. The Company shall be managed by one manager, who shall be referred to herein as the "Manager".

5.2    **Management Authority**.  Except for Member Decisions and Major Decisions, the Manager shall have the authority on behalf of the Company to make all decisions with respect to the Company's business without the approval of the Members. In connection with the implementation, consummation or administration of any matter within the scope of the Manager's authority, the Manager is authorized, without the approval of the Members, to execute and deliver on behalf of the Company contracts, instruments, conveyances, checks, drafts and other documents of any kind or character to the extent the Manager deems it necessary or desirable. The Manager may delegate to Officers, employees, agents or representatives any or all of the foregoing powers by written authorization identifying specifically or generally the powers delegated or acts authorized. The Manager is responsible for implementing the Annual Operating Plan

5.3    **Decisions that Require Member Approval**. Neither the Manager, nor any Member, Officer, employee, agent or representative of the Company, shall have any authority to bind or take any action on behalf of the Company with respect to any Member Decision unless such Member Decision has been approved by a Majority Voting Interest as provided in Section 6.2 or Section 6.3. Each of the following matters shall constitute a "Member Decision":

5.3.1    amending the Company's articles of organization or this Agreement;

5.3.2    approving the merger of the Company into or with another legal entity of any type, converting the Company into another form of legal entity or making or revoking any federal income tax election that causes the entity to be treated for federal income tax purposes as a different type of entity;

5.3.3    selling, exchanging or otherwise disposing of all or substantially all of the assets or business of the Company or terminating or ceasing all or any substantial portion of the business of the Company;

5.3.4    approving the transfer (whether by merger, consolidation, or otherwise) in one transaction or a series of related transactions, to a person or group of affiliated persons, of the Company's Membership Interests if, after such closing, such person or group of affiliated persons would hold fifty percent (50%) or more of the outstanding Units or the outstanding voting rights of the Company (or surviving or acquiring entity);

5.3.5    liquidating, dissolving, or winding up the Company;

5.3.6   making any expenditure of the Company which is not in furtherance of the Business;

5.3.7   increasing or decreasing the number of Managers of the Company; and

5.3.8   approving and making all final decisions and determinations regarding the distribution to the Members other than as provided under ARTICLE 7.

5.4   **Major Decisions that Require Li's Approval.** Neither the Manager, nor any Member, Officer, employee, agent or representative of the Company, shall have any authority to bind or take any action on behalf of the Company with respect to any Major Decision unless such Major Decision has been approved by Li. The Members acknowledge and agree that although Li is not a Member, that he is an Affiliate of Z.L. and instrumental to the Company's operations, giving rise to his approval rights set forth in this Agreement. Each of the following matters shall constitute a "Major Decision":

5.4.1   the appointment, hiring, removal, or dismissal of the Manager or any Officer or employee of the Company;

5.4.2   the compensation and benefits provided to the Manager, Officers, and employees of the Company;

5.4.3   the timing and amount of any distributions by the Company to the Members, including the distributions set forth in Sections 7.2 and 7.3;

5.4.4   the guaranty by the Company of the obligations of any third party;

5.4.5   the investment or use of the Company's funds outside of the ordinary course of the Company's business (such as the purchase of securities);

5.4.6   licensing, transferring, or otherwise providing rights to a third party in any of the Company's intellectual property, except as otherwise provided by this Agreement;

5.4.7   making any single expenditure of the Company in excess of $20,000 or any contract or commitment of the Company which could result in obligations of the Company that exceed $200,000 in any one year;

5.4.8   making any loan or other incurrence of debt of the Company in excess of $50,000 (excluding trade payables or receivables in the ordinary course of business);

5.4.9   the issuance of any new Units, redemption, purchase, or other acquisition by the Company of any Units;

5.4.10   the making of any additional Capital Contributions;

5.4.11   the commencement and the settlement of any legal or administrative claim, action, investigation, or dispute, except as otherwise provided in this Agreement; and

5.4.12 engaging in an affirmative act of Bankruptcy.

5.5     **Duties.** The Manager and each Officer shall carry out his or her duties in good faith. The Manager shall devote such time to the business and affairs of the Company for the efficient carrying on the Company's business. The Manager and Officers shall have fiduciary duties to the Company, and the Manager's and the Officers' duties and liabilities are restricted by the provisions of this Agreement to the extent that any such provisions restrict the duties and liabilities of the Manager and the Officers otherwise existing at law or in equity.

5.6     **Resignation.** The Manager may resign at any time by giving written notice to the Members and Li. Unless otherwise specified in the notice, the resignation will take effect upon receipt thereof by the Members and Li, and the acceptance of the resignation shall not be necessary to make it effective. Notwithstanding the foregoing, the Manager shall be deemed to have resigned as the Manager upon the earlier of his death, Disability or adjudication of insanity or incompetence.

5.7     **Removal.** The Manager may be removed by Li, in his reasonable discretion.

5.8     **Vacancies.** Vacancies in the position of Manager occurring for any reason shall be filled by the vote or written consent of the Members.

5.9     **Exculpation and Indemnification.**

5.9.1   Limitation of Liability. In carrying out their respective duties hereunder, the Manager and the Officers shall not be liable to the Company nor to any Member for their good faith actions or failures to act, nor for any errors of judgment, nor for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement, but shall be liable only for fraud, willful misconduct or gross negligence in the performance of their respective duties under this Agreement.

5.9.2   Reliance. To the extent the Manager or the Officers have duties (including fiduciary duties) and liabilities relating thereto to the Company, to any Member, or Li, the Manager or the Officers acting under this Agreement shall not be liable to the Company, to any Member, or to Li for such Person's good faith reliance on the provisions of this Agreement, the records of the Company, and such information, opinions, reports or statements presented to the Company by any of the Company's other Officers or employees, or by any other Person as to matters the Manager or any such Officer reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Act.

5.9.3   No Personal Liability. Neither the Manager nor any Officer, or any combination of the foregoing, shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being the Manager or an Officer or any combination of the foregoing.

5.9.4   Indemnification.  The Company shall indemnify and hold harmless the Manager, his Affiliates and any Officer or employee of the Company, to the fullest extent permissible under applicable law, from and against any loss, liability, judgment, damages, amounts paid in settlement or expense, including, without limitation, reasonable attorneys' and accountants' fees and disbursements, arising from or in connection with any threatened or actual claim, action, suit or proceeding and any appeal therein, including any brought by or in the right of the Company, if the Manager, or any such Affiliate, Officer or employee acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company, and provided that its, her, or its conduct is not adjudged to have constituted gross negligence, willful misconduct or an intentional breach of his, her, or its fiduciary obligations in the performance of his, her, or its duties to the Company.  The termination of any action, suit or proceeding by judgment, order or settlement shall not, of itself, create a presumption that the Manager, or any such Affiliate, Officer or employee did not act in good faith or in a manner reasonably believed to be in or not opposed to the best interests of the Company.

5.9.5   Insurance.  The Company may purchase and maintain insurance on behalf of the Manager, his Affiliates and any Officers or employees of the Company with respect to any liability or expense against which the Company would be obligated to indemnify such Persons pursuant to this Section 5.9.  In no event shall the Company bear any portion of the cost of any liability insurance which insures the Manager, his Affiliates or any Officers or employees of the Company against any liability as to which indemnification is not allowed under this Section 5.9.

5.9.6   Other Rights.  The indemnification and advancement of expenses provided by this Section 5.9 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may otherwise be entitled.

5.10   **Officers**.

5.10.1   Appointment.  The Manager may, subject to Section 5.4.1, from time to time, nominate one or more individuals to be officers of the Company (each an "Officer", and collectively "Officers"), subject to the rights, if any, of an Officer under any contract of employment. Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the Officers shall be fixed from time to time by Li, subject to Section 5.4.1.

5.10.2   Duties of Officers.  In all cases where the duties of any Officer are not prescribed by this Agreement, such Officer shall have the duties that are normally associated with his or her title, and follow the orders, instructions, and limitations on authority provided by the chairman and the Manager, except that in any event each Officer shall exercise such powers and perform such duties as may be required by law.  The Officers shall have the following specific duties:

5.10.2.1   Duties of Chairman.  The chairman shall supervise the operations of the Company. He shall chair all meetings of the Members, and if there is no president, the chairman shall exercise the powers and perform the duties of the president. Li shall be the chairman, to serve until his death or resignation, or until Li appoints a successor chairman.

5.10.2.2   Duties of President.  The president shall have general and active control of the Company's affairs and business and general supervision of its Officers, agents and employees.

5.10.2.3   Finance Officer.  Li has the authority to designate a Person to serve as the finance officer of the Company, who shall be no less qualified than a certified public accountant, and who shall have such title as Li determines. The finance officer shall: (a) be the principal accounting officer of the Company and as such prescribe and maintain the methods and systems of accounting to be followed, keep complete books and records of account, prepare and file all local, state and federal tax returns, prescribe and maintain an adequate system of internal audit and prepare and furnish to the chairman and Manager statements of account showing the financial position of the Company and the results of its operations; (b) upon request of the Manager or the chairman, make such reports as may be required at any time; (c) provide the chairman and the Manager with quarterly financial reports (with such content and in such form as reasonably requested by the chairman or Manager) within three (3) Business Days of the end of each fiscal quarter of the Company; and (d) provide the chairman and the Manager with annual financial reports for the previously completed fiscal year (with such content and in such form as reasonably requested by the chairman or Manager) by March 1 of each year.

5.10.3  Resignation and Removal.  Any Officer may resign at any time by giving written notice thereof to the Manager and Li. Except for the chairman (who may not be removed), any Officer may be removed, either with or without cause, by either the Manager, subject to Section 5.4.1, or the chairman, whenever in their judgment the best interests of the Company will be served thereby; *provided, however*, that such removal shall be without prejudice to the contract rights, if any, of the Person so removed. Designation of an Officer shall not, by itself, create contract rights.

5.11   **Salary**.  The salary of the Manager shall be determined by Li. Members may review the Manager's salary in the Annual Meeting, and fix it with the written consent of Li. The Manager shall additionally be entitled to reimbursement from the Company for out-of-pocket costs and expenses reasonably incurred by the Manager for or on behalf of the Company.

5.12   **Affiliate Transactions**.  Upon the approval of Li, the Manager may cause the Company to enter into transactions, agreements, contracts and undertakings with the Manager, any Member, or any of their respective Affiliates, so long as such transactions, agreements, contracts or undertakings are in the ordinary course of business and on commercially reasonable terms and conditions.

## ARTICLE 6

## MEMBERS

6.1   **Limited Liability**.  The liability of each Member shall be limited as provided by the Act. Except as permitted under this Agreement, a Member shall take no part in the control, management, direction or operation of the affairs of the Company, and shall have no power to bind the Company in his, her, or its capacity as a Member.

6.2   **Quorum and Voting**. Except as otherwise stated below, a Majority Voting Interest, represented in person or by proxy, shall be necessary to constitute a quorum at meetings of the Members. One or more Members may participate in a meeting of the Members by means of conference telephone or similar communication equipment by which all persons participating in the meeting can hear each other at the same time, and such participation shall constitute presence in person at the meeting. If a quorum is present, the affirmative vote of a Majority Voting Interest shall be approval of the action by the Members, unless a greater number is required by the Act or this Agreement. In the absence of a quorum, those present may adjourn the meeting for any period, but in no event shall such period exceed sixty (60) days.

6.3   **Informal Action**. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is evidenced by a written consent describing the action taken, signed by a Majority Voting Interest, unless this Agreement requires the approval of a greater number, or class, of Members for such action to be taken, in which case such written consent must be signed by the requisite number of Members required to approve such action. Action taken under this Section 6.3 shall be effective when the required number of Members have signed the consent, unless the consent specifies a different effective date.

6.4   **Meetings**. Meetings of the Members for any purpose or purposes may be called by the Manager or by Members holding not less than a majority of the issued Units.

6.4.1   **Place of Meeting**. The Manager or the Members calling a meeting may designate the place for any meeting either inside or outside the state of Colorado.

6.4.2   **Notice of Meeting**. Written notice stating the place, day and hour of the meeting, and the purpose or purposes for which the meeting is called, shall be delivered pursuant to ARTICLE 13, by or at the direction of the Manager or the Member calling the meeting, to each Member of record entitled to vote at such Meeting. Meetings of the Members may be called upon not less than ten (10) days' written notice.

6.4.3   **Proxies**. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his, her, or its duly authorized attorney-in-fact. Such proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

6.4.4   **Conduct of Meeting**. The chairman, or his designee, shall preside over and conduct the meeting and shall appoint someone in attendance to make accurate minutes of the meeting. Following each meeting, the minutes of the meeting shall be sent to the Manager and each Member.

6.4.5   **Remote Participation**. The Manager or the Member calling a meeting shall provide for Members to participate in such meeting by telephone or other means of remote communication which is reasonably accessible to all Members and through which all of the participants can hear one another.

6.5   **Members' Annual Meeting**. the Members, and Li, shall have an annual meeting, which shall take place in the last quarter of each fiscal year of the Company, at such time and at

- 14 -

such place (or by such forms of telephonic or electronic communication) as determined by the agreement of all of the Members and Li. At the Members' Annual Meeting, the Members and Li shall review the annual operating plan, prepared by the Manager, for the next fiscal year, including items such as the hiring of employees and contractors, the remuneration of employees, officers, and the Manager, the Company's budget, distributions by the Company to the Members, and new products of the Company (the "Annual Operating Plan"). The Annual Operating Plan shall be approved by the Members, in writing, in accordance with their Sharing Ratios, and also by Li. The Annual Operating Plan for 2013 is attached hereto as Schedule B.

6.6     **No Member Fees**. Except as otherwise provided in this Agreement, no Member shall be entitled to compensation for attendance at Member meetings or for time spent in his, her, or its capacity as a Member.

6.7     **No State-Law Partnership**. The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member or Manager be a partner or a party of a joint venture of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise. Except as otherwise required by the Act, other applicable Law, and this Agreement, no Member shall have any fiduciary duty to any other Member.

6.8     **Tax Matters Partner**. Li shall appoint the "tax matters partner" as such term has the meaning specified in section 6231(a)(7) of the Code. The appointment of any successor tax matters partner shall be approved by Li. Subject to the provisions hereof, the tax matters partner is authorized and required to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Notwithstanding the foregoing, the tax matters partner shall promptly notify all Members of the commencement of any audit, investigation or other proceeding concerning the tax treatment of Company tax items and shall keep all Members adequately informed of such proceedings.

The tax matters partner shall make or cause to be made all available elections as required by the Code and the Treasury Regulations to cause the Company to be classified as a partnership for federal income tax purposes.

## ARTICLE 7

### DISTRIBUTIONS TO THE MEMBERS

7.1     **Minimum Distribution to Pay Tax**. By March 1 of each year, the Company shall make distributions to the Members sufficient to enable them to pay their federal, state, or other United States income tax liability attributable to the net income of the Company during the prior tax year.

7.2     **Non-Liquidating Distributions.** Subject to Section 5.4.3, the Manager may cause the Company to make distributions of Available Cash in such aggregate amounts and at such times as Li may determine in conformance with the Annual Operating Plan. All non-liquidating distributions shall be made to the Members in accordance with their Sharing Ratios.

7.3 **Liquidating Distributions**. Distributions made in connection with the sale or exchange of all or substantially all of the Company's assets and all distributions made in connection with the liquidation of the Company shall be made after applying the provisions of ARTICLE 12 to the Members in accordance with their Sharing Ratios.

7.4 **Distributions in Kind**. During the existence of the Company, no Member shall be entitled or required to receive as distributions from the Company any Company asset other than money. In-kind distributions of assets in connection with the dissolution and winding-up of the Company shall be governed by ARTICLE 12.

## ARTICLE 8

### ALLOCATION OF PROFITS AND LOSSES

8.1 **Capital Accounts.** The Manager shall cause the Company to maintain a separate capital account for each Member and such other Member accounts as may be necessary or desirable to comply with the requirements of applicable Law ("Capital Accounts"). No Member may withdraw any part of his, her, or its Capital Account.

8.2 **Allocation of Profits and Losses**. Each Member's Capital Account shall be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (3) allocations to such Member of Profits. Each Member's Capital Account shall be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); and (3) allocations to such Member of Losses.

8.3 **Transfers During Year**. In order to avoid an interim closing of the Company's books, the allocation of Profits and Losses under ARTICLE 8 between a Member who Transfers part or all of its interest in the Company during the Company's accounting year and his, her, or its transferee, or to a Member whose Sharing Ratio varies during the course of the Company's accounting year, may be determined pursuant to any method chosen by the Manager, in consultation with the finance officer, and such Member; *provided, however*, that any Profit or Loss attributable to extraordinary items related to the sale of Company property shall be allocated to the owner of the interest in the Company at the time the Profit or Loss attributable to the extraordinary item was realized.

8.4 **Compliance with the Internal Revenue Code and Regulations.** Capital Accounts shall be maintained in accordance with the provisions of this Operating Agreement, the Code, and the Treasury Regulations. To the extent that there is a conflict between the provisions of this Operating Agreement and the Code or the Treasury Regulations, then the Capital Accounts shall be maintained in accordance with the Internal Revenue Code and the Regulations.

## ARTICLE 9

### INTELLECTUAL PROPERTY

9.1 **License to Existing intellectual property**. Banjo shall ensure that the Company has the right to use freely, any patents (whether registered in the United States or elsewhere) that relate to CIU products that are within his control, and any new patents that relate to CIU products which are in his control while he is a Member of the Company. Banjo represents and warrants to Li that as of the Effective Date, except as set forth in this Agreement, he has not granted any license, or assigned any rights in, any patents which he owns or otherwise has the right to use to any third party which Banjo does not control.

9.2 **Existing intellectual property Representations**. The Company shall defend CIU with respect to any claim, lawsuit, legal action, or penalty that is based on or attributable to any of the patent licenses set forth in Section 9.1, and shall notify Mr. Li promptly of these matters that may come to its attention. Meanwhile, the Company shall indemnify CIU, and hold it harmless from and against any loss, damages, liability and any costs, expenses and reasonable attorneys' fees finally awarded that relate to the patent licenses set forth in Section 9.1.

9.3 **Ownership of Company Intellectual Property**. All intellectual property developed by the Officers, employees, or otherwise specifically for the Company shall be the property of the Company. And the Company shall provide CIU with a worldwide, perpetual, royalty free license to all of its intellectual property once the intellectual property is developed.

9.4 **Intellectual Property Protection**. Upon the approval of Li, the Manager shall cause the Company to take reasonable actions to protect and defend the intellectual property of the Company, including acquiring such registrations in the United States and elsewhere. Notwithstanding anything to the contrary set forth in this Agreement, the Manager may cause the Company to take legal action to defend and protect its intellectual property rights notwithstanding Section 5.4.11, although he shall promptly inform Li of any such actions being taken.

## ARTICLE 10

### ACCOUNTING AND REPORTING

10.1 **Books**. The Manager shall cause the Company to maintain complete and accurate books of account of the Company's affairs at the principal office of the Company. The Company's books shall be kept in accordance with generally accepted accounting principles, consistently applied, and on an accrual basis method of accounting, or upon on such other method as determined by the finance officer and agreed upon by the Manager and Li. Subject to the requirements of applicable Law, the fiscal year of the Company shall be the same as the taxable year of the Company, which shall end on December 31 of each year.

10.2 **Reports**. The Manager shall cause the Company to deliver to the Members such financial and tax information, returns and reports as may be reasonably requested.

10.3   **Inspection of Documents**.  Each Member, and Li, shall have the right to inspect, review, make copies of, and audit all agreements, documents, records and reports relating to the business of the Company, and all other items prepared by or obtained by the Manager in connection with the performance of his duties hereunder, in each case at such Member's (or Li's, as applicable) expense during reasonable business hours and with at least five (5) Business Days prior written notice to the Manager.

## ARTICLE 11

### TRANSFER OF MEMBER'S INTEREST

11.1   **Restrictions on Transfers and Liens**.  No Member shall Transfer or create a Lien on all or any portion of his, her, or its Units except as expressly permitted by this ARTICLE 11. Any attempted Transfer of, or creation of a Lien on, any Unit not in accordance with the terms of this ARTICLE 11 shall be null and void and of no legal effect.

11.2   **Permitted Transfers and Liens**.  Any Transfers and Liens permitted under this Section 11.2 shall be subject to the other provisions of this ARTICLE 11.  A Member may Transfer all or any portion of his, her, or its Units as follows:

(a)   A Member may Transfer all or any portion of his, her, or its Units to any other Member without the consent of any Member (besides the Members who are parties to the Transfer);

(b)   A Member may Transfer all or any portion of his, her, or its Units to an Affiliate of such Member without the consent of any other Member; provided that the transferring Member provides notice of such Transfer to the other Members at least ten (10) Business Days prior to effecting the Transfer;

(c)   A Member who is a natural person may Transfer all or a portion of his Units in connection with estate planning transfers for the benefit of one or more relatives (e.g., transfers to family trusts or family partnerships, limited partnerships, limited liability companies, or limited liability limited partnerships), provided that such Member continues to have and to exercise control over such Units, without the consent of any other Member.

11.3   **Substitution of a Member**.

11.3.1 Obligations.  No Transfer of any interest in the Company otherwise permitted under this Agreement shall be effective for any purpose whatsoever until the transferee shall have assumed the transferor's obligations to the extent of the interest Transferred, and shall have agreed to be bound by all the terms and conditions hereof, by written instrument, duly acknowledged, in form and substance reasonably satisfactory to the Manager.  Without limiting the foregoing, any transferee that has not become a substituted Member shall nonetheless be bound by the provisions of this ARTICLE 11 with respect to any subsequent Transfer. Upon admission of the transferee as a substituted Member, the transferor shall have no further obligations under this Agreement with respect to those Units Transferred to the transferee; *provided, however*, no Member or former Member shall be released, either in whole or in part, from any liability of such Member to the Company pursuant to this Agreement or otherwise

- 18 -

which has accrued through the date of such Transfer (whether as the result of a voluntary or involuntary Transfer) of all or part of such Member's interest in the Company unless the Manager agrees to any such release.

11.3.2 **Conditions to Substitution**.  As conditions to his, her, or its admission as a Member (1) any assignee, transferee or successor of a Member shall execute and deliver such instruments, in form and substance satisfactory to the Manager, as the Manager shall deem necessary, and (2) such assignee, transferee or successor shall pay all reasonable expenses in connection with his, her, or its admission as a substituted Member.

11.4   **Admission as a Member**.  No Person shall be admitted to the Company as a Member unless either (1) the Units acquired by such Person have been registered under the Securities Act, and any applicable state securities laws or (2) the Manager has received a favorable opinion of the transferor's legal counsel or of other legal counsel acceptable to the Manager to the effect that the Transfer of the Units to such Person is exempt from registration under those Laws.  The Manager, however, may waive the requirements of this Section 11.4.

11.5   **Right of First Refusal**.

11.5.1 Limitations on Transfer.  Except as otherwise provided in Section 11.1 or 11.2, no Member (the "Selling Member") may Transfer all or any portion of his, her, or its Units to any Proposed Purchaser, unless the Selling Member has received a bona fide written offer from the Proposed Purchaser, and the Selling Member first provides a written offer notice (an "Offer Notice") to the other Members (the "Notified Members") stating that the Selling Member desires to Transfer all or a portion of his, her, or its Units, designating the number of Units (the "Offered Units") that the Selling Member desires to Transfer, and specifying the proposed purchase price (the "Offered Price"), the name and address of the Proposed Purchaser, and all of the other proposed material terms and conditions of the proposed Transfer, of the Offered Units (the "Offered Terms"), in each case as set forth in the offer from the Proposed Purchaser.  In addition, the Selling Member shall include with the Offer Notice a copy of the Proposed Purchaser's offer.

11.5.2 Election to Purchase.  Each Notified Member shall have the right, but not the obligation, for a period of twenty (20) Business Days after his, her, or its receipt of the Offer Notice, to elect to purchase all, but not less than all, of his Pro Rata Share of the Offered Units for the Offered Price and on the other Offered Terms.  Any such election shall be made by providing written notice of such election to the Selling Member within such 20-Business Day period.

11.5.3 Closing.  If a Notified Member timely elects to purchase the Offered Units, the parties shall close the sale of the Offered Units for the Offered Price and on the Offered Terms on the later of thirty (30) Business Days after the Selling Member provides the Offer Notice, and five (5) Business Days after the receipt of all required consents and approvals, if any, with respect to such Transfer from all governmental authorities. If more than one Notified Member timely elects to purchase the Offered Units, the Notified Members shall purchase the Offered Units pro rata in proportion to their respective Sharing Ratios.  If no Notified Member elects to purchase the Offered Units or the Notified Members that elect to purchase the Offered

Units fail to close the purchase thereof within the time period specified above (subject to the rights of the Notified Members under Section 11.5.2), the Selling Member may Transfer all, but not less than all, of the Offered Units to the Proposed Purchaser during the *later of* the 90-day period following the expiration of such 20-Business Day election period, or if the Notified Members that elect to purchase fail to close within the time specified in clauses (i) and (ii) above, the 90-day period following the expiration of such period, but only for a cash value of the consideration to be received by the Selling Member from the Proposed Purchaser that is greater than or equal to the Offered Price and on the Offered Terms. If the Selling Member does not sell the Offered Units in accordance with the terms described above within such 90-day period, the Selling Member shall again afford the Notified Members the purchase rights set forth in this Section 11.5, with respect to any offer to sell, assign or dispose of all or any portion of the Offered Units or any other Units held by the Selling Member.

## ARTICLE 12

## WITHDRAWAL, DISSOLUTION AND TERMINATION

12.1   **Withdrawal**.  No Member shall have any right to voluntarily withdraw from the Company.  Notwithstanding the foregoing, a Member shall be deemed to withdraw from the Company upon the Bankruptcy of such Member.  When a transferee of all or any portion of a Member's Units becomes a substituted Member pursuant to Section 11.3, the transferring Member shall cease to be a Member with respect to the Units so Transferred.

12.2   **Dissolution**.  The Company shall be dissolved upon the occurrence of any of the following:

(a)     Upon the unanimous approval of the Members; or

(b)     The sale of all or substantially all of the assets of the Company.

12.3   **Liquidation**.  Upon dissolution of the Company under Section 12.2, Li shall appoint in writing one or more liquidators (who may be Members or the Manager) who shall have full authority to wind up the affairs of the Company and to make a final distribution as provided herein.  The liquidator shall continue to operate the Company properties with all of the power and authority of the Manager.  The steps to be accomplished by the liquidator are as follows:

(a)     As promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities and operations through the last day of the month in which the dissolution occurs or the final liquidation is completed, as appropriate, including in such accounting the Profit or Loss resulting from the actual or deemed sale or distribution of the Company's properties.

(b)     The liquidator shall pay all of the debts and liabilities of the Company or otherwise make adequate provision therefore (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine).  The liquidator shall then, by payment of cash or property (at the election of the liquidator, and, in the case of property, valued as of the date of

termination of the Company at its fair market value by an appraiser selected by the liquidator), distribute all remaining amounts to the Members in accordance with ARTICLE 7. For purposes of this ARTICLE 12, a distribution of an asset or an undivided interest in an asset in-kind to a Member shall be considered a distribution of an amount equal to the fair market value of such asset or undivided interest. Each Member shall have the right to designate another Person to receive any property that otherwise would be distributed in kind to that Member pursuant to this Section 12.3.

(c)      Any real property distributed to the Members shall be conveyed by special warranty deed and shall be subject to the operating agreements and all Liens, contracts and commitments then in effect with respect to such property, which shall be assumed by the Members receiving such real property.

(d)      Except as expressly provided herein, the liquidator shall comply with any applicable requirements of the Act and all other applicable Laws pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

(e)      The distribution of cash or property to the Members in accordance with the provisions of this Section 12.3 shall constitute a complete return to the Members of their respective Capital Contributions and a complete distribution to the Members of their respective interests in the Company and all Company property. Notwithstanding any other provision of this Agreement, no Member shall have any obligation to contribute to the Company, pay to any other Member or pay to any other Person any deficit balance in such Member's Capital Account.

12.4   **Articles of Dissolution.**   Upon the completion of the distribution of the Company's assets as provided in this ARTICLE 12, the Company shall be terminated and the Person acting as liquidator shall file articles of dissolution and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE 13

### NOTICES

13.1   **Method of Notices.**   All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by reputable international delivery service (such as UPS or FedEx), or by email if delivery is confirmed, and shall be effective when personally delivered, or, if sent by courier, on the date set forth on the delivery receipt, or if sent by email, upon receipt of confirmation, at their respective addresses set forth on Schedule A attached hereto. Any Member, Li, or the Manager may give notice from time to time changing his, her, or its respective address for that purpose.

13.2   **Computation of Time.**   In computing any period of time under this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday or Sunday, in which event the period shall run until the end of the next day which is not a Saturday or Sunday.

## ARTICLE 14

### GENERAL PROVISIONS

14.1 **Amendment**. This Agreement may not be amended except by an instrument signed and approved by all of the Members and Li.

14.2 **Waiver**. Except as otherwise provided herein, rights hereunder may not be waived except by an instrument in writing signed by the Member sought to be charged with the waiver, or, if applicable, Li.

14.3 **Confidentiality**. Each Member, Li, and the Manager will keep confidential and not use, reveal, provide or transfer to any third party any Confidential Information he, she, or it obtains or has obtained concerning the Company, except (1) to the extent that disclosure to a third party is required by applicable Law; (2) information which, at the time of disclosure, is generally available to the public (other than as a result of a breach of this Agreement or any other confidentiality agreement to which such Person is a party or of which it has knowledge), as evidenced by generally available documents or publications; (3) information that was in his, her, or its possession prior to disclosure (as evidenced by appropriate written materials) and was not acquired directly or indirectly from the Company; (4) to the extent disclosure is necessary or advisable, to his, her, its, or the Company's employees, consultants or advisors for the purpose of carrying out their duties hereunder; (5) to banks or other financial institutions or agencies or any independent accountants or legal counsel or investment advisors employed by the Manager, the Company, Li, or any Member, to the extent disclosure is necessary; (6) to the extent necessary, disclosure to third parties to enforce this Agreement, or (7) to a Member, Li, or the Manager or to their respective Affiliates; *provided, however*, that in each case of disclosure pursuant to (4), (5), (6), or (7), the Persons to whom disclosure is made agree to be bound by this confidentiality provision. The obligation of each Member and the Manager not to disclose Confidential Information except as provided herein shall not be affected by the termination of this Agreement or the replacement of the Manager or substitution of any Member.

14.4 **Public Announcements**. Except as required by Law, no Member, or Li, shall make any press release or other public announcement or public disclosure relating to this Agreement, the subject matter of this Agreement or the activities of the Company without the consent of the Manager.

14.5 **Applicable Law**. This Agreement shall be construed in accordance with and governed by the laws of the State of Colorado, United States, excluding its conflicts of laws rules.

14.6 **Arbitration; Consent to Jurisdiction**.

14.6.1 Arbitration. Each Member and Li, on his, her, or its own behalf and on behalf of the Company, hereby agrees to submit all controversies, claims and matters of difference arising under or relating to this Agreement or the Company, which cannot be resolved between the Members and Li, to arbitration in accordance with the provisions and procedures set forth herein, except for a suit for injunctive relief, which may be brought in any court in the State

- 22 -

of Colorado, United States pursuant to Section 14.6.2. Without limiting the generality of the foregoing, the following shall be considered controversies for this purpose: (a) all questions relating to the interpretation or breach of this Agreement, (b) all questions relating to any representations, negotiations and other proceedings leading to the execution of this Agreement, the formation of the Company, or the issuance of Membership Interests, and (c) all questions as to whether the right to arbitrate any such question exists. Notwithstanding the foregoing, each Member, Li, and the Manager shall have the right to seek and obtain such temporary or preliminary injunctive relief from a court of competent jurisdiction to which it may be entitled pending a final determination by arbitration of the dispute to which such relief relates.

14.6.2 Exclusive Jurisdiction. Each Member, and Li, on his, her, or its own behalf and on behalf of the Company, hereby submits to the exclusive jurisdiction of the state and federal courts located in the State of Colorado, United States, to seek injunctive relief and to enforce arbitral awards, without regard to and irrespective of any claims of *forum non conveniens*, in respect of all claims arising in connection with the Company, the provisions of this Agreement and all related matters.

14.6.3 Procedures. Such arbitration procedures shall be conducted before a panel of three arbitrators, sitting in a location selected by mutual agreement within the City of Denver, Colorado in accordance with the rules for commercial arbitration of the American Arbitration Association then in effect—with each Party selecting one arbitrator and the two arbitrators so selected themselves selecting the third—except that: (i) each arbitrator shall agree to treat as confidential all evidence and other information presented by the parties; (ii) the arbitrators shall have no authority to amend or modify any of the terms of this Agreement or of any related agreement; and (iii) the arbitrators shall have fourteen (14) days from the later of the closing statements or the submission of post-hearing briefs by the parties to render their decision. The arbitration shall take place entirely in English.

14.6.4 Authority. The arbitrators shall have the authority to award any remedy or relief that a court of competent jurisdiction could order or grant.

14.6.5 Judgment. Judgment may be entered on the arbitrators' award in any court having competent jurisdiction; however, the parties hereto each consent to the jurisdiction of the state and federal courts located in the State of Colorado with respect to any proceeding to enter judgment upon the arbitrators' award, without regard to and irrespective of any claims of *forum non conveniens*.

14.6.6 Statute of Limitations. The arbitration procedures set forth herein shall in no respect be construed to prevent a Party from instituting formal proceedings at any time to avoid the expiration of any applicable statute of limitations or to preserve a senior position with respect to creditors.

14.6.7 Enforcement. These arbitration procedures specifically contemplate that the Members, Li, and the Manager shall be entitled to seek enforcement of this Agreement in any court of competent jurisdiction to the fullest extent permitted by law, by seeking any remedy available in equity, including but not limited to a temporary restraining order, preliminary and/or temporary injunctive relief and specific performance, until the arbitration award is rendered or

the controversy is otherwise resolved, without having to arbitrate and without need to post any bond.

14.6.8 Continuing Obligations. During the period before and during any arbitration to settle any controversy hereunder, the Parties shall continue to fulfill their duties under this Agreement.

14.7   Costs of Dispute. In any dispute that arises under this Agreement, the prevailing Party shall be entitled to recover reasonable attorney's fees and costs, including court costs and arbitration fees, from the losing Party.

14.8   Costs of this Agreement. Each Party shall pay his or its own costs associated with this Agreement.

14.9   Entire Agreement. This Agreement embodies the entire understanding and agreement among the parties concerning the Company and supersedes any and all prior negotiations, understandings or agreements in regard thereto.

14.10  References. References to a Member or the Manager, including by use of a pronoun, shall be deemed to include masculine, feminine, singular, plural, individuals, partnerships or corporations where applicable. References in this Agreement to terms in the singular shall include the plural and vice versa.

14.11  U.S. Dollars. References herein to "Dollars" or "$" shall refer to U.S. dollars and all payments and all calculations of amounts hereunder shall be made in Dollars.

14.12  Counterparts. This instrument may be executed in any number of counterparts each of which shall be considered an original, but all of which together shall constitute one instrument. Delivery of an executed counterpart of this Agreement by facsimile transmission or by email in .pdf format shall be as effective as delivery of a manually executed counterpart of this Agreement.

14.13  Language. This Agreement is executed in both Chinese and English. The Parties agree that both language versions shall have equal validity and legal effect. Each Party acknowledges that it has reviewed both language texts and they are substantially the same in all material respects.

14.14  Additional Documents. The Members hereto covenant and agree to execute such additional documents and to perform additional acts as are or may become necessary or convenient to carry out the purposes of this Agreement.

14.15  No Third Party Beneficiaries. This Agreement is for the sole benefit of the Members, the Manager, and the Company, and no other Person is intended to be a beneficiary of this Agreement or shall have any rights hereunder.

14.16  Representation. The parties acknowledge that Izbiky & Associates PLLC prepared this Operating Agreement as the attorney for the Company and not as the attorney for

any of the Members or Li.  Each Member and Li is advised to seek separate tax and legal counsel to the extent she considers advisable.

[*Signature page follows.*]

The parties have executed this Agreement to be effective as of the Effective Date.

**MEMBERS:**

Daniel Banjo

Z.L. Investment

By: _____

Name: JUN LI

Title: GM

**LI ZHIXIANG**

Li Zhixiang

**SCHEDULE A**

MEMBERS, ADDRESSES, UNITS

| Members | Address | Initial Capital Contribution | Units | Sharing Ratio |
|---------|---------|------------------------------|-------|---------------|
| Z.L. Investment | | $1,800,000 | 900,000 | 90% |
| Daniel Banjo | 3278 Folsom St. Boulder, CO 80304 Email: dbanjo@frictionlessworld.com | $200,000 | 100,000 | 10% |

Li's address for notice is:

Li Zhixiang
Changzhou Inter Universal Machinery/Equipment Company
Zhaiqiao Town,
Wujin, Changzhou, Jiangsu, China 213117
Email:

**SCHEDULE B**

**2013 BUSINESS PLAN**

# Ex. C-2

**FUNDING AGREEMENT**

This Funding Agreement (this "Agreement") is entered into effective as of April // , 2013 (the "Effective Date") by and between Daniel Banjo ("Banjo"), Z.L. Investment ("Z.L."), and Li Zhixiang ("Li").

In consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     PRIOR EXPENSES. The parties acknowledge and agree that, as of the Effective Date, Banjo has spent $187,877.38 in furtherance of the business of Frictionless, LLC, a Colorado limited liability company (the "Company"), and Li has spent $700,000 in furtherance of the Company's business.

2.     LI'S EXPENSES CREDITED TO CAPITAL CONTRIBUTIONS. Li desires, and the parties agree, that his previous expenses shall be credited to Z.L., so that as of the Effective Date Z.L. shall be credited with a $700,000 capital contribution to the Company.

3.     BANJO'S EXPENSES CREDITED TO CAPITAL CONTRIBUTIONS. On the Effective Date, Banjo shall be credited with a $187,877.38 capital contribution to the Company.

4.     BANJO'S CASH CONTRIBUTION. Within seven days of the Effective Date, Banjo shall transfer $12,122.62 to the Company's bank account, which will be used to fund Company operations on and after that date.

5.     Z.L.'S CASH CONTRIBUTION. On or before May 3, 2013, or such later date as the parties mutually agree (in writing, including by email) Z.L. shall wire $1,100,000 to the Company's bank account, according to wire instructions to be provided by Banjo.

6.     TOTAL CAPITAL CONTRIBUTIONS AND UNITS. Immediately upon the Company's receipt of the payment from Z.L. set forth in Section 5, Z.L. shall be credited with a total capital contribution to the Company in the amount of $1,800,000. Immediately upon the Company's receipt of the payment from Banjo set forth in Section 4, Banjo shall be credited with a total capital contribution to the Company in the amount of $200,000. In exchange for their capital contributions, Z.L. shall be granted 900,000 Units in the Company and Banjo shall be granted 100,000 Units in the Company.

7.     COMPANY EXPENSES. Effective immediately after the Company's receipt of the payment from Z.L. set forth in Section 5, all Company expenses shall be paid through the Company's bank accounts. To the extent Banjo incurs any further expenses (in addition to his payment set forth in Section 4) on behalf of the Company or otherwise in furtherance of its business before the Company receives the payment from Z.L., such amounts shall be considered a short term loan from Banjo to the Company, bearing interest at a rate of 0.22% per year, which shall be repaid as soon as is reasonably practicable after the Company receives the payment from Z.L. Banjo shall retain documentation evidencing the amount of any such expenses.

i

8.    OPERATING AGREEMENT. To the extent any term in this Agreement conflicts with the Operating Agreement of the Company, this Agreement shall control.

9.    MISCELLANEOUS. This Agreement constitutes the entire agreement of the parties hereto and supersedes all prior representations, proposals, discussions, and communications, whether oral or in writing. This Agreement may be modified only by a writing signed by all three parties. This Agreement may be executed in any number of counterparts. Delivery of an executed counterpart of this Agreement by facsimile transmission or by email in .pdf format shall be as effective as delivery of a manually executed counterpart of this Agreement. This Agreement shall be governed by the laws of the State of Colorado, and exclusive venue for any dispute under this Agreement shall be the state and federal courts located in Denver, Colorado. All currency amounts in this Agreement are United States Dollars.

*[Signature page follows.]*

2

IN WITNESS WHEREOF, the parties have caused this Funding Agreement to be executed effective as of the Effective Date.

Li Zhixiang

Daniel Banjo

Z.L. Investment

By:

Name: JUN LI

Title: GM

# Ex. C-3

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement") is entered into effective as of April __11__, 2013 (the "Effective Date") by and between Frictionless, LLC, a Colorado limited liability company (the "Company"), Daniel Banjo ("Banjo"), and Li Zhixiang ("Li").

1.   BANJO'S SERVICES.  Banjo shall work for the Company in such position as Li determines, which may or may not be as the Manager or President of the Company.

2.   THE COMPANY'S RESPONSIBILITIES.  The Company shall pay Banjo an annual salary of at least $189,000 (US Dollars) per year plus such benefits as are common for persons of similar experience working for a company in the United States in a similar role as Banjo, including health insurance. Banjo's salary may be increased, and he may receive bonuses, as determined by Li.

3.   TERM. The term of this Agreement shall begin on the Effective Date and shall continue until the date that is at least five years from the Effective Date, unless terminated sooner pursuant to Section 4.

4.   TERMINATION OF BANJO'S EMPLOYMENT. The Company may terminate Banjo's employment immediately for cause. For purposes of this section, cause shall mean: (i) Banjo failing or refusing to perform his reasonable duties for a period of thirty (30) days following written notice of such failure or refusal from the Company; or (ii) Banjo engaging in conduct or activities materially damaging to the business or reputation of the Company, which conduct or activities continues for a period of thirty (30) days following a written request to desist from the Company. Any dispute regarding whether there is cause shall be settled according to the dispute resolution provisions in Section 6(a). Banjo may resign from his employment with the Company at any time following one (1) month's prior written notice to the Company, but only so long as Li has provided his consent, which consent may be withheld by Li only for good reason.

5.   OBLIGATIONS UPON TERMINATION. In the event that Banjo's employment is terminated or he resigns, for any reason at any time:

(a) Banjo shall have the right, at his option, to sell all, but not less than all, of his membership interest in the Company to Li for an amount equal to the greater of either (i) the fair market value of Banjo's membership interest on the date of his termination or resignation, as determined by a qualified third party located in the United States agreed upon by Banjo and Li, or (ii) $200,000. In the event that Banjo does not elect to sell his membership interest to Li, Banjo may remain a member of the Company and continue to receive distributions from the Company. For so long as Banjo remains a member of the Company, Li shall use his commercially reasonable efforts to maximize the profits of the Company and distribute those profits to the members.

(b) The Company shall use its best efforts to terminate any personal guaranty or personal liability of Banjo (including by substituting the personal guaranty of another person) which he executed or incurred for the benefit of the Company, including the personal guaranty on any leases for space used by the Company.

6.    MISCELLANEOUS.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the state of Colorado. If any dispute arises under this Agreement, the parties shall negotiate in good faith to resolve the dispute.  Any dispute which the parties cannot resolve by negotiation shall be submitted to mediation before a mediator agreed upon by the parties, or, if the parties cannot agree upon a mediator, a mediator in Denver, Colorado shall be selected by the American Arbitration Association. If a dispute is not resolved within thirty (30) days of the holding of a mediation session, the dispute shall be submitted to binding arbitration in Denver, Colorado before an arbitrator agreed upon by the parties, or, if the parties cannot agree on an arbitrator, the American Arbitration Association in accordance with its Commercial Arbitration Rules, except that (i) disputes concerning $15,000 or less shall be resolved in the courts of the City and County of Denver, Colorado; and (ii) disputes in which a party seeks injunctive relief shall be resolved in the district courts of the City and County of Denver, Colorado, in which case all claims shall be resolved in such lawsuit. Judgment upon the award rendered by said arbitration may be entered in any court having jurisdiction thereof. In any dispute that arises under this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs, including court costs and arbitration fees, from the losing party. The jurisdiction set forth in this paragraph is the exclusive jurisdiction without regard to and irrespective of any claims of forum non conveniens, in respect of all claims arising in connection with this Agreement and all related matters.

(b)    All notices required or permitted by this Agreement shall be in writing and shall be hand delivered or sent by reputable international delivery service (such as UPS or FedEx), or by email if delivery is confirmed, and shall be effective when personally delivered, or, if sent by courier, on the date set forth on the delivery receipt, or if sent by email, upon receipt of confirmation. The Company, Li, and Banjo acknowledge and agree that any communication from Banjo to Li with regard to the operation of the Company may be made via email or telephone through Allen, Frank, or LiShan (the "Intermediaries"), and that Li shall use reasonable efforts to respond to Banjo within twenty-four hours of Banjo contacting either Li or the Intermediaries. Notice to Li shall be deemed effective when given to the Intermediaries.

(c)    Sections 5 and 6 shall survive termination of this Agreement.

(d)    This Agreement constitutes the entire agreement of the parties hereto and supersedes all prior representations, proposals, discussions, and communications, whether oral or in writing.  This Agreement may be modified only by a writing signed by all three parties.

(e)    This instrument may be executed in any number of counterparts. Delivery of an executed counterpart of this Agreement by facsimile transmission or by email in .pdf format shall be as effective as delivery of a manually executed counterpart of this Agreement.

[*Signature page follows.*]

IN WITNESS WHEREOF, the parties have caused this Employment Agreement to be executed effective as of the Effective Date.

FRICTIONLESS, LLC

By _____
Li Zhixiang, Chairman


_____
Li Zhixiang


_____
Daniel Banjo

3

# Exhibit 2

IN THE MATTER OF AN ARBITRATION UNDER THE COMMERCIAL RULES OF THE
AMERICAN ARBITRATION ASSOCIATION

**CHANGZHOU ZHONG LIAN INVESTMENT CO. LTD. (A/K/A Z.L. INVESTMENT),
INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF FRICTIONLESS, LLC,
CHANGZHOU INTER UNIVERSAL MACHINE & EQUIPMENT CO. LTD,
AND FRICTIONLESS, LLC, ON ITS OWN BEHALF,**

*Claimants,*

v.

**DANIEL BANJO, INDIVIDUALLY AND DERIVATIVELY ON BEHALF OF
FRICTIONLESS, LLC, AND FRICTIONLESS WORLD LLC, INDIVIDUALLY**

*Respondents, Counterclaimants, & Third-Party Claimants,*

v.

**LI ZHIXIANG, CHANGZHOU ZHONG LIAN INVESTMENT CO. LTD.
(A/K/A Z.L. INVESTMENT), AND CHANGZHOU INTER UNIVERSAL
MACHINE & EQUIPMENT CO. LTD.,**

*Counterclaim and Third-Party Respondents,*

**and**

**FRICTIONLESS, LLC,**

*Nominal Claimant, Nominal Respondent, Nominal Counter-Claimant, & Nominal Third-Party Claimant*

---

**[PROPOSED] AMENDED DEMAND FOR ARBITRATION**

---

**K&L GATES LLP**
Brian D. Koosed
1601 K Street, NW
Washington, D.C.
*And*
Kodey M. Haddox
599 Lexington Avenue
New York, New York
**Counsel for the Claimants**

# Table of Contents

**Page**

I.   PROCEDURAL HISTORY ........................................................................................ 1

II.   PRELIMINARY STATEMENT ............................................................................... 2

III.   THE PARTIES ........................................................................................................ 7

    A.   Claimants ..................................................................................................... 7

    B.   Respondents ................................................................................................. 8

    C.   Third-Party Respondents ............................................................................. 9

IV.   ARBITRATION AGREEMENT AND GOVERNING LAW ...................................... 10

V.   FACTUAL BACKGROUND .................................................................................. 12

    A.   The Li Parties Seek To Expand Their Presence In The United States By Forming A Company That Eventually Becomes Frictionless ............................. 12

    B.   The Parties Engage In Lengthy Negotiations For Over A Year Before Executing The Frictionless Agreements ............................................................ 12

    C.   The Parties Sign The Frictionless Agreements ................................................. 20

    D.   The LLC Agreement Defines The Rights And Obligations of Z.L. Investment And Banjo Vis-à-Vis Frictionless ..................................................... 22

    E.   The Undisputed Facts About How Banjo Operated The Company From April 2013 – April 2019 ..................................................................................... 28

    F.   The Li Parties Discover Banjo's Fraud, Banjo And World Stonewall, and Z.L. Investment Is Forced To File Its Initial Demand .......................................... 32

    G.   After The Initial Demand Is Filed, Banjo Resigns As Frictionless' Manager Rather Than Collect The Debts That World Owes Frictionless; Banjo Then Wrongfully Takes Possession Of The Final Four Shipments For World, Without Paying Frictionless Or CIU ................................................... 36

    H.   After Banjo's Resignation, Z.L. Investment Appoints A New Manager For Frictionless And Discovers Additional Evidence Of Fraud ........................... 39

    I.   The Central Dispute In This Arbitration ............................................................ 41

VI.   DESCRIPTION OF CLAIMS .............................................................................. 42

VII.   FURTHER SUBMISSIONS AND RESERVATION OF RIGHTS ............................ 63

VIII.   RELIEF REQUESTED ....................................................................................... 63

1.      In accordance with Rules 4 and 6 of the Commercial Arbitration Rules of the American Arbitration Association (the "**Commercial Rules**"), and the Tribunal's Procedural Order No. 2, dated September 9, 2019 ("**Procedural Order No. 2**"), Claimants Frictionless, LLC ("**Frictionless**" or "**the Company**"), Changzhou Zhong Lian Investment Co. Ltd. (a/k/a Z.L. Investment) ("**Z.L. Investment**"), on behalf of itself and derivatively on behalf of the Company, and Changzhou Inter Universal Machine & Equipment Co., Ltd. ("**CIU**," and collectively with Frictionless and Z.L. Investment, "**Claimants**"), hereby file their amended demand for arbitration ("**Amended Demand**") of the dispute described herein under Sections 14.6.1 and 14.6.3 of that certain Operating Agreement of Frictionless, LLC, dated April 11, 2013 (the "**LLC Agreement**")[1], against the Company's co-owner and former Manager, Respondent Daniel Banjo ("**Banjo**"), for the fraud, misconduct, and other breaches described below that Banjo perpetrated using his wholly-owned company, Respondent Frictionless World LLC ("**World**").

## I.      PROCEDURAL HISTORY

2.      On April 15, 2019, Claimant Z.L. Investment filed a demand for arbitration, on behalf of itself and derivatively on behalf of the Company (the "**Initial Demand**"), against Respondents Banjo and World, asserting claims for, among other things, fraud, constructive fraud, civil theft, conversion, breach of contract (including misappropriation and breaches of contractual rights to intellectual property), and breaches of contractual and common law fiduciary duties.

3.      On May 8, 2019, Respondents Banjo and World filed their Response to the Initial Demand, along with certain Counterclaims against Z.L. Investment, and Third-Party Claims against CIU and Li Zhixiang ("**Mr. Li**") (together with CIU, the "**Third-Party Respondents**").

---

[1]      *See* LLC Agreement, annexed hereto as Claimants' Exhibit C-1).  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the LLC Agreement.

4.      On June 10, 2019, Claimant Z.L. Investment and Third-Party Respondents CIU and Mr. Li (collectively, the "**Li Parties**"), submitted their joint answer and reply to the Answer, Counterclaims, and Third-Party Claims filed by Respondents.

5.      On June 18, 2019, Respondents Banjo and World filed an Emergency Motion for Preliminary Injunction seeking to order CIU to continue shipping product to World.  The appointed Emergency Arbitrator denied Respondents' Emergency Motion on July 19, 2019.

6.      Thereafter, the Tribunal was empaneled.  Following a September 6, 2019 preliminary hearing, the Tribunal issued Procedural Order No. 2, which, among other things, instructed the parties to submit amended claims or counterclaims no later than 5:30 p.m. (Denver time) on Friday October 4, 2019.

7.      On September 29, 2019, the Tribunal issued Procedural Order No. 3, establishing interim deadlines for the completion of, among other things, discovery and pre-hearing procedures.

8.      On Monday September 30, 2019, World filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Colorado ("**Bankruptcy Court**").  On [DATE,] the Bankruptcy Court lifted the automatic stay under Section 362(a)(1) of the Bankruptcy Code to permit this Arbitration to proceed against World.

## II.    **PRELIMINARY STATEMENT**

9.      Claimant Z.L. Investment is a Chinese investment entity owned by certain members of Mr. Li's family.  Mr. Li and his family also own CIU, which is a company located in Changzhou, China that manufactures professional grade power tools and equipment.

10.     Until 2012, CIU's presence in the U.S. market had been strictly limited to a role as a behind-the-scenes contract manufacturer for other equipment brands, such as Blount International, Inc. ("**Blount**").  But Mr. Li and his family wanted more direct access to the U.S.

market for CIU's products and, accordingly, decided that they wanted to create:  (a) their own brand for the U.S. market, which CIU would manufacture; and (b) their own U.S. affiliate that would sell this new brand's products directly to U.S. retailers including, among others, Wal-Mart, Home Depot, Lowe's, Tractor Supply Company, and Amazon (collectively, the "**Retailers**").

11.     Toward that end, Mr. Li took a series of steps in the Spring of 2012 to start a U.S.-based business with Respondent Banjo, a Colorado resident whom Mr. Li had met while Banjo worked for Speeco, Inc., which was subsequently acquired by Blount.  As set forth in more detail below, these steps included:  (a) investing substantial sums with Banjo to create a new U.S.-based company and accompanying brand for the U.S. market; and (b) forming Z.L. Investment as an investment entity to invest in that new company, which would eventually be called Frictionless.

12.     After a lengthy negotiation process that lasted over a year, these efforts culminated in the following activity in the Spring of 2013:

13.     *First*, on or about March 1, 2013, Z.L. Investment and Banjo formed a Colorado limited liability company – Frictionless – to serve as a U.S. wholesaler of CIU's products to various Retailers in the United States.

14.     *Second*, on or about April 11, 2013, Mr. Li, Z.L. Investment, and Banjo signed three agreements:

    a.     The LLC Agreement, to govern the Company's operations going forward and confirm that its two Members – Z.L. Investment and Banjo – would own 90% and 10% of the Company's equity, respectively;

    b.     A "Funding Agreement," memorializing the Members' capital contributions to the Company and the allocation thereof (the "**Funding Agreement**"); and

- 3 -

c. An "Employment Agreement," pursuant to which the Company would employ Banjo in a position to be determined by Mr. Li, in his role as Frictionless' Chairman (the "**Employment Agreement**," together with the LLC Agreement and the Funding Agreement, the "**Frictionless Agreements**").[2]

15. It is undisputed that the text of the three Frictionless Agreements nowhere mentions "Frictionless World LLC."

16. As detailed further below, from mid-April 2013 until late 2018, Z.L. Investment, Mr. Li, and the rest of the Li family resided in China while Banjo ran the Company's day-to-day operations in Colorado as Frictionless' Manager. Throughout that time, the Li Parties understood that: (a) CIU would manufacture products branded for Frictionless; (b) CIU would sell those products to Frictionless; (c) Frictionless would then sell those products to U.S. Retailers; and (d) Frictionless' profits would be divided between Z.L. Investment and Banjo in accordance with their respective pro rata equity interests in the Company.

17. However, *and unbeknownst to the Li Parties until late 2018*, throughout this time Banjo – who was in charge of the Company's day-to-day operations at all times – was using a separate Colorado limited liability company that he alone owned and controlled, World, to siphon off revenues and profits to which Frictionless was rightfully entitled. Indeed, and as detailed further below, Respondents have admitted the salient facts of how Banjo operated the Company while he served as its Manager.

18. Respondents' scheme consisted of both a "revenue-side fraud" and an "expense-side fraud." The revenue-side fraud operated as follows:

---

[2]     *See* Funding Agreement, dated April 11, 2013 (annexed as Claimants' Exhibit C-2) & Employment Agreement, dated April 11, 2013 (annexed as Claimants' Exhibit C-3). No breach of the Funding Agreement is alleged in this matter.

- 4 -

a. As the parties intended, CIU sold Frictionless-branded products to Frictionless;

b. At all times, and contrary to the parties' original intent, Banjo unilaterally directed Frictionless to sell those products *to World*, rather than having Frictionless sell CIU's products directly to the Retailers;

c. While Banjo sometimes directed Frictionless to sell CIU's products to World at some mark-up – i.e., at a price slightly higher than what Frictionless paid CIU for them – Banjo at other times directed Frictionless to sell CIU's products to World *at cost*, meaning Frictionless made no money whatsoever off those sales; and

d. World then sold CIU's products to the Retailers at a still unknown price, which, upon information and belief, reflected a significant "mark-up" from the price at which World bought CIU's products from Frictionless.

19. In sum, by inserting World as a "middleman" into the sale process between Frictionless and the Retailers, Respondents' "revenue-side fraud" enabled them to siphon off substantial revenues and profits from the sale of CIU's products to the Retailers into an entity that Banjo alone owned and controlled – World – at the expense of Frictionless, of which Banjo owns only 10% and Z.L. Investment owns the rest.

20. While engaged in this "revenue-side fraud," Respondents also perpetrated an "expense-side fraud," as follows:

a. Banjo operated Frictionless' business through World, with World hiring all employees, entering into all contracts for warehousing, information technology, insurance, legal representation, etc.;

b. World paid all of its operating expenses directly to its landlord, employees, IT and legal service providers, etc.; and

c.     In each instance, Banjo then directed Frictionless to reimburse World for **all** of World's expenses, **even** for World's unique brands and business lines that were not supplied by CIU and had nothing to do with Frictionless or the Li Parties.

21.    It is undisputed that this is how Banjo ran the Company on a day-to-day basis – with Frictionless operating as a mere "pass through" company, World conducting all sales and operations vis-à-vis the Retailers, and Frictionless ultimately bearing all of World's expenses.

22.    The end result of this scheme was that World was able to operate a substantial business – involving certain brands supplied by CIU, through Frictionless, and other brands that were not – with little to no operating expenses.

23.    These facts are, again, undisputed.  The **only** material dispute presented by this factual scenario is whether, as Respondents have alleged since Z.L. Investment filed its Initial Demand, this entire arrangement – whereby Frictionless paid for everything, while World apparently realized a substantial profit margin on its sales to Retailers because it had little to no operating expenses – was agreed to by the Li Parties.  As set forth below and as they will prove at the July 13-17, 2020 hearing (the "**Hearing**"), the Li Parties never agreed to such a commercially absurd arrangement.  Rather, they are simply the victims of Respondents' years-long fraud.

24.    As a direct result of this fraudulent scheme and the misconduct and breaches outlined herein, Claimants have suffered an undetermined amount of lost Frictionless revenue and profits believed to exceed tens of millions of dollars, all of which will be finally determined and quantified at the Hearing.  Z.L. Investment has also suffered damages in an amount to date of at least $900,000 in legal and consultant fees and other expenses, which continue to accrue.

III.  **THE PARTIES**

A.  **Claimants**

25.      The Claimants are:  (i) Frictionless, LLC; (ii) Z.L. Investment; and (iii) CIU.

26.      Claimant Frictionless, LLC is a Colorado limited liability company.  Frictionless sells tools under the brand names "Dirty Hand Tools," "RanchEx," and "Vinsetta."

27.      The Company's details are as follows:

Name:          Frictionless, LLC

Address:      Room 608, Caifu Guangchang Yanzheng Middle Road
                    Wujin High-Tech District

                    Changzhou City
                    Jiangsu Province, China[3]

28.      Claimant Z.L. Investment is an investment entity organized under the laws of China that was formed for the purpose of investing in Frictionless.  As noted, pursuant to the LLC Agreement, Z.L. Investment owns 90% of the Company.

29.      Z.L. Investment's details are as follows:

Name:          Changzhou Zhong Lian Investment Co. Ltd. (a/k/a Z.L. Investment)

Address:      Room 102, No. 18 Xin Ya Road
                    Wujin High-Tech District
                    Changzhou City
                    Jiangsu Province, China

30.      Claimant Changzhou Inter Universal Machine & Equipment Co., Ltd. is a Chinese company, owned and operated by Mr. Li and his family, that specializes in the manufacture and distribution of tools and power equipment.  CIU is not a party to the LLC Agreement, but has agreed to arbitrate this dispute in submissions made to the AAA/ICDR in May and June 2019.

---

[3]      Frictionless' address was moved from Colorado to China in May 2019, for the reasons outlined below in Section V.G.

31.     CIU's details are as follows:

Name:          Changzhou Inter Universal Machine & Equipment Co., Ltd.

Address:       Wujin High-Tech District
               Changzhou City
               Jiangsu Province, China

32.     All communications to Claimants related to this arbitration should be sent to their

legal counsel, K&L Gates LLP, whose contact details are set forth below:

> Brian D. Koosed
> Lacey A. Gehm
> K&L Gates LLP
> 1601 K Street, NW
> Washington, D.C. 20006
> P: +1 202 778 9204
> brian.koosed@klgates.com
>
> With copy to:
>
> Kodey M. Haddox
> K&L Gates LLP
> 599 Lexington Avenue
> New York, NY 10022
> P: +1 212 536 3920
> kodey.haddox@klgates.com

**B.      Respondents**

33.     The Respondents are:  (i) Daniel Banjo; and (ii) Frictionless World LLC.

34.     Banjo is an individual residing in Colorado with a home address located at 2807

Jay Road, Boulder, Colorado.  As discussed, Banjo owns 10% of the Company's equity and is a

party to the LLC Agreement.

35.     Banjo owns 100% of World's membership interests.  World is not a party to the

LLC Agreement or to any other contracts with the Li Parties, but previously agreed to arbitrate

this dispute in submissions made to the AAA/ICDR in May and June 2019.

36.     World is a limited liability company organized under the laws of the State of Colorado with its registered business address at 1100 W. 120th Avenue, Suite 600, Westminster, Colorado 80234.  World sells tools under the brand names "Dirty Hand Tools," "RanchEx," and "Vinsetta" – i.e., the same brands sold by Frictionless.  World also sells other tools under additional brand lines named "Redback" and "Trophy Strike."

37.     All communications to Respondents related to this arbitration should be sent to their legal counsel, Thomas P. Howard, whose contact details are set forth below:

> Thomas P. Howard, Esq.
> THOMAS P. HOWARD, LLC
> 842 W. South Boulder Rd., Suite #100
> Louisville, CO 80027
> Phone: (303) 665-9845
> Fax: (303) 665-9847
> Email: thoward@thowardlaw.com

### C.     Third-Party Respondents

38.     The Third-Party Respondents are:  (i) Li Zhixiang; and (ii) Changzhou Inter Universal Machine & Equipment Co., Ltd.

39.     As noted, Mr. Li is a Chinese businessman who, among other things, owns and operates CIU with several family members.  Certain of Mr. Li's family members also own Z.L. Investment.  Mr. Li is a party to the LLC Agreement, by which he was designated as Frictionless' Chairman, but he is not a Member of the Company.

40.     CIU is a Chinese company, owned and operated by Mr. Li and his family, that specializes in the manufacture and distribution of tools and power equipment.  CIU is not a party to the LLC Agreement, but has agreed to arbitrate this dispute.

41.     All communications to Third-Party Respondents related to this arbitration should be sent to their legal counsel, K&L Gates LLP, whose contact details are set forth below:

Brian D. Koosed
Lacey A. Gehm
K&L Gates LLP
1601 K Street, NW
Washington, D.C. 20006
P: +1 202 778 9204
brian.koosed@klgates.com

With copy to:

Kodey M. Haddox
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022
P: +1 212 536 3920
kodey.haddox@klgates.com

## IV.   **ARBITRATION AGREEMENT AND GOVERNING LAW**

42.    During the September 6, 2019 preliminary hearing with the Tribunal, the parties confirmed that Claimants, Respondents, and Third-Party Respondents have agreed to arbitrate this dispute in accordance with Section 14.6 of the LLC Agreement, which is entitled "**Arbitration; Consent to Jurisdiction.**"  Section 14.6.1 of the LLC Agreement provides as follows:

> 14.6.1. Arbitration.  Each Member [Banjo and Z.L. Investment] and Li, on his, her, or its own behalf and on behalf of the Company, hereby agrees to submit all controversies, claims and matters of difference arising under or relating to this Agreement or the Company, which cannot be resolved between the Members and Li, to arbitration in accordance with the provisions and procedures set forth herein . . . . Without limiting the generality of the foregoing, the following shall be considered controversies for this purpose: (a) all questions relating to the interpretation or breach of this [LLC] Agreement, (b) all questions relating to any representations, negotiations and other proceedings leading to the execution of this Agreement, the formation of the Company, or the issuance of Membership Interests, and (c) all questions as to whether the right to arbitrate any such question exists.   Notwithstanding the foregoing, each Member, Li, and the Manager shall have the right to seek and obtain such temporary or preliminary injunctive relief from a court of competent jurisdiction to which it may be entitled pending a final determination by arbitration of the dispute to which such relief relates.

43.     Section 14.6.1 constitutes a broad arbitration agreement.

44.     Section 14.6.3 of the LLC Agreement further provides the following arbitral

procedural mandate, which the parties confirmed to the Tribunal applies here during the September

6, 2019 preliminary hearing:

> 14.6.3. Procedures. Such arbitration procedures shall be conducted
> before a panel of three arbitrators, sitting in a location selected by
> mutual agreement within the City of Denver, Colorado in
> accordance with the rules for commercial arbitration of the
> American Arbitration Association then in effect – with each Party
> selecting one arbitrator and the two arbitrators so selected
> themselves selecting the third – except that: (i) each arbitrator shall
> agree to treat as confidential all evidence and other information
> presented by the parties; (ii) the arbitrators shall have no authority
> to amend or modify any of the terms of this Agreement or of any
> related agreement; and (iii) the arbitrators shall have fourteen (14)
> days from the later of the closing statements or the submission of
> post-hearing briefs by the parties to render their decision. The
> arbitration shall take place entirely in English.

45.     Accordingly, the parties have agreed that the Hearing shall take place in Denver,

Colorado.  The parties have further agreed that, under Section 14.5 of the LLC Agreement, the

governing substantive law here is Colorado law.

46.     Finally, pursuant to Section 14.7 of the LLC Agreement, the parties have agreed

that, "[i]n any dispute that arises under this [LLC] Agreement, the prevailing Party shall be entitled

to recover reasonable attorneys' fees and costs, including court costs and arbitration fees, from the

losing Party."

47.     As required by Procedural Order No. 2, this Amended Demand for Arbitration is

being sent via email to the Tribunal, the ICDR, and Respondents' counsel.

## V.      FACTUAL BACKGROUND

### A.      The Li Parties Seek To Expand Their Presence In The United States By Forming A Company That Eventually Becomes Frictionless

48.      Z.L. Investment and Mr. Li began investing in a potential joint venture with Banjo in April 2012.  *See* Claimants' Ex. C-11.  The Li Parties were interested in such a business venture because, to that point, CIU had only served as a supplier to other brands in the U.S. market. Accordingly, the Li Parties were eager to engage in their first ever business investment outside of China – and to tackle the U.S. market with their own products, using their own unique brand – rather than continuing to serve as just a contract manufacturer and supplier of products to others.

49.      Contrary to Respondents' claims otherwise since Claimant filed the Initial Demand, the Li Parties were excited about the prospects of doing business in the United States, and were not troubled with, or concerned about, the potential risks of doing so.  Nor were they concerned about the need to obtain insurance, invest in a sales force, or do anything else that is part and parcel of operating a business in the U.S.  Indeed, the Li Parties intended Frictionless to do each of those things and, notably, thought for years that Frictionless was, in fact, engaged in such business activity based on the Company's own financial statements, which Banjo sent them periodically.

### B.      The Parties Engage In Lengthy Negotiations For Over A Year Before Executing The Frictionless Agreements

50.      After investment started in April 2012, the Li Parties continued discussions with Banjo about the specific terms for their joint venture business relationship for over a year.

51.      As the Li Parties will prove at the Hearing, at no point during those negotiations did Banjo tell the Li Parties – or anyone associated with them – that he intended to use his wholly-owned company, World, as part of the business being created.  Nor did Banjo otherwise raise the prospect of using a separate company to act as a "middleman" between Frictionless and the Retailers, to whom the Li Parties expected Frictionless would sell CIU's products.

- 12 -

52.     Rather, as the Li Parties will show, the parties' contemporaneous conduct and correspondence in their negotiations from April 2012 until the Frictionless Agreements were signed in April 2013 proves that the Li Parties:  (a) at all times understood that the brand name "Frictionless World" was just another way of referring to the parties' joint venture, Frictionless; and (b) were never aware of World's existence as a separate company, in part because, as described below, Banjo took efforts to ensure that the Li Parties did not learn about World.  Consider:

53.     *First*, on numerous occasions between April 2012 and April 2013, Banjo referred to the joint venture between the Li Parties and Banjo as both "Frictionless World" and "Frictionless," repeatedly using those terms interchangeably.  For example, on November 25, 2012, Banjo emailed an associate of Mr. Li and Z.L. Investment and provided an estimate of the profit that Frictionless and Mr. Li could expect to receive from the sale of one of CIU's log splitter products to the Retailers.  In his own words, Mr. Banjo wrote:

| | |
|---|---|
| Mr Li's CIU actual cost for materials/labor/packaging | $504.66 |
| Frictionless World actual US cost for materials | $20.19 |
| Total | $524.86 |
| | |
| Mr Li's CIU quoted cost for materials/labor/packaging | $545.73 |
| Frictionless World actual US cost for materials | $20.19 |
| Shipping to the US per Unit | $74.50 |
| US tax and Duty for importation into USA | $13.10 |
| Total | $653.51 |
| | |
| Mr Li profit in China per Splitter | $41.06 |
| | |
| Sell to Frictionless | $545.73 |
| Frictionless pays shipping $65/splitter plus decals, etc | $107.79 |
| Frictionless sells to market | $743.00 |
| | |
| **Total profit on a splitter in USA** | **$89.49** |
| | |
| **Total profit per splitter USA + China** | **$130.55** |

*See* Claimants' Ex. C-5 (highlighted emphasis in original).

- 13 -

54.     Not only did Banjo use the terms "Frictionless World" and "Frictionless" interchangeably in his profit analysis for this particular product, Banjo's analysis specifically stated that "Frictionless sells to market."   *Id.*   This is directly contrary to how Banjo ran Frictionless' business in practice – with World selling all products to the Retailers – and further contradicts the position Respondents have taken in this Arbitration.  Nowhere did Banjo state in either his November 25, 2012 email or his attached profit analysis that there would be a separate entity – World – acting as a middleman between Frictionless and the Retailers.  *See* Claimants' Ex. C-5.  Nor did Banjo indicate in his analysis that Frictionless' profits would be shared with any separate entity, let alone one primarily owned by Banjo.  *See id.*

55.     Notably, Banjo had already formed World as of this time.  In other words, if, as Respondents now claim in this Arbitration, the parties intended from the start for World to sell CIU's products to the Retailers, Banjo presumably could have identified World in this November 2012 correspondence with Mr. Li's associate.  But, instead, Banjo nowhere mentioned such an entity and instead referred to "Frictionless" and "Frictionless World" interchangeably.

56.     This conduct continued through the parties' negotiation of legal documents memorializing their business relationship.  Most notably, on January 19, 2013, Banjo emailed an associate of Mr. Li a Letter of Intent for the formation of Frictionless, LLC (the "**LOI**").  Even though the LOI solely discussed forming "Frictionless, LLC . . . to be the ***exclusive*** direct importer of parts from [CIU]," Banjo used the brand name and logo "Frictionless World" for this LOI.  *See* Claimants' Exhibit C-45 (emphasis added).  Nowhere, again, is "Frictionless World LLC" mentioned or is there any discussion of a separate entity serving as a "middleman" between Frictionless and the Retailers.

57.     For these reasons, and others that the Li Parties will present at the Hearing, Respondents' current claims during the course of this Arbitration – that the Li Parties knew of World's existence before the April 2013 execution of the Frictionless Agreements because Banjo used an "@frictionlessworld.com" email address, and because certain purchase orders sent to CIU before April 2013 used the term "Frictionless World" instead of simply "Frictionless" – miss the mark.  As the Li Parties will prove, at all times prior to late 2018, they understood that "Frictionless World" was just a brand name for Frictionless and not itself a separate company.[4]

58.     *Second*, Banjo's own description of how the parties should set up their business relationship similarly supports the Li Parties' understanding in 2012-2013 that "Frictionless World" was just another way of referring to the Company, and that they had no actual knowledge of World's existence as a separate company at that time.

59.     For example, on June 1, 2012, approximately two weeks after Banjo formed World, Banjo emailed Mr. Li's associate a PowerPoint detailing the proposed business venture between Banjo and Z.L. Investment.  *See* Claimants' Ex. C-12.  The text of this PowerPoint nowhere referred to "Frictionless World LLC" or even to Frictionless.  *See id.*  Instead, the June 1, 2012 PowerPoint named the joint venture between Banjo and Mr. Li as "Irva Tool," apparently because Banjo had incorporated a separate Colorado limited liability company, Irva LLC, in January 2011, while he was still employed by SpeeCo.[5]  *See id.*

---

[4]     Indeed, for long after the parties executed the Frictionless Agreements in April 2013, Banjo continued his pre-execution pattern of using "Frictionless World" and "Frictionless" interchangeably, including in his formal communications with the United States government.  The Li Parties, therefore, continued to understand throughout this time and until late 2018 that "Frictionless World" was simply another way of referring to the Company.  *See, e.g.*, Claimants' Exs. C-8 – C-9 (2014 and 2015 correspondence from Banjo to the U.S. government seeking visas on behalf of "Frictionless, LLC," using the brand name and logo "Frictionless World").

[5]     Presumably, this was in violation of non-compete obligations Banjo owed to SpeeCo at the time.

60.     Despite having already formed two LLCs – Irva and World – as of the date of this June 2012 email, Banjo's PowerPoint proposal mentioned neither LLC.  Instead, Banjo's proposal for "Irva Tool" simply indicated, under the heading "Company Structure," that "an international business lawyer . . . will create an entity" for the joint venture, and that this new entity "will be a US based company and Mr. Li will be the primary owner," unlike World and Irva, both of which are wholly owned by Banjo.  *See* Claimants' Ex. C-12, p. 22.

61.     In September 2012, similarly, Banjo handed the Li Parties a printed copy of a PowerPoint presentation on the business venture, this time dubbed the "LiBanjo" venture, during an in-person meeting in China (the "**Hard Copy LiBanjo Presentation**").  The Hard Copy LiBanjo Presentation attached hereto as Claimants' Exhibit C-19 is the only version of the "LiBanjo" presentation received by the Li Parties.  And, yet again, the Hard Copy LiBanjo Presentation did not discuss, or contain any reference to, World.  *See* Claimants' Ex. C-19.  Instead, as the Hard Copy LiBanjo Presentation reflects, the parties' discussion centered on forming a new company, primarily owned by Mr. Li, that would run the parties' business in the U.S.  *See id.*[6]

62.     *Third*, Banjo's conduct in preparing the Frictionless Agreements themselves confirms that the Li Parties were not aware of World's existence as a separate company in 2013

---

[6]      In filing their Emergency Motion for Preliminary Injunction in June 2019, Respondents initially produced another version of the "LiBanjo" presentation that does make reference to World.  As discussed in the Li Parties Opposition to Respondents' Emergency Motion, this version was never received by the Li Parties and appears to have been a materially altered version of the Hard Copy LiBanjo Presentation that the Li Parties actually did receive from Banjo in September 2012.  *See* Opposition, ¶¶ 6-9.  Indeed, the Hard Copy LiBanjo Presentation has strong indicia of authenticity because it includes the contemporaneous handwritten translation in real time – by Mr. Li's son-in-law, Gelei Yin, who is a native Mandarin speaker but also speaks English – of some of the Presentation's text into Mandarin for Mr. Li, who does not speak, read, or write English.  *Id.*

In response to this filing, Respondents claimed in July 2019 that there were actually three different versions of the September 2012 "LiBanjo" presentation, one of which was identical to the Hard Copy LiBanjo Presentation and the others of which mentioned World.  As the Li Parties will prove at the Hearing, the Hard Copy LiBanjo Presentation attached hereto as Claimants' Exhibit C-19 is the only version of the "LiBanjo" presentation that the Li Parties ever saw, received, or discussed before this Arbitration began.  The Li Parties intend to test the authenticity of any other purported version during discovery and, if necessary, at the Hearing.

and, in fact, that Banjo took steps to ensure that the Li Parties would not learn of World's existence at that time.

63.     For example, on February 4, 2013, an associate of Mr. Li emailed Banjo a draft joint venture agreement, incorporating many of the proposed principles in Banjo's LOI.  *See* Claimants' Exhibit C-46.  Among other things, this draft joint venture agreement stated that:  (a) Mr. Li "ha[d] authorized and provided funds to Banjo for him to set up a joint venture, ***Frictionless, LLC***, a Colorado limited liability company" in 2012; and (b) "Li and Banjo desire[d] to jointly invest in the United States to set up a company, ***with the main purpose of the exclusive sales of CIU products in North America*** . . . ."  (Emphasis added).  Again, notably absent from the draft joint venture agreement sent on Mr. Li's behalf was any mention of "Frictionless World, LLC," or any notion that Frictionless would be sharing its revenues, profits, or costs with any other affiliate or entity.  Instead, the language throughout was consistent with the Li Parties' understanding at the time – and all the way up until late 2018 – that there was only one entity at issue here – the Company, Frictionless.

64.     After receiving the draft joint venture agreement, Banjo worked with outside counsel – who had been retained to represent Frictionless – to prepare what would eventually become the LLC Agreement.  As the drafting history of that document shows, Banjo, upon information and belief, ***specifically instructed*** the Company's counsel to ***delete*** any references to World in drafts of the LLC Agreement before sending those drafts to the Li Parties.  Consider:

a.      On or around February 21, 2013, Banjo, upon information and belief, provided redline edits and comments to a draft of the LLC Agreement prepared by Frictionless' counsel.  *See* Claimants' Exhibit C-47.  Unlike any of the correspondence or draft documents actually exchanged between the parties to that

- 17 -

point or afterwards, this draft of the LLC Agreement prepared by Frictionless' counsel specifically referred to "Frictionless World, LLC." Indeed, Article 1 of this draft expressly included "Frictionless World" as a defined term, defined as "Frictionless World, LLC, a Colorado limited liability company . . . ."

b.    Notably, and despite expressly referring to "Frictionless World," this draft of the LLC Agreement said ***nothing*** about World acting as a middleman between Frictionless and the Retailers. Nor did this draft of the LLC Agreement provide that Frictionless would be sharing its revenues, profits, or costs with World. Rather, Article 9 of this draft of the LLC agreement merely proposed that Banjo would cause World to provide Frictionless with a royalty free license to any patents related to CIU products that World then owned, or subsequently owned in the future.

c.    Nevertheless, despite this extremely limited reference to World, Banjo, upon information and belief, responded to the draft by instructing the Company's counsel to "***remove all references to Frictionless World. I prefer that we keep this separate.***" *See id.*, p. 21 (emphasis added). And, next to those patent provisions expressly referencing World, Banjo, upon information and belief, again instructed: "***again remove all concepts of Frictionless World***." *See id.* (emphasis added).

d.    To accompany this draft of the LLC Agreement, a draft cover letter to Mr. Li was also prepared that would enclose the draft of the LLC Agreement, as well as a chart explaining how key aspects of Mr. Li's proposed joint venture agreement had been incorporated into the draft of the LLC Agreement. *See* Claimants' Exhibit C-48. Upon information and belief, however, Banjo again instructed the Company's counsel to delete this draft cover letter's reference to "Frictionless World, LLC"

owning certain patents, and suggested replacing that reference with the following generic language: "Banjo will ensure that the patents to which he has rights will be available to the company."  *See id.*, p. 9.

65.     On March 2, 2013, Banjo emailed associates of Mr. Li the above-referenced cover letter, which enclosed the referenced chart and a draft of the LLC Agreement.  *See* Claimants' Exhibit C-49.  As Banjo apparently instructed, none of the cover letter, the chart, or the draft LLC Agreement actually sent to Mr. Li contained any reference to World.

66.     Instead, as the negotiations continued, Banjo continued to refer to the Company – Frictionless, LLC – as "Frictionless World."  For example, Banjo emailed associates of Mr. Li a "5 Year Plan" PowerPoint presentation on March 12, 2013.  *See* Claimants' Ex. C-6.  While the title page of the "5 Year Plan" PowerPoint said "Frictionless World," the text of the PowerPoint itself discussed throughout the projected revenues and strategy of "Frictionless."  *See* Claimants' Ex. C-6, pp. 2-6.  Yet again, nowhere was World mentioned, nor was any separate entity discussed as a middleman between Frictionless and the Retailers, nor was there any notion that Frictionless would be sharing its revenues, profits, or costs with any other affiliate or entity.

67.     On March 17, 2013, less than a week after sending his "5 Year Plan" PowerPoint, Banjo emailed drafts of what would become the Frictionless Agreements for Mr. Li's review.  *See* Claimants' Ex. C-7.  In his email, Banjo explained why he had inserted the name "Frictionless LLC" into the draft agreements, as follows:

> "Added the company name ***'Frictionless LLC'*** back into the agreement.  This is important because ***we have substantial equity in this company name already.  All of our customers have been informed that <u>this is the name of our entity</u>*** and have set up our business name in their systems.  Changing it now may cause damage to the trust we have developed with them . . . ."

*Id.* (emphasis added).

68.     Notably, again, Banjo's email mentioned nothing about "Frictionless World LLC" or about using that entity – or any other – as a middleman between Frictionless and the Retailers. Instead, according to Banjo's own representations to the Li Parties as of mid-March 2013, the Retailers had been informed that "*Frictionless LLC*" was the company's name, and the Retailers were relying on that name in setting up their relationships with the Company.  *See id.*

69.     In the end, and apparently at Banjo's instruction, the Li Parties never received a draft of the LLC Agreement – or any other agreement – that contained any reference to World. Instead, Banjo left the Li Parties completely in the dark about his wholly-owned company, World.

## C.     The Parties Sign The Frictionless Agreements

70.     Z.L. Investment, Banjo, and Mr. Li executed the Frictionless Agreements at an in-person meeting in China on or about April 11, 2013.

71.     The LLC Agreement attached to this Amended Demand as Exhibit C-1 is the final, complete version of the LLC Agreement.  It is the only version of the LLC Agreement that the Li Parties ever saw, received, or discussed with Banjo in China, it is the only version of the LLC Agreement that Z.L. Investment and Mr. Li signed, and it is the only version of the LLC Agreement to which Z.L. Investment and Mr. Li agreed to be bound.

72.     It is undisputed that World is *nowhere* mentioned in the text of the LLC Agreement or in any of the drafts of the LLC Agreement circulated to the Li Parties before signing.  *See* LLC Agreement; *see also* Ex. C-7, C-10.

73.     Nevertheless, Respondents have alleged in this Arbitration that the parties agreed to *another* version of the LLC Agreement, one which attached a purported "Operating Plan" (the "**Alleged Operating Plan**").  Specifically, Respondents claim that:  (a) this Alleged Operating Plan was intended to be attached to the LLC Agreement as "Schedule B" thereto; and (b) Banjo

presented this Alleged Operating Plan to Z.L. Investment and Mr. Li in person at the April 2013 meeting in China held in conjunction with the signing of the Frictionless Agreements.

74.     The Li Parties do not concede the validity or authenticity of the Alleged Operating Plan, or even that it was created before the Initial Demand was filed, let alone in April 2013 as alleged.  Indeed, Respondents' counsel has been unable to provide any contemporaneous evidence showing that the Alleged Operating Plan was, in fact, created in 2013, as Respondents now claim. The Li Parties intend to test those facts during the discovery process and, if necessary, at the Hearing.[7]

75.     In any event, as the Li Parties will prove at the Hearing, Banjo's reliance on the Alleged Operating Plan is misplaced because the Li Parties never saw this Alleged Operating Plan, and never received a copy of it at any time before Claimant filed its Initial Demand.  In fact, on April 3, 2013, Banjo emailed Mr. Li's associate the "final documents" to be executed to create the Company. *See* Claimants' Ex. C-10.  Neither that email, nor the "final" versions of the Frictionless Agreements attached to it, included the Alleged Operating Plan that Banjo now purports was appended as Schedule B to the LLC Agreement. *See id.*

76.     Moreover – and as the Li Parties will prove at the Hearing – the Alleged Operating Plan was never discussed with Banjo, or presented to anyone associated with Z.L. Investment, CIU, or Mr. Li, at any 2013 meeting in China or at any time thereafter until after the Initial Demand was filed.  In fact, when asked about the LLC's reference to an "Operating Plan" in April 2013, Banjo explicitly told Z.L. Investment and Mr. Li that there was no need to review or discuss any "Operating Plan" for Frictionless, because it was "not important."

---

[7]     For these reasons, the Li Parties do not attach a copy of the Alleged Operating Plan to this Amended Demand.

77.     Of course, the Li Parties recognize that these disputes over the Alleged Operating Plan present credibility issues that must be determined by the Tribunal at the Hearing.  The Li Parties look forward to offering evidence on these points and are confident that Banjo's belated efforts to explain away his misconduct – through the sudden appearance of this purported "Operating Plan" – will be rejected after all the evidence is heard.

**D.     The LLC Agreement Defines The Rights And Obligations of Z.L. Investment And Banjo Vis-à-Vis Frictionless**

78.     Although the parties dispute whether the LLC Agreement included the Alleged Operating Plan as "Schedule B" thereto, there is no dispute as to the text of the LLC Agreement itself, which, again, nowhere mentions World.

79.     Instead, as is common, the LLC Agreement defines the rights and obligations of Frictionless' Members, Z.L. Investment and Banjo, with respect to the Company.  Among other things, Schedule A to the LLC Agreement made clear that Z.L. Investment would own 90% of the Company's Membership Interests and Banjo would own the other 10%, consistent with each of their respective capital contributions of $1.8 million and $200,000, pursuant to the Funding Agreement.  The other provisions of the LLC Agreement most pertinent to the parties' present dispute are as follows:

*(i)     The LLC Agreement Prohibits Banjo from Competing with Frictionless*

80.     Article 4 of the LLC Agreement is entitled "Representations, Warranties, and Covenants." Pursuant to that Article, Z.L. Investment and Banjo made the following representations and warranties pertinent to this dispute.

81.     *First*, pursuant to Section 4.4 of the LLC Agreement, Banjo represented and warranted that he would not compete with the Company's business, as follows:

- 22 -

4.4. **Non-Competition**. While a Member is a member of the Company, and for Li, while Z.L. [Claimant] is a Member of the Company, except as otherwise provided herein, each Member, and Li, agrees that he, she, or it shall, and he, she, or it shall cause his, her, or its Affiliates, to ***not compete with the Company, directly or indirectly, in a business substantially similar to the business of the Company*** or any of its subsidiaries anywhere where the Company does business, or the distribution of any products distributed by the Company or any of its subsidiaries anywhere in the world. ***For purposes of this Agreement, direct and indirect competition shall include, but not be limited to,*** having any business or employment relationship with any past or present client, supplier, or employee of the Company, and ***any competition as a sole proprietor, partner, corporate officer, director, shareholder, member, manager, employee, agent, independent contractor, trustee, or in any other manner in which such Member or Li, or its or his Affiliates, holds any beneficial interest in a competitive business, derives any income from such business, or provides any service, including the benefit of his, her, or its reputation or knowhow, to such business.*** For purposes of clarification, the sale of parts and products that are materially different from parts and products that the Company sells or intends to sell shall not be considered to be competing with the Company.

82. *Second*, pursuant to Section 4.6 of the LLC Agreement, Z.L. Investment, Mr. Li, and Banjo agreed to indemnify each other for any breach of the representations or warranties set forth in Article 4 of the LLC Agreement:

4.6 **Indemnification for Breach**. ***Each Member***, and Li, on behalf of such Member (or, for Li, on behalf of himself) and his, her, or its successors and assigns, ***shall defend, indemnify and hold harmless the other Members, Li, and the Company from and against any and all claims***, threats, liabilities, taxes, interest, fines, penalties, suits, actions, proceedings, demands, damages, losses, costs and expenses (***including attorneys' and experts' fees and court costs***) of every kind and nature arising out of, resulting from, or in connection with ***any breach of a representation and warranty or covenant set forth in this ARTICLE 4***.

- 23 -

> ### (ii) The LLC Agreement Grants Z.L. Investment and Mr. Li Decision-Making Authority over Certain Aspects of the Company's Management

83.     Pursuant to Article 5 of the LLC Agreement, entitled "Company Management," the Members and Mr. Li agreed to the following terms governing Frictionless' business:

84.     *First*, under Section 5.1 of the LLC Agreement, Z.L. Investment, Mr. Li, and Banjo agreed that Frictionless would be a "manager-managed LLC," i.e., that it "shall be managed by one manager," rather than its Members.  And, consistent with the Employment Agreement, Banjo served as Frictionless' Manager at all times from April 11, 2013 until May 3, 2019.

85.     *Second*, under Section 5.3 of the LLC Agreement, Z.L. Investment, Mr. Li, and Banjo agreed that certain business decisions would require the approval of a Majority Voting Interest of the Company's Members:

> 5.3.    **Decisions that Require Member Approval**. *Neither the Manager, nor any Member, Officer, employee, agent or representative of the Company, shall have any authority to bind or take any action on behalf of the Company with respect to any Member Decision unless such Member Decision has been approved by a Majority Voting Interest* as provided in Section 6.2 or Section 6.3. Each of the following matters shall constitute a "Member Decision":
>
> > 5.3.1    amending the Company's articles of organization or this Agreement; . . .
> >
> > 5.3.6    making any expenditure of the Company which is not in furtherance of the Business;

86.     Because, pursuant to the LLC Agreement, Z.L. Investment owns 90% of the Company's Membership Interests, by definition its approval had to be obtained for any decision that required a Majority Voting Interest under Section 5.3 of the LLC Agreement.

87.     *Third*, under Section 5.4 of the LLC Agreement, Z.L. Investment, Mr. Li, and Banjo agreed that for certain "Major Decisions," Mr. Li's approval would also be required:

5.4.   **Major Decisions that Require Li's Approval**. *Neither the Manager, nor any Member, Officer, employee, agent or representative of the Company, shall have any authority to bind or take any action on behalf of the Company with respect to any Major Decision unless such Major Decision has been approved by Li*. . . . Each of the following matters shall constitute a "Major Decision":

5.4.4   the guaranty by the Company of the obligations of any third party;

5.4.5   *the investment or use of the Company's funds outside of the ordinary course of the Company's business (such as the purchase of securities);*

5.4.6   *licensing, transferring, or otherwise providing rights to a third party in any of the Company's intellectual property, except as otherwise provided by this Agreement;*

5.4.7   *making any single expenditure of the Company in excess of $20,000 or any contract or commitment of the Company which could result in obligations of the Company that exceed $200,000 in any one year;*

5.4.8   making any loan or other incurrence of debt of the Company in excess of $50,000 (excluding trade payables or receivables in the ordinary course of business); and

5.4.11   the commencement and the settlement of any legal or administrative claim, action, investigation, or dispute, except as otherwise provided in this [LLC] Agreement.

88.   *Fourth*, under Section 5.5 of the LLC Agreement, Z.L. Investment, Mr. Li, and Banjo set the scope of the Manager's and Officers' duties in operating the Company, and expressly agreed that, consistent with Colorado law for a manager-managed LLC like Frictionless, *only* the Manager and Officers would owe fiduciary duties to the Company, as follows:

5.5.   **Duties**.   *The Manager and each Officer shall carry out his or her duties in good faith.*   The Manager shall devote such time to the business and affairs of the Company for the efficient carrying on the

- 25 -

Company's business. ***The Manager and Officers shall have fiduciary duties to the Company***, and the Manager's and the Officers' duties and liabilities are restricted by the provisions of this Agreement to the extent that any such provisions restrict the duties and liabilities of the Manager and the Officers otherwise existing at law or in equity.

89.    *Fifth*, under Section 5.9 of the LLC Agreement, Z.L. Investment, Mr. Li, and Banjo

agreed that the Manager and Officers would have limited liability for their actions, except for

certain instances of misconduct, as follows:

> 5.9    **Exculpation and Indemnification.**
>
> 5.9.1    <u>Limitation of Liability</u>. ***In carrying out their respective duties hereunder, the Manager and the Officers shall not be liable to the Company nor to any Member for their good faith actions or failures to act***, nor for any errors of judgment, nor for any act or omission believed in good faith to be within the scope of authority conferred by this Agreement, ***but shall be liable only for fraud, willful misconduct or gross negligence in the performance of their respective duties under this Agreement***.

90.    *Sixth*, under Section 5.12 of the LLC Agreement, Z.L. Investment, Mr. Li, and

Banjo agreed that Mr. Li would need to approve any "Affiliate Transactions," as follows:

> 5.12    **Affiliate Transactions**. ***Upon the approval of Li***, the Manager may cause the Company to enter into transactions, agreements, contracts and undertakings with the Manager, any Member, or any of their respective Affiliates, ***so long as such transactions, agreements, contracts or undertakings are in the ordinary course of business and on commercially reasonable terms and conditions***.

> *(iii)    **The LLC Agreement Explicitly States that Frictionless Owns Any Intellectual Property Developed by Company Officers or Employees Such as Banjo***

91.    Article 9 of the LLC Agreement is entitled "Intellectual Property."  Pursuant to

Section 9.1 of that Article, Banjo agreed that the Company would have a royalty free license to

- 26 -

use any patents related to CIU's products that were in Banjo's control as of April 11, 2013 or that became under his control while he was a Member of the Company:

> 9.1 **License to Existing intellectual property.** Banjo shall ensure that the Company has the right to use freely, any patents (whether registered in the United States or elsewhere) that relate to CIU products that are within his control, and any new patents that relate to CIU products which are in his control while he is a Member of the Company. Banjo represents and warrants to Li that as of the Effective Date, except as set forth in this Agreement, he has not granted any license, or assigned any rights in, any patents which he owns or otherwise has the right to use to any third party which Banjo does not control.

92. As noted, Banjo held these patents at World, but, upon information and belief, instructed the Company's counsel to remove any references to World from the LLC Agreement.

93. Further, pursuant to Section 9.3 of the LLC Agreement, Z.L. Investment, Mr. Li, and Banjo agreed that the Company – Frictionless, and not Banjo, World, or any other entity – would own all intellectual property that was created or developed by the Company's Officers or employees, as follows:

> 9.3 **Ownership of Company Intellectual Property**. *All intellectual property developed by the Officers, employees, or otherwise specifically for the Company shall be the property of the Company*. And the Company shall provide CIU with a worldwide, perpetual, royalty free license to all of its intellectual property once the intellectual property is developed.

94. As of this date, World and/or Banjo have 14 patents and 27 trademarks. *See* Claimants' Exs. C-51 & C-52. Upon information and belief, nearly all of these patents and trademarks were obtained after the Frictionless Agreements were signed in April 2013, and all such intellectual property was created or developed by employees who, although ostensibly working for World, were being paid by Frictionless at all relevant times.

> ### (iv)    *The LLC Agreement Requires Books and Records To Be Maintained and Grants Members an Unqualified Right to Inspect Them, as Required by Colorado Law*

95.    Pursuant to Section 10.1 of the LLC Agreement, Z.L. Investment, Mr. Li, and Banjo

agreed that the Company would maintain accurate books and records, as follows:

> 10.1.    **Books**. *The Manager shall cause the Company to maintain complete and accurate books of account of the Company's affairs* at the principal office of the Company. The Company's books shall be kept *in accordance with generally accepted accounting principles, consistently applied*, and on an accrual basis method of accounting . . . .

96.    Pursuant to Section 10.3 of the LLC Agreement, Z.L. Investment, Mr. Li, and Banjo

further agreed – consistent with governing Colorado law – that any Member, and Mr. Li, could

inspect the Company's books and records upon notice, as follows:

> 10.3.    **Inspection of Documents**.   Each Member, and Li, *shall have the right to inspect, review, make copies of, and audit all agreements, documents, records and reports relating to the business of the Company*, and all other items prepared by or obtained by the Manager in connection with the performance of his duties hereunder, in each case at such Member's (or Li's, as applicable) expense during reasonable business hours and with at least five (5) Business Days prior written notice to the Manager.

### E.    The Undisputed Facts About How Banjo Operated The Company From April 2013 – April 2019

97.    From the day the Frictionless Agreements were signed in April 2013 until Claimant

filed its Initial Demand in April 2019, Banjo ran Frictionless' day-to-day operations as its

Manager.  This was largely because Banjo is a Colorado resident, while the Li Parties reside in

China and only visited Colorado periodically.  Accordingly, the Li Parties relied on Banjo to do

what he agreed to do under the LLC Agreement – run the Company's day-to-day operations in

good faith, seek Z.L. Investment's and Mr. Li's approval for those "Major Decisions" requiring

their approval, and provide an annual summary of the Company's performance.

98.     As detailed below, the parties vigorously dispute whether Banjo operated Frictionless as the parties intended the Company to operate when they signed the Frictionless Agreements in April 2013.  But, even at this early stage, there is no reasonable dispute about how Banjo **actually** ran Frictionless' business in practice while serving as the Company's Manager from April 2013 – April 2019.  Consider:

99.     *First*, it is undisputed that Frictionless and CIU never entered into a formal, written agreement whereby CIU was obligated to ship products to Frictionless.  Instead, from April 2013 until the Initial Demand was filed in April 2019, Banjo, as the Company's Manager, caused Frictionless to send individual, numbered purchase orders to CIU.  *See* Claimants' Ex. C-20.  CIU then replied via email to confirm whether it would be able to fulfill the specific, numbered purchase order.  CIU generally agreed to fulfill Frictionless' purchase orders, but that was not always the case; CIU always had the right to reject those purchase orders, and did so when necessary due to pricing, supply, timing, or other business considerations.  *See* Claimants' Ex. C-22, pp. 5-7 (November 2018 emails advising that CIU would not fulfill certain purchase orders due to pricing issues).

100.    *Second*, it is undisputed that the **only** parties to these purchase orders were Frictionless and CIU.  *See* Claimants' Ex. C-20.

101.    *Third*, it is undisputed that CIU granted Frictionless payment terms of 360 days after shipment on all of Frictionless' purchase orders.  In other words, Frictionless was not obligated to pay CIU for a shipment for nearly a year after that shipment was made.[8]

---

[8]     CIU granted Frictionless such favorable payment terms because CIU treated Frictionless as effectively a subsidiary, given the Company's relationship to Z.L. Investment and Mr. Li.  Further, there is no dispute that CIU granted Frictionless these 360-day payment terms, notwithstanding Respondents' baseless counterclaim alleging that CIU overcharged Frictionless for products, which, if Respondents continue to assert, the Li Parties will refute at the Hearing.

102.     *Fourth*, it is undisputed that Frictionless owes CIU **$22,600,236.47** for products that CIU delivered to Frictionless, and for which Frictionless has not yet paid CIU.  *See* Claimants' Exs. C-53 & C-54.  Of that $22.6 million figure, **$15,276,514.65** million is overdue past CIU's generous 360-day payment terms.  *See* Claimants' Ex. C-54.  Indeed, Frictionless still has not paid CIU for certain products that CIU shipped to Frictionless in ***June 2017***, more than two years ago.  *Id.* at 1.

103.     *Fifth*, whether or not the parties intended it, it is undisputed that Banjo unilaterally directed Frictionless to sell CIU's products to World – an entity that he alone owned and controlled – and not to any of the Retailers.  In fact, Frictionless apparently never sold CIU's products to ***any*** Retailers; instead, World was Frictionless' only customer, ever.

104.     *Sixth*, it is undisputed that, after purchasing CIU's products from the Company, World sold those products to the Retailers at some currently unknown price, reflecting a mark-up above and beyond what World paid Frictionless for those products.

105.     *Seventh,* it is undisputed that World's September 30, 2019 bankruptcy filing states that World owes Frictionless $12,645,740.62 for, among other things, products that World purchased from Frictionless and then sold to the Retailers, and for which World has never paid Frictionless.  *See* Claimants' Exhibit C-50 (World's Bankruptcy Filing), at Schedule D, p. 36 of 43.  In other words, regardless of the parties' dispute over whether Banjo used World to defraud the Li Parties, World still received $12.64 million worth of products and inventory from Frictionless that World took from Frictionless, sold to Retailers, and never paid for.

106.     *Eighth*, it is undisputed that each and every employee who worked to sell CIU's products to the Retailers was formally employed by World, such that the Company itself only ever had one employee – Z.L. Investment's designee.

107.   *Ninth,* it is undisputed that, after World paid its employees, Banjo unilaterally caused Frictionless to reimburse World for ***all*** employee expenses, even the employee expenses associated with World's products that are not supplied by CIU and/or Frictionless.

108.   *Tenth*, it is undisputed that Banjo similarly caused Frictionless to reimburse World for ***all*** of World's other operating expenses – ranging from warehousing expenses, to insurance, IT, legal representation, and on and on.  For example, according to the Company's financials:  (a) Frictionless' warehouse expenses grew from approximately $260,000 in 2014 to over $1.86 million in 2018, a 715% increase; (b) Frictionless' payroll expenses grew from approximately $808,000 in 2014 to nearly $2.8 million in 2018, a 345% increase; and (c) Frictionless' professional fees grew from approximately $150,000 in 2014 to $436,000 in 2018, a 290% increase.  All of these expenses were actually incurred by World, who was then reimbursed for these expenses by Frictionless.

109.   *Eleventh*, it is undisputed that Frictionless lost money in each of its years of operation under Banjo's control:



*See* Claimants' Exs. C-13 – C-15.

- 31 -

110.    All of the above facts formed the basis, to varying degrees, for Z.L. Investment's allegations in its Initial Demand.  At the time, they were just that – allegations.  But Respondents have subsequently admitted many of the above facts in correspondence and/or in their Arbitration filings to date, and others are not subject to reasonable dispute based on the Li Parties' own business records.  Thus, to the best of the Li Parties' knowledge, these facts are effectively undisputed as the parties proceed to discovery.

### F.    The Li Parties Discover Banjo's Fraud, Banjo And World Stonewall, and Z.L. Investment Is Forced To File Its Initial Demand

111.    Summing them up, the end result of the above undisputed facts is clear:  Frictionless completely financed World's business for years starting in April 2013 (when the Frictionless Agreements were signed), while World captured most, if not all, of the revenue and profits from the sale of CIU's products to the Retailers during that time.  In fact, World's Chief Financial Officer Rob Germundson ("**Germundson**") admitted, in discussions with Claimants' representatives in February 2019, detailed further below, that Frictionless pays for World's expenses, *even for those associated with the products that World sells under the brand names "Redback" and "Trophy Strike,"* which are not supplied by CIU and/or Frictionless.

112.    For the avoidance of doubt, the Li Parties had no actual knowledge of World's existence as a separate entity before the Frictionless Agreements were signed and did not learn of any aspect of Banjo's fraud or misconduct using World until late 2018.  Indeed, as noted above, until late 2018, the Li Parties understood "Frictionless World" to be a brand name that was simply another way of referring to the Company.  Until that time, the Li Parties were not aware that Banjo owned a separate legal entity called "Frictionless World LLC," let alone that Banjo had used that entity as a "middleman" between Frictionless and the Retailers.

113.    In October/November 2018, however, Mr. Li's daughter-in-law, Mingsu Li ("**Ms. Li**"), noticed certain discrepancies in Frictionless' financials that led her and her husband, Jun Li ("**Jun Li**"), to plan a visit to Frictionless' offices in Colorado.  During that visit, Germundson – who the Li Parties had always understood to be Frictionless' Chief Financial Officer, being unaware of World's existence to that point – would not provide Jun Li or Ms. Li with any of Frictionless' bank statements.  This led Ms. Li to begin her own efforts to investigate Banjo, which led her to discover World's existence as a separate legal entity in late November 2018.

114.    Around this same time, the financial impact of Banjo's fraudulent scheme on CIU started to become more apparent.  Specifically, in early December 2018, the Li Parties advised Banjo that "CIU is experiencing some financial problems" and did not "have sufficient money to pay all [of its] suppliers" due to the extensive and long overdue amounts owed by Frictionless to CIU.  *See* Claimants' Ex. C-26 (December 3, 2018 email to Banjo).  The Li Parties further advised Banjo at that time that an auditing of Frictionless' books may be necessary.  *See id.*

115.    The combination of CIU's lender issues, the Company's poor performance, and the revelation that World was a separate legal entity owned by Banjo led the Li Parties to retain an accounting firm, Armanino LLP ("**Armanino**"), which conducted a site visit to Frictionless' offices in February 2019.  During that site visit, Armanino's auditors attempted to learn more about World's relationship with Frictionless, as well as World's relationship with the Retailers.

116.    At every turn, however, Banjo and his subordinates at World stonewalled Armanino's auditors, apparently in an effort to conceal Banjo's fraud perpetrated through World. Banjo did so despite the fact that Z.L. Investment, as a Member and 90% owner of Frictionless, had an absolute right, under the LLC Agreement and Colorado law (*see* Colo. Rev. Stat. Ann. § 7-80-408), to obtain such basic information about Frictionless' relationship with World.

117.    For example, despite admitting that World was Frictionless' *only* customer, Banjo and his subordinates at World took the incredible position with Armanino's representatives that any information about World – including, for example, how much World paid Frictionless for CIU's products, and how that price was determined – was "outside the scope" of Z.L. Investment's information rights under the LLC Agreement.  In other words, even though such sales and pricing data plainly relates to, and materially impacts, the Company's financial results – and even though Section 10.3 of the LLC Agreement plainly entitles Z.L. Investment to review "***all agreements . . . relating to the business of the Company***" – Banjo and his subordinates at World told Z.L. Investment and its representatives from Armanino that "if it's in Dan [Banjo]'s company, it's out of scope" for a review of the Company's books.

118.    Similarly, Banjo and his subordinates at World – including Germundson – refused to provide Armanino's auditors with any of World's payroll register information during this site visit.  In other words, even though Banjo and his subordinates at World admitted that Frictionless was paying for all of World's employees, they claimed that the Company was not entitled to the payroll documentation to prove how much those employees were being paid.

119.    Finally, Banjo and his subordinates at World – including, but not limited to, Germundson – refused to provide Z.L. Investment's representatives from Armanino with any information concerning World's sales to the Retailers, claiming this, too, was "out of scope," and that the Retailers only entered into oral contracts, not written ones.  To the best of Z.L. Investment's knowledge and belief, these statements are false and contrary to standard practice in the industry.  They are further contradicted by Banjo's own subsequent statements to Z.L. Investment's representatives that one Retailer, Lowe's, has awarded certain business for a period of thirty (30) months, i.e., for a specific and defined contract term.

120.     Banjo's and World's conduct in stonewalling Armanino's auditors in February 2019 is particularly notable in light of the claims that Respondents have previously made in this Arbitration.  For example, throughout May, June, and July 2019, Respondents Banjo and World repeatedly claimed that the Li Parties agreed, in 2013, that CIU would sell goods to Frictionless for delivery to World, who would then sell those goods to the Retailers.  But Banjo and World notably refused to provide *any* information about the supposedly above-board business relationship between Frictionless and World during Armanino's site visits in February 2019.

121.     Similarly, although Respondents have claimed in their Arbitration filings to date that the Li Parties were presented with, and agreed to, the Alleged Operating Plan in April 2013, ***neither Banjo nor anyone at World ever once mentioned the existence of this purportedly dispositive document*** – or any other contract supposedly governing the overarching business relationship between Frictionless and World – to any of Armanino's representatives over the course of two days of site visits in February 2019.  Nor did Banjo or World provide a copy of the Alleged Operating Plan to Armanino or to anyone else associated with the Li Parties in February 2019 or at any other point before Z.L. Investment filed its Initial Demand in mid-April 2019.

122.     Despite Z.L. Investment incurring over $100,000 in legal, consultant, and other expenses to investigate Respondents' fraudulent scheme before April 2019, Banjo's and World's efforts to stonewall were initially successful.  For example, as a result of Banjo's and his subordinates' repeated efforts to mislead Z.L. Investment and its representatives and to hide relevant information to which Z.L. Investment was entitled, Frictionless and the Li Parties have still to this date been unable to determine, among other things:  (a) the exact prices at which both Frictionless sold CIU's products to World, and World sold those same products to the Retailers;

(b) the exact amount of the Company's revenue that Banjo siphoned off into World; or (c) the exact amount of World's expenses that Banjo foisted onto the Company's financials.

123.    This repeated stonewalling, in the face of Z.L. Investment's clear legal right to the information – information which, if Respondents' prior claims in this Arbitration are to be believed, would only confirm what the Li Parties allegedly agreed to years ago in April 2013 – is what ultimately forced Claimant Z.L. Investment to file its Initial Demand on April 15, 2019.

**G.    After The Initial Demand Is Filed, Banjo Resigns As Frictionless' Manager Rather Than Collect The Debts That World Owes Frictionless; Banjo Then Wrongfully Takes Possession Of The Final Four Shipments For World, Without Paying Frictionless Or CIU**

124.    While Z.L. Investment filed its Initial Demand, CIU's lender issues were continuing, largely because Frictionless, then still under Banjo's day-to-day control, continued to owe tens of millions of dollars to CIU and continued to not make timely payments on that debt.

125.    On April 23, 2019, eight days after Z.L. Investment filed its Initial Demand, CIU's lender – the Jiangnan Rural Commercial Bank, Wujing Gaoxin District Branch – sent CIU a letter advising that CIU could not increase its "accounts receivable" to Frictionless and that actions might be taken if CIU's "financial circumstances" did not improve.

126.    By definition, any further shipment to Frictionless would increase CIU's "accounts receivable," and would worsen CIU's "financial circumstances," because CIU would not be paid for such shipments for months, if at all, given:  (a) the extremely favorable 360-day payment terms that CIU had always granted to Frictionless; and (b) the tens of millions of dollars that Frictionless already owed to CIU.

127.    This was further evidenced by Frictionless' own financials, which showed that the Company made no profit in the first quarter of 2019 on its sale of CIU's products to World. Specifically, Frictionless' own Profit & Loss ("**P&L**") statement for January-March 2019 shows

that Frictionless bought $4,595,517 worth of products from CIU during those three months.  *See* Claimants' Ex. C-27 ("Product COGS [Cost of Goods Sold]" line on the Company's March 2019 P&L Statement).  The same P&L shows that, during those months, Frictionless sold CIU's products to World for $4,595,517, the exact same amount.  *See id.* ("Product Sales" line on the same March 2019 P&L Statement).

128.   In other words, ***for the entire first quarter of 2019, Banjo caused Frictionless to transfer the products that Frictionless had purchased from CIU to World at cost***.  *See id.* Frictionless therefore received no markup on those goods and, as a result, the Company had no first quarter profit from its sales to World that could be used to repay CIU for its substantial outstanding receivable.  *See id.*

129.   For these reasons completely outside of its control and largely driven by Respondents' fraud and misconduct – and the resulting impact that that fraud had on CIU's relationship with its lender – CIU was constrained from further shipping to Frictionless by late April 2019.

130.   Specifically, on Monday April 29, 2019, the Li Parties' counsel advised Respondents' counsel – first via phone and then via email – that CIU would be permitted to make a final set of shipments, but none further, due to CIU's lender issues, which precluded CIU from further shipping product without payment on Frictionless' extensive – and growing – overdue amounts owed to CIU.  *See* Claimants' Ex. C-55, pp. 2-3.

131.   In response, Banjo advised CIU that Frictionless' purchase orders to CIU were "cancelled" and Banjo further "recommend[ed]" that Frictionless should be dissolved and file for bankruptcy.  *See id.* at p. 4 (April 29 email from Banjo).  Although the Li Parties' counsel advised Respondents' counsel that CIU was "not [] issuing any cancellation of the existing purchase orders

. . . from Frictionless," Respondents' counsel nevertheless advised that "CIU does not issue the POs, Frictionless does.  As CIU failed to honor the POs . . . Frictionless had every right to cancel the same."  *See id.* at p. 2 (emphasis added).

132.    On May 3, 2019, the Li Parties reiterated to Respondents' counsel that Z.L. Investment – as Holder of a Majority Voting Interest in the Company – had previously directed Banjo, as Frictionless' Manager, to collect from World the outstanding amounts that World admittedly owed to Frictionless, so that Frictionless could then use those monies to pay down its debt to CIU, which would alleviate CIU's lender and cash flow issues and allow at least some shipments to continue.[9]  *See* Claimants' Ex. C-25, p. 2.

133.    Rather than collect the money that World admittedly owed to Frictionless, Respondents' counsel responded four hours later by tendering Banjo's resignation as the Company's Manager.  *See* Claimants' Ex. C-25, p. 1.

134.    In its schedules filed with the Bankruptcy Court, World lists Frictionless as its largest creditor by far, with a disputed claim of $12,645,740.62.   In fact, Frictionless will demonstrate its claim against World is substantially larger.  *See* Claimants' Exhibit C-50 (World's Bankruptcy Filing), at Schedule D, p. 36 of 43.

135.    Meanwhile, during this time, CIU was permitted to make a final set of four shipments to Frictionless for purchase orders previously placed by Frictionless, and accepted by CIU ("**Final Four Shipments**").  The first of these Shipments left China on or about April 13, 2019; the last Shipment left China on or about May 1.  *See* Claimants' Ex. C-31 (Bills of Lading).

---

[9]       In an effort to alleviate CIU's lender and cash flow issues, Banjo and the Li Parties had previously agreed, in early 2019, to a monthly payment plan pursuant to which Frictionless would pay CIU a total of $20.04 million during 2019, although CIU was still anticipated to lose money for the year by shipping $27 million worth of goods to Frictionless.  *See* Claimants' Ex. C-29.  But, Frictionless stopped making those weekly payments to CIU after CIU was unable to ship further product, thus further exacerbating CIU's cash flow and lender issues.  *See id.*

136.     One of the Final Four Shipments arrived in the U.S. on May 3, 2019; the other three Shipments arrived on May 12, 2019.

137.     It is undisputed that Banjo resigned as Manager of Frictionless on May 3, 2019 and had no authority thereafter to conduct business on behalf of the Company.  Nevertheless, on May 14 – ten days after he resigned from the Company – Banjo directed the last three of the Final Four Shipments to Frictionless to instead be sent to World.

138.     The total value of the Final Four Shipments is $369,444.08.  *See* Claimants' Ex. C-30 (invoices).  Neither Frictionless nor CIU has been paid for any of the Final Four Shipments. Instead, Respondents wrongfully possessed products valued at $369,444.08 and, presumably, World has already sold those products to certain Retailers for even more money.

139.     CIU, meanwhile, has been forced to lay off a majority of its employees due to these issues, which the Li Parties directly attribute to Respondents' fraud and misconduct.

**H.     After Banjo's Resignation, Z.L. Investment Appoints A New Manager For Frictionless And Discovers Additional Evidence Of Fraud**

140.     As noted, Banjo resigned as Manager of Frictionless on Friday, May 3, 2019.  *See* Claimants' Ex. C-25.  That weekend, Z.L. Investment hurriedly worked to appoint Ms. Li – Z.L. Investment's prior designee to the Company – as Frictionless' new Manager.  *See* Claimants' Ex. C-33.

141.     As part of the Company's and Z.L. Investment's efforts to transition Frictionless to Ms. Li's management, Frictionless and Z.L. Investment sought copies of Frictionless' books, records, and other operational information from Banjo, so that Ms. Li could attempt to operate the Company, which, according to Banjo, was effectively insolvent at the time.  *See* Claimants' Ex. C-34; *see also* Claimants' Ex. C-55, p. 4 (April 29 email from Banjo).  And continuing thereafter, the Li Parties' counsel asked Respondents' counsel – who had offered to facilitate the transition

- 39 -

efforts to Frictionless' new Manager – for a variety of operational documents relating to, among other things, the expenses reflected on Frictionless' financials.

142.     After repeated emails and questioning, Respondents' counsel finally provided Ms. Li, through counsel, with Frictionless' general ledger data in mid-May 2019.  Among other things, that data, combined with Frictionless' existing P&L statements, tax filings, and the parties' Arbitration filings to date, shows the following:

- The Company's Payroll Expenses:  Frictionless hired only one employee during its entire existence – Ms. Li.  At all times from 2016-2018, Ms. Li's salary was $70,000 per year.  *See* Claimants' Ex. C-35 (Payroll Journal).  But Frictionless' own P&L statements for those years show ***significantly higher*** payroll expense figures:  (a) $2,083,106 in 2016; (b) $2,106,317 in 2017; and (c) $2,790,474 in 2018.  *See* Claimants' Exs. C-13 – C-15.

- The Company's Rent Expenses:  Frictionless never had its own physical location or lease.  But Frictionless' 2018 Form 1065 tax filing lists rent expense of $1,292,180.  *See* Claimants' Ex. C-16, p. 5.[10]

- The Company's Warehouse Expenses:  Frictionless never operated a warehouse.  But Frictionless' P&L statements show that Frictionless incurred warehousing expenses of $1,585,387 in 2017 and $1,861,951 in 2018.  *See* Claimants' Exs. C-14 – C-15.

- The Company's Insurance Expenses:  Frictionless never obtained insurance.  But Frictionless' P&L statements indicate that Frictionless incurred insurance expenses of $216,516 in 2017 and $214,983 in 2018.  *See* Claimants' Exs. C-14 – C-15.

143.     After raising a number of questions about these and other discrepancies in Frictionless' financials over the course of nearly a month of correspondence, Respondents' counsel finally advised the Li Parties' counsel on June 4, 2019 – more than a month after Banjo resigned as Manager – that:

> As you will recall, based on the Frictionless Operating Agreement and [the Alleged] Operating Plan . . . Banjo was to operate

---

[10]     To the extent that Claimants are able to confirm, after discovery and the Hearing, that these entries are, in fact, inaccurate and/or fraudulent, they will have to incur the time and expense of amending Frictionless' tax returns with the IRS.

> Frictionless LLC "directly or indirectly through another company, joint venture or other arrangement." . . . [T]hat company was Frictionless World ("FW"). **FW since the signing of the Operating Agreement has overseen all business-related matters**, including but not limited to leases, professional needs (such as legal counsel), insurance payments, and where applicable, bank service fees. **From 2013 – 2018, these expenses were passed on to Frictionless LLC.**

Claimants' Ex. C-36 (June 4, 2019 email from T. Howard) (emphasis added).[11]

144.     As noted, Z.L. Investment and Mr. Li were never aware of, let alone agreed to, any such arrangement.  Nor would they have ever agreed to an arrangement whereby Frictionless paid for all of World's expenses, but did not get the benefit of profiting from sales to the Retailers.

## I.     The Central Dispute In This Arbitration

145.     The end result of Banjo's conduct here – as reflected by, among other things, the undisputed facts in Section V.E above – is crystal clear:  Frictionless completely financed World's business from 2013-2019, while World captured most, if not all, of the revenue and profits from the sale of CIU's products to the Retailers.

146.     The central dispute in this arbitration to be resolved at the Hearing, therefore, is whether:

a.     As Respondents allege, the Li Parties knew about World in 2012-2013, and simply agreed to a business arrangement whereby:  (i) Frictionless sold CIU's products to World at a slight or no markup; (ii) World sold those products to the Retailers at a further mark-up; (iii) World – which Banjo alone owned and controlled and in which the Li Parties had no interest whatsoever – obtained most, if not all, of the

---

[11]     Although Respondents claimed in this email, and have since alleged in this Arbitration, that the Alleged Operating Plan reflected an agreement whereby Frictionless would reimburse World for all expenses, there is no such agreement reflected in the Alleged Operating Plan, even accepting Respondents' past assertions (which the Li Parties do not).

profits from those sales to Retailers; and (iv) Frictionless paid for all of World's expenses, even for those lines of World's business completely unrelated to the Li Parties;

**OR**

b.      As the Li Parties allege:  (i) they intended from the start to engage in an ordinary course, common sense business relationship with Banjo whereby the parties would share profits in Frictionless pro rata; (ii) they therefore understood all along that, once Frictionless purchased products from CIU, Frictionless would sell those products directly to the Retailers; (iii) Frictionless – of which Z.L. Investment owned 90% and Banjo owned 10% – would therefore obtain the benefit of any profits from sales to Retailers; and (iv) Banjo's operation of the Company to negate this intent simply reflects a years-long fraud perpetrated by Banjo through World.

147.    At the Hearing, the Li Parties will show that the undisputed facts in Section V.E above, as well as other facts to be adduced during discovery as well as basic common sense, support the Li Parties' claims and prove that Respondents, engaged in a years-long fraud that deprived Z.L. Investment and the Company of tens of millions of dollars.

## VI.    DESCRIPTION OF CLAIMS

148.    As set forth in Paragraphs 1 through 147 above, Respondents have engaged in various fraudulent misconduct – and Banjo has breached various provisions of the LLC Agreement – through their fraudulent scheme to siphon off revenues from the Company into Banjo's wholly-owned entity, World, while simultaneously foisting World's expenses onto the Company's financials.  Claimants anticipate providing evidence supporting the following claims at the Hearing.

## Count 1:  Fraud

### By Frictionless, Individually, and Z.L. Investment, Individually and Derivatively on Behalf of Frictionless, Against Banjo and World

149.    Banjo, acting on his own behalf and on behalf of World, knowingly made deceptive and material misrepresentations and omissions to Claimants and their representatives regarding the conduct of the Company's business.

150.    Specifically, instead of selling CIU's products directly from Frictionless to the Retailers as he told Claimants would occur, Banjo devised and engaged in a fraudulent scheme using his wholly-owned and controlled entity, World, to: (a) siphon off the Company's revenue into World, so that Banjo and World alone would enjoy most, if not all, of the profit from the sale of CIU's products to the Retailers; and (b) foist all of World's expenses, whether or not associated with the Company's business, onto the Company's financials.

151.    Banjo and World further fraudulently concealed this scheme by, among other things, refusing to provide documentation to which Z.L. Investment and/or the Company was entitled.

152.    As a result of this fraud, Frictionless and Z.L. Investment have been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

## Count 2:  Constructive Fraud

### By Frictionless, Individually, and Z.L. Investment, Individually and Derivatively on Behalf of Frictionless, Against Banjo

153.    As the Company's Manager, Banjo owed Frictionless a fiduciary duty, and he further owed Z.L. Investment a duty of good faith as a fellow Member of Frictionless.

- 43 -

154.    In his capacity as a Member and the Company's Manager, Banjo made deceptive and material misrepresentations and omissions to Claimant and its representatives regarding the conduct of the Company's business.

155.    Specifically, instead of selling CIU's products directly from Frictionless to the Retailers as he told Z.L. Investment would occur, Banjo devised and engaged in a fraudulent scheme using his wholly-owned and controlled entity, World, to: (a) siphon off the Company's revenue into World, so that Banjo and World alone would enjoy most, if not all, of the profit from the sale of CIU's products to the Retailers; and (b) foist all of World's expenses, whether or not associated with the Company's business, onto the Company's financials.

156.    Banjo – individually and through World – further fraudulently concealed this scheme by, among other things, refusing to provide documentation to which Z.L. Investment and/or the Company was entitled.

157.    As a result of this constructive fraud, Frictionless and Z.L. Investment have been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

### **Count 3:  Civil Theft**

*By Frictionless, Individually, and Z.L. Investment, Individually and
Derivatively on Behalf of Frictionless, Against Banjo and World*

158.    Banjo and World knowingly obtained, retained, and exercised control over (a) the revenues from the sales of CIU's products to the Retailers that properly belonged to the Company; (b) by extension, the profits that would have accrued to the Company and Z.L. Investment; (c) the funds from the Company and/or Z.L. Investment that were used to pay all of World's expenses; and (d) intellectual property created during the Company's business operations that properly belonged to the Company, all without required authorization and through other deceptive means,

and with the intent to permanently deprive the Company and Z.L. Investment of those revenues, funds, and intellectual property.

159.     As a result of this civil theft, Frictionless and Z.L. Investment have been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

160.     Pursuant to Colorado law (C.R.S.A. § 18-4-405), the Company and Z.L. Investment are entitled to treble damages, costs, and reasonable attorneys' fees for this civil theft.

### Count 4:  Conversion

*By Frictionless, Individually, and Z.L. Investment, Individually and Derivatively on Behalf of Frictionless, Against Banjo and World*

161.     Banjo and World engaged in acts of ownership over:  (a) the revenues from the sales of CIU products to the Retailers that belonged to the Company; (b) by extension, the profits that would have accrued to the Company and/or Z.L. Investment; and (c) the funds from the Company and/or Z.L. Investment that were used to pay all of World's expenses, all without required authorization and through other deceptive means, and with the intent to permanently deprive the Company and Z.L. Investment of the use of those revenues and funds.

162.     As a result of this conversion and fraudulent scheme, Frictionless and Z.L. Investment have been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

### Count 5:  Conversion of the Final Four Shipments

*By Frictionless, Individually, and CIU, Individually, Against Banjo and World*

163.     Banjo resigned as Manager of Frictionless on May 3, 2019 and had no authority thereafter to conduct business on behalf of the Company.  Nevertheless, on May 14 – ten days

after he resigned from the Company – Banjo directed three of the Final Four Shipments destined for Frictionless to instead be sent to World.

164.     Neither Frictionless nor CIU has been paid for any of the Final Four Shipments. Instead, Respondents wrongfully possessed products valued at $369,444.08 and, presumably, Banjo has already directed World to sell those products to Retailers for even more money.

165.     Respondents engaged in acts of ownership over:  (a) the Final Four Shipments belonging to CIU and/or Frictionless; (b) the revenues from the sales of the Final Four Shipments to Retailers that belonged to the Company; and (c) by extension, the profits that would have accrued to Frictionless from those sales, all without required authorization and through other deceptive means, and with the intent to permanently deprive the Company and CIU of the Final Four Shipments, as well as the those revenues and profits.

166.     As a result of this conversion of the Final Four Shipments, Frictionless and CIU have been damaged in an amount to be determined at the Hearing, but believed to be at least $369,444.08, plus interest and lost profits from the sale of the Final Four Shipments.

### Count 6:  Civil Theft of the Final Four Shipments

*By Frictionless, Individually, and CIU, Individually, Against Banjo and World*

167.     Banjo resigned as Manager of Frictionless on May 3, 2019 and had no authority thereafter to conduct business on behalf of the Company.  Nevertheless, on May 14 – ten days after he resigned from the Company – Banjo directed three of the Final Four Shipments destined for Frictionless to instead be sent to World.

168.     Neither Frictionless nor CIU has been paid for any of the Final Four Shipments. Instead, Banjo wrongfully possessed products valued at $369,444.08 and, presumably, Banjo has already directed World to sell those products to Retailers for even more money.

- 46 -

169.     Banjo used World to knowingly obtain, retain, and exercise control over: (a) the Final Four Shipments belonging to CIU and/or Frictionless; (b) the revenues from the sales of the Final Four Shipments to Retailers that belonged to the Company; and (c) by extension, the profits that would have accrued to Frictionless from those sales, all without required authorization and through other deceptive means, and with the intent to permanently deprive the Company and CIU of the Final Four Shipments, as well as the those revenues and profits.

170.     As a result of this civil theft of the Final Four Shipments, Frictionless and CIU have been damaged in an amount to be determined at the Hearing, but believed to be at least $369,444.08, plus interest and lost profits from the sale of the Final Four Shipments.

171.     Pursuant to Colorado law (C.R.S.A. § 18-4-405), the Company and CIU are entitled to treble damages, costs, and reasonable attorneys' fees for this civil theft.

### Count 7:  Civil Conspiracy

**By Frictionless, Individually, and Z.L. Investment, Individually and Derivatively on Behalf of Frictionless, Against Banjo and World**

172.     Banjo and World acted in concert with the goal of committing fraud, civil theft, and conversion against the Company and Z.L. Investment.

173.     Specifically, Banjo and World acted together to concoct and engage in a fraudulent scheme to: (a) siphon off the Company's revenue into World; (b) foist World's expenses onto the Company's financials; wrongfully possess the Final Four Shipments; and (c) misappropriate the Company's intellectual property.

174.     Banjo and World further fraudulently concealed this scheme by, among other things, refusing to provide documentation to which Z.L. Investment was entitled.

175.     As a result of Respondents' conspiracy, Frictionless and Z.L Investment have been damaged in an amount to be determined at the Hearing, but believed to be in the tens of millions of dollars, plus interest.

### Count 8:  Breach of Contract (LLC Agreement)

*By Z.L. Investment, Individually, Against Banjo for*
*Breach of the Non-Compete Provisions*

176.     Consistent with the LLC Agreement and the Employment Agreement, Banjo served as Frictionless' Manager from April 2013 until his resignation on May 3, 2019.

177.     Pursuant to Section 4.4 of the LLC Agreement, Banjo represented and warranted to Z.L. Investment that he would not compete in a substantially similar business with Frictionless while serving as the Company's Manager.

178.     The terms of these "Non-Compete Provisions" were reasonable with respect to their duration, geographic scope, and proscription and are properly applied to Banjo without violating Colorado law because at all relevant times, Banjo served as an executive officer of the Company, specifically as its Manager.

179.     Because Banjo wholly owns and controls World, it is an "Affiliate" of Banjo's within the meaning of the LLC Agreement's Non-Compete Provisions.

180.     Banjo breached those Non-Compete Provisions by, among other things: (a) operating World, his wholly-owned and controlled entity, to directly compete with, and convert the revenues for CIU products that belonged to, Frictionless; and (b) using the Company to pay for all of World's expenses, whether or not they were associated with the Company's business, while World captured most, if not all, of the profit from the sale of CIU's products that rightfully belonged to Frictionless.

181.     Banjo is therefore liable to Z.L. Investment and must indemnify Z.L. Investment for his breaches pursuant to Section 4.6 of the LLC Agreement.

182.     As a result of Banjo's breach of the LLC Agreement's Non-Compete Provisions, Z.L. Investment has been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

### Count 9:  Breach of Contract (LLC Agreement)

*By Z.L. Investment, Individually, Against Banjo for*
*Not Obtaining Required Approvals*

183.     Pursuant to Sections 5.3, 5.4, and 5.12 of the LLC Agreement, Banjo was required to obtain Z.L. Investment's and/or Mr. Li's approval prior to making certain decisions involving, among other things, using Company funds for purposes other than furthering Frictionless' business, making expenditures above certain limits, transferring or providing rights to the Company's intellectual property to a third party, and/or causing Frictionless to transact business with Banjo or one of his Affiliates.

184.     Banjo breached all of these provisions in various ways, including, but not limited to, by:  (a) causing Frictionless to sell CIU's products only to World, Banjo's wholly-owned and controlled entity; (b) providing World with access and rights to intellectual property that properly belonged to Frictionless and, in fact, were developed at Frictionless' expense; and (c) expending Frictionless' funds and resources to further the interests of World rather than the Company.

185.     Banjo engaged in this and other misconduct all without obtaining the approvals of Z.L. Investment and/or Mr. Li, as required under Sections 5.3, 5.4, and 5.12 of the LLC Agreement.

186.     As a result of Banjo's breaches of these provisions of the LLC Agreement, Z.L. Investment has been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

## **Count 10:  Breach of Contract (LLC Agreement)**

### *By Z.L. Investment, Individually, Against Banjo for*
### *Failure to Account, Report, and Allow Inspection*

187.    Pursuant to Section 10.1 of the LLC Agreement, Banjo, as the Company's Manager, was required to cause Frictionless to maintain complete and accurate books of account of the Company's affairs in accordance with generally accepted accounting principles.  And, pursuant to Section 10.3 of the LLC Agreement and consistent with Colorado law, Z.L. Investment is entitled to inspect, review, and audit all of the agreements, documents, records and reports relating to the Company's business, as well as all other items prepared or obtained by Banjo in connection with his role as Manager of Frictionless.

188.    In an apparent effort to conceal his fraudulent scheme using World, Banjo breached these provisions of the LLC Agreement by, among other things, either not maintaining accurate books and records for the Company, or by repeatedly refusing to provide Z.L. Investment with information about:  (a) the Company's agreements with its only customer, World; (b) how much World pays Frictionless for CIU's products, and how that price is determined; and/or (c) World's sales of CIU's products to the Retailers, including any mark-up of the price that World pays to Frictionless for those products.

189.    As a result of Banjo's breaches of these provisions of the LLC Agreement, Z.L. Investment has been damaged in an amount to be determined at the Hearing, plus interest.

## **Count 11:  Accounting of Frictionless Financial and Business Records**

### *By Frictionless, Individually, and Z.L. Investment, Individually and Derivatively on Behalf of Frictionless, Against Banjo*

190.    Pursuant to Colo. Rev. Stat. Ann. § 7-80-408, Z.L. Investment is entitled to inspect full information regarding the business and financial condition of Frictionless.  As the Manager of Frictionless, Banjo had a fiduciary duty to account to Frictionless for all property, profit, or benefit

- 50 -

Banjo derived through his conduct as Manager.  And, pursuant to Section 10.3 of the LLC Agreement, Z.L. Investment is entitled to inspect, review, and audit all of the agreements, documents, records and reports relating to the Company's business, as well as all other items prepared or obtained by Banjo in connection with his role as Manager of Frictionless.

191.   In an apparent effort to conceal his fraudulent scheme using World, Banjo breached Colo. Rev. Stat. Ann. § 7-80-408, his fiduciary obligations, and the LLC Agreement by, among other things, either not maintaining accurate books and records for the Company, or by repeatedly refusing to provide Z.L. Investment with information about:  (a) the Company's agreements with its only customer, World; (b) how much World pays Frictionless for CIU's products, and how that price is determined; (c) World's sales of CIU's products to the Retailers, including any mark-up of the price that World pays to Frictionless for those products; (d) World's profit and loss figures for the period from April 2013-present; and/or (e) intellectual property developed by Banjo, related to CIU products, or otherwise developed for the benefit of the Company.

192.   Frictionless requests an Order from the Tribunal directing Banjo to provide an accounting of:  (a) the Company's agreements with its only customer, World; (b) how much World pays Frictionless for CIU's products, and how that price is determined; (c) World's sales of CIU's products to the Retailers, including any mark-up of the price that World pays to Frictionless for those products; (d) World's profit and loss figures for the period from April 2013-present; and/or (e) any ownership interest that Banjo possesses in any and all patents and/or trademarks created or otherwise developed after the signing of the Frictionless Agreements.

## Count 12:  Breach of Contract (LLC Agreement)

### By Z.L. Investment, Individually, Against Banjo for
### Misappropriation of the Company's Intellectual Property

193.    Pursuant to Section 9.1 of the LLC Agreement, Banjo agreed that the Company had the right to freely use any patents that were within his control at the time of signing the LLC Agreement, as well as any new patents that relate to CIU products that are in his control after the execution of the LLC Agreement.

194.    Pursuant to Section 9.3 of the LLC Agreement, Banjo, as a Member and the Company's Manager, further agreed that all intellectual property "*developed by the Officers, employees, or otherwise specifically for the Company shall be the property of the Company*."

195.    In other words, Banjo agreed that any intellectual property developed by the Company's Officers – which, by definition, included Banjo – or otherwise developed for the Company would belong to Frictionless, not to Banjo or any other person or entity.

196.    Banjo breached these contractual obligations by, among other things: (a) either assigning intellectual property created during the Company's business operations to World and/or otherwise giving World access to such intellectual property that rightfully belonged to the Company; and (b) using World to employ all employees working on the Company's business, in order to evade the applicable provisions of the LLC Agreement governing the Company's ownership of intellectual property, as reflected by, among other things, Banjo's apparent instructions to the Company's counsel to remove references to World from the LLC Agreement's intellectual property provisions.

197.    According to a search of the U.S. Patent and Trademark Office's website attached hereto as Claimants' Exhibit C-51, Banjo applied for at least 14 patents in his own name or in the name of World after the execution of the LLC Agreement.

198. Given that Frictionless paid for all of World's expenses, it is highly likely – if not downright certain – that Frictionless incurred the cost of all those patent applications, as well as the legal costs associated with preparing them.

199. It is further undisputed that Frictionless paid for all of World's employee expenses including, by definition, the efforts of any World employees to develop patents subsequently registered by Banjo to himself and/or World.

200. Upon information and belief, Banjo also created and applied for at least 27 trademarks since the execution of the LLC Agreement. Claimants' Exhibit C-52. Again, given that Frictionless paid for all of World's expenses, it is highly likely – if not downright certain – that Frictionless incurred the cost of all those trademark applications, as well as the legal costs associated with preparing them.

201. It is further undisputed that Frictionless paid for all of World's employee expenses including, by definition, the efforts of any World employees to develop trademarks subsequently registered by Banjo to himself and/or World.

202. As a result of Banjo's breaches of these provisions of the LLC Agreement, Z.L. Investment has been damaged in an amount to be determined at the Hearing, but believed to exceed millions of dollars, plus interest.

### Count 13: Conversion of the Company's Intellectual Property

#### *By Frictionless, Individually, Against Banjo and World*

203. Pursuant to Section 9.3 of the LLC Agreement, Banjo, as a Member and the Company's Manager, agreed that all intellectual property "***developed by the Officers, employees, or otherwise specifically for the Company shall be the property of the Company***."

204.    In other words, Banjo agreed that any intellectual property developed by the
Company's Officers – which, by definition, included Banjo – or otherwise developed for the
Company would belong to Frictionless, not to Banjo or any other person or entity.

205.    According to a search of the U.S. Patent and Trademark Office's website attached
hereto as Claimants' Exhibit C-51, Banjo applied for at least 14 patents in his own name or in the
name of World after the execution of the LLC Agreement.

206.    Given that Frictionless paid for all of World's expenses, it is highly likely – if not
downright certain – that Frictionless incurred the cost of all those patent applications, as well as
the legal costs associated with preparing them.

207.    It is further undisputed that Frictionless paid for all of World's employee expenses
including, by definition, the efforts of any World employees to develop patents subsequently
registered by Banjo to himself and/or World.

208.    Upon information and belief, Banjo also created and applied for at least 27
trademarks since the execution of the LLC Agreement.  Claimants' Exhibit C-52.  Again, given
that Frictionless paid for all of World's expenses, it is highly likely – if not downright certain –
that Frictionless incurred the cost of all those trademark applications, as well as the legal costs
associated with preparing them.

209.    It is further undisputed that Frictionless paid for all of World's employee expenses
including, by definition, the efforts of any World employees to develop trademarks subsequently
registered by Banjo to himself and/or World.

210.    Through the fraudulent scheme outlined herein, Banjo and World engaged in acts
of ownership over the Company's intellectual property, without required authorization and through

- 54 -

other deceptive means, with the intent to permanently deprive the Company of the ownership and use of that intellectual property.

211.     As a result of this conversion and fraudulent scheme, Frictionless has been damaged by Banjo and World in an amount to be determined at the Hearing but believed to exceed millions of dollars, plus interest.

## Count 14:  Breach of Contract

### *By Frictionless, Individually, Against World, Individually, for Failure to Pay for Goods Under the Colorado Uniform Commercial Code*

212.     It is undisputed that, while he was Manager of Frictionless, Banjo caused Frictionless, upon receiving CIU's products, to sell those products to World.

213.     It is further undisputed that, as of the date of this filing, World has failed to pay Frictionless approximately $12.6 million for those products, even though Frictionless delivered those products to World and World has subsequently sold those products to the Retailers or used that inventory to obtain loans to benefit World and/or Banjo.

214.     As a result of World's breaches of the contracts between Frictionless and World governing the purchase and sale of those products, Frictionless is entitled to an amount to be determined at trial but anticipated to be at least $12.6 million, plus interest.

## Count 15:  Unjust Enrichment

### *By Frictionless, Individually, Against World, Individually, for Failure to Pay for Goods*

215.     As noted, it is undisputed that, while he was Manager of Frictionless, Banjo caused Frictionless, upon receiving CIU's products, to sell those products to World.

216.     It is further undisputed that, as of the date of this filing, World has failed to pay Frictionless approximately $12.6 million for those products, even though Frictionless delivered

those products to World and World has subsequently sold those products to the Retailers or used that inventory to obtain loans to benefit World and/or Banjo.

217.    World has therefore received a benefit – Frictionless' products purchased from CIU – at Frictionless' expense, under circumstances where it would be unjust for World to continue to keep them without compensating the Company.

218.    World has therefore been unjustly enriched at Frictionless' expense in an amount to be determined at trial but anticipated to be at least $12.6 million, plus interest.

### Count 16:  Breach of Contractual Fiduciary Duties

*By Z.L. Investment, Individually, Against Banjo for Willful Misconduct,*
*Fraud, and Gross Negligence and Otherwise Failing to Act in Good Faith*
*in Violation of His Contractual Fiduciary Duties under the LLC Agreement*

219.    Pursuant to Section 5.5 of the LLC Agreement, Banjo, as the Company's Manager, owed fiduciary duties to Frictionless and he further owed Z.L. Investment duties of good faith as a fellow Member, including the duty to carry out his duties as Manager in good faith.

220.    Banjo breached these duties by devising and engaging in a fraudulent scheme to: (a) siphon off the Company's revenue into his wholly-owned and controlled entity, World; and (b) foist World's expenses onto the Company's financials, whether or not those expenses were associated with the Company's business.

221.    Banjo also took steps to cover up this fraud by, among other things, refusing to provide documentation to which Z.L. Investment is entitled.

222.    Banjo's conduct constitutes fraud, willful misconduct, and gross negligence; Banjo is therefore not entitled to the limitations on liability in Section 5.9.1 of the LLC Agreement.

223.    As a result of Banjo's breaches of fiduciary duties owed under the LLC Agreement, Z.L. Investment has been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

## Count 17:  Breach of Common Law Fiduciary Duties

*By Frictionless, Individually, and Z.L. Investment, Individually and
Derivatively on Behalf of the Company, Against Banjo
for Breaching His Duty Not to Take LLC Property*

224.    As the Company's Manager, Banjo had a fiduciary duty to account to the Company, and to further hold as a trustee for the Company, any property, profit, or benefit derived by Banjo during the conduct of the Company's business.  Banjo similarly owed Z.L. Investment duties of good faith as a fellow Member of the Company not to take the Company's property.

225.    Banjo breached these duties by, among other things, devising and engaging in a fraudulent scheme using his wholly-owned and controlled entity, World, to:  (a) siphon off the Company's revenue into World; and (b) foist World's expenses onto the Company's financials, whether or not those expenses were associated with the Company's business.

226.    Banjo has further breached these duties by taking steps to cover up his fraudulent scheme using World.

227.    As a result of Banjo's breaches of fiduciary duties and/or duties of good faith, Frictionless and Z.L. Investment have been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

## Count 18:  Breach of Common Law Fiduciary Duties

*By Frictionless, Individually, and Z.L. Investment, Individually and
Derivatively on Behalf of the Company, Against Banjo
for Usurpation of Corporate Opportunity*

228.    As the Company's Manager, Banjo had a fiduciary duty to the Company, and he further owed duties of good faith to Z.L. Investment as his fellow Member therein, not to appropriate any business opportunity of the Company.

- 57 -

229.    Frictionless had an actual and expected interest in the revenue from the sale of CIU's products to the Retailers, and Z.L. Investment had an actual and expected interest in its pro rata share of the resulting profits from those sales, if any.

230.    Instead of Frictionless directly selling CIU's products to the Retailers, Banjo used World – which he alone owned and controlled – to usurp this corporate opportunity from the Company, directing Frictionless to sell CIU's products to World as a "middleman," in order to siphon revenue from the Company and hoard it for himself and World, at the Company's and Z.L. Investment's expense.

231.    As a result of Banjo's breaches of fiduciary duties and/or duties of good faith, Frictionless and Z.L. Investment have been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

### Count 19:  Breach of Common Law Fiduciary Duties

*By Frictionless, Individually, and Z.L. Investment, Individually and
Derivatively on Behalf of the Company, Against Banjo for
Breach of the Duty of Loyalty and to Avoid Conflict of Interest*

232.    As the Company's Manager, Banjo had a fiduciary duty to serve the Company's interests loyally and to refrain from acting on behalf of a party whose interests were adverse to the Company.  Banjo owed Z.L. Investment similar duties of loyalty as part of his duty of good faith as a fellow Member of the Company.

233.    Banjo breached these duties by using his day-to-day operational control of Frictionless to cause the Company to use World – which Banjo alone owned and controlled – as its only customer, so that Banjo could siphon off the Company's revenue into World.

234.    Banjo further breached these duties by causing Frictionless to reimburse World for all of World's expenses, whether or not those expenses were associated with the Company's business.

- 58 -

235.    As a result of Banjo's breaches of fiduciary duties and/or duties of good faith, Frictionless and Z.L. Investment have been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

## Count 20:  Breach of Common Law Fiduciary Duties

*By Frictionless, Individually, and Z.L. Investment, Individually and*
*Derivatively on Behalf of the Company, Against Banjo for*
*Breach of the Duty of Due Care*

236.    As the Company's Manager, Banjo had a common law fiduciary duty to refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or knowing violations of law.  Banjo owed Z.L. Investment similar duties as part of his duty of good faith as a fellow Member of the Company.

237.    Banjo breached these duties by devising and engaging in a fraudulent scheme using his wholly-owned and controlled entity, World, to, among other things:  (a) siphon off the Company's revenue into World; (b) foist World's expenses onto the Company's financials, whether or not they were associated with the Company's business; and (c) cover up his fraud perpetrated through World fraud by, among other things, refusing to provide documentation to Z.L. Investment.

238.    As a result of Banjo's breaches of fiduciary duties and/or duties of good faith, Frictionless and Z.L. Investment have been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

## Count 21:  Breach of the Duty of Good Faith and Fair Dealing

### By Z.L. Investment, Individually, Against Banjo for
### Breach of the Duty of Good Faith and Fair Dealing

239.     As a Member and the Company's Manager, Banjo had a common law duty to Z.L. Investment to discharge his duties under the Frictionless Agreements and otherwise consistent with the duty of good faith and fair dealing.

240.     Banjo breached these duties by devising and engaging in a fraudulent scheme using his wholly-owned and controlled entity, World, to, among other things:  (a) siphon off the Company's revenue into World; (b) foist World's expenses onto the Company's financials, whether or not those expenses were associated with the Company's business; and (c) cover up his fraud perpetrated through World by refusing to provide documentation to which Z.L. Investment was entitled.

241.     As a result of Banjo's breach of his duty of good faith and fair dealing, Z.L. Investment was deprived of its rights to the benefit of the bargain it struck with Banjo in the Frictionless Agreements.

242.     Z.L. Investment has been damaged by Banjo's breach of his duty of good faith and fair dealing in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

## Count 22:  Negligent Misrepresentation

### By Frictionless, Individually, and Z.L. Investment, Individually and
### Derivatively on Behalf of Frictionless, Against Banjo

243.     As the Company's Manager, Banjo owed Frictionless certain contractual and/or common law fiduciary duties.  Banjo further owed Z.L. Investment similar contractual and other duties as part of his duty of good faith to Z.L. Investment as a fellow Member of the Company.

244.    In his capacity as a Member and the Company's Manager, Banjo negligently making deceptive and material misrepresentations and omissions to the Company, and to Z.L. Investment and its representatives, regarding the conduct of the Company's business.

245.    Specifically, instead of selling CIU products directly from Frictionless to the Retailers, Banjo devised and engaged in a fraudulent scheme using his wholly-owned and controlled entity, World, to, among other things:  (a) siphon off the Company's revenue into World; (b) foist World's expenses onto the Company's financials, whether or not those expenses were associated with the Company's business; and (c) cover up his fraud perpetrated through World by refusing to provide documentation to which Z.L. Investment was entitled.

246.    As a result of Banjo's negligent misrepresentations, the Company and Z.L. Investment have been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

### Count 23:  Tortious Interference With Prospective Business Advantage

#### *By Frictionless, Individually, Against Banjo and World*

247.    The Li Parties understood that:  (a) CIU would manufacture products branded for Frictionless; (b) CIU would sell those products to Frictionless; (c) Frictionless would then sell those products to U.S. Retailers; and (d) Frictionless' profits would be divided between Z.L. Investment and Banjo in accordance with their respective pro rata equity interests in the Company.

248.    Accordingly, Frictionless had prospective contractual and business relations with the Retailers.

249.    Instead of selling CIU's products directly from Frictionless to the Retailers as he told Claimants would occur, Banjo intentionally and improperly interfered with Frictionless' prospective contractual and business relations with the Retailers by engaging in a fraudulent scheme that included, among other things, causing Frictionless to sell CIU's products only to

World, Banjo's wholly-owned and controlled entity, thereby siphoning off the Company's revenue into World.

250.     Respondents' intentional and improper interference caused the Retailers to enter into contractual and business relations with his wholly owned company, World, instead of Frictionless.

251.     As a result of this tortious interference, Frictionless has been damaged in an amount to be determined at the Hearing but believed to exceed tens of millions of dollars, plus interest.

## Count 24: Unjust Enrichment

### *By Frictionless, Individually, and Z.L. Investment, Individually and Derivatively on Behalf of Frictionless, Against Banjo and World*

252.     Banjo used his position as the Manager of Frictionless to enrich himself and his wholly owned company, World, at the expense of Frictionless and Z.L. Investment.

253.     Specifically, Banjo and World received various benefits at Claimants' expense, including, but not limited to, by: (a) causing Frictionless to sell CIU's products only to World, thereby siphoning off the Company's revenues and profits into World; (b) providing World with access and rights to intellectual property properly belonging to Frictionless; and (c) expending Frictionless' funds and resources to further the interests of World rather than the Company – all without obtaining the required approvals of Z.L. Investment and/or Mr. Li.

254.     It would be unjust to allow Banjo and World to retain the benefits of this scheme without commensurate compensation to Frictionless and Z.L. Investment.

255.     Banjo and World have therefore been unjustly enriched at Frictionless' and Z.L. Investment's expense in an amount to be determined at trial but believed to exceed tens of millions of dollars, plus interest.

## VII.    FURTHER SUBMISSIONS AND RESERVATION OF RIGHTS

256.    Claimants reserve all rights in this matter, including the right to further amend this Amended Demand, to make further submissions with respect to the facts and law, merits, costs, and any other relevant matters, and/or to expand or vary its claims and the relief it seeks up to the date of the final award issued by the Tribunal.

## VIII.   RELIEF REQUESTED

257.    For all the reasons set out above, Claimants respectfully request that the Arbitral Tribunal issue an award:

(i)     Declaring that Claimants were defrauded by Respondents, who further committed, among other things, civil theft, conversion, and various breaches of fiduciary duty and/or of the LLC Agreement;

(ii)    Directing Banjo to provide a full accounting of all transactions between Frictionless and World, including, but not limited to, a detailed accounting of all pricing data, profit and loss data, and other relevant financials;

(iii)   Awarding Claimants their damages to be proven at the Hearing;

(iv)    Awarding Claimants the costs associated with these proceedings, including:  (a) legal fees and expenses (including any expert fees and expenses); (b) the Emergency Arbitrator's fees and expenses; and (c) the Arbitral Tribunal's fees and expenses, and ordering Respondents to pay all of the same pursuant to Section 14.7 of the LLC Agreement; and

(v)     Awarding Claimants any and all further or other relief as the Arbitral Tribunal may deem appropriate.

**Respectfully submitted for and on behalf of the Claimants**
**K&L Gates LLP**
**Counsel for the Claimants**

# Exhibit 3

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| CHANGZHOU ZHONG LIAN INVESTMENT CO. LTD. (A/K/A Z.L. INVESTMENT), INDIVIDUALLY | |
|          Claimant, | AAA Case No. |
|    v. | |
| DANIEL BANJO AND FRICTIONLESS WORLD, LLC | |
|       Respondents – Counterclaimants | |
| LI ZHIXIANG, ZL INVESTMENT AND CHANGZHOU INTER UNIVERSAL MACHINE & EQUIPMENT CO., LTD. | |
|      Counterclaim and Third Party Defendants | |

**DANIEL BANJO AND FRICTIONLESS WORLD, LLC'S RESPONSE, COUNTERCLAIMS AND THIRD PARTY CLAIMANTS IN RESPONSE TO ZL INVESTMENT'S ARBITRATION DEMAND**

\_\_\_

Thomas P. Howard
William C. Groh
Scott Brenner
Thomas P. Howard, LLC
842 W. South Boulder Rd. Suite 100
Louisville, CO 80027
Tel: 303-665-9845
Fax: 303-665-9847
thoward@thowardlaw.com
wcgroh@thowardlaw.com

**Counsel for Daniel Banjo and Frictionless World, LLC**

May 8, 2019

Pursuant to R-5 of the American Arbitration Association's (the "AAA") Rules for Commercial Arbitration, Daniel Banjo and Frictionless World, LLC ("Frictionless World") ("Respondents") hereby submit this First Response and Counterclaim ("Response") to Claimant Changzhou Zhong Lian Investment Co. LTD. ("ZL Investment" or "Claimant") Arbitration Demand (the "Demand").

## I.      Preliminary Statement

1.      Frictionless World LLC ("Frictionless World") is a Colorado limited liability company providing outstanding design, engineering, outsourcing and quality control of farm, ranch and garden machinery as well as equipment and supplies for development and delivery of custom products to its customers.

2.      Daniel Banjo, the president and founder of Respondent Frictionless World, has a Master's Degree in Engineering from Purdue University as well as a Bachelor of Science degree in Mechanical Engineering from Michigan Technological University. He has been an adjunct graduate engineering teacher for the University of Michigan, Stanford, Purdue, the University of Illinois and M.I.T.

3.      Frictionless World's products are marketed to retail distributors nationally and worldwide, and have been since October 2012.

4.      Claimant's arbitration demand is founded on the factual unsupported allegation that Frictionless World was "unbeknownst to Claimant until late 2018 . . . was using a separate Colorado limited liability company that he alone owned and controlled, [Frictionless] World, to siphon off revenues and profits to which Frictionless – and by extension Claimant – was rightfully entitled."

5.      Claimant's allegation that it was unaware of the Frictionless World until December 2018 is complete nonsense. As the evidence reflects, Mr. Banjo and the Li

family from China have worked together since 2007 and have conducted a very significant amount of business together since October 2012. This arbitration demand was filed in a bad faith effort to head off the counterclaims detailed below.

6.      Daniel Banjo created the company Frictionless World, LLC on May 14, 2012. Frictionless World began using the trademark "Frictionless World" in commerce on May 1, 2012 and publically registered that name with the Patent and Trademark Office. Claimant has known and worked with Mr. Banjo since 2007, and did business with Frictionless World starting in 2012, well before the signing of the Agreement. Exhibit R1.

7.      Changzhou Inter Universal, Machine & Equipment Co., Ltd. ("CIU") is owned and operated by Li Zhixiang ("Li"). It began manufacturing products <u>for Frictionless World</u> in November 2012, and began shipping to Frictionless World and invoicing them for products shipped in February 2012. CIU began invoicing Frictionless World in early 2013 and continued to send them invoices into 2014. On its face, Claimant's argument that they did not know about the existence of Frictionless World is complete nonsense.

8.      Mr. Li of CIU and Daniel Banjo of Frictionless World negotiated the Agreement in December through April of 2012-2013. The goal of the Agreement was to help CIU, through Frictionless World, broaden its sales base in the US. The Parties intentionally named the company "Frictionless, LLC", a direct derivative of the already existing and trademarked name "Frictionless World". The Parties intended from the outset to conduct all sales and distribution of products through Frictionless World, which already was conducting established brick and mortar operations in the US and had connections through Mr. Banjo throughout the relevant industry. The reasons for having Frictionless World handle all sales and marketing, and act as the forward facing company, were discussed at length between the Parties. Further, they are detailed in Schedule B to the Operating Agreement.

9.      Underlining the above, Frictionless at all times has operated with no physical location of its own, using instead the recorded address of Frictionless World. No website was ever created for Frictionless. No email address was ever created for Frictionless. All correspondence with Mr. Banjo and his employees at all times relevant to this matter, from mid-2012 through this date, has been conducted via the @frictionlessworld.com email address. That includes sales prior to the creation of Frictionless and negotiations regarding the creation of the same.

10.      Mr. Li, Serena Li and employees from ZL Investments have visited the Frictionless World facility on a regular basis starting in 2013. The facility has the name "Frictionless World," right out front and again inside over the front desk. Exhibit R2. See, e.g., the attached photo of Serena Li posing with Daniel Banjo in front of the interior sign stating "Frictionless World." Exhibit R2.

11.      The reasons for having Frictionless World handle all sales were clear. First, Mr. Li did not want his or CIU's name linked to the sale of its products in the United States. If Frictionless sold directly, it would become known that Mr. Li and ZL Investments were the 90 percent owners of this US company and open them up to potential product liability lawsuits by consumers in the US, as well as breach of contract claims by the retailers with whom they were doing business. Liability insurance for lawsuits related to dangerous power equipment would be all but impossible for Frictionless to obtain from US insurers. Further, it was much easier for Frictionless World, acting under Mr. Banjo, to obtain property leases, loans and insurance, and all of the same had long since been obtained by Frictionless World by the time the Agreement was finalized in April 2013. Never did Frictionless obtain a lease, insurance, or hire any employees, with the single exception of Mr. Li's daughter in 2015 as its CFO (detailed below).

12.    Finally, Claimant alleges that Frictionless World has "siphon[ed] off revenues and profits". Claimant's claim is without merit. First, pursuant to the Operating Agreement and Schedule B thereto, Frictionless World was to use 5-10 percent of revenue and up to 5 percent of uplifted expenses to purchase products that CIU does not sell from other manufacturers, in order to expand product offerings and increase the client base. The entire purpose of the Agreement, as detailed in the Operating Agreement and Schedule B to the same, as well as the actions of the parties since April 2012, was to build a new and competitive player in this market. That said, at all times Frictionless World's retained revenues have in fact been significantly smaller than the percentages permitted pursuant to the Operating Agreement.

13.    For each of the above reasons, and for the additional reasons set forth below, each of Claimant's claims must be denied. Further, Respondents Daniel Banjo and Frictionless World should be compensated for all legal fees and costs arising from this frivolous and groundless action.

14.    Respondent below sets forth in detail Counterclaims against Claimant, and respectfully requests a finding of judgement against Claimant with regards to the same.

## II.    Procedural Matters

15.    This Response is limited to the requirements set forth in R-5 of the AAA Rules. Respondents expressly reserve the right to amend this Response and offer necessary evidence at the appropriate later stage of the proceedings. Respondents deny all allegations herein not specifically admitted and assert all applicable legal defenses.

16.    Respondent Dan Banjo admits that it is the jurisdiction of the AAA to hear disputes arising out of the Agreement, in accordance with section 14.6 of the Arbitration Agreement. As set forth in section 14.6 of the Agreement, Respondents agree that the location of the arbitration will be in the State of Colorado. However, Respondent Banjo believes that it

would not be cost effective to litigate this matter in two forums, and therefore stresses the issues detailed below in Paragraph 17.

17.    Respondent Frictionless World, although mentioned in the Agreement, is not a party to the same. It will agree to have this heard under by the AAA pursuant to this Agreement if counterclaim defendant Changzhou Inter Universal, Machine & Equipment Co., Ltd. ("CIU") also agrees to have the claims against it heard under this Agreement. Should CIU refuse to appear in this forum than Frictionless World will refuse the same.

### III.    The Parties

18.    Claimant Z.L. Investment is an investment entity organized under the laws of China.

19.    The Respondents are Daniel Banjo and Frictionless World LLC.

20.    Dan Banjo is an individual residing in Colorado.

21.    Frictionless World is a Colorado limited liability company located at 1100 W. 120th Avenue, Suite 600, Westminster, Colorado. Frictionless World has sold power equipment under the its trademarked names "Frictionless World", "Dirty Hand Tools", "Trophy Strike", "Vinsetta Tools" and "Ranchex" since April 1, 2013. Twenty nine (29) separate trademarks have been publically filed by Frictionless World for those names since 2013. Said filings are viewable on the Patent and Trademark Office website. Daniel Banjo has authored and registered multiple design and utility patents for Frictionless World. Those registrations are viewable on the Patent and Trademark website as well.

22.    Frictionless, LLC ("Frictionless") is a Colorado limited liability company. Frictionless has no physical location. At all times relevant to this lawsuit Frictionless has used Frictionless World's address as its mailing address.

23.    Li Zhixiang ("Li") is an individual living in China. His exact address is currently

unknown

24.     Changzhou Inter Universal, Machine & Equipment Co., Ltd. is a business that, upon information and belief, is owned and operated by Li and located in Shanghai.

**IV.     Relevant Factual Background**

19.     Mr. Banjo's first contact with the Li family was in 2007 while working as head of engineering at SpeeCo, Inc. At that time Mr. Banjo began working with Mr. Li and became familiar with his factory in China, CIU. Upon information and belief, prior to 2007 CIU had been a supplier to SpeeCo for 10+ years and had no other customers in the USA or China. Upon information and belief, CIU's sole business in 2007 was with SpeeCo in the USA.

20.     In the years between 2007 and 2011, Mr. Banjo worked at SpeeCo and made numerous trips to China to work with CIU and Mr. Li. Mr. Li and members of what is now ZL investments made multiple trips to the USA to work with SpeeCo, and specifically with Mr. Banjo. Mr. Li and CIU never produced a whole good, or complete product for SpeeCo. They were a producer of parts. Log splitter beams, tanks and wedges were their primary business. They had no assembly lines at that time. They had no contacts for any of the other components used in the final assembly of products that SpeeCo assembled in the USA. SpeeCo, its engineers and Mr. Banjo developed those suppliers on behalf of SpeeCo at that time.

21.     In the years prior to 2012 CIU was not manufacturing or selling outdoor power equipment products such as log splitters, lawn mowers, etc. They had no technologies like CNC benders, laser cutting machines etc. At that point in time CIU was solely a parts supplier and had no other capabilities.

22.     In or around 2012 Blount International bought SpeeCo. Upon information and belief, Blount was going to start sourcing away from CIU. Such an action by Blount would have resulted in a loss of business for CIU.

23.     Mr. Banjo left Blount in 2011, and on May 14, 2012 created Frictionless World. Exhibit R4. Frictionless World began using the trademark "Frictionless World" in commerce on May 1, 2012 and publically registered that name with the Patent and Trademark Office. Frictionless World and Mr. Banjo entered into a lease for an office with an 18,335 square foot warehouse in Louisville CO. Construction took place on the building over several months in late summer and fall of 2012. Frictionless World moved into the building in October of 2012.

24.     During trips to China in 2012 Mr. Banjo visited and met with Mr. Li and members of CIU and ZL Investments. They expressed concern about CIU's long term future given the new ownership of SpeeCo, and disappointment that Mr. Banjo had left Blount/SpeeCo. Mr. Banjo advised them that he had created a new company called Frictionless World, LLC, and told them that it would be selling outdoor power equipment to retailers.

25.     Frictionless World began designing new products and developing Frictionless World brand names for those products such as "Dirty Hand Tools" and "Ranchex". In late October and November 2012, Frictionless World began communicating with CIU and negotiation the manufacture and delivery of products including log splitters. Exhibit R5.

26.     Over the course of the next 7-8 months, Mr. Li on the behalf of CIU, and Mr. Banjo on the behalf of Frictionless World, negotiated doing business together. These negotiations were conducted with full knowledge of Frictionless World's existence and were pursued precisely because of its existence. Dan Banjo had over eight years of experience in the US industry and the many necessary contacts among large retailers that would be necessary in order to sell the type of products CIU was hoping to manufacture and market in the US. Further, Frictionless World already had a recognized name, a lease and brick and mortar presence, and product liability insurance granted in the U.S., all of which were issues for Mr. Li and ZL Investments. Dan Banjo had provided plans to Mr. Li and ZL Investments for his obtaining of retail sale placements in

Menards, Midstates, Lowes, TSC and Home Depo within 12 months. Negotiations between Frictionless World and TSC were ongoing at that time and were discussed at length in telephone calls and emails between the parties. Exhibit R5. It was agreed that ZL Investments and Mr. Banjo would jointly create Frictionless, which would operate as an affiliate selling CIU products to Frictionless World, which would act as the forward facing company to handling leases, employees, insurance and all US sales and marketing.

27.     As part of these negotiations, Mr. Li agreed that he would stop selling products to Speeco/Blount, direct competitors of Frictionless and Frictionless World. See R3, Sched B, pp. 8, 11. He agreed that he would move the approximately $50m of Purchase Orders from them per year to the new company to be created. He never did this. When asked in months after the signing of the document he said he couldn't but claimed to be stopping all of CIU's business with Speeco/Blount. As detailed below, CIU in fact never stopped conducting business with Blount and others, in direct violation of the non-compete clause entered into with Frictionless. See Exhibit R7 showing hundreds of shipments by CIU to Speeco/Blount well after April 2013.

28.     Throughout the time that these negotiations were taking place in 2012 and early 2013, CIU conducted business with Frictionless World, invoicing Frictionless World for various shipments. Exhibits R6, R8. Mr. Banjo and other employees from Frictionless World repeatedly communicated with people at CIU regarding business issues. Exhibit R1. Every email sent between to CIU was from a Frictionless World email address at frictionlessword.com. *Id*.

29.     The goal of the Agreement was to help CIU, through Frictionless World, broaden its sales base in the US. The Parties intentionally named the company "Frictionless, LLC", a direct derivative of Frictionless World, the company with which the Parties were doing business. Pursuant to the Agreement, "the business of the Company may be conducted directly by the Company **or indirectly through another company, joint venture or other arrangement**."

Exhibit R3, Section 2.5 (Emphasis added). The Parties actions and the Operating Plan of the Operating Agreement both demonstrate that they intended from the outset to conduct all sales and distribution of products through Frictionless World, which was at that time conducting established brick and mortar operations in the US and had multiple connections through Mr. Banjo throughout the relevant industry. The precise manner in which that was to occur is set forth in the Operating Plan, incorporated as Schedule B to the Agreement, referenced therein and attached thereto at the time of signing. Exhibit R3, Sched. B.

30.     The reasons for having Frictionless World handle all sales and marketing and act as the forward-facing company are crystal clear. First, product liability insurance for lawsuits related to outdoor power equipment would be all but impossible for 90 percent foreign owned Frictionless to obtain from U.S. insurers, but was already in place with regards to Frictionless World, which had been created back in May 2012. Exhibit R4. Second, Frictionless World, acting under Mr. Banjo, had already obtained a property lease, registered the business with the state and federal tax authorities, opened a business account, hired in house staff, and begun building a sales force. Exhibits R4, R9. Third, future credit would be much easier to be obtained by Frictionless World. See Exhibit R3, Sched. B, p. 11. Fourth, Frictionless World was offering its employees company ownership options that Frictionless could never provide. *Id*.

31.     Even had Frictionless somehow obtained a physical location, hired a sales force and obtained product liability insurance, none of which occurred, it and its 90 percent owners would have been placed at risk to potential product liability lawsuits by retailers and consumers in the US, breach of contract claims by the retailers with whom they were doing business, and intellectual property infringement claims in US courts by third parties. Reflecting these realities, since the signing of the Agreement *Frictionless World* has twice raised claims of patent infringement against third parties for sales of products *manufactured by CIU based on Frictionless*

*World* patents. Each such claim has been resolved by Frictionless World.

32.     Reflecting the above, Frictionless – 90 percent owned by Claimant - *intentionally* never obtained a building lease, business liability insurance, or hired <u>any</u> employees, with the single exception of Mr. Li's daughter in 2015 as its CFO. No website was ever created for Frictionless. No email address was ever created for Frictionless. All correspondence with Mr. Banjo and his employees have at all times relevant to this matter, from 2012 through this date, been conducted via the @frictionlessworld.com email address. At all times, the risks of selling and marketing the goods at issue have been intentionally left with Daniel Banjo and Frictionless World, which to this day handles the employment of over a dozen employees at warehouse and shipping facilities.

33.     The Operating Agreement was signed in China on April 11, 2013. Exhibit R3, p. 26. The Operating Plan was attached and incorporate by reference to the Operating Agreement at the time of signing as Schedule B. Exhibit R3, Section 6.5. The Operating Plan was prepared by Mr. Banjo and comprises a Power Point presentation showing how CIU, ZL Investments, Frictionless, <u>and</u> Frictionless World were to function together moving forward. It was taken by Mr. Banjo to China on April 8, 2013 and attached to the final Operating Agreement. All parties to the Operating Agreement were provided copies of the same, including Schedules A and B, at the time of signing.

34.     Claimant's Arbitration Demand attaches an incomplete version of the Operating Agreement that is missing Schedule B. Schedule B is expressly referenced both within the Agreement and at the close of the Agreement immediately after Schedule A. Exhibit R3, Section 6.5. Claimants provide no explanation for this omission. Immediately after the service of the Demand the complete Operating Agreement was provided to this attorney by Respondents; this counsel then provided Schedule B to counsel for Claimant. After a delay of almost two weeks,

counsel for Claimant advised that Claimants are alleging that (1) they never before saw Schedule B; and (2) Mr. Banjo at the time of signing told the other signers that it was not necessary for them to attach Schedule B as it was "just a business plan" and "not important".

35.     Claimant's current statements regarding Schedule B are completely false. Mr. Banjo worked with his attorney preparing the Operating Agreement and the parties discussed the purpose of the Operating Plan while drafting the same. Counsel agrees that Mr. Banjo intended to have the Operating Plan attached as Schedule B, as per the terms of the Agreement, and has agreed to sign a declaration to that effect. Claimant's spouse viewed the Operating Plan and witnessed Mr. Banjo taking the same to China for the purpose of the signing. Declarations will be obtained to support these facts as this case moves forward. At no time did Mr. Banjo advise his counsel that the Operating Plan was "not important". No emails or other correspondence exist suggesting anything of the sort. To the contrary, it was Mr. Banjo's duty as Manager to prepare the Operating Plan pursuant to Section 6.5 of the Agreement. Exhibit R3. It was Mr. Li's duty pursuant to Section 6.5 to review the Operating Plan. That is precisely what occurred. Claimants are bound by the terms of the Agreement, in its entirety. Exhibit R3.

36.     The facts demonstrate that Mr. Li, CIU, and ZL Investments intended for Frictionless World to buy the CIU Products from Frictionless and to sell them worldwide. Exhibit R3, Sched. B, p. 13. On April 11, 2013, Li agreed to this fundamental sales flow when he signed the Operating Agreement. *Id*. Schedule B to the LLC Agreement expressly states that "CIU manufactures log splitters, post hole digger, trimmers, etc. CIU sells them to [Frictionless]. [Frictionless World] buys them from [Frictionless] and sells to the customers worldwide." Exhibit R3, Sched. B, p. 13. The facts demonstrate that this is precisely what then occurred.

37.     The documentary record demonstrates that CIU as early as February 2013, before the creation of Frictionless, LLC, began shipping products to Frictionless World.

Exhibit R6, p. 5.

38.     The documentary record demonstrates that CIU began invoicing Frictionless World for products shipped by CIU in February 2013, months before the creation of Frictionless, LLC. Exhibit R6. The record further demonstrates that CIU continued invoicing Frictionless World directly for nearly a year *after* the creation of Frictionless, LLC. Exhibit R8. The records demonstrate beyond question that CIU had full knowledge of, and did substantive amounts of business with, Frictionless World.

39.     The facts demonstrate that, subsequent to the April 11, 2013 Agreement, Frictionless World began making its payments for product deliveries to Frictionless, as opposed to CIU. Frictionless acted as the in between to create a US company

### V.  Claims

40.     **Breach of fiduciary duty** -- **Li Zhixiang.** The Agreement demonstrates that Li, as the Chairman of the Company, owed the Company and Banjo fiduciary duties. Exhibit R3, Section 5.10.2.1 "Li shall be the chairman."

41.     The evidence demonstrates that from April 2013 though 2018, CIU under the direction of Li, significantly overcharged its 90 percent owned company Frictionless for its CIU Products.

42.     Only in 2019 did CIU admit to overcharging and correct its pricing. The result of that overcharging have cost Frictionless an estimated 7 million dollars in lost revenue over the last 6 years.

43.     The overcharging conducted by CIU to its 90 percent owned company Frictionless directly resulted in Frictionless World, as the party responsible for sales to retailers, being similarly overcharged.

44.     Daniel Banjo, on the behalf of Frictionless and as a member and owner thereof,

brings a derivative claim against Mr. Li for breach of fiduciary duty, as the actions of Mr. Li have caused significant injury to Frictionless.

45.     Frictionless World purchases the products from Frictionless that Frictionless purchases from CIU. Frictionless Word is a third-party beneficiary of Frictionless' contractual relationship with Mr. Li and CIU. Mr. Li's breach of fiduciary duty to Frictionless, by causing injury to Frictionless, has caused direct and foreseeable injury to Frictionless World.

46.     Frictionless World, as a third-party beneficiary of Frictionless, brings a direct claim against Mr. Li for breach of fiduciary duty, as the actions of Mr. Li have caused significant injury to Frictionless World.

47.     **Breach of Contract – Li and CIU.** Pursuant to Section 4.4 of the LLC Agreement, Claimant and Li represented and warranted that they would not compete with the Company's business, as follows:

> 4.4. Non-Competition. While a Member is a member of the Company, and for Li, while Z.L. [Claimant] is a Member of the Company, except as otherwise provided herein, each Member, and Li, agrees that he, she, or it shall, and he, she, or it shall cause his, her, or its Affiliates, to not compete with the Company, directly or indirectly, in a business substantially similar to the business of the Company or any of its subsidiaries anywhere where the Company does business, or the distribution of any products distributed by the Company or any of its subsidiaries anywhere in the world. For purposes of this Agreement, direct and indirect competition shall include, but not be limited to, having any business or employment relationship with any past or present client, supplier, or employee of the Company, and any competition as a sole proprietor, partner, corporate officer, director, shareholder, member, manager, employee, agent, independent contractor, trustee, or in any other manner in which such Member or Li, or its or his Affiliates, holds any beneficial interest in a competitive business, derives any income from such business, or provides any service, including the benefit of

his, her, or its reputation or knowhow, to such business. For purposes of clarification, the sale of parts and products that are materially different from parts and products that the Company sells or intends to sell shall not be considered to be competing with the Company.

48.     Pursuant to Section 4.6 of the LLC Agreement, Claimant and Li agreed to indemnify each other for any breach of the representations or warranties set forth in Article 4 of the LLC Agreement:

> 4.6 Indemnification for Breach. Each Member, and Li, on behalf of such Member (or, for Li, on behalf of himself) and his, her, or its successors and assigns, shall defend, indemnify and hold harmless the other Members, Li, and the Company from and against any and all claims, threats, liabilities, taxes, interest, fines, penalties, suits, actions, proceedings, demands, damages, losses, costs and expenses (including attorneys' and experts' fees and court costs) of every kind and nature arising out of, resulting from, or in connection with any breach of a representation and warranty or covenant set forth in this ARTICLE 4.

49.     Under the terms of the Operating Agreement CIU comprises an affiliate of Li. Exhibit R3, Article 1 Definitions; Arbitration Demand, ¶2.

50.     The facts demonstrate that, between April 12, 2012 and January 8, 2019, CIU, an affiliate of Li under the control of Li, has shipped nearly *400 separate orders* of CIU products to direct competitors of Frictionless. Exhibit R7. The competitors include Blount, Inc., Speeco, Inc., and Tooltuff LLC.

51.     By making these shipments, Li, and CIU acting as Li's affiliate, acted in direct breach of the Agreement, and caused severe injury to Frictionless and to Mr. Banjo as a member of Frictionless.

52.     Mr. Banjo brings a derivative claim on the behalf of Frictionless for damages that it has suffered arising from this breach.

53.     Additionally, Daniel Banjo and Frictionless World have suffered direct and foreseeable injury, as pursuant to the Operating Agreement, Schedule B, Frictionless World was to be the sole party to which Li and CIU sold product.

54.     By their actions, Li and CIU have acted in direct breach and have caused, and continue to cause, severe and ongoing injury to Frictionless, Mr. Banjo and Frictionless World.

55.     **Breach of Contract – Li, CIU and ZL Investments.**  CIU has accepted multiple purchase orders from the Company. Exhibit R10. Li and CIU repeatedly assured Mr. Banjo, Frictionless World and Frictionless that CIU would fulfill the purchase orders. CIU then delayed or failed to deliver the majority of those purchase orders.

56.     Since August 2018 Li and CIU accepted purchase orders totaling $8,849,654.22 of CIU Products, reflecting Frictionless World's preparing for what was expected to be a terrific 2019 season. Exhibit R10. But despite repeated promises to perform, CIU then fulfilled only 25% of the purchase orders. *Id*. As of today, CIU has failed to fulfill 70 purchase orders for more than $3.5 million in CIU Products. *Id*.

57.     In January 2019, Z.L. Investments, which is affiliated with Mr. Li, agreed to change the purchase terms for purchase orders between Frictionless and CIU. Specifically, Frictionless and Z.L. Investments, on behalf of CIU, agreed the payment terms would be "reduced from 360 days to 180 days on all PO's going forward from Feb 1, 2019." Exhibit R11.

58.     From November 2018 through February 2019, CIU and ZL Investments assured Frictionless World that deliveries were going to be shipped.

59.     As recently as April of 2019, Mr. Li, CIU and ZL Investments, through their counsel, continued to assure Mr. Banjo and Frictionless that CIU would fulfill the purchase orders, despite continuing to delay all deliveries. Exhibit R12.

60.     CIU then, after months of delay, on or about April 29, 2019 advised Frictionless and Frictionless World that it would not fulfill the outstanding purchase orders.

61.     Each purchase order accepted by CIU constitutes a separate outstanding contract to deliver the CIU Products identified in the purchase order.

62.     By failing to deliver after contracting to perform, CIU is in breach of contract with Frictionless, thereby causing Frictionless injury.

63.     Frictionless World comprises a third-party beneficiary of the Frictionless purchase orders, as all deliveries from CIU were to be delivered to Frictionless World or directly to retailers to whom Frictionless World has promised delivery.

64.     CIU has been placed on direct, written notice that its failure to perform is causing direct and severe injury to Frictionless World, and yet it continues to refuse to deliver as per its multiple purchase orders.

65.     Frictionless World as third party beneficiary of the Frictionless purchase orders sets forth a claim arising from the same.

66.     By failing to deliver after repeatedly contracting to perform, CIU has caused and is causing direct and severe  harm to Frictionless World, as it has gone into its busiest season of the year with no products in the stores and no deliveries of products arising, entirely due to the false representations and breach of contract of CIU and Li.

67.     By falsely and repeatedly assuring the Company, Mr. Banjo and Frictionless World that CIU would fulfill the purchase orders it accepted, Li and CIU caused Frictionless World not to seek alternative sources for products between November 2018 and April 2019.

68.     By falsely and repeatedly assuring the Company, Mr. Banjo and Frictionless World that CIU would fulfill the purchase orders it accepted, then failing to deliver, Frictionless World has lost millions in sales, is losing retail clients, is being fined by retail clients for failing to

deliver, and is just now searching for alternative suppliers.

**VI. Prayer for relief:**

For the reasons set forth above, Banjo, Frictionless, LLC through Mr. Banjo as a member thereof, and Frictionless World, LLC, respectfully request that the Arbitrators enter an award in favor of Banjo, Frictionless, LLC, and Frictionless World, LLC, and against the complainant, Mr. Li, and CIU as follows:

a)  For damages, and all other appropriate legal and equitable relief;

b)  For reasonable attorneys' fees and costs pursuant to Section 14.7 of the Operating Agreement;

c)  A declaration that Mr. Li and CIU defrauded Banjo and Frictionless, LLC;

d)  Awarding Claimant any and all further or other appropriate relief as the Arbitral Tribunal may deem appropriate.

.

Date: <u>May 8, 2019</u>                    Respectfully submitted,

                                        <u>/s/ Thomas P. Howard</u>
                                          Thomas P. Howard

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the all counsel of record are being served this 8th day of May 2019, with a copy of the foregoing document via electronic mail.

                                        <u>/s/ Thomas P. Howard</u>
                                          Thomas P. Howard

# Exhibit 4

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FRICTIONLESS WORLD, LLC | ) | Case No. 19-18459 MER |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| FRICTIONLESS WORLD LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 19-_____ MER |
| | ) | |
| FRICTIONLESS LLC, CHANGZHOU | ) | |
| INTER UNIVERSAL MACHINE & | ) | |
| EQUIPMENT CO., LTD, LI ZHIXIANG, | ) | |
| CHANGZHOU ZHONG LIAN | ) | |
| INVESTMENT CO. LTD., SERENA LI, | ) | |
| AND FRANK LI, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S COMPLAINT FOR TURNOVER OF PROPERTY OF THE ESTATE, CLAIM DISALLOWANCE, AVOIDANCE, DAMAGES AND INJUNCTIVE RELIEF

---

Frictionless World, LLC ("FW") brings the following claims against Defendants Changzhou Inter Universal Machine & Equipment Co., Ltd. ("CIU"), Li Zhixiang ("Li"), Changzhou Zhong Lian Investment Co. LTD. ("ZL Investment"), Serena Li, and Frank Li (collectively "Li Defendants"), as well as against Defendant Frictionless, LLC, with knowledge as to FW's own acts and those of Defendants, and on information and belief as to all other matters, as follows:

## **INTRODUCTION**

FW was created in 2012 by its CEO and sole owner Dan Banjo, an engineer with years of experience in the industry, to manufacture and distribute to retailers professional grade outdoor equipment for household and agricultural use. Because Banjo had known the Li family and CIU since 2007, he used CIU to manufacture parts and products for FW, per FW's direction. The parties also began negotiating a joint investment venture intended to quickly expand FW's number of retail clients and total sales, thereby assisting all involved. The other parties in this venture were Li, his company CIU, an investment company Li created in 2013 called ZL Investment, and a pass-through entity jointly created by ZL Investment and Banjo to handle revenue transfers between FW and CIU called Frictionless LLC. The Operating Agreement for Frictionless LLC was entered into on April 11, 2013. Schedule B to the Operating Agreement, repeatedly referenced in the same, provides a detailed description of how the joint venture operated.

The parties operated under the clear provisions of that agreement for six years. By late 2018, FW had registered steadily increasing sales numbers since 2012 and was projecting 2019-2020 to be its best year ever, with almost $50 million in sales.

Now, 10 months later, FW finds itself in a chapter 11 bankruptcy case as a direct result of Defendants' actions. Per Defendants' requests, FW in good faith made accelerated payments to Defendants in early 2019 totaling over $4.5 million. Upon receipt of the same, Defendants breached over 250 purchase orders and ceased all shipments. Defendants' failure to ship directly resulted in FW's loss of multiple major clients it had taken years to obtain, including Lowes and Home Depot. Defendants' actions reflect an intentional effort to destroy FW as a competitor and obtain FW's clients and intellectual property.

2

FW now brings this action to (a) compel turnover of all property of the estate currently in the possession of Defendants, including all intellectual property, all patented product designs, all patented products, all trademarked products and all other parts and products; (b) disallow or equitably subordinate Frictionless LCC's claim; (c) avoid obligations owed and transfers made to Frictionless LLC; (d) obtain damages arising from Defendants' ongoing breaches of contract, fraud, negligent misrepresentation, and other claims; and (e) to obtain injunctive relief to (1) compel turnover as set forth above; (2) enjoin Defendants' sale, distribution, licensing or distribution, in any form, of FW's patented and trademarked property remaining in their possession as a result of their failure to ship, as contracted; and (3) stay the arbitration filed by Defendants against FW and its CEO and sole owner Daniel Banjo.

## **THE PARTIES**

1.      Plaintiff FW is a limited liability company organized and in good standing under the laws of the State of Colorado, with its principal place of business at 1100 West 120th Avenue, Suite 600, Westminster, Colorado.  FW is a chapter 11 debtor-in-possession in the underlying bankruptcy case.  Banjo is FW's sole member, founder, and CEO.

2.      On April 1, 2019, FW had almost 80 employees working to provide retailers all over the world with FW's outstanding professional-grade outdoor power equipment; high-quality affordable replacement parts for tractors, hitches and agricultural implements; gate and fence equipment; lithium-ion powered tools; and ice fishing equipment.  At this time, FW has approximately 20 employees.

3.      Defendant Li, a natural person, is a Chinese citizen and billionaire. Li owns and operates CIU and ZL Investment.  Li is a party to the Frictionless LLC Operating Agreement (hereinafter the "FOA"). *See* Exhibit 1.  During 2013-2018, Li and members of his immediate

and extended family visited FW's facility in Colorado several times per year. Li has two children:
(1) Tracey Li; and (2) Frank Li. Both offsprings and their spouses are heavily involved in Li's
business affairs.

4.     Defendant CIU is a company organized under the laws of China. Its business
address is Zhaiqiao Town, Wujin, Chiangzhou, Jiangsu 21337, P.R. China. CIU has been
assembling components for log splitters, post hole diggers, trimmers, and general farm equipment
parts for FW since 2012, long before the joint venture involving Frictionless LLC was established.
CIU never assembled such products prior to working with FW. Li is the majority owner and
president of CIU.

5.     Defendant Serena Li is a natural person and citizen of China. Serena Li at one-time
was a resident of the State of California. She is married to Frank Li and is therefore Li's daughter-
in-law. Defendant Serena Li is believed to be a member of both ZL Investment and CIU. Serena
is the Chief Financial Officer ("CFO") of CIU and on May 1, 2015 was also made the CFO of
Frictionless LLC. Serena was appointed Frictionless LLC's Manager in May 2019 after Banjo
resigned from the same position on May 3, 2019.

6.     Starting in 2015, Serena frequently communicated with FW through Banjo's email
at dbanjo@frictionlessworld.com. Serena also personally visited FW's business office in
Westminster, Colorado to meet with FW's employees over business dealings involving FW and
the Li Defendants. See Exhibit 2 (photographs of Serena's visit).

7.     Defendant Frank Li is a natural person and citizen of China. Frank Li is married to
Serena Li and the parties once jointly resided in California. Frank Li signed the FOA as ZL
Investment's General Manager. Frank Li is an owner of ZL Investment. Frank Li has been
familiar with the business dealings between FW and the Li Defendants since 2013, but did not

4

actively participate in the same until approximately 2015.

8.  Defendant ZL Investment is a Chinese company that was created by Li in 2013. ZL Investment is a member of, and owns 90% of the membership interests in, Frictionless LLC. ZL Investment is a signatory to the FOA. *See* <u>Exhibit 1</u>, in particular, Schedule A. Upon information and belief, the ownership of ZL Investment is divided among Mr. Li, his two children, and their two spouses.

9.  Defendant Frictionless LLC is a Colorado limited liability company separate and apart from FW. Its FEIN is 46-2674896, compared to FW's FEIN, which is 45-5285986. Frictionless LLC was formed in April 2013 to act as a pass-through vehicle for revenues arising from a sales and marketing venture between FW and CIU, both of which already existed at the time Frictionless LLC was formed and already had a long-standing business relationship.

10. At all relevant times, Frictionless LLC had no physical location of its own, no website, no email address, and no telephone. Up until 2015, Frictionless LLC also had no employees. On May 1, 2015, pursuant to the terms of the FOA, Schedule B, p.11, Serena Li was designated as the CFO of Frictionless LLC. No other party was subsequently made an officer or director of Frictionless LLC.

## RELEVANT PERSONS/NON-PARTIES

11. Banjo, a natural person, is a Colorado citizen and the owner and operator of FW. At all relevant times, Banjo was and remains the Chief Executive Officer ("CEO") of FW. Banjo established FW on May 14, 2012. *See* <u>Exhibit 3</u> (FW Art. of Organization). After establishing FW, Banjo authored multiple design and utility patents for the company. *See* <u>Exhibit 4</u> (listing of patents and patent applications). Banjo is also a member of Frictionless LLC and owns 10% of Frictionless LLC's membership interests. *See* <u>Exhibit 1</u> at Schedule A. Banjo was the Manager

of Frictionless LLC from March 1, 2013 through May 3, 2019. *See* Exhibit 5. Banjo is a signatory to the April 11, 2013 FOA between Frictionless LLC, Li, ZL Investment, and Banjo. *See* Exhibit 1 at Schedule A. Banjo's email address, business card, LinkedIn information, and all websites related to Banjo all prominently displayed information evincing his long-standing use and operation of FW, including the use and ownership of FW's email address dbanjo@frictionlessworld.com.

12.     Yin Gelei ("Allen Yin"), a natural person, is a citizen of China. Allen is married to Li's daughter, Tracey Li, (now Tracy Yin) and is therefore Li's son-in-law. Since its creation in 2013, Allen Yin is believed to have been a member of ZL Investment.

13.     Between 2012 and 2015, Allen Yin was deeply involved in Li's business affairs and was the general manager of CIU. Starting in 2012, Allen regularly communicated with FW, both its CEO and employees, regarding assembly and shipping issues associated with CIU's manufacture of goods for FW. Some of the issues Allen Yin routinely discussed include the placement of shipping labels bearing FW's trademarked name on every product, the placement of decals bearing FW's name on all products, purchase orders from FW, FW's directions for the proper assembly of its products, and the shipping and delivery of products assembled by CIU, using specific directions from emails sent to CIU by FW's engineers and employees. Allen is believed to have managed CIU until he was replaced as its manager sometime in 2015 or 2016.

## JURISDICTION AND VENUE

14.     The Court has exclusive jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(a) and (e)(1). The Court also has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), (H) and (O).

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## FACTUAL BACKGROUND OF CLAIMS

### *FW's Establishment of Its Operations Since 2012*

16.     FW's owner, founder, and CEO, Daniel Banjo, is a mechanical engineer with multiple engineering degrees from among others, Purdue University, Michigan Technological University, Stanford, and the Massachusetts Institute of Technology (M.I.T.).  In early 2012, Banjo established FW after previously working as the head of engineering for SpeeCo, an engineering company in Golden, Colorado. When Banjo worked for SpeeCo, CIU was a SpeeCo supplier.  At that time, CIU had no other customers in the USA.

17.     As SpeeCo's lead engineer, Banjo frequently traveled to China to interact with CIU and to carry out various assignments and projects on SpeeCo's behalf.  While engaged in those efforts, Banjo met and became close acquaintances with Li and his business circle, i.e., Allen Yin, Serena Li and Frank Li.  Li and his inner circle also traveled to Colorado to observe SpeeCo's business practices, because at that time CIU did not produce a whole good or a complete product. It was merely a producer of parts.

18.     Because Banjo worked primarily in the final assembly and manufacture of products for SpeeCo, his work caused him to work closely with Li and his family members.

19.     Banjo left SpeeCo in early 2012 after Blount International ("Blount") purchased SpeeCo.  Blount's purchase of SpeeCo created issues for Li and his inner business circle, as Blount could order its supplies from a different company.

20.     After its creation and registration with the Colorado Secretary of State on May 14, 2012, FW began creating, using and registering multiple trademarks bearing its name, as well as other names that it started using in interstate commerce.

21.     FW began using the trademark "FRICTIONLESS WORLD" in interstate

commerce on May 1, 2012, and it federally registered that mark with the USPTO on November 8, 2016. *See* Exhibit 6.

22.     Since 2012, FW has obtained and registered over two dozen trademarks, including "FRICTIONLESS WORLD", "DIRTY HAND TOOLS", "TROPHY STRIKE", "VINSETTA TOOLS" and "RANCHEX." *See* Exhibits 6, 7. Its trademark applications are public and identify FW as the owner of each application. Those trademarks are placed on decals attached to FW products, on hang tags attached to the same, and on the owners' manuals that accompany all products.

23.     In addition to trademark registrations, since 2012 FW has also filed and obtained at least fifteen patents. *See* Exhibit 4. FW also has at least eight pending patent applications. *Id*. FW's patents and patent applications began being published in 2013 when the first of these applications was published. The earliest patent (D681,701) was issued on May 7, 2013, and the earliest patent application (2014/0124097) was published on May 8, 2014. *See* Exhibits 8, 9.

24.     FW operates multiple websites, each of which promote FW as the sole source of the products it sells. *See* Exhibits 10, 11. Its websites list all the brands of products FW owns and sells, including Dirty Hand Tools, Redback, Vinsetta Tools, Trophy Strike, and RanchEx. *Id.*

### *FW Began Transacting Business with The Li Defendants in 2012*

25.     In 2012 FW entered a lease for an office space and warehouse that spanned no less than 18,335 square feet, in Louisville, Colorado. FW used that office space for all of its business purposes, including the manufacture, distribution, and sale of "Dirty Hand Tools" and "Ranchex" products. As business grew, FW in 2014 entered a new lease for a 151,000 square foot facility in Westminster, Colorado. These leases were signed by FW and all payments were made solely by FW.

26.     Shortly after FW was created, Banjo visited China and interacted with Li and members of his inner business circle.  Li and his business circle expressed significant concern about CIU's long term future given the new ownership of SpeeCo, as well as disappointment that Banjo had left Blount/SpeeCo.  Banjo advised them about "Frictionless World LLC" and explained that it would be selling outdoor power equipment to retailers.  *See, e.g.*, Exhibit 1, Schedule B at pp. 11-13 (naming FW and detailing its relationship to other entities); *see also* Exhibit 12 (email from Allen Yin to FW, Jan. 21, 2013 (inquiring about FW's structural details on Li's behalf)).

27.     On FW's behalf, Banjo conferred with the Li Parties regarding CIU assembling products under FW's direction.  Banjo and Li agreed that CIU would assemble products pursuant to FW's directions, using FW's patented drawings as guidelines and inserting or attaching hang tags, decals and instruction manuals bearing FW trademarks and created by FW. *See, e.g.*, Exhibits 13, 14 (showing history of correspondence related to use of FW documentation and technology).

28.     Crucially, CIU had never previously done this type of assembly.  All direction came from FW.  Thus, the parties considered it a remarkable step in their relationship when in November 2012, CIU began assembling products for FW using FW's drawings, labeling, and instructions from FW's engineers.  *See*, *e.g.* Exhibit 15 (email from FW to LiShan/Allen of at CIU to FW, Nov. 7, 2012 (regarding orders)); Exhibit 16 (email chain between FW, Allen for CIU, and vendors, Dec. 10, 2012, (discussing parts and production)).  Contemporaneous with shipping products to FW, CIU began invoicing FW for the products it shipped. *See* Exhibit 17; *see also* Exhibit 18.

29.     At the same time FW and CIU's product and supply relationship officially

began, FW successfully began marketing its products to major retailers in the US and worldwide, including Lowes, Home Depot, Menards, Mid-States, and TSC. *See* Exhibit 20 (FW email to Allen of CIU, Mar. 1, 2013 (providing update on FW sales efforts)).

30.     FW's marketing efforts with large retailers achieved rapid success because of FW CEO Banjo's recognized engineering expertise, his rapid development of new, cutting-edge, patented FW product designs, and his connections developed over years throughout the relevant industry.

31.     CIU relied on FW drawings and the regular instructions from FW's engineers to assemble products for FW. FW's engineers provided detailed instructions to CIU regarding: (a) the assembly, packaging, labeling and shipping of FW's products; (b) the FW trademark to be used and properly placed; (c) FW's identifying decals to be used; (d) handbooks from FW to be included in the shipping boxes. *See*, *e.g.*, Exhibit 21.

32.     CIU invoiced FW at its US address for its product assembly services. *See e.g.*, Exhibits 17, 18.

33.     As CIU became the primary product assembly provider for FW between 2012-2013, FW and CIU employees communicated directly on an almost a daily basis regarding the assembly and shipment of the significant and increasing numbers of products that FW designed, patented, and sold to the increasing number of major US retailers to whom FW sold.

### *FW, Banjo, Li and CIU Engage in Discussions and Negotiations Regarding Joint Investment Venture*

34.     While the business alliance between FW and CIU continued in the latter stages of 2012, Banjo, on FW's behalf, and Li on CIU's behalf, began discussing a joint investment venture. *See, e.g.,* Exhibits 22, 23 (early 2012 project proposals for Li-Banjo investment); Exhibits 24, 25 (email chain between Allen of CIU to FW, Dec. 16, 2012 (discussing proposed

venture); Exhibit 26 (email from Allen Li of CIU to FW, Jan. 7, 2013 (regarding Frictionless LLC investment agreement)).

35.     The reasons for the new and proposed joint venture were multiple.  While CIU assembled FW's products in 2012 and 2013, Li witnessed, on a first-hand basis, FW's marketing acumen with American retail giants such as Lowes and Home Depot.  Li became interested in a joint investment venture that would result in an increase in the number of products that CIU assembled and supplied for FW.  Li also desired CIU to obtain an agreement that protected CIU against incurring any liability risks, specifically employee claims, product liability lawsuits and intellectual property infringement lawsuits – all of which were potential pitfalls to selling products in the US market.  Finally, Li was interested in exploring a legal vehicle through which his family members could obtain US green cards or long-term business or resident visas, through membership interests or employment in an American LLC.

36.     Banjo explained to Li that in order to rapidly build FW's business and obtain major clients, the parties would need to make a joint initial investment of capital to manufacture and stock a variety of products in an increased inventory, so that FW could effectively compete against its large competitors.  Under the plans discussed, CIU would transfer the product to a pass-through company until sales occurred, at which time that company would transfer the product to FW and the product would ship to the retailer.  This plan would permit for a large inventory to exist in the US, thereby allowing immediate delivery to retailers and a large offering of products, without requiring FW to make large cash outlays for standing inventory prior to selling product.

37.     This third-party pass through arrangement was further intended to shield Li, CIU and the other Li Defendants from any potential personal or business liability arising from their sale of products to FW and from the sale of products by FW to retailers.  *See, e.g.,* Exhibit 27

(email from Allen Yin of CIU to FW, Mar. 26, 2013 (identifying Li's creation of separate company to conduct the purchases from CIU and himself to remain silent partner)).  FW would undertake all the risks associated with being a US employer and wholesale retailer, including the risk of product liability and intellectual property lawsuits, while sharing revenues from the same with CIU through the pass-through company.

38.     In September 2012, Banjo provided Li with three initial variations of a proposal for this pass-through company proposal.  The company would be majority-owned by Li and called "LiBanjo."  The proposals set forth several alternative concepts for the "LiBanjo" pass-through company, pursuant to which a separate front-facing company would manage all designs, patents, sales, marketing and insurance, and pass revenues after expenses back through "LiBanjo."  *See, e.g.*, Exhibits 25, 28, 29.  All of the three presentations Banjo presented to Li envisioned using such a front-facing company: two of the presentations named FW as that company, the third outline used the words "shell company." *See id.*  None of the presentations suggested operating "LiBanjo" as the front-facing company.  *See id*.

39.     The most complete presentation that Banjo gave Li is a presentation dated September 20, 2012.  That presentation contains a cover page, describes marketing and initial product offering strategies, and requests feedback from Li on the same.  *See* Exhibit 25.  Sections of each of the "LiBanjo" proposals again appear in Schedule B to the FOA.  *Compare* Exhibit 25 *with* Exhibit 1, Schedule B.  Those sections identify FW as the front-facing company that would sell the products from the expanded joint venture, retain a small percentage (5%-10%) of the sales price, and pass on certain costs to the pass-through company, Frictionless LLC.  This multi-tiered operating concept, with CIU in the center protected by two other companies, was detailed and made explicit in the FOA that the parties executed on April 11, 2013.  Page 12 of Schedule B

provides a diagram of the same.  *See*, <u>Exhibit 1</u>, Schedule B at p. 12.[1]



40.     The name "LiBanjo" was eventually rejected as the suggested name for the pass-through company because it contained Li's name.  Instead, the parties went with "Frictionless LLC," which was favored because it was a direct derivative of FW's recognized trademarked name – "Frictionless World".

41.     The idea of Frictionless LLC as the pass-through company, and FW as the front-facing company responsible for all potential liabilities associated with the joint venture, was appealing to Li for reasons other than just the avoidance of liability. First, as a newly created LLC with no intellectual property and no track record with retailers, Frictionless LLC would find it extremely difficult to obtain retail sales contracts in the US with large retailers who already had

---

[1] As part of their ongoing discussions for the expanded joint venture, Banjo and Li even discussed the concept of an EB-5 visa. The EB-5 visa program provides a method for obtaining a green card for foreign nationals who invest in a company in the US. *See, e.g.,* <u>Exhibits 24</u> (email chain between Allen Yin and Dan Banjo, Dec. 27, 2012 (discussing EB-5 status) and <u>Exhibits 28, 29</u>. Banjo and Li initially explored having Li invest the required one million dollars in the new pass-through company. Li rejected the idea of the EB-5 visa program because it would require his name to be extensively associated with the paperwork required for such an immigration process. *See id.* He was determined to remain a silent party to the expanded joint venture, hence the need for a pass-through company.  *See* <u>Exhibit 24</u> (email from Allen Yin to Dan Banjo, Jan. 7, 2013) and <u>Exhibit 31</u> (email from Allen Yin to Dan Banjo, Mar. 27, 2013 (identifying name to be used for ownership)).

created a relationship with FW.  Second, as a 90% foreign-owned company, Frictionless LLC would have encountered significant difficulty obtaining liability insurance from US insurers, and such insurance is a requirement for obtaining contracts to sell with US retailers.  This issue would have been aggravated by the fact that ZL Investments, the entity Li created to own his equity in Frictionless LLC, is a Chinese shell company with no known business record.

42.     Finally, FW had already been in business since May 2012 and had signed property leases, obtained US lines of credit, and had hired (and continued to hire) top-notch technicians and sales employees – all of which created obligations and risks.  Given these multiple issues, Li pushed for FW to be the front-facing company, with Frictionless LLC acting only as a pass-through company.  In essence, Frictionless LLC would receive the revenue, but take no risk.

43.     As the parties worked to finalize the FOA for Frictionless LLC, and Li learned more about the legal risks involved in US investments, he not only desired for FW to be the front-facing company, he also decided that his portion of Frictionless LLC would be owned neither by him nor CIU, but rather by a completely new Chinese pass-through company, ZL Investment, as an "investment company".  *See* Exhibit 31.

44.     During the parties' negotiations and discussions, Banjo frequently communicated with Allen Yin and members of the Li Defendants over the new joint venture.  Several weeks before the deal was finalized Allen informed Banjo about "ZL Investment" and stated that it would consist of "Frank, Selina, Tracy [Li's daughter, married to Allen] and [Allen]" as its members.  *Id.*

45.     Allen emphasized that Li wanted to keep Li and CIU as silent partners on the joint venture, and reiterated that the expanded venture between FW and CIU should operate to "keep sale products to customer but *never mention CIU's name*." Exhibit 32 (email Allen Yin to FW,

14

Dec. 16, 2012, 7:29 PM).

46.     While the discussions for the expanded joint venture were ongoing, FW and CIU carried on business as usual.  CIU regularly fulfilled FW's orders and its employees communicated with FW's on a range of crucial matters via phone, email and in-person communications over the assembly and shipping of FW's products.  CIU assembled products for FW starting in November 2012, and began invoicing FW for products shipped in February 2013, months before Frictionless LLC's creation.  *See* Exhibit 17.  CIU continued invoicing FW directly for over a year after Frictionless' creation.  *See* Exhibit 18.  All emails to CIU from FW from 2012 through 2019 were sent and received through email addresses with the @frictionlessworld.com affixation.

### *The Parties Execute the Frictionless LLC FOA*

47.     Banjo, on FW's behalf, met with Li and members of his business circle in China on April 8, 2013 to review the FOA and Exhibits to the same.

48.     In the days leading up to that meeting, Banjo as Manager for Frictionless LLC prepared the Operating Plan per the negotiations of the Parties and the proposed terms of the FOA.  *See* Exhibit 1 at ¶5.4.

49.     Pursuant to the FOA, ¶5.4, "The Manager is responsible for implementing the Annual Operating Plan".  *Id*.

50.     Pursuant to the FOA, ¶6.5, "At the Members annual meeting, the Members and Li shall review the Operating Plan, prepared by the Manager."  *Id*.

51.     Pursuant to the FOA, ¶6.5, **"**The Annual Operating Plan for 2013 is attached hereto as Schedule B".  *Id*.

52.     Li and the members of ZL Investment reviewed the FOA for Frictionless LLC in its totality, including the attached Schedule B as per the FOA. *Id*., ¶ 6.5.

53.     On April 11, 2019 the parties executed the FOA.  *See* Exhibit 1 (executed agreement).

54.     The FOA executed by the parties accommodates the structure of FW as the front-facing entity. It states that the company's purpose includes "***the manufacture and distribution of tools and power equipment***" and that said business can be conducted "***indirectly through another company, joint venture, or other arrangement***" (***emphasis added***). *Id*. at ¶2.5.

55.     Pursuant to the FOA, Schedule B, CIU manufactures products in response to purchase orders issued by FW through the pass-through company Frictionless, LLC.  *See* Exhibit 1 at Schedule B, p. 11-13. CIU then sells the products to Frictionless, LLC which then sells them to FW.  *Id*.  FW acts as the front-facing company dealing with retail and consumer customers worldwide, product marketing, US credit and banking relationships, leases, employees, liability and employee insurance, legal issues, and retaining and obtaining all business.  *Id*.  FW, to expand its client base and grow the business, retains 5-10 percent of revenue and charges a five percent fee on expense costs.  *Id*.  All remaining revenues are passed back through Frictionless LLC to CIU.  *Id*.

56.     Pursuant to the FOA, FW retained all ownership over FW intellectual property.  *Id*. FW provided a perpetual, limited non-exclusive patent license to CIU for the purpose of manufacturing products per its direction for Frictionless, for delivery to FW or its retailers.

57.     The FOA contains a non-competition covenant. Under that covenant, each member of Frictionless LLC and Li agreed that he or she:

> "shall cause his, her, ***or its Affiliates***, to not compete with the Company, directly, or indirectly, in a business substantially similar to the business of the Company of its subsidiaries anywhere where the Company does business, ***or the distribution of any products distributed by the Company*** or any of its subsidiaries anywhere in the World."

16

(***Emphasis added***).  Exhibit 1 at ¶4.4. Under this definition, "Affiliates" would include CIU or any

other company owned by Li, preventing them from competing with Frictionless LLC.

58.     The non-competition covenant further states that direct and indirect competition

under its auspices shall include but is not limited to:

> "having any business or employment relationship with any past or present
> client, supplier, or employee of the Company, and any competition as a sole
> proprietor, partner, corporate officer, director, shareholder, member,
> manager, employee, agent, independent contractor, trustee, or in any other
> manner in which such Member or Li, ***or its or his Affiliates***, holds any
> beneficial interest in a competitive business, derives any income from such
> business, ***or provides any service, including the benefit of his, her or its***
> ***reputation or knowhow, to such business***. For purposes of clarification, the
> sale of parts and products that are materially different from parts and
> products that the Company sells or intends to sell shall not be considered to
> be competing with the Company."

(***Emphasis added***).  *Id*.  Based on these provisions, direct sales to competitors of Frictionless LLC

and FW by Li and his affiliates – that is the Li Defendants – constitute a direct breach of this

clause, and are a severe detriment to Frictionless LLC and to FW.

59.     Under the FOA, Frictionless LLC's members unambiguously agreed to indemnify

and hold harmless each other and their successor's and assigns:

> "from and against ***any and all claims … of every kind and nature*** arising
> out of, resulting from, or in connection with ***any breach*** of a representation
> and warranty or covenant set forth in this ARTICLE 4."

(***Emphasis added***).  *Id*. at ¶4.6.  The FOA provides broad limitations of liability for the Manager

in the execution of his duties to the company.  Under the agreement, Banjo as the Manager could

not be liable to Frictionless LLC, or to any other member of the company, for actions or failures

to act, or errors of judgment, or for any act or omission "believed in good faith to be within the

scope of authority conferred by this Agreement."  *Id*. at ¶5.9.1.  The FOA also insulates Banjo

from personal liability in the event Frictionless LLC as a company is adjudged liable "under any

judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise…." *Id*. at ¶5.9.3.

60.     Finally, the FOA states that Frictionless LLC will indemnify and hold Banjo, <u>his affiliates</u>, and any officer or employee harmless:

> "from and against any loss, liability, judgment, damages, amounts paid in settlement or expense, including without limitation, reasonable attorneys' and accountants' fees and disbursements, arising from or in connection with any threatened or actual claim, action, suit or proceeding and any appeal therein, including any brought by or in the right of the Company, if the Manager, or any such Affiliate, Officer, or employee acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company, and provided that his or her conduct is not adjudged to have constituted gross negligence, willful misconduct, or an intentional breach of his, her, or its fiduciary obligations in the performance of his, her, or its duties to the Company."

<u>Exhibit 1</u> at ¶5.9.4.

61.     FW, as a company wholly owned and operated by Banjo through which the operations of Frictionless LLC were conducted from April 11, 2013 through April 29, 2019 pursuant to the terms of the FOA, comprised an affiliate of Frictionless LLC.

### *Schedule B of The FOA Explicitly Identifies FW's Role in the Expanded Joint Venture*

62.     The FOA, Schedule B sets forth the basic operating terms that the parties then operated under for the next six years. Those terms include conditions detailing the parties' obligations under the proposed joint venture as follows:

- FW would remain the forward-facing company to customers. In doing so, it would continue to be the named entity for all business-related matters, including leases, employees, insurance, and all sales and marketing.

- CIU would be the first manufacturer of choice for all of FW's products.  Only if CIU could not manufacture a product would FW be allowed to have the same product manufactured elsewhere. The goal was to both provide additional business to CIU and broaden the product base being offered to retailers.

18

- FW would remain an independent company but would also be utilized as a means to significantly increase CIU's product base and US product sales. That would happen by increasing the number of products assembled on FW's behalf by CIU and increasing the number of retailers selling FW products assembled by CIU.

- FW would issue purchase orders to CIU through Frictionless, and CIU would assemble and ship those products directly to FW or to FW's contracted retailers, as directed.

- FW would license CIU the right to use patents developed by FW for the purpose of assembling and shipping products developed and patented by FW to FW, so long as Banjo remains a member of Frictionless.

- That license of intellectual property did not include trademarks or other intellectual property developed by and/or registered to FW. No such licenses have ever been issued to CIU.

- When FW sold products pursuant to the joint venture, FW would: (a) retain and use 5-10% of the revenue realized from those sales to help grow the parties' collective business; and (b) retain and use a 5% markup on some overhead costs for purposes of expanding FW's and CIU's marketplace reach.

- FW would remit all monies left over after the deduction of its overhead costs, labor, and expenses ("Operating Costs") and the aforementioned percentages to Frictionless LLC, which would in turn remit payments to CIU for products assembled by CIU and sold by FW.

- Where FW sold products strictly assembled by FW and/or not assembled by CIU, FW would keep 100% of the revenues associated with any such product.

Exhibit 1 at Schedule B, pp. 11-14.

### *FW and CIU Conduct Business in Accordance with Schedule B of the FOA*

63.     After the execution of the FOA, FW moved forward in reliance on the contractual representations made by ZL Investment and Li.  FW continued handling all property leases, loans, liability insurance, handling all employees, managing all advertising and client relations, and entering into all third- party business agreements.  All communications from the Li Defendants

continued to be conducted via the _@frictionlessworld.com domain, and all products assembled by CIU for FW continued to be assembled using FW patent designs and bearing FW's company decals and hang tags. *See*, *e.g*., Exhibit 21. Frictionless LLC never obtained any lease, liability insurance, hired any employees, created or owned an email address, obtained any phone number, or obtained any domain and website. It existed solely as a pass-through LLC between FW and CIU.

64. Per the terms of the FOA and Section 2.5 of the FOA's Schedule B, CIU continued conducting business directly with FW on a nearly daily basis. CIU continued to invoice FW for products shipped from CIU to FW. *See, e.g.,* Exhibit 18. From 2013 to April 2019, CIU delivered tens of millions worth of products to FW for FW's distribution and sales. The parties exchanged thousands of emails pertaining to their business operations. This pattern and practice continued consistently for over seven years, with both sides fully aware of their nature and course of performance, and importantly without any objection ever raised to the course of conduct between them or by any of the Li Defendants.

65. The expanded joint venture required constant contact between FW and CIU, as prior to doing business with FW, CIU did not manufacture whole products. It had previously had no assembly lines. It had never before assembled outdoor power equipment products, including the log splitters or tillers it was assembling under FW's guidance and direction. It had solely been a parts supplier. Subsequent to November 1, 2012, CIU became able to assemble and produce products as well as specialized parts for FW, all of which were patented by FW, through the diligent efforts and expertise of FW's designers and engineers. Based on these efforts, FW arranged for approximately 90% of its production to be performed by CIU. FW employees contacted, visited, and consulted CIU multiple times a year between 2012 and early 2019.

66.     Relying on this seven-year course of conduct, FW, through Frictionless LLC, continued placing purchase orders with CIU in 2018 and 2019. Those products were to be assembled in accordance with FW's patented designs, labeled with FW's trademarks, and delivered either to FW or directly to the retailers with which FW contracted. *See, e.g.,* Exhibit 33 (email summary of order statuses).

67.     Pursuant to the FOA, FW absorbed all risks associated with the joint venture. Reflecting these realities, FW has unilaterally litigated several business-related disputes which would otherwise have implicated Frictionless LLC and Li, including two matters involving claims of patent infringement against third parties. FW alone resolved each dispute.

68.     The arrangement described in the FOA and in Schedule B is a true and correct reflection of how FW, CIU and Frictionless LLC performed pursuant to the joint venture for seven years. FW ordered products from CIU through Frictionless. CIU manufactured the products and delivered the same directly to FW or its contracted retailers, consistent with Exhibit 1, Schedule B at pp. 11-13. Products transferred from Frictionless to FW at the time of sale. The business goal was always to increase the number of products being manufactured by CIU and sold by FW. FW at all times acted as the forward-facing company. *Id.*

69.     Following the mandate in Schedule B, Li appointed a CFO for Frictionless by appointing Serena Li, his daughter-in-law. *Id.* at p. 11.

### *Defendants Act in Repeated Breach of the FOA, Intentionally Defraud FW and Halt Product Delivery to FW, Causing Irreconcilable Injury to the Same*

70.     At all times since the April 2013 signing of the FOA, FW, and Banjo operated in good faith to increase sales and jointly achieve the parties' goals. Unbeknownst to FW and Banjo, however, from 2014 through 2018 the Li Defendants were significantly overcharging Frictionless LLC for the cost of assembling the products CIU delivered to FW. After discovering

this issue, FW confronted Li and members of his inner circle in a meeting in January 2019. Li conceded CIU had been overcharging Frictionless LLC for certain products assembled for delivery to FW under the joint venture agreement and corrected CIU's pricing in early 2019. CIU's overcharging from 2014 – 2018 cost FW <u>over seven million dollars</u> in lost profits. *See* <u>Exhibit 34</u>.

71.     In addition, Li contractually agreed pursuant to the FOA, Section 4.4, and the attached Operating Plan, that his affiliate CIU would <u>immediately</u> cease selling products to competitors of Frictionless LLC and its operating affiliate FW. *See* <u>Exhibit 1</u>, § 4 and Schedule B at p. 11.  Contrary to the same, between April 12, 2012 and the present, the Li Defendants sent nearly 400 separate shipments of CIU products to direct competitors of Frictionless LLC and FW. *See* <u>Exhibit 35</u>. Those competitors include Blount and Tooltuff LLC, to which Li and CIU expressly represented they would cease such sales. *See* <u>Exhibit 36</u> (email chain between Allen Yin of CIU to FW, Sep. 29, 2013).  Upon information and belief, these shipments alone total *over $50 million dollars* in goods, and constitute a direct violation of the FOA. Upon information and belief, CIU <u>never</u> ceased shipping products to companies directly competing with Frictionless LLC and FW.

### Banjo Modified the FOA in Reliance on False Representations from the Li Defendants

72.     Serena Li, acting on the behalf of Li and CIU, repeatedly represented to FW in late 2018 and early 2019 that CIU was running low on operating funds and needed to receive additional payments from Frictionless LLC.[2]  *See* <u>Exhibits 37-39</u>.  In response to Serena and

---

[2] No evidence supporting said representations has been produced to date.

Frank Li's representations, Banjo agreed on behalf of FW to obtain a company loan and make accelerated payments in order to assist CIU in fulfilling its shipment obligations to FW. *See, e.g.,* Exhibit 40 (email chain between Frank Li and FW, Feb. 20, 2019).

73.     Towards that end, and in reliance upon Serena Li's representations regarding CIU's cash needs, FW agreed to the assignment of all Frictionless LLC inventory to FW (totaling $6,611,227.00) and a long-term loan from FW back to Frictionless for that amount, followed by the use of that assigned inventory as collateral to obtain a bank loan for an additional $1.5 million paid directly to Frictionless and then to CIU.  FW further agreed to the acceleration of FW's payments to Frictionless prior to their due dates.  All of those funds were immediately passed on to CIU.

74.     FW took these actions in early 2019 based on the understanding that CIU was going to ship products as ordered by FW through Frictionless LLC.  During this period FW was repeatedly being assured by CIU that products were being assembled and shipped. *See e.g.,* Exhibits 41-43; *see also* Exhibit 33.

75.     FW also believed that the products it was agreeing to accept were of suitable quality consistent with CIU's historic production.  FW soon learned, however, that beginning in late 2018, CIU started shipping substantially substandard products, thereby causing a marked increase in FW's warranty obligations to retailers.  FW is informed and believes that CIU knew of the quality issues and either intentionally or negligently concealed those issues from FW.  After FW discovered the quality issues, inventory was either sold at substantially reduced prices or could not be sold at all.

76.     On February 1, 2019 Banjo signed a long-term Loan Agreement on the behalf of FW for the purchase of all Frictionless LLC inventory.  *See* Exhibits 44-46. FW then borrowed

$1.5 million dollars from Chase Bank and paid the entire amount to Frictionless, for payment to CIU. The Frictionless LLC inventory was not used as collateral for this loan or to induce Chase Bank to make the loan. In addition to the Chase Bank loan, FW began making accelerated payments to Frictionless LLC starting in January 2019. Between January 1, 2019 and the time that ZL Investments' arbitration action was filed in April 2019, FW had paid Frictionless LLC an astonishing $4,460,265.84.

77.     Heading into March – April 2019, FW repeatedly asked Frank Li for confirmation of outstanding shipping orders. Frank Li or his employees at CIU repeatedly and fraudulently responded that CIU was about to ship, stating falsely in March and April that shipping was occurring. *See* Exhibit 47 (April 2, 2019 email from Frank Li to FW saying shipping was occurring "this week."); Exhibit 48 (March 6, 2019 email from Janice Jia at CIU to FW, copying Frank Li, saying "CIU is producing them in a hurry now, CIU really does not want to delay the delivery for these POs").

78.     The facts show that while Serena and Frank Li, on behalf of Li and CIU, urged FW to take on millions of dollars in additional liability and repeatedly promised to ship products, they were simultaneously conspiring to halt all shipments to FW and Frictionless LLC under the joint venture with the foreseeable goal of causing irreconcilable injury to FW.

79.     On April 15, 2019, the Li Defendants, through ZL Investments, filed a factually and legally unsupported arbitration demand against FW and its CEO, Daniel Banjo. FW was not a party to an arbitration agreement with the Li Defendants. The claims asserted in the arbitration were based on the incredible contention, contrary to the 7 year history of transactions detailed above, that the Li Defendants did not learn of the existence of FW until late 2018 and believed at all times that its business was being solely conducted through Frictionless LLC, the pass-through

entity jointly created by FW, Banjo, CIU and Li that had no physical location of its own, no website, no email address, no telephone and no employees other than Serena Li.

80.      Upon receiving the arbitration demand, FW and Banjo, through counsel, immediately asked CIU and counsel for ZL Investments whether shipments would be provided, per contract and as had been repeatedly represented.  The next day, on April 16, 2019, the Li Defendants, **via counsel,** assured counsel for FW that regardless of the arbitration, CIU would continue to fulfill the purchase orders. *See* Exhibit 49.

81.      On April 29, 2019, after making misleading promises for over six months, Frank Li reversed his representations and advised FW that CIU was ceasing shipments.  In response to a text from FW asking whether or not CIU would again start shipping, he stated it "depends on your attitude."  Exhibit 50.  Other than the vindictive text message, Frank Li made no mention of any issue causing CIU not to ship, nor did he mention any of the alleged logistical issues CIU had offered previously as a reason for delays.  This abrupt reversal of the representations made for months took place at the beginning of the 2019 summer sales season, just as retail stores were being stocked with goods, and well after third-party contracts for the delivery of millions of dollars in goods had been executed by FW with multiple third-party retailers.

82.      By these acts, the Li Defendants overtly breached a total of $20,814,091 in purchase orders issued by FW through Frictionless LLC for delivery to FW or to FW's contracted retailers. *See* Exhibit 51 (aggregate amount of existing and unfulfilled purchase orders as of April 29, 2019).

83.      The breaches were knowingly committed to undermine FW's relationships with its multiple major retailers, and to leave FW – a Colorado employer of almost 80 people – unable to operate in 2019.

84.     By leaving FW and by extension Frictionless LLC with no products to sell in the 2019 season, the Li Defendants' actions caused irreconcilable harm to FW, as well as to Frictionless LLC.  As a direct result of the Li Defendants' breaches of contract, multiple retailers who had contracted with FW for years have been forced to abandon FW.  *See, e.g.*, Exhibits 52-55.  The retailers, among them Lowes, Costco, Menards, Mid-States, and Fleet Farm, have been forced to switch to alternative suppliers due to FW's ongoing failure to deliver.  *Id.*

85.     These same retailers also began penalizing FW for its contractual failure.  *See, e.g.*, Exhibit 56 (almost $397,000 dollars of charges assessed by Mid-States against FW for unfulfilled orders).  Moreover, these retailers will not contract with FW again at any time in the foreseeable future.  CIU's actions caused irreconcilable harm to FW's reputation and earnings ability.

86.     On May 3, 2019, due to the actions of Li and his associates, Banjo became unable to manage Frictionless LLC and resigned his position as Manager of Frictionless LLC.  *See* Exhibit 5 (email chain between counsel).

87.     As stated, CIU has breached a total of $20,814,091 in purchase orders to FW and Frictionless LLC.  *See* Exhibit 51. FW has been unable to find alternative sources for that production, primarily because CIU intentionally mislead FW for months regarding its alleged intentions to ship the products, only to disclose its intention not to ship and breach the purchase orders on April 29, 2019, well into the sales season.

88.     Subsequent to the breach, CIU for the first time alleged its reason for breach was financial constraints.  CIU has never produced evidence to support this assertion.  To the contrary, the evidence demonstrates Serena and Frank Li, from December 2018 through April 29, 2019, repeatedly promised on behalf of CIU to ship FW's product while making false statements regarding delays and other false excuses.  *E.g.*, Exhibits 41-43, 47-48.  The evidence also

demonstrates that, during the same time period, CIU pressed for accelerated payments from FW – allegedly to assist in faster assembly and shipment. *See id*.; *see also* <u>Exhibit 37-39</u>. In reliance on the same, FW borrowed and paid a total of $4,460,265.84 to CIU between January and April 2019. FW further agreed to modify Schedule B of the FOA to release Frictionless LLC from any obligation to pay FW operating expenses. *See* <u>Exhibits 44-46</u>. FW took these multiple costly actions *in direct reliance on the fraudulent representations made by both the Li Defendants and Li's counsel that CIU would continue to fulfill its purchase orders*. The evidence now shows that the Li Defendants at no time had any intent to ship. They were at all times acting with fraudulent intent to cause severe and irreconcilable harm to FW, as well as to Frictionless LLC.

89. Confirming the false nature of CIU's post-breach explanation for its failure to ship, the Li Defendants refused FW's offer to make <u>immediate</u> on-delivery payment to CIU for every shipment made.[3] This stop-gap solution would have ensured that FW would be able to meet its obligations to its retailers and customers, thereby mitigating monetary damages to FW. The Li Defendants rejected the offer and still refused to ship, in direct breach of contract and further evidencing their bad faith, fraudulent intent to cause harm to FW.

90. CIU's breach of over 250 purchase orders and failure to ship products to FW triggered a cascade of losses for FW: (a) a staggering reduction of revenue due to inability to deliver/sell products; (b) it caused what was expected to be FW's most profitable year to instead reflect extreme losses, resulting in the filing of bankruptcy; (c) it caused a reduction of the FW workforce by over 90%, and growing; (d) it forced the process of abandoning FW's 151,000 square feet warehouse in Westminster, Colorado; (e) it caused FW's loss of long-standing

---

[3] Pursuant to the agreement between Frictionless and

contracts with mammoth retailers such as Lowes, Home Depot, Costco, Menards and others, which in turn resulted in the removal of FW products from hundreds of stores both inside and outside of the US; and (f) it caused an over 90% loss in the value of FW as a business, which immediately prior to breach was valued at over $50 million. All of the above-stated damages increase daily.

91.     Because of its sharp drop in income and daily operating losses, FW filed a chapter 11 bankruptcy petition on September 30, 2019.  That filing occurred as a direct result of the intentional and ongoing actions of the Li Defendants.

92.     Finally, the actions of the Li Defendants reflect an overt effort to halt the business of Frictionless LLC, to the detriment of FW, as they ceased to deliver to Frictionless.  That action constitutes a breach of the FOA.  The FOA requires that "[d]uring the period before and during any arbitration... the Parties shall continue to fulfill their duties under this Agreement."  Exhibit 1 at ¶14.6.8.  By breaching the purchase orders and failing to ship immediately after filing this action, the Li Defendants intentionally acted in direct breach of the FOA.

***The Li Defendants' Actions Comprise Unlicensed and Infringing Use and Possession of FW Intellectual Property***

93.     Pursuant to the FOA, CIU was provided a limited license by FW to use FW patents for the purpose of assembling products for the pass-through company Frictionless, "to be sold through F to FW".  Exhibit 1, Schedule B, p.11.  All products manufactured by CIU between 2012 and 2019 for Frictionless LLC were done so at the direction of FW, in reliance on FW's patented designs, with the support of FW engineers and pursuant to the limited patent license provided to CIU under the FOA. *Id*., *see, e.g.*, Exhibit 21.

94.     Upon reasonable information and belief, CIU between December 2018 and April 2019 assembled multiple products pursuant to the direction of FW and in reliance on FW patents.

95. CIU failed to deliver said products to FW (in breach of over 250 purchase orders).

96. On reasonable information and belief, CIU is now using, distributing, selling and manufacturing FW's patented products, or sublicensing the right to use, distribute, sell and manufacture FW's patented products to third-parties, or attempting to use, sell, distribute and/or license or sublicense FW's patented products, without license or permission, to the direct detriment of FW.

97. CIU has possession of 7 years of protected patent designs provided by FW for its product assembly.

98. On reasonable information and belief, CIU is using those protected patent designs to manufacture FW's patented products, without license or permission, to the direct detriment of FW.

99. In addition, CIU has at no time been provided any license to use FW trademarks. FW's trademarked names and designs were prepared by FW and sent in decal, hang tag and user manual format for CIU to place on or insert with the products assembled per the direction of FW, for shipment to FW and FW retailers.

100. Upon reasonable information and belief, CIU between December 2018 and April 2019 assembled multiple products pursuant to the direction of FW bearing FW registered trademarks in decal and hang tag format and packaged with FW manuals bearing FW trademarks.

101. CIU failed to deliver said products to FW in breach of over 250 POs issued to CIU.

102. Upon information and belief, CIU is now using, distributing, selling and/or licensing, or attempting to use, sell, distribute and/or license FW's trademarked products, without license or permission, to the detriment of FW.

*Injury to Frictionless World, LLC*

103.   FW believes that unless enjoined by the Court, the Li Defendants will continue their course of wrongful conduct and, based on 7 years of access and non-stop training from FW, use, sell, distribute, manufacture and infringe upon and/or otherwise profit from FW's patented designs and trademarks.

104.   As a direct and proximate result of the Li Defendants' wrongful acts, FW has already suffered irreconcilable injury and been forced to file the underlying bankruptcy case.

105.   FW has no adequate remedy at law to redress the injuries that Li Defendants have caused, are causing and are likely to continue to cause by their conduct.  FW will continue to suffer irreconcilable injury until the Li Defendants wrongful actions are enjoined by this Court.

### FIRST CLAIM FOR RELIEF
### TURNOVER OF PROPERTY OF THE ESTATE – 11 U.S.C. § 542(a)
### (All Defendants)

106.   FW incorporates by reference the allegations above, as though fully set forth herein.

107.   11 U.S.C. § 542(a) requires an entity in possession of property of the estate that the debtor-in-possession may use, sell or lease to turnover and account for such property, or the value of such property.

108.   One or more of the Li Defendants and/or Frictionless LLC are in possession of the following property of the estate:

A. Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and control and using FW's patented product designs;

B. Communications from FW to CIU, CIU employees and/or the Li Defendants containing product assembly instructions, including but not limited to written assembly instructions and/or patented product designs.

C. Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and

control bearing FW trademarks on the product and/or packaging;

D. Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and
control that previously bore FW trademarks, which have been altered to remove the
same;

E. Products assembled by CIU and/or the Li Defendants pursuant to FW's direction and
control that have not had FW trademarks attached, as required.

(the "Property").

109. The Property has significant value and is property that FW may use, sell or lease
pursuant to 11 U.S.C. § 363(b).

110. Accordingly, Defendants must account for and turnover the Property to FW.

**SECOND CLAIM FOR RELIEF**
**PERMANENT INJUNCTION – 11 U.S.C. § 105(a)**
**(All Defendants)**

111. FW incorporates by reference the allegations above, as though fully set forth herein.

112. Defendants' use of FW's intellectual property and competition with FW in violation
of the non-competition covenant in the FOA violate the automatic stay provided for in 11 U.S.C.
§ 362(a), as they are exercising control over property of the estate, as detailed above.

113. If an injunction does not issue enjoining Defendants from in any way using FW's
intellectual property in their possession and violating the non-competition covenant in the FOA,
FW will, upon reasonable information and belief, suffer irreparable injury through the loss of its
intellectual property and the importation, sale, distribution to retailers and/or licensing of
infringing products in the US. Moreover, the infringing products remaining in Defendants'
possession may be sold, distributed to retailers and/or licensed for use using one or more of FW's
marks, which have become famous through the sale of tens of millions of dollars' worth of FW

products in major retailers nationwide over the past 7 years.  Such actions would cause severe

consumer confusion and irreconcilable harm to FW that could not rectified via a damages award.

114.    Defendants will suffer no damage to any legal right or interest through the issuance

of such an order because they have no right to the intellectual property at issue.

115.    The injunction sought will not be adverse to the public interest.

### THIRD CLAIM FOR RELIEF
### DECLARATION THAT THE STAY APPLIES TO THE
### ARBITRATION – 11 U.S.C. § 105(a)
### (All Defendants)

116.    FW incorporates by reference the allegations above, as though fully set forth herein.

117.    11 U.S.C. § 362(a) operates as a stay of, among other actions: (1) the

commencement of litigation against the debtor and (2) any act to obtain possession of property of

the estate and exercise control over property of the estate.

118.    Through the arbitration, Defendants seek relief against FW and Banjo.

119.    FW and Banjo are bound by contract in such a way that (a) FW is obligated to fund

the cost of Banjo's legal defense and (b) the liability of Banjo, if any, in the arbitration may be

imputed to FW.

120.    Accordingly, the Court should declare that the stay set forth in 11 U.S.C. § 362

applies to the arbitration to prevent irreparable damage to FW and its bankruptcy estate.

### FOURTH CLAIM FOR RELIEF
### PERMANENT INJUNCTION – 11 U.S.C. § 105(a)
### (All Defendants)

121.    FW incorporates by reference the allegations above, as though fully set forth herein.

122.    Defendants' continued prosecution of the arbitration violates the automatic stay set

forth in 11 U.S.C. § 362.

123.    If an injunction does not issue enjoining Defendants from continuing to prosecute

the arbitration, FW will suffer irreparable injury, including, without limitation, the following: (a) the obligation to fund the defenses of Banjo; (b) the obligation to indemnify Banjo; (c) the potential collateral estoppel effect against FW of any judgment entered against Banjo; and (d) the potential of conflicting rulings arising against Banjo and FW in separate forums.

124.   Defendants will suffer no damage to any legal right or interest since the claims against Banjo can be stayed until after the completion of this proceeding.

125.   The injunction sought will not be adverse to the public interest.

**FIFTH CLAIM FOR RELIEF**
**OBJECTION TO CLAIM – 11 U.S.C. § 502**
**(Against Frictionless LLC)**

126.   FW incorporates by reference the allegations above, as though fully set forth herein.

127.   Frictionless LLC is scheduled by FW as a creditor holding a disputed, unliquidated, and contingent claim in the amount of $12,645,740.62.

128.   The disputed claim is comprised of two components: approximately 50% consists of the long-term loan executed on February 1, 2019 and the remaining approximately 50% consists of a 360-day payable purportedly due Frictionless LLC for products sold to FW.

129.   As set forth in the Fourth Claim for Relief below, the long-term loan obligation is avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) and Frictionless LLC's claim in the bankruptcy case should be reduced by the amount of the avoidable loan.

130.   In addition, Frictionless LLC, by (a) wrongfully breaching purchase orders submitted by FW to CIU through Frictionless in 2019 in excess of $20 million and (b) delivering substandard product resulting in numerous warranty claims, substantially reduced sale prices, and in many instances, unsellable inventory, has caused damages to FW far exceeding the remaining approximately $6 million purportedly due Frictionless LLC.

131.   Accordingly, Frictionless LLC should be deemed to have no claim in the bankruptcy case.

## SIXTH CLAIM FOR RELIEF
### EQUITABLE SUBORDINATION – 11 U.S.C. § 510(c)
### (Against Frictionless LLC)

132.   FW incorporates by reference the allegations above, as though fully set forth herein.

133.   Frictionless LLC is scheduled by FW as a creditor holding a disputed, unliquidated, and contingent claim in the amount of $12,645,740.62.

134.   Frictionless LLC is an insider of FW.

135.   The Li Defendants engaged in a fraudulent scheme to convince Banjo, through FW, to execute a long term loan agreement with Frictionless, to borrow $1.5 million from Chase Bank and pay it to Frictionless, and to have FW accelerate payments to Frictionless. All said funds then transferred to CIU.

136.   FW took these actions in reliance on repeated fraudulent representations of the Li Defendants that CIU was assembling and would be shipping products.

137.   The scheme culminated in the commencement of a groundless arbitration proceeding against Banjo premised on the incredible assertions that the Li Defendants had no knowledge until late 2018 of the existence of FW – a company with whom the Li Defendants had conducted business nonstop since 2012.

138.   Despite receiving inflated sums from FW, Frictionless and CIU failed to provide fair value in return.   On April 29, 2019, subsequent to the filing of the arbitration, the Li Defendants advised FW that no shipments would be issued.

139.   As a result of the foregoing fraud and unfair conduct, to the extent Frictionless,

LLC's claim is allowed, the claim should be equitably subordinated pursuant to 11 U.S.C. § 510(c).

**SEVENTH CLAIM FOR RELIEF**
**FRAUDULENT CONVEYANCE – 11 U.S.C. § 548(a)(1)(B))**
**(Against Frictionless LLC)**

140.    FW incorporates by reference the allegations above, as though fully set forth herein.

141.    Under 11 U.S.C. § 548(a)(1)(B), the debtor-in-possession may avoid any obligation incurred by the debtor that was incurred on or within two years of the bankruptcy filing date, if the debtor received less than a reasonably equivalent value in exchange for the obligation and (i) became insolvent as a result of the obligation, (ii) was engaged in business or about to engage in business for which any property remaining with the debtor was an unreasonably small capital, or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

142.    The long-term loan in the amount of $6,611,227.00 from FW back to Frictionless LLC (the "Obligation") was an obligation of FW.

143.    The Obligation was incurred on February 1, 2019, on or within two years of the Petition Date.

144.    FW did not receive reasonably equivalent value for the Obligation.  Rather, FW was induced into incurring the Obligation by the Li Defendants in furtherance of their fraudulent scheme to ruin FW more fully described above.

145.    FW historically did not purchase products from Frictionless LLC until entering agreements to sell such products to third parties.

146.    By altering this arrangement, the inventory received from Frictionless in exchange

for the Obligation would only have "reasonably equivalent value" to FW if CIU intended to and, in fact, did continue to fulfill purchase orders.

147.   Because CIU never intended to and, in fact, did not fulfill purchase orders going forward, FW was fraudulently induced to incur the Obligation. Due to CIU's failure to deliver products, FW lost the very contracts (with retailers like Lowes and Home Depot), necessary to sell the inventory at fair market value.

148.   CIU also refused to ship the parts necessary for FW to complete the US manufacture of the products delivered in incomplete form.  FW was thus left with partial products that it could not manufacture and sell.

149.   Further, the complete products received were of extremely poor quality and many were returned by retailers.  What could be sold was sold at drastically reduced prices and FW received numerous warranty claims.  Much of the inventory cannot be sold.

150.   Accordingly, FW did not receive reasonably equivalent value in exchange for the Obligation.

151.   As a result of the fraudulent scheme of which the Obligation was a central component, FW became insolvent.

152.   In addition, as a result of the fraudulent scheme of which the Obligation was a central component, FW engaged in business in 2019 for which its remaining capital was an unreasonably small capital.

153.   As a result of the foregoing, the Obligation is avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

## EIGHTH CLAIM FOR RELIEF
### FRAUDULENT CONVEYANCE – 11 U.S.C. §§ 548(a)(1)(B) and 550(a))
### (Against Frictionless LLC and the Li Defendants)

154. FW incorporates by reference the allegations above, as though fully set forth herein.

155. Under 11 U.S.C. § 548(a)(1)(B), the debtor-in-possession may avoid any transfer made by the debtor on or within two years of the bankruptcy filing date, if the debtor received less than a reasonably equivalent value in exchange for the transfer and (i) became insolvent as a result of the transfer, (ii) was engaged in business or about to engage in business for which any property remaining with the debtor was an unreasonably small capital, or (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

156. Between January 1, 2019 and April 29, 2019, FW pre-paid invoices to Frictionless LLC in the amount of $4,460,265.84 (the "Transfers").

157. The Li Defendants induced FW to make the Transfers in furtherance of their fraudulent scheme to cripple FW by depleting its cash reserves and fraudulently promising to fulfill purchase orders that it had no intention of fulfilling.

158. FW did not receive reasonably equivalent value for the Transfers as a significant portion of the Transfers were not made on account of any antecedent debt.

159. Further, a number of the Transfers were made to pre-purchase product of substandard quality that could not be sold at historic prices.

160. As a result of the fraudulent scheme of which the Transfers were a central component, FW became insolvent.

161. In addition, as a result of the fraudulent scheme of which the Transfers were a central component, FW engaged in business in 2019 for which its remaining capital was an unreasonably small capital.

162. As a result of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. §

548(a)(1)(B).

163.    CIU was the initial transferee of the Transfers because Frictionless LLC, the pass-through entity, acted as a mere conduit.

164.    Alternatively, CIU was an immediate or mediate transferee of the Transfers and CIU did not take the Transfer in good faith.

165.    Under either scenario, CIU and/or Li were immediate or mediate transferees of the Transfers and CIU and/or Li did not take the Transfers in good faith

166.    The Transfers are therefore recoverable from the Li Defendants pursuant to either 11 U.S.C. § 550(a)(1) or (a)(2).

## NINTH CLAIM FOR RELIEF
## BREACH OF CONTRACT—PURCHASE ORDER
### (FW as Third-Party Beneficiary Against CIU)

167.    FW incorporates by reference the allegations above, as though fully set forth herein.

168.    FW through the pass-through entity Frictionless LLC issued purchase orders to CIU from late 2018 through April 2019.  *See* Exhibit 51.

169.    Over 250 purchase orders were provided to CIU.  *See* Exhibit 57 (sample of March 2019 orders).

170.    The parties intended FW to be a third-party beneficiary of all such purchase orders, as reflected by the location for delivery of goods on each purchase order and as reflected in the FOA.  *See* Exhibit 1 at Schedule B.

171.    All products ordered through the Frictionless LLC purchase orders were to be shipped directly to FW or to contractual customers of FW.

172.    FW is a third-party beneficiary of the purchase orders.

173.    CIU accepted each of these purchase orders.

174.    Each of these purchase orders placed by Frictionless LLC and accepted by CIU

constitutes a valid and binding contract to which FW was the intended third-party beneficiary.

175. All parties knew that the purchase orders were placed by Frictionless LLC and accepted by CIU for the benefit of FW.

176. According to the terms of each purchase order, CIU was required to ship the specified number of specified products by the ship date identified on each order.

177. Shipping the ordered product is a material term.

178. CIU failed to ship the products.

179. CIU has refused to ship the products.

180. CIU's failure to ship constitutes a breach of each purchase order.

181. FW has been severely harmed by the breach of each purchase order and has suffered damages to be proven at trial.

**TENTH CLAIM FOR RELIEF**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR**
**DEALING WITH RESPECT TO PURCHASE ORDERS**
**(FW as Third-Party Beneficiary Against CIU)**

182. FW incorporates by reference the allegations above, as though fully set forth herein.

183. FW through the pass-through entity Frictionless LLC issued purchase orders to CIU from late 2018 through April 2019. *See* Exhibit 51.

184. Over 250 purchase orders were provided and accepted by CIU between August 2018 and April 2019. *See* Exhibit 57 (sample of March 2019 orders).

185. These orders were for the benefit of FW as reflected by the location for delivery of goods pursuant to the purchase orders and as reflected in the FOA. *See* Exhibit 1 at Schedule B.

186. The product ordered by the purchase orders was to be shipped directly to FW or to customers of FW.

187. FW is a third-party beneficiary of the purchase orders.

188.   CIU accepted each of these purchase orders.

189.   Each of these purchase orders placed by Frictionless LLC and accepted by CIU constitutes a valid and binding contract to which FW was the intended third-party beneficiary.

190.   All parties knew that the purchase orders were placed by Frictionless LLC and accepted by CIU for the benefit of FW.

191.   The purpose of the purchase orders was for FW to receive shipments from CIU and the benefit of that bargain was to receive the products identified on the purchase order by the ship date.

192.   CIU unreasonably and in bad faith refused to ship the majority of the products ordered.

193.   In fact, correspondences from the Li Defendants and CIU managers reveal that CIU never intended to ship said products despite entering into contract to do so by accepting the purchase orders.

194.   CIU's actions in accepting the purchase orders but not intending to fill them deprived FW of the benefit of its bargain and constitutes a breach of the covenant of good faith and fair dealing.

195.   FW has been harmed by said breach and has suffered damages to be proven at trial.

**ELEVENTH CLAIM FOR RELIEF**
**COMMON LAW FRAUDULENT MISREPRESENTATION**
**(FW Against Li, Serena Li, Frank Li, ZL Investments, and CIU)**

196.   FW incorporates by reference the allegations above, as though fully set forth.

197.   The Li Defendants, including ZL Investment, CIU, Li, Frank Li and Serena Li, owed a duty to not make or cause to be made false and misleading statements, representations, and warranties to FW concerning, among other things, CIU's cessation of shipping to competing companies and the price CIU would charge.

198.    Li and his affiliates, including representatives and agents of ZL Investment and CIU, recklessly or knowingly, and with the intent to mislead, made false representations to Banjo and FW concerning their intent to ship, sales to competition, and pricing on products shipped to FW.

199.    Li and his affiliates, including representatives and agents of ZL Investment and CIU, knowingly made materially false statements, representations, and warranties to FW.

200.    From 2013 – 2018, products were ordered by FW through Frictionless LLC and shipped directly to FW or its retailers.

201.    From 2013 – 2018, the Li Defendants fraudulently represented to FW, with the intent to mislead, that CIU was charging Frictionless LLC a reasonable rate for the products that were ordered through Frictionless then shipped to FW.

202.    In January 2019 the Li Defendants admitted to FW that they had been overcharging for products and dropped their rates, resulting in significantly lower rates to FW.

203.    The Li Defendants, as co-operators in a joint business venture with FW, had a duty to speak the truth to FW.

204.    The fraudulent representations of the Li Defendants on pricing between 2013 and 2018 cost FW over $7 million in lost profits.

205.    From April 2013 through April 2019, the Li Defendants, including their agents and representatives, knowingly, and with the intent to mislead, repeatedly represented that they were not selling to competitors of Frictionless LLC or its affiliates.  FW is an affiliate of Frictionless LLC.

206.    The evidence demonstrates that the Li Defendants, contrary to their representations, have been selling to competitors of Frictionless or its affiliates.  Upon information and belief, the

41

Li Defendants are continuing to sell to competitors of Frictionless LLC and its affiliate FW.

207.   From August 27, 2018 through April 2019, the Li Defendants, including their agents and representatives, knowingly, and with the intent to mislead, repeatedly and explicitly represented the intent to ship to FW and its retailers.

208.   The Li Defendants, including their agents and representatives, were knowingly making materially false statements, representations, and warranties concerning shipments of goods.

209.   FW relied on the representations being made by the Li Defendants well into the 2019 sales season.  Those representations were false.  Based on that reliance FW did not seek an alternative source for products.

210.   The Li Defendants, including their agents and representatives, breached their duty of honesty.

211.   The false statements made by, for, or on behalf of ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, were made by, for, or on behalf of one another and are imputed to each of them.

212.   ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, made false statements to, *inter alia*, induce Banjo and FW to release the joint venture from any financial obligation to FW, induce payment of almost $4.5 million dollars to Frictionless LLC for pass-through to CIU, and to induce FW to take on an over 6 million dollar loan for poorly made and partially built products that would be difficult or impossible to sell.

213.   FW justifiably and reasonably relied on the false, incomplete, and misleading statements and assurances from the Li Defendants, including their agents and representatives, believed them to be true, and relied on the same, to its severe and ongoing detriment.

214.   The false statements and representations of the Li Defendants, including their agents and representatives, have caused significant injury and damage to FW.

215.   FW has suffered damages in an amount to be proven at trial.

## TWELFTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION
### (FW Against Li, Serena Li, Frank Li, ZL Investments, and CIU)

216.   FW incorporates by reference the allegations above, as though fully set forth.

217.   Li and his affiliates, including representatives and agents of ZL Investment and CIU, had a duty to speak the truth to Banjo and FW concerning, among other things, CIU's cessation business with competing companies and accurate pricing to FW.

218.   Li and his affiliates, including representatives and agents of ZL Investment and CIU, negligently misrepresented their business with competitors and pricing information to Banjo and FW.

219.    ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, had a duty to Banjo and FW speak the truth concerning CIU's cessation of business with competitors and accurate pricing to FW.

220.   Li and his affiliates, including representatives and agents of ZL Investment and CIU, knowingly made and warranties to FW.

221.   From 2013 – 2018, products were ordered by FW through Frictionless and shipped directly to FW or its retailers.

222.   From 2013 – 2018, the Li Defendants negligent misrepresented that CIU was charging Frictionless a reasonable rate for the products that were ordered through Frictionless then shipped to FW.

223.   In January 2019 the Li Defendants admitted to FW that they had been overcharging for products and dropped their rates, resulting in significantly lower rates to FW.

224.    The Li Defendants, as co-operators in a joint business venture with FW, had a duty to speak the truth to FW.

225.    The negligent misrepresentations of the Li Defendants on pricing between 2013 and 2018 cost FW over $7 million in lost profits.

226.    From April 2013 through April 2019, the Li Defendants, including their agents and representatives, negligent misrepresented that they were not selling to competitors of Frictionless or its affiliates.  FW is an affiliate of Frictionless LLC.

227.    The evidence demonstrates that the Li Defendants, contrary to their representations, have been selling to competitors of Frictionless or its affiliates.  Upon information and belief, the Li Defendants are continuing to sell to competitors of Frictionless and its affiliate FW.

228.    From August 27, 2018 through April 2019, ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, negligently misrepresented to FW and Banjo that CIU intended to ship products to FW and its retailers.

229.    ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, made materially false statements, representations, and warranties concerning shipments of goods to Banjo and FW.

230.    Banjo and FW relied on the negligent misrepresentations made by ZL Investments, Li, CIU, Serena Li, and Frank Li.  Based on that reliance, at no time between August 2018 and April 2019 did FW and Banjo seek alternative sources for products.

231.    ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, breached their duty of honesty to Banjo and FW.

232.    The false statements made by, for, or on behalf of ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, were made by, for, or on behalf of

44

one another and are imputed to each of them.

233.   ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, made negligent misrepresentations to, among other things, induce FW to release the joint venture from financial obligations to FW, and to induce FW to pay almost $4.5 million dollars for pass-through to CIU.

234.   FW justifiably and reasonably relied on the negligent misrepresentations from ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, believed them to be true, and relied on the same, to its severe and ongoing detriment.

235.   The negligent misrepresentations from ZL Investments, Li, CIU, Serena Li, and Frank Li, including their agents and representatives, have caused significant injury and damage to FW.

236.   Banjo and FW have suffered damages in an amount to be proven at trial.

### THIRTEENTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (FW Against ZL Investment, Li, and CIU)

237.   FW incorporates by reference the allegations above, as though fully set forth.

238.   ZL Investment, Li, CIU, Serena Li, and Frank Li agreed, by words and conduct, to accomplish an unlawful goal or accomplish a goal through unlawful means.

239.   ZL Investment, Li, CIU, Serena Li, and Frank Li engaged in multiple overt acts to accomplish their unlawful goals, including making false representations to FW.

240.   ZL Investment, Li, CIU, Serena Li, and Frank Li intentionally engaged in the malicious, willful, and fraudulent commission of wrongful acts for the purpose of causing FW harm, including significant pecuniary, reputational, and other damages.

241.   FW is entitled to actual and consequential damages as well as costs, including witness fees, attorneys' fees, pre-judgment and post-judgment interest, and other appropriate

equitable and legal relief, in an amount to be proven at trial, imposed jointly and severally, on ZL Investment, Li, CIU, Serena Li, and Frank Li arising from their conspiratorial acts.

**FOURTEENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(FW Against the Li Defendants)**

242.    FW incorporates by reference the allegations above, as though fully set forth.

243.    Each of Li, ZL Investment, and CIU agreed to be bound by certain agreements governing their relationship with FW and Banjo and the distribution of profits amongst them based on the parties' joint efforts.

244.    As a result of entering into the aforementioned agreements, FW expended significant efforts and conferred substantial monetary benefits on each of the Li Defendants, as described above.

245.    As a result of entering into the aforementioned agreements, FW expected certain pecuniary and reputational benefits to accrue to them.

246.    Each of the Li Defendants unlawfully diverted funds from FW, refused to perform their obligations under the agreements described herein, and unjustly enriched themselves to the detriment of FW.

247.    The Li Defendants received benefits in the form of profits and other advantages at the expense of FW under circumstances that make it unjust for the Li Defendants to retain the profits and other moneys paid without compensating FW.

248.    FW and Banjo have suffered, and will continue to suffer, expense and detriment to the benefit of all of the Li Defendants, making it inequitable for them to retain the benefit FW conferred on them without payment, in an amount to be proven at trial.

**I.    PRAYER FOR RELIEF**

FW seeks an award in its favor on each of the above-cited claims, as follows:

- Finding each of Li Defendants jointly and severally liable on each Claim for Relief set forth against the same above;

- Finding Defendant Frictionless, LLC liable on each Claim for Relief against Frictionless, LLC set forth above;

- Ordering Defendants to turnover and account for all estate property pursuant to 11 U.S.C. § 542;

- Enjoining Defendants from infringing on FW's intellectual property;

- Declaring the arbitration is subject to automatic stay set forth in 11 U.S.C. § 362(a) and enjoining Defendants from continued prosecution of the arbitration against Banjo;

- Disallowing or, in the alternative, equitably subordinating Frictionless LLC's claim against the estate;

- Avoiding the Obligation and the Transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and awarding FW the Transfers or the value thereof from CIU pursuant to 11 U.S.C. § 550(a);

- Awarding damages sufficient and adequate to compensate FW for the injuries and damage caused by the Li Defendants and Frictionless, LLC, in an amount to be determined, including, without limitation, compensatory damages, recessionary damages, and/or equitable disgorgement;

- Ordering a full accounting of the Li Defendants' affairs, including, without limitation, an accounting of all transactions between FW and CIU, CIU and each of the other Li Defendants, and CIU and any competitor of FW from 2013 to the present;

- Awarding pre-judgment and post-judgment interest, as allowed by law, and awarding Banjo his attorneys' fees and costs, and other legal and/or equitable relief as is fair and just as mandated under the LLC Agreement and/or allowed by law.

Dated this 9th day of October, 2019.

Respectfully submitted,

WADSWORTH GARBER WARNER CONRARDY, P.C.

*/s/ David V. Wadsworth*
David V. Wadsworth, #32066
Aaron J. Conrardy, #40030
2580 West Main Street, Suite 200
Littleton, Colorado 80120
303-296-1999 / 303-296-7600 FAX
dwadsworth@wgwc-law.com
aconrardy@wgwc-legal.com

THOMAS P. HOWARD, LLC

*/s/Thomas P. Howard*
Thomas P. Howard, No. 31684
Olayinka L. Hamza, No. 44523
842 W. South Boulder Rd., Ste. 100
Louisville, CO  80027
303-665-9845 / 303-665-9847 FAX
thoward@thowardlaw.com
ohamza@thowardlaw.com

Co-Counsel for Frictionless Word, LLC