# Exhibit 5

<table>
<tr><td colspan="2"><strong>Fill in this information to identify your case:</strong></td></tr>
</table>

United States Bankruptcy Court for the:

DISTRICT OF COLORADO

Case number *(if known)* _____   Chapter   **11**

☐ Check if this an
   amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy      4/19

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).
For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | Debtor's name | **Frictionless World, LLC** |
| 2. | All other names debtor used in the last 8 years<br><br>Include any assumed names, trade names and *doing business as* names | |
| 3. | Debtor's federal Employer Identification Number (EIN) | **45-5285986** |

4. Debtor's address

**Principal place of business**

**1100 W. 120th Ave., Suite 600
Westminster, CO 80234**
Number, Street, City, State & ZIP Code

**Adams**
County

**Mailing address, if different from principal place of business**

_____
P.O. Box, Number, Street, City, State & ZIP Code

**Location of principal assets, if different from principal place of business**

_____
Number, Street, City, State & ZIP Code

5. Debtor's website (URL)     **www.frictionlessworld.com**

6. Type of debtor

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

Debtor    **Frictionless World, LLC**                                       Case number (*if known*) _____
          Name

---

7.   **Describe debtor's business**      A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor.
See http://www.uscourts.gov/four-digit-national-association-naics-codes.

___4238___

---

8.   **Under which chapter of the Bankruptcy Code is the debtor filing?**    *Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply:*

☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625 (amount subject to adjustment on 4/01/22 and every 3 years after that).

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

---

9.   **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

■ No.

☐ Yes.

If more than 2 cases, attach a separate list.

| District | _____ | When | _____ | Case number | _____ |
| District | _____ | When | _____ | Case number | _____ |

---

10.  **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

■ No

☐ Yes.

List all cases. If more than 1, attach a separate list

| Debtor | _____ | | | Relationship | _____ |
| District | _____ | When | _____ | Case number, if known | _____ |

---

Debtor   **Frictionless World, LLC**                                    Case number (*if known*) _____
    Name

| | |
|---|---|
| **11. Why is the case filed in this district?** | *Check all that apply:*<br>■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.<br>☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district. |
| **12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?** | ■ No<br>☐ Yes.  Answer below for each property that needs immediate attention. Attach additional sheets if needed.<br><br>**Why does the property need immediate attention?** (*Check all that apply.*)<br>☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.<br>    What is the hazard? _____<br>☐ It needs to be physically secured or protected from the weather.<br>☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).<br>☐ Other<br>**Where is the property?** _____<br>    Number, Street, City, State & ZIP Code<br>**Is the property insured?**<br>☐ No<br>☐ Yes.  Insurance agency _____<br>        Contact name _____<br>        Phone _____ |

---

**▮ Statistical and administrative information**

| | |
|---|---|
| **13. Debtor's estimation of available funds** | .  *Check one:*<br>■ Funds will be available for distribution to unsecured creditors.<br>☐ After any administrative expenses are paid, no funds will be available to unsecured creditors. |

| **14. Estimated number of creditors** | ■ 1-49<br>☐ 50-99<br>☐ 100-199<br>☐ 200-999 | ☐ 1,000-5,000<br>☐ 5001-10,000<br>☐ 10,001-25,000 | ☐ 25,001-50,000<br>☐ 50,001-100,000<br>☐ More than100,000 |
|---|---|---|---|
| **15. Estimated Assets** | ☐ $0 - $50,000<br>☐ $50,001 - $100,000<br>☐ $100,001 - $500,000<br>☐ $500,001 - $1 million | ☐ $1,000,001 - $10 million<br>■ $10,000,001 - $50 million<br>☐ $50,000,001 - $100 million<br>☐ $100,000,001 - $500 million | ☐ $500,000,001 - $1 billion<br>☐ $1,000,000,001 - $10 billion<br>☐ $10,000,000,001 - $50 billion<br>☐ More than $50 billion |
| **16. Estimated liabilities** | ☐ $0 - $50,000<br>☐ $50,001 - $100,000<br>☐ $100,001 - $500,000<br>☐ $500,001 - $1 million | ☐ $1,000,001 - $10 million<br>■ $10,000,001 - $50  million<br>☐ $50,000,001 - $100 million<br>☐ $100,000,001 - $500 million | ☐ $500,000,001 - $1 billion<br>☐ $1,000,000,001 - $10 billion<br>☐ $10,000,000,001 - $50 billion<br>☐ More than $50 billion |

| Debtor | **Frictionless World, LLC** | | Case number (*if known*) | |
|---|---|---|---|---|
| | Name | | | |

▊ **Request for Relief, Declaration, and Signatures**

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is trued and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   **September 30, 2019**
                       MM / DD / YYYY

*X* **/s/ Daniel Banjo**                                    **Daniel Banjo**
Signature of authorized representative of debtor            Printed name

Title   **Chief Executive Officer**

**18. Signature of attorney**

*X* **/s/ David V. Wadsworth**                              Date   **September 30, 2019**
Signature of attorney for debtor                                   MM / DD / YYYY

**David V. Wadsworth 32066**
Printed name

**Wadsworth Garber Warner Conrardy, P.C.**
Firm name

**2580 West Main Street**
**Suite 200**
**Littleton, CO 80120**
Number, Street, City, State & ZIP Code

Contact phone   **303-296-1999**        Email address   **dwadsworth@wgwc-law.com**

**32066 CO**
Bar number and State

Fill in this information to identify the case:

Debtor name **Frictionless World, LLC**

United States Bankruptcy Court for the: **DISTRICT OF COLORADO**

Case number (if known): _____

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders
                                                                                                                    12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Agtec Industries Pvt Ltd 38-B, Udyog Vihar, Ecotech -II Greater Noida, U.P. 201306 India** | | **Trade debt** | **Contingent Disputed** | | | $338,553.00 |
| **Atlas Denver Industrial, LP 12001 N. Central Expressway, Suite 875 Dallas, TX 75243** | | **Breach of contract -commercial office lease agreement** | | | | $110,563.04 |
| **Bluesea Trailer Parts Co Ltd Poli Huangdo Qingdao China** | | **Trade debt** | **Contingent Unliquidated Disputed** | | | $13,387.50 |
| Changzhou Henghao Special Alloy Co., Ltd No. 5-2, West Taihu Road Xinbei District Changzhou City JS China | | **Trade debt** | **Contingent Unliquidated Disputed** | | | $16,500.00 |
| **Frictionless LLC Room 608, Caifu Guangchang, Yanzheng Middle Rd Wujin District, Changzhou 213000 CHINA** | | | **Contingent Unliquidated Disputed Subject to Setoff** | | | $12,645,740.62 |

Official form 204                    Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured claims                    page 1

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com                                                                                    Best Case Bankruptcy

| Debtor | **Frictionless World, LLC** | | | Case number *(if known)* | | |
|---|---|---|---|---|---|---|
| | Name | | | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Hong Kong Chinabase Intl. Grp. 4th Floor, B Block, Jianhua Indst. Park No 207-208 Qi Gu Deng Shou Shandong Road, Hangzhou China | | Trade debt | Contingent Unliquidated Disputed | | | $6,864.00 |
| Intradin Machinery Co [Huzhou] No. 118 Dohui Road Minhang District Shanghai 201109 China | | Trade debt | Contingent Unliquidated Disputed | | | $1,386,720.00 |
| Kenneth Wilmes 1388 Mt. Moriah Road Livermore, CO 80536 | | Disputed severance | Contingent Unliquidated Disputed | | | $25,000.00 |
| Ningbo NGP Industry Co., Ltd. No. 88, Lane 666 Jinshan Road Czone Jianbei Investment Center Ningbo China | | Trade debt | | | | $964,243.94 |
| Sinotub Industry Co Ltd D-802 Pufa Plaza 1759 North Zhongshan Road Shanghai China | | Trade debt | Contingent Unliquidated Disputed | | | $20,496.00 |
| Syndigo 833 E. South St. Stoughton, WI 53589 | | Trade debt | | | | $12,690.00 |
| Tiya International Co Ltd B12B Shenye Center 9 Shangdong Rd Qingdao 266071 China | | Trade debt | | | | $1,119,369.50 |
| Yongkang Legend Garden Machinery Factory No. 501 Xita Road Chengxi Industrial Zone Yongkang City, Zhejiang Prov. China | | Trade debt | Contingent Unliquidated Disputed | | | $37,170.00 |

Debtor   **Frictionless World, LLC**
_____

Name

Case number *(if known)*   _____

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Z.L. Investment Room 102, No. 18 Xin Ya Road Wujin High-Tech District, Changzhou City Jiangsu Province, China** | | **Contested litigation claims against Debtor** | **Contingent Unliquidated Disputed Subject to Setoff** | | | $0.00 |
| **Zhejiang Kc Mechanical & Electrical No. 299 East Huaxi Road Gushan Yongkang Zhejiang China** | | **Trade debt** | **Contingent Unliquidated Disputed** | | | $147,244.76 |

| Fill in this information to identify the case: |
| --- |

Debtor name **Frictionless World, LLC**

United States Bankruptcy Court for the: DISTRICT OF COLORADO

Case number (if known) _____

☐ Check if this is an
amended filing

## Official Form 207
## Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy                    04/19

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages,
write the debtor's name and case number (if known).

| Part 1: | Income |
| --- | --- |

1. **Gross revenue from business**

☐ None.

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | Sources of revenue Check all that apply | Gross revenue (before deductions and exclusions) |
| --- | --- | --- |
| **From the beginning of the fiscal year to filing date:** From **1/01/2019** to **Filing Date** | ■ Operating a business<br>☐ Other | $17,727,792.00 |
| **For prior year:** From **1/01/2018** to **12/31/2018** | ■ Operating a business<br>☐ Other | $26,223,116.00 |
| **For year before that:** From **1/01/2017** to **12/31/2017** | ■ Operating a business<br>☐ Other | $17,565,086.00 |

2. **Non-business revenue**
Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits,
and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

■ None.

| Description of sources of revenue | Gross revenue from each source (before deductions and exclusions) |
| --- | --- |

| Part 2: | List Certain Transfers Made Before Filing for Bankruptcy |
| --- | --- |

3. **Certain payments or transfers to creditors within 90 days before filing this case**
List payments or transfers--including expense reimbursements--to any creditor, other than regular employee compensation, within 90 days before
filing this case unless the aggregate value of all property transferred to that creditor is less than $6,825. (This amount may be adjusted on 4/01/22
and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None.

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer Check all that apply |
| --- | --- | --- | --- |

| Debtor | **Frictionless World, LLC** | | Case number *(if known)* | |

| Creditor's Name and Address | Dates | Total amount of value | Reasons for payment or transfer *Check all that apply* |
|---|---|---|---|
| 3.1. **See attachment** | | $3,179,427.10 | ■ Secured debt<br>■ Unsecured loan repayments<br>■ Suppliers or vendors<br>■ Services<br>■ Other___ |

**4. Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $6,825. (This amount may be adjusted on 4/01/22 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

■ None.

| Insider's name and address<br>Relationship to debtor | Dates | Total amount of value | Reasons for payment or transfer |
|---|---|---|---|

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

■ None

| Creditor's name and address | Describe of the Property | Date | Value of property |
|---|---|---|---|

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

■ None

| Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|

| **Part 3:** | **Legal Actions or Assignments** |

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None.

| Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|
| 7.1. **Atlas Denver Industrial, LP v. Frictionless World, LLC**<br>**19CV31488** | **Forcible entry and detainer** | **Adams District Court**<br>**1100 Judicial Center Dr.**<br>**Brighton, CO 80601** | ■ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.2. **Changzhou Zhong Lian Investment Co. Ltd v. Daniel Banjo, Frictionless World LLC, Frictionless, LLC v. Li Zhixiang, Z.L. Investment and Changzhou Inter Universal Machine & Equipment Co., Ltd.**<br>**01-19-0001-1748** | **Breach of contracts, fraud** | **American Arbitration Association**<br>**120 Broadway, 21st Floor**<br>**New York, NY 10271** | ■ Pending<br>☐ On appeal<br>☐ Concluded |

Debtor    **Frictionless World, LLC**                                          Case number *(if known)*

| | Case title<br>Case number | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.3. | Wilmes v. Frictionless World, LLC et al.<br>19C757 | Breach of Employment Contract | Boulder County Court<br>1777 6th Street<br>Boulder, CO 80302 | ■ Pending<br>☐ On appeal<br>☐ Concluded |

**8. Assignments and receivership**
List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

■ None

**9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

■ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

■ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss<br><br>If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received.<br><br>List unpaid claims on Official Form 106A/B *(Schedule A/B: Assets – Real and Personal Property)*. | Dates of loss | Value of property lost |
|---|---|---|---|

**11. Payments related to bankruptcy**
List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None.

| | Who was paid or who received the transfer?<br>Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | Wadsworth Garber Warner Conrardy, PC<br>2580 W. Main St., Suite 200<br>Littleton, CO 80120 | | 8/1/19,<br>9/16/19 | $105,000.00 |
| | Email or website address | | | |
| | Who made the payment, if not debtor? | | | |

| Debtor | **Frictionless World, LLC** | Case number (if known) | |
|---|---|---|---|

| | Who was paid or who received the transfer? Address | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.2. | r2 advisors llc<br>1350 17th Street, Suite 206<br>Denver, CO 80202 | | 8/5/19 | $50,000.00 |
| | Email or website address | | | |
| | Who made the payment, if not debtor? | | | |

**12. Self-settled trusts of which the debtor is a beneficiary**
List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

■ None.

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|

**13. Transfers not already listed on this statement**
List any transfers of money or other property by sale, trade, or any other means made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☐ None.

| | Who received transfer? Address | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1 | Three Twenty-One Capital Partners<br>5950 Symphony Woods Road, Suite 200<br>Columbia, MD 21044 | Retainer | 9/18/19 | $30,000.00 |
| | Relationship to debtor | | | |
| 13.2 | Anderson Industrial Engines<br>13423 Lynam Drive<br>Omaha, NE 68106 | Return of Honda engines not previously paid for. | 9/16/19 | $70,689.42 |
| | Relationship to debtor | | | |
| 13.3 | Thomas P. Howard, LLC<br>842 W. South Boulder Road, Suite 100<br>Louisville, CO 80027 | Retainer | 9/19 | $300,000.00 |
| | Relationship to debtor | | | |
| 13.4 | Frictionless LLC | All transfers made to Frictionless in 2019. | 2019 | $4,611,143.40 |
| | Relationship to debtor | | | |

Debtor   **Frictionless World, LLC**                                   Case number *(if known)*

---

**Part 7:**   **Previous Locations**

**14. Previous addresses**
List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

■ Does not apply

| Address | Dates of occupancy From-To |
|---|---|

**Part 8:**   **Health Care Bankruptcies**

**15. Health Care bankruptcies**
Is the debtor primarily engaged in offering services and facilities for:
- diagnosing or treating injury, deformity, or disease, or
- providing any surgical, psychiatric, drug treatment, or obstetric care?

■ No. Go to Part 9.
☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|

**Part 9:**   **Personally Identifiable Information**

**16. Does the debtor collect and retain personally identifiable information of customers?**

■ No.
☐ Yes. State the nature of the information collected and retained.

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☐ No. Go to Part 10.
■ Yes. Does the debtor serve as plan administrator?

☐ No Go to Part 10.
■ Yes. Fill in below:
Name of plan                                      Employer identification number of the plan
**Frictionless World LLC 401k Plan**              EIN:   **45-5285986**

Has the plan been terminated?
■ No
☐ Yes

**Part 10:**   **Certain Financial Accounts, Safe Deposit Boxes, and Storage Units**

**18. Closed financial accounts**
Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?
Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

■ None

| Financial Institution name and Address | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|

**19. Safe deposit boxes**
List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this

| Debtor | **Frictionless World, LLC** | | Case number *(if known)* | |

case.

■ None

| Depository institution name and address | Names of anyone with access to it Address | Description of the contents | Do you still have it? |
|---|---|---|---|

### 20. Off-premises storage

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☐ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Do you still have it? |
|---|---|---|---|
| **Barr Small Engine Repair**<br>**3-53 Armstrong Ave**<br>**Georgetown, ON**<br>**L7G 4S1, Canada** | **Greg Barr** | **Warranty Parts** | ☐ No<br>■ Yes |
| **Dan Banjo**<br>**2807 Jay Road**<br>**Boulder, CO 80301** | **Dan Banjo** | **Prototype/demo equipment and tractor for videography/customer service enhancements/ product testing** | ☐ No<br>■ Yes |
| **Public Storage**<br>**3150 S. 44th Street**<br>**Kansas City, KS 66106** | **Paul Emig** | **Demo Equipment** | ■ No<br>☐ Yes |

---

### Part 11:   Property the Debtor Holds or Controls That the Debtor Does Not Own

### 21. Property held for another

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

■ None

---

### Part 12:   Details About Environment Information

For the purpose of Part 12, the following definitions apply:

*Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).

*Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.

*Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

### 22.  Has the debtor been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.

■  No.
☐  Yes. Provide details below.

| Case title<br>Case number | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|

### 23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an

Debtor   **Frictionless World, LLC**                                           Case number *(if known)*

---

**environmental law?**

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| | | | |

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

■ No.
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| | | | |

**Part 13:   Details About the Debtor's Business or Connections to Any Business**

**25. Other businesses in which the debtor has or has had an interest**
List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

■ None

| Business name address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN.<br><br>Dates business existed |
|---|---|---|
| | | |

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.
■ None

| Name and address | | Date of service<br>From-To |
|---|---|---|
| | | |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☐ None

| Name and address | | Date of service<br>From-To |
|---|---|---|
| 26b.1. | **Anton Collins Mitchell LLP**<br>**303 E. 17th Avenue**<br>**Suite 600**<br>**Denver, CO 80203** | **2/28/17-present** |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

■ None

| Name and address | If any books of account and records are unavailable, explain why |
|---|---|
| | |

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☐ None

| Name and address | |
|---|---|
| 26d.1. | **See attachment** |

**27. Inventories**

| Debtor | **Frictionless World, LLC** | Case number *(if known)* |
|---|---|---|

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☐ No

■ Yes. Give the details about the two most recent inventories.

| | Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|---|
| 27.1 | Hampton Smith | Various (spot checks, physicals, cycle counts) | Basis is physical and cycle counts of products on continuing basis |
| | Name and address of the person who has possession of inventory records | | |
| | Frictionless World, LLC | | |

28. **List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| Dan Banjo | 2807 Jay Road<br>Boulder, CO 80301 | CEO, Member | 100 |
| Name | Address | Position and nature of any interest | % of interest, if any |
| Paul Emig | 10129 W. 119th Terrace<br>Overland Park, KS 66213 | VP Sales | |
| Name | Address | Position and nature of any interest | % of interest, if any |
| Hampton Smith | 11704 Pecos Street, #101<br>Denver, CO 80234 | VP Operations | |
| Name | Address | Position and nature of any interest | % of interest, if any |
| Rob Germundson | 15915 Vermillion Way<br>Broomfield, CO 80023 | CFO | |

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☐ No

■ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| Ken Wilmes | 1388 Mount Moriah Road<br>Livermore, CO 80536 | VP Business Development | April 2019-August 2019 |

30. **Payments, distributions, or withdrawals credited or given to insiders**
Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☐ No

■ Yes. Identify below.

| Debtor | **Frictionless World, LLC** | | Case number *(if known)* | |
|--------|------|---|------|---|

| | Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|---|
| 30.1 | **Dan Banjo**<br>**2807 Jay Road**<br>**Boulder, CO 80301** | $293,412.93 | 10/1/18-9/27/19 | **W2 salary and distributions** |
| | Relationship to debtor<br>**CEO/Member** | | | |
| 30.2 | **Paul Emig**<br>**10129 W. 119th Terrace**<br>**Overland Park, KS 66213** | $153,087.48 | 10/1/18-9/27/19 | **W2 salary and 2018 performance bonus paid in 2019.** |
| | Relationship to debtor<br>**VP Sales** | | | |
| 30.3 | **Hampton Smith**<br>**11704 Pecos Street, #101**<br>**Denver, CO 80234** | $109,131.44 | 10/1/18-9/27/19 | **W2 salary and 2018 performance bonus paid in 2019.** |
| | Relationship to debtor<br>**VP Operations** | | | |
| 30.4 | **Rob Germundson**<br>**15915 Vermillion Way**<br>**Broomfield, CO 80023** | $153,576.58 | 10/1/18-9/27/19 | **W2 salary and 2018 performance bonus paid in 2019.** |
| | Relationship to debtor<br>**CFO** | | | |
| 30.5 | **Kenneth Wilmes**<br>**1388 Mt. Moriah Road**<br>**Livermore, CO 80536** | $175,665.93 | 10/1/18-8/12/19 | **W2 Salary and 2018 performance bonus paid in 2019.** |
| | Relationship to debtor<br>**VP** | | | |
| 30.6 | **Dan Banjo**<br>**2807 Jay Road**<br>**Boulder, CO 80301** | Federal and State tax refunds: $96,795 | 8/15/19 | |
| | Relationship to debtor | | | |

**31. Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

■ No
☐ Yes. Identify below.

| Name of the parent corporation | Employer Identification number of the parent corporation |
|---|---|

**32. Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

■ No
☐ Yes. Identify below.

Debtor **Frictionless World, LLC** _____ Case number *(if known)* _____

| Name of the pension fund | Employer Identification number of the parent corporation |

## Part 14: Signature and Declaration

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on      **September 30, 2019**

**/s/ Daniel Banjo** _____      **Daniel Banjo** _____
Signature of individual signing on behalf of the debtor      Printed name

Position or relationship to debtor    **Chief Executive Officer** _____

**Are additional pages to** *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* **(Official Form 207) attached?**
☐ No
☒ Yes

**SOFA #3 Attachment**

| Creditors Name | Street Address 1 | Street Address 2 | City | State | Country | Zip | Total Amount $ |
|---|---|---|---|---|---|---|---|
| ACCOUNTEMPS | P.O. BOX 743295 | | LOS ANGELES | CA | US | 90074-3295 | $17,715.91 |
| AGILITY LOGISTICS CORP | BLDG 2, SUITE 300 | 14221 EAST 4TH AVENUE | AURORA | CO | US | 80111 | $301,593.38 |
| AGTEC INDUSTRIES PVT LTD | 38-B, UDYOG VIHAR, ECOTECH - II | GREATER NOIDA | | U.P. | IN | 201306 | $27,316.00 |
| ALTAQUIP LLC | 100 PRODUCTION DRIVE | | HARRISON | OH | US | 45030 | $15,620.76 |
| ATLAS DENVER INDUSTRIAL LP | C/O CEDAR RIDGE SERVICES | 2001 N. CENTRAL EXPRESSWAY, SUITE 87 | DALLAS | TX | US | 75243 | $109,590.97 |
| BEANSTALK | 1285 SIXTH AVE | | NEW YORK | NY | US | 10019 | $25,085.55 |
| BRIGGS & STRATTON CORPORATION | 12301 W. WIRTH STREET | | WAUWATOSA | WI | US | 53222 | $85,722.00 |
| BRUCE CLARK | 2286 KENSINGTON WAY | | NEW BRAUNFELS | TX | US | 78130 | $6,840.00 |
| CHANGZHOU HENGHAO SPECIAL ALLOY CO., LTD | NO. 5-2 , WEST TAIHU ROAD | XINBEI DISTRICT | CHANGZHOU CITY | JS | CN | | $27,500.00 |
| CHANGZHOU KING-TOWN | INTERNATIONAL TRADE CO., LTD | 1103,NO.50JUQIANJIE,CHANGZHOU,JIAN | CHANGZHOU | JIANGSU | CN | | $8,250.00 |
| CHASE BANK | 1301 CANYON BLVD | | BOULDER | CO | US | 80301 | $16,995.04 |
| CHASE COMMERCIAL LOAN | PO BOX 6026 MAILCODE IL1-0054 | | CHICAGO | IL | US | 60680-6026 | $258,285.48 |
| CHASE COMMERCIAL PURCHASE CARD | 1301 CANYON BLVD | | BOULDER | CO | US | 80301 | $354,716.47 |
| CHASE INK CREDIT CARD | 1301 CANYON BLVD | | BOULDER | CO | US | 80301 | $89,415.74 |
| CONSTRUCTION CASUALTY INSURANCE | 3637 4TH STREET NORTH | | SAINT PETERSBURG | FL | US | 33701 | $9,000.00 |
| DAN BANJO | 2807 JAY ROAD | | BOULDER | CO | US | 80301 | $13,333.33 |
| ESTES EXPRESS LINES | PO BOX 25612 | | RICHMOND | VA | US | 23260-5612 | $10,232.78 |
| FRICTIONLESS LLC | Room 608, Caifu Guangchang, Yanzheng Middle Rd | Wujin District | Changzhou | JIANGSU | CN | 213000 | $72,188.04 |
| HARTFORD FINANCIAL SERVICES, INC | PO BOX 415738 | | BOSTON | MA | US | 02241-5738 | $88,504.55 |
| INTRADIN | No.118 DUHUI ROAD | MINHANG DISTRICT | SHANGHAI | | US | 201109 | $438,480.00 |
| KAISER PERMANENTE | MEMBERSHIP ADMINISTRATION | PO BOX 711697 | DENVER | CO | US | 80271-1697 | $43,737.87 |
| LENERTZ INDUSTRIAL SUPPLY CO INC | 725 VENTURA STREET | | AURORA | CO | US | 80011 | $84,998.88 |
| MID-STATES DISTRIBUTING COMPANY | ATTN: ACCTS RECV/SHOW PAYMENTS | P.O. Box 64537 | ST. PAUL | MN | US | | $7,600.00 |
| NEXT STRATEGIC TECHNOLOGIES INC | 420 EAST 58TH AVE STE 141 | | DENVER | CO | US | 80216 | $28,359.44 |
| PRIMESOURCE STAFFING LLC | 10065 E HARVARD AVE, STE 230 | | DENVER | CO | US | 80231 | $13,356.21 |
| R+L CARRIERS | PO BOX 10020 | | PORT WILLIAM | OH | US | 45164-2000 | $64,926.55 |
| REDDAWAY INC. | 26401 NETWORK PLACE | | CHICAGO | IL | US | | $8,225.67 |
| SAIA MOTOR FREIGHT LINE, LLC | PO BOX 730532 | | DALLAS | TX | US | 75373 | $98,955.75 |
| SCHNEIDER NATIONAL INC | PO BOX 841831 | | DALLAS | TX | US | 75284-1831 | $20,801.19 |
| SOURCE ONE | NO. 298 YONG DING WEST ROAD | ECONOMIC DEVELOPMENT ZONE | TAIZHOU, JIANGSU | | CN | 225300 | $37,987.00 |
| THOMAS HOWARD | 842 W. SOUTH BOULDER RD | SUITE 100 | LOUISVILLE | CO | US | 80027 | $95,706.86 |
| TIYA INTERNATIONAL CO LTD | 8128 SHENYE CENTER | 9 SHANDONG RD | QINGDAO | 0 | CN | 266071 | $118,630.69 |
| UPS | LOCKBOX 577 | | CAROL STREAM | IL | US | 60132-0577 | $172,413.97 |
| US CBP PAYMENT | P.O. BOX 979126 | | ST. LOUIS | MO | US | 63197-9000 | $457,993.14 |
| WANDA TYRE | EASTSIDE TO JINGJINTANG HIGHWAY | YIXINGBU TOWN, BEICHEN | DISTRICT TIANJIN | | CN | 300402 | $28,652.10 |
| YONGKANG LEGEND GARDEN MACHINERY FACTORY | NO. 501 XITA ROAD | CHENGXI INDUSTRIAL ZONE | YONGKANG CITY, ZHEJIANG PROV. | | CN | 0 | $34,454.00 |
| ZHEJIANG KC MECHANICAL & ELECTRICAL | NO. 299 EAST HUAXI ROAD | GUSHAN YONGKANG | ZHEJIANG | | CN | 0 | $238,094.00 |

## SOFA 26d.1 Attachment

Chase Bank
1301 Canyon Blvd
Boulder
CO
80302

R2 Advisors
1350 17th Street, Suite 210
Denver
CO
80202

Integris Partners
1099 18th St
Denver
CO
80202

Champion
12039 Smith Ave
Santa Fe Springs
CA
90670

CIBC
1550 Wetta St. Suite 520
Denver
CO
80202

Encina Business Credit
123 N. Wacker Drive, Suite 2400
Chicago
IL
60606

Gibraltar Business Capital
400 Skokie Blvd #375
Northbrook
IL
60062

Ares Management LLC
245 Park Avenue 41st Floor
New York
NY
10167

Capital Value Advisors
101 University Blvd #400
Denver
CO
80206

Highline Group
250 Fillmore St
Denver
CO
80206

Anton, Collins, and Mitchell
303 E. 17th Avenue, Suite 600
Denver
CO
80203

Three Twenty-One Capital Partners
5950 Symphony Woods Rd. Ste 200
Columbia
MD
21044

Peak View Partners
1610 Wynkoop St #150
Denver
CO
80202

Fruition Private Equity
1331 17th St
Denver
CO
80202

Aramar Capital Group
489 5th Ave
New York
NY
10017

Focal Point Partners
11150 CA-2 #1550
Los Angeles
CA
90025

Hitachi Business Finance
800 West University Dr.
Rochester
MI
48307

Stonegate Capital
123 N Wack Drive, Suite 1160
Chicago
IL
60606

Copley Equity Partners
150 Newport Avenue Extension
Quincy
MA
2171

Houlihan Lokey
100 Crescent Ct.
Dallas
TX
75201

Siena Lending
220 North Green Street
Chicago
IL
60607

Forbers M&A Group
8480 E Orchard Rd #2400
Greenwood Village
CO
80111

Ariens
655 West Ryan Street PO Box 157
Brillion
WI
54110-1098

Cowen
300 Park St. Suite 480
Birmingham
MI
48009

Gordon Brothers
800 Boylston Street, 27th Floor
Boston
MA
20199

Crestmark
3146 Hardin Street
Castle Rock
CO
80109

Business Capital
311 California Street
San Francisco
CA
94104

Capital Peak Partners LLC
50 Ivanhoe St
Denver
CO
80220

Grey Mountain Partners
1470 Walnut St
Boulder
CO
80302

| Fill in this information to identify the case: |
| --- |
| Debtor name **Frictionless World, LLC** |
| United States Bankruptcy Court for the:   DISTRICT OF COLORADO |
| Case number (if known) _____ |

☐ Check if this is an
amended filing

## Official Form 206Sum
### Summary of Assets and Liabilities for Non-Individuals                    12/15

| Part 1: | Summary of Assets |
| --- | --- |

1.  *Schedule A/B: Assets-Real and Personal Property* (Official Form 206A/B)

    **1a. Real property:**
    Copy line 88 from *Schedule A/B*.................................................................................... $        0.00

    **1b. Total personal property:**
    Copy line 91A from *Schedule A/B*.................................................................................. $    14,600,503.09

    **1c. Total of all property:**
    Copy line 92 from *Schedule A/B*.................................................................................... $    14,600,503.09

| Part 2: | Summary of Liabilities |
| --- | --- |

2.  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
    Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*................................... $        0.00

3.  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

    **3a. Total claim amounts of priority unsecured claims:**
    Copy the total claims from Part 1 from line 5a of *Schedule E/F*.......................................................... $    25,000.00

    **3b. Total amount of claims of nonpriority amount of unsecured claims:**
    Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*................................ +$    17,339,542.36

4.  **Total liabilities** ..................................................................................................
    Lines 2 + 3a + 3b        $    17,364,542.36

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **Frictionless World, LLC** |
| United States Bankruptcy Court for the: | DISTRICT OF COLORADO |
| Case number (if known) | |

☐ Check if this is an
amended filing

# Official Form 206A/B
## Schedule A/B: Assets - Real and Personal Property                    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

**Part 1:**      Cash and cash equivalents

1. Does the debtor have any cash or cash equivalents?

   ☐ No. Go to Part 2.
   ■ Yes Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | | | Current value of debtor's interest |
|---|---|---|---|
| 2.    **Cash on hand** | | | $182.52 |

3.    **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|---|
| 3.1. | **Chase Bank** | **Operating account** | 6981 | $203,269.16 |
| 3.2. | **Chase Bank** | **Accounts Receivable account** | 7389 | $565,145.84 |
| 3.3. | **Chase bank** | **Accounts Payable account** | 7005 | $0.00 |
| 3.4. | **PayPal** | **Cash account** | | $14,936.83 |
| 3.5. | **Chase Bank** | **Savings account** | 3005 | $3,740,708.19 |

4.    **Other cash equivalents** *(Identify all)*

5.    **Total of Part 1.**

      Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

| $4,524,242.54 |
|---|

Debtor  **Frictionless World, LLC**                                Case number *(If known)* _____
         Name

| Part 2: | Deposits and Prepayments |

**6. Does the debtor have any deposits or prepayments?**

☐ No.  Go to Part 3.
■ Yes Fill in the information below.

7.    **Deposits, including security deposits and utility deposits**
      Description, including name of holder of deposit

   7.1.  **Security Deposits (Landlord may have offset)** _____        **$100,000.00**

8.    **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**
      Description, including name of holder of prepayment

   8.1.  **Prepayments contracts, leases, insurance and taxes** _____        **$44,686.58**

9.    **Total of Part 2.**

      Add lines 7 through 8. Copy the total to line 81.        | **$144,686.58** |

| Part 3: | Accounts receivable |

**10. Does the debtor have any accounts receivable?**

☐ No.  Go to Part 4.
■ Yes Fill in the information below.

11.   **Accounts receivable**

   11a. 90 days old or less:   **2,633,143.63** -     **0.00** = ....        **$2,633,143.63**
                               face amount          doubtful or uncollectible accounts

   11b. Over 90 days old:      **233,020.43** -     **0.00** =....        **$233,020.43**
                               face amount          doubtful or uncollectible accounts

12.   **Total of Part 3.**

      Current value on lines 11a + 11b = line 12.  Copy the total to line 82.        | **$2,866,164.06** |

| Part 4: | Investments |

**13. Does the debtor own any investments?**

■ No.  Go to Part 5.
☐ Yes Fill in the information below.

| Part 5: | Inventory, excluding agriculture assets |

**18. Does the debtor own any inventory (excluding agriculture assets)?**

☐ No.  Go to Part 6.
■ Yes Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|

Debtor    **Frictionless World, LLC**        Case number *(If known)* _____
       Name

| | | | | | |
|---|---|---|---|---|---|
| 19. | **Raw materials** | | | | |
| 20. | **Work in progress** | | | | |
| 21. | **Finished goods, including goods held for resale**<br>Inventory: see attached<br>spreadsheet | | $0.00 | Recent cost | $6,439,446.91 |
| 22. | **Other inventory or supplies** | | | | |

23. **Total of Part 5.**
     Add lines 19 through 22. Copy the total to line 84.

                                                          **$6,439,446.91**

24. **Is any of the property listed in Part 5 perishable?**
     ■ No
     ☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
     ☐ No
     ■ Yes. Book value      **381,100.56**   Valuation method _____    Current Value      0.00

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**
     ☐ No
     ■ Yes

| Part 6: | Farming and fishing-related assets (other than titled motor vehicles and land) |
|---|---|

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

     ■ No. Go to Part 7.
     ☐ Yes Fill in the information below.

| Part 7: | Office furniture, fixtures, and equipment; and collectibles |
|---|---|

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

     ☐ No. Go to Part 8.
     ■ Yes Fill in the information below.

| | General description | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|---|
| 39. | **Office furniture**<br>Office furniture including book cases,<br>cabinets, partitions, chairs, tables | $83,139.78 | Recent cost | Unknown |
| 40. | **Office fixtures** | | | |
| 41. | **Office equipment, including all computer equipment and**<br>**communication systems equipment and software**<br>Office Equipment: see attached list | $38,096.17 | Recent cost | Unknown |
| 42. | **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork;<br>books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card<br>collections; other collections, memorabilia, or collectibles | | | |

43. **Total of Part 7.**
     Add lines 39 through 42. Copy the total to line 86.

                                                           **$0.00**

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com                                          Best Case Bankruptcy

| Debtor | **Frictionless World, LLC** | Case number *(If known)* | |
|---|---|---|---|
| | Name | | |

44. **Is a depreciation schedule available for any of the property listed in Part 7?**
☐ No
☑ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
☑ No
☐ Yes

---

**Part 8:**  **Machinery, equipment, and vehicles**

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.
☑ Yes Fill in the information below.

| General description<br>Include year, make, model, and identification numbers<br>(i.e., VIN, HIN, or N-number) | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|
| 47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 47.1.  **2019 Ford F250 diesel truck (white)** | **$45,246.92** | **Recent cost** | **Unknown** |
| 47.2.  **2019 GMC Sierra truck (black)** | **$54,299.80** | **Recent cost** | **Unknown** |
| 47.3.  **2019 GMC Sierra truck (white)** | **$55,069.05** | **Recent cost** | **Unknown** |
| 48. **Watercraft, trailers, motors, and related accessories** *Examples:* Boats, trailers, motors,<br>floating homes, personal watercraft, and fishing vessels | | | |
| 48.1.  **Work trailer 1** | **$491.09** | **Recent cost** | **$0.00** |
| 48.2.  **Work trailer 2** | **$3,297.13** | **Recent cost** | **$0.00** |
| 48.3.  **Trailer 1 accessories** | **$66.54** | **Recent cost** | **$0.00** |
| 49. **Aircraft and accessories** | | | |
| 50. **Other machinery, fixtures, and equipment (excluding farm<br>machinery and equipment)**<br>**Other machinery, fixtures and equipment: see<br>attached list** | **$694,003.18** | **Recent cost** | **$0.00** |

51. **Total of Part 8.**
Add lines 47 through 50.  Copy the total to line 87.

| | $0.00 |
|---|---|

52. **Is a depreciation schedule available for any of the property listed in Part 8?**
☐ No
☑ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**
☑ No
☐ Yes

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com                                                          Best Case Bankruptcy

Debtor __**Frictionless World, LLC**__   Case number *(If known)* _____
        Name

| Part 9: | Real property |

**54. Does the debtor own or lease any real property?**

☐ No. Go to Part 10.
☒ Yes Fill in the information below.

55.    **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building, if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1.   **Leasehold improvements** | | **$56,148.48** | **Recent cost** | **Unknown** |

56.    **Total of Part 9.**                                                                                          | **$0.00** |
       Add the current value on lines 55.1 through 55.6 and entries from any additional sheets.
       Copy the total to line 88.

57.    **Is a depreciation schedule available for any of the property listed in Part 9?**
       ☐ No
       ☒ Yes

58.    **Has any of the property listed in Part 9 been appraised by a professional within the last year?**
       ☒ No
       ☐ Yes

| Part 10: | Intangibles and intellectual property |

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.
☒ Yes Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60.    **Patents, copyrights, trademarks, and trade secrets**<br>**Patents, copyrights, trademarks, and trade secrets -see attached list** | **Unknown** | | **Unknown** |
| 61.    **Internet domain names and websites**<br>**Internet domain names and website -see attached list** | **Unknown** | | **Unknown** |
| 62.    **Licenses, franchises, and royalties** | | | |
| 63.    **Customer lists, mailing lists, or other compilations**<br>**Customer master record list** | **Unknown** | | **Unknown** |

Debtor    **Frictionless World, LLC**        Case number *(If known)* _____
<br>_____ Name

| | | | | |
|---|---|---|---|---|
| 64. | Other intangibles, or intellectual property<br>**Unamortized Epicor software license and add<br>on modules** | **$8,802.02** | | **$0.00** |

| | | | | |
|---|---|---|---|---|
| 65. | Goodwill<br>**Goodwill** | **Unknown** | | **$0.00** |

| | | |
|---|---|---|
| 66. | **Total of Part 10.** | **$0.00** |
| | Add lines 60 through 65. Copy the total to line 89. | |

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C.§§ 101(41A) and 107?
   ■ No
   ☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
   ■ No
   ☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
   ■ No
   ☐ Yes

**Part 11:**    **All other assets**

70. **Does the debtor own any other assets that have not yet been reported on this form?**
   Include all interests in executory contracts and unexpired leases not previously reported on this form.

   ☐ No. Go to Part 12.
   ■ Yes Fill in the information below.

|  |  | **Current value of<br>debtor's interest** |
|---|---|---|
| 71. | **Notes receivable**<br>Description (include name of obligor) | |
| 72. | **Tax refunds and unused net operating losses (NOLs)**<br>Description (for example, federal, state, local) | |
| | **NOL's**     Tax year **2016** | **$524,558.00** |
| | **NOL's**     Tax year **2018** | **$96,795.00** |
| 73. | **Interests in insurance policies or annuities** | |
| 74. | **Causes of action against third parties (whether or not a lawsuit<br>has been filed)**<br>**Claims against ZL Investments, CIU, Li Zhixiang, Li<br>Mingsu, Li Jun, and Yin Gelei.** | **Unknown** |
| | Nature of claim<br>**Amount requested**     **$50,000,000.00** | |

| Debtor | **Frictionless World, LLC** | Case number *(If known)* |
|---|---|---|
| | Name | |

| | | |
|---|---|---|
| **Claims again Ken Wilmes for turnover of property, violation of non-compete, tortious interference with business.** | | $0.00 |
| Nature of claim | | |
| Amount requested | **$5,000,000.00** | |

---

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

76. **Trusts, equitable or future interests in property**

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

   **Sportsman's club membership**                                $3,300.00

---

   **AICPA Membership**                                     $655.00

---

   **AICPA Membership**                                     $655.00

---

78. **Total of Part 11.**                                                | $625,963.00 |

   Add lines 71 through 77. Copy the total to line 90.

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
   ■ No
   ☐ Yes

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com           Best Case Bankruptcy

| Debtor | **Frictionless World, LLC** | Case number *(If known)* |
| | Name | |

**Summary**

In Part 12 copy all of the totals from the earlier parts of the form

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** Copy line 5, Part 1 | $4,524,242.54 | |
| 81. **Deposits and prepayments.** Copy line 9, Part 2. | $144,686.58 | |
| 82. **Accounts receivable.** Copy line 12, Part 3. | $2,866,164.06 | |
| 83. **Investments.** Copy line 17, Part 4. | $0.00 | |
| 84. **Inventory.** Copy line 23, Part 5. | $6,439,446.91 | |
| 85. **Farming and fishing-related assets.** Copy line 33, Part 6. | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** Copy line 43, Part 7. | $0.00 | |
| 87. **Machinery, equipment, and vehicles.** Copy line 51, Part 8. | $0.00 | |
| 88. **Real property.** Copy line 56, Part 9.............................................................> | | $0.00 |
| 89. **Intangibles and intellectual property.** Copy line 66, Part 10. | $0.00 | |
| 90. **All other assets.** Copy line 78, Part 11. | + $625,963.00 | |
| 91. **Total.** Add lines 80 through 90 for each column | $14,600,503.09 | + 91b. $0.00 |

92. **Total of all property on Schedule A/B.** Add lines 91a+91b=92      $14,600,503.09

SCHEDULE B.21-23 ATTACHMENT

| 21 | Finished Goods | | | |
|---|---|---|---|---|
| 21.1 | ACCESSORIES | $35,339.02 | Standard landed cost | $35,339.02 |
| 21.2 | ALL TERRAIN CARTS | $24,405.86 | Standard landed cost | $24,405.86 |
| 21.3 | AUGERS | $88,870.60 | Standard landed cost | $88,870.60 |
| 21.4 | CHIPPER/SHREDDERS | $282,337.10 | Standard landed cost | $282,337.10 |
| 21.5 | CLAM ICE AUGER | $855,113.73 | Standard landed cost | $855,113.73 |
| 21.6 | GENERATORS | $309,936.75 | Standard landed cost | $309,936.75 |
| 21.7 | HITCHES | $62,636.63 | Standard landed cost | $62,636.63 |
| 21.8 | LOG SPLITTERS | $286,205.95 | Standard landed cost | $286,205.95 |
| 21.9 | MOWERS | $98,912.34 | Standard landed cost | $98,912.34 |
| 21.10 | OEM | $188,525.69 | Standard landed cost | $188,525.69 |
| 21.11 | OTHER | $14,584.01 | Standard landed cost | $14,584.01 |
| 21.12 | PARTS | $1,225,452.52 | Standard landed cost | $1,225,452.52 |
| 21.13 | PHD/POST POUNDERS | $93,379.37 | Standard landed cost | $93,379.37 |
| 21.14 | PLATE COMPACTORS | $117,571.90 | Standard landed cost | $117,571.90 |
| 21.15 | PUMPS | $58,595.24 | Standard landed cost | $58,595.24 |
| 21.16 | RANCHEX | $764,855.18 | Standard landed cost | $764,855.18 |
| 21.17 | REDBACK | $404,295.84 | Standard landed cost | $404,295.84 |
| 21.18 | SNOW BLOWERS | $338,096.41 | Standard landed cost | $338,096.41 |
| 21.19 | STRING TRIMMERS | $14,100.55 | Standard landed cost | $14,100.55 |
| 21.20 | TILLERS | $336,297.35 | Standard landed cost | $336,297.35 |
| 21.21 | TROLLING MOTOR | $2,889.38 | Standard landed cost | $2,889.38 |
| 21.22 | TROPHY STRIKE | $562,040.08 | Standard landed cost | $562,040.08 |
| 21.23 | WIRE STRETCHERS | $25,927.99 | Standard landed cost | $25,927.99 |
| 22.10 | Other inventory or supplies - Advance Inventory Payments | $240,007.48 | Vendor Deposits | $240,007.48 |
| 22.11 | Other inventory or supplies - Inventory in Transit | $627,417.94 | Standard landed cost | $627,417.94 |
| 22.12 | Other inventory or supplies - Inventory Reserve | ($618,349.00) | Reserve Estimate | ($618,349.00) |
| 23 | Total of part 5 | | | $6,439,446.91 |

SCHEDULE B.41 ATTACHMENT

| PART 7 | | General Description | NBV | Valuation Method | Current Value of Debtors Interest |
|---|---|---|---|---|---|
| 41 | Office Equipment, computers, communication systems, software | Office Equipment, computers, communication systems, software | $38,098.17 | Cost | Unknown |
| 41.1 | | Telephony Telephony Depot/Fax-Deposit | $608.30 | Cost | Unknown |
| 41.2 | | D2R Solutions IT Buildout | $4,568.38 | Cost | Unknown |
| 41.3 | | D2R Solutions IT Buildout | $1,330.74 | Cost | Unknown |
| 41.4 | | VTI Security Security System (Deposit) | $1,916.67 | Cost | Unknown |
| 41.5 | | VTI Security Security System (Remainder) | $2,104.46 | Cost | Unknown |
| 41.6 | | VTI Security  Security System (Remainder) | $492.12 | Cost | Unknown |
| 41.7 | | Capital Business System Printer&Staple Finisher for CS Team | $419.10 | Cost | Unknown |
| 41.8 | | Dell Business Credit  Laptop | $183.76 | Cost | Unknown |
| 41.9 | | Apple Store IMAC 27" | $362.49 | Cost | Unknown |
| 41.10 | | Dell Business Credit  3-OptiPlex 9020M BTX | $550.94 | Cost | Unknown |
| 41.11 | | D2R Solutions Second Production shipping station | $724.46 | Cost | Unknown |
| 41.12 | | Amazon.com 80" television | $999.50 | Cost | Unknown |
| 41.13 | | Dell Business Credit  4-Dell UltraSharp 24 Monitor | $282.34 | Cost | Unknown |
| 41.14 | | Dell Business Credit  1-XPS 13 (9350) | $390.41 | Cost | Unknown |
| 41.15 | | B&H PHOTO Audio Equipment | $1,454.48 | Cost | Unknown |
| 41.16 | | Dell Business Credit  2-Dell Precision Tower 5810 XCTO Base | $1,225.56 | Cost | Unknown |
| 41.17 | | Dell Business Credit   Computer and monitor | $1,437.69 | Cost | Unknown |
| 41.18 | | Apple Online Computer and monitor | $911.72 | Cost | Unknown |
| 41.19 | | D2R Solutions   Port expansion for IT room | $846.49 | Cost | Unknown |
| 41.20 | | D2R Solutions   Additional Cabling & Installation for IT room | $2,259.16 | Cost | Unknown |
| 41.21 | | Dell Business Credit   Computer | $594.78 | Cost | Unknown |
| 41.22 | | Epicor  UCC/128 Processing | $1,448.33 | Cost | Unknown |
| 41.23 | | Dell Business Credit   Monitors | $711.79 | Cost | Unknown |
| 41.24 | | D2R Solutions  Tablet and cordless imager | $908.73 | Cost | Unknown |
| 41.25 | | Aspen Laser & Technology  Kyocera 4200 Printer - Shipping Station | $426.91 | Cost | Unknown |
| 41.26 | | Dell Business Credit   Computer and monitors | $3,389.50 | Cost | Unknown |
| 41.27 | | Dell Business Credit   Computer and monitors | $2,524.75 | Cost | Unknown |
| 41.28 | | Dell Business Credit   Computer and monitors | $753.92 | Cost | Unknown |
| 41.29 | | Dell Business Credit   Computer and monitors | $2,394.52 | Cost | Unknown |
| 41.30 | | D2R Solutions HP Expansion Module | $1,874.20 | Cost | Unknown |

**SCHEDULE B.50 ATTACHMENT**

| | | General Description | NBV | Valuation Method | Current Value of Debtors Interest |
|---|---|---|---|---|---|
| 50 | Other Machinery, Fixtures, Equipment | | | | |
| 50.10 | | Fork Lift #1 Crown Lift Trucks | $0.00 | Cost | Unknown |
| 50.11 | | Fork Lift #2 Crown Lift Trucks | $0.00 | Cost | Unknown |
| 50.12 | | Steel Dockboard Dockboard to unload/load | $69.79 | Cost | Unknown |
| 50.13 | | Standing Fork Lift Crown Lift Trucks | $3,338.88 | Cost | Unknown |
| 50.14 | | Wire Racks Wire Racks | $110.66 | Cost | Unknown |
| 50.15 | | Rack Sytem Rack System(Downpayment) | $4,046.40 | Cost | Unknown |
| 50.16 | | Rack System Rack System (60% downpayment) | $8,092.81 | Cost | Unknown |
| 50.17 | | Rack System Rack System (remainder) | $2,251.21 | Cost | Unknown |
| 50.18 | | Forklift Charger Crown Lift Trucks | $195.48 | Cost | Unknown |
| 50.19 | | Rider Scrubber Battery-Powered Rider Scrubber | $5,211.44 | Cost | Unknown |
| 50.20 | | Wrapper Machine Victory Packaging | $2,129.42 | Cost | Unknown |
| 50.21 | | 4-Wheel Sit Down Counterbalance Warehouse Equipment | $6,293.66 | Cost | Unknown |
| 50.22 | | Fork Lift Charger 3 Phase 480 AC Input Charger | $677.15 | Cost | Unknown |
| 50.23 | | Jamco Products Inc BS90 Flammable Locker | $232.80 | Cost | Unknown |
| 50.24 | | RF Scanner Custom Hardware | $1,506.84 | Cost | Unknown |
| 50.25 | | RF Scanner Spare battery, holster, cradle | $295.94 | Cost | Unknown |
| 50.26 | | Crown Lift Trucks Rack System (30% downpayment) | $7,182.50 | Cost | Unknown |
| 50.27 | | Biometric Clock Warehouse Time Clock | $531.87 | Cost | Unknown |
| 50.28 | | Selective Rack Rack from Crown Lift | $19,174.73 | Cost | Unknown |
| 50.29 | | Air Compressor 7.5-HP 53-Gallon Rotary Screw Compressor | $1,772.40 | Cost | Unknown |
| 50.30 | | Fork Lift Forks Extended length forks | $366.77 | Cost | Unknown |
| 50.31 | | Permit  Permit for the rack system | $829.76 | Cost | Unknown |
| 50.32 | | Fridge Fridge In warehouse | $898.24 | Cost | Unknown |
| 50.33 | | Tools Warehouse tools | $940.10 | Cost | Unknown |
| 50.34 | | Scanner Guns Scanner, battery, and holster | $1,839.62 | Cost | Unknown |
| 50.35 | | Scissor Lift Above All Equipment | $7,595.24 | Cost | Unknown |
| 50.36 | | Fork Lift 4-Wheel Sit Down Counterbalance | $13,242.50 | Cost | Unknown |
| 50.37 | | Uline  Utility Carts | $628.61 | Cost | Unknown |
| 50.38 | | Uline Work Platforms | $2,055.95 | Cost | Unknown |
| 50.39 | | Victory Packaging Strap Tensioner Wrapper | $4,931.52 | Cost | Unknown |
| 50.40 | | Two Way Radio Two Way Radio | $672.57 | Cost | Unknown |
| 50.41 | | Crown Lift Trucks 84 Bays of Selective rack | $683.60 | Cost | Unknown |
| 50.42 | | Two Way Radio Two Way Radio | $521.18 | Cost | Unknown |
| 50.43 | | AED Super Store Defibrillator | $786.86 | Cost | Unknown |
| 50.44 | | Sheet metal working tools Klutch Deluxe Foot Shear & Klutch Plate Shear | $1,656.58 | Cost | Unknown |
| 50.45 | | Discount Two Way Radio Discount Two Way Radio | $735.02 | Cost | Unknown |
| 50.46 | | Pneumatic Tool Pnuematic Bander | $2,250.12 | Cost | Unknown |
| 50.47 | | Tractor Tractor | $17,387.18 | Cost | Unknown |
| 50.48 | | Crown Lift Trucks Fork Lift SP3520-30 | $23,950.57 | Cost | Unknown |
| 50.49 | | Barreto  Manufacturing Rototiller Model 1320 Serial #13019 | $2,118.26 | Cost | Unknown |
| 50.50 | | Vectrax Lathe Lathe | $3,381.55 | Cost | Unknown |
| 50.51 | | Sharp Mill/Acu-Rite Readout Mill | $4,800.82 | Cost | Unknown |
| 50.52 | | Welch Rack System | $62,847.38 | Cost | Unknown |
| 50.53 | | Miller Miller 350P Welder | $4,444.00 | | |
| 50.54 | | Lift Trucks Encore RR with Battery & Charger | $31,459.92 | | |
| 50.55 | | Sealed Air Insta Packer | $5,538.60 | | |
| 50.56 | | Arclight Dynamics, Cascade Steel Works Engineers' CNC Table | $16,118.97 | | |
| 50.57 | | Tooling - HK Chinabase Tooling from HK Chinabase | $5,043.42 | | |
| 50.58 | | Tooling - HK Chinabase Tooling from HK Chinabase | $707.14 | | |
| 50.59 | | Tooling - HK Chinabase Tooling from HK Chinabase | $4,533.33 | | |
| 50.60 | | Tooling  - Packaging Corp of America Tooling – Packaging Corp of America | $2,127.71 | | |
| 50.61 | | Tooling - Packaging Corp of America Tooling- Print Plates | $1,066.76 | | |
| 50.62 | | Tooling-  Packaging Corp of America Tooling- Cutting Die Bottom | $1,470.99 | | |
| 50.63 | | Tooling- Source One Tooling- Ice Auger cutterhead | $4,410.71 | | |
| 50.64 | | Tooling - HK Chinabase Tooling from HK Chinabase | $11,611.52 | | |
| 50.65 | | Tooling - Ningbo NGP Tooling - Clam Ice Auger | $30,586.11 | | |
| 50.66 | | Tooling - Agtec Tooling – Agtec Log Splitters | $4,880.95 | | |
| 50.67 | | Air Compressor 10-HP 120-Gallon Rotary Screw Compressor | $1,858.86 | | |
| 50.68 | | Lottman Oil 8000 Gallon Tank | $7,183.45 | | |
| 50.69 | | Conveyor Assembly Line Lynch Material Handling | $136,453.78 | | |
| 50.70 | | Conveyor Assembly Line Lynch Material-Rough Cut Assembly | $17,181.02 | | |
| 50.71 | | Conveyor Assembly Line Assembly Line Electrical Work | $24,417.46 | | |
| 50.72 | | Conveyor Assembly Line Crane & Runway System - RC line | $6,203.92 | | |

SCHEDULE B.60-61 ATTACHMENT

| | | | NBV | Valuation Method | Current Value of Debtors Interest |
|---|---|---|---|---|---|
| 60 | Patents, copyrights, trademarks, trade secrets | | | | |
| 60.10 | Log Splitters | US D681,701 | Unknown | Intangible | Unknown |
| 60.11 | Log Splitters | US D706,318 | Unknown | Intangible | Unknown |
| 60.12 | Log Splitters | US D706,319 | Unknown | Intangible | Unknown |
| 60.13 | Log Splitters | US D706,643 | Unknown | Intangible | Unknown |
| 60.14 | Log Splitters | US D789,997 | Unknown | Intangible | Unknown |
| 60.15 | Log Splitters | US 9,381,668 | Unknown | Intangible | Unknown |
| 60.16 | Log Splitters | US 10,011,040 | Unknown | Intangible | Unknown |
| 60.17 | Log Splitters | CA 150,322 | Unknown | Intangible | Unknown |
| 60.18 | Log Splitters | CA 156,312 | Unknown | Intangible | Unknown |
| 60.19 | Log Splitters | CA 156,313 | Unknown | Intangible | Unknown |
| 60.20 | Log Splitters | CA 156,314 | Unknown | Intangible | Unknown |
| 60.21 | Log Splitters | CA 165,016 | Unknown | Intangible | Unknown |
| 60.22 | Log Splitters | CA 2,850,939 | Unknown | Intangible | Unknown |
| 60.23 | Log Splitters | CN ZL2013300846643.5 | Unknown | Intangible | Unknown |
| 60.24 | Log Splitters | CN ZL201430116885.2 | Unknown | Intangible | Unknown |
| 60.25 | Log Splitters | CN ZL201430116993.X | Unknown | Intangible | Unknown |
| 60.26 | Log Splitters | CN ZL201430116886.7 | Unknown | Intangible | Unknown |
| 60.27 | Log Splitters | CN ZL201530400856.6 | Unknown | Intangible | Unknown |
| 60.28 | String Trimmers | US D757,121 | Unknown | Intangible | Unknown |
| 60.29 | String Trimmers | US 9,743,582 | Unknown | Intangible | Unknown |
| 60.30 | String Trimmers | CA 164,918 | Unknown | Intangible | Unknown |
| 60.31 | String Trimmers | CA 2,867,727 | Unknown | Intangible | Unknown |
| 60.32 | String Trimmers | CN ZL201530409190.8 | Unknown | Intangible | Unknown |
| 60.33 | Field and Brush Mowers | US D757,122 | Unknown | Intangible | Unknown |
| 60.34 | Field and Brush Mowers | CA 165,015 | Unknown | Intangible | Unknown |
| 60.35 | Field and Brush Mowers | CN ZL201530420520.3 | Unknown | Intangible | Unknown |
| 60.36 | Equipment Shipping | US 10,023,093 | Unknown | Intangible | Unknown |
| 60.37 | Equipment Shipping | US 10,086,741 | Unknown | Intangible | Unknown |
| 60.38 | Equipment Shipping | US 10,118,531 | Unknown | Intangible | Unknown |
| 60.39 | Frictionless World® | | Unknown | Intangible | Unknown |
| 60.40 | Dirty Hand Tools® | | Unknown | Intangible | Unknown |
| 60.41 | Ranchex® | | Unknown | Intangible | Unknown |
| 60.42 | Trophy Strike® | | Unknown | Intangible | Unknown |
| 60.43 | Vinsetta Tools® | | Unknown | Intangible | Unknown |
| 60.44 | Redback® | | Unknown | Intangible | Unknown |
| 61 | Internet Domain Names and Websites | | | | |
| 61.10 | clamwarranty.com | | Unknown | Intangible | Unknown |
| 61.11 | DIRTYHANDTOOL.COM | | Unknown | Intangible | Unknown |
| 61.12 | DIRTYHANDTOOLS.COM | | Unknown | Intangible | Unknown |
| 61.13 | DIRTYHANDTOOLS.NET | | Unknown | Intangible | Unknown |
| 61.14 | FRICTIONLESSWORLD.COM | | Unknown | Intangible | Unknown |
| 61.15 | RANCHEX.COM | | Unknown | Intangible | Unknown |
| 61.16 | RANCHEXPARTS.COM | | Unknown | Intangible | Unknown |
| 61.17 | RANCHEXPRODUCTS.COM | | Unknown | Intangible | Unknown |
| 61.18 | redback-power.com | | Unknown | Intangible | Unknown |
| 61.19 | redback120v.com | | Unknown | Intangible | Unknown |
| 61.20 | redback40v.com | | Unknown | Intangible | Unknown |
| 61.21 | redbackpower.us | | Unknown | Intangible | Unknown |
| 61.22 | redbackpowerna.com | | Unknown | Intangible | Unknown |
| 61.23 | redbackpowerusa.com | | Unknown | Intangible | Unknown |
| 61.24 | redbackpro.com | | Unknown | Intangible | Unknown |
| 61.25 | trophystrike.com | | Unknown | Intangible | Unknown |
| 61.26 | vinsettaequipment.com | | Unknown | Intangible | Unknown |
| 61.27 | vinsettapowertools.com | | Unknown | Intangible | Unknown |
| 61.28 | vinsettatools.com | | Unknown | Intangible | Unknown |

| Fill in this information to identify the case: |
| --- |

Debtor name    **Frictionless World, LLC**

United States Bankruptcy Court for the:   DISTRICT OF COLORADO

Case number (if known)   _____

☐ Check if this is an
   amended filing

Official Form 206D
## Schedule D: Creditors Who Have Claims Secured by Property                    12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

   ■ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

   ☐ Yes. Fill in all of the information below.

**Fill in this information to identify the case:**

Debtor name    **Frictionless World, LLC**

United States Bankruptcy Court for the:   DISTRICT OF COLORADO

Case number (if known)   _____

☐ Check if this is an amended filing

## Official Form 206E/F
## Schedule E/F: Creditors Who Have Unsecured Claims     12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

| **Part 1:** | **List All Creditors with PRIORITY Unsecured Claims** |
| --- | --- |

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

   ☐ No. Go to Part 2.

   ■ Yes. Go to line 2.

2. List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part. If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  |  | Total claim | Priority amount |
| --- | --- | --- | --- |
| **2.1** | Priority creditor's name and mailing address<br>**Colorado Department Of Revenue**<br>**Tax Audit Compliance Div.**<br>**1375 Sherman St**<br>**Denver, CO 80203-2246** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $0.00 | $0.00 |
|  | Date or dates debt was incurred | Basis for the claim:<br>**Notice Purposes Only** | | |
|  | Last 4 digits of account number<br>Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (_8_) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |
| **2.2** | Priority creditor's name and mailing address<br>**Internal Revenue Service**<br>**1999 Broadway**<br>**MS 5012 DEN**<br>**Denver, CO 80202** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $0.00 | $0.00 |
|  | Date or dates debt was incurred | Basis for the claim:<br>**Notice Purposes Only** | | |
|  | Last 4 digits of account number<br>Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (_8_) | Is the claim subject to offset?<br>■ No<br>☐ Yes | | |

| Debtor | **Frictionless World, LLC** | Case number (if known) | |
|--------|------|------|------|
| | Name | | |

| 2.3 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $25,000.00 | $13,650.00 |
|-----|------|------|------|------|
| | **Kenneth Wilmes**<br>**1388 Mt. Moriah Road**<br>**Livermore, CO 80536** | Check all that apply.<br>■ Contingent<br>■ Unliquidated<br>■ Disputed | | |
| | Date or dates debt was incurred | Basis for the claim:<br>**Disputed severance** | | |
| | Last 4 digits of account number | Is the claim subject to offset? | | |
| | Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (4) | ■ No<br>☐ Yes | | |

---

**Part 2:**   **List All Creditors with NONPRIORITY Unsecured Claims**

3.  List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

| | | Amount of claim |
|---|---|---|

| 3.1 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $338,553.00 |
|-----|------|------|------|
| | **Agtec Industries Pvt Ltd**<br>**38-B, Udyog Vihar, Ecotech -II**<br>**Greater Noida, U.P. 201306**<br>**India** | ■ Contingent<br>☐ Unliquidated<br>■ Disputed | |
| | Date(s) debt was incurred _ | Basis for the claim:  **Trade debt** | |
| | Last 4 digits of account number _ | Is the claim subject to offset?  ■ No  ☐ Yes | |

| 3.2 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $110,563.04 |
|-----|------|------|------|
| | **Atlas Denver Industrial, LP**<br>**12001 N. Central Expressway, Suite 875**<br>**Dallas, TX 75243** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred  **9/2019** | Basis for the claim:  **Breach of contract -commercial office lease agreement** | |
| | Last 4 digits of account number _ | Is the claim subject to offset?  ■ No  ☐ Yes | |

| 3.3 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $13,387.50 |
|-----|------|------|------|
| | **Bluesea Trailer Parts Co Ltd**<br>**Poli Huangdo**<br>**Qingdao China** | ■ Contingent<br>■ Unliquidated<br>■ Disputed | |
| | Date(s) debt was incurred _ | Basis for the claim:  **Trade debt** | |
| | Last 4 digits of account number _ | Is the claim subject to offset?  ■ No  ☐ Yes | |

| 3.4 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $16,500.00 |
|-----|------|------|------|
| | **Changzhou Henghao Special Alloy Co., Ltd**<br>**No. 5-2, West Taihu Road**<br>**Xinbei District**<br>**Changzhou City JS**<br>**China** | ■ Contingent<br>■ Unliquidated<br>■ Disputed | |
| | Date(s) debt was incurred _ | Basis for the claim:  **Trade debt** | |
| | Last 4 digits of account number _ | Is the claim subject to offset?  ■ No  ☐ Yes | |

| 3.5 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | $520,000.00 |
|-----|------|------|------|
| | **Dan Banjo**<br>**2807 Jay Road**<br>**Boulder, CO 80301** | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | |
| | Date(s) debt was incurred _ | Basis for the claim:  **Rent** | |
| | Last 4 digits of account number _ | Is the claim subject to offset?  ■ No  ☐ Yes | |

---

| Debtor | Frictionless World, LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

| 3.6 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $12,645,740.62 |
|---|---|---|---|

**Frictionless LLC**
Room 608, Caifu Guangchang,
Yanzheng Middle Rd
Wujin District, Changzhou 213000
CHINA

- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim: __

Date(s) debt was incurred __
Last 4 digits of account number __

Is the claim subject to offset? □ No ■ Yes

---

| 3.7 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $6,864.00 |
|---|---|---|---|

**Hong Kong Chinabase Intl. Grp.**
4th Floor, B Block, Jianhua Indst. Park
No 207-208 Qi Gu Deng
Shou Shandong Road, Hangzhou
China

- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim:  **Trade debt**

Date(s) debt was incurred __
Last 4 digits of account number __

Is the claim subject to offset? ■ No □ Yes

---

| 3.8 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $1,386,720.00 |
|---|---|---|---|

**Intradin Machinery Co [Huzhou]**
No. 118 Dohui Road
Minhang District
Shanghai 201109
China

- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim:  **Trade debt**

Date(s) debt was incurred __
Last 4 digits of account number __

Is the claim subject to offset? ■ No □ Yes

---

| 3.9 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $964,243.94 |
|---|---|---|---|

**Ningbo NGP Industry Co., Ltd.**
No. 88, Lane 666 Jinshan Road
Czone Jianbei Investment Center
Ningbo
China

- □ Contingent
- □ Unliquidated
- □ Disputed

Basis for the claim:  **Trade debt**

Date(s) debt was incurred __
Last 4 digits of account number __

Is the claim subject to offset? ■ No □ Yes

---

| 3.10 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $20,496.00 |
|---|---|---|---|

**Sinotub Industry Co Ltd**
D-802 Pufa Plaza
1759 North Zhongshan Road
Shanghai
China

- ■ Contingent
- ■ Unliquidated
- ■ Disputed

Basis for the claim:  **Trade debt**

Date(s) debt was incurred __
Last 4 digits of account number __

Is the claim subject to offset? ■ No □ Yes

---

| 3.11 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | $12,690.00 |
|---|---|---|---|

**Syndigo**
833 E. South St.
Stoughton, WI 53589

- □ Contingent
- □ Unliquidated
- □ Disputed

Basis for the claim:  **Trade debt**

Date(s) debt was incurred __
Last 4 digits of account number __

Is the claim subject to offset? ■ No □ Yes

---

| Debtor | **Frictionless World, LLC** | Case number (if known) | |
|---|---|---|---|
| | Name | | |

---

**3.12** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$1,119,369.50**

**Tiya International Co Ltd**
**B12B Shenye Center**
**9 Shangdong Rd**
**Qingdao 266071**
**China**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Basis for the claim: __Trade debt__

Last 4 digits of account number __

Is the claim subject to offset? ■ No ☐ Yes

---

**3.13** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$37,170.00**

**Yongkang Legend Garden Machinery**
**Factory**
**No. 501 Xita Road**
**Chengxi Industrial Zone**
**Yongkang City, Zhejiang Prov.**
**China**

■ Contingent
■ Unliquidated
■ Disputed

Date(s) debt was incurred __

Basis for the claim: __Trade debt__

Last 4 digits of account number __

Is the claim subject to offset? ■ No ☐ Yes

---

**3.14** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **Unknown**

**Z.L. Investment**

**Room 102, No. 18 Xin Ya Road**
**Wujin High-Tech District, Changzhou City**
**Jiangsu Province, China**

■ Contingent
■ Unliquidated
■ Disputed

Date(s) debt was incurred __

Basis for the claim: __Contested litigation claims against Debtor__

Last 4 digits of account number __

Is the claim subject to offset? ☐ No ☐ Yes

---

**3.15** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: Check all that apply. | **$147,244.76**

**Zhejiang Kc Mechanical & Electrical**
**No. 299 East Huaxi Road**
**Gushan Yongkang**
**Zhejiang**
**China**

■ Contingent
■ Unliquidated
■ Disputed

Date(s) debt was incurred __

Basis for the claim: __Trade debt__

Last 4 digits of account number __

Is the claim subject to offset? ■ No ☐ Yes

---

| **Part 3:** | **List Others to Be Notified About Unsecured Claims** |
|---|---|

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.

| | Name and mailing address | On which line in Part1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|---|
| 4.1 | **Brian D. Koosed**<br>**K&L Gates LLP**<br>**1601 K Street, NW**<br>**Washington, DC 20006** | Line __3.14__<br><br>☐ Not listed. Explain ____ | __ |
| 4.2 | **Kodey M. Haddox**<br>**K&L Gates LLP**<br>**599 Lexington Avenue**<br>**New York, NY 10022** | Line __3.14__<br><br>☐ Not listed. Explain ____ | __ |
| 4.3 | **Nathan G. Osborn**<br>**Montgomery, Little & Soran PC**<br>**5445 DTC Pkwy, Suite 800**<br>**Englewood, CO 80111** | Line __3.2__<br><br>☐ Not listed. Explain ____ | __ |

---

Debtor  **Frictionless World, LLC**                                             Case number (if known) _____
_____
Name

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |

**5. Add the amounts of priority and nonpriority unsecured claims.**

| | | Total of claim amounts |
|---|---|---|
| **5a. Total claims from Part 1** | 5a. | $ 25,000.00 |
| **5b. Total claims from Part 2** | 5b.  +  $ | 17,339,542.36 |
| **5c. Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | 5c. | $ 17,364,542.36 |

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **Frictionless World, LLC** |
| United States Bankruptcy Court for the: | DISTRICT OF COLORADO |
| Case number (if known) | |

☐ Check if this is an
amended filing

## Official Form 206G
## Schedule G: Executory Contracts and Unexpired Leases                    12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, number the entries consecutively.

1.  **Does the debtor have any executory contracts or unexpired leases?**
    ☐ No. Check this box and file this form with the debtor's other schedules.  There is nothing else to report on this form.
    ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B: Assets - Real and Personal      Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|

| | | |
|---|---|---|
| 2.1. | State what the contract or lease is for and the nature of the debtor's interest | **Facility lease of 1100 West 120th Ave., Suite 600, Westminster, CO 80234** |
| | State the term remaining | **29.5 months** |
| | List the contract number of any government contract | |

**Cedar Ridge Property Management
12001 N. Central Expressway, Suite 875
Dallas, TX 75243**

| | | |
|---|---|---|
| 2.2. | State what the contract or lease is for and the nature of the debtor's interest | **License Agreement** |
| | State the term remaining | **30 months** |
| | List the contract number of any government contract | |

**Clam Corporation
12135 Brockton Lane N
Rogers, MN 55374**

| | | |
|---|---|---|
| 2.3. | State what the contract or lease is for and the nature of the debtor's interest | **Lease of warehouse space** |
| | State the term remaining | **23 months** |
| | List the contract number of any government contract | |

**Dan Banjo
2807 Jay Road
Boulder, CO 80301**

| | | |
|---|---|---|
| 2.4. | State what the contract or lease is for and the nature of the debtor's interest | **Lease of Sharp multi-function printer Contract no. 100-3647138-001** |
| | State the term remaining | **23 months** |
| | List the contract number of any government contract | |

**Leaf Services
PO Box 5066
Hartford, CT 06115**

Debtor 1   **Frictionless World, LLC**_____          Case number *(if known)* _____
          First Name      Middle Name      Last Name

▮ **Additional Page if You Have More Contracts or Leases**

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|

| 2.5. | State what the contract or lease is for and the nature of the debtor's interest | **Lease of Ice Machine** | |
|---|---|---|---|
| | State the term remaining | **13 months** | **Pure Water Dynamics** |
| | List the contract number of any government contract | _____ | **30 Kalamath Street** **Denver, CO 80223** |

| 2.6. | State what the contract or lease is for and the nature of the debtor's interest | **License Agreement** | |
|---|---|---|---|
| | State the term remaining | **15 months** | **Stanley Black & Decker, Inc.** |
| | List the contract number of any government contract | _____ | **1000 Stanley Drive** **New Britain, CT 06053** |

| Fill in this information to identify the case: |
|---|

Debtor name    **Frictionless World, LLC**

United States Bankruptcy Court for the:    DISTRICT OF COLORADO

Case number (if known)  _____

☐ Check if this is an
amended filing

## Official Form 206H
## Schedule H: Your Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

**1. Do you have any codebtors?**

☐ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

■ Yes

**2. In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, Schedules D-G.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: Codebtor | | Column 2: Creditor | |
|---|---|---|---|
| Name | Mailing Address | Name | Check all schedules that apply: |
| 2.1   **Dan Banjo** | | **Z.L. Investment** | ☐ D _____<br>■ E/F ___3.14___<br>☐ G _____ |

| Fill in this information to identify the case: | |
|---|---|
| Debtor name **Frictionless World, LLC** | |
| United States Bankruptcy Court for the: DISTRICT OF COLORADO | |
| Case number (if known) | ☐ Check if this is an amended filing |

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors   12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ■ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ■ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ■ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ■ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ■ *Schedule H: Codebtors* (Official Form 206H)
- ■ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐ Amended *Schedule*
- ■ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☐ Other document that requires a declaration

I declare under penalty of perjury that the foregoing is true and correct.

Executed on **September 30, 2019**      X **/s/ Daniel Banjo**
                                          Signature of individual signing on behalf of debtor

                                          **Daniel Banjo**
                                          Printed name

                                          **Chief Executive Officer**
                                          Position or relationship to debtor

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com                                        Best Case Bankruptcy

# United States Bankruptcy Court
## District of Colorado

In re   **Frictionless World, LLC**

Debtor(s)

Case No. 

Chapter   **11**

# VERIFICATION OF CREDITOR MATRIX

I, the Chief Executive Officer of the corporation named as the debtor in this case, hereby verify that the attached list of creditors is true and correct to the best of my knowledge.

Date:   **September 30, 2019**

**/s/ Daniel Banjo**
**Daniel Banjo/Chief Executive Officer**
Signer/Title

# Exhibit 6

## TERM LOAN AGREEMENT

**February 1, 2019**

**PARTIES:**

LENDER:        Frictionless, LLC
1100 W 120th Ave, Ste 600
Westminster, CO  80234

BORROWER:     Frictionless World, LLC
1100 W 120th Ave, Ste 600
Westminster, CO  80234

**AGREEMENT:**

Frictionless LLC (Lender) agrees to assign its inventory value of $6,611,227 USD as of January 31, 2019 to Frictionless World LLC (Borrower). In return, Frictionless World LLC agrees to pay for the inventory value through a long-term loan. The terms are set forth in the agreement below.

This Agreement sets out the terms on which the Lender has agreed to provide to the Borrower the loan facility as described below.

1.     **FACILITY AMOUNT**: $6,510,122 USD

2.     **EFFECTIVE DATE**: February 1, 2019

3.     **MATURITY DATE**: January 31, 2039

4.     **REPAYMENT AMOUNT**: Monthly repayments of $24,063

5.     **INTEREST RATE**: 2% per annum for the first 11 months, increasing to 4% per annum for the remaining term of the loan.

6.     **INTEREST PERIODS**: Monthly periods ending on last day of each month

7.     **PAYMENT OF PRINCIPLE AND INTEREST**: Due the first day of the month. Grace period is 15 days subject to an additional late payment fee of $100.00.

8.     **EARLY REPAYMENT**: Permitted without penalty at any time in whole or in part.

9.     **SECURITIZATION**: The loan amount is not secured by the value of the inventory.

10.   **SPECIAL TERMS**: None

Exhibit
44

## TERM LOAN AGREEMENT

**11.    AGREEMENT FOR BANK RELEASE FROM ZL INVESTMENTS:**



Agreement for bank release

**12.    ENTIRE AGREEMENT:** This Agreement, together with the Standard Terms referred to above, constitutes the whole agreement in respect of the loan facilities referred to above.

**SIGNATURES:**

**(1) Signed for and on behalf of the LENDER**

Daniel Banjo                                    Date        2/1/19
Managing General Partner
Frictionless, LLC

**(2) Signed for and on behalf of the BORROWER**

Daniel Banjo                                    Date        2/1/19
President
Frictionless World, LLC

2

# Exhibit 7

| | |
|---|---|
| **From:** | J. Brian Johns, LL.M. |
| **To:** | Koosed, Brian D.; thoward@thowardlaw.com; Haddox, Kodey M.; Meyers, Deborah; wcgroh@thowardlaw.com |
| **Subject:** | RE: Changzhou Zhong Lian Investment Co. Ltd. v. Daniel Banjo, individually; - Case 01-19-0001-1748 |
| **Date:** | Monday, May 13, 2019 11:36:47 AM |
| **Attachments:** | image001.png |
| | image083d95.PNG |

**External Sender:**

Dear Counsel,

Thank you for your confirmation. We will update the case file accordingly.

Sincerely,

J. Brian Johns, LL.M.

 **J. Brian Johns, LL.M.**
**Director**
International Centre for Dispute Resolution
American Arbitration Association
120 Broadway, 21st Floor
New York, NY 10271
www.icdr.org
T: 212 484 3262
F: 212 246 7274



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

**From:** Koosed, Brian D. <Brian.Koosed@klgates.com>
**Sent:** Monday, May 13, 2019 10:55 AM
**To:** J. Brian Johns, LL.M. <JohnsJ@adr.org>; thoward@thowardlaw.com; Haddox, Kodey M. <Kodey.Haddox@klgates.com>; Meyers, Deborah <Deborah.Meyers@klgates.com>; wcgroh@thowardlaw.com
**Subject:** RE: Changzhou Zhong Lian Investment Co. Ltd. v. Daniel Banjo, individually; - Case 01-19-0001-1748

**\*\*\* External E-Mail – Use Caution \*\*\***

Mr. Johns,

K&L Gates LLP (Mr. Haddox and I) will be representing Counterclaim Respondents Li Zhixiang; Z.L. Investment; and Changzhou Inter Universal Machine & Equipment Co., Ltd. ("CIU") in this matter. There is no need to resend the correspondence to us on behalf of Counterclaim Respondents.

Additionally, as I have advised Mr. Howard via email, CIU has accepted Respondent Frictionless World LLC's proposal that CIU and Frictionless World LLC jointly consent to arbitration before the AAA.

Please let me know if you have any questions. Thank you.

BDK

**From:** JohnsJ@adr.org [mailto:JohnsJ@adr.org]
**Sent:** Monday, May 13, 2019 10:50 AM
**To:** thoward@thowardlaw.com; Haddox, Kodey M.; Meyers, Deborah; Koosed, Brian D.; wcgroh@thowardlaw.com
**Subject:** Changzhou Zhong Lian Investment Co. Ltd. v. Daniel Banjo, individually; - Case 01-19-0001-1748

Hello,

Please review the attached correspondence regarding the above-referenced case.

Feel free to contact me with any questions, comments or concerns you have related to this matter.

Thank you.

 **J. Brian Johns, LL.M.**
**Director**
International Centre for Dispute Resolution
American Arbitration Association
120 Broadway, 21st Floor
New York, NY 10271
www.icdr.org
T: 212 484 3262
F: 212 246 7274



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Brian.Koosed@klgates.com.

# Exhibit 8

IN THE MATTER OF AN ARBITRATION UNDER THE COMMERCIAL RULES OF
THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| In the Matter of Arbitration Between: | : | |
| | : | |
| CHANGZHOU ZHONG LIAN INVESTMENT CO. LTD. (A/K/A Z.L. INVESTMENT), | : | |
| | : | |
| Claimant, | : | |
| | : | Case No. 01-19-0001-1748 |
| vs. | : | |
| | : | |
| DANIEL BANJO AND FRICTIONLESS WORLD LLC, | : | |
| | : | |
| Respondents, | : | |
| | : | |
| vs. | : | |
| | : | |
| LI ZHIXIANG, Z.L. INVESTMENT, AND CHANGZHOU INTER UNIVERSAL MACHINE & EQUIPMENT CO., LTD., | : | |
| | : | |
| Counterclaim and Third-Party Respondents. | : | |

---

**JOINT ANSWER OF THIRD-PARTY RESPONDENTS LI ZHIXIANG AND
CHANGZHOU INTER UNIVERSAL MACHINE & EQUIPMENT CO., LTD.,
AND REPLY OF CLAIMANT Z.L. INVESTMENT, TO RESPONDENTS'
COUNTERCLAIMS AND THIRD-PARTY CLAIMS**

---

June 10, 2019

**K&L GATES LLP**
Brian D. Koosed
1601 K Street, NW
Washington, D.C.  20006
*and*
Kodey M. Haddox
599 Lexington Avenue
New York, New York  10002

**Counsel for the Claimant and Third-Party Respondents**

## TABLE OF CONTENTS

Page

I.  GENERAL DENIALS, DEFENSES, AND RESERVATIONS OF RIGHTS .................... 1

II. CLAIMANT'S AND THIRD-PARTY RESPONDENTS' SPECIFIC
    RESPONSES TO PARTICULAR ALLEGATIONS IN RESPONDENTS'
    COUNTERCLAIMS ........................................................................................ 2

    A.  The Demand was Filed in Good Faith After Respondents Stonewalled
        Claimant's Well-Founded Efforts to Investigate the Company's Losses;
        Respondents' Claim to the Contrary is Completely Baseless .................... 2

    B.  Claimant and Third-Party Respondents Did Not Learn of Respondents'
        Fraudulent Scheme Until Late 2018 at the Earliest; Respondents' Claims
        Otherwise Are Wrong ............................................................................ 4

        1.  Respondents' Reliance on Email Addresses and Purchase Orders
            is Sorely Misplaced ...................................................................... 5

        2.  Respondents' Reliance on the Purported "Operating Plan" Allegedly
            Attached as Schedule B to the LLC Agreement Is Misplaced Because,
            as Respondents' Counsel was Repeatedly Advised, Neither Claimant
            Nor Third-Party Respondents Ever Saw or Received a Copy of that
            Purported "Operating Plan" ......................................................... 9

        3.  Respondents' Theory of the Case – That the Parties Always Intended
            World, not Frictionless, to Sell to the Retailers – Is At Odds With the
            Parties' Correspondence and Makes No Commercial Sense .................... 11

    C.  Respondents Effectively Concede Their Wrongdoing As to Frictionless'
        Payment of World's Expenses ................................................................ 14

III. CLAIMANT'S AND THIRD-PARTY RESPONDENTS' SPECIFIC RESPONSES
     TO RESPONDENTS' COUNTERCLAIMS AND THIRD-PARTY CLAIMS ............... 16

    A.  Specific Response to Respondents' First Claim:  Breach of Fiduciary Duty
        Against Mr. Li ...................................................................................... 17

    B.  Specific Response to Respondents' Second Claim:  Breach of Contract
        Against CIU and Mr. Li ......................................................................... 19

    C.  Specific Response to Respondents' Third Claim:  Breach of Contract
        Against Z.L. Investment, CIU, and Mr. Li ............................................... 21

1.      Pursuant to Rule 5 of the Commercial Rules,[1] Claimant Z.L. Investment, and
Third-Party Respondents Li Zhixiang ("**Mr. Li**") and Changzhou Inter Universal Machine &
Equipment Co., Ltd. ("**CIU**," together with Mr. Li, the "**Third-Party Respondents**"), hereby
submit their joint answer and reply (the "**Answer and Reply**") to the Response, Counterclaims,
and Third-Party Claims filed by Respondents Banjo and World in this arbitration on May 8, 2019
(the "**Counterclaims**").

## I.      GENERAL DENIALS, DEFENSES, AND RESERVATIONS OF RIGHTS

2.      Initially, Claimant Z.L. Investment and Third-Party Respondents CIU and Mr. Li
deny all of the allegations in Respondents' Counterclaims not specifically admitted in this
Answer and Reply.  To the extent that any particular allegations are not specifically denied in
this Answer and Reply, it should not be construed as an admission of such allegations.

3.      Claimant Z.L. Investment and Third-Party Respondents CIU and Mr. Li further
assert and incorporate by reference herein all applicable legal defenses that they now have, or
may in the future have, to any of the allegations or claims set forth in Respondents'
Counterclaims.  To the extent that any particular defense is not specifically cited in this Answer
and Reply, it should not be construed as a waiver of such defense.  All such defenses are
expressly preserved and shall be asserted at the appropriate time in this matter, whether via
dispositive motions or at the merits hearing.

4.      Finally, Z.L. Investment, CIU, and Mr. Li reserve all of their rights in this matter,
including the right to amend this Answer and Reply, to assert further or additional claims, to
make further submissions with respect to the merits, the facts and the law, and any other relevant

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the
Demand for Arbitration filed by Claimant Z.L. Investment in this matter on April 15, 2019 (the
"**Demand**").

matters, and to expand or vary their defenses to the claims asserted, and to the relief requested, by Respondents Banjo and World.

## II.    CLAIMANT'S AND THIRD-PARTY RESPONDENTS' SPECIFIC RESPONSES TO PARTICULAR ALLEGATIONS IN RESPONDENTS' COUNTERCLAIMS

5.    As noted above, Claimant and Third-Party Respondents do not intend to correct all of the misstatements, mischaracterizations, and/or outright inaccuracies reflected in Respondents' Counterclaims, all of which are denied. Instead, Z.L. Investment, CIU, and Mr. Li hereby rebut those specific misstatements, mischaracterizations, and inaccuracies that are, in their view, most critical to helping the arbitral panel understand the parties' business relationship, the reasons why Claimant was forced to initiate this arbitration, and the likely issues to be addressed at the hearing. Accordingly, and without admitting any matters asserted in Respondents' Counterclaims but not expressly addressed herein, Claimant Z.L. Investment and Third-Party Respondents CIU and Mr. Li hereby respond to particular allegations set forth in Respondents' Counterclaims, as follows:

### A.    The Demand was Filed in Good Faith After Respondents Stonewalled Claimant's Well-Founded Efforts to Investigate the Company's Losses; Respondents' Claim to the Contrary is Completely Baseless

6.    Initially, Claimant and Third-Party Respondents deny Respondents' baseless allegation that Claimant's Demand "was filed in a bad faith effort to head off [Respondents'] counterclaims." Counterclaims, ¶ 5. Nothing could be further from the truth. As the Demand makes clear, Z.L. Investment filed its Demand only after: (a) it discovered in late 2018/early 2019 that Banjo was using World to siphon off Frictionless' revenue and was passing World's expenses onto Frictionless; and (b) Banjo and his subordinates subsequently stonewalled Claimant's efforts to investigate why Frictionless was losing money or to otherwise determine how and to what extent Respondents' fraud had damaged the Company and Claimant.

- 2 -

7.      Specifically, and for the avoidance of doubt, upon learning of World's existence in November 2018, Claimant retained outside professionals, including an accounting firm, to assist Z.L. Investment in determining exactly why the Company and Claimant had lost money, and how much.   Indeed, as detailed in its Demand, Claimant invested over *$100,000* to investigate Frictionless' losses *before* the Demand was filed against Respondents.

8.      Despite this substantial outlay of funds, Claimant was unable to learn basic – and critical – information about the Company or its relationship with World during this investigation. Reason:   Banjo and his subordinates at World repeatedly refused to provide Claimant's accountants with that information.   Respondents did so even though Claimant was clearly entitled to such information, both under Colorado law (*see* C.R.S. § 7-80-408) and under the plain language of Section 10.3 of the LLC Agreement that Banjo himself signed.

9.      Respondents' stonewalling was initially successful.   For example, at no time before its Demand was filed was Claimant ever able to determine:   (a) how much of the Company's revenue Banjo had siphoned into World; or (b) how much of World's expenses Banjo had forced the Company to bear.

10.      Respondents continued to stonewall Claimant's and its accountants' efforts to elicit this kind of information for *months*.   Only then – after it became abundantly clear that Banjo and World would never voluntarily disclose this information – did Claimant file its Demand.   Thus, contrary to Respondents' unfounded assertion, Claimant filed its Demand as an absolute *last resort* here.   And Claimant did so to stop Respondents' illegal stonewalling, and to recoup the monies that Respondents had usurped, not out of some absurd concern about Respondents' baseless claims, which Claimant had no knowledge of whatsoever until well after the Demand was filed and the deficiencies of which are detailed further below.

- 3 -

**B.**     **Claimant and Third-Party Respondents Did Not Learn of Respondents'
Fraudulent Scheme Until Late 2018 at the Earliest; Respondents' Claims
Otherwise Are Wrong**

11.     Contrary to Respondents' assertions in their Counterclaims, each of Z.L.

Investment, CIU, and Mr. Li stand by the allegations in Claimant's Demand and expressly deny

any and all contentions by Respondents that any of Z.L. Investment, CIU, and/or Mr. Li had

actual knowledge of World's existence before late 2018.

12.     Nor did any of Z.L. Investment, CIU, or Mr. Li have any actual knowledge, prior

to late 2018/early 2019, that Banjo intended to, and did, use World as a middleman between the

Company and the Retailers.  Nor, similarly, did Claimant or Third-Party Respondents have any

actual knowledge, before late 2018/early 2019, that Banjo would use Frictionless to pay for

World's expenses, whether or not those expenses were associated with the Company's brands or

business.

13.     Claimant and Third-Party Respondents expressly reaffirm and reallege that, at all

times from the execution of the LLC Agreement in April 2013 until at least late 2018, CIU sold

its products to Frictionless with the expectation that Frictionless would then sell those products

directly to the Retailers, and that Frictionless' profits would be divided between Z.L. Investment

and Banjo in accordance with their pro rata equity interest in the Company.

14.     In their Counterclaims, Respondents make several arguments in an effort to

portray World as a constant – and universally known – aspect of the Company's business.  Each

such argument is without merit, as Claimant and Third-Party Respondents will prove at the

hearing.  For present purposes, Z.L. Investment, CIU, and Mr. Li respond to the following

specific points on which Respondents' flawed theory rests, in order to aid the arbitral panel's

understanding of the history of the parties' business relationship, and to sharpen the issues for discovery and trial.

        1.    <u>Respondents' Reliance on Email Addresses and Purchase Orders is Sorely Misplaced</u>

15.    Respondents' initial claim – that Z.L. Investment, CIU, and Mr. Li knew of World's existence before the April 2013 execution of the Frictionless Agreements because Banjo used an "@frictionlessworld.com" email address, and because certain purchase orders sent to CIU before April 2013 used the term "Frictionless World" instead of simply "Frictionless" – is wrong and Respondents' reliance on these points is misplaced. *See, e.g.*, Counterclaims, ¶¶ 7, 9.

16.    At all times prior to November 2018, Claimant and Third-Party Respondents understood that "Frictionless World" was just a brand name for Frictionless and not itself a separate company. Indeed, ***every single one*** of the purchase orders that Respondents attached as Exhibits R-6 and R-8 to their Counterclaims used the term "Frictionless World," rather than identifying the existence of a separate company, "Frictionless World LLC." *See* Counterclaims Exs. R-6, R-8. Similarly, Banjo's email address and email signature lacked any notation signifying that "Frictionless World" was anything other than a brand name for the Company – Frictionless, LLC.

17.    This understanding is further evident from a sampling of Banjo's own interchangeable use of the names "Frictionless" and "Frictionless World," both before and after the Frictionless Agreements were signed on or about April 11, 2013.

18.    For example, on November 25, 2012, Banjo emailed an associate of Mr. Li and Z.L. Investment and provided an estimate of the profit that Frictionless and Mr. Li could expect to receive from the sale of one of CIU's log splitter products to the Retailers. In his own words, Mr. Banjo wrote:

| | |
|---|---|
| Mr Li's CIU actual cost for materials/labor/packaging | $504.66 |
| Frictionless World actual US cost for materials | $20.19 |
| Total | $524.86 |
| | |
| Mr Li's CIU quoted cost for materials/labor/packaging | $545.73 |
| Frictionless World actual US cost for materials | $20.19 |
| Shipping to the US per Unit | $74.50 |
| US tax and Duty for importation into USA | $13.10 |
| Total | $653.51 |
| | |
| Mr Li profit in China per Splitter | $41.06 |
| | |
| Sell to Frictionless | $545.73 |
| Frictionless pays shipping $65/splitter plus decals, etc | $107.79 |
| Frictionless sells to market | $743.00 |
| | |
| **Total profit on a splitter in USA** | **$89.49** |
| | |
| **Total profit per splitter USA + China** | **$130.55** |

*See* Claimant's Ex. C-5 (highlighted emphasis in original).

19.     Not only did Banjo use the terms "Frictionless World" and "Frictionless" interchangeably in his profit analysis for this particular product, Banjo's analysis specifically stated that "*Frictionless sells to market,*" which is directly contrary to the position he now takes in this arbitration that "[t]he Parties intended from the outset to conduct all sales and distribution of products through [] World." *Compare* Ex. C-5 (emphasis added), *with* Counterclaims, ¶ 8. Nowhere did Banjo state in either his November 25, 2012 email or his attached profit analysis that there would be a separate entity – World – acting as a middleman between Frictionless and the Retailers. *See* Ex. C-5. Nor did Banjo indicate in his analysis that Frictionless' profits would be shared with any separate entity, let alone one primarily owned by Banjo. *See id.*

20.     This is especially noteworthy because it is undisputed that Banjo had already formed World as of this time. *See* Counterclaims, ¶ 29 (noting World was created on May 14,

2012).  In other words, Banjo presumably could have identified World in his November 2012

correspondence with Mr. Li's associate as the "forward-facing company" selling to the Retailers,

as Respondents now allege was the parties' intent. *Id.* at ¶¶ 8, 29.  But, instead, Banjo nowhere

mentioned such an entity and instead referred to "Frictionless" and "Frictionless World"

interchangeably.

21.     This pattern – of Banjo referring to "Frictionless" and "Frictionless World" as two

different names for the same thing, including in his formal communications with the United

States government – repeated itself throughout the parties' negotiations leading up to the

execution of the Frictionless Agreements in April 2013 and thereafter.  Consider:

22.     March 12, 2013:  Banjo emailed associates of Mr. Li and Z.L. Investment a "5

Year Plan" PowerPoint presentation. *See* Claimant's Ex. C-6.  Contrary to the Counterclaims'

allegations and as further discussed below, this "5 Year Plan" PowerPoint was the ***only*** "business

plan" that Banjo ever provided to Z.L. Investment, CIU, and/or Mr. Li before the Frictionless

Agreements were signed. *See infra*, ¶¶ 29-33.  And here, again, Banjo used the terms

"Frictionless World" and "Frictionless" interchangeably.  Specifically, while the title page of the

"5 Year Plan" PowerPoint said "Frictionless World," the text of the PowerPoint itself discussed

throughout the projected revenues and strategy of "Frictionless." *See* Claimant's Ex. C-6, pp. 2-

6.   Again, nowhere was "Frictionless World LLC" mentioned, or was any separate entity

discussed as a middleman between Frictionless and the Retailers, or was there any notion that

Frictionless would be sharing its revenues, profits, or costs with any other affiliate or entity.

Instead, the language throughout was consistent with the understanding at the time of Z.L.

Investment, CIU, and Mr. Li that there was only one entity at issue here – the Company,

Frictionless, LLC.

- 7 -

23.     March 17, 2013:  Less than a week after sending his "5 Year Plan" PowerPoint,

Banjo emailed drafts of what would become the Frictionless Agreements for Mr. Li's review.

*See* Claimant's Ex. C-7.   In his email, Banjo explained why he had inserted the name

"Frictionless LLC" into the draft agreements, as follows:

> "Added the company name ***'Frictionless LLC'*** back into the
> agreement. This is important because ***we have substantial equity
> in <u>this</u> company name already. All of our customers have been
> informed that <u>this is the name of our entity</u>*** and have set up our
> business name in their systems.  Changing it now may cause
> damage to the trust we have developed with them . . . ."

*Id.* (emphasis added).

24.     Notably, again, Banjo's email mentioned nothing about "Frictionless World LLC"

or using that entity as a middleman between Frictionless and the Retailers.  Instead, according to

Banjo's own representations to Claimant and Third-Party Respondents as of mid-March 2013,

the Retailers had been informed that "***Frictionless LLC***" was the company's name, and the

Retailers were relying on that name in setting up their relationships with the company.  *See id.*

25.     November 24, 2014:  More than 18 months after the Frictionless Agreements

were signed, Banjo sent Mr. Li's daughter-in-law, Mingsu Li, a job offer to become Frictionless'

Vice President.  *See* Claimant's Ex. C-8, p. 6.  Banjo's letter to Ms. Li used the brand name and

logo "Frictionless World" on its letterhead, even though Respondents admit that at all times Ms.

Li was only an employee of Frictionless, not World.  *See* Counterclaims, ¶¶ 11, 38.

26.     January 12, 2015:  Banjo sent a letter to the U.S. government "in support of the

petition ***by Frictionless LLC***" for a visa for Ms. Li.  *See* Claimant's Ex. C-8, pp. 1-4 (emphasis

added).[2]  Again, Banjo's letter expressly used the brand name and logo "Frictionless World," but

only discussed Frictionless' business.  "Frictionless World LLC" is never mentioned.

27.     April 10, 2015:  Banjo sent a letter on behalf of Frictionless to the U.S. embassy

in Shanghai, China to help Mr. Li obtain a travel visa to the United States.  *See* Claimant's Ex.

C-9.  Yet again, that letter solely discussed the Company's business, but used the "Frictionless

World" brand name and logo.    The entity "Frictionless World LLC" is, again, nowhere

mentioned.

28.     These are just a few examples; more evidence will almost certainly be adduced

during discovery and presented by Claimant and Third-Party Respondents at the hearing.  Suffice

to say, however, that given these examples, it is not surprising that, for many years, Z.L.

Investment, CIU, and Mr. Li simply understood that "Frictionless World" was just another way

of referring to the Company in which Claimant had invested – Frictionless, LLC.  *See* Claimant's

Exs. C-5 – C-9.

> 2.     Respondents' Reliance on the Purported "Operating Plan" Allegedly
>         Attached as Schedule B to the LLC Agreement Is Misplaced Because, as
>         Respondents' Counsel was Repeatedly Advised, Neither Claimant Nor
>         Third-Party Respondents Ever Saw or Received a Copy of that Purported
>         "Operating Plan"

29.     Respondents stake much of their defense to Claimant's Demand on the purported

"Operating Plan" that Respondents attach as pages 29-43 of Exhibit R3 to their Counterclaims

(the **"Alleged Operating Plan"**).    Specifically, Respondents claim that:    (a) this Alleged

Operating Plan was intended to be attached to the LLC Agreement as "Schedule B" thereto; and

(b) Banjo presented this Alleged Operating Plan to Z.L. Investment and Mr. Li in person at an

---

[2]      Although this letter is dated "January 12, 2014," the surrounding documentation included with it
suggests that this letter was actually sent in January 2015, and that the "2014" date was merely a typo
common at the start of a new year.

April 2013 meeting in China held in conjunction with the signing of the Frictionless Agreements.
*See* Counterclaims, ¶¶ 33-35, 39.

30.     Initially, Claimant and Third-Party Respondents do not concede the authenticity
of the Alleged Operating Plan, or that it was created prior to the execution of the LLC
Agreement, and intend to test those facts during the discovery process and at the hearing.

31.     In any event, Respondents' reliance on the Alleged Operating Plan is misplaced
because, as Respondents' counsel was repeatedly advised before filing the Counterclaims,
Claimant and Third-Party Respondents *never* saw this "Operating Plan," and *never* received a
copy of it at any time before the Demand was filed.  In fact, on April 3, 2013, Banjo emailed Mr.
Li's associate the "final documents" to be executed to create the Company.  *See* Claimant's Ex.
C-10.  Neither that email, nor the "final" versions of the Frictionless Agreements attached to it,
included the Alleged Operating Plan that Banjo now purports was appended as Schedule B to the
LLC Agreement.  *See id.*[3]

32.     Moreover – and as Claimant and Third-Party Respondents will prove at the
hearing through documentary evidence and the testimony of Mr. Li, his associates, and
Claimant's then-counsel – the Alleged Operating Plan was *never* discussed with Banjo, or
presented to anyone associated with Z.L. Investment, CIU, or Mr. Li, at any 2013 meeting in
China or at any time thereafter until after the Demand was filed.  In fact, Mr. Banjo explicitly
told Z.L. Investment and Mr. Li in April 2013 that there was no need to review or discuss any
"Operating Plan" for Frictionless, because it was "not important."

---

[3]      A copy of this email establishing that Claimant never received a copy of the Alleged Operating
Plan before the Frictionless Agreements were signed or Claimant filed its Demand was provided to
Respondents' counsel on May 6, 2019, several days before Respondents filed their Counterclaims.
Respondents' statement in those Counterclaims – that Claimant attached an "incomplete" LLC
Agreement to its Demand and "provide[d] no explanation" for the "omission" – is thus disingenuous at
best.  *See* Counterclaims, ¶ 40.

33.    Of course, Claimant and Third-Party Respondents recognize that whether Banjo ever provided the Alleged Operating Plan to Claimant or Third-Party Respondents is a credibility issue that must be determined by the arbitral panel at the hearing in this matter.  Claimant and Third-Party Respondents look forward to offering evidence on that point and are confident that Banjo's belated efforts to explain away his misconduct – through the sudden appearance of this purported "Operating Plan" – will be rejected after all the evidence is heard.

      3.    <u>Respondents' Theory of the Case – That the Parties Always Intended World, not Frictionless, to Sell to the Retailers – Is At Odds With the Parties' Correspondence and Makes No Commercial Sense</u>

34.    In their Counterclaims, Respondents lay out their basic theory of the case by alleging, among other things, that:

    a.    CIU was selling its products directly to World before the Frictionless Agreements were signed.  *See* Counterclaims, ¶¶ 6, 34, 44.

    b.    "The goal of the [LLC] Agreement" – pursuant to which Banjo and Z.L. Investment created Frictionless – "was ***to help CIU, through [] World, broaden its sales bases in the U.S.***"  *Id.* at ¶ 8 (emphasis added).

    c.    "The Parties intended from the outset to conduct all sales and distribution of products through [] World . . . ."  *Id.*

    d.    World handled "all sales and marketing and act[ed] as the forward-facing company" with the Retailers because Claimant was concerned about forming a U.S. company and having to obtain insurance and credit, lease property, register the business, and hire employees.  *Id.* at ¶¶ 8, 11, 32, 36.

35.    As Claimant and Third-Party Respondents will prove during discovery and at the hearing, these allegations are internally inconsistent, cannot be squared with the parties' contemporaneous conduct or correspondence on these issues, and lack basic commercial logic. A few examples suffice to illustrate these points at this time.

- 11 -

36.   *First*, Respondents simultaneously claim that:   (a) CIU was already selling its products to World before the Frictionless Agreements were signed in April 2013; and (b) the parties nevertheless needed to sign those Agreements, and thereby form Frictionless, to further the "goal" of "help[ing] CIU . . . broaden its sales base in the U.S." Counterclaims, ¶¶ 6, 8, 34-35. But these allegations are inconsistent with one another: if CIU was already selling directly to a U.S.-based company, World, then why did the parties need to do anything – let alone form a separate company, Frictionless – to help CIU "broaden its sales" in the U.S.? *Id.* at ¶ 35. According to Respondents' own theory, that "goal" was already being served by CIU's direct sales to World.

37.   Moreover, Respondents' theory makes no commercial sense.   At bottom, Respondents allege that World was always intended to be the "forward-facing company" doing business with the Retailers because Z.L. Investment and Mr. Li were concerned that, if they formed their own LLC in the United States, that LLC would not be able to obtain insurance or credit, lease property, register the business, hire employees, or build a sales force. *See* Counterclaims, ¶¶ 8, 11, 32, 36. But if, as Respondents contend, any such company primarily owned by Z.L. Investment would be unable to perform these essential functions and all business would have to be run through World, then why was there any need to form Frictionless at all? Again, CIU could have simply continued selling its products directly to World, as Respondents allege was already occurring before the Frictionless Agreements were signed.[4]

---

[4]   In subsequent correspondence since the Counterclaims were filed, Respondents' counsel has essentially confirmed that Respondents' position here is that Claimant and Mr. Li agreed to set up a U.S. company, Frictionless, so that it could perform no standard business functions and, instead, simply pay for all such expenses on behalf of World. It should go without saying that such a theory makes no sense whatsoever, from a commercial standpoint or otherwise, and was not what Claimant or Mr. Li understood or agreed to in entering into the Frictionless Agreements, as they will establish at the hearing.

38.    *Second*, Respondents' allegations are at odds with the parties' contemporaneous conduct and correspondence on these issues.  In addition to those already discussed above, consider the following additional pieces of evidence identified to date:

39.    April 2, 2012:  Z.L. Investment and Mr. Li began investing in a potential joint venture with Banjo, more than a year before the Frictionless Agreements were signed.  *See* Claimant's Ex. C-11, p. 4 (showing funds transferred to Banjo in early April 2012).

40.    May 14, 2012:  One month after these investments started, Banjo formed World, unbeknownst to Z.L. Investment, CIU, or Mr. Li.  *See* Counterclaims, ¶ 29.

41.    June 1, 2012:  Two weeks after Banjo formed World, Banjo emailed Mr. Li's associate a PowerPoint detailing the proposed joint venture between Banjo and Z.L. Investment. *See* Claimant's Ex. C-12.  Although its metadata apparently did so, the text of this PowerPoint nowhere referred to "Frictionless World LLC" or even to Frictionless.  *See id.*  Instead, the PowerPoint named the joint venture between Banjo and Z.L. Investment as "Irva Tool," apparently because Banjo had incorporated a separate Colorado limited liability company, Irva LLC, in January 2011, while he was still employed by SpeeCo.  *See id.*; Counterclaims, ¶ 26.

42.    Despite having already formed two LLCs – Irva and World – as of the date of this June 2012 email, Banjo's PowerPoint proposal mentioned neither LLC, even though, according to Respondents, World was "intended from the outset" to conduct all business for Banjo's joint venture with Z.L. Investment.  *Compare* Claimant's Ex. C-12, *with* Counterclaims, ¶¶ 8, 35. Instead, Banjo's proposal for "Irva Tool" simply indicated, under the heading "Company Structure," that "an international business lawyer . . . will create an entity" for the joint venture, and that this new entity "will be a US based company and Mr. Li will be the primary owner," unlike World and Irva.  *See* Claimant's Ex. C-12, p. 22.

- 13 -

43.     April 11, 2013:  Banjo, Z.L. Investment, and Mr. Li executed the Frictionless

Agreements.  Despite Respondents' current theory that the "goal" and "entire purpose" of the

LLC Agreement was to sell products through World, World is nowhere mentioned in the LLC

Agreement's text or in any of the drafts of that Agreement previously circulated and discussed

above (*supra*, ¶¶ 23-24, 31).[5]  *See* Counterclaims, ¶¶ 8, 12, 35.

44.     In sum, if Respondents' theory – that the parties "intended from the outset" to use

World as the "forward-facing company" for the joint venture – were supported by the evidence,

one would expect that, at some point in the year-long process of forming Frictionless, there

would have been an explicit mention, or at least some basic discussion, of using World in that

manner.  *See* Counterclaims, ¶¶ 8, 32, 35-36.  Neither the parties' contemporaneous conduct nor

their contemporaneous correspondence reviewed to date suggests anything of the sort, however.

45.     For all these reasons, and others that Claimant and Third-Party Respondents

intend to explore during discovery and present at the hearing, Respondents' apparent theory of

the case – that Frictionless was formed to essentially do nothing, while simultaneously paying

for World to conduct all business with the Retailers – is without merit.

### C.     Respondents Effectively Concede Their Wrongdoing As to Frictionless' Payment of World's Expenses

46.     Throughout its Demand, Z.L. Investment alleged that, as part of their fraudulent

scheme, Respondents caused Frictionless to pay for all of World's expenses, whether or not

those expenses related to the Company's brands – such as "Dirty Hand Tools" and "RanchEx" –

or to World's unique brands like "Redback" and "Trophy Strike."  *See* Demand, ¶¶ 51–55.

---

[5]     Respondents' half-hearted attempt to avoid this inconvenient fact – by pointing to form language in the LLC Agreement about Frictionless' business "purpose" that also happens to refer to the Members' ability to conduct the Company's business "indirectly through another company" – is the best they can muster to plug this obvious hole in their theory. *See* Counterclaims, ¶ 35 (citing LLC Agreement, § 2.5).

- 14 -

47.     Tellingly, Respondents nowhere deny or otherwise address these allegations in their Counterclaims. *See generally* Counterclaims.  To the contrary, Banjo and World make a number of notable admissions in their Counterclaims that, when read in conjunction with Frictionless' own Profit and Loss ("**P&L**") statements and tax filings, strongly support Claimant's allegations that Banjo was, in fact, fraudulently using Frictionless to absorb World's expenses.  Consider:

48.     The Company's Payroll Expenses:  Banjo and World admit that Frictionless hired only one employee during its entire existence – Ms. Li, who was hired as Frictionless' CFO in 2015.  *See* Counterclaims, ¶¶ 11, 38.  At all times from 2016-2018, Ms. Li's salary was $70,000 per year.  But Frictionless' own P&L statements for those years show *significantly* higher payroll expense figures:  (a) $2,083,106 in 2016; (b) $2,106,317 in 2017; and (c) $2,790,474 in 2018.  *See* Claimant's Exs. C-13 – C-15.

49.     The Company's Rent Expenses:  Banjo and World admit that Frictionless never had its own physical location or lease.  *See* Counterclaims, ¶¶ 11, 38.  Frictionless' 2018 Form 1065 tax filing, however, lists rent expense of $1,292,180.  *See* Claimant's Ex. C-16, p. 5.

50.     The Company's Warehouse Expenses:  Respondents claim that World had an actively operating warehouse, but Frictionless did not.  *See* Counterclaims, ¶¶ 29, 38.  But Frictionless' P&L statements nevertheless indicate that Frictionless incurred warehousing expenses of $1,585,387 in 2017 and $1,861,951 in 2018.  *See* Claimant's Exs. C-14–C-15.

51.     The Company's Insurance Expenses:  Finally, Banjo and World admit that Frictionless never obtained business or product liability insurance.  *See* Counterclaims, ¶¶ 36–38.  But Frictionless' P&L statements nevertheless indicate that Frictionless incurred insurance expenses of $216,516 in 2017 and $214,983 in 2018.  *See* Claimant's Exs. C-14 – C-15.

- 15 -

52.     No explanation for these discrepancies was provided before Claimant's Demand

or Respondents' Counterclaims were filed.  However, at 8:37 p.m. (Eastern Time) on Friday

May 3, 2019, Banjo abruptly resigned as Frictionless' Manager – a position he had held since

April 2013 – through his counsel.  In subsequent correspondence in light of Banjo's resignation,

Respondents' counsel has since confirmed to Claimant's counsel that:  (a) Frictionless had no

insurance costs in 2018; (b) the 2018 insurance expenses noted above were therefore World's

expenses; and (c) from 2013-2018, World's expenses were "passed on to Frictionless."[6]

53.     To be sure, Respondents' counsel has claimed that Z.L. Investment and Mr. Li

agreed to this arrangement, citing Section 2.5 of the LLC Agreement and the Alleged Operating

Plan.  But, as noted, Z.L. Investment and Mr. Li *never* agreed to any such thing.  *See* Demand,

¶¶ 51–55; *supra*, ¶¶ 29-33, 43 n.5.  Respondents' admission that the 2018 insurance expenses

noted above – and, presumably, nearly all of the expenses incurred by the Company since the

Frictionless Agreements were signed in April 2013 – were actually World's expenses thus

strongly suggests that Respondents were, in fact, fraudulently foisting World's expenses onto

Frictionless' financials, just as Claimant alleged in its Demand.

## III.   CLAIMANT'S AND THIRD-PARTY RESPONDENTS' SPECIFIC RESPONSES TO RESPONDENTS' COUNTERCLAIMS AND THIRD-PARTY CLAIMS

54.     As noted above, Claimant and Third-Party Respondents do not intend to expressly

assert in this Answer and Reply all applicable defenses to the counterclaims and third-party

claims set forth in Respondents' Counterclaims.  *See supra*, ¶¶ 3-4.  Instead, Z.L. Investment,

CIU, and Mr. Li hereby assert only those specific legal and factual defenses that they believe are

---

[6]     Claimant's counsel has subsequently asked Respondents' counsel to confirm that the Frictionless
warehousing, rent, and payroll expenses reflected on Frictionless' 2018 financials, among others, reflect
expenses actually incurred by World and then "passed on to Frictionless."  Respondents' counsel has not
yet responded to that request as of the time of filing of this Answer and Reply.

most critical to helping the arbitral panel understand why Respondents' claims are, on balance, completely without merit.

A.     **Specific Response to Respondents' First Claim:   Breach of Fiduciary Duty Against Mr. Li**

55.     Respondents' first claim – alleging that Mr. Li breached a fiduciary duty to Banjo, Frictionless, and World because CIU allegedly "overcharged" Frictionless for CIU's products from April 2013 through 2018 – is flawed for a number of reasons.   Mr. Li expressly notes the following examples here, some of which may be the subject of dispositive motions before the hearing in this matter:

56.     *First*, although Respondents' claim rests on CIU's alleged misconduct in "overcharging" Frictionless, it is undisputed that CIU is not a party to the LLC Agreement and is not a Member of Frictionless.  *See* Claimant's Ex. C-1.  *See* therefore owes no fiduciary duties to the Company as a matter of law.

57.     To circumvent this obvious pitfall in their first claim, Respondents allege that CIU's conduct in allegedly overcharging Frictionless was done "under the direction of Mr. Li." *See* Counterclaims, ¶ 47.   But this spin does nothing to help Respondents.   Mr. Li – who is merely an affiliate of a Member (Z.L. Investment), and not a Member or Manager himself – owes no fiduciary duties to Frictionless or Banjo either.   And Mr. Li certainly owes no fiduciary duties to World – a company that, upon information and belief, is primarily or wholly owned and controlled by Banjo, and that is neither a Member of Frictionless nor a party to the LLC Agreement.   For this reason alone, Respondents' first claim fails.

58.     *Second*, to the extent Respondents' first claim is based on conduct occurring prior to May 8, 2016, it is time-barred.  *See* C.R.S. § 13-80-101(1)(f) (establishing a three-year statute of limitations for breach of fiduciary duty claims).

59.     *Third*, even if Mr. Li owed fiduciary duties to Frictionless (and he does not),
Respondents' first claim fails on both the law and the facts to the extent it is based on World's
assertion that it is somehow a "third-party beneficiary" of those fiduciary duties.   *See*
Counterclaims, ¶ 52.

60.     On the law, there is no "third-party beneficiary" doctrine in the context of a
breach of fiduciary duty.  A claim for breach of fiduciary duty exists to remedy harm caused to a
company by the officers or directors who owe that company fiduciary duties of care and loyalty.
Such a claim does not exist – and cannot be used – to remedy alleged harm to *third-parties* with
whom the company that is owed fiduciary duties (here, Frictionless) does business.

61.     Moreover, on the facts, World could not have been a third-party beneficiary to
either the LLC Agreement or any alleged fiduciary duties owed by Mr. Li here.  For starters,
none of Z.L. Investment, CIU, or Mr. Li actually knew of World's existence at the time the LLC
Agreement was signed, so they certainly could not have intended World to be a third-party
beneficiary of that Agreement, as would be required to confer such status under Colorado law.
And, even if Claimant and Third-Party Respondents actually knew of World's existence before
November 2018 (and they did not), Section 14.15 of the LLC Agreement expressly precludes
recognizing World – or any other person or entity – as a third-party beneficiary of the LLC
Agreement:

> 14.15  **No Third Party Beneficiaries**.  This Agreement is for the sole
> benefit of the Members, the Manager, and the Company, and no other
> Person is intended to be a beneficiary of this Agreement or shall have any
> rights hereunder.

*See* Claimant's Ex. C-1, § 14.15.  This provision alone is dispositive of the third-party
beneficiary issue vis-à-vis the LLC Agreement under Colorado law.

- 18 -

62.     *Fourth*, even if a legal basis existed for Respondents' assertions that Mr. Li owed them fiduciary duties (and no such legal basis exists), CIU never "overcharged" Frictionless for any of CIU's products.  To the contrary, and as CIU will establish at the hearing if necessary, at all times CIU's pricing has been consistently set at below-market rates and with extremely favorable payment terms, all in an effort to ensure that Frictionless could grow and succeed.

63.     To take just one example, although Banjo initially proposed in November 2012 that CIU and Frictionless agree to 180-day payment terms, CIU subsequently agreed to even more generous, 360-day payment terms, in an effort to promote Frictionless' growth.  *Compare* Claimant's Ex. C-5, p. 4 (showing proposed 180 day payment terms for Frictionless' purchase of CIU's products), *with* Counterclaims, ¶ 63 (noting 360 day payment terms were used until early 2019).  Those efforts were stymied by Respondents' fraudulent scheme, however, leaving CIU with a substantial receivable still owed by Frictionless.  Claimant and Third-Party Respondents are confident that this and other evidence will prove that CIU never overcharged Frictionless compared to industry standards and look forward to presenting such evidence at the hearing.

64.     *Fifth*, and finally, Mr. Li notes that, to the extent any recovery might be warranted on Respondents' first claim for damages caused to Frictionless (and no such recovery is warranted), 90% of any such derivative recovery would redound to Z.L. Investment, and only 10% to Banjo, consistent with the Members' respective pro rata interests in the Company.

**B.     Specific Response to Respondents' Second Claim:   Breach of Contract Against CIU and Mr. Li**

65.     Respondents' second claim – alleging that Mr. Li and CIU breached the non-compete provisions set forth in Section 4.4 of the LLC Agreement – suffers from similar errors of both law and fact.  *See* Counterclaims, ¶¶ 53-60.  CIU and Mr. Li note the following examples of these errors, some of which may also be the subject of dispositive motions before the hearing:

- 19 -

66.     *First*, CIU is not a proper third-party respondent to Respondents' second claim
because, as noted above, CIU is not a party to the LLC Agreement and thus never owed any non-
compete obligations to either Frictionless or Banjo thereunder.

67.     *Second*, and similarly, World is not a proper claimant on the second claim
because it was never a party to the LLC Agreement. World therefore has no standing to bring
any claims against Mr. Li or CIU – or anyone else – for a breach of the LLC Agreement. Nor,
similarly, did Mr. Li or CIU ever owe any non-compete obligations to World under Section 4.4
of that Agreement. And, as noted, World cannot be a third-party beneficiary of the LLC
Agreement under Section 14.15 thereof. *Supra*, ¶ 61.

68.     *Third*, in addition to including improper parties, Respondents' second claim fails
to the extent it seeks to recover for sales of products that occurred before the LLC Agreement
was signed. Specifically, Respondents allege that CIU "shipped nearly 400 separate orders of
CIU products to direct competitors of Frictionless" from April 12, 2012 through January 8, 2019.
*See* Counterclaims, ¶ 56. But the LLC Agreement did not go into effect until April 11, 2013.
*See* Claimant's Ex. C-1. Thus, Banjo and World include claims for nearly a year's worth of sales
before the LLC Agreement and its non-compete provisions were even in effect.[7] Any claims
based on these sales are, therefore, improper and should be dismissed.

69.     *Fourth*, and in any event, to the extent Respondents' second claim is based on
conduct occurring prior to May 8, 2016, it is time-barred. *See* C.R.S. § 13-80-101(1)(a)
(establishing a three-year statute of limitations for breach of contract claims).

---

[7]     Similarly, the first five-and-a-half five pages of Exhibit R-7, which Respondents rely on to
support their second claim, list sales prior to the effective date of the LLC Agreement. *See*
Counterclaims, Ex. R-7.

70.     *Fifth*, at a minimum, Banjo and World have waived, and should be estopped from raising, any claims related to CIU's sales of products to Blount International, Inc. ("**Blount**"). As Respondents admit, CIU had a pre-existing relationship with, and sold products directly to, Blount before the LLC Agreement was signed. *See* Counterclaims, ¶¶ 25-27. While CIU continued to sell goods to Blount after the LLC Agreement was signed, this was done with Banjo's full knowledge and understanding. Indeed, not only did CIU's representatives ask Banjo for his "recommendation" on CIU's agreement with Blount, Banjo himself received a copy of that agreement and referred to it in assisting CIU to devise a business strategy for its dealings with Blount. *See* Claimant's Exs. C-17 – C-18.[8]

71.     At no time before the Demand was filed did Banjo ever object to CIU's sales to Blount or claim that those sales amounted to a violation of the non-compete provisions set forth in Section 4.4 of the LLC Agreement. Banjo and World have thus waived, and should be estopped from raising, any claims of breach for these sales in which Banjo himself played a role.

72.     *Sixth*, and finally, CIU and Mr. Li note that, to the extent any recovery might be warranted on Respondents' second claim for damages caused to Frictionless (and no such recovery is warranted), 90% of any such derivative recovery would redound to Claimant, and only 10% to Banjo, consistent with the Members' respective pro rata interests in the Company.

**C.     Specific Response to Respondents' Third Claim: Breach of Contract Against Z.L. Investment, CIU, and Mr. Li**

73.     Respondents' third claim – alleging that CIU has failed to fulfill various purchase orders submitted by Frictionless since August 2018, and that this amounts to a breach of contract by each of Z.L. Investment, CIU, and Mr. Li – is as flawed as Respondents' first two claims.

---

[8]     Exhibit C-18 refers to a company called "SpeeCo." As noted by Respondents in their Counterclaims, SpeeCo. was acquired by Blount in or around 2012. *See* Counterclaims, ¶ 28.

Specifically, Claimant and Third-Party Respondents note the following exemplary errors of law and fact relating to Respondents' third claim for breach of contract, some of which may be the subject of dispositive motions before the hearing:

74.     *First*, Respondents' third claim cannot lie against Z.L Investment or Mr. Li because neither Z.L. Investment nor Mr. Li is a party to the purchase orders at issue here, which are contracts solely between CIU and Frictionless. That claim should therefore be dismissed as against Z.L. Investment and Mr. Li.

75.     *Second*, all claims by World related to these purchase orders similarly fail because World, too, is not a party to any of the purchase orders between CIU and Frictionless. Although Respondents allege that World is a third-party beneficiary to those purchase orders, this argument fails because, as CIU will prove at the hearing, CIU never intended to confer any benefit or rights to World by entering into purchase orders with Frictionless.

76.     *Third*, and unlike Respondents' first two claims which are essentially derivative in nature, Respondents' third claim asserts a ***direct*** claim by Frictionless against CIU for breach of contract arising from the Frictionless-CIU purchase orders. But, under Section 5.4.11 of the LLC Agreement, no such claim can be brought on Frictionless' behalf without the consent of both Z.L. Investment and Mr. Li, neither of whom consented to Respondents' third claim for breach of contract against CIU on Frictionless' behalf. For this reason, too, Respondents' third claim should be dismissed before the merits hearing.

77.     *Fourth*, and as Claimant and Third-Party Respondents will also prove at the hearing, it was Banjo – not CIU – that was ultimately responsible for any delayed or unfulfilled shipments during this August/September 2018 timeframe. Specifically, any delays in shipment during that time were the result of Banjo's delay in providing final designs of the products at

- 22 -

issue, as well as changing the designs for the accessories for those products without advance notice to CIU.  In fact, Banjo's actions not only caused these delays in shipment, they actually caused significant losses *to CIU*, because in some cases CIU was forced to re-manufacture products with Banjo's updated designs.[9]

78.     *Fifth*, and finally, with respect to unfulfilled purchase orders – as Respondents' counsel has been repeatedly advised – CIU has been unable to make shipments due to lender-imposed constraints.  Specifically, CIU's creditors will not allow CIU to ship products to Frictionless due to the substantial amount – over $7.1 million – in outstanding invoices that are beyond the generous 360-day payment period that CIU afforded to Frictionless under the terms of the purchase orders.

79.     Notably, and despite his counsel being advised of this situation, Banjo has refused to collect the substantial sums that World apparently owes Frictionless – amounts that could be used to pay down Frictionless' substantial debt to CIU and allow shipments to resume.  In essence, then, Banjo demands that CIU ignore these substantial amounts that it is owed, continue to ship products to Frictionless without payment, and fund World's operations (through shipments to Frictionless) without any compensation.  As CIU will establish at the hearing, it is not a non-profit and has no obligation – contractual or otherwise – to engage in such commercially unreasonable behavior.

*            *            *            *

---

[9]     CIU reserves all rights to assert necessary claims against Banjo and/or World for these and any other damages they may have caused CIU. *See also supra*, ¶ 4.

80.    For all of these reasons, and others that will be presented at the hearing if
necessary, Respondents' claims against Z.L. Investment, CIU, and/or Mr. Li are without merit.
All such claims should be dismissed, and Claimant and Third-Party Respondents should be
awarded attorneys' fees and such other and further relief as the panel deems just and proper.

**Respectfully submitted for and on behalf of
Claimant and Third-Party Respondents**

**K&L Gates LLP**
*Counsel for the Claimant and
Third-Party Respondents*
**June 10, 2019**

# Exhibit 9

# AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| CHANGZHOU ZHONG LIAN INVESTMENT CO. LTD. (A/K/A Z.L. INVESTMENT), INDIVIDUALLY | |
| Claimant, | AAA Case No. |
| v. | |
| DANIEL BANJO AND FRICTIONLESS WORLD, LLC | |
| Respondents – Counterclaimants | |
| LI ZHIXIANG, ZL INVESTMENT, CHANGZHOU INTER UNIVERSAL MACHINE & EQUIPMENT CO., LTD, AND FRICTIONLESS, LLC. | |
| Counterclaim and Third-Party Defendants | |

## DANIEL BANJO, DERIVATIVELY ON BEHALF OF FRICTIONLESS, LLC, AND FRICTIONLESS WORLD, LLC'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

Thomas P. Howard
William C. Groh
Scott Brenner
Thomas P. Howard, LLC
842 W. South Boulder Rd. Suite 100
Louisville, CO 80027
Tel: 303-665-9845
Fax: 303-665-9847
thoward@thowardlaw.com
wcgroh@thowardlaw.com
**Counsel for Daniel Banjo and Frictionless World, LLC**

June 18, 2019

Daniel Banjo ("Banjo"), derivatively on the behalf of Frictionless, LLC ("Frictionless LLC"), and Frictionless World, LLC ("World") (Movants), pursuant to R-38 of the American Arbitration Association's (the "AAA") Rules for Commercial Arbitration and C.R.C.P. 65, hereby submit this Motion for Preliminary Injunction, enjoining Claimant Changzhou Zhong Lian Investment Co. LTD. ("ZL Investment") and Third Party Defendants Changzhou Inter Universal Machine Equipment Co., Ltd. ("CIU") and Li Zhixiang ("Li") from their continued (a) violation of the Frictionless LLC Operating Agreement ("Operating Agreement"); and (b) breach of the multiple purchase orders issued regarding sale and shipment of goods worth more than $5 million. The continuing violations by Claimants CIU, ZL Investment and Li have caused, and continue to cause, irreparable harm to Frictionless LLC and World. As grounds for injunctive relief, Movants state as follows:

## INTRODUCTION

This case involves a dispute between Frictionless World, LLC ("World"), a widely recognized American company that manufactures and distributes patented professional grade outdoor equipment for agricultural, gardening, and fishing use, and CIU, the Chinese company that since 2012 has been assembling and supplying World with those products. World employs, or did employ until recently, several dozen Coloradans. Banjo is an engineer and World's CEO, and has acted in that capacity since he created World in 2012. Li, a Chinese billionaire, is the president and majority owner of CIU. Li has worked with Banjo and World since 2012 when the parties agreed that CIU would assembly and produce World's products. CIU, at all times, built products per the instructions of World's engineers, who have obtained and applied for multiple design and utility patents. CIU prior to 2012 lacked the familiarity with the US Market and desired World's assistance for purposes of making inroads into the US market. Mr. Li was also interested in helping his family members immigrate to the US.

2

The business arrangement involved CIU's assembly and shipping of significant numbers of products directly to World, as well as major retailers contracting to World (Lowes, Home Depot, and others) per World's direction. This has occurred non-stop for the past seven years, and resulted in substantial gains for both companies. For World, its rapid growth and sales numbers increased dramatically, making it a recognized name with these large retailers. For CIU and Li, the alliance with World fulfilled their objective of supplying and selling far more products in the United States, and laid the foundation for Li's immediate and extended family members to obtain legal papers to work and/or reside in the US.

The success of this alliance from 2012 – 2013 resulted in the parties' formation of a joint venture in April 2013. The joint venture involved the creation of a pass-through company called "Frictionless LLC." That entity had no officers, no employees, no physical location, no website, and no email address. The purpose of the joint venture was to provide a vehicle for Li's family members to own a membership interest in an American limited liability company, thereby providing a basis for immigration and/or work visas, and a sharing of the profits arising from World's sale of goods to retailers. The joint venture did nothing to change the parties' pattern and practice of CIU's assembly and shipping of goods directly to World at its distribution facility in Louisville, Colorado (and later in Westminster, Colorado), World's oversight of all such assembly and shipping practices, and World's handling of all lease, liability insurance, employee, marketing, and other business matters related to World.

The primary change that occurred as a result of the joint venture was that purchase orders for goods were issued by Frictionless LLC, per World's direction. As noted, CIU continued to assemble the products per World's directions, and ship the products directly to World or retailers at World's direction (Frictionless LLC never had any physical location – it existed only on paper). Payments from retailers for goods went to World, revenues from sales, after expenses,

were passed back to Frictionless LLC minus a small percentage retained to promote the growth of the joint venture.  Frictionless LLC then made payments to CIU for the purchase orders.

Earlier this year, a dispute arose between the parties over the joint venture.  At the outset of that dispute, World immediately requested confirmation that CIU would follow through on the many already contracted purchase orders, as any cessation of shipments would cause irreconcilable injury to both Frictionless LLC and World.  This was especially the case as World had received repeated reassurances from representatives of CIU that shipments would continue in the months leading up to the action, despite repeated delays.  Despite the filing of the action, Claimant ZL Investment and Third Party Defendants CIU and Li assured World that shipments would continue.  The same assurances were received from opposing counsel.  Despite these representations, however, Claimant and Third Party Defendants on April 29, 2019 reversed themselves and ceased all shipments of goods, in direct breach of over $5 million dollars of outstanding purchase orders that CIU was obligated to ship to World or the retailers stated on the individual purchase orders.  This refusal to ship, in addition to comprising a substantial breach of contract, has resulted and is resulting in substantial late and cancellation fees issued against World, a massive drop in World's sales for the first portion of 2019 (as CIU produced approximately 85% of its products), significant lost profits to Frictionless LLC and World, and the probable loss of World's long-standing relationship with numerous crucial retailers like Walmart, Costco, Lowes, and Home Depot.  Further injuries are ongoing.  For these reasons, an entry of preliminary injunction is crucial to preserve the status quo that existed at the time that this arbitration was filed – which was the contractually promised shipment of these products.  CIU must resume shipping to World under the parties' joint venture, pending the parties' arbitration of this dispute.

## CONFERRAL STATEMENT

Movants' counsel conferred with counsel for Li, ZL Investment, and CIU regarding the relief requested herein. Li, ZL Investment, and CIU oppose Movants' requested relief.

## FACTUAL BACKGROUND

1.     Banjo holds a master's degree in Engineering from Purdue University, as well as a Bachelor of Science in Mechanical Engineering from Michigan Technological University. Over the years, Banjo has served as an adjunct graduate engineering teacher for the University of Michigan, Stanford University, Purdue University, the University of Illinois, and the Massachusetts Institute of Technology (M. I. T).

2.     Banjo is the president, CEO and founder of World. Before creating World, Banjo worked for SpeeCo, an engineering company in Golden, Colorado. When Banjo worked for SpeeCo, CIU was a SpeeCo supplier and had served in that capacity for over ten years. CIU had no other customers in the USA or China. Via travelling to China as SpeeCo's head of engineering, Banjo regularly met and became close acquaintances with Li and his business circle i.e. Allen Li, Serena Li, Frank Li, and Tracy. Li and his inner circle also travelled to Colorado to observe SpeeCo's business practices, because at the time, CIU merely sold parts to SpeeCo and lacked the expertise to manufacture products it supplied SpeeCo with parts.

3.     In 2012, Blount International Inc. ("Blount") bought SpeeCo. Shortly after the buyout Banjo left SpeeCo and created World, in May 2012. (**Exhibit 1**.). In July 2012 World entered into a lease for an office space and warehouse spanning 18,335 square feet in Louisville, Colorado. (**Exhibit 2**.) Soon after the construction was completed, World began using the office and warehouse space for all of its business purposes, including the manufacture, distribution, and sale of its products.

4.     World specializes in the manufacture and distribution of outstanding professional

grade outdoor power equipment, high quality affordable replacement parts for tractors, hitches and agricultural implements, gate and fence equipment, lithium ion powered tools, and ice fishing equipment. To protect its intellectual property rights, World owns multiple patents and trademarks, including but not limited to World's recognized registered trademarks "FRICTIONLESS WORLD", "DIRTY HAND TOOLS", "TROPHY STRIKE", "VINSETTA TOOLS" and "RANCHEX." Each of the trademark applications World filed since 2012 have at all times been open to the public and each application, and resulting registration, identifies "Frictionless World, LLC" as the registrant and owner. (*See, e.g.* **Exhibit 3**.)

5.     In addition to trademark registrations, World has since 2012 filed and registered multiple patents. According to the Patent and Trademark Office database, there are fifteen issued U.S. Patents and eight published patent applications for "Frictionless World" (all of which also name Banjo as one of the inventors). (*See*, **Exhibits 4** and **5**.) The earliest patent (D681,701) was issued on May 7, 2013, and the earliest patent application (20140124097) was published on May 8, 2014. (*See*, **Exhibits 6** and **7**.)

6.     World began the manufacture and sale of products in October 2012. World successfully marketed its products to major retailers in the US and worldwide, including Lowes, Home Depot, Menards, Midstates, and TSC. That marketing effort achieved rapid success because of Banjo's recognized engineering expertise in this field, his rapid development of new, patented product designs, and his connections going back for years throughout this industry.

7.     During 2012 and 2013, World used the Chinese part assembly company CIU, which Banjo knew from his time at SpeeCo, for World's assembly of products. That assembly included attaching a decal to each product bearing the Frictionless Word, LLC name. (**Exhibit 8**.) That assembly included the insertion of a hang tag on each product bearing both the

6

FRICTIONLESS WORD and DIRTY HAND TOOLS trademarks, as well as the contact information for the offices of Frictionless World, LLC.  (**Exhibit 9**.)  That assembly included the insertion of instruction manuals written by World into each products packaging.  (**Exhibit 10.**)  The front page of each instruction manual held the FRICTIONLESS WORD and DIRTY HAND TOOLS trademarks, as well as the contact information for the offices of Frictionless World, LLC.  (*Id*).  During that time period, World and CIU communicated almost daily via email, phone and in person regarding the correct way in which to assemble World's patented products, the World trademarks to be used, the World company identifying decals to be applied, the World product handbooks to be placed in the shipping boxes, and other details relevant to the assembly and shipping of products.  All emails to CIU from World during this period were sent from the @frictionlessworld.com email address.

8.     CIU is majority owned by Li.  Prior to working with World, CIU lacked the knowledge to assemble whole products of the type that World was selling and marketing. Second, CIU lacked any familiarity with the US market, and had limited comprehension of the regulatory hurdles associated with running a large business operation in America.  As a Chinese company, CIU had little or no access to loans, leases, and product liability insurance in the US. Further, it is extremely difficult for Chinese citizens to live for any extended period in the US under US immigration laws, much less operate a US company.  Thus, CIU desired World's assistance if it were to make any substantial gains in the US Market.

9.     CIU began assembling products for World in 2012 and began shipping products to World in early 2013.  CIU invoiced World for said shipments as early as February 2013. (**Exhibit 11.**)    When assembling products for World, CIU relied on World's drawings, and regular instructions from World's engineers. (*See*, *e.g.* **Exhibit 12**.)  CIU and World continued that same practice and pattern throughout the time that they conducted business together.  (*Id.*;

*see also* **Exhibit 13**).

### The Joint Venture Involving World, Frictionless LLC, ZL Investment, and CIU

10.    While CIU was assembling products for World in 2012-2013, Banjo and Li began discussing the idea of a joint venture.  Banjo wanted rapid growth and additional sales, and working with Li as an investment partner would boost World's ability to market and hire necessary employees.  Li wanted to sell more products in the US and was interested in assembling World products using Banjo's engineering and marketing expertise.  Li further wanted to obtain a legal vehicle by which his son, daughter in law and other relatives could live in the United States.  In September 2012, Banjo visited China and presented Li with the concept of a pass-through company owned by both Li and Banjo, which would function as a subsidiary of World.  (**Exhibit 14**).  The proposed name of the pass-through was "LiBanjo, LLC".  *(Id)*.  In that presentation the obtaining of US residency for Li's children is discussed, as that was a goal Li was interested in achieving.  (*Id*. at 2, 3.)  The pass-through company would exist to "support the work of Frictionless World."  *Id*.  The presentation provided to Li details of how everything assembled by CIU would be sold to the pass-through company, then passed through to World.  (*Id*. at 4).  The presentation details how World would retain 5-10% of revenue from sales to help stimulate growth, and how the balance of revenues, after expenses, would pass back to "LiBanjo".  (*Id*.)  It further details how World would sell non-CIU products for benefit and growth of all parties.  (*Id*).

11.    While assembling products and parts for World in 2012-2013, Li and Banjo and CIU continued developing the terms of this joint venture.  It was intended to enhance the parties' already existing business relationship.  The new company would operate under the umbrella of World, as it would have no employees of its own, no physical location of its own, and no email address.  Li rejected any mention of CIU's name.  The parties renamed the pass-though company

Frictionless, LLC, a direct derivative of the existing company name "Frictionless World." (**Exhibit 15**.)  They agreed to conduct all sales and distribution of Frictionless LLC's purchase orders through World, since World was already firmly established in the United States.  (*Id.*; *see also* **Exhibit 16**.)

12.     Reflecting the above, the Operating Agreement prepared for Frictionless LLC states that the business of the company can be conducted "indirectly through another company, joint venture or other arrangement".  (Operating Agreement, Section 2.5).  Schedule B to the Operating Agreement designates World as the forward-facing company through which the business of the company is to be conducted.  (**Ex. 16**, Schedule B, p. 11).  World would conduct all business-related matters for the new pass-through company Frictionless LLC.  World would issue purchase orders to Frictionless LLC, which would in turn issue the orders to CIU.  CIU would assemble and ship the products to World, since Frictionless LLC had no physical location of its own. The parties would split revenue from the business joint venture, based on the revenue structure enunciated in the Operating Agreement.  (*Id.*, at pp. 11-14.)

13.     The reasons for conducting the new pass-through company's business through World were numerous, and included the fact that World owned the existing property lease for a massively sized warehouse (18,335 sq. ft.), was already registered with the appropriate state and federal authorities, was fully insured for potential business liabilities, already had developed a trained engineering and sales staff, and already had a bank account. It would have been extremely difficult for a majority owned Chinese company, with all owners in China, to obtain a US lease and business liability insurance, and retailers would have been hesitant to buy and sell products from such a company due to lack of indemnification on intellectual property and product liability claims.

14.     Further, had Frictionless LLC somehow obtained a physical location, hired a

sales force and obtained product liability insurance, none of which occurred, it and its 90 percent owners would have been at risk of product liability lawsuits by retailers and consumers in the US, breach of contract claims by the retailers with whom they were doing business, and intellectual property infringement claims in US courts by third parties. Reflecting these realities, since the signing of the Agreement *Frictionless World* has twice raised claims of patent infringement against third parties for sales of products *manufactured by CIU* based on *Frictionless World* patents. Each such claim has been filed, litigated and resolved by Frictionless World, with no mention of CIU or Frictionless LLC.

15.    Reflecting the above, Frictionless – 90 percent owned by Claimant – *intentionally* never obtained a building lease, business liability insurance, or hired any employees, with the single exception of naming Mr. Li's daughter in 2015 as its CFO, for the purpose of her US immigration application. No Frictionless LLC office was ever leased, no website was ever created, no email address was ever obtained. All correspondence with Mr. Banjo and his employees has at all times relevant to this matter, from 2012 through this date, been conducted via the @frictionlessworld.com email address. At all times, the risks of selling and marketing the goods at issue have been intentionally left with Banjo and World, which to this day handles the employment of over a dozen employees at its warehouse and shipping facilities.

16.    To consent to the joint venture, World insisted that Li and his affiliates agree to stop selling products to several entities that directly competed with World, including but not limited to Blount/SpeeCo. For that purpose, an explicit non-compete provision was written into the Operating Agreement. Li and his affiliates agreed that they would direct the approximately $50 million in purchase orders they were currently receiving from competitors yearly to Frictionless, LLC, to be passed through to World. (**Ex. 16**).

17.     Throughout the time the parties discussed terms involving Frictionless LLC, CIU carried on conducting business with World, including invoicing World for various shipments and sending shipments to World's office in Colorado. (*See*, **Ex. 11**.)  In fact, the negotiations for the creation of Frictionless LLC occurred *precisely* because Li and his affiliates recognized the importance of a continued business alliance with World.  When the parties negotiated the joint venture involving Frictionless LLC, Li and his affiliates knew that World had created and was creating valuable connections with large retailers like Lowes, Menards, Midstates, TSC, and Home Depot.  For nearly a year after the creation of Frictionless LLC, CIU continued to directly invoice World for shipments.  (*See*, **Exhibit 17.**)

18.     The Operating Plan governing how Frictionless LLC would function through World was attached as Schedule B to the Operating Agreement and incorporated by reference. It is dated April 11, 2013, the same day as the Operating Agreement.  The plan comprises a Power Point presentation detailing the functional terms by which the joint venture was to be carried out. It incorporates relevant portions of the "LiBanjo" presentation discussed by Banjo and Li in September 2018, including the concept and purpose of using a pass-through company. Banjo flew to China for the signing of the Operating Agreement, and provided Schedule B to the other parties for their review on April 8, 2013. The Operating Plan was attached to the Operating Agreement at the time of signing. After execution of the Operating Agreement, as per the terms of the Operating Agreement as negotiated and signed by the parties, World retained and updated as necessary all the necessary property leases, loans, and insurance.  World continued to build its list of retailers selling World products.  World continued to conduct all business directly with CIU on a nearly daily basis as to the assembly, packaging and shipping of products.  At no

point in time did the pass-through company Frictionless LLC obtain any lease, insurance, email address, website, or hire any employees.[1]

### The Frictionless LLC Operating Agreement

19.     The Frictionless LLC Operating Agreement was entered into between Frictionless LLC, Li, ZL Investment, and Banjo. (**Ex. 16**, at p. 1.) The Operating Agreement states that the company's purpose includes "*the manufacture and distribution of tools and power equipment*" and that its business can "be conducted directly by the Company *or indirectly through another company, joint venture, or other arrangement*." (*Id.* at p.5, ¶ 2.5.) (Emphasis added.)

20.     The Operating Agreement contains a non-competition covenant.   Under that covenant, each member of Frictionless, LLC, and Li agreed that he or she:

> "shall cause his, her, or its **Affiliates**, to not compete with the Company, directly, or indirectly, in a business substantially similar to the business of the Company of its subsidiaries anywhere where the Company does business, or the **distribution of any products distributed by the Company** or any of its subsidiaries anywhere in the World."

(*Id.* at p.8, ¶ 4.4.)

21. The non-competition covenant goes on to explain that direct and indirect competition under its auspices shall include but is not limited to:

> "having any business or employment relationship with any past or present client, supplier, or employee of the Company, and any competition as a sole proprietor, partner, corporate officer, director, shareholder, member, manager, employee, agent, independent contractor, trustee, or in any other manner in which such Member or Li, or its or his Affiliates, holds any beneficial interest in a competitive business, derives any income from such business, or provides any service, including the benefit of his, her or its reputation or knowhow, to such business."

(*Id.*) (emphasis added.)

---

[1] The sole exception was Serena Li, Mr. Li's daughter-in law, who was assigned the title of Frictionless LLC's "CFO" on May 1, 2015. In reality, however, her employment did nothing to change the course of conduct between the parties as she was a CFO in name only for purposes of showing that she had some measure of employment with an American limited liability company, to bolster her application for US permanent residency. That said, as CFO, she had complete access to all accounting records evincing all transactions between World and Frictionless LLC.

22.     The key components of this joint venture, as incorporated in the Operating

Agreement, are as follows:

- World would remain the forward-facing company to customers.  In
  doing so, World would oversee and will be the named entity for all
  business-related matters, including leases, employees, insurance,
  and all sales and marketing;

- CIU would be the first manufacturer of choice for all World
  products.  If CIU could not manufacture a product, World was
  allowed to seek to have the same product manufactured elsewhere.
  The goal was to broaden the product base being offered to retailers.

- World would remain its own independent company but would also
  be utilized as a means to significantly increase CIU's product base
  and US product sales.  That would happen through by increasing the
  number of products assembled on World's behalf by CIU, and
  increasing the number of retailers selling World products assembled
  by CIU;

- World would issue purchase orders to CIU through Frictionless, and
  CIU would assemble and ship those products directly to World, as
  Frictionless had no physical location. If directed, CIU would ship
  products directly to the third-party retailers with whom World was
  dealing that were directly listed on the POs;

- World will grant CIU the right to use the multiple patents developed
  by World for the purpose of assembling and shipping products
  developed and patented by World to World;

- The grant intellectual property did not include trademarks or other
  intellectual property developed by and/or registered to World;

- When World sold products pursuant to the joint venture, World
  would: (a) retain 5-10% of revenue and a 5% markup on expenses to
  grow the parties' collective business and expand World's and CIU's
  marketplace reach (World in actuality retained only an estimated
  6.5% of revenue);

- World would remit all monies earned after the deduction of
  overhead costs, labor, and expenses ("Operating Costs") and its
  retained revenue percentages to Frictionless LLC, which would in
  turn remit payments to CIU for products assembled by CIU and sold
  by World.

### *Li, ZL Investment, and CIU's Improper Competition and Destructive Actions*

23.     In addition to his rights as a member in Frictionless LLC, Banjo was also employed as Frictionless LLC's Manager or President. (**Ex. 16**, at ¶ 1.) As Manager, Banjo had the right "to execute and deliver on behalf of the Company contract, conveyances, checks, drafts and other documents of any kind or character to the extent the Manager deems it necessary or desirable." (*Id.* at § 5.2.)   Under his management, the parties carried on the business of Frictionless LLC exactly as mandated by Schedule B and the Operating Agreement.

24.     Throughout the period that the parties have done business, from November 2012 through the present, World's graphic designers have regularly sent designs and decals bearing "Frictionless World" and "Frictionless World" serial numbers and product barcodes to CIU. (*See, e.g.*, **Ex. 8**.) Never have they sent CIU any decal, hang tag, product manual, or other information mentioning the pass-through company called "Frictionless LLC". Never were any federal bar codes – reflected on these decals - registered pertaining to any such company.  World's efforts have resulted in substantial exposure of CIU's products.  Through the parties' agreed upon course of conduct, World has placed $8,849,654.22 worth of purchase orders with CIU just since August 2018.

25.     In accordance with the parties' Operating Plan, World subtracted operating expenses such as payroll, administrative, marketing, insurance, warehouse, IT, professional, and travel expenses, and its delineated revenue percentages, before forwarding all remaining revenues to Frictionless LLC. Expenses were documented on statements that were made available to Li and his affiliates.  In accordance with the parties' agreement, World ensured that neither Frictionless LLC, CIU or Li were mentioned in any sales, and that World absorbed all risks related to the business plan.

26.     Unbeknownst to World, Frictionless LLC, and Banjo, however, from April 2013

through 2018, Li and his affiliates significantly overcharged Frictionless LLC for products CIU

assembled and delivered to Colorado. Realizing the incongruency, Banjo confronted Li in 2019.

Li admitted that CIU had in fact been overcharging for the products it supplied under the joint

alliance, and stated that CIU would correct its pricing. Upon information and belief, no such

correction occurred. The overcharging has cost the joint venture no less than 7 million dollars in

lost revenue.

27.     In the same fashion, contrary to Li's agreement that CIU would redirect

competing sales to Frictionless LLC, between April 12, 2012 and January 8, 2019, Li and his

affiliates have directed nearly 400 separate orders of CIU products to direct competitors of

Frictionless LLC and World. (**Exhibit 18**.)   Those competitors include Blount/SpeeCo and

Tooltuff LLC. (*Id.*) When Banjo confronted Li over that misconduct, Li promised that CIU

would cease all shipping to Frictionless LLC's competitors, including Speeco/Blount. Upon

information and belief, no such cessation has occurred. Now, opposing counsel is requesting

that the non-compete be waived. Damages arising from this breach will require discovery to

determine, but competing sales are believed to total in the tens of millions of dollars.

28.     Since August 2018, CIU accepted Purchase Orders from World, issued through

Frictionless LLC, totaling no less than $8,849,654.22. All said products are for delivery to

World or retailers contracting with World. As of 2019, CIU had filled only 25% of the orders.

Fearing for the business and what would amount to a catastrophic collapse of their relationship

with large retail customers due to non-delivery of multimillion-dollar orders, World and

Frictionless LLC, starting in November 2018, repeatedly sought reassurances from Li and his

affiliates regarding the shipment from CIU of these outstanding purchase orders. Li and his

affiliates repeatedly assured Banjo, acting as World's CEO, that the purchase orders would be

shipped. (*See*, **Exhibit 19**.) In fact, on April 16, 2019, via counsel and after the filing of this

action, Li and his affiliates continued to assure Banjo that CIU would ship the purchase orders, despite the continuing delays on deliveries. (*See*, **Exhibit 20**.) Then, after over six months of delays, excuses and misleading promises, after the parties were well into the production season, Li, CIU and ZL Investment abruptly reversed themselves on April 29, 2019 and advised World, without any legal justification, that CIU would not ship the outstanding purchase orders. (**Exhibit 21.**)

29.     Banjo, president and CEO of World, resigned his position as Manager or Frictionless LLC on May 3, 2019, as the damaging actions of the other two members, Li and 90% owner ZL Investment, had made that position untenable for him to maintain. As of the date of his resignation, Frictionless LLC had failed to pay Banjo no less than $78,750 in compensation for his services as Manager.

30.     CIU is majority owned by Li. ZL Investment is owned by Li and his direct relatives. Frictionless LLC, the joint venture created by these parties, is 90% owned by ZL Investment. Li is a member and key decision maker. Banjo owns 10% of Frictionless LLC.

31.     As of the date of this filing, CIU has failed to ship products to World and third-party retailers, in direct breach of the Purchase Orders, in excess of five million dollars. CIU's stated reason for not shipping products is that its creditors would not allow it to ship to Frictionless LLC any longer, given that Frictionless LLC owes it substantial sums of money under the joint venture. That explanation is a red herring. Defense counsel has refused to produce any evidence in support of the same, and Li, CIU *and its counsel* made repeated written promises to ship for months, and literally days, before CIU's abrupt reversal. What is plain is that Li and CIU (1) made repeated misstatements as to shipments; and (2) are now malevolently withholding shipments, in an effort to cause severe damage to the joint venture, Frictionless LLC and World.

32.     CIU's ongoing refusal to ship is even more difficult to grasp in light of the offer recently made by World.  It was proposed that while the parties continue to arbitrate their dispute, payments would be immediately made to CIU for every purchase order CIU ships, so long as CIU provides proof of shipment. (*See*, **Exhibit 22**.)  In the past, payments were made on a 180–360 day basis to allow time for the product to be sold.  This proposal would have ensured that Frictionless LLC and World continue to meet their contractual obligations to retailers and customers under the joint venture, and ensured that CIU obtain immediate payments -- regardless of how long the actual sales take to close.  Li and CIU rejected this offer.

33.     In addition to its requesting shipment pursuant to outstanding purchase orders, World requested that CIU produce the names, email addresses, and all other relevant information related to third-party vendors to which CIU subcontracted some of the work it performed for World pursuant to the joint venture.  Given CIU's breach, World now needs to contact those vendors directly in order to resume some measure of performance and production.  CIU willfully delayed providing that information for several weeks, until June 4, 2019, thereby causing World more injury.  Even so, when CIU sent the purported information on an excel spreadsheet provided to its counsel, CIU failed to provide anything near the data required.  Rather, CIU produced a partial list of companies and personnel, without complete information or directions regarding: (a) the precise part, supply, or product that CIU contracted to the third-party vendor for production; (b) the actual amount paid by CIU for the services rendered by the third-party vendor; (c) the name and contact information of the appropriate person with the third-party vendor that is responsible for the terms and conditions of the relationship between CIU and the third-party vendor; and (d) any useful information regarding the scope of the relationship between CIU and the third-party vendor. (*See*, **Exhibit 23**.)

34.     CIU does not own any patents, trademarks or rights related to any design or

drawing ever provided to CIU by World under the joint venture. CIU's refusal to assemble or ship products is solely borne out of a misplaced and bad faith effort to cause injury to Banjo and World. Regardless, irrespective of the personal disagreement between the parties, CIU is still obligated to ship products under the parties' joint venture agreement. Its refusal to ship has caused, and is causing, irreparable harm to Banjo and Frictionless World.

35.     To detail that harm, as of this date, CIU's refusal to ship products related to the joint venture has triggered: (a) the unfulfillment of purchase orders in the amount of no less than $5 million; (b) a mammoth reduction in World's sale of products due to complete lack of delivery (and by extension an equally significant amount of revenue loss for Frictionless LLC); (c) significant lost profits for Frictionless LLC and World; (d) a forced reduction of World's (Colorado) workforce by about 50%; (e) discussions over abandoning World's 18,335 square feet warehouse in Louisville, Colorado that is used as a massive distribution center in the parties' joint venture; and (f) a potentially permanent loss of World's long-standing relationship with mammoth retailers such as Lowes, Home Depot, Costco, Walmart, Menards, TSC, and Midstates members, including no less than 40 individual retailers and about 900 stores. The total loss that has been caused by Li and CIU's ongoing breach has caused irreconcilable harm, and that harm grows still worse with each passing day.

**GROUNDS FOR INJUNCTIVE RELIEF UNDER THE ARBITRATION AGREEMENT**

The Operating Agreement between Frictionless LLC, Li, ZL Investment, and Banjo contains the following dispute resolution provision:

> "Each member and Li, on his, her, or its own behalf and on behalf of the Company, hereby agrees to submit all controversies, claims and matters of difference arising under or relating to this Agreement or the Company, which cannot be resolved between the Members and Li, to arbitration in accordance with the provision and procedures set forth herein, except for a suit for injunctive relief, which may be brought in any court in the State of Colorado, United States pursuant to Section 14.6.2 . . . *Notwithstanding the foregoing, **each Member**, Li, and the Manager shall have the right to seek*

> *and obtain such temporary or preliminary injunctive relief from a court of competent jurisdiction to which it may be entitled pending a final determination by arbitration of the dispute to which such relief relates.*"

(**Ex. 16**, p. 22, at ¶ 14.6.1.)  (emphasis added).

The Operating Agreement also contains an enforcement provision that dictates that any party to the agreement may seek "any remedy available in equity, including but not limited to a temporary restraining order, preliminary and/or temporary relief and specific performance, until the arbitration award is rendered or the controversy is otherwise resolved, without having to arbitrate and *without need to post any bond*." (*Id.*, p. 23, at ¶ 14.6.7.)  (emphasis added).

The Operating Agreement also mandates that in the event of an "actual or threatened breach" of the Operating Agreement's non-compete provisions, the members of Frictionless LLC "shall have the right to obtain injunctive relief (*without the necessity of posting a bond*) and to seek any other remedy available to the Company. (*Id.*, p. 8, at ¶ 14.4.2.)  (Emphasis added).

## ARGUMENT

### *Preliminary Injunction*

"A preliminary injunction is designed to preserve the status quo or protect rights pending the final determination of a cause." *Gilitz LLC v. Bellock*, 171 P.3d 1274, 1278 (Colo. App. 2007); *City of Golden v. Simpson*, 83 P.3d 87, 96 (Colo. 2004). "Its purpose is to prevent irreparable harm prior to a decision on the merits of a case." *Id.* To obtain a preliminary injunction, the moving party must satisfy six elements: (1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (3) lack of a plain, speedy, and adequate remedy at law; (4) no disservice to the public interest; (5) balance of equities in favor of the injunction; and, (6) the injunction will preserve the status quo pending a trial on the merits. *See, Rathke v. MacFarlane*, 648 P.2d 648, 653-54 (Colo. 1982). As explained below, each of these factors weighs heavily in favor of

granting an injunction on Frictionless LLC and World's behalf to preserve the status quo until a final determination can be made on the merits of the claims and counterclaims at issue in the pending arbitration.  Without the AAA's immediate action, Li and his affiliates will continue to intentionally inflict serious and irreparable injury upon the joint venture entered into between Banjo and Li, and their actions, which currently threaten the viability of World and Frictionless LLC, are likely to cause the destruction of both entities.

## A. Frictionless LLC And World Have A Reasonable Probability of Prevailing on the Merits and are Therefore Entitled to a Preliminary Injunction

### 1. *Li, ZL Investment and CIU Have Materially Breached Multiple Contractual Obligations Arising From The Operating Agreement and the Purchase Orders*

World, Banjo and/or Frictionless LLC have a reasonable probability of prevailing on the merits of several of the breach of contract counterclaims they have set forth against Li, ZL Investment and CIU in this lawsuit, as detailed below.

A party alleging breach of contract must demonstrate: (1) the existence of a contract; (2) plaintiff's performance or justification for nonperformance; (3) the defendant's failure to perform; and (4) resulting damages to the plaintiff.  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).  The "performance" element means "substantial" performance.  *Id.* Substantial performance occurs when although the conditions of the contract have been deviated from by immaterial issues, the defendant has received substantially the benefit he expected and is, therefore, "bound to pay." *Id.*

"A plaintiff that is the first to breach a contract cannot also recover on that agreement. *See*, *Lawry v. Palm*, 192 P.3d 550, 560 (Colo. App. 2008).  And "an injured party claiming breach of contract has the duty to take such steps as are reasonable under the circumstances in order to mitigate or minimize the damages sustained." *Fair v. Red Lion Inn*, 943 P.2d 431, 437 (Colo. 1997).  "This means that the plaintiff may not recover damages for injuries which he or

she reasonably might have avoided." *Id.* at 437. When the performance of a duty under a contract is due, "*any nonperformance is a breach.*" *Id. McDonald v. Zions First Nat'l Bank,* 348 P.3d 957, 965 (Colo. App. 2015). (emphasis added).

A third-party beneficiary is a "person not a party to an express contract [who nevertheless] may bring an action on the contract if the parties to the agreement intended to benefit the [third party and if] ... the benefit claimed is a direct and not merely an incidental benefit of the contract." *S K Peightal Engineers, LTD v. Mid Valley Real Estate Sols. V, LLC,* 342 P.3d 868, 872 (2015). Here, a joint venture was entered into in April 2013 between Banjo and Li creating "Frictionless LLC" as a pass-through entity between CIU and World. World at that time and through today controlled all relevant lease, insurance, employees and retail connections, as well as multiple patents and trademarks, related to the marketing and sales of the products relevant at hand. (Operating Agreement, p. 5, § 2.5; Schedule B, 11-14). Neither CIU nor Frictionless LLC ever controlled any of the same. World dutifully followed the terms of the Operating Agreement for six years, transferring all revenues minus expenses and a small retained percentage back to Frictionless LLC, through which all said revenues were transferred back to CIU. World was at all times intended to directly benefit from any contracts entered into by or for Frictionless LLC, and comprises a direct third-party beneficiary to Frictionless, LLC's breach of contract claims against Li, ZL Investment and CIU.

### a. Breach of The Purchase Orders by CIU

Li is president and majority owner of CIU. Per his direction, CIU has directly breached multiple purchase orders issued by Frictionless LLC on the behalf of World. (*See, e.g.* **Exs. 19, 20, & 21.**). Each purchase order breached constitutes a separate breach of contract. As of this date these breaches total over 5 million dollars, and that number is climbing. Each of these purchase orders requires the delivery of products from CIU directly to World, or to a retailer

contracting for delivery from World. CIU's ongoing failure to deliver has caused and is causing irreconcilable harm to both Frictionless LLC and World. It has already caused a loss of millions of dollars in revenue, and will cause the loss of countless dollars in future revenue, and possibly the complete destruction of these two companies, due to cancelled orders and lost clients. Li and CIU are fully aware that the survival of Frictionless LLC and World are directly tied to CIU's shipping to World of the products ordered by World through Frictionless LLC. CIU and Li's (as president of CIU) current actions comprise a knowing, intentional effort to disturb the status quo and cause terminal financial harm to these companies.

CIU has offered no viable defense to explain its repeated and ongoing breaches of the purchase orders, other than to state though counsel that allegedly outstanding amounts owed from Frictionless LLC to CIU are a condition precedent to CIU's shipping that justify CIU's breach. CIU's argument fails. Colorado law "does not recognize a provision in a contract as a condition precedent unless clearly so identified . . ." *Balzano v. Bluewater Ins. Ltd.*, 801 P.2d 1, 3 (Colo. App. 1990). *See also Main Elec., Ltd. v. Printz Servs. Corp.*, 980 P.2d 522, 526 (Colo. 1999) ("a condition precedent in a contract is not favored and will not be given effect unless established by clear and unequivocal language"). Nowhere in the purchase orders or in the Operating Agreement or its accompanying documents is it stated or implied that Frictionless LLC's failure to timely make payments to CIU will serve as a condition precedent to CIU's obligation to satisfy its contractual duties under the parties' agreements.

Moreover, CIU's sudden claim of financial impossibility as a reason for its failure to ship will not suffice under Colorado law. The reason is that "changes in economic conditions cannot provide a basis for rescission of a contract, nor can the fact that the value of the bargain has decreased be an excuse for nonperformance." *Magnetic Copy Servs, v. Seismic Specialists, Inc.*, 805 P.2d 1161, 1165 (Colo. App. 1990). The fact that a person's economic condition may

22

change after entering into a contract is "not so unforeseeable that they are outside the risks assumed under the contract." *Beals v. Tri-B Assocs.*, 644 P.2d 78, 81 (Colo. App. 1982). Accordingly, there is no justifiable excuse for sudden nonperformance by CIU simply because Frictionless LLC is behind on its payments to CIU.

For the reasons stated above, Frictionless LLC has a reasonable probability of success on the merits of the breach of contract claim against CIU being brought on its behalf by Banjo. Similarly, World has a reasonable probability of success on the merits of its direct third-party beneficiary breach of contract claim against CIU. Both parties are suffering irreconcilable injury as a result of CIU's ongoing breach.

### b. Breach of the Operating Agreement

The Operating Agreement constitutes a valid, binding contract. (**Ex. 16**.) Under the Operating Agreement, Li and ZL Investment both agreed to be liable to Frictionless LLC for any actions related to "fraud, **willful misconduct** or **gross negligence** in the performance of their duties" under the agreement. (*Id.* at p. 11, § 5.9.1.) The Operating Agreement explicitly mandates that Frictionless LLC's business "may be conducted directly by the Company or indirectly through another company, joint venture, or other arrangement." (*Id.* at p.5, ¶ 2.5). Here, Banjo, pursuant to the joint venture detailed in the Operating Agreement, for six years operated Frictionless LLC as a pass-through business to World, an already established and recognized US owned company. (*Id.*; *see also* **Ex. 16**, Schedule B, at pp. 11-14).

The status quo that existed at the time that this action was filed was the ongoing shipment of products from CIU directly to World and its retailers. (*See*, **Exs. 19** and **20**.). Reflecting that fact, Li, CIU and ZL Investment, as well as their counsel, all referenced ongoing shipments that would not cease despite this litigation. (*Id.*). Li and ZL Investment were bound to conduct themselves in a manner that did not interfere with the status quo existing in the joint venture at

the time that this action was filed, including refraining from directing CIU to act in breach of contract and cease all shipping. Despite those contractual duties, Li and ZL Investment directed on or about April 29 directed CIU to cease all shipments. That action by Li and ZL Investment comprised a material breach of their obligations to Frictionless LLC and World under the Operating Agreement. By so acting, they knowingly disturbed the status quo and caused irreconcilable harm to Frictionless LLC and World.

Li and ZL Investment have set forth no justifications for this breach of the Operating Agreement other than that cited above to justify CIU's ongoing breach of the purchase orders. As explained, no such arguments justify such a breach. Furthermore, under Colorado law, members of a limited liability company owe one another fiduciary duties. *See*, *Gagne v. Gagne*, No. 17CA2036, 2019 WL 1284883, at *1, 6 (Colo. App. Mar. 21, 2019). *See also Hooper v. Yoder*, 737 P.2d 852, 859 (Colo. 1987) ("partners in a business enterprise owe to one another the highest duty of loyalty; they stand in a relationship of trust and confidence to each other and are bound by standards of good conduct and square dealing"); *and Silverberg v. Colantuno*, 991 P.2d 280, 284-85 (Colo. App. 1998) (each partner in business relationship "has the right to demand and expect from the other a full, fair, open, and honest disclosure of everything affecting the relationship").

By the conduct described above (as well as below), Banjo, on the behalf of Frictionless LLC, will be able to establish all the elements of a direct violation of fiduciary duties by ZL Investment and Li. While still a member and chairman of the company respectively, ZL Investment and Li openly directed their affiliate (CIU) to engage in direct competition with Frictionless LLC, and to cause severe harm to the same by halting all ordered shipments that were to be delivered to World and its contracted third-party retailers. These actions have harmed and are harming Frictionless, LLC and World significantly. As part of their fiduciary duties, Li

and ZL Investment had a duty of loyalty to the company. *See, Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 493 (Colo. 1989); and *Silverberg*, 991 P.2d at 284-85. Their duty of loyalty included the duty to not direct their affiliate to engage in a rival business. *Id.* Because Li and ZL Investment have engaged in overt tortious conduct that is directly in breach of their fiduciary duties, Frictionless LLC has a reasonable probability of success on the merits of its breach of fiduciary duty claim against them.

## B. Movants Will Suffer Real, Immediate, and Irreparable Injury Without Injunctive Relief

"Irreparable harm" is a pliant term adaptable to the unique circumstances that an individual case might present." *Gilitz*, 171 P.3d at 1278-79. (citation omitted). Generally, it "has been defined as "certain and imminent harm for which a monetary award does not adequately compensate." *Id.* "Thus, as a corollary, an injunction is available as equitable relief if there is no legal remedy that provides full, complete, and adequate relief." *Id.* At its core, an injury may be regarded as irreparable, "where monetary damages are difficult to ascertain or where there exists no certain pecuniary standard for the measurement of the damages." *Id.*

For purposes of irreparable harm, "purely speculative harm will not suffice." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). Yet, "[a] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative" and will be held to have properly established irreparable harm. *Id.* More importantly, "the demonstration of irreparable harm in the absence of relief is the single most important prerequisite for obtaining a preliminary injunction and must be established first, before consideration of the other … factors is necessary." *Bray v. QFA Royalties, LLC*, 486 F. Supp.2d 1237, 1247 (D. Colo. 2007).[2]

---

[2] The application for relief in *Bray* was construed pursuant to Fed. R. Civ. P. 65. That rule is substantially similar in language and purpose to C.R.C.P. 65. Where, as here, the Colorado rule is similar in language and serves the same purpose as the federal version, Colorado courts may look to federal cases interpreting the same rule for guidance. *See, Antero Res. Corp. v. Strudley*, 347 P.3d 149, 155 (Colo. 2015).

In *Bray*, Quiznos terminated its supply of food supplies necessary for the operations of several of its toasted sandwich franchises on the basis that the franchises engaged in conduct that disparaged the company, while the parties litigated over the terms and conditions of their franchise agreements with Quiznos. *Id.* at 1240-41. So, the issuance or non-issuance of a preliminary injunction against Quiznos stood on whether the threatened loss of the franchises as the franchise owners argued was sufficient to constitute irreparable harm that warranted injunctive relief, even though Quiznos asserted that monetary relief would be sufficient to compensate for any such loss. *Id.* at 1248. The court held that the imminent closure of the franchisees arising from the refusal to ship the critical supplies needed for the franchise day-to-day operations was tantamount to irreparable injury. *Id.* at 1249.

Such is exactly the sequence of events here, thereby necessitating the issuance and entry of a Preliminary Injunction. The Operating Agreement the parties have worked under since April 2013 makes clear that World was to be the front facing company under the joint venture encapsulated in the Operating Agreement. All leases, insurance, payroll, etc. are managed by and paid by World. Under the parties' agreement, CIU was obligated to ship any orders placed under the joint venture, for revenue to be divided between the parties to the venture per the terms of the agreement.

Just like *Bray*, Banjo, on Frictionless LLC's behalf and for purposes of the joint venture, has repeatedly pointed out to ZL Investment, Li, and CIU that the loss of long-standing business relationships with large American retailers is very real. Already millions of dollars in sales have been lost, and retailers are cancelling unfulfilled orders and switching to other suppliers daily. ZL Investment, Li, and CIU have demonstrated through their actions that they do not care about these facts. As in *Bray*, Li and his affiliates have already demonstrated their willingness to disrupt and destroy the business venture altogether, and to cause massive collateral damage to

Movants, by refusing to provide the contracted deliveries necessary for World to continue the business venture, and for Frictionless LLC to continue to exist.

Frictionless LLC's existence is predicated on World's long-lasting relationship with several large retailers and customers, and its ability to sell products under its recognized brand names. It is not measurable in monetary terms should those business relationships fail, thereby undermining what World has built since 2012. It is for this reason that courts have held in similar circumstances the threat to "the very existence of the movant's business," or the disappearance of goodwill built over the years, is equivalent to irreparable injury. *See, e.g., Husky Ventures, Inc. v. B55 Invs, Ltd.*, 911 F.3d 1000, 1013-14 (10th Cir. 2018) (non-movant's intent to undermine and destroy movant's business warranted a finding of irreparable harm should injunction fail to issue); *Gilitz*, 171 P.3d at 1279 (mismanagement of company that may lead to company wipeout supports finding of irreparable harm); *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) (loss of right to continue business supports claim of irreparable injury).

This record is replete with evidence that ZL Investment and Li are competing in direct breach of contract, and are now working to unravel and destroy both Frictionless LLC and World. (*See, e.g.* **Ex. 19**; and **Exhibit 24**). Indeed, after initiating the arbitration demand, Li and his affiliates made repeated false representations – even to their counsel -- about CIU's continued shipping of outstanding purchase orders. (*See*, **Ex. 20**, counsel categorically stating that "I have just confirmed with my client that production and shipment will continue as usual vis-à-vis the purchase orders we discussed."). Not only did CIU then fail to ship any orders, but it subsequently flatly refused to do so. Should an injunction fail to issue, it is extremely likely that the joint venture at issue will unravel, causing irreconcilable injuries to Frictionless LLC and

World.  A preliminary injunction is crucially necessary to preserve the status quo, pending the parties' arbitration of their dispute.

### C. **Movants Have No Plain, Speedy, and Adequate Remedy at Law**

As noted above, Li and his affiliates' continued refusal to ship the millions of dollars in products ordered by Frictionless LLC for delivery to World, as well as their continuing shipment of products to competing companies, is continuing to cause injuries to Frictionless LLC that cannot be fully compensated with monetary damages.  It will be difficult, if not impossible, to show the full impact of their actions.  No circumstance exists under which the Arbitration Panel can force the customers that have been lost due to CIU's refusal to ship to again do business with World.  The only viable and immediate relief Movants may obtain is in the form of injunctive relief that prohibits Li and his affiliates from continuing to withhold shipments under the joint venture involving World and Frictionless LLC.

### D. **The Balance of Harms and Public Interest Weigh Heavily in Favor of Emergency Relief**

The balance of harms and public interest weigh strongly in favor of granting emergency relief.  Here, Movants seek to preserve the very existence of a business, which is one of the strongest interests protected by law.  *See, e.g.*, *Husky Ventures, Inc.*, 911 F.3d at 1013-14; *Gilitz*, 171 P.3d at 1279; *Tri-State Generation and Transmission Ass'n, Inc.*, 805 F.2d at 356; and *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 653-54 (10th Cir. 2004).   There is no discernible harm that will accrue to ZL Investment, Li or CIU from CIU resuming shipments under the joint venture.  To the contrary, they will receive immediate payment for every product delivered.  Nor will Li and ZL Investment suffer any cognizable injury in staying within the ambits of the non-compete provision they signed and **agreed to be bound** by, under the Operating Agreement.   Further, the entry of injunctive relief in this instance is not adverse to the public interest.  To the contrary, a very large number of loyal customers and retailers **rely** on the

quality and delivery of World's patented and trademarked products that are assembled and shipped pursuant to the joint venture the parties have operated for six years. The same customers and retailers have been (and continue to be) gravely disappointed by World's inexplicable failure to deliver products this season, due to CIU's refusal to fulfill its contractual obligations. Indeed, the public has been directly harmed from CIU's failure to send shipments to Colorado, and retailers involved with the joint venture have been left scrambling, with little recourse to redress the issue, based on the abrupt and disruptive manner under which CIU ceased all shipments.

Not only have customers been harmed in droves, but World's employees, who have also been working under the joint venture, are distraught over their employment situation, given that the majority of the products World sells come from CIU. Therefore, the refusal to ship has significantly affected World's ability to generate revenue for the joint venture, as well as pay employees' salaries that would have been expensed to Frictionless LLC under the agreement, all stemming from Li and his affiliates' malicious decision to impede product flow. If an injunction issues, however, the harm to the public will be immediately alleviated, pending the litigation of this business dispute and a trial on the merits before the Arbitration Panel. Thus, the grant of this Motion is clearly within the public interest.

Finally, the balance of equities also favors enforcement. The Movants are only seeking to curb the malicious conduct by Li and his affiliates of illegally violating several provisions of the Operating Agreement. For CIU and Li, the refusal to ship is clearly a weapon of choice in their personal vendetta against Banjo and World. But such a tactic is a direct breach of both the purchase orders and the Operating Agreement. The violation of multiple valid, binding agreements is not the appropriate tool for settling personal grievances, and the balance of equities favors the entry of an injunction, especially where Li, ZL Investment and CIU will suffer no financial harm and will have ample opportunity to litigate this dispute on the merits.

Granting Frictionless LLC and World's request for preliminary injunctive relief in the meantime, however, will preserve the status quo by placing the parties back into the status quo that existed prior to these actions.

### E. **No Bond Is Required**

A bond is not necessary in this instance, as the Operating Agreement specifically allows for the entry of injunctive relief without the necessity of a bond. (*See*, **Ex. 16**, p. 8, at ¶ 14.4.2.; and p. 23, at ¶ 14.6.7.) Further, based on Li and his affiliates conduct, Movants have sustained significant monetary injuries in the past six months, such that they have very little, if any, capital, with which to put up a substantial bond in the event one is required. Also, no injury will arise to CIU, Li and ZL Investment as a result of any injunction entered against them given that CIU will receive immediate payment for each sale upon proof of shipment. On its face, CIU stands to directly benefit from the resumed sales and distribution of the products.

### F. **Closing**

For each of the above reasons, Banjo, derivatively on the behalf of Frictionless LLC, and World, as a direct third-party beneficiary of the Operating Agreement and the purchase orders, respectfully request that the arbitrator assigned to hear this emergency motion issue a Preliminary Injunction ordering Li, ZL Investment and CIU to return to the status quo that existed at the outset of this lawsuit, and remain there until a final ruling is issued in this matter. Based on the same, CIU must resume shipping products to World or to third party retailers. World will issue payment for each product shipped upon receiving proof of shipment.

As a part of this Order, it is requested that the parties be directed to address any future issues related to the shipment of goods with the assigned arbitrators as a part of this action.

Your assistance with this matter is sincerely appreciated in advance. Should you require a proposed order, please let us know and one will be submitted.

Date: <u>June  18, 2019</u>                    Yours truly,

                                        <u>*/s/ Thomas P. Howard*</u>
                                        Thomas P. Howard

## **CERTIFICATE OF SERVICE**

I hereby certify that the all counsel of record are being served this 18th day of June

2019, with a copy of the foregoing document via electronic mail.

*/s/ Thomas P. Howard*
Thomas P. Howard

# Exhibit 10



# Commercial

## Arbitration Rules and Mediation Procedures

**Including Procedures for Large, Complex Commercial Disputes**



AMERICAN ARBITRATION ASSOCIATION®

Available online at **adr.org/commercial**

Rules Amended and Effective October 1, 2013
Fee Schedule Amended and Effective July 1, 2016

## Regional Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, Virginia**
P. Jean Baker, Esq.
Vice President
Phone: 202.223.7093
Email: BakerJ@adr.org

**States: Oklahoma, Texas**
Andrew Barton
Vice President
Phone: 210.998.5750
Email: BartonA@adr.org

**States: Alabama, Georgia**
John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org

**States: City of Houston, Louisiana, Mississippi**
Ingeuneal C. Gray, Esq.
Vice President
Phone: 832.308.7893
Email: GrayI@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**
Karen Jalkut
Vice President
Phone: 617.695.6062
Email: JalkutK@adr.org

**States: Alaska, California, Hawaii, Oregon, Washington**
Serena K. Lee, Esq.
Vice President
Phone: 415.671.4053
Email: LeeS@adr.org

**States: Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, West Virginia**
Michelle M. Skipper
Vice President
Phone: 704.643.8605
Email: SkipperM@adr.org

**States: Florida**
Rebecca Storrow, Ph.D.
Vice President
Phone: 954.372.4341
Email: StorrowR@adr.org

**States: Arizona, Colorado, Kansas, Idaho, Montana, Nebraska, Nevada, New Mexico, Utah, Wyoming**
Lance K. Tanaka
Vice President
Phone: 303.831.0824
Email: TanakaL@adr.org

**States: Arkansas, Illinois, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, Wisconsin**
A. Kelly Turner, Esq.
Vice President
Phone: 312.361.1116
Email: TurnerK@adr.org

**States: New York**
Jeffrey T. Zaino, Esq.
Vice President
Phone: 212.484.3224
Email: ZainoJ@adr.org

## Case Management Vice Presidents and Assistant Vice Presidents

Jeffrey Garcia
Vice President
Phone: 559.490.1860
Email: GarciaJ@adr.org
**Administers cases in: AK, AZ, AR, CA, CO, HI, ID, IL, IA, KS, LA, MN, MS, MO, MT, NE, NV, NM, ND, OK, OR, SD, TX, UT, WA, WI, WY**

John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org
**Administers cases in: AL, DC, FL, GA, IN, KY, MD, NC, OH, SC, TN, VA**

Yvonne Baglini
Assistant Vice President
Phone: 866.293.4053
Email: BagliniY@adr.org
**Administers cases in: CT, DE, MA, ME, MI, NH, NJ, NY, PA, RI, VT, WV**

# Table of Contents

Important Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

Standard Arbitration Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Administrative Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Large, Complex Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9


Commercial Arbitration Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    R-1. Agreement of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

    R-2. AAA and Delegation of Duties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    R-3. National Roster of Arbitrators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    R-4. Filing Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    R-5. Answers and Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

    R-6. Changes of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    R-7. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

    R-8. Interpretation and Application of Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    R-9. Mediation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    R-10. Administrative Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    R-11. Fixing of Locale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    R-12. Appointment from National Roster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

    R-13. Direct Appointment by a Party. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

    R-14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties. . . . . . . .16

    R-15. Nationality of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

    R-16. Number of Arbitrators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

    R-17. Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

    R-18. Disqualification of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

    R-19. Communication with Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

    R-20. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

    R-21. Preliminary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

    R-22. Pre-Hearing Exchange and Production of Information . . . . . . . . . . . . . . . . . . .19

    R-23. Enforcement Powers of the Arbitrator. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

    R-24. Date, Time, and Place of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

    R-25. Attendance at Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    R-26. Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

    R-27. Oaths . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

R-28. Stenographic Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

R-29. Interpreters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-30. Postponements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-31. Arbitration in the Absence of a Party or Representative . . . . . . . . . . . . . . . . . . . . .22

R-32. Conduct of Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

R-33. Dispositive Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-34. Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-35. Evidence by Written Statements and Post-Hearing Filing of Documents or
Other Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

R-36. Inspection or Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-37. Interim Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-38. Emergency Measures of Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

R-39. Closing of Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

R-40. Reopening of Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-41. Waiver of Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-42. Extensions of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-43. Serving of Notice and Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

R-44. Majority Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-45. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-46. Form of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

R-47. Scope of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-48. Award Upon Settlement—Consent Award . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-49. Delivery of Award to Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-50. Modification of Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

R-51. Release of Documents for Judicial Proceedings. . . . . . . . . . . . . . . . . . . . . . . . .29

R-52. Applications to Court and Exclusion of Liability. . . . . . . . . . . . . . . . . . . . . . . . .29

R-53. Administrative Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-54. Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

R-55. Neutral Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-56. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-57. Remedies for Nonpayment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

R-58. Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

Preliminary Hearing Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
   P-1. General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
   P-2. Checklist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

Expedited Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
   E-1. Limitation on Extensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
   E-2. Changes of Claim or Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
   E-3. Serving of Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34
   E-4. Appointment and Qualifications of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . .34
   E-5. Exchange of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
   E-6. Proceedings on Documents and Procedures for the Resolution of Disputes
   Through Document Submission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
   E-7. Date, Time, and Place of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
   E-8. The Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
   E-9. Time of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
   E-10. Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

Procedures for Large, Complex Commercial Disputes . . . . . . . . . . . . . . . . . . . . . . . .37
   L-1. Administrative Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
   L-2. Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
   L-3. Management of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

Administrative Fee Schedules (Standard and Flexible Fees) . . . . . . . . . . . . . . . . . . .38

Commercial Mediation Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
   M-1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
   M-2. Initiation of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
   M-3. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
   M-4. Appointment of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
   M-5. Mediator's Impartiality and Duty to Disclose . . . . . . . . . . . . . . . . . . . . . . . . . .40
   M-6. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
   M-7. Duties and Responsibilities of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . .41
   M-8. Responsibilities of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42
   M-9. Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42
   M-10. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42
   M-11. No Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

M-12. Termination of Mediation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

M-13. Exclusion of Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

M-14. Interpretation and Application of Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

M-15. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

M-16. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

M-17. Cost of the Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

# Commercial Arbitration Rules and Mediation Procedures

(Including Procedures for Large, Complex Commercial Disputes)

## Important Notice

These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA®. To ensure that you have the most current information, see our web site at **www.adr.org.**

## Introduction

Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.

The American Arbitration Association® (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on various forms of alternative dispute resolution.

## Standard Arbitration Clause

The parties can provide for arbitration of future disputes by inserting the
following clause into their contracts:

> *Any controversy or claim arising out of or relating to this contract, or the
> breach thereof, shall be settled by arbitration administered by the
> American Arbitration Association under its Commercial Arbitration Rules,
> and judgment on the award rendered by the arbitrator(s) may be entered
> in any court having jurisdiction thereof.*

Arbitration of existing disputes may be accomplished by use of the following:

> *We, the undersigned parties, hereby agree to submit to arbitration
> administered by the American Arbitration Association under its
> Commercial Arbitration Rules the following Controversy: (describe briefly).
> We further agree that the above controversy be submitted to (one) (three)
> arbitrator(s). We further agree that we will faithfully observe this
> agreement and the rules, that we will abide by and perform any award
> rendered by the arbitrator(s), and that a judgment of any court having
> jurisdiction may be entered on the award.*

The services of the AAA are generally concluded with the transmittal of the
award. Although there is voluntary compliance with the majority of awards,
judgment on the award can be entered in a court having appropriate jurisdiction
if necessary.

## Administrative Fees

The AAA charges a filing fee based on the amount of the claim or counterclaim.
This fee information, which is included with these rules, allows the parties to
exercise control over their administrative fees. The fees cover AAA administrative
services; they do not cover arbitrator compensation or expenses, if any, reporting
services, or any post-award charges incurred by the parties in enforcing the award.

## Mediation

Subject to the right of any party to opt out, in cases where a claim or
counterclaim exceeds $75,000, the rules provide that the parties shall mediate
their dispute upon the administration of the arbitration or at any time when the
arbitration is pending. In mediation, the neutral mediator assists the parties in

reaching a settlement but does not have the authority to make a binding decision or award. Mediation is administered by the AAA in accordance with its Commercial Mediation Procedures. There is no additional filing fee where parties to a pending arbitration attempt to mediate their dispute under the AAA's auspices.

Although these rules include a mediation procedure that will apply to many cases, parties may still want to incorporate mediation into their contractual dispute settlement process. Parties can do so by inserting the following mediation clause into their contract in conjunction with a standard arbitration provision:

> *If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission agreement:

> *The parties hereby submit the following dispute to mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

## Large, Complex Cases

Unless the parties agree otherwise, the procedures for Large, Complex Commercial Disputes, which appear in this pamphlet, will be applied to all cases administered by the AAA under the Commercial Arbitration Rules in which the disclosed claim or counterclaim of any party is at least $500,000 exclusive of claimed interest, arbitration fees and costs. The key features of these procedures include:

> A highly qualified, trained Roster of Neutrals;
> A mandatory preliminary hearing with the arbitrators, which may be conducted by teleconference;
> Broad arbitrator authority to order and control the exchange of information, including depositions;
> A presumption that hearings will proceed on a consecutive or block basis.

## Commercial Arbitration Rules

### R-1. Agreement of Parties*

**(a)** The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a Demand for Arbitration or Submission Agreement received by the AAA. Any disputes regarding which AAA rules shall apply shall be decided by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

**(b)** Unless the parties or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $75,000, exclusive of interest, attorneys' fees, and arbitration fees and costs.

Parties may also agree to use these procedures in larger cases. Unless the parties agree otherwise, these procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Sections E-1 through E-10 of these rules, in addition to any other portion of these rules that is not in conflict with the Expedited Procedures.

**(c)** Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $500,000 or more, exclusive of claimed interest, attorneys' fees, arbitration fees and costs. Parties may also agree to use the procedures in cases involving claims or counterclaims under $500,000, or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Sections L-1 through L-3 of these rules, in addition to any other portion of these rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

**(d)** Parties may, by agreement, apply the Expedited Procedures, the Procedures for Large, Complex Commercial Disputes, or the Procedures for the Resolution of Disputes through Document Submission (Rule E-6) to any dispute.

**(e)** All other cases shall be administered in accordance with Sections R-1 through R-58 of these rules.

---

\*  *A dispute arising out of an employer-promulgated plan will be administered under the AAA's Employment Arbitration Rules and Mediation Procedures. A dispute arising out of a consumer arbitration agreement will be administered under the AAA's Consumer Arbitration Rules.*

## R-2. AAA and Delegation of Duties

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices. Arbitrations administered under these rules shall only be administered by the AAA or by an individual or organization authorized by the AAA to do so.

## R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Arbitrators ("National Roster") and shall appoint arbitrators as provided in these rules. The term "arbitrator" in these rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

## R-4. Filing Requirements

**(a)** Arbitration under an arbitration provision in a contract shall be initiated by the initiating party ("claimant") filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration.

**(b)** Arbitration pursuant to a court order shall be initiated by the initiating party filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of any applicable arbitration agreement from the parties' contract which provides for arbitration.

    **i.** The filing party shall include a copy of the court order.

    **ii.** The filing fee must be paid before a matter is considered properly filed. If the court order directs that a specific party is responsible for the filing fee, it is the responsibility of the filing party to either make such payment to the AAA and seek reimbursement as directed in the court order or to make other such arrangements so that the filing fee is submitted to the AAA with the Demand.

    **iii.** The party filing the Demand with the AAA is the claimant and the opposing party is the respondent regardless of which party initiated the court action. Parties may request that the arbitrator alter the order of proceedings if necessary pursuant to R-32.

**(c)** It is the responsibility of the filing party to ensure that any conditions precedent to the filing of a case are met prior to filing for an arbitration, as well as any time requirements associated with the filing. Any dispute regarding whether a condition precedent has been met may be raised to the arbitrator for determination.

**(d)** Parties to any existing dispute who have not previously agreed to use these rules may commence an arbitration under these rules by filing a written submission agreement and the administrative filing fee. To the extent that the parties' submission agreement contains any variances from these rules, such variances should be clearly stated in the Submission Agreement.

**(e)** Information to be included with any arbitration filing includes:

    **i.** the name of each party;

    **ii.** the address for each party, including telephone and fax numbers and e-mail addresses;

    **iii.** if applicable, the names, addresses, telephone and fax numbers, and e-mail addresses of any known representative for each party;

    **iv.** a statement setting forth the nature of the claim including the relief sought and the amount involved; and

    **v.** the locale requested if the arbitration agreement does not specify one.

**(f)** The initiating party may file or submit a dispute to the AAA in the following manner:

    **i.** through AAA WebFile, located at **www.adr.org;** or

    **ii.** by filing the complete Demand or Submission with any AAA office, regardless of the intended locale of hearing.

**(g)** The filing party shall simultaneously provide a copy of the Demand and any supporting documents to the opposing party.

**(h)** The AAA shall provide notice to the parties (or their representatives if so named) of the receipt of a Demand or Submission when the administrative filing requirements have been satisfied. The date on which the filing requirements are satisfied shall establish the date of filing the dispute for administration. However, all disputes in connection with the AAA's determination of the date of filing may be decided by the arbitrator.

**(i)** If the filing does not satisfy the filing requirements set forth above, the AAA shall acknowledge to all named parties receipt of the incomplete filing and inform the parties of the filing deficiencies. If the deficiencies are not cured by the date specified by the AAA, the filing may be returned to the initiating party.

## R-5. Answers and Counterclaims

**(a)** A respondent may file an answering statement with the AAA within 14 calendar days after notice of the filing of the Demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of any answering statement to the claimant and to all other parties to the arbitration. If no answering statement is filed within the stated time, the respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

**(b)** A respondent may file a counterclaim at any time after notice of the filing of the Demand is sent by the AAA, subject to the limitations set forth in Rule R-6. The respondent shall send a copy of the counterclaim to the claimant and all other parties to the arbitration. If a counterclaim is asserted, it shall include a statement setting forth the nature of the counterclaim including the relief sought and the amount involved. The filing fee as specified in the applicable AAA Fee Schedule must be paid at the time of the filing of any counterclaim.

**(c)** If the respondent alleges that a different arbitration provision is controlling, the matter will be administered in accordance with the arbitration provision submitted by the initiating party subject to a final determination by the arbitrator.

**(d)** If the counterclaim does not meet the requirements for filing a claim and the deficiency is not cured by the date specified by the AAA, it may be returned to the filing party.

## R-6. Changes of Claim

**(a)** A party may at any time prior to the close of the hearing or by the date established by the arbitrator increase or decrease the amount of its claim or counterclaim. Written notice of the change of claim amount must be provided to the AAA and all parties. If the change of claim amount results in an increase in administrative fee, the balance of the fee is due before the change of claim amount may be accepted by the arbitrator.

**(b)** Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have a period of 14 calendar days from the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

## R-7. Jurisdiction

**(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

**(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

R-8. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

R-9. Mediation

In all cases where a claim or counterclaim exceeds $75,000, upon the AAA's administration of the arbitration or at any time while the arbitration is pending, the parties shall mediate their dispute pursuant to the applicable provisions of the AAA's Commercial Mediation Procedures, or as otherwise agreed by the parties. Absent an agreement of the parties to the contrary, the mediation shall take place concurrently with the arbitration and shall not serve to delay the arbitration proceedings. However, any party to an arbitration may unilaterally opt out of this rule upon notification to the AAA and the other parties to the arbitration. The parties shall confirm the completion of any mediation or any decision to opt out of this rule to the AAA. Unless agreed to by all parties and the mediator, the mediator shall not be appointed as an arbitrator to the case.

R-10. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, mediation of the dispute, potential exchange of information, a timetable for hearings, and any other administrative matters.

R-11. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. Any disputes regarding the locale that are to be decided by the AAA must be submitted to the AAA and all other parties within 14 calendar days from the date of the AAA's initiation of the case or the date established by the AAA. Disputes regarding locale shall be determined in the following manner:

(a) When the parties' arbitration agreement is silent with respect to locale, and if the parties disagree as to the locale, the AAA may initially determine the place of

arbitration, subject to the power of the arbitrator after appointment, to make a final determination on the locale.

**(b)** When the parties' arbitration agreement requires a specific locale, absent the parties' agreement to change it, or a determination by the arbitrator upon appointment that applicable law requires a different locale, the locale shall be that specified in the arbitration agreement.

**(c)** If the reference to a locale in the arbitration agreement is ambiguous, and the parties are unable to agree to a specific locale, the AAA shall determine the locale, subject to the power of the arbitrator to finally determine the locale.

The arbitrator, at the arbitrator's sole discretion, shall have the authority to conduct special hearings for document production purposes or otherwise at other locations if reasonably necessary and beneficial to the process.

## R-12. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

**(a)** The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

**(b)** If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 14 calendar days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. The parties are not required to exchange selection lists. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable to that party. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

**(c)** Unless the parties agree otherwise, when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

## R-13. Direct Appointment by a Party

**(a)** If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. The notice of appointment, with the name and address of the arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

**(b)** Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Section R-18 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Section R-18(b) that the party-appointed arbitrators are to be non-neutral and need not meet those standards.

**(c)** If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

**(d)** If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 14 calendar days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

## R-14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties

**(a)** If, pursuant to Section R-13, either the parties have directly appointed arbitrators, or the arbitrators have been appointed by the AAA, and the parties have authorized them to appoint a chairperson within a specified time and no appointment is made within that time or any agreed extension, the AAA may appoint the chairperson.

**(b)** If no period of time is specified for appointment of the chairperson, and the party-appointed arbitrators or the parties do not make the appointment within 14 calendar days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

**(c)** If the parties have agreed that their party-appointed arbitrators shall appoint the chairperson from the National Roster, the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Section R-12, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Section.

## R-15. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these rules.

## R-16. Number of Arbitrators

**(a)** If the arbitration agreement does not specify the number of arbitrators, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. A party may request three arbitrators in the Demand or Answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

**(b)** Any request for a change in the number of arbitrators as a result of an increase or decrease in the amount of a claim or a new or different claim must be made to the AAA and other parties to the arbitration no later than seven calendar days after receipt of the R-6 required notice of change of claim amount. If the parties are unable to agree with respect to the request for a change in the number of arbitrators, the AAA shall make that determination.

## R-17. Disclosure

**(a)** Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration. Failure on the part of a party or a representative to comply with the requirements of this rule may result in the waiver of the right to object to an arbitrator in accordance with Rule R-41.

**(b)** Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

**(c)** Disclosure of information pursuant to this Section R-17 is not an indication that the arbitrator considers that the disclosed circumstance is likely to affect impartiality or independence.

## R-18. Disqualification of Arbitrator

**(a)** Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for:

    **i.** partiality or lack of independence,

    **ii.** inability or refusal to perform his or her duties with diligence and in good faith, and

    **iii.** any grounds for disqualification provided by applicable law.

**(b)** The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Section R-13 shall be non-neutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

**(c)** Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified under the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

## R-19. Communication with Arbitrator

**(a)** No party and no one acting on behalf of any party shall communicate *ex parte* with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate *ex parte* with a candidate for direct appointment pursuant to R-13 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

**(b)** Section R-19(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Section R-18(b), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Section R-18(b), the AAA shall as an administrative practice suggest to the parties that they agree further that Section R-19(a) should nonetheless apply prospectively.

**(c)** In the course of administering an arbitration, the AAA may initiate communications with each party or anyone acting on behalf of the parties either jointly or individually.

**(d)** As set forth in R-43, unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

R-20. Vacancies

**(a)** If for any reason an arbitrator is unable or unwilling to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

**(b)** In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

**(c)** In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

R-21. Preliminary Hearing

**(a)** At the discretion of the arbitrator, and depending on the size and complexity of the arbitration, a preliminary hearing should be scheduled as soon as practicable after the arbitrator has been appointed. The parties should be invited to attend the preliminary hearing along with their representatives. The preliminary hearing may be conducted in person or by telephone.

**(b)** At the preliminary hearing, the parties and the arbitrator should be prepared to discuss and establish a procedure for the conduct of the arbitration that is appropriate to achieve a fair, efficient, and economical resolution of the dispute. Sections P-1 and P-2 of these rules address the issues to be considered at the preliminary hearing.

R-22. Pre-Hearing Exchange and Production of Information

**(a)** *Authority of arbitrator.* The arbitrator shall manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute, while at the same time promoting equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses.

**(b)** *Documents.* The arbitrator may, on application of a party or on the arbitrator's own initiative:

   **i.** require the parties to exchange documents in their possession or custody on which they intend to rely;

   **ii.** require the parties to update their exchanges of the documents on which they intend to rely as such documents become known to them;

   **iii.** require the parties, in response to reasonable document requests, to make available to the other party documents, in the responding party's possession or custody, not otherwise readily available to the party seeking the documents, reasonably believed by the party seeking the documents to exist and to be relevant and material to the outcome of disputed issues; and

iv. require the parties, when documents to be exchanged or produced are maintained in electronic form, to make such documents available in the form most convenient and economical for the party in possession of such documents, unless the arbitrator determines that there is good cause for requiring the documents to be produced in a different form. The parties should attempt to agree in advance upon, and the arbitrator may determine, reasonable search parameters to balance the need for production of electronically stored documents relevant and material to the outcome of disputed issues against the cost of locating and producing them.

## R-23. Enforcement Powers of the Arbitrator

The arbitrator shall have the authority to issue any orders necessary to enforce the provisions of rules R-21 and R-22 and to otherwise achieve a fair, efficient and economical resolution of the case, including, without limitation:

(a) conditioning any exchange or production of confidential documents and information, and the admission of confidential evidence at the hearing, on appropriate orders to preserve such confidentiality;

(b) imposing reasonable search parameters for electronic and other documents if the parties are unable to agree;

(c) allocating costs of producing documentation, including electronically stored documentation;

(d) in the case of willful non-compliance with any order issued by the arbitrator, drawing adverse inferences, excluding evidence and other submissions, and/or making special allocations of costs or an interim award of costs arising from such non-compliance; and

(e) issuing any other enforcement orders which the arbitrator is empowered to issue under applicable law.

## R-24. Date, Time, and Place of Hearing

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 calendar days in advance of the hearing date, unless otherwise agreed by the parties.

R-25. Attendance at Hearings

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person.

R-26. Representation

Any party may participate without representation (*pro se*), or by counsel or any other representative of the party's choosing, unless such choice is prohibited by applicable law. A party intending to be so represented shall notify the other party and the AAA of the name, telephone number and address, and email address if available, of the representative at least seven calendar days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

R-27. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

R-28. Stenographic Record

**(a)** Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three calendar days in advance of the hearing. The requesting party or parties shall pay the cost of the record.

**(b)** No other means of recording the proceedings will be permitted absent the agreement of the parties or per the direction of the arbitrator.

**(c)** If the transcript or any other recording is agreed by the parties or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

**(d)** The arbitrator may resolve any disputes with regard to apportionment of the costs of the stenographic record or other recording.

R-29. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

R-30. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

R-31. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

R-32. Conduct of Proceedings

(a) The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

(b) The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

(c) When deemed appropriate, the arbitrator may also allow for the presentation of evidence by alternative means including video conferencing, internet communication, telephonic conferences and means other than an in-person presentation. Such alternative means must afford a full opportunity for all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute and, when involving witnesses, provide an opportunity for cross-examination.

(d) The parties may agree to waive oral hearings in any case and may also agree to utilize the Procedures for Resolution of Disputes Through Document Submission, found in Rule E-6.

R-33. Dispositive Motions

The arbitrator may allow the filing of and make rulings upon a dispositive motion
only if the arbitrator determines that the moving party has shown that the motion
is likely to succeed and dispose of or narrow the issues in the case.

R-34. Evidence

(a) The parties may offer such evidence as is relevant and material to the dispute and
shall produce such evidence as the arbitrator may deem necessary to an
understanding and determination of the dispute. Conformity to legal rules of
evidence shall not be necessary. All evidence shall be taken in the presence of all
of the arbitrators and all of the parties, except where any of the parties is absent,
in default, or has waived the right to be present.

(b) The arbitrator shall determine the admissibility, relevance, and materiality of the
evidence offered and may exclude evidence deemed by the arbitrator to be
cumulative or irrelevant.

(c) The arbitrator shall take into account applicable principles of legal privilege, such
as those involving the confidentiality of communications between a lawyer and
client.

(d) An arbitrator or other person authorized by law to subpoena witnesses or
documents may do so upon the request of any party or independently.

R-35. Evidence by Written Statements and Post-Hearing Filing of Documents or
Other Evidence

(a) At a date agreed upon by the parties or ordered by the arbitrator, the parties shall
give written notice for any witness or expert witness who has provided a written
witness statement to appear in person at the arbitration hearing for examination.
If such notice is given, and the witness fails to appear, the arbitrator may disregard
the written witness statement and/or expert report of the witness or make such
other order as the arbitrator may consider to be just and reasonable.

(b) If a witness whose testimony is represented by a party to be essential is unable or
unwilling to testify at the hearing, either in person or through electronic or other
means, either party may request that the arbitrator order the witness to appear
in person for examination before the arbitrator at a time and location where the
witness is willing and able to appear voluntarily or can legally be compelled to do
so. Any such order may be conditioned upon payment by the requesting party of
all reasonable costs associated with such examination.

(c) If the parties agree or the arbitrator directs that documents or other evidence be
submitted to the arbitrator after the hearing, the documents or other evidence
shall be filed with the AAA for transmission to the arbitrator. All parties shall be
afforded an opportunity to examine and respond to such documents or other
evidence.

### R-36. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

### R-37. Interim Measures

(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

(b) Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

(c) A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

### R-38. Emergency Measures of Protection

(a) Unless the parties agree otherwise, the provisions of this rule shall apply to arbitrations conducted under arbitration clauses or agreements entered on or after October 1, 2013.

(b) A party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile or e-mail or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

(c) Within one business day of receipt of notice as provided in section (b), the AAA shall appoint a single emergency arbitrator designated to rule on emergency applications. The emergency arbitrator shall immediately disclose any circumstance likely, on the basis of the facts disclosed on the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

**(d)** The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such a schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone or video conference or on written submissions as alternatives to a formal hearing. The emergency arbitrator shall have the authority vested in the tribunal under Rule 7, including the authority to rule on her/his own jurisdiction, and shall resolve any disputes over the applicability of this Rule 38.

**(e)** If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage shall result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim order or award granting the relief and stating the reason therefore.

**(f)** Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the panel is constituted; thereafter such a request shall be addressed to the panel. The emergency arbitrator shall have no further power to act after the panel is constituted unless the parties agree that the emergency arbitrator is named as a member of the panel.

**(g)** Any interim award of emergency relief may be conditioned on provision by the party seeking such relief for appropriate security.

**(h)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with this rule, the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in this rule and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

**(i)** The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the tribunal to determine finally the apportionment of such costs.

## R-39. Closing of Hearing

**(a)** The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

**(b)** If documents or responses are to be filed as provided in Rule R-35, or if briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If no documents, responses, or briefs are to be filed, the arbitrator shall declare the hearings closed as of the date of the last hearing (including telephonic hearings). If the case was heard without any oral hearings, the arbitrator shall close the hearings upon the due date established for receipt of the final submission.

(c) The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing. The AAA may extend the time limit for rendering of the award only in unusual and extreme circumstances.

## R-40. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties , the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award (14 calendar days if the case is governed by the Expedited Procedures).

## R-41. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

## R-42. Extensions of Time

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these rules, except the time for making the award. The AAA shall notify the parties of any extension.

## R-43. Serving of Notice and Communications

(a) Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

(b) The AAA, the arbitrator and the parties may also use overnight delivery or electronic facsimile transmission (fax), or electronic (e-mail) to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by e-mail or other methods of communication.

(c) Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

(d) Unless otherwise instructed by the AAA or by the arbitrator, all written communications made by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

(e) Failure to provide the other party with copies of communications made to the AAA or to the arbitrator may prevent the AAA or the arbitrator from acting on any requests or objections contained therein.

(f) The AAA may direct that any oral or written communications that are sent by a party or their representative shall be sent in a particular manner. The failure of a party or their representative to do so may result in the AAA's refusal to consider the issue raised in the communication.

## R-44. Majority Decision

(a) When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement or section (b) of this rule, a majority of the arbitrators must make all decisions.

(b) Where there is a panel of three arbitrators, absent an objection of a party or another member of the panel, the chairperson of the panel is authorized to resolve any disputes related to the exchange of information or procedural matters without the need to consult the full panel.

## R-45. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 calendar days from the date of closing the hearing, or, if oral hearings have been waived, from the due date set for receipt of the parties' final statements and proofs.

## R-46. Form of Award

(a) Any award shall be in writing and signed by a majority of the arbitrators. It shall be executed in the form and manner required by law.

(b) The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

R-47. Scope of Award

**(a)** The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

**(b)** In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

**(c)** In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

**(d)** The award of the arbitrator(s) may include:

    **i.** interest at such rate and from such date as the arbitrator(s) may deem appropriate; and

    **ii.** an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

R-48. Award Upon Settlement—Consent Award

**(a)** If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses.

**(b)** The consent award shall not be released to the parties until all administrative fees and all arbitrator compensation have been paid in full.

R-49. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at their last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

R-50. Modification of Award

Within 20 calendar days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other

parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto.

## R-51. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party to the arbitration, furnish to the party, at its expense, copies or certified copies of any papers in the AAA's possession that are not determined by the AAA to be privileged or confidential.

## R-52. Applications to Court and Exclusion of Liability

**(a)** No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

**(b)** Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary or proper party in judicial proceedings relating to the arbitration.

**(c)** Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

**(d)** Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

**(e)** Parties to an arbitration under these rules may not call the arbitrator, the AAA, or AAA employees as a witness in litigation or any other proceeding relating to the arbitration. The arbitrator, the AAA and AAA employees are not competent to testify as witnesses in any such proceeding.

## R-53. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe administrative fees to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable. The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

## R-54. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and

the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

### R-55. Neutral Arbitrator's Compensation

(a) Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation.

(b) If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

(c) Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

### R-56. Deposits

(a) The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

(b) Other than in cases where the arbitrator serves for a flat fee, deposit amounts requested will be based on estimates provided by the arbitrator. The arbitrator will determine the estimated amount of deposits using the information provided by the parties with respect to the complexity of each case.

(c) Upon the request of any party, the AAA shall request from the arbitrator an itemization or explanation for the arbitrator's request for deposits.

### R-57. Remedies for Nonpayment

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment.

(a) Upon receipt of information from the AAA that payment for administrative charges or deposits for arbitrator compensation have not been paid in full, to the extent the law allows, a party may request that the arbitrator take specific measures relating to a party's non-payment.

(b) Such measures may include, but are not limited to, limiting a party's ability to assert or pursue their claim. In no event, however, shall a party be precluded from defending a claim or counterclaim.

**(c)** The arbitrator must provide the party opposing a request for such measures with the opportunity to respond prior to making any ruling regarding the same.

**(d)** In the event that the arbitrator grants any request for relief which limits any party's participation in the arbitration, the arbitrator shall require the party who is making a claim and who has made appropriate payments to submit such evidence as the arbitrator may require for the making of an award.

**(e)** Upon receipt of information from the AAA that full payments have not been received, the arbitrator, on the arbitrator's own initiative or at the request of the AAA or a party, may order the suspension of the arbitration. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

**(f)** If the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full deposits requested within the time provided after the suspension, the arbitrator, or the AAA if an arbitrator has not been appointed, may terminate the proceedings.

## R-58. Sanctions

**(a)** The arbitrator may, upon a party's request, order appropriate sanctions where a party fails to comply with its obligations under these rules or with an order of the arbitrator. In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.

**(b)** The arbitrator must provide a party that is subject to a sanction request with the opportunity to respond prior to making any determination regarding the sanctions application.

## Preliminary Hearing Procedures

### P-1. General

**(a)** In all but the simplest cases, holding a preliminary hearing as early in the process as possible will help the parties and the arbitrator organize the proceeding in a manner that will maximize efficiency and economy, and will provide each party a fair opportunity to present its case.

**(b)** Care must be taken to avoid importing procedures from court systems, as such procedures may not be appropriate to the conduct of arbitrations as an alternative form of dispute resolution that is designed to be simpler, less expensive and more expeditious.

### P-2. Checklist

**(a)** The following checklist suggests subjects that the parties and the arbitrator should address at the preliminary hearing, in addition to any others that the parties or the arbitrator believe to be appropriate to the particular case. The items to be addressed in a particular case will depend on the size, subject matter, and complexity of the dispute, and are subject to the discretion of the arbitrator:

**(i)** the possibility of other non-adjudicative methods of dispute resolution, including mediation pursuant to R-9;

**(ii)** whether all necessary or appropriate parties are included in the arbitration;

**(iii)** whether a party will seek a more detailed statement of claims, counterclaims or defenses;

**(iv)** whether there are any anticipated amendments to the parties' claims, counterclaims, or defenses;

**(v)** which

**(a)** arbitration rules;

**(b)** procedural law; and

**(c)** substantive law govern the arbitration;

**(vi)** whether there are any threshold or dispositive issues that can efficiently be decided without considering the entire case, including without limitation,

**(a)** any preconditions that must be satisfied before proceeding with the arbitration;

**(b)** whether any claim or counterclaim falls outside the arbitrator's jurisdiction or is otherwise not arbitrable;

**(c)** consolidation of the claims or counterclaims with another arbitration; or

**(d)** bifurcation of the proceeding.

**(vii)** whether the parties will exchange documents, including electronically stored documents, on which they intend to rely in the arbitration, and/or make written requests for production of documents within defined parameters;

**(viii)** whether to establish any additional procedures to obtain information that is relevant and material to the outcome of disputed issues;

**(ix)** how costs of any searches for requested information or documents that would result in substantial costs should be borne;

**(x)** whether any measures are required to protect confidential information;

**(xi)** whether the parties intend to present evidence from expert witnesses, and if so, whether to establish a schedule for the parties to identify their experts and exchange expert reports;

**(xii)** whether, according to a schedule set by the arbitrator, the parties will

> **(a)** identify all witnesses, the subject matter of their anticipated testimonies, exchange written witness statements, and determine whether written witness statements will replace direct testimony at the hearing;
>
> **(b)** exchange and pre-mark documents that each party intends to submit; and
>
> **(c)** exchange pre-hearing submissions, including exhibits;

**(xiii)** the date, time and place of the arbitration hearing;

**(xiv)** whether, at the arbitration hearing,

> **(a)** testimony may be presented in person, in writing, by videoconference, via the internet, telephonically, or by other reasonable means;
>
> **(b)** there will be a stenographic transcript or other record of the proceeding and, if so, who will make arrangements to provide it;

**(xv)** whether any procedure needs to be established for the issuance of subpoenas;

**(xvi)** the identification of any ongoing, related litigation or arbitration;

**(xvii)** whether post-hearing submissions will be filed;

**(xviii)** the form of the arbitration award; and

**(xix)** any other matter the arbitrator considers appropriate or a party wishes to raise.

**(b)** The arbitrator shall issue a written order memorializing decisions made and agreements reached during or following the preliminary hearing.

## Expedited Procedures

### E-1. Limitation on Extensions

Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the Demand for Arbitration or counterclaim as provided in Section R-5.

### E-2. Changes of Claim or Counterclaim

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, upon the agreement of the other party, or the consent of the arbitrator. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $75,000, the case will be administered under the regular procedures unless all parties and the arbitrator agree that the case may continue to be processed under the Expedited Procedures.

### E-3. Serving of Notices

In addition to notice provided by Section R-43, the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

### E-4. Appointment and Qualifications of Arbitrator

(a) The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

(b) The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

(c) The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Section R-18. The parties shall notify the AAA within seven calendar days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

E-5. Exchange of Exhibits

At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

E-6. Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission

Where no party's claim exceeds $25,000, exclusive of interest, attorneys' fees and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. Where cases are resolved by submission of documents, the following procedures may be utilized at the agreement of the parties or the discretion of the arbitrator:

(a) Within 14 calendar days of confirmation of the arbitrator's appointment, the arbitrator may convene a preliminary management hearing, via conference call, video conference, or internet, to establish a fair and equitable procedure for the submission of documents, and, if the arbitrator deems appropriate, a schedule for one or more telephonic or electronic conferences.

(b) The arbitrator has the discretion to remove the case from the documents-only process if the arbitrator determines that an in-person hearing is necessary.

(c) If the parties agree to in-person hearings after a previous agreement to proceed under this rule, the arbitrator shall conduct such hearings. If a party seeks to have in-person hearings after agreeing to this rule, but there is not agreement among the parties to proceed with in-person hearings, the arbitrator shall resolve the issue after the parties have been given the opportunity to provide their respective positions on the issue.

(d) The arbitrator shall establish the date for either written submissions or a final telephonic or electronic conference. Such date shall operate to close the hearing and the time for the rendering of the award shall commence.

(e) Unless the parties have agreed to a form of award other than that set forth in rule R-46, when the parties have agreed to resolve their dispute by this rule, the arbitrator shall render the award within 14 calendar days from the date the hearing is closed.

(f) If the parties agree to a form of award other than that described in rule R-46, the arbitrator shall have 30 calendar days from the date the hearing is declared closed in which to render the award.

(g) The award is subject to all other provisions of the Regular Track of these rules which pertain to awards.

E-7. Date, Time, and Place of Hearing

In cases in which a hearing is to be held, the arbitrator shall set the date, time, and place of the hearing, to be scheduled to take place within 30 calendar days of confirmation of the arbitrator's appointment. The AAA will notify the parties in advance of the hearing date.

E-8. The Hearing

**(a)** Generally, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of documents within two business days after the hearing. For good cause shown, the arbitrator may schedule additional hearings within seven business days after the initial day of hearings.

**(b)** Generally, there will be no stenographic record. Any party desiring a stenographic record may arrange for one pursuant to the provisions of Section R-28.

E-9. Time of Award

Unless otherwise agreed by the parties, the award shall be rendered not later than 14 calendar days from the date of the closing of the hearing or, if oral hearings have been waived, from the due date established for the receipt of the parties' final statements and proofs.

E-10. Arbitrator's Compensation

Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

## Procedures for Large, Complex Commercial Disputes

### L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA shall, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call. The conference will take place within 14 calendar days after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

(a) to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

(b) to discuss the views of the parties about the technical and other qualifications of the arbitrators;

(c) to obtain conflicts statements from the parties; and

(d) to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

### L-2. Arbitrators

(a) Large, complex commercial cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. With the exception in paragraph (b) below, if the parties are unable to agree upon the number of arbitrators and a claim or counterclaim involves at least $1,000,000, then three arbitrator(s) shall hear and determine the case. If the parties are unable to agree on the number of arbitrators and each claim and counterclaim is less than $1,000,000, then one arbitrator shall hear and determine the case.

(b) In cases involving the financial hardship of a party or other circumstance, the AAA at its discretion may require that only one arbitrator hear and determine the case, irrespective of the size of the claim involved in the dispute.

(c) The AAA shall appoint arbitrator(s) as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator(s) shall not have served as the mediator in the mediation phase of the instant proceeding.

## L-3. Management of Proceedings

**(a)** The arbitrator shall take such steps as deemed necessary or desirable to avoid delay and to achieve a fair, speedy and cost-effective resolution of a Large, Complex Commercial Dispute.

**(b)** As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be scheduled in accordance with sections P-1 and P-2 of these rules.

**(c)** The parties shall exchange copies of all exhibits they intend to submit at the hearing at least 10 calendar days prior to the hearing unless the arbitrator(s) determines otherwise.

**(d)** The parties and the arbitrator(s) shall address issues pertaining to the pre-hearing exchange and production of information in accordance with rule R-22 of the AAA Commercial Rules, and the arbitrator's determinations on such issues shall be included within the Scheduling and Procedure Order.

**(e)** The arbitrator, or any single member of the arbitration tribunal, shall be authorized to resolve any disputes concerning the pre-hearing exchange and production of documents and information by any reasonable means within his discretion, including, without limitation, the issuance of orders set forth in rules R-22 and R-23 of the AAA Commercial Rules.

**(f)** In exceptional cases, at the discretion of the arbitrator, upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator may order depositions to obtain the testimony of a person who may possess information determined by the arbitrator to be relevant and material to the outcome of the case. The arbitrator may allocate the cost of taking such a deposition.

**(g)** Generally, hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.

## Administrative Fee Schedules (Standard and Flexible Fees)

*FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT* **www.adr.org/feeschedule.**

## Commercial Mediation Procedures

### M-1. Agreement of Parties

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedural guidelines, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

### M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a request for mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via WebFile at **www.adr.org.**

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

(i) A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.

(ii) The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.

(iii) A brief statement of the nature of the dispute and the relief requested.

(iv) Any specific qualifications the mediator should possess.

### M-3. Representation

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

## M-4. Appointment of the Mediator

If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

(i) Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

(ii) If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

(iii) If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

## M-5. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the *Model Standards of Conduct for Mediators* in effect at the time a mediator is appointed to a case. Where there is a conflict between the *Model Standards* and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

## M-6. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

## M-7. Duties and Responsibilities of the Mediator

(i) The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

(ii) The mediator is authorized to conduct separate or *ex parte* meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.

(iii) The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

(iv) The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

(v) In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

(vi) The mediator is not a legal representative of any party and has no fiduciary duty to any party.

## M-8. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-9. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

## M-10. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

**(i)** Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;

**(ii)** Admissions made by a party or other participant in the course of the mediation proceedings;

**(iii)** Proposals made or views expressed by the mediator; or

**(iv)** The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

M-11. No Stenographic Record

There shall be no stenographic record of the mediation process.

M-12. Termination of Mediation

The mediation shall be terminated:

(i) By the execution of a settlement agreement by the parties; or

(ii) By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or

(iii) By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or

(iv) When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

M-13. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

M-14. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

M-15. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

M-16. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

M-17. Cost of the Mediation

*FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT* **www.adr.org/feeschedule.**

© 2016 American Arbitration Association, Inc. All rights reserved. These rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.

## Regional Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, Virginia**
P. Jean Baker, Esq.
Vice President
Phone: 202.223.7093
Email: BakerJ@adr.org

**States: Oklahoma, Texas**
Andrew Barton
Vice President
Phone: 210.998.5750
Email: BartonA@adr.org

**States: Alabama, Georgia**
John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org

**States: City of Houston, Louisiana, Mississippi**
Ingeuneal C. Gray, Esq.
Vice President
Phone: 832.308.7893
Email: GrayI@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**
Karen Jalkut
Vice President
Phone: 617.695.6062
Email: JalkutK@adr.org

**States: Alaska, California, Hawaii, Oregon, Washington**
Serena K. Lee, Esq.
Vice President
Phone: 415.671.4053
Email: LeeS@adr.org

**States: Indiana, Kentucky, North Carolina, Ohio, South Carolina, Tennessee, West Virginia**
Michelle M. Skipper
Vice President
Phone: 704.643.8605
Email: SkipperM@adr.org

**States: Florida**
Rebecca Storrow, Ph.D.
Vice President
Phone: 954.372.4341
Email: StorrowR@adr.org

**States: Arizona, Colorado, Kansas, Idaho, Montana, Nebraska, Nevada, New Mexico, Utah, Wyoming**
Lance K. Tanaka
Vice President
Phone: 303.831.0824
Email: TanakaL@adr.org

**States: Arkansas, Illinois, Iowa, Michigan, Minnesota, Missouri, North Dakota, South Dakota, Wisconsin**
A. Kelly Turner, Esq.
Vice President
Phone: 312.361.1116
Email: TurnerK@adr.org

**States: New York**
Jeffrey T. Zaino, Esq.
Vice President
Phone: 212.484.3224
Email: ZainoJ@adr.org

## Case Management Vice Presidents and Assistant Vice Presidents

Jeffrey Garcia
Vice President
Phone: 559.490.1860
Email: GarciaJ@adr.org
**Administers cases in: AK, AZ, AR, CA, CO, HI, ID, IL, IA, KS, LA, MN, MS, MO, MT, NE, NV, NM, ND, OK, OR, SD, TX, UT, WA, WI, WY**

John M. Bishop
Vice President
Phone: 404.320.5150
Email: BishopJ@adr.org
**Administers cases in: AL, DC, FL, GA, IN, KY, MD, NC, OH, SC, TN, VA**

Yvonne Baglini
Assistant Vice President
Phone: 866.293.4053
Email: BagliniY@adr.org
**Administers cases in: CT, DE, MA, ME, MI, NH, NJ, NY, PA, RI, VT, WV**

 AMERICAN ARBITRATION ASSOCIATION®

800.778.7879 | websitemail@adr.org | adr.org

# Exhibit 11

| From: | JohnsJ@adr.org |
|---|---|
| To: | thoward@thowardlaw.com; Haddox, Kodey M.; Meyers, Deborah; Koosed, Brian D.; wcproh@thowardlaw.com |
| Subject: | Changzhou Zhong Lian Investment Co. Ltd. v. Daniel Banjo, Individually; - Case 01-19-0001-1748 |
| Date: | Thursday, June 20, 2019 9:30:21 AM |
| Attachments: | image96027e.PNG |
| | INT002.pdf |
| | Notice of Appointment, Oath, and Disclosures - Robertson.pdf |
| | Notice of Compensation Arrangements - Robertson.pdf |
| | Resume - Robertson.pdf |

External Sender:

Hello,

Please review the attached correspondence regarding the above-referenced case.

Feel free to contact me with any questions, comments or concerns you have related to this matter.

Thank you.

 **J. Brian Johns, LL.M.**
**Director**
International Centre for Dispute Resolution
American Arbitration Association
120 Broadway, 21st Floor
New York, NY 10271
www.icdr.org
T: 212 484 3262
F: 212 246 7274



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.



International Centre for Dispute Resolution
Thomas Ventrone, Esq.
ICDR Vice President
120 Broadway, 21st Floor
New York, NY 10271
Telephone: (212)484-4181
Fax: (212)246-7274

20 June 2019

**Via Email Only**
Brian D. Koosed, Esq.
Kodey M. Haddox, Esq.
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022

William C. Groh, Esq.
Thomas P. Howard, Esq.
Thomas P. Howard, LLC
842 West South Boulder Road
Suite #200
Louisville, CO 80027

**Case Number: 01-19-0001-1748**
Changzhou Zhong Lian Investment Co. Ltd.
(a/k/a Z.L. Investment)
-vs-
Daniel Banjo, individually;
Frictionless World LLC
Frictionless, LLC
-vs-
Li Zhixiang;
Z.L. Investment; and
Changzhou Inter Universal Machine &
Equipment Co., Ltd.

Dear Parties and Counsel,

We are writing this letter to inform the parties that the ICDR has appointed Arbitrator Ann Ryan Robertson of Locke Lord, LLP (the "Arbitrator") to consider Respondents' Emergency Motion for Preliminary Injunction as an Emergency Arbitrator. Enclosed please find copies of the Emergency Arbitrator's duly executed Notice of Appointment. Per our rules, all arbitrators are impartial and independent, unless otherwise agreed by the parties in the situation of party-appointed arbitrators.

The Emergency Arbitrator has made a disclosure, as detailed on the enclosed Notice of Appointment and attachment. Please advise the ICDR of any objections to the appointment of the Emergency Arbitrator by close of business 21 June 2019, copying the other side. The Tribunal shall not be copied on any comments related to the disclosure. If any objections to the Emergency Arbitrator's appointment

are raised, the other party may respond within two days. The ICDR will make a determination regarding the Emergency Arbitrator's continued service in accordance with the Rules.

If either party or their counsel knows of any contact or conflict that may be relevant, they are to communicate this information to the ICDR within two days. Each party is responsible for updating its disclosures as such information becomes available. The duty to update this information is ongoing through the conclusion of this matter.

The Emergency Arbitrator's Notice of Compensation Arrangements including the specific compensation rates for this matter is also attached. Compensation to the Emergency Arbitrator represents an independent obligation of the parties, and it is understood that the ICDR/AAA has no liability, direct or indirect, for such payment. Respondent, as the requesting party, shall promptly deposit in advance with the ICDR such sums of money as required by the administrator to defray the Tribunal's invoices. Compensation incurred will be deducted from deposits on hand, if any. Upon consideration of the documents submitted, the Emergency Arbitrator has requested an initial deposit sufficient to cover 40 hours of anticipated work. An invoice reflecting this cost will be circulated shortly under separate cover.

This letter will also serve to confirm that a Preparatory Conference will be scheduled shortly. The parties and the Tribunal are kindly requested to promptly advise of their conference call availability for 20 and 21 June 2019.

There shall be no direct telephone or any other type of contact with the Emergency Arbitrator. Please note that any challenges or financial matters must be exclusively submitted to the undersigned.

As a reminder, cases may be viewed and managed online through AAA's WebFile.

Sincerely,

J. Brian Johns, Esq., LL.M.
Director
Direct Dial: (212) 484-3262
Fax: (212) 246-7274
Email: JohnsJ@adr.org

# Exhibit 12

| From: | Robertson, Ann |
|---|---|
| To: | JohnsJ@adr.org; thoward@thowardlaw.com; Haddox, Kodey M.; Meyers, Deborah; Koosed, Brian D.; wcgroh@thowardlaw.com |
| Subject: | RE: Changzhou Zhong Lian Investment Co. Ltd. v. Daniel Banjo, individually; - Case 01-19-0001-1748 |
| Date: | Friday, June 21, 2019 6:21:56 PM |
| Attachments: | Frictionless - Procedural Order 1.pdf |

**External Sender:**

Dear Counsel

Attached is Procedural Order No. 1 setting the deadlines and providing instructions regarding the witness statements and hearing procedure.

Regards,
Ann Ryan Robertson
Emergency Arbitrator


Ann Ryan Robertson
International Partner
Locke Lord LLP
600 Travis, Suite 2800
Houston, Texas 77002
713.226.1356 Direct
713.229.2646 Direct Fax
www.lockelord.com

Atlanta, Austin, Chicago, Dallas, Hong Kong, Houston, London, Los Angeles, New Orleans, New York, Sacramento, San Francisco, Washington DC
The information contained in this e-mail message is intended only for the personal and confidential use of the recipients named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.



Atlanta | Austin | Boston | Chicago | Cincinnati | Dallas | Hartford | Hong Kong | Houston | London | Los Angeles | Miami | New Orleans | New York | Princeton | Providence | San Francisco | Stamford | Washington DC | West Palm Beach

For more information visit www.lockelord.com

CONFIDENTIALITY NOTICE:
This e-mail and any attached files from Locke Lord LLP may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or

copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to and from our servers to ensure regulatory compliance to protect our clients and business.

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| CHANGZHOU ZHONG LIAN INVESTMENT CO. LTD. (A/K/A Z.L. INVESTMENT), INDIVIDUALLY<br>    Claimant,<br><br>v.<br>DANIEL BANJO AND FRICTIONLESS WORLD, LLC<br>    Respondents – Counterclaimants<br><br>v.<br>LI ZHIXIANG, ZL INVESTMENT, CHANGZHOU INTER UNIVERSAL MACHINE & EQUIPMENT CO., LTD, AND FRICTIONLESS, LLC<br>    Counterclaim and Third-Party Respondents | Case No. 01-19-0001-1748 |

### EMERGENCY ARBITRATOR'S PROCEDURAL ORDER NO. 1

This matter came before the duly appointed Emergency Arbitrator, Ann Ryan Robertson, for a telephonic scheduling conference on June 21, 2019. The following counsel and parties appeared:

1. Brian D. Koosed and Austin E. McCullough of K&L Gates LLP appeared on behalf of Changzhou Zhong Lian Investment Co. Ltd. (a/k/a Z.L. Investment), ("***Z.L. Investment***"), Li Zhixiang ("***Li***"), and Changzhou Inter Universal Machine & Equipment Co., Ltd. ("***CIU***"); and

2. Thomas P. Howard of Thomas P. Howard, LLC appeared on behalf of Daniel Banjo, individually ("***Banjo***") and derivatively on behalf of Frictionless, LLC and Frictionless World LLC ("***World***").

In addition to establishing the deadlines set forth below, the parties have agreed that in connection with these emergency proceedings, the AAA/ICDR Accelerated Exchange Program shall apply. Pursuant to the program, the following protocols are now in force and effect:

a. The parties will be permitted to directly transmit to the Emergency Arbitrator letters, emails, documents, and briefs. A copy of any transmitted document must be provided simultaneously to the opposing party and the AAA/ICDR with a cover letter or email confirming said transmittal. The parties shall not provide the AAA/ICDR with paper copies of hearing materials such as exhibits, witness statements, or prehearing briefs; and

1

b.      The Accelerated Exchange Program does not provide for: (1) *ex parte* communications of any kind with the Emergency Arbitrator, whether by email, telephone, or any other form of electronic communication; (2) discussion between the parties and the Emergency Arbitrator regarding compensation, fees, and expenses; or (3) discussion concerning arbitrator disclosures and/or challenges, locale disputes, or settlement negotiations occurring during the pendency of the arbitration proceeding.

## TIMETABLE

1.      The following schedule is hereby established and in force.  **All deadlines shall be interpreted to mean that the required documents shall be served on the opposing parties, the Emergency Arbitrator, and the ICDR by 11:59 PM Central Time on the indicated date:**

**A.      Monday, 24 June 2019**

All parties shall file a submission agreement submitting all claims and disputes to arbitration.

**B.      Tuesday, 25 June 2019**

Z.L. Investments, Li and CIU shall file their Response to Banjo, derivatively on behalf of Frictionless, LLC's and World's Emergency Motion for Preliminary Injunction. Each paragraph of the Response shall be numbered sequentially.

**C.      Thursday, 27 June 2019**

All parties shall file any written witness statements containing testimony they wish to be considered by the Emergency Arbitrator.

**D.      Monday, 1 July 2019**

All parties shall file any written rebuttal witness statements containing rebuttal testimony they wish to be considered by the Emergency Arbitrator.

**E.      Wednesday, 3 July 2019**

If an oral hearing is necessary, the parties shall notify each other as to which witnesses whose witness statements have been served are required to attend the hearing for cross-examination. Attendance will be either telephonically or by videoconferencing.

**F.      Monday, 9 July 2019**

This date is reserved for a telephonic or videoconference hearing should such a hearing be deemed appropriate and necessary by the Emergency Arbitrator after further consultation with the parties. The hearing will commence at 9:00 AM Central Time.

## EXHIBITS

2.     The parties shall identify each exhibit submitted to the Emergency Arbitrator with a distinct number. Each exhibit submitted by Claimant and/or Third Party Respondents shall begin with a letter "C" followed by the applicable number (i.e., C-001, C-002, etc.); each exhibit submitted by Respondents/Counterclaimants shall begin simply state Ex.-001, Ex.-002, etc. The parties shall refrain from submitting duplicate exhibits.

3.     The parties shall identify each legal authority submitted to the Emergency Arbitrator with a distinct number. Each legal authority submitted by Claimant and/or Third-Party Respondents shall begin with the letters "CLA" followed by the applicable number (i.e., CLA-001, CLA-002, etc.); each legal authority submitted by Respondents/Counterclaimants shall begin with the letters "RLA" followed by the applicable number (i.e., RLA-001, RLA-002, etc.).

## WITNESS STATEMENTS

4.     For each witness, a written and signed witness statement in English shall be submitted to the Emergency Arbitrator in accordance with the Timetable.

5.     The contents of any reply or supplemental witness statement shall be restricted in scope to matters raised in the preceding submissions and accompanying witness statements.

6.     All factual witness statements shall contain:

(a)     the full name, address and a description of his or her background, qualifications, training and experience, if such a description may be relevant and material to the dispute or to the contents of the statement;

(b)     a detailed description of the facts, and the source of the witness's information as to those facts, sufficient to serve as that witness's evidence in the matter in dispute;

(c)     confirmation that the witness is able and willing to attend the hearing either telephonically or by teleconferencing, if so required;

(d)     copies of all documents relied upon or alternatively citations to such documents if already filed;

(e)     an affirmation of the truth of the statement; and

(f)     the signature of the witness and its date and place.

7.     The witness statements shall be in sufficient detail so as to stand as examination in chief of the witness at the evidential hearing.

8.     The paragraphs of the witness statements shall be numbered sequentially.

9.     As a general principle, the witness statements should not engage in hearsay or speculation. In the interests of avoiding unnecessary expense and of ensuring an efficient and

expeditious resolution of the dispute, the witness statements should focus on material matters in dispute for which witness testimony is forensically necessary.

10.     The parties shall inform their potential witnesses of the **9 July 2019** hearing date to ensure their availability to attend the hearing via telephone or video conference.

11.     If a witness is required to attend for cross-examination but fails to do so without valid reason, the Emergency Arbitrator may in her discretion receive the statement, disregard the statement, or accept it but attach less weight to it, to be determined in the Tribunal's discretion.

## HEARING PROCEDURE

12.     The procedure for examining witnesses at the oral hearing shall be the following:

(a)     Respondents/Counterclaimants' fact witnesses will generally be examined first, followed by Claimant's and/ or Third-Party Respondents' fact witnesses. The parties' expert witnesses, if any, will, if possible, be heard following the completion of the factual evidence.

(b)     Each witness shall first be invited to confirm, deny and/or correct the written statement.

(c)     Upon request by the party presenting a witness, the Emergency Arbitrator may allow short direct examination of that witness at the hearing.

(d)     After a short introduction by the party producing the witness, the other party shall proceed to cross-examine the witness, followed by a re-examination if the first party so wishes.

(e)     The Emergency Arbitrator shall have the right to examine the witnesses and to interject questions during the examination by Counsel. It shall ensure that each party has the opportunity to re-examine a witness with respect to questions raised by the Emergency Arbitrator.

(f)     The scope of the re-examination shall be limited to matters that have arisen in the cross-examination.

(g)     The Emergency Arbitrator shall at all times have complete control over the procedure in relation to a witness giving oral evidence, including the right to limit or exclude any question to, or to refuse to a party to examine a witness when it considers that the factual allegation(s) on which the witness is intended to be examined is (are) sufficiently proven by exhibits or other witnesses or that the particular witness' examination as such is irrelevant, immaterial or burdensome.

(h)     Witnesses will not be heard under oath but the Emergency Arbitrator shall draw their attention to the fact that the Emergency Arbitrator requests them to tell the truth, the entire truth and nothing but the truth and shall ask them to confirm that they will comply with this request.

(i)     The party producing a witness who cannot speak English for cross-examination will be responsible for securing the interpreter and initially paying for same, with the Emergency Arbitrator reserving the right to shift costs in her ruling on the Motion for Preliminary Injunction.

So ORDERED this 21st day of June 2019.

Ann Ryan Robertson
Emergency Arbitrator

# Exhibit 13

| From: | Olayinka Hamza |
|---|---|
| To: | Robertson, Ann |
| Cc: | J. Brian Johns, LL.M.; Thomas P. Howard; Haddox, Kodey M.; William Groh; Scott Brenner; Meyers, Deborah; Koosed, Brian D.; McCullough, Austin E. |
| Subject: | ICDR Submission to Dispute Resolution |
| Date: | Monday, June 24, 2019 8:46:05 PM |
| Attachments: | ICDR Submission to Dispute Resolution.pdf |

**External Sender:**

Arbitrator Robertson:

Please see the attached and signed ICDR Submission to Dispute Resolution Form.

Thank you.

*Olayinka L. Hamza*

Attorney, Thomas P. Howard LLC

842 West South Boulder Road, Suite 100

Louisville, Colorado 80027

p: 303.665.9845

f: 303.665.9847

ohamza@thowardlaw.com

www.thowardlaw.com

 Thomas P. Howard LLC



**International Centre
for Dispute Resolution**

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
*The International Division of the American Arbitration Association*

## SUBMISSION TO DISPUTE RESOLUTION

The named parties hereby submit the following dispute for resolution, under the rules of the International Centre for Dispute Resolution.

**Rules Selected:**
☐ International Dispute Resolution Procedures
☑ Commercial Arbitration Rules and Mediation Procedures (AAA)
☐ Procedures for Cases under the UNCITRAL Arbitration Rules
☐ Other (please specify) _____

**Procedure Selected:**
☑ Binding Arbitration          ☐ Early Neutral Evaluation
☐ Fact-Finding                 ☐ Mediation
☐ Mini-Trial                   ☐ Other (please specify) _____

**Nature of Dispute** (attach additional sheets if necessary): Breach of contract; Breach of fiduciary duty; Breach of LLC Agreement, among others.
Claimant and its affiliates' wanton breach of the multiple agreements with Respondents continues to cause millions of dollars in damages to Respondents.

**Amount of Monetary Claim or Nature of Non-Monetary Claim:** Over $5 million and still to be determined

**Type of Business: Claimant** _____    **Respondent** Manufacture and Distribution of farm and agricultural equipment.

**Place of Hearing:** Telephonic _____

We agree that, if arbitration is selected, we will abide by and perform any award rendered hereunder and that a judgment may be entered on the award.

*To be completed and signed by all parties*

| | |
|---|---|
| DANIEL BANJO, individually and derivatively on behalf of Frictionless, LLC | FRICTIONLESS WORLD, LLC |
| Name of Party | Name of Party |
| 1100 West 120th Ave, Suite #600 | 1100 West 120th Ave, Suite #600 |
| Address | Address |
| Westminster, CO 80234 | Westminster, CO 80234 |
| City, State/Province, Country, Post Code | City, State/Province, Country, Post Code |
| 720-287-5182 | 720-287-5182 |
| Telephone          Facsimile | Telephone          Facsimile |
| Thomas P. Howard | Thomas P. Howard |
| Name of Party's Attorney or Representative | Name of Party's Attorney or Representative |
| Thomas P. Howard LLC | Thomas P. Howard LLC |
| Name of Firm (if applicable) | Name of Firm (if applicable) |
| 842 W. South Boulder Rd, Ste 100 | 842 W. South Boulder Rd, Ste 100 |
| Address | Address |
| Louisville, CO 80027 | Louisville, CO 80027 |
| City, State/Province, Country, Post Code | City, State/Province, Country, Post Code |
| 303-665-9845     303-665-9847 | 303-665-9845     303-665-9847 |
| Telephone          Facsimile | Telephone          Facsimile |
| Signed† (may be signed by a representative) | Signed† (may be signed by a representative) |
| Attorney | Attorney |
| Title          Date | Title          Date |

† *Signatures of all parties are required.*

*Please file two signed copies and the non-refundable filing fee with the ICDR at Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhess, NJ 08043 email: casefiling@adr.org.*

*For additional information, please contact us at 1.888.855.9575 or +1 212 484 4181 or visit our website at www.icdr.org.*