# Exhibit 14

IN THE MATTER OF AN ARBITRATION UNDER THE COMMERCIAL RULES OF
THE AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| In the Matter of Arbitration Between: | : | |
| | : | |
| CHANGZHOU ZHONG LIAN INVESTMENT CO. LTD. (A/K/A Z.L. INVESTMENT), | : | |
| | : | |
| Claimant, | : | |
| | : | |
| vs. | : | Case No. 01-19-0001-1748 |
| | : | |
| DANIEL BANJO AND FRICTIONLESS WORLD LLC, | : | |
| | : | |
| Respondents, | : | |
| | : | |
| vs. | : | |
| | : | |
| LI ZHIXIANG, Z.L. INVESTMENT, AND CHANGZHOU INTER UNIVERSAL MACHINE & EQUIPMENT CO., LTD., | : | |
| | : | |
| Counterclaim and Third-Party Respondents. | : | |

**JOINT RESPONSE AND OPPOSITION OF CLAIMANT Z.L. INVESTMENT, AND THIRD-PARTY RESPONDENTS LI ZHIXIANG AND CHANGZHOU INTER UNIVERSAL MACHINE & EQUIPMENT CO., LTD., TO RESPONDENTS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

June 25, 2019

**K&L GATES LLP**
Brian D. Koosed
1601 K Street, NW
Washington, D.C. 20006
*and*
Kodey M. Haddox
599 Lexington Avenue
New York, New York 10002

**Counsel for the Claimant and Third-Party Respondents**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND .............................................................................................6

    A.    The Li Parties' Goals in Forming Frictionless.........................................6

    B.    The Undisputed Facts about Frictionless' Business Operations..........................11

    C.    CIU's Lender Issues Arise In Late 2018, Respondents' Fraud is Discovered, and Claimant Files Its Demand – *Contains Attorneys' Eyes Only Material*..........................................................................................15

    D.    Banjo Resigns as Frictionless' Manager But Nevertheless Takes Possession of the April 2019 Shipments.............................................18

    E.    After Banjo's Resignation as Manager, Claimant Appoints a New Manager and Discovers Additional Evidence of Fraud.......................................21

    F.    Respondents Request, and CIU Provides, Proprietary Business Information about CIU's Suppliers, But Respondents Nevertheless File Their Motion.........................................................................................23

ARGUMENT .....................................................................................................................24

    A.    Respondents Are Not Likely to Succeed on Their Claims against the Li Parties ..........................................................................................26

            1.    Respondents Are Not Likely to Succeed on Their Breach of Contract Claim against CIU ..................................................26

            2.    Respondents Are Not Likely to Succeed on Their Claims for Breach of the Operating Agreement and/or Breach of Fiduciary Duty Against Z.L. Investment and/or Mr. Li ...........................................33

                    a.    Respondents Are Not Likely to Succeed on Their Claim for Breach of the Operating Agreement Against Z.L. Investment and/or Mr. Li ..................................................34

                    b.    Respondents Are Not Likely to Succeed on Their Claim for Breach of Fiduciary Duty Against Z.L. Investment and/or Mr. Li ................................................................35

    B.    Respondents Have Not Demonstrated, and Cannot Demonstrate, Any Real, Immediate, and Irreparable Injury Warranting Injunctive Relief ........................38

1.      Lost Sales Resulting from Unfilled Purchase Orders ...............................39

2.      Lost Goodwill and Purported Loss of the Business..................................40

C.      Respondents Have Adequate Remedies at Law......................................................44

D.      The Balance of Equities Plainly Does Not Favor an Injunction Here ..................45

E.      Granting Respondents' Motion Would Disserve the Public Interest....................55

F.      An Injunction Would Alter, Not Preserve, the Status Quo While the
        Parties Arbitrate Their Dispute ...............................................................................56

CONCLUSION.................................................................................................................................57

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bewley v. Semler,*
  432 P.3d 582 (Colo. 2018) ................................................................................. 28

*Bray v. QFA Royalties, LLC,*
  486 F. Supp. 2d 1237 (D. Colo. 2007) ................................................. 41, 42, 43

*City P'ship Co. v. IR-TCI Partners V, L.P.,*
  252 F. Supp. 2d 1114 (D. Colo. 2003) ................................................. 24, 38, 45

*Cobra N. Am., LLC v. Cold Cut Sys. Svenska AB,*
  639 F. Supp. 2d 1217 (D. Colo. 2008) ......................................................... 38, 41

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,*
  356 F.3d 1256 (10th Cir. 2004) ........................................................................ 38

*E. Meadows Co., LLC v. Greeley Irrigation Co.,*
  66 P.3d 214 (Colo. App. 2003) .......................................................................... 27

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado,*
  916 F.3d 792 (10th Cir. 2019) .............................................................. 25, 26, 57

*Gitlitz LLC v. Bellock,*
  171 P.3d 1274 (Colo. App. 2007) ........................................................ 24, 38, 43

*Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n,*
  771 F.3d 1230 (10th Cir. 2014) .................................................................... 28, 30

*Husky Ventures, Inc. v. B55 Invs, Ltd.,*
  911 F.3d 1000 (10th Cir. 2018) ........................................................................ 43

*Klun v. Klun,*
  Case No. 18SA26, 2019 WL 2332186 (Colo. June 3, 2019) .............................. 27

*Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,*
  970 F.2d 273 (7th Cir. 1992) ....................................................................... 46, 54

*PDC Pharmacy Colorado, Inc. v. McKesson Corp.,*
  No. 13-CV-01663-MSK-BNB, 2013 WL 3242836 (D. Colo. June 26, 2013) .................... 56

*Premier Farm Credit, PCA v. W-Cattle, LLC,*
  155 P.3d 504 (Colo. App. 2006) ................................................................... 45, 54

*Q-Tech Labs. Pty Ltd. v. Walker,*
  No. CIV.A.01-RB-1458(CBS), 2002 WL 1331897 (D. Colo. June 4, 2002) .................. 40, 41, 45

*Rathke v. MacFarlane*,
 648 P.2d 648 (Colo.1982) ........................................................................................ 24

*Salzman v. Bachrach*,
 996 P.2d 1263 (Colo. 2000) ............................................................................... 45, 54

*Sampson v. Murray*,
 415 U.S. 61 (1974) ................................................................................................. 45

*Shake Enterprises, Inc. v. Globex Co., LLC*,
 No. 13-CV-01751-RM-CBS, 2013 WL 4718757 (D. Colo. Sept. 3, 2013) .................................. 39, 40

*Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,
 874 F.2d 1346 (10th Cir. 1989) ................................................................................ 40

*Tri-State Generation and Transmission Ass'n v. Shoshone River Power, Inc.*,
 805 F.2d 351 (10th Cir. 1986) ................................................................................ 43

**Statutes**

Colo. Rev. Stat. Ann. § 4-2-712 ....................................................................................... 45

Colo. Rev. Stat. Ann. § 7-80-4 ......................................................................................... 15

Colo. Rev. Stat. Ann. § 7-80-404(1) ................................................................................... 36

Colo. Rev. Stat. Ann. § 7-80-404(1) ................................................................................... 36

Colo. Rev. Stat. Ann. § 7-80-404 (2) .................................................................................. 36

Colo. Rev. Stat. Ann. § 13-80-101(1)(a) .............................................................................. 37

Pursuant to Rule 38 of the AAA's Commercial Rules and the Emergency Arbitrator's Procedural Order Number 2 (the "**Order**"), Claimant Z.L. Investment, and Third-Party Respondents CIU and Mr. Li (collectively, the "**Li Parties**"), hereby submit their opposition to Respondents' Emergency Motion for Preliminary Injunction filed in this arbitration on June 18, 2019 (the "**Motion**").[1]  As set forth below, Respondents' Motion should be denied because they have not and cannot meet any of the requirements for such extraordinary relief.

## PRELIMINARY STATEMENT

1.      One word is noticeably missing from Respondents' Motion, even though it is the only reason why this dispute exists – "fraud."  Claimant filed this arbitration in April 2019 because it had uncovered, starting in late 2018, that Respondents had engaged in a years-long fraud to siphon off millions of dollars from Frictionless, LLC (the "**Company**"), the joint venture between Claimant and Banjo.  As Claimant alleged in its arbitration demand (the "**Demand**"), this scheme consisted of efforts on both the revenue and expense sides of the Company's income statement:

- Revenue Side:  Banjo inserted World as a "middleman" between Frictionless and the retailers who were intended to purchase its products (collectively, "**Retailers**").  So, instead of CIU selling its products to the Company, and then the Company selling those products directly to Retailers, Banjo – who was running Frictionless on a daily basis because the Li Parties reside in China – caused Frictionless to sell CIU's products to World, so that World would be the one selling them to Retailers.  The effect of this scheme was that World was able to capture an as yet-undetermined markup for each sale to Retailers.

- Expense Side:  Banjo caused Frictionless to pay for *all* of World's expenses, even for World's unique brands and business lines that had nothing to do with Frictionless or the Li Parties.  The effect of this scheme was that World was able to operate a substantial business – involving brands supplied by CIU, through Frictionless, and other brands that were not – with no operating expenses.

---

[1]      Unless otherwise noted, capitalized terms not defined herein shall have the meaning ascribed to them in Respondents' Motion.

2.      It is undisputed that this is how Banjo ran Frictionless; indeed, after initially refusing to address the expense side issues in their pleadings, Respondents have since admitted, in correspondence and in their Motion, that Frictionless bore all of World's expenses, that World alone sold products to Retailers, that Frictionless was only used as a "pass through" company. These facts are further reflected in the Company's own financial statements.

3.      For example, on the revenue side, from January-March 2019, Frictionless' own Profit & Loss ("**P&L**") statements show that, during those months, Banjo caused Frictionless to sell all of its product to World *at cost*, allowing Respondents to pocket the entirety of any sales to Retailers on those products.  On the expense side, similarly, Respondents admit, for example, that Frictionless never had a lease, but Frictionless' own 2018 tax return shows that it incurred nearly $1.3 million in rent expense in 2018, evidently for World's lease obligations.

4.      These facts are, again, undisputed.  The *only* dispute is whether, as Respondents allege, this entire arrangement – whereby Frictionless paid for everything, while World apparently realized a massive profit margin on its sales to Retailers because it had no operating expenses – was agreed to by the Li Parties.  That issue will be resolved at the final merits hearing, and the Emergency Arbitrator need not resolve it here.  Nevertheless, as the witness statements being filed later this week will show, the Li Parties are confident that they will prevail at the final merits hearing, because they never agreed to such a commercially absurd arrangement.  Rather, they are simply the victims of Respondents' years-long fraud.

5.      Sadly, that fraud and misconduct has continued since Claimant filed its Demand. For example, in April 2019, CIU was allowed to send its final four shipments to Frictionless (the "**April 2019 Shipments**").  Three of those Shipments arrived in the U.S. on May 12.  It is undisputed that Banjo resigned as Manager of Frictionless on May 3 and had no authority

thereafter to conduct business on behalf of the Company. Nevertheless, on May 14 – ten days *after* he resigned from the Company – Banjo directed those three Shipments destined for Frictionless to instead be sent to World. Contrary to Respondents' current claim that CIU "will receive immediate payment for every product" if their Motion is granted, neither Frictionless nor CIU has been paid for any of the four April 2019 Shipments. Instead, Respondents have wrongfully possessed products valued at $369,444.08 and, presumably, have already sold those products to Retailers for even more money.

6. Moreover, Respondents' fraud has apparently continued through to this proceeding. Counsel does not make this assertion lightly, but the ethical duty of candor compels counsel to note that, in support of their position that the Li Parties agreed to a business deal whereby World handled all sales to Retailers and Frictionless paid for all of World's expenses, Respondents primarily rely on two documents: (i) a purported "Operating Plan" that Respondents contend was annexed as Schedule B to the Frictionless Operating Agreement, *see* Ex. 16, pp. 29-43 (the "**Alleged Operating Plan**"); and (ii) a September 2012 presentation for a "LiBanjo" joint venture. *See* Motion, ¶ 10 & Ex. 14 ("**Exhibit 14**").

7. Respondents essentially proffer that Exhibit 14 was a precursor to the supposedly later-in-time Alleged Operating Plan, and they rely on Exhibit 14 to support their contention that the parties always intended Frictionless to function as just a "pass through" entity. See Motion, p. 8. But, critically, Exhibit 14 appears to be a ***materially altered*** version of the "LiBanjo" presentation that the Li Parties actually received in hard copy form in September 2012, and which is submitted herewith as Exhibit C-19 (the "**Hard Copy LiBanjo Presentation**").[2] The Hard

---

[2]     For the record, the undersigned counsel has no reason to believe – and does not believe – that Respondents' counsel had any knowledge of this apparent alteration before the Motion was filed.

Copy LiBanjo Presentation contains Mr. Yin's ***contemporaneous, handwritten notes*** made during the presentation in an attempt to translate some of the Presentation's text into Mandarin for Mr. Li. A complete analysis of these two documents is set forth in more detail below, but initially just compare the following page from both documents:

**Page 2 of the Hard Copy LiBanjo Presentation:**

- This is the company that Mr. Li owns. Dan, Steve, LiShan will also own a portion. [handwritten note in Mandarin]
- Everything that CIU makes will be sold to this company in the USA. [handwritten note in Mandarin]
- This company sees all of the profit from the sale. [handwritten note in Mandarin]
- Must also pay insurance and taxes in the US as well as over head expenses. [handwritten note in Mandarin]
- OE parts are also sold to this company. [handwritten note in Mandarin]
- Propose that Mr Li own 70% of this company. Dan, Steve, LiShan split the remainder. [handwritten note in Mandarin]
- We could even make Blount buy from this company in the USA thus we would reduce the payment issues Mr. Li is having with Blount. [handwritten note in Mandarin]

**Page 4 of Exhibit 14:**

- This is the company that Mr. Li owns. Dan, Steve, LiShan will also own a portion.
- Everything that CIU makes will be sold to this company in the USA, then passed through to Frictionless World.
- This company sees enough profit from the sale to Frictionless World to support expenses and growth.
- Must also pay insurance and taxes in the US as well as over head expenses. Frictionless World also sells non-CIU built products to help growth of all companies.
- Propose that Mr Li own 70% of this company. Dan, Steve, LiShan split the remainder. Dan owns FW.
- We could even make Blount buy from this company in the USA thus we would reduce the payment issues Mr. Li is having with Blount.

8.      As even a cursory review reveals, the proffered version of Exhibit 14 contains additional text – highlighted in yellow for the Emergency Arbitrator's convenience – all of which refers to World and the purported business arrangement on which Respondents exclusively rely for their Motion and their defense to Claimant's Demand.  But the Hard Copy LiBanjo Presentation – supported by the forthcoming Witness Statements of Mr. Li and his associate, Mr. Yin – contains **none** of those references.  Indeed, that Hard Copy Presentation includes an additional line of text – the fifth bullet point concerning "OE parts" – that is apparently omitted from Exhibit 14, presumably to make room for the added text about World in Exhibit 14's fourth bullet point.  Had the text included on Exhibit 14 actually been on the Hard Copy LiBanjo Presentation provided to the Li Parties, it would have been impossible for Mr. Yin to make the handwritten notes reflect on the Hard Copy Presentation.

9.      To be sure, full discovery and trial may be needed on this issue and may not be possible in the context of Respondents' Motion.  But the Hard Copy LiBanjo Presentation is supported by sworn testimony from multiple witnesses, contemporaneous handwritten notes, and the presence of text that nowhere appears on Exhibit 14 (and that could not have been fabricated given that the Li Parties only ever received a hard copy of the Presentation, not an electronic one).  Exhibit 14 has none of those indicia of reliability and, sadly, appears to have been altered.

10.     Standing alone, this apparent effort to mislead the tribunal and the Li Parties is sufficient to deny Respondents' Motion seeking equitable relief.  Coupled with the other indicia of fraud and misconduct here, both before and after the Demand was filed, the equities plainly do not favor Respondents.  And, as set forth below, even setting aside the substantial equities at play here, Respondents' Motion still fails because Respondents have failed to demonstrate, among other things:

a.  A reasonable probability of success on the merits of their claims against the Li Parties, because CIU has not breached any contracts with Frictionless, let alone World, nor have Z.L. Investment or Mr. Li breached any obligations or fiduciary duties here;

b.  Any irreparable harm if their Motion is denied, because Respondents only cite to speculative future harm, not anything imminent that justifies injunctive relief; or

c.  The lack of adequate remedies at law, because all of Respondents' alleged harms can be compensated by money damages, many of which Respondents are seeking from the Li Parties in this arbitration.

11.  For all these reasons, Respondents' Motion should be denied and the Li Parties' should be awarded costs for their time and expense incurred in responding to Respondents' Motion, which is premised in part on apparently altered evidence.

## **FACTUAL BACKGROUND**

12.  Pursuant to the Order, the Li Parties incorporate by reference herein the factual background and exhibits set forth in the pleadings filed by Claimant and the Li Parties to date.  The Li Parties only note here the facts and evidence most relevant to Respondents' current Motion, as follows:

A.  The Li Parties' Goals in Forming Frictionless

13.  As noted above and in the pleadings filed to date, the parties hotly contest their intent in forming Frictionless – Claimant alleges that Respondents committed fraud by using World as a "middleman" between Frictionless and Retailers, and by foisting World's expenses onto Frictionless, while Respondents claim that the Li Parties agreed to such an arrangement whereby Frictionless would merely be a "pass through" company.  *Compare* Demand, *and* Li

Parties' Joint Answer and Reply to Respondents' Counterclaims, *with* Motion. This dispute will be resolved at the final merits hearing. Nevertheless, the Li Parties note here the following facts concerning the formation of Frictionless, LLC – many of which they acknowledge are likely to be disputed by Respondents – so that the Emergency Arbitrator can at least understand the Li Parties' business motivations leading up to this arbitration and the present Motion.

14.     *First*, Z.L. Investment and Mr. Li began investing in a potential joint venture with Banjo in April 2012, and discussions about such a joint venture continued for over a year before Frictionless was formed in April 2013. *See* First Witness Statement of Mingsu Li ("Mingsu Statement"); First Witness Statement of Li Zhixiang ("Mr. Li Statement"); Claimant's Ex. C-11.

15.     The Li Parties were interested in such a joint venture in the 2012 time period because, to that point, they had only served as a supplier to other brands in the U.S. market. Accordingly, the Li Parties were eager to engage in their first business investment outside of mainland China – and to tackle the U.S. market with their own products, using their own brand – rather than simply supplying products for others. *See* Mingsu Statement; Mr. Li Statement.

16.     Moreover, and contrary to Respondents' repeated claims, the Li Parties were not deterred by the potential risks of doing business in the U.S., or by the need to obtain insurance, invest in a sales force, or anything else. Indeed, they intended Frictionless to do each of those things and, for years, thought that Frictionless itself was engaged in such business based on Frictionless' own financial statements. *See* Mingsu Statement; Mr. Li Statement. Simply put, at no time were the Li Parties concerned about insurance risk, litigation risk, or any of the other ordinary-course risks associated with doing business in the U.S. that Respondents assert – without evidence – deterred them and/or required the parties to use a U.S.-owned entity instead of a primarily Chinese-owned one. *See* Mingsu Statement; Mr. Li Statement; Motion, ¶¶ 8, 13.

17.    *Second*, at no point during any of the parties' extensive negotiations leading up to
the formation of Frictionless in April 2013 did Banjo tell the Li Parties – or anyone associated with
them – that he intended to use his World as part of the joint venture's business.  *See* Mingsu
Statement; Mr. Li Statement; First Witness Statement of Jun Li ("Jun Statement"); First Witness
Statement of Gelei Yin ("Yin Statement").  Indeed, the Li Parties did not learn of World's existence
as a separate entity until late 2018.  *See* Mingsu Statement; Mr. Li Statement; Jun Statement; Yin
Statement.  Not surprisingly, then, it is undisputed that World is ***nowhere*** mentioned in the text of
the Frictionless Operating Agreement or in any of the drafts of it circulated to the Li Parties before
signing.  *See* Operating Agreement; *see also* Ex. C-7, C-10.

18.    *Third*, while Banjo did give the Li Parties a hard copy version of a PowerPoint
presentation on the "LiBanjo" joint venture in China in September 2012 – the Hard Copy LiBanjo
Presentation noted above – at no time did the version of that Presentation received by the Li Parties
discuss, or contain any reference to, World.  *See* Ex. C-19; Mr. Li Statement; Yin Statement.
Instead, as the Hard Copy LiBanjo Presentation reflects, the parties' discussion centered on
forming a company, owned by Mr. Li, that would run the parties' joint venture in the U.S.  *See* Ex.
C-19.  Further, because Mr. Li does not speak, read, or write English, the Hard Copy LiBanjo
Presentation includes Mr. Yin's contemporaneous handwritten translation, in real time, of some of
the Presentation's text into Mandarin for Mr. Li.  *Id.*; *see also* Mr. Li Statement; Yin Statement.[3]

19.    *Fourth*, the Alleged Operating Plan on which Respondents so heavily rely was
never actually sent to, or reviewed by, the Li Parties or anyone associated with them at any time

---

[3]    The Hard Copy LiBanjo Presentation was provided to the Li Parties' counsel as part of an otherwise
privileged communication received at 8:38 a.m. (US Eastern time) on Wednesday June 19, 2019,
approximately ten hours after portions of the Motion, including Exhibit 14, were sent to Z.L. Investment
and CIU.

before the Demand was filed.  *See* Mingsu Statement; Mr. Li Statement; Jun Statement; Yin Statement.  In fact, on April 3, 2013, Banjo emailed Mr. Li's associate the "final documents" to be executed to create the Company.  *See* Ex. C-10.  Neither that email, nor the "final" versions of the Frictionless Agreements attached to it, included the Alleged Operating Plan that Respondents now purport was appended as Schedule B to the LLC Agreement.  *See id.*

20.    Moreover, the Alleged Operating Plan was ***never*** discussed with Banjo – or presented to anyone associated with Z.L. Investment, CIU, or Mr. Li – at any 2013 meeting in China or at any time thereafter until after the Demand was filed.  *See* Mingsu Statement; Mr. Li Statement; Jun Statement; Yin Statement.

21.    *Fifth*, from late 2012 until late 2018, the Li Parties understood that the name "Frictionless World" was simply a brand name for the Company, Frictionless, LLC.  The Li Parties believed this because, among other things, Banjo repeatedly and interchangeably used the names "Frictionless" and "Frictionless World" to refer to the parties' joint venture, both before and after Frictionless was created in April 2013.  *See* Mingsu Statement; Yin Statement; *see also* Joint Answer and Reply, ¶¶ 16-28; *see also* Exs. C-5, C-8.  The Li Parties' Joint Answer and Reply is replete with examples of this practice by Banjo, but to take just two briefly:

22.    November 25, 2012:  In describing the estimated profit that Frictionless and CIU could expect to receive from the sale of one of CIU's products to the Retailers, Banjo used the terms "Frictionless World" and "Frictionless" interchangeably, and further stated that "***Frictionless sells to market,***" which is directly contrary to the position Respondents now take in their Motion, as follows:

| | |
|---|---|
| Mr Li's CIU actual cost for materials/labor/packaging | $504.66 |
| Frictionless World actual US cost for materials | $20.19 |
| Total | $524.86 |
| | |
| Mr Li's CIU quoted cost for materials/labor/packaging | $545.73 |
| Frictionless World actual US cost for materials | $20.19 |
| Shipping to the US per Unit | $74.50 |
| US tax and Duty for importation into USA | $13.10 |
| Total | $653.51 |
| | |
| Mr Li profit in China per Splitter | $41.06 |
| | |
| Sell to Frictionless | $545.73 |
| Frictionless pays shipping $65/splitter plus decals, etc | $107.79 |
| Frictionless sells to market | $743.00 |
| | |
| **Total profit on a splitter in USA** | **$89.49** |
| | |
| **Total profit per splitter USA + China** | **$130.55** |

*See* Ex. C-5 (highlighted emphasis in original).

23.   <u>January 12, 2015</u>:  Banjo sent a letter to the U.S. government "in support of the petition **by Frictionless LLC**" for a visa for Ms. Li.  *See* Ex. C-8, pp. 1-4 (emphasis added).[4] Banjo's letter to the U.S. government expressly used the brand name and logo "Frictionless World," even though the letter only discussed Frictionless' business.

---

[4]   Although this letter is dated "January 12, 2014," the surrounding documentation included with it suggests that this letter was actually sent in January 2015, and that the "2014" date was merely a typo common at the start of a new year.  *See* Ex. C-8.

Moreover, as this letter makes clear, Ms. Mingsu Li was the only member of the Li Family who ever applied for a U.S. visa (other than a straightforward travel visa), and Ms. Li did so only through the L-1 visa program permitting U.S. companies to transfer foreign employees to their U.S. offices.  *See* Ex. C-8.  While Banjo presented EB-5 visas as a potential option for the Li Family that might result from forming Frictionless, such an option was never a motivating factor for the Li Parties in creating the Company. Indeed, the documents relied upon by Respondents in support of their Motion confirm as much.  *See* Ex. 15, p. 1 (where Mr. Li's associate advises Banjo that "EB5 can be discussed ***after company setting up***") (emphasis added).  For the record, and contrary to Respondents' unsupported assertions in their Motion, at no time did any member of the Li Family intend to apply for, or actually apply for, an EB-5 visa.  *See* Mingsu Statement; Mr. Li Statement.

24.     Given these facts, the Li Parties did not think twice about the fact that Frictionless'

business was run using an "@frictionlessworld.com" email address.  *See* Mingsu Statement.  Nor

did CIU's staff processing purchase orders from Frictionless – many of whom were not English

speakers – think it odd that certain purchase orders sent to CIU by Frictionless used the term

"Frictionless World" instead of "Frictionless."  *See* Mingsu Statement.  In fact, **none** of the

invoices that Respondents attach to their Motion used anything other than the brand name

"Frictionless World," rather than identifying a separate company like "Frictionless World LLC."

*See* Exs. 11, 17.  In sum, to the Li Parties, all of this verbiage just reflected the business of the

Company in which they had invested, Frictionless LLC.

        B.      The Undisputed Facts about Frictionless' Business Operations

25.     As noted, Respondents and the Li Parties hotly contest whether Frictionless was

operated as the parties intended.  That issue should be resolved after discovery and a full hearing

on the merits before the parties' chosen arbitral panel, not on this Motion.

26.     More importantly, however, the Emergency Arbitrator **does not need** to resolve that

issue here because, although the parties dispute whether Frictionless operated as they initially

intended, there is little dispute about how Frictionless' business actually operated in practice while

Banjo was Manager from April 2013 – May 2019.  And, as set forth below, those basic, undisputed

facts warrant denial of Respondents' Motion in full.

27.     Specifically, the salient facts of Frictionless' business operations for purposes of

Respondents' Motion – which, at bottom, seeks to force CIU to continue contracting with, and

shipping products to, World for the length of the parties' arbitration – are as follows and, the Li

Parties submit, are essentially undisputed:

28.     *First*, Frictionless was formed in April 2013 by the Operating Agreement. Ex. C-1.

29.     *Second*, neither CIU nor World is a party to that Operating Agreement.  *See id.*

30.     *Third*, by its terms, the Frictionless Operating Agreement states that:

> 14.15  **No Third Party Beneficiaries**.  This Agreement is for the sole benefit of the Members, the Manager, and the Company, and no other Person is intended to be a beneficiary of this Agreement or shall have any rights hereunder.

*See* Ex. C-1, § 14.15.

31.     *Fourth*, at no time did CIU enter into any formal, written agreement with Frictionless, with Banjo, or with World.  *See* Mingsu Statement; Jun Statement.  As a result, there is no overarching agreement whereby CIU is obligated – contractually or otherwise – to ship products to Frictionless, to World, or to any other party on an ongoing basis.  *See* Mingsu Statement; Jun Statement.  Indeed, no such agreement is alleged to exist in Respondents' Motion, let alone attached to it.  *See generally* Motion.

32.     *Fifth*, because they had no formal, overarching agreement, Frictionless and CIU did business on a purchase order-by-purchase order basis.  *See* Mingsu Statement; Jun Statement. From April 2013 until the Demand was filed, Frictionless – then under Banjo's day-to-day control as Manager – sent individual, numbered purchase orders to CIU.  *See* Mingsu Statement; Jun Statement; *see also* Ex. C-20.  CIU then replied via email and advised whether it would fulfill the requested order.  *See* Mingsu Statement; Jun Statement; *see also* Exs. C-21 – C-22.

33.     Typically, CIU agreed to fulfill Frictionless' purchase orders but, critically, CIU had the right to reject them, and did so when necessary, typically based on pricing, supply, delivery timing, or other business considerations.  *See* Mingsu Statement; Jun Statement; *see also* Ex. C-22, pp. 5-7 (November 2018 emails advising that CIU would not fulfill certain purchase orders due to pricing issues).

34.     *Sixth*, it is undisputed that, from April 2013 – May 2019, each of those purchase orders was entered into between Frictionless and CIU, ***not*** between CIU and World.  *See* Motion, ¶¶ 12, 22, 28; *see also* Mingsu Statement; Jun Statement; Ex. C-20.  At most, then, World was a third-party beneficiary to those purchase orders.[5]

35.     *Seventh*, CIU granted the Company extremely favorable payment terms of 360 days after shipment.  *See* Mingsu Statement.[6]  As a result, Frictionless was not obligated to pay CIU for shipments for nearly a year after those shipments were made.

36.     *Eighth*, despite claiming in their Motion that CIU's shipments to Frictionless, which were then sold to World, have "resulted in substantial gains for" CIU, it is undisputed that, as of the time of this filing, Frictionless owes CIU **$22,600,236.44** for products that CIU delivered to Frictionless, and for which Frictionless has not yet paid CIU.  *Compare* Motion, p. 3, *with* Ex. C-23, *and* Mingsu Statement.  Of that $22.6 million figure, **$9,222,441.13** is overdue past CIU's generous 360-day payment terms.  *See* Ex. C-24; Mingsu Statement.  In other words, Frictionless owes CIU $9.2 million for products that Frictionless received more than a year ago, but for which CIU still has not been paid.  *See* Ex. C-24.  Indeed, Frictionless still has not paid CIU for certain products that CIU shipped to Frictionless in ***June 2017***, more than two years ago.  *Id.* at 1.

37.     *Ninth*, although the Li Parties dispute that this was ever intended, they acknowledge that, while he was Manager of Frictionless, Banjo caused Frictionless, upon receiving CIU's products, to sell those products to World, who then sold those products to Retailers.  *See* Mingsu

---

[5]     As set forth below, CIU vigorously disputes that it had any intent to make World a third-party beneficiary when it entered into purchase orders with Frictionless.  *See* Mingsu Statement; Jun Statement; *supra*, ¶¶ 75-80.

[6]     CIU did so because it treated Frictionless as effectively a subsidiary, given the Company's relationship to Claimant and Mr. Li.  *See* Mingsu Statement.

Statement.  In addition to and not including the April 2019 Shipments discussed below, it is undisputed that World owes *some* amount of money to Frictionless for World's purchase of CIU's goods from Frictionless.  *See* Ex. C-25.  But Respondents have refused, to date, to identify the amount that World owes to Frictionless for those products, or to provide the Li Parties with documentation of the same.[7]

38.     *Tenth*, in late April 2019, Banjo advised Z.L. Investment and CIU that Frictionless "has substantially no assets or cash on hand" and "recommend[ed]" that Frictionless should be dissolved or put into bankruptcy.  *Compare* Motion, p. 3 (promoting the "substantial gains" caused by the parties' joint venture), *with id.*, Ex. 21, p. 4 (April 29 email from Banjo).  In fact, Frictionless has lost money in each of its years of operation under Banjo's control:



*See* Exs. C-13 – C-15.

---

[7]     For example, Respondents claim in their Motion that "World would issue purchase orders to Frictionless LLC, which would in turn issue the orders to CIU" (Motion, ¶ 12), but Respondents have steadfastly refused to identify and provide documentation of these purchase orders, or of other like kinds of contracts between Frictionless and World, to the Li Parties.

39.    As a result, Frictionless owes CIU more than $22.6 million, with no apparent prospect of CIU being paid for those amounts because, as Banjo himself said, Frictionless "has substantially no assets or cash on hand." *Supra*, ¶¶ 36 - 38.  And, similarly, World has not yet paid Frictionless for the amounts World owes to the Company.

C.    CIU's Lender Issues Arise In Late 2018, Respondents' Fraud is Discovered, and Claimant Files Its Demand – *Contains Attorneys' Eyes Only Material*

40.    In December 2018, the Li Parties advised Banjo that "CIU is experiencing some financial problems" and did not "have sufficient money to pay all [of its] suppliers" due to the extensive and long overdue amounts owed by Frictionless to CIU.  *See* Ex. C-26 (December 3, 2018 email to Banjo); *see also* Mingsu Statement.  The Li Parties further advised Banjo at that time that an auditing of Frictionless' books may be necessary, in part to try to find a new investor for CIU so that CIU could continue to support the Company as it had consistently done since April 2013.  *See* Ex. C-26 (December 3, 2018 email to Banjo); *see also* Mingsu Statement.

41.    The combination of lender and other issues led the Li Parties to retain an accounting firm, Armanino LLP ("Armanino"), which conducted a site visit to Frictionless in February 2019. *See* Mingsu Statement.  During that site visit, as detailed in Claimant's Demand and in the Li Parties' Joint Answer and Reply, Banjo and his subordinates at World repeatedly refused to provide Armanino with basic information about Frictionless' business or its relationship with World.  *See* Demand, ¶¶ 56 - 61; Joint Answer and Reply, ¶¶ 7 - 10.  Banjo did so despite the fact that Claimant, as a 90% owner of Frictionless' equity, had an absolute right, under Section 10.3 of the Operating Agreement and under Colorado law (*see* CLA-001, Colo. Rev. Stat. Ann. § 7-80-408), to obtain such basic information.  *See* Joint Answer and Reply, ¶¶ 8.

42.    Although Respondents now claim in this arbitration that "the parties' agreed upon course of conduct" since 2013 has involved CIU selling goods to Frictionless for delivery to World

(*see* Motion, p. 14), Respondents refused, during Armanino's site visits, to provide *any* information about that "course of conduct."  Joint Answer and Reply, ¶¶ 7 - 10.  This repeated stonewalling, in the face of Claimant's clear legal right to the information – information which, if Respondents' current claims are to be believed, would only confirm what Claimant allegedly agreed to years ago – is what ultimately forced Claimant to file its Demand on April 15, 2019.  *Id.*

43.     Meanwhile, CIU's lender issues continued, in part because Frictionless, then under Banjo's day-to-day operation, continued to owe millions upon millions of dollars to CIU and to not make timely payments to CIU.  *See* Mingsu Statement.  For example, according to Frictionless' own P&L statement for January-March 2019, it is undisputed that, during those months, Frictionless bought $4,595,517 worth of products from CIU, as reflected by the "Product COGS [Cost of Goods Sold]" line on that P&L statement.  *See* Ex. C-27 (March 2019 P&L Statement). It is further undisputed that, during those months, Frictionless sold CIU's products to World for $4,595,517, the exact same amount, as reflected by the P&L's "Product Sales" line.  *See id.*  In other words, for the entire first quarter of 2019, Banjo caused Frictionless to transfer the products that Frictionless had purchased from CIU to World *at cost*.  *See id.*  Frictionless therefore received no markup on those goods and, as a result, had no profit from its sales to World that could be used to repay CIU for its substantial outstanding receivable.  *See id.*; Mingsu Statement.

44.     **[ATTORNEYS' EYES ONLY]**  That receivable has continued to grow, ultimately culminating in CIU's lender sending correspondence dated April 23, 2019.  *See* Mingsu Statement; *see also* Ex. C-28.[8]  To be sure, up until that point, CIU believed that it would at least be able to

---

[8]     This correspondence is in Mandarin but a certified translation is included.  This document has also been designated Attorneys' Eyes Only and, per the agreement of the parties' counsel, that document and Paragraphs 44-46 of this Opposition may only be shared with Respondents' counsel, not with Respondents themselves.

honor the very limited number of purchase orders that Frictionless had submitted to CIU, and CIU had accepted but not yet shipped, as of the time the Demand was filed (the "Accepted But Not Shipped POs"). *See* Mingsu Statement. The volume of those Accepted But Not Shipped POs, however, is only $838,512.00, far smaller than Respondents' claims of $5 million and $8 million in their Motion, which apparently represents additional purchase orders that were sent to, but never accepted by, CIU. *See* Mingsu Statement; Jun Statement; Ex. C-40; Motion, ¶¶ 24, 28, 31, 35. And, with that in mind, Claimant's counsel advised Respondents' counsel on April 16, 2019 that CIU expected to fulfill those purchase orders that Frictionless had submitted and CIU had accepted to that point. *See* Ex. 20.

45.     **[ATTORNEYS' EYES ONLY]** But just one week later, on April 23, 2019, CIU's lender – the Jiangnan Rural Commercial Bank, Wujing Gaoxin District Branch – sent CIU a letter advising as follows:

> You have a total loan of 95,000,000 RMB with this bank. Upon the financial analysis we conducted on your company in the end of 2018, it was revealed that ***your company holds a large amount of accounts receivable***. This bank is now notifying you due to risk control of the loan that ***in case the financial circumstances of your company do not improve, this bank will reevaluate the loan to your company, including but not limited to lowering the loan limit. This bank has the power to intervene on your company's actions that increase the risks of the loan.***

*See* Ex. C-28 (emphasis added) (Attorney's Eyes Only).

46.     **[ATTORNEYS' EYES ONLY]** By definition, any shipment to Frictionless in late April 2019 or thereafter would increase CIU's "accounts receivable," and worsen CIU's "financial circumstances," because CIU would not be paid for such goods for months, if at all, given the substantially overdue payments owed by Frictionless to CIU. *See* Mingsu Statement. This was further evidenced at this time by Frictionless' own financials, which showed that the Company

was not making any profit in the first quarter of 2019 on its sale of CIU's products to World.  *See supra*, ¶ 3.  Accordingly, for these reasons outside of its control, CIU was constrained from further shipping to Frictionless by these lender issues.  *See* Ex. C-28 (Attorney's Eyes Only); Mingsu Statement.

47.     In an effort to alleviate these lender and cash flow issues for CIU, Banjo and the Li Parties had previously agreed, in early 2019, to a monthly payment plan pursuant to which Frictionless would pay CIU a total of $20.04 million during 2019, although CIU was still anticipated to lose money for the year by shipping $27 million worth of goods to Frictionless.  *See* Mingsu Statement; *see also* Ex. C-29.  Nevertheless, Frictionless stopped making those weekly payments to CIU after CIU was unable to ship further product, thus further exacerbating CIU's cash flow and lender issues since that time.  *See* Mingsu Statement; Ex. C-29.  CIU has further had to endure employee layoffs of its own due to these issues which, as noted in the Demand, Claimant attributes to Respondents' fraud.  *See* Mingsu Statement.

> D.     Banjo Resigns as Frictionless' Manager But Nevertheless Takes Possession of the April 2019 Shipments

48.     In light of the above issues detailed in the forthcoming Mingsu Statement, CIU was permitted to make a final set of four shipments to Frictionless in April 2019 for purchase orders previously placed by Frictionless, and accepted by CIU.  These are the April 2019 Shipments noted above.  *See supra*, ¶ 5; Mingsu Statement; *see also* Ex. C-30 (Invoices and Declaration forms). The first of the April 2019 Shipments left China for Denver, Colorado on or about April 13, 2019; the last Shipment left China on or about May 1, 2019.  *See* Mingsu Statement; *see also* Ex. C-31 (Bills of Lading).

49.     Meanwhile, on April 29, 2019, Claimant's counsel advised Respondents' counsel – first via phone and then via email – that CIU would be permitted to make a final set of shipments,

but none further, due to CIU's lender issues, which precluded CIU from further shipping product without payment on the extensive – and since growing – amount of Frictionless' overdue amounts owed to CIU.  *See* Ex. 21, pp. 2-3.  In response, Banjo advised CIU that Frictionless' purchase orders submitted to CIU were "cancelled" and Banjo further "recommend[ed]" that Frictionless should be dissolved and file for bankruptcy because "it has substantially no assets or cash on hand." *See id.* at p. 4 (April 29 email from Banjo).

50.     Although Claimant's counsel advised Respondents' counsel that CIU was "not [] issuing any cancellation of the existing purchase orders . . . from Frictionless," Respondents' counsel nevertheless advised that "***CIU does not issue the POs, Frictionless does.  As CIU failed to honor the POs . . . Frictionless had every right to cancel the same.***"  *See id.* at pp. 2-3 (emphasis added).  These same purchase orders are apparently now the partial subject of Respondents' Motion.

51.     Later that week, on Thursday May 2, 2019, Respondents' counsel made a settlement offer to the Li Parties with respect to ongoing shipments.  *See* Ex. 22.[9]  The Li Parties rejected that proposal on the afternoon of May 3, 2019.  *See* Ex. 22, p. 1.  Instead, the Li Parties reiterated to Respondents' counsel that Z.L. Investment – as Holder of a Majority Voting Interest in the Company – had previously directed Banjo, as Frictionless' Manager, to collect from World the outstanding amounts that World admittedly owed to Frictionless, so that Frictionless could then use those monies to pay down its debt to CIU, which would alleviate CIU's lender and cash

---

[9]      Although this communication was marked "For Settlement Purposes Only," it is included as part of Respondents' Motion.  Elsewhere in their Motion, Respondents also make a passing reference to a limited settlement proposal that the Li Parties made to Respondents – under the explicit header "**Discrete Proposal; For Settlement Purposes Only.**"  *See* Motion, ¶ 27.  Suffice to say, Respondents cannot rely on that proposal for anything in their Motion, and the Li Parties' counsel will not be invoking any of Respondents' other settlement proposals, or discussions, in opposing that Motion here.

flow issues and allow at least some shipments to continue.  *See* Ex. 22, p. 1.  At the time, the Li Parties understood that World owed Frictionless more than $5 million, about 70% of what Frictionless owed CIU at that point.  *See id.*

52.     Although it is redacted in their Motion, Respondents' counsel responded four hours later by tendering Banjo's resignation as Manager of Frictionless, LLC.  *See* Ex. C-25.  World still has not paid Frictionless any of the amounts that World admittedly owes Frictionless, whatever that amount may now be.  *See* Mingsu Statement.

53.     While Banjo was resigning as Frictionless' Manager, the four April 2019 Shipments remained outstanding.  One of those Shipments arrived in Denver before his resignation on April 26, 2019; the other three arrived afterwards, on May 12.  *See* Ex. C-32 (Delivery Instructions).  On the date of his resignation, May 3, 2019, Banjo directed the first of those Shipments to be sent to World.  *See* Ex. C-32, p. 5.  On May 14, 2019 – ten days after his resignation, at a time when he undisputedly had ***no*** authority to conduct any business on behalf of the Company – Banjo ordered that the remaining three Shipments, which CIU had sent to Frictionless, be shipped to World instead.  *See* Ex. C-32, pp. 2 - 4.

54.     The total value of the April 2019 Shipments is $369,444.08.  *See* Ex. C-30 (invoices); Mingsu Statement.  CIU has never been paid for the goods included in those Shipments even though World has presumably already sold those products to Retailers at a premium above and beyond the cost of the goods.  *See id.*

E.      After Banjo's Resignation as Manager, Claimant Appoints a New Manager and Discovers Additional Evidence of Fraud

55.     As noted, Banjo resigned as Manager of Frictionless on the evening of Friday, May 3, 2019.  *See* Ex. C-25.  That weekend, Claimant Z.L. Investment hurriedly worked to appoint Mingsu Li as Frictionless' new Manager.  *See* Ex. C-33.

56.     As part of Claimant's efforts to transition Frictionless to new management, Claimant sought Frictionless' books, records, and operational information from Banjo, so that Ms. Li could attempt to operate the Company which, according to Banjo, was effectively insolvent at the time.  *See* Ex. C-34; *see also* Ex. 21, p. 4 (April 29 email from Banjo).  And continuing thereafter, Claimant asked Respondents' counsel – who had offered to facilitate the transition efforts to Frictionless' new Manager – for a variety of operational documents relating to, among other things, the expenses reflected on Frictionless' financials.

57.     During this time, Respondents also filed their Response, Counterclaims, and Third-Party Claims to Claimant's Demand, which was noticeably silent on the issue of Frictionless' expenses, despite the "expense side fraud" being a central element of Claimant's Demand.  *See generally* Respondents' Counterclaims.

58.     After repeated emails and questioning, Respondents finally provided Frictionless' general ledger data in mid-May 2019.  Among other things, that data, combined with Frictionless' existing P&L statements, tax filings, and arbitration filings, shows the following:

- The Company's Payroll Expenses:  Frictionless hired only one employee during its entire existence – Ms. Li.  *See* Counterclaims, ¶¶ 11, 38; Motion, ¶ 15.  At all times from 2016-2018, Ms. Li's salary was $70,000 per year.  *See* Ex. C-35 (Payroll Journal).  But Frictionless' own P&L statements for those years show ***significantly higher*** payroll expense figures:  (a) $2,083,106 in 2016; (b) $2,106,317 in 2017; and (c) $2,790,474 in 2018.  *See* Exs. C-13 – C-15.

- <u>The Company's Rent Expenses</u>:  Frictionless never had its own physical location or lease.  *See* Counterclaims, ¶¶ 11, 38; Motion, ¶¶ 15, 22.  But Frictionless' 2018 Form 1065 tax filing lists rent expense of $1,292,180.  *See* Ex. C-16, p. 5.[10]

- <u>The Company's Warehouse Expenses</u>:  Only World had an actively operating warehouse; Frictionless did not.  *See* Counterclaims, ¶¶ 29, 38; Motion, ¶¶ 13, 15.  But Frictionless' P&L statements indicate that Frictionless incurred warehousing expenses of $1,585,387 in 2017 and $1,861,951 in 2018.  *See* Exs. C-14 – C-15.

- <u>The Company's Insurance Expenses</u>:  Frictionless never obtained insurance.  *See* Counterclaims, ¶¶ 36–38; Motion, ¶ 15.  But Frictionless' P&L statements indicate that Frictionless incurred insurance expenses of $216,516 in 2017 and $214,983 in 2018.  *See* Exs. C-14 – C-15.

59.    After raising a number of questions about these discrepancies over the course of nearly a month, Respondents' counsel finally advised Claimant's counsel on June 4, 2019 – more than a month after Banjo resigned as the Company's Manager – that:

> As you will recall, based on the Frictionless Operating Agreement and Operating Plan . . . Banjo was to operate Frictionless LLC "directly or indirectly through another company, joint venture or other arrangement."  . . . [T]hat company was Frictionless World ("FW").  ***FW since the signing of the Operating Agreement has overseen all business-related matters***, including but not limited to leases, professional needs (such as legal counsel), insurance payments, and where applicable, bank service fees.  ***From 2013 – 2018, these expenses were passed on to Frictionless LLC.***

*See* Ex. C-36 (June 4 email from T. Howard) (emphasis added).[11]

---

[10]    To the extent that Claimant is able to confirm, after discovery and trial, that these entries are, in fact, fraudulent, it will also have to incur the time and expense of amending Frictionless' tax returns with the IRS.

[11]    Although Respondents claimed in this email, and again in their Motion, that the Alleged Operating Plan reflected an agreement whereby Frictionless would reimburse World for all expenses, there is no such agreement reflected in the Alleged Operating Plan, even accepting Respondents' assertions (which the Li Parties do not).  *Compare* Motion, ¶ 25, *with* Ex. 16, pp. 39, 41.

60.     As noted, Z.L. Investment and Mr. Li **never** agreed to any such arrangement.  *See* Demand, ¶¶ 51–55; Joint Answer & Reply, ¶¶ 29-33, 43 n.5; Mingsu Statement; Mr. Li Statement. Respondents' counsel has not responded to additional follow up on this point.  But, based on the above correspondence, it appears that Frictionless has, in fact, paid for all of World's expenses since April 2013 – just as Claimant alleged in its Demand.  *See* Demand, ¶¶ 51–55.   And Frictionless has apparently done so regardless of whether World's expenses related to those brands that were supplied by CIU and Frictionless – such as "Dirty Hand Tools" and "RanchEx" – or whether the expenses related to World's additional brand lines such as "Redback" and "Trophy Strike," which are **not** supplied by Frictionless and/or CIU.

F.     Respondents Request, and CIU Provides, Proprietary Business Information about CIU's Suppliers, But Respondents Nevertheless File Their Motion

61.     For nearly a month after CIU advised that it could no longer ship goods to Frictionless – and thus that World would no longer receive product from Frictionless – the Li Parties heard little to nothing from Respondents about further shipments.  Instead, the Li Parties understood that Respondents were searching for other suppliers to replace CIU, as Banjo himself indicated he and World intended to do.  *See* Ex. 21, p. 4 (directing World employees to "move forward quickly on re-sourcing these to other supplier for [World]").

62.     Suddenly, on Friday afternoon May 24, 2019 – shortly before the start of the Memorial Day holiday weekend – Respondents' counsel demanded that CIU turn over to World certain information about CIU's third-party parts suppliers, and threatened to seek emergency injunctive relief if CIU refused to do so.  *See* Ex. C-37 (May 24 email from T. Howard).  Although that information was confidential and proprietary business information that CIU had obtained over years of doing business with the suppliers and at great cost – and although travel delayed the

provision of it somewhat – the Li Parties provided Respondents with that third-party supplier information on June 4, 2019.  *See id*.; *see also* Ex. 23.

63.     At no point from June 4, 2019 until the filing of this Motion did Respondents notify the Li Parties of any purported deficiencies or shortcomings with the supplier information provided to Respondents.   Instead, on June 17, 2019, after hearing nothing for nearly two weeks, Respondents suddenly demanded that CIU agree to resume shipments within the next six (6) hours, presumably because Respondents were unable to reach agreement with any of the suppliers identified for them by CIU.  *See* Ex. C-38.

64.     The undersigned counsel promptly advised Respondents' counsel on June 18, 2019 that CIU would not agree to resume shipments because its business position had not changed.  *See* Ex. C-39.  Respondents' Motion followed later that day.

## **ARGUMENT**

65.     A preliminary injunction is an "extraordinary remedy," so a party's right to it "must be clear and unequivocal."  CLA-002, *City P'ship Co. v. IR-TCI Partners V, L.P.*, 252 F. Supp. 2d 1114, 1118 (D. Colo. 2003).  Specifically, under Colorado law, the moving party bears the burden of demonstrating:  "(1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (3) lack of a plain, speedy, and adequate remedy at law; (4) no disservice to the public interest; (5) balance of equities in favor of the injunction; and (6) preservation by the injunction of the status quo pending a trial on the merits."  CLA-003, *Gitlitz LLC v. Bellock*, 171 P.3d 1274, 1278 (Colo. App. 2007) (citing CLA-004, *Rathke v. MacFarlane,* 648 P.2d 648, 653–54 (Colo.1982)).

66.     Additionally, Colorado courts have often noted that granting a preliminary injunction is disfavored if:  "(1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win."  CLA-005, *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019).  In such cases, the moving party "faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors [and] . . . must make a 'strong showing' that these tilt in her favor."  *Id.*

67.     Here, Respondents' Motion should be denied because:

    a.     Respondents do not have a reasonable probability of succeeding on the merits of their claims against the Li Parties;

    b.     Respondents have not demonstrated irreparable harm will occur in the absence of an injunction;

    c.     Respondents have various adequate remedies at law, at least some of which they are already pursuing in this arbitration;

    d.     The balance of equities strongly weighs against granting an injunction, particularly because, even setting aside the parties' dispute over whether Respondents committed fraud in connection with operating Frictionless, Respondents have engaged in multiple, documented instances of fraud and other misconduct in the 2019 calendar year alone, including in submitting evidence in connection with this Motion;

    e.     Forcing CIU to contract with World *ad infinitum* is contrary to applicable law and would be against the public interest; and

    f.     An injunction here would disrupt the status quo, not preserve it.

68.     For all these reasons, Respondents' Motion should be denied.

A.      <u>Respondents Are Not Likely to Succeed on Their Claims against the Li Parties</u>

69.      Respondents' Motion is premised on the notion that they have a reasonable chance of success on their claims asserting: (i) breach of contract against CIU, based on both the purchase orders between Frictionless and CIU, and on the Frictionless Operating Agreement; and/or (ii) breach of fiduciary duty against Z.L. Investment and Mr. Li. But, as set forth below, Respondents are not likely to prevail on those claims, whether purportedly brought on behalf of Banjo, World, or derivatively on behalf of Frictionless. As a result, Respondents cannot show any reasonable probability of success on the merits here, let alone the "strong showing" required for this kind of disfavored injunction. CLA-005, *Free the Nipple-Fort Collins*, 916 F.3d at 797. Their Motion should therefore be denied.

1.      <u>Respondents Are Not Likely to Succeed on Their Breach of Contract Claim against CIU</u>

70.      Initially, Respondents allege that CIU has breached "multiple purchase orders issued by Frictionless LLC on behalf of World" and seek an injunction based on that purported breach. *See* Motion, p. 21.[12] Respondents' breach of contract claims against CIU based on CIU's purchase orders with Frictionless are not likely to succeed for a number of reasons.

71.      *First*, as a threshold matter, Respondents lack standing to bring a claim against CIU for breach of contract because it is undisputed that the only parties to the purchase orders at issue are Frictionless and CIU. *See* Motion, ¶¶ 12, 22, 28. While a breach of fiduciary duty claim may

---

[12]      Elsewhere, confusingly, Respondents also invoke alleged breaches of the Operating Agreement, largely in their discussion of Z.L. Investment and Mr. Li. *See generally* Motion, pp. 23-25. To the extent Respondents attempt to rely on purported breaches of the Operating Agreement *by CIU* as a basis for their Motion, that reliance is badly misplaced because it is undisputed that CIU is not a party to the Frictionless Operating Agreement. Nor can CIU be considered a third-party beneficiary of that Operating Agreement because the Agreement's express terms preclude it. *See* Operating Agreement, § 14.15. CIU thus cannot be claimed to have breached the Operating Agreement in any way.

be brought derivatively, a breach of contract claim is a direct claim that can only be brought by the contract parties. *See, e.g., CLA-006, E. Meadows Co., LLC v. Greeley Irrigation Co.*, 66 P.3d 214, 217 (Colo. App. 2003) ("The general rule is that one who is not a party to a contract, and from whom no consideration moved, has no connection therewith.  He can avail himself of its terms neither as a cause of action nor a defense.").

72.    Here, Frictionless could certainly bring a breach of contract claim against CIU if it chose to do so, but Banjo cannot do so ***derivatively*** on Frictionless' behalf.  Banjo no longer has any managerial role with Frictionless, and is merely a Member of the Company.  Moreover, Section 5.4.11 of the Operating Agreement expressly provides that "the commencement . . . of any legal or administrative claim, action, investigation, or dispute" is a "Major Decision" that cannot be brought on Frictionless' behalf without Mr. Li's approval, which has not been provided here. *See* Operating Agreement, § 5.4.11.  For this reason alone, Respondents' breach of contract claim based on breach of the CIU-Frictionless purchase orders fails as a matter of law, because neither Banjo nor World is authorized to bring such a direct claim.  Instead, the power to do so is vested in Frictionless' management alone, subject to approval by Mr. Li. *See* Operating Agreement; *see also* CLA-007, *Klun v. Klun*, Case No. 18SA26, 2019 WL 2332186, at *4 (Colo. June 3, 2019) ("When a written contract is complete and free from ambiguity, we will deem it to express the intent of the parties, and we will enforce it according to its plain language.")

73.    *Second*, and in any event, it is undisputed that there is no overarching agreement between CIU and Frictionless that, for example, requires CIU to supply Frictionless with products for a specified period of time (*i.e.*, a requirements contract).  Indeed, Respondents nowhere identify

such a written contract, let alone attach one to their Motion. *See generally* Motion.[13]  Accordingly, CIU is not contractually obligated to ship product to Frictionless on any ongoing basis.  There is therefore no claim or other basis whatsoever for Respondents' attempt, by way of this Motion, to obligate CIU to ship product to Frictionless, let alone to World, for months or years on end while this arbitration proceeds.  Simply put, CIU has never had any such obligation and the Emergency Arbitrator cannot – and should not – create one out of whole cloth.

74.     Instead, as detailed above and in the forthcoming Mingsu and Jun Witness Statements, the parties' practice was to enter into successive purchase orders, whereby Frictionless would submit an individual, numbered purchase order to CIU, and CIU would inform Frictionless, typically via email, whether it could fulfill the order.  *Supra*, ¶¶ 32 - 33.  In other words, a binding contract between Frictionless and CIU would be formed **only** when CIU specifically agreed to fulfill a purchase order.  *See* Exs. C-21, C-22.[14]

75.     *Third*, because the purchase orders are only between CIU and Frictionless, World cannot seek recovery under them.  *See, e.g.,* CLA-009, *Bewley v. Semler*, 432 P.3d 582, 586–87 (Colo. 2018) ("Generally, only parties to a contract may seek to enforce its terms.").  To get around this obvious fact, Respondents allege that World was a "third-party beneficiary" to the purchase orders, and "was at all times intended to directly benefit from any contracts entered into by or for Frictionless LLC."  Motion, pp. 21, 23.  This argument fails for several reasons.

---

[13]     Moreover, no such oral contract could commit CIU to supply Frictionless with product for more than one year under Colorado's Statute of Frauds.  *See generally* CLA-008, C.R.S.A. § 38-10-112.

[14]     For this same reason, Respondents cannot credibly suggest, as they appear to do, that Mr. Li and/or Z.L. Investment are liable for CIU's alleged breach of "purchase orders issued by Frictionless."  Motion, p. 21 (contending that CIU breached purchase orders at Mr. Li's "direction").  Neither Mr. Li nor Z.L. Investment was a party to those purchase orders, so no breach of contract claim lies against them.  Instead, those purchase orders were contracts solely between CIU and Frictionless.

76.     Initially, "[u]nder Colorado law, the parties to a contract must intend to create third-party beneficiaries, and the best evidence of their intent is the contract itself."  CLA-010, *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1238 (10th Cir. 2014).  Here, none of the purchase orders at issue reflect any intent to make World a third-party beneficiary thereof.  *See, e.g.,* Ex. C-20 (purchase orders).

77.     Further, even if the text of the purchase orders themselves were not dispositive, there is no evidence that CIU intended to make World a third-party beneficiary of the CIU-Frictionless purchase orders.  Far from it, as Z.L. Investment has maintained throughout this arbitration, World's role in Frictionless' business operations was never agreed to and, instead, reflects Respondents' fraud upon the Li Parties.  *See* Demand, ¶¶ 43 - 55; Joint Answer and Reply, ¶ 61.  While the merits of Claimant's fraud claims will be proved at trial, the fact that Claimant has asserted such claims after discovering World's existence is strong evidence that the Li Parties never intended to make World a beneficiary to any contractual relationship of theirs.

78.     Finally, the only evidence that Respondents can even point to in support of the notion that World is a third-party beneficiary relates to the Operating Agreement, ***not*** the purchase orders actually at issue here.  Specifically, Respondents rely on the following, none of which is evidence that World is a third-party beneficiary to the CIU-Frictionless purchase orders:

      a.    The Alleged Operating Plan:  Respondents rely heavily on this document for what they claim was the overarching business arrangement between the parties.  *See* Motion, pp. 11 - 14, 21 - 23.  But, setting aside that the Li Parties never saw the Alleged Operating Plan until after the Demand had been filed and do not concede its genuineness, particularly in light of Respondents' conduct with respect to Exhibit 14 discussed below, the Alleged Operating Plan is, at best, part of a contract – the Operating Agreement – to which CIU is not a party.  *See supra*, ¶ 29; *see generally*

Operating Agreement.  That Alleged Operating Plan thus cannot make World a third-party beneficiary of the purchase orders at issue here, all of which were between CIU and Frictionless.

b. <u>Exhibit 14</u>:  As detailed further below, this appears to be an ***altered piece of evidence*** that materially differs from the Hard Copy LiBanjo Presentation that Mr. Li and Mr. Yin actually received from Banjo.  *See supra*, ¶ 7; *infra*, ¶¶ 125- 132.  It is therefore not reliable evidence of anything, other than potentially of Respondents' continued efforts to mislead the Li Parties and, sadly, this tribunal.

c. <u>Section 2.5 of the Operating Agreement</u>:  This provision of the Operating Agreement simply states that Frictionless may conduct its business "directly or indirectly through another company, joint venture, or other arrangement."  *See* Operating Agreement, § 2.5; Motion, pp. 9, 12, 23. Neither this provision nor any of the other provisions of the Operating Agreement make any specific mention of World.  It can thus hardly be relied on as evidence of an overarching business arrangement, purportedly designed to last for years if not decades, pursuant to which World handled all sales to Retailers and Frictionless paid for all of World's expenses. Simply put, one would expect that if the parties were going to document their business arrangement in writing, as they did in the Operating Agreement, they would have mentioned World ***somewhere***.

79.    Finally, even if this evidence supported Respondents' contention that World is a third-party beneficiary *to the Operating Agreement* – which is completely irrelevant to the issue of whether World may be considered a third-party beneficiary to the CIU-Frictionless purchase orders at issue – Section 14.15 of the Operating Agreement expressly precludes recognizing any entity as a third-party beneficiary to the Operating Agreement.  This alone is dispositive of the parties' intent to add World, or any other entity, as a third-party beneficiary to that Agreement

under Colorado law.  *See* CLA-010, *Gorsuch, Ltd., B.C.*, 771 F.3d at 1238 ("Courts construing Colorado law have determined an [No Third Party Beneficiary] provision offers strong proof of the parties' intent to preclude recognition of third-party beneficiaries.").

80.     For all these reasons, World cannot be considered likely to prove that it is a third-party beneficiary of the purchase orders between CIU and Frictionless.  This, too, is fatal to Respondents' Motion.

81.     *Fifth*, even if World or Banjo could show that they had standing to try to enforce the purchase orders between CIU and Frictionless here (and neither Banjo nor World has such standing), it is not even clear whether any the purchase orders remain pending.  As detailed in ¶¶ 49 *supra*, on April 29, 2019, Mr. Banjo – who at that time was still Frictionless' Manager – wrote to various members of World and CIU:  "Please document and save all PO's that were submitted to CIU.  Effective today they are cancelled."  *See* Ex. 21, p. 4.  It appears that Respondents are now seeking to enforce those same purchase orders.  Respondents cannot have it both ways and seek performance of purchase orders that it apparently canceled in writing.

82.     *Sixth*, and in any event, as explained in ¶ 44 *supra*, to the extent the purchase orders remain in effect, Respondents vastly overstate the amount of the purchase orders that are even arguably enforceable here.  As noted, Frictionless sent individual, numbered purchase orders to CIU, which would then advise Frictionless as to whether CIU was able to fulfill the order.  A purchase order thus can only be considered binding if CIU accepted it.

83.     Contrary to Respondents' assertions, to the extent that any of the purchase orders here can be enforced, and that Banjo or World can enforce them, there are, at most, approximately $838,512.00 in Accepted But Not Shipped POs, less than 20% of what Respondents claimed (without any evidentiary support) were outstanding.  *Compare* Ex. C-40 (detailing the Accepted

But Not Shipped POs), *with* Motion (which nowhere attaches any purchase orders, let alone indicates which have been accepted by CIU).  At the absolute most, then, any recovery sought by Respondents' Motion is limited to the Accepted But Not Shipped POs though, as noted below, Respondents are not even entitled to that relief due to their failure to meet the other prerequisites for injunctive relief.

84.     *Seventh*, even as to the Accepted But Not Shipped POs – the only potential contracts on which Respondents' claim for breach of the CIU-Frictionless purchase orders could be based – Respondents are not likely to prevail because CIU has not breached its contract as to those POs under the circumstances presented here.  Specifically, as the Li Parties detailed at length in ¶ 36 *supra*, CIU is currently owed over $22.6 million by Frictionless, including $9.2 million in unpaid invoices for products delivered to Frictionless more than a year ago.  CIU's lender has refused to allow CIU to make further shipments to an entity that has shown no evidence that it intends to pay for CIU's products, and Banjo's statements that Frictionless "has substantially no assets or cash" suggest that CIU's lenders are correct.  *Supra*, ¶ 38.

85.     To be sure, Banjo could have caused Frictionless to sell CIU's products to World at an increased markup, and further collected those sums from World that World admittedly owes Frictionless, all of which he was obligated to do so as Frictionless' Manager.  Instead, Banjo spent the entire first quarter of 2019 transferring all of Frictionless' inventory – acquired from CIU – to World at cost, so that Frictionless made no money on those sales, and, once Z.L. Investment instructed him to collect the monies owed to Frictionless by World, he chose to resign as Manager rather than fulfilling his duties to the Company.  *See* C-25; *supra*, ¶ 43.  Even now, Banjo could cause World to pay Frictionless.  He has not done so.  Simply put, it is commercially unreasonable to force CIU to continue shipping even the Accepted But Not Shipped POs to, effectively, World,

thereby funding World's operations for free, where, as here, Banjo has repeatedly breached his duties to Frictionless and refused to order World to pay either Frictionless or CIU the amounts that World undisputedly owes.

86. *Eighth*, as detailed in ¶¶ 53 - 54 *supra*, the last time CIU sent shipments to Frictionless – the April 2019 Shipments – Banjo wrongfully directed that those Shipments be sent to World, even though he had resigned as Frictionless' Manager by that point and thus had no authority to conduct business on Frictionless' behalf. Again, it is simply not commercially reasonable to require CIU to ship products to Frictionless when such products will be diverted to another company without any payment to CIU. Moreover, Respondents cannot credibly claim that their Motion presents no commercial risk to CIU, or that "no injury will arise" if their Motion is granted, because CIU will get paid for all products shipped. *See* Motion, pp. 28, 30. The actual evidence of Respondents' conduct with respect to the April 2019 Shipments – for which CIU still has not been paid – proves that those assertions are simply not true.

> 2. <u>Respondents Are Not Likely to Succeed on Their Claims for Breach of the Operating Agreement and/or Breach of Fiduciary Duty Against Z.L. Investment and/or Mr. Li</u>

87. The second claim forming the basis for Respondents' Motion is against Z.L. Investment and Mr. Li, and Respondents' Motion vacillates between claiming that Z.L. Investment and Mr. Li: (a) breached the Operating Agreement; and (b) breached their fiduciary duties to Frictionless. *See* Motion, pp. 23-25 (noting that "action by Li and Z.L. Investment comprised a material breach of their obligations . . . under the Operating Agreement" and that "Frictionless LLC has a reasonable probability of success on . . . its breach of fiduciary duty claim against [Li and Z.L. Investment]").

88.     Initially, Respondents' purported theories and claims differ from those pleaded in their Counterclaims.  In any event, whether new or old, and whether framed as breach of the Operating Agreement or breach of fiduciary duty, Respondents do not have a reasonable probability of success on the merits of their claims against Z.L. Investment and/or Mr. Li.

a.     <u>Respondents Are Not Likely to Succeed on Their Claim for Breach of the Operating Agreement Against Z.L. Investment and/or Mr. Li</u>

89.     To the extent Respondents claim Z.L. Investment and Mr. Li breached the Operating Agreement, Respondents are not likely to succeed on that claim for several reasons.

90.     *First*, the muddled nature of Respondents' claim for breach of the Operating Agreement becomes clear when attempting to determine the exact breach alleged here.  For example, Respondents cite in their Motion to Section 5.9.1 of the Operating Agreement.  *See* Motion, p. 23.  But that provision is a limitation of liability clause that only applies to Frictionless' "Manager and the Officers," not to a Member like Z.L. Investment or to a non-Officer affiliate of a Member, like Mr. Li.  *See* Operating Agreement, § 5.9.1.  Simply put, this clause imposes no obligations whatsoever on either Z.L. Investment or Mr. Li, and thus cannot form the basis of any breach of contract claim here.  If anything, this clause can give rise to a breach of fiduciary duty claim, but as addressed further in Section A.2.b *infra*, no such claim for that can lie here either.

91.     *Second*, to the extent an alleged breach can be deciphered here, it appears to be related to the fact that CIU stopped making shipments to Frictionless.  *See* Motion, pp. 23-24 (noting that CIU's cessation of shipment "interfere[d] with the status quo" and thus breached Z.L. Investment's and Mr. Li's alleged "obligations to Frictionless LLC and World").  But no obligation for CIU to ship products to Frictionless exists in the Operating Agreement, nor is there some other agreement that obligates Mr. Li and Z.L. Investment to cause CIU to make further shipments to Frictionless, let alone to World (which is neither a party to the Operating Agreement nor to the

purchase orders at issue, as discussed above).  Simply put, Respondents fail to explain how the Operating Agreement is even remotely relevant to CIU's cessation of shipments.

92.     Nor could they – no such provision of the Operating Agreement could even purport to bind CIU to make shipments to Frictionless because CIU is not a party to the Operating Agreement.  Rather, any such obligation would have to come from the CIU-Frictionless purchase orders, but, as stated in ¶ 29 *supra*, neither Z.L. Investment nor Mr. Li is a party to those purchase orders and neither has any obligations thereunder.  Accordingly, any alleged breach of those purchase orders cannot form the basis of a claim against Claimant or Mr. Li.

93.     *Third*, even if there was an obligation to make shipments to Frictionless in the Operating Agreement (and there is no such obligation), World is not a party to that Agreement and cannot be a third-party beneficiary thereof.  *See supra*, ¶¶ 75 - 80.  Indeed, Section 14.15 of the Operating Agreement expressly precludes recognizing World as a third-party beneficiary, separate and apart from the fact that Z.L. Investment and Mr. Li did not know of World's existence when the Operating Agreement was signed and certainly did not intend to confer any benefits upon World at that time.  *Supra*, ¶ 30.

94.     For all these reasons, Respondents do not have a reasonable probability of success on the merits of any claim against Z.L. Investment and/or Mr. Li for breach of the Frictionless Operating Agreement premised on CIU's cessation of shipments to Frictionless.

> b.     <u>Respondents Are Not Likely to Succeed on Their Claim for Breach of Fiduciary Duty Against Z.L. Investment and/or Mr. Li</u>

95.     Perhaps recognizing that their claim for breach of the Operating Agreement is fatally flawed as to Z.L. Investment and Mr. Li, Respondents shift gears halfway through this section of their Argument and begin making a claim for breach of fiduciary duty against Z.L. Investment and Mr. Li.  *See* Motion, pp. 23-24.  Like their other claims, this also fails.

96.     *First*, Mr. Li is an affiliate of a Member – Z.L. Investment– but not a Member or
Manager of Frictionless himself.  As such, he owes no fiduciary duties to either Frictionless or
Banjo as a matter of law.  *See* CLA-011, Colo. Rev. Stat. Ann. § 7-80-404(1) and (2).  And Mr. Li
certainly owes no fiduciary duties to World which, upon information and belief, is wholly owned
by Banjo.  Respondents fail to cite any statute or case law suggesting otherwise.

97.     *Second*, under Colorado law, where a limited liability company ("LLC") is
"manager-managed," only the manager owes fiduciary duties to the LLC; the members do not owe
fiduciary duties to that LLC.  *See* CLA-011, Colo. Rev. Stat. § 7-80-404(1) and (2); *see also* CLA-
026, § 5:25.Members and managers—Duties, 1 Colo. Prac., Methods Of Practice § 5:25 (7th ed.).
Here, by its terms, the Operating Agreement provides that Frictionless is a manager-managed LLC,
so only Banjo owed a fiduciary duty to Frictionless, for the period while he was the Company's
Manager.  *See* Operating Agreement, § 5.1.  Neither Mr. Li nor Z.L. Investment have any such
duty (nor does Banjo now that he has resigned as Manager).

98.     *Third*, to the extent Respondents are alleging that either Mr. Li or Z.L. Investment
owes a fiduciary duty to World as a third-party beneficiary, that fails on both the law and the facts.
As addressed in ¶ 17, Z.L. Investment and Mr. Li were never aware of World's existence until
November 2018 and thus could not have intended to convey any benefit to World by forming
Frictionless in April 2013.

99.     Further, even if Z.L. Investment or Mr. Li had been aware of World, there is no
such thing as third-party beneficiary doctrine in the context of fiduciary duties, and Respondents
have not cited any cases or other law suggesting otherwise.  Indeed, a claim for breach of fiduciary
duty is meant to address alleged harms to a company (here, Frictionless) by those who owe the
company duties of care and loyalty (here, Banjo, while he was Manager).  Fiduciary duty doctrine

cannot be used to address alleged harm that shareholders of one company (Frictionless) purportedly caused to an unrelated entity (World) with which the first company does business.

100.    *Fourth*, although not discussed in their Argument, Respondents allege elsewhere in their Motion that Z.L. Investment and Mr. Li breached the fiduciary duty of loyalty by engaging in "direct competition with Frictionless," an apparent reference to CIU's alleged sales to Frictionless' competitors between April 2012 and January 2019.  *See* Motion, ¶ 27.  Such a claim fails for a number of reasons noted in the Li Parties' Joint Answer and Reply.  *See* Joint Answer and Reply, ¶¶ 55-72.  To take just one example, to the extent Respondents are asserting a breach of the Operating Agreement's non-compete obligations based on conduct that occurred before May 8, 2016, such a claim would be time-barred.  *See* CLA-012, Colo. Rev. Stat. Ann. § 13-80-101(1)(a).  Indeed, Respondents repeatedly reference alleged sales by CIU to Blount in their Motion, but, even if Respondents' filing is to be believed, that filing shows that CIU's last shipment to Blount was in January 2016, so *all* purportedly breaching sales to Blount took place outside the applicable limitations period here.  *Compare* Motion, ¶ 27, *with* Ex. 19, p. 18 (sixth row from the bottom, showing last shipment to Blount on January 6, 2016), and CLA-012, Colo. Rev. Stat. § 13-80-101(1)(a).

101.    More fundamentally, however, these alleged breaches of the Operating Agreement's non-compete provisions – which the Li Parties flatly deny and which, even based on Respondents' own evidence, at most amount to only a handful of shipments since the applicable the limitations period date of May 8, 2016 – have **nothing** to do with the remedy sought by Respondents' Motion here, which is an emergency order that CIU resume shipping products to World for the entire length of the parties' arbitration.  Simply put, there is no nexus between the purported claim at issue – whether any of the Li Parties owed any non-compete obligations under

the Operating Agreement, let alone breached those obligations, which will be determined after discovery and the merits hearing – and the injunctive relief sought by Respondents.  Without that nexus, such a claim simply cannot form the basis for the requested injunctive relief here.

102.    For all these reasons, Respondents do not have a reasonable probability of success on the merits of any claim against Z.L. Investment and/or Mr. Li for breach of fiduciary duties allegedly owed to Frictionless, whether in connection with CIU's cessation of shipments thereto or otherwise.

> B.    <u>Respondents Have Not Demonstrated, and Cannot Demonstrate, Any Real, Immediate, and Irreparable Injury Warranting Injunctive Relief</u>

103.    Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction" and "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  CLA-013, *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004). Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate."  CLA-003, *Gitlitz*, 171 P.3d at 1279 (citation omitted).  This occurs where, for example, "monetary damages are difficult to ascertain or where there exists no certain pecuniary standard for the measurement of the damages."  *Id.*

104.    Further, Respondents must show that their injury is reasonably certain or imminent, as opposed to speculative.  CLA-014, *Cobra N. Am., LLC v. Cold Cut Sys. Svenska AB*, 639 F. Supp. 2d 1217, 1230 (D. Colo. 2008); *see also* CLA-002, *City P'ship Co.*, 252 F. Supp. 2d at 1118 (D. Colo. 2003) (stating the moving party "must come forward with evidence showing that irreparable injury may occur *pendente lite* if the preliminary injunction is not granted") (citation omitted).

105.   "Simple economic losses usually do not constitute irreparable harm as such losses
are compensable by monetary damages."  CLA-015, *Steak n Shake Enterprises, Inc. v. Globex
Co., LLC*, No. 13-CV-01751-RM-CBS, 2013 WL 4718757, at *13 (D. Colo. Sept. 3, 2013)
(citation omitted).  Also, it is axiomatic that "preliminary injunctive relief cannot remedy harm
that already has occurred."  *Id.*

106.   Here, at bottom, Respondents' allegations of irreparable harm in their Motion boil
down to two types of damage:  (1) lost sales resulting from unfilled purchase orders; and 2) loss
of goodwill.  Neither is sufficient to establish irreparable harm.

1.   <u>Lost Sales Resulting from Unfilled Purchase Orders</u>

107.   Initially, Respondents fail to make the necessary showing of irreparable harm
because, aside from bare assertions of "millions of dollars in sales" being lost and "retailers []
canceling unfilled orders" (*see* Motion, pp. 26-28), they rely on only two documents to support
their assertions – an email chain with a Lowe's employee questioning whether World will be able
to supply certain goods, and a WeChat text message chain with Jun Li discussing certain
purchasers' frustration with the delays in delivery of products.  *See* Respondents' Exs. 24 & 19,
respectively.   At best, these exhibits show strained relations with certain Retailers, but they
nowhere suggest, let alone prove, that any threatened harm is certain or imminent, as opposed to
merely speculative.  Indeed, Respondents have even redacted their apparent response to Lowe's,
precluding the Li Parties from obtaining further insight on that topic.  *See* Ex. 24, p. 1.

108.   Moreover, to the extent that Respondents could even show that "millions of dollars
in sales have been lost," that loss is not irreparable harm justifying injunctive relief because, at
best, those lost sales represent harms that have already occurred.  *See* Motion, p. 26; CLA-015,
*Steak n Shake Enterprises, Inc.*, 2013 WL 4718757, at *13.  These alleged damages are also easily

quantifiable as simple economic losses – and, in the case of outstanding purchase orders, Respondents have already purported to quantify them – and therefore compensable as monetary damages. *See id.*; *see also* Motion, ¶ 35.

109.   Further, any future unfilled purchase orders would be easily quantifiable in precisely the same manner. *See* CLA-016, *Q-Tech Labs. Pty Ltd. v. Walker*, No. CIV.A.01-RB-1458(CBS), 2002 WL 1331897, at *14 (D. Colo. June 4, 2002) (finding "claims of future lost sales" to be adequately remedied by money damages).   Indeed, Colorado courts have even been able to quantify monetary damages for requirements contracts, thus precluding a finding of irreparable harm, even though requirements contracts present a far more challenging structure for ascertaining damages than the straightforward purchase orders present here.   CLA-017, *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1362 (10th Cir. 1989) (noting "requirements can vary considerably over a lengthy period of time").

110.   For all these reasons, Respondents' claims of irreparable harm based on unfilled purchase orders fail to meet the standard for irreparable harm required for injunctive relief.

### 2.   Lost Goodwill and Purported Loss of the Business

111.   Respondents' claims of irreparable harm based on lost goodwill and purported "threat" to World's business fare no better.   Initially, any goodwill lost, or business relations damaged, before Respondents' Motion was filed constitutes harm that has already occurred and therefore cannot form the basis for injunctive relief. *See, e.g.,* CLA-016, *Q-Tech Labs*, 2002 WL 1331897, at *14 ("[A]ny good will that Plaintiffs may have lost prior to filing the instant action will not justify a preliminary injunction.").

112.   Further, as noted, Respondents have not provided any evidence to show that any future loss of goodwill, or "threat to 'the very existence of the movant's business,'" is in fact

imminent.  *See* Motion, p. 27.  The email chain with Lowe's and WeChat chain with Jun Li certainly do not suffice.  *See*  Exs. 24 & 19, respectively.  Indeed, Colorado courts have rejected similar assertions when parties requesting an injunction to prevent loss of business relations fail to show they have lost any business partners or been unable to establish new ones because of the opposing party's actions.  *See, e.g.*, CLA-014, *Cobra N. Am., LLC*, 639 F. Supp. 2d at 1234 (denying injunction due to lack of evidence of impending harm to business network).

113.    Moreover, loss of goodwill or business relations is, again, compensable by monetary damages, even if these alleged harms are supported by evidence.  *See, e.g.*, CLA-016, *Q-Tech Labs*, 2002 WL 1331897, at *14 (finding claims of "future . . . damage to goodwill" to be adequately remedied by money damages).

114.    In an effort to make these kinds of necessary showings of irreparable harm, Respondents' Motion relies heavily on CLA-018, *Bray v. QFA Royalties, LLC*, 486 F. Supp. 2d 1237 (D. Colo. 2007).  *See* Motion, pp. 26-27.  But *Bray* is easily distinguishable on a number of fronts:

> b.    *First, Bray* occurred in the franchise context, where the "threatened loss of a franchise business" has itself been held to constitute "irreparable harm sufficient to warrant injunctive relief."  *Id.* at 1247.  That unique situation does not apply to the business situation here.  Indeed, World has entire brands and lines of business that are separate and apart from any products supplied by Frictionless and CIU, so World's business will continue irrespective of the outcome of this Motion.  *See* Mingsu Statement.

> c.    *Second, Bray* involved a written franchise agreement for Quiznos franchises, which exclusively provided that "the supplier [to the franchisee] must be either Quiznos or a Quiznos-directed vendor."  *Id.* at 1246.  Here, there is no overarching written supply agreement between CIU and Frictionless – let alone between CIU and World – and neither the Operating

- 41 -

Agreement nor the purchase orders provide for any kind of exclusive supply arrangement between CIU and Frictionless.  The same parts and products that CIU provides to Frictionless – which Banjo directed be sold to World – are available from other sources.  In fact, Respondents can and have sought out other suppliers – and even obtained contact information for parts manufacturers from CIU – in an effort to find different sources of supply. *See* Exs. 21, 23.  This Motion only followed because, apparently, those efforts were unsuccessful.  But CIU cannot be responsible for others' decision not to enter into contracts with Respondents, nor can that form a basis to make CIU do business with Frictionless or World.  Simply put, unlike Quiznos in *Bray*, CIU is not "free to refuse to supply [Frictionless] and to demand the immediate shut-down" of World.  *Id.* at 1247.

d.      *Third*, the written franchise agreement in *Bray* contained express termination provisions, including granting the franchisee a 30-day cure period, none of which are present here.  *Id.* at 1240.  In fact, the lack of an overarching supply agreement meant that, as a legal matter, CIU could refuse to continue to do business with Frictionless ***at any time***, regardless of whether doing so helped or hurt the business.

e.      *Fourth*, the equities plainly favored the plaintiffs in *Bray*, because Quiznos terminated their franchise rights solely because the plaintiffs belonged to an advocacy group that had posted the suicide note of a former Quiznos franchisee online and, in response, Quiznos terminated their franchises immediately, without granting the plaintiffs their contractually entitled opportunity to cure.  *Id.* at 1239-40.  This is a far cry from the situation here, where:  (i) no overarching supply contract exists or has been breached; and (ii) this arbitration arises because of fraud and misconduct by Respondents, a fraud that has continued into these proceedings.  *See supra*, ¶¶ 31 - 32; *infra*, ¶¶ 122 - 132.  Unlike the franchisees in *Bray*, then, Respondents' own "egregious infractions" and "unclean hands" do not warrant injunctive relief.  *Id.* at 1250.

- 42 -

115.    For all those reasons, *Bray* is completely inapposite here.  The other cases that Respondents cite for their assertion – that loss of goodwill is sufficient grounds for injunctive relief – are similarly either mischaracterized or clearly distinguishable.  *See* Motion, p. 27.  Consider:

a.    *Husky Ventures, Inc. v. B55 Invs, Ltd.* is inapplicable because the injunction in that case was issued against parties that had already been held to have tortuously interfered with business relations at trial.  CLA-019, 911 F.3d 1000, 1013-14 (10th Cir. 2018).  There is no such evidence that CIU's actions are motivated by a desire to destroy Respondents' business here, as opposed to CIU's own ordinary course business considerations given its lender issues and substantial outstanding receivable from Frictionless.

b.    Respondents' parenthetical for *Gitlitz* is not supported by the case itself; contrary to Respondents' claims, that case did not address whether "mismanagement" of a company could constitute irreparable harm, but rather whether the loss of bargained-for voting rights – specifically, voting power in a limited liability company – can be considered irreparable harm.  *See* Motion, p. 27 (citing CLA-003, *Gitlitz*, 171 P.3d at 1279).  *Gitlitz* is thus irrelevant to Respondents' claims of irreparable harm here.

c.    In *Tri-State Generation and Transmission Ass'n v. Shoshone River Power, Inc.*, the court enjoined one of the members of an energy cooperative from selling off its assets based on evidence that other members would likely also sell off if the initial sale was allowed, thus dissolving the entire cooperative before it could obtain relief at trial.  CLA-020, 805 F.2d 351, 356 (10th Cir. 1986).  Here, by contrast, Respondents' Motion seeks to force CIU to do business with a party it does not want to contract with for months or years, not simply prevent a party from selling off assets before trial.

116.    Finally, the Li Parties are constrained to note that Respondents' claim – that the Li Parties are motivated by a desire to destroy Respondents' business – is absurd.  *See* Motion, pp.

27-28.  Setting aside the conclusory nature of these allegations, Respondents cannot credibly claim that they seek to avoid "irreconcilable injuries to Frictionless" here, given that:  (a) Frictionless' own P&L statements show Respondents caused such "injuries" to the Company by transferring Frictionless' inventory to World at cost in the first quarter of 2019; and (b) Respondents effectively stole Frictionless' April 2019 Shipments for their own benefit.  *Supra*, ¶ 43.

117.    Moreover, and in any event, CIU's decision to stop accepting Frictionless' purchase orders was due to ordinary course business considerations – the fact that Frictionless currently owes CIU over ***$22 million*** for completed purchased orders, many of which are long past the contractually obligated window for payment, and CIU's lender will not allow CIU to further increase its accounts receivable with Frictionless.  *Supra* ¶¶ 36, 44 - 46.

118.    In sum, Respondents' alleged damages are not unavoidable, much less irreparable. CIU is far from the only supplier of the type of products it produces.  Respondents can get their needed products elsewhere; in fact, CIU has provided them with information to do so.  *See* Motion, p. ¶ 33; Exs. 21, 23.  Further, the Li Parties are not acting to destroy Frictionless or Respondents' business, but rather to stop Respondents' fraud and ensure that their own businesses will not continue to be harmed by it.  For all these reasons, Respondents cannot make the requisite showing of irreparable harm here.  Their Motion should be denied.

C.    Respondents Have Adequate Remedies at Law

119.    Respondents' Motion should also be denied because Respondents have various adequate remedies at law, some of which they are already pursuing in this arbitration.  "[T]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  CLA-002, *City P'ship Co.*, 252 F. Supp. 3d at 1118 (quoting *Sampson v. Murray,* 415 U.S. 61, 90 (1974)).

120.     As described above, *supra* ¶¶ 103 - 118, all of the alleged harms Respondents have raised can be remedied by monetary damages.  These monetary damages can all be recouped if Respondents are able to establish at trial that:  (a) a contractual relationship exists between CIU and either Frictionless or World that requires CIU to supply product; and (b) CIU has breached that contract (though Respondents have not been able to make such a showing on their Motion). *See, e.g.*, CLA-016, *Q-Tech Labs*, 2002 WL 1331897, at *14 (finding an adequate remedy at law exists for future lost sales or damage to goodwill that are compensable by money damages).

121.     Indeed, if Respondents can make such a showing, Colorado's Uniform Commercial Code gives them a specific remedy for just this very situation – it allows a buyer to "recover from the seller as damages" the difference between the price of any replacement goods and the contract price, as well as incidental and consequential damages.  CLA-021, Colo. Rev. Stat. Ann. § 4-2-712.  All of these damages would be available through the ordinary course of this arbitration.  None of them suffice to establish the kind of irreparable harm justifying injunctive relief.

### D.     The Balance of Equities Plainly Does Not Favor an Injunction Here

122.     Even setting aside the parties' dispute over their intent in forming Frictionless – which need not be resolved on this Motion – the balance of equities plainly do not favor Respondents here based solely on the parties' conduct in 2019.  "[A] party engaging in improper or fraudulent conduct relating in some significant way to the subject matter of the cause of action may be ineligible for equitable relief."  CLA-022, *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 519 (Colo. App. 2006) (citing CLA-023, *Salzman v. Bachrach*, 996 P.2d 1263, 1269 (Colo. 2000)).

123.     Here, Respondents' breaches of the Operating Agreement and perpetration of fraud against the Li Parties, *supra* ¶¶ 27 - 60, precludes them from receiving injunctive relief.  *See* CLA-

024, *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281 (7th Cir. 1992) (denying injunctive relief to a franchisee who had defrauded the franchisor and engaged in "egregious infractions" of the franchise agreement).  Consider just the following evidence of fraud and misconduct in 2019 alone, which the Li Parties submit is not subject to reasonable dispute:

    a.    From January – March 2019, Banjo ran Frictionless as its Manager.  And, as Frictionless' P&L statement for that time period makes clear, Banjo caused Frictionless to transfer all of its inventory for the first quarter of 2019 to World at cost, guaranteeing that Frictionless would make no substantive profit for the quarter, and further harming CIU by extension by depriving Frictionless of funds that could be used to pay off Frictionless' massive – and growing – debt to CIU.  *Supra*, ¶ 43.

    b.    In April 2019, Banjo and World took possession of the April 2019 Shipments – which CIU sent to Frictionless and which belonged to the Company as its property – without basis.  Respondents therefore obtained $369,444.08 worth of Frictionless' property for nothing, and neither CIU nor Frictionless has been paid for those goods.  *Supra*, ¶ 43.

124.    The above points are undisputed and, standing alone, justify denial of Respondents' request for the equitable remedy of injunctive relief, independent of any analysis or assessment of the alleged fraud at the heart of Claimant's Demand.  But Respondents' conduct in connection with this very Motion further suggests that Claimant's fraud claims are well-founded and that Respondents' efforts to mislead the Li Parties have, sadly, extended to this proceeding.

125.    Specifically, Respondents rely on a document – Exhibit 14 – that appears to have been materially altered before filing.  As set forth in ¶¶ 7-9, *supra*, Respondents submitted Exhibit 14 to support their claims that the Li Parties had agreed from the outset to involve World in the

joint venture, and to simply use Frictionless as a "pass through" entity.  Respondents claim that they showed Exhibit 14 to Mr. Li in September 2012.  *See* Motion, ¶¶ 10, 18.  But both Mr. Lin and Mr. Yin will be submitting sworn witness statements attesting to the fact that they were shown a different presentation entirely, the Hard Copy LiBanjo Presentation.

126.    With the exception of Mr. Yin's handwritten notes, Page 1 of the Hard Copy LiBanjo Presentation is identical to page 5 of Exhibit 14.  *Compare* Ex. C-19, *with* Ex. 14.  But the balance of the Hard Copy LiBanjo Presentation differs from Exhibit 14 in a number of material ways, as follows:

a.      The Hard Copy LiBanjo Presentation contains no references to World; Exhibit 14 contains at least ten such references.  *Compare* Ex. C-19, *with* Ex. 14.

b.      The Hard Copy LiBanjo Presentation does not refer to a "pass through" entity of any kind.  *Compare* Ex. C-19, *with* Ex. 14.

c.      The Hard Copy LiBanjo Presentation discusses the general business structure that the Li Parties believed was in place until at least November 2018 (i.e., CIU would sell its products to a US-based company owned by the Li Parties and Banjo, and that company would then sell CIU's products to Retailers, making all profits from such sales).  *See* Ex. C-19; *see also* Mingsu Statement; Mr. Li Statement.  Exhibit 14, by contrast, makes multiple references to the supposed role that World would play in the joint venture and states that only Banjo would own World, which would retain 5-10% of the profit from any sale, even though none of that appears in the Hard Copy LiBanjo Presentation.

d.      The "Product Flow" diagram in the Hard Copy LiBanjo Presentation differs from the version in Exhibit 14 in several ways.  Namely, while the diagram in the Hard Copy Presentation does list a number of supposed "cons" to

using an LLC owned by both the Li Parties and Banjo, that Presentation nowhere states, as Exhibit 14 does, that such an approach "won't work," that insurance will be "impossible to get," that renting warehouse space would be "impossible," or that the parties "can not pursue this option." *Compare* Ex. C-19, *with* Ex. 14.  Further, the slide is titled "LiBanjo direct Product Flow" in Exhibit 14, but is simply named "Product Flow" in the Hard Copy LiBanjo Presentation.  *Compare* Ex. C-19, *with* Ex. 14.  Finally, the arrow showing the flow of product from the LiBanjo company logo to the Tractor Supply Company logo (one of the Retailers) is intact in the Hard Copy LiBanjo Presentation, but is crossed out on Exhibit 14.  *Compare* Ex. C-19, *with* Ex. 14.

e.     Exhibit 14 states that "Frictionless World also sells non-CIU built products to help growth of all companies," but the Hard Copy LiBanjo Presentation nowhere mentions World or Frictionless selling non-CIU products. *Compare* Ex. C-19, *with* Ex. 14.  Moreover, Exhibit 14's use of the present tense "sells," as opposed to the future tense "will" in most of the Hard Copy LiBanjo Presentation, is out of place, as is Exhibit 14's discussion of World selling non-CIU products, which, upon information and belief, did not occur until long after Frictionless was formed.

f.     Finally, Exhibit 14 refers to an "investigation into EB5 investment for Mr. Li to get citizenship for children per discussion with Mr. Li, but this language is missing entirely from the Hard Copy LiBanjo Presentation. *Compare* Ex. C-19, *with* Ex. 14.  As noted, Mr. Li's children did not obtain or even seek U.S. citizenship or EB5 visas at any time.  *See supra*, ¶ 23, n.4.

127.   These differences are easy to see upon a basic review of the two documents. Consider the following, with Exhibit 14's differences from the Hard Copy LiBanjo Presentation highlighted in yellow:

**Page 2 of the Hard Copy LiBanjo Presentation**:

- This is the company that Mr. Li owns.  Dan, Steve, LiShan will also own a portion. 这是 Mr.Li 的公司，Dan、Steve、Ls 持会打所有
- Everything that CIU makes will be sold to this company in the USA. CIU 锻的产持以息卖的减隐借给 LiBanjo
- This company sees all of the profit from the sale. 利润都自销售.
- Must also pay insurance and taxes in the US as well as over head expenses. 也除在美国购买保险 支付税金 以及行政 开销
- OE parts are also sold to this company. OE 和也世"总卖"给 LiBanjo
- Propose that Mr Li own 70% of this company.  Dan, Steve, LiShan split the remainder. Mr Li 拥有这大部份的股份.
- We could even make Blount buy from this company in the USA thus we would reduce the payment issues Mr. Li is having with Blount. 还可以让 Blount 经由 LiBanjo 向 CIU 购买产品.

**Page 4 of Exhibit 14**:

- This is the company that Mr. Li owns.  Dan, Steve, LiShan will also own a portion.
- Everything that CIU makes will be sold to this company in the USA, then passed through to Frictionless World.
- This company sees enough profit from the sale to Frictionless World to support expenses and growth.
- Must also pay insurance and taxes in the US as well as over head expenses.  Frictionless World also sells non-CIU built products to help growth of all companies.
- Propose that Mr Li own 70% of this company.  Dan, Steve, LiShan split the remainder. Dan owns FW.
- We could even make Blount buy from this company in the USA thus we would reduce the payment issues Mr. Li is having with Blount.

**Page 3 of the Hard Copy LiBanjo Presentation:**



**Page 6 of Exhibit 14:**



**Page 4 of the Hard Copy LiBanjo Presentation:**

## EB5 investment issues

- A foreigner can not simply create a company in the US and then put $1 million in the bank to get a residency.  This is illegal.

- Thus we would need to create two companies.  One Mr Li owns and one that is a "shell company."

- The second would be the one Mr. Li invests in.  This will be the "shell company."  This will be the company that employs the people needed to satisfy the EB5 requirements.  Mr. Li gets his money back after the investment period which is usually 12-15 years.  The longer the better from the government perspective.

- "Shell Company" makes no profit but would be the employer of record to satisfy the EB5 requirements.

- Have lawyers and translators ready to get started next month if Mr. Li approves.

**Page 3 of Exhibit 14:**

# EB5 investment issues

- A foreigner can not simply create a company in the US and then put $1 million in the bank to get a residency.  This is illegal.

- Thus we would need to create a "pass through company." Mr Li invests in the one that is a "pass through company."  The this company would only support Frictionless World.  Ultimately both companies support the growth of CIU.

- Frictionless World will be the "parent company."  This will be the company that employs the people needed to satisfy the EB5 requirements for the parent.  Mr. Li gets his money back after the investment period which is usually 12-15 years.  The longer the better from the government perspective.

- "Parent company" makes some profit (5-10%) but would be the employer of record to satisfy the EB5 requirements.  Need to check into the legal aspects to make sure this structure is possible.

- Have lawyers and translators ready to get started next month if Mr. Li approves.

**Page 5 of the Hard Copy LiBanjo Presentation**:

## EB5 Foreign Investment

- Normally a $1 million USD dollar investment per individual.

- Because we moved the new company to a city with less than 20,000 people we can use the targeted investment criteria. Then the investment is only $500k per person.

- Current population of Louisville, CO is 19,000 people. Once it goes over 20,000 we must invest $1 million per person.

- Lawyer fees are about $100k per application.

- Moving the office and warehouse to Louisville will save Mr Li $500k for each application for a **total of $1 million!!!**

- Can get both Tracey and Frank applications in by the end of the year.

**Page 2 of Exhibit 14**:

# EB5 Foreign Investment

- Investigation into EB5 investment for Mr. Li to get citizenship for children per discussion with Mr. Li.
- Company would support work of Frictionless World.

- Normally a $1 million USD dollar investment per individual.

- Because we moved the new company to a city with less than 20,000 people we can use the targeted investment criteria. Then the investment is only $500k per person. (need to verify this with an EB5 lawyer)

- Current population of Louisville, CO is 19,000 people. Once it goes over 20,000 we must invest $1 million per person.

- Lawyer fees are about $100k per application.

- Moving the office and warehouse to Louisville will save $500k for each application for a **total of $1 million!!!**

- Can get both Tracey and Frank applications in by the end of the year.

128.   Complete discovery and a full trial may be needed to conclusively determine whether Exhibit 14 was altered before the Motion was filed.  But there is strong evidence of that – and of the Hard Copy LiBanjo Presentation's reliability – available now.

129.   *First*, the Li Parties are submitting two sworn witness statements attesting to the fact that Mr. Li and Mr. Yin never saw Exhibit 14 and were instead given the Hard Copy LiBanjo Presentation by Banjo in 2012.  *See* Mr. Li Statement; Yin Statement.

130.   *Second*, as the images above make clear, the Hard Copy LiBanjo Presentation contains Mr. Yin's ***contemporaneous, handwritten notes*** seeking to translate portions of the Presentation's English text to Mandarin for Mr. Li's benefit, an effort that is confirmed by the Mandarin-to-English translation of those handwritten notes (where legible).  *See* C-19.  Exhibit 14, by contrast, is supported only by Respondents' bare allegations in their Motion, which should not be accorded any weight.  *See* Motion, ¶¶ 10, 18.

131.   *Third*, the Li Parties never received an electronic version of the Hard Copy LiBanjo Presentation itself.  *See* Mr. Li Statement; Yin Statement.  Accordingly, Respondents cannot credibly claim that the Li Parties somehow fabricated the Hard Copy LiBanjo Presentation given that they only ever possessed a hard copy version.  This is particularly true because the Li Parties provided the Hard Copy LiBanjo Presentation to counsel ***within ten (10) hours*** of receiving Respondents' Motion and Exhibit 14.[15]

---

[15]   Further, if Respondents were to engage in such speculative accusations, the Li Parties note that, two months after receiving a copy of the Alleged Operating Plan, the Li Parties still have not come forward with any "alternative" version of that Alleged Operating Plan.  The reason for this is simple:  the Li Parties have no record of ever seeing, discussing, or receiving a copy of the Alleged Operating Plan.  In contrast, in connection with Respondents' Exhibit 14, what the Li Parties did receive, and do have, is a materially different document – the Hard Copy LiBanjo Presentation.  Given the compelling evidence that Exhibit 14 appears to have been materially altered before the Motion was filed, and the lack of any evidence that the Alleged Operating Plan was ever provided to the Li Parties, the Li Parties respectfully submit that it is also appropriate to question the authenticity of the Alleged Operating Plan in connection with Respondents' Motion.

132.    In short, Respondents' submission of Exhibit 14 – which appears to have been materially altered before filing – is alone sufficient to find that the balance of equities weighs against granting Respondents' Motion here.  CLA-022, *Premier Farm Credit, PCA*, 155 P.3d 504, 519 (Colo. App. 2006) ("[A] party engaging in improper or fraudulent conduct relating in some significant way to the subject matter of the cause of action may be ineligible for equitable relief." (citing CLA-023, *Salzman*, 996 P.2d at 1269).

133.    Finally, even without considering this compelling evidence of fraud and misconduct by Respondents just in the 2019 calendar year, the balance of the equities still weighs against granting an injunction here.  The volume of the Accepted But Not Shipped POs is markedly less than Respondent claims, *supra* ¶ 44, so any financial burden CIU has placed on Respondents' business has been greatly exaggerated.  Further, there is no danger to the existence of Respondents' business because World has other product lines and brands that are not supplied by Frictionless and/or CIU.  And, even if those lines of World's business supplied by Frictionless and/or CIU may be disrupted to an extent, Respondents' refusal to either take advantage of, or to be able to enter into contracts with, the readily-available alternative sources of supply for those products cannot be held against CIU. *See supra* ¶¶ 61 - 64.

134.    For CIU, by contrast, granting this injunction would force CIU to effectively contract with World for the first time, against CIU's will, to further do so for months or years without any contractual basis therefor, and to lock CIU into business for an extended period with a party that has, at the very least, been an unreliable and damaging business partner and who, in CIU's eyes, has repeatedly misled it. *See* CLA-024, *Original Great Am. Chocolate Chip Cookie Co.*, 970 F.2d at 277 (finding the damage of being forced to do business with an undesired partner to be irreparable harm, as CIU would suffer here if the Motion were granted).

135.   CIU has already been deprived of substantial sums of money by Respondents'
misconduct:  over $22 million in unpaid shipments, of which over $9 million is overdo, and over
$360,000 in wrongfully possessed products just since April 2019.  *Supra*, ¶ 36.  These amounts
have contributed to CIU's precarious financial situation, as described *supra* ¶¶ 44 - 46.  Given the
history of the Li Parties' relationship with Respondents and Respondents' own failures to pay
Frictionless amounts undisputedly owing – culminating with Respondents' transferring of goods
from Frictionless to World at cost for the entire first quarter of 2019, and their conversion of the
April 2019 Shipments without compensation – there is no reason to believe Respondents would
satisfy these past due payments, much less payments for future shipments.

136.   For all these reasons, the balance of equities plainly tips in the Li Parties' favor and
against granting Respondents' Motion.

E.   Granting Respondents' Motion Would Disserve the Public Interest

137.   Additionally, granting Respondents' requested injunction here would be against the
public interest because it would be antithetical to the core principle that all parties are free to decide
whether or not to enter into contracts with whichever other parties they choose.  Specifically, as
noted, Respondents' requested injunction would effectively force CIU to enter into a contract with
World for the first time and, moreover, would require CIU to continue to supply World for months
or even years while the arbitration proceeds, even though CIU never even had any such obligation
to Frictionless, let alone to World.  *Supra*, ¶¶ 29 - 32.  This injustice is exacerbated by the fact that
CIU has been defrauded by Respondents.  *Supra*, ¶ 1.

138.   Moreover, Respondents' claim on this point – that the Retailers whom World
supplies are harmed by CIU's failure to send shipments – lacks any evidentiary support and ignores
that the products World sells are common and readily replaceable.  The public is not harmed by

the loss of one avenue of supply for a product when the same product can easily be found from

other sources.  *See, e.g.*, CLA-025, *PDC Pharmacy Colorado, Inc. v. McKesson Corp.*, No. 13-

CV-01663-MSK-BNB, 2013 WL 3242836, at *5 (D. Colo. June 26, 2013) (allowing a pharmacy

to run out of particular drugs did not harm the public enough to merit an injunction when another

pharmacy could also provide the drugs).

139.    Finally, Respondents' invocation of the potential damage to World's employees,

though unfortunate, cannot be laid at CIU's feet.  As discussed *supra*, ¶¶ 61 - 64, Respondents had

multiple alternative sources with which to supply World with necessary products.  *See* Exs. 21, 23.

CIU cannot be held accountable for Respondents' unwillingness, or inability, to contract with other

suppliers, particularly given that CIU itself has been forced to lay off certain of its own employees

because of the financial issues caused by the Company's business difficulties.  *See* Mingsu

Statement.

F.      <u>An Injunction Would Alter, Not Preserve, the Status Quo While the Parties
        Arbitrate Their Dispute</u>

140.    Finally, far from preserving the status quo, granting Respondents' requested

injunction would irrevocably alter it, in essence creating a contract between two parties – CIU and

World – who have undisputedly never contracted with each other since April 2013.  *Supra*, ¶¶ 29

- 32.  Such an injunction would upset the status quo – whereby CIU and Frictionless contracted on

a purchase order-by-purchase order basis – and effectively impose a requirements contract

between CIU and Frictionless for the length of the arbitration, which would then presumably be

extended to World.

141.    In sum and substance, CIU would be forced to enter into a new contract with

Frictionless, and by extension World, with materially different terms than the *status quo ante*, even

though there is no evidence, contractual or otherwise, that CIU was obligated to continue accepting

purchase orders from Frictionless.  Simply put, just because CIU often accepted purchase orders from Frictionless does not mean it was obligated to do so.  And the Li Parties are aware of no precedent for issuing an injunction forcing one party to enter into a long-term contract that did not previously exist, particularly where, as here, there is not a single piece of evidence suggesting that the parties had any intention, or are obligated contractually or otherwise, to do so.  Nor do Respondents cite any such precedent.  CLA-005, *Contra Free the Nipple-Fort Collins*, 916 F.3d at 797 (noting that a preliminary injunction is disfavored if "it mandates action (rather than prohibiting it)" or "changes the status quo").

## **<u>CONCLUSION</u>**

For all of these reasons, and others that will be presented at the hearing if necessary, Respondents' Motion should be denied in its entirety.  Claimant and Third-Party Respondents further respectfully request that the Emergency Arbitrator award them costs and attorneys' fees for their time and money spent responding to a Motion premised in part on apparently altered evidence.

**Respectfully submitted for and on behalf of
Claimant and Third-Party Respondents**

**K&L Gates LLP**
*Counsel for the Claimant and
Third-Party Respondents*
**June 25, 2019**

# Exhibit 15

| From: | Olayinka Hamza |
|---|---|
| To: | J. Brian Johns, LL.M. |
| Cc: | Koosed, Brian D.; Scott Brenner; Haddox, Kodey M.; McCullough, Austin E.; Thomas P. Howard; William Groh; Meyers, Deborah |
| Subject: | Respondents-Counterclaimants" Arbitrator Selection |
| Date: | Wednesday, July 03, 2019 11:44:34 PM |

**External Sender:**

Mr. Johns:

Please be advised that Respondents -- Counterclaimants are appointing Steven Choquette, an arbitrator that is available and regularly handles these kinds of cases.  His bio is available at https://jamsdenver.com/neutral/steven-c-choquette-esq/

For background information, Mr. Howard worked with Mr. Choquette 17 years ago at Holland & Hart for about 3.5 years.  Also, Mr. Choquette mediated one case for Thomas P. Howard, LLC.  Thomas P. Howard, LLC does not have any current contractual or other relationships with Mr. Choquette and Mr. Howard does not think that there would be any conflict from Mr. Choquette taking this position.

I do not know if Mr. Choquette is currently on the AAA National Roster, but if he isn't I am certain that can be easily corrected.

Please let me know if you have any questions.

Sincerely,

*Olayinka L. Hamza*

Attorney, Thomas P. Howard LLC

842 West South Boulder Road, Suite 100

Louisville, Colorado 80027

p: 303.665.9845

f: 303.665.9847

ohamza@thowardlaw.com

www.thowardlaw.com



# Exhibit 16

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| CHANGZHOU ZHONG LIAN INVESTMENT CO. LTD. (A/K/A Z.L. INVESTMENT), INDIVIDUALLY<br> Claimant,<br><br>v.<br><br>DANIEL BANJO AND<br>FRICTIONLESS WORLD, LLC<br> Respondents – Counterclaimants<br><br>v.<br><br>LI ZHIXIANG, ZL INVESTMENT, CHANGZHOU INTER UNIVERSAL MACHINE & EQUIPMENT CO., LTD, AND FRICTIONLESS, LLC.<br> Counterclaim and Third-Party Defendants<br><br>and<br><br>DANIEL BANJO, DERIVATIVELY ON THE BEHALF OF FRICTIONLESS LLC. | AAA Case: 01-19-0001-1748 |

## RESPONDENTS' REPLY IN SUPPORT OF
## MOTION FOR EMERGENCY INJUNCTIVE RELIEF

Daniel Banjo, derivatively on the behalf of Frictionless, LLC ("Frictionless"), and Frictionless World, LLC ("World") (collectively "Movants") offer this reply relief in support of their Motion for emergency injunctive relief:

### I.    Introduction

From May 2013 through April 2019 Frictionless, per the directions of World, sent purchase orders ("POs") to Changzhou Inter Universal Machine Equipment Co., Ltd. ("CIU"). CIU, prior to late 2018, would in response to the receipt of each PO from Frictionless prepare and ship the order as written, thereby accepting through shipment. Occasionally CIU would ask for additional

time or have questions regarding the product being assembled. Never did CIU reject any PO issued by Frictionless. Each PO was a new contract to assemble and deliver the products listed in the PO.

Beginning in late 2018, and continuing after the filing of this action, CIU began delaying shipments, while repeatedly promising it was going to ship the products specified on all POs issued. Then, on April 29, 2019, well after the filing of this lawsuit and at the beginning of the busy season for the sale of these products, CIU abruptly announced that it was not going to honor the outstanding POs. On its face, CIU intentionally delayed its contractual obligation while repeatedly promising to ship, then breached the same by refusing to ship, in an obvious effort to cause direct injury to Frictionless and World.

CIU's actions have caused, and are causing, irreconcilable injury to Frictionless, as well as to World, a direct third-party beneficiary of the POs. For each of the reasons detailed below, the parties must be returned to the status quo and shipment of the goods on the existing POs conducted.

## II.     Background

### 1.     Over the last six years, Frictionless and CIU established a consistent course of conduct.

Over the last six years, Frictionless repeatedly issued POs to CIU. Up until late 2018 CIU always delivered on the POs. Ex. 1[1] at ¶¶ 23-24, 29, 42 (Witness statement of D. Banjo, June 27, 2019); Ex. 2 at ¶¶ 3-4 (Declaration of D. Banjo, June 27, 2019). Over this six-year period, Frictionless issued POs and CIU performed and delivered on the same. Ex. 1 at ¶¶ 23-24, 29, 42; Ex 2 at ¶¶ 3-4. These actions occurred on tens of millions of dollars in POs and comprised the parties' normal course of conduct. Ex 2 at ¶¶ 3-4. In the recent 2018-2019 time period, CIU began delaying its shipments, but at no time rejected any PO. Ex. 1 at ¶ 42; Ex. 2 at ¶ 4. To the contrary, CIU repeatedly promised to ship all products being ordered. Ex. 19 to Motion; Ex. 20 Motion (CIU's counsel assuring Frictionless' counsel that "productions and shipment will continue as usual vis-à-vis the purchase orders we discussed."). Frank Li repeatedly assured Banjo and Frictionless that it would ship on the POs Frictionless already issued. In May 2019 Frank Li sent Banjo multiple text messages assuring Banjo and Frictionless POs "Should ship from.this week

---

[1] Exhibits 1 and 7 are witness statements that were previously submitted. Movants attached them them to filing for the convenience of the Arbitrator.

[sic];" "From this week the shipping will become normal;" "We can ship all the future order on time." Ex. 19 from Motion at pp. 1, 4, and 5. Then on April 29, 2019, CIU reversed itself and stated that it would not ship, thereby acting in direct breach of its contractual obligations to the detriment of Frictionless and Word. *See* Ex. 21 to Motion (CIU's counsel stating CIU will not make any further shipments)

> **2.    CIU is upon information and belief competing with Frictionless in direct violation of the non-compete.**

Upon information and belief, CIU is directly and knowingly competing against Frictionless, to the detriment of both Frictionless and World, in direct violation of the Operating Agreement. Ex.16 to Motion at p.8, ¶ 4.4. The evidence shows that CIU has acted in violation of the non-compete with Frictionless throughout their term of business together. *Id*.

> **3.    CIU's claimed financial inability to ship is without merit.**

CIU's alleged financial inability to ship as a justification for its breach comprises a frivolous factual defense never alleged prior to the filing of this Motion. It is supported solely by inadmissible third-party hearsay from China, and it is directly contradicted by the facts. First, Frank Li, the son of Li Zhixiang ("Li") and a part owner of CIU, expressly advised Banjo that he was a billionaire who could start shipping again depending on Banjo's "attitude." Ex. 3. No mention was made of any financial issue. *Id*. Second, although previously payments for goods shipped were not due for 360 days, Banjo in good faith offered to have World pay for each delivery, through Frictionless, immediately upon receipt. Under such a system, Frictionless would not run up further debt. CIU rejected this, without basis. Finally, Frictionless is 90% owned by ZL Investments, which is 100% owned by the Lis. The sole reason that Frictionless has any "debt" to CIU (owned by the Lis) in the first place is that CIU 1) charged Frictionless inflated prices through 2018, and 2) acted in direct breach of the non-compete contained in the Frictionless Operating Agreement. CIU's alleged "debt" from Frictionless is a smokescreen argument being used to justify a breach of over 200 POs and the consequent irreparable injury being caused to Frictionless and World.

      4.      **Li viewed <u>three separate versions</u> of the LiBanjo presentation.**

In 2012, Banjo and Li began discussing forming a venture to import log splitters and other equipment to the U.S. market. In the early stage of their discussions, Banjo created multiple different proposals. Ex. 1 at ¶¶ 16-18. Banjo created three separate versions of the "LiBanjo" proposal alone, <u>all</u> of which were provided to Li in September 2012. *Id.*; Ex. 4 (metadata from PowerPoint files showing presentation discussed in Ex. 1 at ¶¶ 16-18 were created in September 2012). These each comprise alternative variations on the same proposal. Ex. 1 at ¶¶ 16-18. Exhibit 6 (to Exhibit 1) version 3 is identical to the exhibit attached to the Movants' Emergency Motion. Exhibit 6 (to Exhibit 1) version 2 is the same as the version Li attached to the Counterclaim Defendants' response brief. Banjo and Li spent many hours discussing, reviewing, and revising these presentations and the joint venture, along with the help of Li's staff. Ex. 1 at ¶¶ 16-26.

Counterclaim Defendants allege with no evidence that 1) Li only received one "LiBanjo" document, and 2) that the exhibit produced by Banjo constitutes a modification of the same. Counterclaim Defendants' claim is false and factually unsupported. Li received <u>all three</u> of the presentations from Banjo. Ex. 1 at ¶¶ 17-18. Li is simply choosing which of these documents to admit that he "saw" and "didn't see" in an effort to evade what the undisputable record shows to be the truth—that seven years ago in 2012-2013 he knew World to exist, and that World—like CIU—was a key component of the joint venture entered into by the parties in April 2013.

Finally, none of the "LiBanjo" proposals were in the end adopted. The parties used a more detailed proposal containing substantive elements of the same, which is the Operating Plan attached as Schedule B to the Operating Agreement and referenced therein (which Li also now denies having seen).

      5.      **Banjo has not used the name "Frictionless" to identify Frictionless World.**

The Counterclaim Defendants' citation to an early 2013 document suggesting that the name "Frictionless" was used to identify World is false and misleading. The table shown in Paragraph 22 of Counterclaim Defendants' brief is from November 22, 2012—five months *before Frictionless ever existed*. At the time the table was created only World existed. Accordingly, it

was reasonable to refer to Frictionless World as "Frictionless." There was no risk that anyone would confuse Frictionless World with a company that did not exist.

Similarly, the Counterclaim Defendants' reference to the immigration letter is misleading. *See* Counterclaim Defendants brief at ¶ 23. Banjo was asked to help members of Li's family get through the U.S. immigration process. Ex. 1 at ¶ 19, 34-36. He was asked to prepare a letter indicating that Frictionless employed Li's daughter as CFO. *See Id.* at ¶ 34 (Banjo rendered substantial assistance). Li and the Counterclaim Defendants knew the purpose of that letter was to help his daughter with the immigration process. *Id.* at 36-37. The letter does not describe Frictionless' business location, website, email address, or other standard business accouterments, as it had none. The Lis were fully aware that Frictionless comprised a shell corporation that acted as a pass-through between World and CIU. *Id.*

## III.    Legal standard

Courts have the discretion to issue temporary restraining orders. The purpose of a temporary restraining order is to prevent future harmful conduct. *City of Colorado Springs v. Blanche*, 761 P.2d 212, 217 (Colo. 1988). A court should enter a temporary restraining order if a party can show: (1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (3) that there is no plain, speedy, and adequate remedy at law; (4) that the granting of a preliminary injunction will not disserve the public interest; (5) that the balance of equities favors the injunction; and (6) that the injunction will preserve the status quo pending a trial on the merits. *Rathke v. MacFarlane*, 648 P.2d 648, 653-54 (Colo. 1982); *Briscoe v. Sebelius*, 927 F. Supp. 2d 1109, 1114 (D. Colo. 2013) (noting that the requirements for issuing a temporary restraining order mirror the requirements for issuing a preliminary injunction).

IV.     **Argument**

A.     **The Movants have a reasonable probability of success on the merits of their claims.**

1.     **Banjo has the right to bring a derivative action on behalf of Frictionless.**

The Counterclaim Defendants' contention that only managers can bring derivative claims is directly contrary to Colorado law. Under Colorado law members of an LLC have the right to bring a derivative action. § 7-80-713, C.R.S. Banjo, as a member, has the right to bring a derivative claim on behalf of Frictionless.

The Counterclaim Defendants' contention that Section 5.4.11 of the Operating Agreement prevents derivative lawsuits is equally misplaced. Section 5.4.11 governs major decision made by the LLC during the normal course of operation. A "derivative action. .. is a mechanism used in the corporate context by shareholders to sue on behalf of a corporation when those in control of a corporation decide not to pursue a claim belonging to the organization." *Curtis v. Nevens*, 31 P.3d 146, 151 (Colo. 2001). If those in control of the corporation could control or prevent members from bringing derivative actions, the Colorado Statute would be *powerless to protect minority shareholders.* In this instance, Claimant ZL Investments, owned 100% by the Lis, owns 90% of Frictionless. Its actions, taken in conjunction with CIU, also owned by the Lis, are directly to Frictionless' severe detriment. It is under precisely such circumstances that the ability for a minority shareholder to file a derivative suit applies.

Moreover, the Operating Agreement expressly permits individual members, such as Banjo, to obtain injunctive relief such as that requested in this Motion. Section 14.6.2 states "each Member, Li, and the Manager shall have the right to seek and obtain such temporary or preliminary injunctive relief from a court of competent jurisdiction to which it may be entitled." Ex.16 at p.23 at ¶ 14.6.1.

2.     **World is a third-party beneficiary of the Operating Agreement and the purchase orders; it has direct standing to bring a third-party claim.**

A third-party beneficiary is an "intended" beneficiary of a contract. *E.B. Roberts Const. Co. v. Concrete Contractors, Inc*., 704 P.2d 859, 865 fn. 7 (Colo. 1985). Frictionless World is a

clear "intended" beneficiary of the POs because the parties intended for CIU to manufacture and ship Frictionless World patented and branded products to Frictionless World and its customers. *See* Rest. 2d of Contracts § 302(b) (1981) (a party is a third-party beneficiary if "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and…the circumstances indicate that a promise intends to give the beneficiary the benefit of the promised performance.")

Colorado law expressly provides that a third-party beneficiary need not be specifically mentioned in the contract at issue. *See Villa Sierra Condo. Ass'n v. Field Corp.*, 878 P.2d 161, 166 (Colo. App. 1994) ("intent [to benefit a specific third party] need not be expressed in the agreement itself; that intent may be evidenced either from the terms of the agreement, the surrounding circumstances, or both." Citing *Jefferson County School District v. Shorey*, 826 P.2d 830 (Colo.1992)).

For the past six years, Frictionless, Li, ZL, and CIU have expressly treated World as a third-party beneficiary. They intended World to benefit from the POs issued by Frictionless. Under Li leadership, CIU has shipped *tens of millions* of dollars' worth of product *directly* to World's facility in Colorado. Ex. 2 at ¶ 4. Frictionless has paid millions of dollars to World for the use of World's facilities and employees to sell and distribute CIU products. Ex. 2 at ¶ 5. Li and CIU intended for World to benefit from the purchase orders Frictionless issued to CIU. Section 2.5 of the Operating Agreement contemplates and authorizes Frictionless to conduct its business, including sales, marketing, and distribution of CIU products through World. Ex.16 to Motion at p.8, ¶ 2.5. World has reasonably come to rely upon this relationship when promoting and selling products to resellers.

As a third-party beneficiary of the POs, World is entitled to sue CIU for performance. *Villa Sierra Condo. Ass'n v. Field Corp.*, 878 P.2d 161, 166 (Colo. App. 1994) ("A third party who is not a signatory to an agreement may, nevertheless, have the authority to enforce one or more of the obligations created by that agreement, if the third party is intended by the other parties to be a direct beneficiary of that agreement."). Accordingly, World has standing to move this Arbitrator for an order directing CIU to maintain the status quo and fulfill the purchase orders that were issued and accepted in the parties normal course of conduct.

3.      **Frictionless and World have a reasonable probability of success on the merits of their breach of contract claims.**

To succeed on a breach of contract claim, Frictionless and World must prove that (1) there was a contract between Frictionless and CIU; (2) Frictionless fulfilled its obligations under the contract; (3) CIU failed to fulfill his obligations under the contract; and (4) Frictionless incurred damages as a result of CIU' breach. *See Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

Frictionless will succeed on its claim for breach of contract because the POs issued by Frictionless and accepted by CIU are enforceable contracts. Pursuant to C.R.S.A. § 4-2-206 § 1(b), "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods." Here, CIU as a standard practice either shipped as per the request or modified the date of shipment, if necessary. Ex. 2 at ¶ 3. CIU never rejected a purchase order. *Id.* at ¶ 4 More importantly, during the time at issue, which is August 2018-April 2019, CIU repeatedly promised to ship all issued POs. Ex. 2 at ¶ 6. By promising to ship, CIU accepted each of the issued POs pursuant to the Colorado Uniform Commercial Code. C.R.S.A. § 4-2-206 § 1(b). CIU then revoked its repeated contractual promises to ship on April 29, 2019. That action was without legal basis, as Frictionless had fully performed all of its obligations under the purchase orders at issue. Finally, contrary to CIU's misleading arguments, Frictionless' payments on the POs at issue were not overdue—they were not even owed until 360 days after delivery, which has yet to occur. Ex. 2 at ¶ 7; Ex. 5 at ¶ 3. Frictionless and World have incurred irreparable harm as a result of CIU's knowing breaches.

CIU's current contention that it had a formal approval process for accepting POs is false and unsupported by the six-year factual record. First, no approval requirement is set forth on the POs. Ex. 2 at ¶ 3. Second, the communications cited by CIU show that Frictionless regularly emailed POs to CIU and CIU then assembled and shipped products based on the same. Ex. 2 at ¶ 3. Third, with regards to the POs relevant to this Motion, CIU repeatedly and expressly confirmed that it *was going to ship* each of the Frictionless POs right up until the April 29 post-filing breach. Ex. 1 at ¶ 42; Ex. 2 at ¶ 4; Exs. 19 and 20 to Motion (text messages and emails assuring shipment of POs); Ex. 21 to Motion (email canceling POs). At no time did CIU limit its promise to ship to

certain POs. Based on its repeated promises to ship, a contract was created on all outstanding POs, as merchants must be able to rely on the representations of suppliers. C.R.S.A. § 4-2-206 § 1(b). Underlining the same, CIU has not produced *any* evidence that it <u>ever</u> rejected a PO prior to April 29, 2019. Up until April 29, <u>CIU and its counsel repeatedly assured Frictionless</u> that CIU would fulfill the POs that Frictionless sent to CIU. Ex. 1 at ¶ 42; Ex. 2 at ¶ 4; Ex. 20 to Motion (email assuring shipment of POs). In March 2019, Frank Li repeatedly texted Banjo, assuring him POs "should ship from.this week [sic];" "from this week the shipping <u>will become normal</u>;" "We can ship all the future <u>order on time</u>." Ex. 19 to Motion at pp. 1, 4, and. 5. In response to Banjo's concerns about late orders, Franki Li texted, "Ok, hope we can get another chance to prove we can do much better." *Id*. at p. 6. This long-standing pattern of conduct demonstrates each PO issued by Frictionless up until April 29, 2019, constitutes an enforceable contract. Accordingly, Frictionless has the right to demand contractual performance on the POs and has a reasonable probability of prevailing at trial on this issue.[2]

**B.      Injunctive relief will prevent the danger of real, immediate, and irreparable injury.**

Frictionless faces real, immediate, and irreparable injury if CIU does not honor the POs it already accepted. Colorado courts have recognized that a supplier will suffer real, immediate, and irreparable harm to its reputation and its business relationships if cannot deliver products it has already sold. For purposes of a preliminary injunction, loss of a contractual right to manage and control a business may constitute "irreparable harm"; monetary damages are an inadequate remedy for such a loss, and a contractual right to participate in the management and control of a business has intrinsic value in and of itself that may not be adequately compensated by monetary damages. *Gitlitz v. Bellock*, App.2007, 171 P.3d 1274. The injuries to World's relationships are exceedingly

---

[2] Counterclaim Defendants suggest that Frictionless cancelled "the POs" following Counterclaim Defendants' breach. Counterclaim Defendants concede to expressly rejecting any such cancellation(s). Counterclaim Defendants further admit that just three days later the parties continued to negotiate a settlement "with respect to <u>ongoing shipments</u>" pursuant to which if Banjo would accept ZL's offer of settlement, CIU could "allow at least some <u>shipments to continue</u>." *Id*. at ¶ 51. (Emphasis added). Since that time, Counterclaimants have continued to demand that the POs be carried out per the status quo in existence at the time that the action was filed, and the Counterclaim Defendants have referred back to their April 29, 2019 refusal to perform.

difficult to repair. World's relationship with Lowe's, Walmart, Tractor Supply, Costco and others, has already been severely damaged.

The Arbitrator must act now to prevent further injury. World is currently talking to alternative suppliers, but will not be able to obtain an alternative supply until November of 2019 at the earliest—long after the buying season for log splitters. If the Arbitrator does not act now, World will likely lose a majority of this year's <u>over $45 million dollars</u> in sales to competitors. Ex. 2 at ¶ 8. Still, more importantly, it will lose the relationships with critical national resellers, including, Lowe's, Home Depot, and others, that it has taken over 7 years to obtain. *Id*.; Ex. 6 at ¶¶ 3-6 (Dec. of World's VP of Sales explaining the damage to the relationship with Lowe's).

The harm that would result to Frictionless and World as a result of losing this year's sales and the related sales relationship would be irreparable and would carry forward for years to come.

### C.      There is no plain, speedy, and adequate remedy at law

Absent a preliminary injunction ordering CIU to honor and fulfill the purchase orders it has already accepted, Frictionless, World, and Banjo will have to wait for the case to be fully litigated before receiving the relief they deserve. Waiting for a final decision could take months or years. During that time, Frictionless will have no revenue, and World's business relationships with key retailers will be destroyed. Waiting for months or years is not a plain, speedy, and adequate remedy at law, and monetary damages would not compensate Frictionless, World, or Banjo for the injury to their reputations and the business relationships with resellers. Granting a temporary injunction ordering CIU to resume shipping the products Frictionless already ordered is the only way that Frictionless, World, and Banjo can protect themselves from this harm.

### D.      The balance of equities favors an injunction.

The equities favor entering an injunction requiring CIU to resume shipping the purchase orders it already accepted. Frictionless, World, and Banjo will be irreparably harmed if CIU is not ordered to honor the purchase orders. If an injunction order is issued, Frictionless and World will

still be able to make some of the sales they already earned from Lowe's, The Home Depot, and other retailers, and protect the business relationships with these key retailers.[3]

Just recently Lowe's effectively canceled a year's worth of orders. Ex. 6 at ¶ 5. It expressly told World that because World could not timely deliver log splitters, it would have to begin using alternative suppliers. *Id.* Lowe's change in position is a direct result of CIU breaching its multiple contracts with Frictionless. Lowe's change in position irreparably harmed World's reputation and more importantly its ability to maintain its supplier relationship with Lowe's. Similar conversations and actions have been taken by other retailers as a result of CIU's breach. Ex. 1 at ¶53; Ex. 2 at ¶ 8. This is causing irreparable harm to Frictionless and World.

### 1.  CIU and Li have starved Frictionless of money and product.

The Counterclaim Defendants continued references to money owed by Frictionless to CIU is a red herring. First, for the past four years, since 2015, Li's daughter Serena Li has been the CFO of Frictionless. Ex. 1 at ¶ 24; Ex. 7 at ¶ 7 (Dec. of R. Germundson, CFO or Frictionless World). She has had access to all of Frictionless' financial records, and she has had the authority to control Frictionless' finances. Ex. 2 at ¶ 9. Had Li has been unhappy with the financial operations of Frictionless, he could have directed his daughter to manage Frictionless' financial relationship with CIU differently.

Second, Frictionless was current on its debt obligation to CIU until CIU began accepting POs, promising to ship, then not shipping the ordered product. Ex. 2 at ¶ 7. By accepting POs but not shipping product, CIU led Frictionless to reasonably believe that it would soon receive the products from CIU, that it could then ship to its resellers. By withholding product, CIU prevented Frictionless from earning money with which to pay CIU, thereby creating the "debt" currently being used as an alleged basis for not shipping.

Finally, in early 2019, while CIU was reassuring Frictionless that it would ship the POs, CIU and Li negotiated with World and Frictionless to alter the Frictionless payment terms from 360 days to 180 days on POs going forward from February 2019. Ex. 2 at ¶ 7; Ex. 5 at ¶ 3. Pursuant

---

[3] Some of the sales have already been cancelled by retailers due to nondelivery, and reseller continue to cancel sales causing World to incur substantial late and cancellation fees. Ex. 1 at ¶ 49; Ex. 2 at ¶ 8. Unless CIU is ordered to ship, this will continue.

to the same, Serena Li, Li, and Frank Li recommended that Frictionless LLC should assign all of its current inventory value (worth roughly $6,611,227.00) under the joint venture to Banjo, in exchange for his agreement to *personally* enter into a long term loan agreement, and make a substantial payment to Frictionless. Ex. 1 at ¶¶ 40-41. The loan was taken out by World and guaranteed by Banjo. *Id.* Once again, under this arrangement, World would be the sole company bearing the risk, as it would be required to secure a loan from a U.S. Bank for purposes of the joint venture, and then make monthly payments to Frictionless LLC for the assigned inventory. *Id.* at ¶ 40.

On February 1, 2019, World agreed to obtain the loan as described with the understanding that World, Frictionless LLC, and CIU will continue to do business under the terms of the joint venture, and that CIU would continue to ship products as ordered. *Id.* at ¶ 41. In reliance on the same, World then obtained a loan against the assigned inventory of $1.5 million dollars and paid that entire amount to Frictionless, to be used towards paying down the Frictionless debt to CIU. *Id.* at ¶ 41. But instead of continuing to do business as usual and ship the POs, CIU continued delay shipments while assuring Frictionless that it would ship the POs. *See* Ex. 20 to Motion (email assuring shipment of POs).

The Arbitrator cannot reward or allow such inequitable conduct. Rather, equity favors an injunction ordering the parties to return to the status quo, because there is <u>no</u> potential harm to CIU, who will be promptly paid for the orders it ships while permitting it to breach will cause irreparable harm to Frictionless and World. *See Engility Corp. v. Daniels*, No. 16–CV–2473–WJM–MEH, 2016 WL 7034976, at *12 (D. Colo. Dec. 2, 2016).

**E.    Granting a temporary restraining order will not disserve the public interest.**

Movants are only required to show that the injunction they seek would <u>not</u> be adverse to the public interest. *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991). The requested injunction is clearly in the public interest. Allowing CIU to continue breaching the purchase orders would disserve the public. The public has a strong interest in having contracts enforced. Many, many consumers now want to purchase these products, and are unable to do the same due to CIU's actions. The Counterclaim Defendants have not identified any disservice to the public that would result from the requested injunction.

### F.      An injunction will preserve the status quo pending a trial on the merits.

For purposes of an injunction, the status quo is "the last uncontested status between the
parties which preceded the controversy." *Dominion Video Satellite, Inc. v. EchoStar Satellite
Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001). Before this controversy, for six years, Frictionless
regularly and consistently issued POs to CIU, and CIU shipped the products ordered to World or
World's resellers. Ex. 2 at ¶¶ 3-4 Here, CIU repeatedly <u>promised</u> to ship the goods listed on these
POs. Ex. 1 at ¶ 42; Ex. 2 at ¶ 4; Ex. 20 to Motion (email assuring shipment of POs). If a temporary
injunction is not issued, CIU's will depart from the status quo by <u>not shipping</u> POs it acknowledged
and through its course of conduct promised to ship to Frictionless. Issuing an injunction order is
necessary to prevent CIU's efforts to disrupt the status quo.

Finally, contrary to the Counterclaim Defendants' assertion, the Movants are not seeking
a blanket order requiring CIU to accept new POs. The Movants are only asking the Arbitrator to
order CIU to honor and fulfill the POs CIU already accepted and promised to ship—all POs issued
prior to April 29, 2019, excluding the POs that retailers have since canceled due to nondelivery.
Ex. 8[4] (summary of POs accepted by CIU). Ordering CIU to make the shipments for all POs issued
through April 28, 2019, and still viable would maintain the status quo.

### G.      No bond is required.

The Operating Agreement expressly states "any remedy available in equity, including but
not limited to a temporary restraining order, preliminary and/or temporary relief and specific
performance, until the arbitration award is rendered or the controversy is otherwise resolved,
without having to arbitrate and without <u>need to post any bond</u>." Ex. 16 to Motion at p. 23, at
¶ 14.6.7 (emphasis added). Pursuant to the same, this Order may be issued without the posting of
any bond.

## V.      Conclusion.

For the reasons above, Frictionless, World, and Banjo are entitled to a temporary
injunction ordering CIU to honor the purchase orders issued by Frictionless and to deliver the
ordered products to the address stated on each relevant PO, which comprise either 1100 West

---

[4] Movants will provide the Arbitrator a final list when an Order is issued (cancellations are ongoing).

120th Ave Suite #600 Westminster, CO or that of the specific reseller identified on the relevant purchase order.

Respectfully submitted this 8th day of July 2019.

THOMAS P. HOWARD, LLC

By: /s/ Thomas P. Howard
Thomas P. Howard
Scott E. Brenner
Olayinka Hamza
William C. Groh, III
THOMAS P. HOWARD, LLC
842 W. South Boulder Rd.
Suite #100
Louisville, CO 80027
Telephone: (303) 665-9845
Fax: (303) 665-9847
thoward@thowardlaw.com
*Attorneys for Respondents /*
*Counterclaimants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2019, I electronically served the foregoing Respondents Reply in Support of Motion for Emergency Injunctive Relief by emailing it to the following email addresses:

brian.koosed@klgates.com

kodey.haddox@klgates.com

Austin.McCullough@klgates.com

deborah.meyers@klgates.com

/s/ Scott E. Brenner

# Exhibit 17

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

International Arbitration Tribunal

| | |
|---|---|
| CHANGZHOU ZHONG LIAN INVESTMENT CO. LTD. (A/K/A Z.L. INVESTMENT), INDIVIDUALLY; AND, DERIVATIVELY ON BEHALF OF FRICTIONLESS, LLC<br>      Claimant,<br><br>v.<br><br>DANIEL BANJO, INDIVIDUALLY; FRICTIONLESS WORLD, LLC<br>      Respondents – Counterclaimants<br><br>v.<br><br>LI ZHIXIANG, ZL INVESTMENT, CHANGZHOU INTER UNIVERSAL MACHINE & EQUIPMENT CO., LTD, AND FRICTIONLESS, LLC<br>      Counterclaim and Third-Party Respondents<br><br>and<br><br>DANIEL BANJO, DERIVATIVELY ON BEHALF OF FRICTIONLESS, LLC. | ICDR Case No. 01-19-0001-1748 |

## EMERGENCY ARBITRATOR'S ORDER DENYING PRELIMINARY INJUNCTION

The undersigned Emergency Arbitrator, Ann Ryan Robertson, has been designated in accordance with the parties' arbitration agreement, the parties' submission agreements and the applicable arbitration rules that are described below, has been duly sworn, and has fully considered the submissions, allegations, and proofs of the parties relating to Daniel Banjo, derivatively on behalf of Frictionless, LLC and Frictionless World, LLC's Emergency Motion for Preliminary

Injunction. ("***Motion for Emergency Relief***"). The Motion for Emergency Relief seeks to enjoin Claimant Changzhou Zhong Lian Investment Co. LTD. and Third-Party Respondents Changzhou Inter Universal Machine Equipment Co., Ltd. and Li Zhixiang from their alleged "(*a*) *violation of the Frictionless LLC Operating Agreement; and* (*b*) *breach of the multiple purchase orders issued regarding sale and shipment of goods*."[1] The Emergency Arbitrator does hereby issue this Order Denying Preliminary Injunction.

## I. THE PARTIES

The parties to this dispute are:

1. Changzhou Zhong Lian Investment Co. Ltd. (a/k/a Z.L. Investment) ("***Z.L. Investment***"). Z.L. Investment is located in China. Z.L. Investment has also appeared on behalf of Frictionless, LLC. ("***Frictionless***"). Frictionless is a Colorado limited liability company.

2. Li Zhixiang ("***Li***"). Mr. Li is a resident of China.

3. Changzhou Inter Universal Machine & Equipment Co., Ltd. ("***CIU***"). CIU is a manufacturer located in China.

4. Daniel Banjo, individually ("***Banjo***"). Mr. Banjo is the owner of Frictionless World, LLC and a member of Frictionless. Mr. Banjo is a resident of Colorado. Mr. Banjo has also appeared derivatively on behalf of Frictionless. When appearing derivatively, Mr. Banjo will be designated "***Banjo/Frictionless***."

5. Frictionless World LLC ("***World***") is a Colorado limited liability company. World manufactures and distributes patented professional grade outdoor equipment for agricultural, gardening and fishing use.

---

[1] Opening paragraph of Motion for Emergency Relief.

## II. PROCEDURAL HISTORY

6.       On 21 June 2109, the Emergency Arbitrator held a telephonic scheduling conference.  The Emergency Arbitrator issued Procedural Order No. 1 setting the dates for the various filings, establishing a hearing date of 9 July 2019 and setting forth the manner in which the filings were to be made.

7.       Not all parties to this arbitration were signatories to the arbitration agreement although each had appeared voluntarily in the arbitration and joined all issues raised.  Pursuant to Emergency Arbitrator's Procedural Order No. 1, on 24 June 2019, all parties filed submission agreements with the ICDR submitting this dispute to arbitration.

8.       Following issuance of Procedural Order 1, Mr. Howard, counsel for Mr. Banjo, Banjo/Frictionless and World, requested that the hearing be rescheduled and the parties agreed that the hearing would occur on 12 July 2019.

9.       On 24 June 2019, Procedural Order 2 issued (1) providing Banjo/Frictionless and World an opportunity to file a Reply Brief and (2) setting the hearing for 12 July 2019.

10.       On 1 July 2019, the Emergency Arbitrator was informed that Mr. Howard was unexpectedly admitted to the hospital.  The parties agreed, due to this unexpected event, that all existing deadlines would be extended for seven days with rebuttal witness statements being due on 8 July 2019 and the Reply Brief being filed on that date.  The parties also agreed to confer with their clients on a hearing date.

11.       On 10 July 2019, the Emergency Arbitrator was informed that the parties had agreed that Z.L. Investment, Li and CIU would be permitted to file a Sur-Reply and that Banjo/Frictionless and World would file a Sur-Sur-Reply.  The parties further agreed that no oral hearing would be necessary and the determination of the Motion for Emergency Relief would be made solely on the written submissions.

3

12.     On 11 July 2019, Z.L. Investment, CIU and Li filed their Sur-Reply.

13.     On 12 July 2019, Banjo/Frictionless and World filed their Sur-Sur-Reply.

### III. THE ARBITRATION AGREEMENT

14.     The parties' dispute arises under, and is connected with, the joint venture establishing Frictionless.  Pursuant to the joint venture agreement ("*Operating Agreement*"), Z.L. Investment owns a 90% equity interest in the venture with Mr. Banjo owning a 10% equity interest.

15.     The arbitration agreement, found at Section 14.6.1 of the Operating Agreement provides, in pertinent part:

> *14.6.1.  **Arbitration**.  Each Member [Banjo and Z.L. Investment] and Li, on his, her, or its own behalf and on behalf of the Company [Frictionless, LLC], hereby agrees to submit all controversies, claims and matters of difference arising under or relating to this Agreement or the Company, which cannot be resolved between the Members and Li, to arbitration in accordance with the provisions and procedures set forth herein . . .*

This arbitration agreement is a broad form agreement.

16.     Section 14.6.3 of the Operating Agreement further provides that the arbitration is to be conducted "*in accordance with the rules for commercial arbitration of the American Arbitration Association then in effect*."  The governing rules of this proceeding are the AAA Commercial Rules, effective 1 October 2013. (the "*AAA Rules*").  Because one or more of the parties is a foreign national, the ICDR is administering the case in accordance with the AAA's Rules.

17.     Section 14.5 of the Operating Agreement provides:

> *14.5  **Applicable Law**.  This Agreement shall be construed in accordance with and governed by the laws of the State of Colorado, United States, excluding its conflicts of laws rules.*

The law of the State of Colorado, therefore, governs the resolution of any substantive issue raised in this emergency proceeding.

4

18.     The parties' arbitration agreement requires that any arbitration proceeding be conducted in Denver, Colorado. The subject arbitration proceeding involves international parties that are nationals of signatory nations to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, commonly known as the New York Convention.

19.     The governing arbitration law of this proceeding therefore is the Federal Arbitration Act, 9 U.S.C. §§1-16 (General Provisions) and §§ 201-08 (Chapter 2—Convention on the Recognition and Enforcement of Foreign Arbitral Awards).

## IV. FACTUAL BACKGROUND

### A.     <u>**The Parties' Pleadings**</u>

20.     On 15 April 2019, Z.L. Investment on behalf of itself and Frictionless filed a Demand for Arbitration against Mr. Banjo and Mr. Banjo's wholly-owned company, World. Z.L. Investment alleges that Mr. Banjo has committed a variety of fraudulent misconduct and breached various provisions of the Operating Agreement and asserts claims for fraud, constructive fraud, civil theft, civil conspiracy, various breaches of contract, various breach of fiduciary duty, and negligent misrepresentation. Z.L. Investment seeks an award declaring that it was "*defrauded by Respondents [Banjo and World], who further committed, among other things, civil theft, conversion, and various breaches of fiduciary duty and/or the LLC Agreement [Operating Agreement]*" and seeks damages in an unspecified amount together with its costs, including attorney's fees.

21.     On 8 May 2019, Mr. Banjo and World in turn filed their "*Response, Counterclaims, and Third Party Claims in Response to Z.L. Investment's Arbitration Demand*" denying the claims asserted in the Demand of Arbitration. Mr. Banjo and World assert a claim for breach of fiduciary duty against Li, breach of contract against Li and CIU predicated on alleged violations of non-

5

compete provisions in the Operating Agreement,[2] and breach of contract against Li, CIU and Z.L. Investment for failure to fulfill certain purchase orders.  Mr. Banjo, Banjo/Frictionless and World seek unspecified damages, all other appropriate legal and equitable relief, a declaration that Li and CIU defrauded Mr. Banjo and Frictionless and costs of the arbitration, including attorney's fees.

22.     On 10 June 2019, in response, Li and CIU filed a Joint Answer and Z.L. Investment a Reply to the Counterclaims and Third-party Claims asserted by Mr. Banjo and World and denied the claims asserted.

23.     On 18 June 2019, Banjo/Frictionless and World filed their Motion for Emergency Relief seeking a:

> *Preliminary Injunction ordering Li, Z.L. Investment and CIU to return to the status quo that existed at the outset of this lawsuit and remain there until a final ruling is issued in this matter. Based on the same, CIU must resume shipping products to World or to third party retailers. World will issue payment for each product shipped upon receiving proof of shipping.*

24.     On 25 June 2019, Z.L. Investment, Li and CUI filed their opposition to the Motion for Emergency Relief.

25.     On 8 July 2019, Banjo/Frictionless and World filed their Reply.  In that Reply, they clarified the relief they are seeking as:

> *Movants are only asking the Arbitrator to order CIU to honor and fulfill the POs CIU already accepted and promised to ship – all POs issued prior to April 29, 2019, excluding the POs that retailers have since cancelled due to nondelivery . . . Ordering CIU to make the shipments for all POs issued through April 28, 2019, and still viable would maintain the status quo.*

26.     On 11 July 2019, Z.L. Investment, Li and CIU filed a limited Sur-Reply.

27.     On 12 July 2018, Banjo/Frictionless and World filed their limited Sur-Sur-Reply.

---

[2] Banjo also brings a claim derivatively for Frictionless.

B.    **The Operating Agreement**

28.    The Frictionless Operating Agreement was entered into on or about 11 April 2013 among Li, Z.L. Investment and Banjo.   The sole members are Z.L. Investment and Banjo. Although not a member of Frictionless, Li is mentioned in the Operating Agreement and is a signatory.  Neither World or CIU is a party to the Operating Agreement nor is either named in the Operating Agreement.

29.    Article 2.5 sets forth the business of Frictionless to include "*the manufacture and distribution of tools and power equipment and the conduct of other business or activity that may be lawfully conducted by a limited liability company.*"  Article 2.5 further provides that "[*t*]*he Business of the Company may be conducted directly by the Company or indirectly through some other company, joint venture or other arrangement.*"[3]  Article 14.15 entitled "*No Third Party Beneficiaries*" states that "[*t*]*his Agreement is for the sole benefit of the Members, the manager and the Company, and no other Person is intended to be a beneficiary of the Agreement or shall have any rights hereunder.*"

C.    **The Role of World**

30.    At the center of the underlying controversy is World and the role it plays in the parties' business arrangement.  Z.L. Investment initiated the arbitration against Banjo and World alleging that Banjo and World have engaged in years-long fraud to siphon millions of dollars from Frictionless.   In particular, Z.L. Investment contends (1) that Banjo inserted World as a "middleman" between Frictionless and the retailers that were intended to purchase the products; (2) World was able to capture and determine the markup for each sale to retailers; and (3) Mr. Banjo improperly caused Frictionless to pay for all of World's expenses.

---

[3] Banjo and World contend that World is authorized and is operating pursuant to this provision.

31.     In response, Mr. Banjo and World contend that Z.L Investment and Li consented to and were aware of World.   In particular, Mr. Banjo and World note that the Operating Agreement permits the business of Frictionless to be conducted indirectly by some other entity.

32.     Over the years, CIU manufactured and shipped products pursuant to purchase orders. Mr. Banjo testifies[4] that World would direct Frictionless to issue a purchase order to CIU. CIU would then ship the goods to World or to the retailers. *See*, Banjo Sec. Dec. ¶ 3.  There is no evidence that there is an overarching written agreement between either Frictionless and CIU or World and CIU obligating CIU to provide products although Mr. Banjo and World point to the course of dealing between CIU and Frictionless in relation to the purchase orders and further contend World is a third-party beneficiary of any purchase order.

33.     Banjo/Frictionless and World complain that CIU initially agreed to provide products and then suddenly reversed course.[5]  Whether CIU agreed to provide products pursuant to certain purchase orders is disputed, as is the reason for CIU's refusing to provide the products. CIU contends that Frictionless is delinquent in paying for products previously provided which has put a strain on its finances and its relationship with its lender.  Banjo/Frictionless and World take a differing view, maintaining that CIU has intentionally not shipped the products in an effort to cause World injury.

34.     To that end, Banjo/Frictionless and World request issuance of a preliminary injunction ordering CIU to fulfill the purchase orders.

## V. STANDARD FOR ISSUANCE OF PRELIMINARY INJUNCTION

35.     A preliminary injunction is designed to preserve the status quo or protect rights pending the final determination of a cause. *Gilitz LLC v. Bellock*, 171 P.3d 1274, 1278 (Colo. App.

---

[4] The testimony of all witnesses was through declarations/witness statements.
[5] There is also evidence that at some point Mr. Banjo stated all purchase orders were cancelled. *See* Ex. 21.

2007); *City of Golden v. Simpson*, 83 P.3d 87, 96 (Colo. 2004). It is, however, an extraordinary remedy, the exception rather than the rule. *Enter. Mgmt. Consultants, Inc*, 883 F.2d. 886, 888. "*Its purpose is to prevent irreparable harm prior to a decision on the merits of a case.*" *Id.*

36.    Pursuant to Colorado law, to obtain a preliminary injunction, the moving party must satisfy each of six elements: (1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (3) lack of a plain, speedy, and adequate remedy at law; (4) no disservice to the public interest; (5) balance of equities in favor of the injunction; and, (6) the injunction will preserve the status quo pending a trial on the merits. *See, Rathke v. MacFarlane*, 648 P.2d 648, 653-54 (Colo. 1982).

37.    Of the six factors that must be satisfied, "*the demonstration of irreparable harm in the absence of relief is the single most important prerequisite for obtaining a preliminary injunction and must be established first, before consideration of the other ... factors is necessary.*" *Bray v. QFA Royalties, LLC*, 486 F. Supp.2d 1237, 1247 (D. Colo. 2007).[6]

38.    "*Irreparable harm*" is a pliant term adaptable to the unique circumstances that an individual case might present." *Gilitz*, 171 P.3d at 1274. "*The concept of irreparable harm . . . 'does not readily lend itself to definition.'*" *Dominion Video Satellite, Inc. v. Echostar Satellite Corp*, 356 F.3d 1256, 1262 (2004). Irreparable harm is not an easy burden to fulfill. *Id.* As noted by the court in *Dominion*, "*case law indicates that the injury 'must be both certain and great, and that it must not be merely serious or substantial.'*" *Id.*

---

[6] Banjo/Frictionless and World rely on *Bray*, stating: "The application for relief in *Bray* was construed pursuant to Fed. R. Civ. P. 65. Where, as here, the Colorado rule is similar in language and serves the same purpose as the federal version, Colorado courts may look to federal cases interpreting the same rule for guidance." *See, Antero Res. Corp. v. Studley*, 347 P.3d 149, 155 (Colo. 2015). *See* footnote 2, Motion for Emergency Relief. Z.L. Investment, CIU and Li do not take issue with this statement.

39.     At its core, an injury may be regarded as irreparable, "*where monetary damages are difficult to ascertain or where there exists no certain pecuniary standard for the measurement of the damages.*" *Gilitz*, 171 P.3d at 1278-1279.

## VI. IRREPARABLE HARM

40.     Banjo/Frictionless and World allege that "*already millions of dollars in sales have been lost, and retailers are cancelling unfulfilled orders and switching to other suppliers daily.*" Mot. for Emergency Relief, p. 26.

41.     In support of the alleged irreparable harm, Banjo/Frictionless and World submitted Exhibit 19.  Exhibit 19 is a Snapchat apparently between World and CIU.  This exhibit contains discussions regarding late fees, partially filled orders and Lowes cancelling an order.  However, no documents underlying the statements contained in the Snapchat have been provided.

42.     Mr. Banjo testifies that the failure of CIU to ship the products would "*cause grave damage to World's business relationship with the large US retailers, which took years to cultivate.*"  Banjo First Dec. ¶ 43.  He further testifies that the refusal to ship:

> … *is causing irreconcilable* [sic] *harm to World.  It is causing daily damage to World's business reputation, causing it to lose sales contracts worth millions, and causing it to lose clients that took years to obtain.  World and Banjo may never recover the damage that they has already suffered to their joint reputations, and this damage is increasing daily …*

Banjo First Dec. ¶ 48.  As an example, Mr. Banjo states that:

> *World has lost roughly $700,000 in unfulfilled sales for Lowes, and will likely lose its business with Lowes if CIU is not compelled to fulfill the outstanding purchase orders and ship products to World.  World has also been accumulating (and continues to accumulate) substantial late and cancellation fees with various retailers as a result of CIU's refusal to ship products under the joint venture.*[7]

Banjo First Dec. ¶ 49.

---

[7] Note should be made that CIU is not a party to the joint venture and the Operating Agreement imposes no obligation on CIU.

43.     Although Mr. Banjo testifies to the value of unfulfilled sales, no documents evidencing this roughly $700,000 loss due to unfilled sales were provided.  Lost sales occurring before seeking an injunction cannot support issuance of an injunction.  *See*, *Q Tech Laboratories Pty Ltd v Walken*, 2002 WL 13318597*14.  However, documents evidencing these losses would lend further and necessary support to the testimony and the potential for future irreparable harm.

44.     Mr. Banjo further testifies that World:

> *is also actively attempting to postpone the permanent loss of its long-standing relationship with giant retailers like Lowes, Home Depot, Costco, Walmart, Menards, TSC, and Midstates members, including no less than 40 individual retailers and about 900 stores. The total loss that has been caused by CIU's refusal to ship is in the multi-millions of dollars and is rapidly growing daily, but the injury in the form of lost reputation, business connections, business contracts, reputation for reliability, and other intangibles of that nature are incalculable and growing worse with each passing hour.*

Banjo First Dec. ¶ 53.

45.     No documents reflecting World's attempt to postpone "*permanent loss of its longstanding relationship with retailers like Lowes,*[8] *Home Depot, Costco, Walmart, Menards, TSC and Midstates members, including no less than 40 individual retailers and about 900 stores,*" were provided.  No documents evidencing the multi-million loss have been provided.  Mr. Banjo has stated these losses are growing daily.  The documents would be a benchmark by which the possibility of alleged future irreparable harm could be assessed.

46.     In his Second Declaration, Mr. Banjo further testifies:

> *Over the past approximately six months Frictionless World has struggled to assure its resellers that it will be able to supply product sufficient to meet the resellers' needs. Multiple resellers have told Frictionless that they will not buy Frictionless World products unless they can deliver on time. Multiple resellers have already cancelled orders. If CIU does deliver on the POs Frictionless already sent to CIU, Frictionless World (and Frictionless) will likely lose over $45 million dollars in sales to competitors. More importantly it will lose its supplier relationships with national resellers, including, Lowe's, Home Depot, and others, that it has taken over 7 years to build.*

---

[8] There are documents relating to Lowes which are discussed at ¶ 61, *infra*.

Banjo Sec. Dec. ¶ 8.

47.     No documents, however, were provided reflecting that "*multiple resellers have told Frictionless that they will not buy Frictionless World products unless they can deliver on time.*" While the Snapchat mentions Lowes' cancellation (but does not provide underlying documentation), no other document evidencing the alleged "*multiple resellers have already cancelled orders*" were provided.

48.     Banjo/Frictionless also submitted the declaration of Mr. Germandson.  Given that Mr. Germandson is the Chief Financial Officer, it appears he would be especially placed to discuss and offer financial documents concerning the alleged cancellation of orders and their impact on World.

49.     Banjo/Frictionless and World's primary authority in support of the irreparable harm prong which must be satisfied is the case of *Bray,* 486 F. Supp. 2d 1237.  The facts in *Bray* are, however, decidedly different.  At issue in *Bray* was Quizno's termination of a group of franchise agreements.   The franchisees alleged that the termination was wrongful and brought suit challenging the termination under the applicable franchise agreements.

50.     In issuing the termination notices, Quizno's had informed the franchisees that the approved and exclusive vendors would be prohibited from supplying the targeted franchisees with any product.  A franchise agreement is a special form of agreement whereby the franchisee agrees to comply with certain terms and conditions of the franchise agreement.  Typically, one of those terms is that the franchisee may only use and sell certain products approved by the franchisor. Those products, therefore, are unique to the business arrangement and cannot be obtained from an alternate supplier.

51.     During the course of any trial alleging wrongful termination of a franchise agreement, it would be impossible for the franchisee to continue the franchise business in accordance with its contractual obligations without these unique products supplied by contractually mandated vendors. As a consequence, without a preliminary injunction ordering that the products be made available to the franchisee, the franchisor would have achieved all that it sought simply by sending the termination notice. It is for this reason that the courts have recognized that the threatened loss of a franchise business before the lawfulness of a termination can be determined constitutes irreparable harm sufficient to warrant injunctive relief. *Id.* at 1247, *but see, Dominion*, 365 F.3d at 1263.

52.     Banjo/Frictionless and World argue "[*t*]*he Operating Agreement that the parties have worked under since April 2013 makes clear that World was to be the front facing company under the joint venture.*" World's name, however, appears nowhere in the Operating Agreement and whether World was to be the front facing company is disputed. Even assuming that Banjo/Frictionless and World are correct in their assertion, unlike the franchise agreement in *Bray*, there is no overarching agreement between CIU and Frictionless or CIU and World requiring CIU to supply product to either entity. For this reason alone, *Bray*, does not support Banjo/Frictionless and World's position.

53.     But even assuming the purchase orders do require CIU to manufacture the products, as Banjo/Frictionless and World assert, CIU is not the sole source for the products. Banjo/Frictionless and World admit that World holds the patents and that CIU merely assembles the product. Unlike the situation in *Bray* where the franchisees were required to use products from approved vendors, these products are not unique products. Indeed, Banjo/Frictionless and World

13

admit that they are seeking to contact other vendors "*in order to resume some measure of performance and production.*"[9] Mot. for Emergency Relief, ¶ 16.

54.      In fact, contained in Ex. A to the Declaration of Mr. Emig, World's Vice President of Sales, is an email dated 1 July 2019, authored by Mr. Banjo and sent to Lowes.  Mr. Banjo represents to Lowes that World is looking for a different supplier: "[o]*ur supply chain and engineering folks are at the new factory today.  Should have updates on the plan shortly.*" Similarly, in an email from Mr. Emig to Lowes dated 2 July 2019, also contained in the same Exhibit A, Mr. Emig states "[w]*e were able to have a call with our folks who are working oversees on the splitters today.*"

55.      Banjo/Frictionless and World also allege that lost sales, loss of goodwill and loss of competitive market position all constitute irreparable harm.

56.      In support of these allegations, Banjo/Frictionless and World rely on *Electrology Lab, v. Kunze*, 169 F.Supp 3d 1119, 1164 -1165 (D. Colo. 2016) and its collected cases for the preposition that loss of goodwill constitutes irreparable harm.

57.      *Electrology* involved claims of breach of contract, fraud in the inducement, misappropriation of trade secrets and trademark infringement.  The trial court issued a permanent injunction based on violations of the Lanham Act and UTSA.  In particular, the court found that the plaintiff would suffer irreparable harm if the defendant were not enjoined from using certain trademarks because use of those trademarks damaged Electrology's goodwill.  Trademarks are not in issue in this arbitration and the injunction issued in *Electrology* was a prohibitory injunction not a mandatory injunction that is disfavored in the law.

---

[9] In Exhibit 21, Mr. Bray instructs his employees: "*please move forward on re-sourcing these other suppliers for FW.*" He also states "[e]*ffective today they* [all PO's that were submitted to CIU] *are cancelled.*"

58.     Among the cases collected in *Electrology* is *Walgreen Co. v. Sara Creek Prop. Co.*, 775 F. Supp. 1192 (E.D. Wis. 1991).  Walgreens had entered into a leasing agreement with a mall that prohibited the lessor from leasing commercial space to any other store with a pharmacy.  In other words, Walgreens had the exclusive contractual right to operate a pharmacy at the mall.  The court found that violation of the exclusivity provision would erode Walgreen's customer base and diminish its corporate image and enjoined the lessor from entering into an agreement with the other store.  The court reasoned, and Walgreens proved, that profits lost could not be determined with accuracy and Walgreens would suffer irreparable harm by losing its exclusivity rights that it had bargained for in lease negotiations.  This dispute, however, does not involve a breach of an exclusivity provision relating to realty.  Moreover, the injunction issued was prohibitory, not a disfavored mandatory injunction.

59.     The final case cited in *Electrology*, is *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 365 F.3d at 1256.  This case also involved an exclusivity provision.  In *Dominion*, the trial court had issued a prohibitory injunction based solely on the exclusivity provision.  In reversing the trial court, the appellate court noted that mere breach of an exclusivity provision is not enough to warrant issuance of an injunction.  The court acknowledged that irreparable harm often arises from the breach of an exclusivity provision, but that courts do not automatically, nor as a matter of course, reach that conclusion.  "*Rather, they examine whether the harms alleged by the party seeking the preliminary injunction are in fact irreparable, and sometime conclude in the negative.*"  *Dominion*, 365 F.3d at 1263.

60.     In this case, CIU is not providing unique products.  Indeed, World itself holds the specifications for product production and the evidence indicates that others are capable of manufacturing the products.  Although Banjo/Frictionless and World state that they will lose sales,

15

the lost sales, if any, can be compensated in monetary damages.  Economic loss usually does not,
in and of itself, constitute irreparable harm.  *Cobra North America, LLC v Cold Cut Systems
Svenska*, 639 F. Supp. 2d 1217, 1231 (D. Colo. 2008) *citing Port City Prosper v Union Pac. R. R.
Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008).  Moreover, aside from the unsupported testimony of
their witnesses, Banjo/Frictionless and World have provided no documentary evidence that the
potential harm arising from CIU's refusal to fill purchase orders imminently threatens the existence
of Frictionless or World.

    61.    Banjo/Frictionless and World contend they will lose goodwill, relying on email
exchanges with Lowes.  But the exchange between Lowes and World indicates two businesses
each recognizing the realities of a supplier situation.  Lowes, while it is looking for alternate
supplier, nevertheless stated "[*i*]*f anything changes with your timeline, please let me know so I can
stop the search for an alternate supplier*."  There is nothing to indicate Lowes' future business or
World's goodwill or reputation will be damaged.

    62.    Moreover, damages based on loss of goodwill can be calculated.  *Q-Tech Labs*,
2002 WL 1331897, at *14.  If this were not so, then any claim alleging loss of goodwill would
satisfy the irreparable harm prong.  Just as a breach of an exclusivity provision does not
automatically result in irreparable harm, an allegation of loss of goodwill without evidence
demonstrating that the loss is incapable of being remedied through an award of damages will not
support a claim of irreparable harm.

    63.    Banjo/Frictionless and World have requested the issuance of a mandatory or
"disfavored" injunction ordering CIU to produce products.  As noted in *Bray*, when a party is
seeking a "disfavored" injunction, "*the party seeking such an injunction is subject to higher
scrutiny and must make a strong showing both with regard to the likelihood of success on the*

*merits and with regard to the balance of harms*" [which includes a showing of irreparable injury].
*Bray*, 486 F. Supp. 2d at 1242.

64.     While the harm that Banjo/Frictionless and World allege is serious and substantial,
it is not "***both certain and great.***" *Dominion*, 356 F.3d. at 1262.   (emphasis supplied).
Banjo/Frictionless and World have *"not established, clearly and unequivocally"* that they are
entitled to a mandatory injunction to prevent irreparable harm. *Cobra North America LLC*, 639 F.
Supp. 2d at 1234.  Issuance of a preliminary injunction, especially a mandatory injunction, is an
extraordinary remedy.    Whether applying a higher scrutiny or a lesser burden standard,
Banjo/Frictionless and World have failed to demonstrate irreparable harm.

65.     Because *Bray* instructs *"the demonstration of irreparable harm in the absence of
relief is the single most important prerequisite for obtaining a preliminary injunction and must be
established first, before consideration of the other ... factors is necessary*," *Bray* 486 F. Supp. 2d
at 1247, and because Banjo/Frictionless and World have not demonstrated irreparable harm, it is
not necessary to consider the remaining five factors that must be satisfied in order for a preliminary
injunction to issue.

### VII. ORDER

In accordance with the foregoing findings, conclusions and reasoning, the Emergency
Arbitrator hereby DENIES the Motion for Emergency Relief.

Subject to the constituted arbitral tribunal's authority to finally allocate the Emergency
Arbitrator's fees incurred in this emergency proceeding and the attorney's fees and expenses
incurred by the parties, each party shall bear their own attorney's fees and costs incurred through
the date of this Order in connection with these emergency proceedings and further shall each pay
one-half of the fees of the Emergency Arbitrator in the total amount of US$20,900.00.

All requested emergency relief not granted by this order is DENIED.

Pursuant to Rule 38(f) of the AAA Rules, until such time as the arbitral tribunal is constituted, the Emergency Arbitrator retains the jurisdiction and authority to modify or vacate this Order.

So ORDERED this 19th day of July 2019 and deemed made in Denver, Colorado.

Ann Ryan Robertson
Emergency Arbitrator

# Exhibit 18

| From: | RobertsonE@adr.org |
|---|---|
| To: | thoward@thowardlaw.com; Haddox, Kodey M.; ohamza@thowardlaw.com; sbrenner@thowardlaw.com; Meyers, Deborah; Koosed, Brian D.; McCullough, Austin E.; wcgroh@thowardlaw.com; Gehm, Lacey A.; bobrien@thowardlaw.com |
| Subject: | Changzhou Zhong Lian Investment Co. Ltd. v. Daniel Banjo, individually; - Case 01-19-0001-1748 |
| Date: | Tuesday, July 23, 2019 6:15:23 PM |
| Attachments: | imagece1c9d.PNG |
| | Notice of Compensation Arrangements-23-Jul-19.pdf |
| | Arbitration General Disclosure.pdf |
| | Mediation General Disclosure.pdf |
| | INT064.pdf |
| | Oath-23-Jul-19.pdf |

**External Sender:**

Hello,

Please review the attached correspondence regarding the above-referenced case.

Feel free to contact me with any questions, comments or concerns you have related to this matter.

Thank you.


 **Elizabeth Robertson, Esq.**
**International Case Counsel**
International Centre for Dispute Resolution
American Arbitration Association
120 Broadway, 21st Floor
New York, NY 10271
www.adr.org
**T:** +1 212 484 3299
**F:** 877 304 8457



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.



International Centre
Thomas Ventrone, Esq.
ICDR Vice President
120 Broadway, 21st Floor
New York, NY 10271
Telephone: (212)484-4181
Fax: (212)246-7274

July 23, 2019

**Via Email**

Brian D. Koosed, Esq.
Austin E. McCullough, Esq.
Kodey M. Haddox, Esq.
Lacey Gehm, Esq.
Deborah Meyers, Esq.
K&L Gates, LLP
1601 K Street NW
Washington, DC 20006-1600


William C. Groh, Esq.
Scott E. Brenner, Esq.
Thomas P. Howard, Esq.
Olayinka Hamza, Esq.
Brenda O'Brien, Esq.
Thomas P. Howard, LLC
842 West South Boulder Road
Suite 100
Louisville, CO 80027

Case Number: 01-19-0001-1748

Changzhou Zhong Lian Investment Co. Ltd.
(a/k/a Z.L. Investment)
-vs-
Daniel Banjo, individually;
Frictionless World LLC
Frictionless, LLC
-vs-
Li Zhixiang;
Z.L. Investment; and
Changzhou Inter Universal Machine &
Equipment Co., Ltd.


Dear Counsel,

Please be advised that Arbitrator Schaner and Arbitrator Choquette have selected David Huebner (http://www.huebnerarbitration.com/) to serve as the third arbitrator/chairperson in this matter. Mr.

Huebner has made disclosures, as detailed in the enclosed Notice of Appointment and general disclosure attachments.

Please advise the ICDR of any objections to the service of the Arbitrator within fifteen days from the date of this letter (or **August 7, 2019**) copying the other side. The Tribunal shall not be copied on any comments related to the disclosure.

If any objections are raised, the other party may respond within seven days from the date of the objection. The ICDR will make a determination regarding the Arbitrator's continued service in accordance with the applicable Rules.

If either party or their Counsel knows of any contact or conflict that may be relevant, they are to communicate this information to the ICDR immediately.

Please do not hesitate to contact us with any questions or concerns.

Sincerely,

/s/

Elizabeth Robertson, Esq.
International Case Counsel
Direct Dial: (212)484-3299
Email: RobertsonE@adr.org
Fax: (877)304-8457


Encl.:  Notice of Appointment
         Notice of Compensation
         Arbitration General Disclosure
         Mediation General Disclosure