## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FRICTIONLESS WORLD, LLC | ) | Case No. 19-18459 MER |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| FRICTIONLESS WORLD LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 19-01282 MER |
| | ) | |
| FRICTIONLESS LLC, CHANGZHOU | ) | |
| INTER UNIVERSAL MACHINE & | ) | |
| EQUIPMENT CO., LTD, LI ZHIXIANG, | ) | |
| CHANGZHOU ZHONG LIAN | ) | |
| INVESTMENT CO. LTD., SERENA LI, | ) | |
| AND FRANK LI, | ) | |
| | ) | |
| Defendants. | ) | |

---

**FRICTIONLESS WORLD, LLC'S (1) RESPONSE IN OPPOSITION TO LI DEFENDANTS' (A) MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW ARBITRATION TO PROCEED, (B) MOTION TO COMPEL THE DEBTOR TO ARBITRATE PURSUANT TO FEDERAL ARBITRATION ACT, AND (C) MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) OR STAY ADVERSARY PROCEEDING PENDING ARBITRATION AND (2) REPLY TO THE LI DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

---

Plaintiff Frictionless World, LLC ("FW"), chapter 11 debtor-in-possession, by and through its undersigned counsel, hereby submits its (1) Response in Opposition to the Li Defendants' (a) Motion for Relief from Stay to Allow Arbitration to Proceed, (b) Motion to Compel the Debtor to Arbitrate Pursuant to Federal Arbitration Act, and (c) Motion to Dismiss under Fed. R. Civ. P.

12(b)(1) or Stay Adversary Proceeding Pending Arbitration; and (2) Reply to the Li Defendants' Opposition to FW's Motion for Preliminary Injunction:

## I.   **INTRODUCTION**

1.      On October 9, 2019, FW commenced an adversary proceeding (the "Adversary Proceeding") by filing a Complaint against Defendants Frictionless LLC, Changzhou Inter Universal Machine & Equipment Co., LTD ("CIU"), Li Zhixiang ("Li"), Changzhou Zhong Lian Investment Co. LTD ("ZL Investments" and, with Frictionless, LLC, CIU, and Li, the "Li Defendants"), Serena Li and Frank Li.

2.      On October 11, 2019, FW filed a motion in the Adversary Proceeding (the "Injunction Motion") against the Li Defendants seeking a temporary restraining order and preliminary injunction enjoining the continued prosecution of an arbitration between FW, FW's CEO Dan Banjo and the Li Defendants that was pending on the date the bankruptcy was filed (the "Arbitration").  The Court granted the temporary restraining order.

3.      In response to the Complaint, the Li Defendants—but not Defendants Frank and Serena Li—filed a flurry of motions in the main case and the Adversary Proceeding that are the subject of this Response.  In the Adversary Proceeding, the Li Defendants (a) moved to compel FW "to continue arbitrating the Arbitration under the FAA, including the Debtor's Claims set forth in the Adversary Complaint," *Li Defendants' Memorandum of Law (the "Memorandum")*, at 59; (b) moved to dismiss or, in the alternative, stay the Adversary Proceeding pending the outcome of the arbitration; and (c) objected to FW's Injunction Motion.  In the main case, the Li Defendants moved for relief from the automatic stay to resume the Arbitration.  These motions are referred to collectively hereinafter as the "Arbitration Motion."

2

4.     The issues raised by the Injunction Motion and the Arbitration Motion are numerous, mostly interrelated, sometimes contradictory and, to say the least, complex.  FW asserts, however, that when the full picture is provided to the Court, rather than the obstructed, partial view provided by the Li Defendants in the Arbitration Motion, a relatively straightforward path to resolution exists.

5.     The Court is by now well aware of the parties' respective summations of the underlying disputes that are front and center in the Adversary Proceeding and the Arbitration Motion.  FW will not devote space in this Response to those summations other than to incorporate by this reference all allegations set forth in the Complaint and all facts and argument set forth in the Injunction Motion.   There are several points, however, that require additional explanation and correction.

6.     With respect to the timeline of the arbitration, the Li Defendants' statement that the parties "conducted an extensive and vigorous Arbitration" is totally false.  *See Memorandum*, at 2. In fact, no case litigation ever even began in the Arbitration.   No discovery requests were propounded by any party, no depositions occurred, no subpoenas of any kind were issued, and no motions to dismiss or summary judgments were filed with regards to party claims.

7.     The sole litigation that occurred in the Arbitration was FW's filing for emergency injunctive relief at the outset of the proceeding, prior to the assignment by the AAA of the three arbitrators, in an effort to force CIU to immediately resume shipping products.  The emergency arbitrator assigned by the AAA held that FW was not suffering irreconcilable harm – despite a complete lack of products and a drop by 85% in revenue – and the motion was denied.  That ruling directly resulted in the bankruptcy filing.  No actions occurred in the Arbitration between the denial of FW's motion for emergency injunctive relief and the bankruptcy filing other than (1) the

appointment of three AAA arbitrators to jointly hear the Arbitration, one of which was objected to by FW due to his inflated hourly rate of $800 per hour, and (2) the preparation of a case scheduling order.

8.      Indeed, Exhibit 2 to the Li Defendants' Arbitration Motion is a <u>proposed</u> amended demand for arbitration that has not even been filed.  If the Arbitration were to go forward, presumably this document would be filed, thereby initiating another wave of responsive pleadings and thereby further delaying the commencement of discovery.  Contrary to what the Li Defendants would have the Court believe, this case is nothing like the central case they rely upon, *In re Touchstone Home Health, LLC*, 572 B.R. 255 (Bankr. D. Colo. 2017), in which the debtor commenced a bankruptcy case after all pre-hearing events in the arbitration had occurred, one day before a response was due to a sanctions motion, and one month before the final hearing was set to begin.  Here, the matter is barely at issue and no substantive pre-trial litigation has occurred.

9.      The dispute before the Court with respect to the Arbitration Motion revolves primarily around the scope and enforceability of various provisions in the Frictionless, LLC Operating Agreement (the "FOA").  Notably, the Li Defendants' entire argument regarding the applicability of the arbitration provisions set forth in the FOA is premised upon their contention that FW is a party to the FOA.  *See, e.g. Memorandum*, at 30-31.  It is undisputed, however, that FW is not a party to the FOA.  FW did not sign the FOA and the FOA explicitly provides that there are no third party beneficiaries thereto.  *See FOA* at § 14.15.  The FOA thus has no bearing on the Arbitration Motion or the Injunction Motion.

10.     FW's consent was limited to arbitrating the claims filed by Defendant ZL Investment against FW in the arbitration.  That consent was given pursuant to a standard AAA dispute resolution form that was not countersigned by the Li Parties.  The signing of that form was

4

not and cannot be equated with the signing of the FOA. For the reasons discussed below, the pre-petition consent to arbitrate has no bearing on the issues before the Court because the bankruptcy filing fundamentally altered the landscape under applicable law and the facts.

11.     Moreover, and also contrary to the Li Defendants' representations and characterizations, while there is slight factual overlap between the claims for relief pled in the Adversary Proceeding and the counterclaims asserted by FW in the Arbitration, the legal theories are entirely different and, most importantly, there is not a single claim for relief in the Adversary Proceeding that concerns the application, interpretation or breach of the FOA (which makes sense because FW is not a party to the FOA). This is extremely significant because the FOA's arbitration provision—even if it were applicable to FW—only covers disputes regarding the FOA. In other words, the entire premise for the Li Defendants' Arbitration Motion is false.

## II.     ARGUMENT

12.     After considering the relevant facts and the applicable law, the Court should rule that none of the claims for relief pled in the Adversary Proceeding are arbitrable, deny the Arbitration Motion in its entirety, and grant the Injunction Motion.

13.     Arbitration is particularly incongruent here because: (1) FW's claims in the Adversarial Proceeding do not pertain – at all – to the FOA entered into solely between ZL Investment, Li and Banjo which contains the arbitration clause; (2) FW is not a party to the FOA; (3) the FOA arbitration provision is the primary basis asserted by the Li Defendants for arbitration; (4) the other basis – the assertion that FW consented to arbitrate "all" disputes by participating in the arbitration for several months – is both wrong and largely irrelevant; (5) the FOA itself provides that the arbitration clause is not enforceable once a bankruptcy case is filed; (6) the FOA arbitration clause is extremely narrow such that even if FW were a party to it (which it is not), the claims in

the Adversary Proceeding would <u>still</u> not be subject to Arbitration, as they are not within the scope of the provision; (7) arbitration of the claims pled in the Adversary Proceeding conflicts with the Bankruptcy Code; (8) arbitration is improper as it relates to Banjo because there is a significant overlap between the claims being raised by FW in the Adversary Proceeding and the claims that would be raised by Banjo in the arbitration, thereby creating an 'unusual situation' where the potential for duplicative and inconsistent judgments is extremely high and existing; and, (9) arbitration as ordered by the AAA over FW's express written objections is prohibitively expensive.

14.     In analyzing the Arbitration Motion and the Injunction Motion, the Court should first consider and dispose of the Li Defendants' contention that FW's agreement to participate in the arbitration somehow precludes them from pursuing the claims for relief pled in the Adversary Proceeding.  The Li Defendants' arguments completely ignore (a) the fact that FW is not a party to the FOA, (b) the language of the FOA itself, and (c) established case law providing that the filing of a bankruptcy represents a fundamental shift in what is and is not arbitrable.  Based upon the nature of the claims pled, the nascent status of the arbitration on the petition date, and the absence of any contractual agreement *compelling* arbitration, the Court can and should dispose of the Arbitration Motion from this analysis alone.

15.     Second, if the Court determines that the mere act of consenting to participate in the pre-petition arbitration somehow requires further analysis of the other arguments advanced in the Arbitration Motion, the Court must determine whether or not that consent actually compels arbitration of the completely different claims being litigated in the Adversary Proceeding.  This analysis necessarily includes consideration of whether the parties clearly and unmistakably agreed in the FOA that the arbitrators had sole authority to decide arbitrability.  The answer to both questions is "no" based upon the plain language of the FOA and the nature of the claims pled in

these two separate actions.  The FOA provides in § 4.1(a) that the arbitration provision is not "enforceable" once a bankruptcy case is filed.  The FOA also excepts claims for injunctive relief from arbitration.  Moreover, the FOA's arbitration provision is extremely narrow provision and does not grant the arbitrators authority over any of the claims for relief pled in the Adversary Proceeding.  These same provisions support the determination that the Bankruptcy Court, not the arbitrator, must make the arbitrability determination.  If the Court reaches these questions, the facts and law support a determination that none of the claims are arbitrable and it should deny the Arbitration Motion in its entirety.

16.     Third, if the Court determines that some of the claims for relief pled in the Adversary Proceeding are arbitrable, the Court must then determine whether the Arbitration conflicts with the bankruptcy case.  Here, under the applicable analysis, the Arbitration irreconcilably conflicts with FW's bankruptcy case, thereby requiring denial of the Arbitration Motion.

17.     Fourth, the Court must consider the Li Defendants' request to lift the stay.  In the event the Court determines none of the claims for relief are arbitrable or that arbitration conflicts with the bankruptcy case, the request must be denied.  If the Court determines that some of the claims are arbitrable and there is no conflict with the bankruptcy case, the Court should nevertheless deny the relief sought because each of the applicable *Curtis* factors weigh entirely against lifting the stay.

18.     Fifth, the Court must consider the Injunction Motion.  FW's motion for preliminary injunction should be granted and the stay should be extended to the Dan Banjo because FW demonstrates (a) a substantial likelihood of prevailing on the merits, (b) irreparable harm unless the injunction is issued, (c) that the threatened injury outweighs the harm that the preliminary

7

injunction may cause the opposing party, and (d) that the injunction, if issued, will not adversely affect the public interest.

19.     With respect to the Li Defendants' motion to dismiss or stay the adversary proceeding, once again they overreach.  Section 3 of the FAA authorizes only stays of proceedings referred to arbitration, not dismissal.  *See* 9 U.S.C. § 3.  For the many reasons argued in this Response, there is no basis for arbitrating the claims pled by FW in the Adversary Proceeding and the motion to stay or dismiss should therefore be denied.  *See also Quinn v. CGR*, 828 F.2d 1463, 1465 n.2 (a stay of the proceedings is the relief statutorily authorized and if the trial court's order were construed as a dismissal it would have been appropriate for the appellate court to vacate the order and remand for issuance of a stay).

A.     **FW's consent to arbitrate pre-petition has no bearing on whether the claims for relief pled in the Adversary Proceeding must be arbitrated.**

20.     The Li Defendants cannot rely on FW's pre-petition filings in the arbitration, as well as email discussions between counsel, as a basis for compelling arbitration of bankruptcy claims filed post-bankruptcy. *In re Payton Constr. Co*., 399 B.R. 352, 355-56 (D. Mass. 2009) emphasizes the importance of courts not giving credence to "pre-petition" arbitration agreements, because they do not serve as a legitimate basis for compelling arbitration of later filed bankruptcy claims.

21.     In that case, a creditor of the debtor sought to compel arbitration on the basis that the debtor agreed to arbitrate its claims with the creditor prior to filing for bankruptcy. *Id*. at 356. The arbitration clauses in question required that the debtor and the creditor arbitrate "any dispute arising out of the interpretation, performance or alleged breach" of the parties' agreement.  *Id*. at 359.  The court held that the debtor's alleged arbitration agreement with the creditor could not serve as a basis for arbitration of the debtor's bankruptcy claims, however, because the debtor did

8

not sign the arbitration agreement "as representative of the bankruptcy estate —as might a debtor-in-possession in chapter 11— or in a fiduciary capacity for the benefit of its creditors." *Id*. Further, there was no evidence that the debtor "waived the bankruptcy estate's rights to judicial resolution" of its bankruptcy claims. *Id*. Based on these considerations, the court denied the motion to compel arbitration. Similarly, in this instance FW's "agreement to arbitrate" was not entered on behalf of the debtor's estate for the purpose of protecting the assets of the estate.

22.     "Disputes involving rights created under the Bankruptcy Code will often fail the preliminary question of arbitrability because the parties did not agree to arbitrate them." *In re Salander—O'Reilly Galleries, LLC v. Jacobs*, 475 B.R. 9, 21 (S.D.N.Y. 2012) (quotations and citations omitted).   In that case, the court denied staying an adversary proceeding in favor of arbitration despite the fact that the debtor had entered into a pre-bankruptcy petition arbitration agreement with the creditor that was seeking to compel arbitration. *Id.* at 30.  Refusing to compel arbitration and allowing the debtor's claims to proceed in bankruptcy was proper, because:

> "If every dispute as to whether property was part of the bankruptcy estate or could be reached by the debtor's creditors were sent to arbitration pursuant to a pre-petition arbitration agreement, unreasonable delay, costs, and duplication of effort would result for all parties involved in the bankruptcy as well as the courts."

*Id*. at 30.  The court also found that compelling arbitration would interfere with the bankruptcy case and would severely prejudice and harm "all of [the debtor's] creditors." *Id*. at 31.

23.     Here, FW at no time agreed to arbitrate the core bankruptcy issues and litigation matters raised for the first time in the Adversary Proceeding.  Further, as discussed below, FW is not a party to the FOA, the FOA itself provides that a bankruptcy filing fundamentally changes the landscape, the FOA arbitration provision does not apply to injunctive relief claims, and the provision is a narrow one that does not apply to any of the pled claims.  For these reasons, FW's

9

pre-petition agreement to arbitrate has no bearing on the outcome of the Arbitration Motion and the Injunction Motion.

**B.    The FOA does not compel arbitration of the claims for relief pled in the Adversary Proceeding.**

   ***i.    Applicable Law***

24.    "Arbitration is a matter of consent, not coercion." *Volt Info. Sciences, Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 109 S.Ct. 1248, 1250 (1989).  A party cannot be compelled to submit to arbitration of any dispute which he or she has not agreed to submit. *See, Eychner v. Van Vleet*, 870 P.2d 486, 490 (Colo. App. 1993) (*citing United Steelworkers of Am. v. Warrior & Gulf Navigation Co*., 363 U.S. 574, 582 (1960); and *Shaffer v. Stratton Oakmont, Inc*., 756 F. Supp. 365 (N.D. Ill. 1991) (public policy favoring arbitration does not give courts license to compel arbitration when there has been no agreement to arbitrate).

25.    A motion to compel arbitration invokes a two-step inquiry.  "First, the court must determine whether the parties agreed to arbitrate the dispute." *Bruzda v. Sonic Auto*., 2017 WL 5178967, at *1, 2 (D. Colo. Jan. 23, 2017) (citation omitted).   "Second, the court must analyze whether a statue or policy renders the claims nonarbitrable." *Id.*  "The burden is on the party seeking arbitration as to the first part of the inquiry; it is on the party resisting arbitration as to the second." *In re E & G Waterworks, LLC*, 571 B.R. 500, 504 (D. Mass. 2017).

26.    Before enforcing an arbitration agreement though, the Court is required to "classify the particular [arbitration] clause as either broad or narrow." *SBM Site Servs, LLC v. Severin*, 2010 WL 4235853, at *1, 4 (D. Colo. Oct. 20, 2010).  This important distinction "furthers freedom of contract so that parties are not required to submit to arbitration any dispute which they have not agreed so to submit." *Id.*  (*quoting Chelsea Family Pharm, PLLC v. Medco Health Sols*., 567 F.3d 1191, 1196 (10th Cir. 2009)).  "The breadth of an arbitration clause is determined by considering

whether the parties clearly manifested an intent to narrowly limit arbitration to specific issues." *Id*. The liberal policy favoring arbitration under the FAA <u>does not apply</u> "when considering narrow arbitration clauses." *Chelsea Family Pharm*., 567 F.3d at 1197.

### ii. The parties did not agree to arbitrate the disputes post-petition.

27.     The Li Defendants bear the burden of proof on the first inquiry into whether the parties agreed to arbitrate the dispute.

28.     As stated above, the mere act of commencing a chapter 11 case fundamentally alters the landscape and the Court must look beyond what occurred pre-petition to whether the claims pled are covered by the arbitration agreement.  Here, FW is not a party to the FOA entered into in April 2013 between ZL Investment, Banjo and Li.  This is underlined on the face of the FOA, which is not signed by FW.  It is further demonstrated by FW's Response to ZL Investment's pre-petition arbitration demand, in which FW expressly states that "Frictionless World, although mentioned in the Agreement, is not a party to the same", and by Defendants themselves, who have repeatedly stated that FW is not a party to the FOA.  As FW is undisputedly not a party to the FOA, there is no arbitration "agreement" for the Court to analyze.

29.     The reality is that FW agreed to only one thing – to have the ZL Investment complaint heard under the AAA Rules.  FW's limited agreement to have the ZL Investment complaint heard under the AAA Rules is identical to consenting to jurisdiction in a state or federal court.  That agreement pertained solely to the ZL Investment complaint and in no way precluded FW, like it does not preclude debtors who were willing participants in pre-petition state court litigation, from seeking to fully avail its rights under the Bankruptcy Code after being driven into bankruptcy.

30.     In short, no arbitration agreement ever existed between FW and the Defendants. The mere act of consenting to the limited ZL Investment complaint pursuant to the AAA rules does not provide the Court any basis for finding that FW somehow "agreed" to arbitrate § 362, § 510, § 542, and § 548 claims that were not yet cognizable until a completely separate bankruptcy case was filed?  It is simply impossible for the Court to make any finding that FW agreed, by its very narrowly defined actions *pre-bankruptcy*, to waive the Bankruptcy Court's jurisdiction over claims that did not even exist until a bankruptcy case was filed.

31.     Moreover, while there is a slight factual overlap between the multiple claims pled in the Adversary Proceeding and the three counterclaims pled in the Arbitration, for the most part the legal theories of relief are entirely different.  Most significantly, the Li Defendants repeatedly assert – incorrectly – that the claims in the Adversary Proceeding are based upon breaches of the FOA, *see Memorandum*, at 30-31.  In fact, a careful reading of the Complaint reveals that contention to be utter nonsense.  The claims in the Adversary Proceeding, in addition to being largely grounded in bankruptcy law, are based upon purchase orders breached by CIU in 2018 and 2019 and tortious conduct arising from fraud committed by the Li Defendants in the years prior to the bankruptcy filing.  There is not a single claim in the Adversary Proceeding relating to the terms of the FOA, its breach or its enforcement.

32.     Further, even if the Court were to find that FW is somehow bound by the FOA, the FOA itself provides that the arbitration provision is not "enforceable" once a bankruptcy case is filed.  The FOA also excepts claims for injunctive relief from arbitration.  Moreover, the FOA's arbitration provision is a narrow provision that does not encompass any of the claims for relief pled in the Adversary Proceeding.

a.      FW is not a party to the FOA.

33.     It is undisputed that FW is not a party to the FOA.  The FOA's arbitration provision therefore has no bearing on this Adversary Proceeding.  As stated above, arbitration is a matter of consent, not coercion.  FW consented to arbitrate certain issues before it filed its bankruptcy case.  Now that it has filed its bankruptcy case, it has elected to pursue remedies available to it under the Bankruptcy Code, many of which are within the exclusive jurisdiction of the Bankruptcy Court.  These choices are within FW's legal rights and no amount of hand-wringing by the Li Defendants can change that.

34.     Further, at the time FW agreed to arbitrate pursuant to the AAA rules it necessarily only agreed to arbitrate the issues it then believed existed.  The Li Defendants' statement that FW agreed "to arbitrate *all* of its claims" is flatly false.  *See Memorandum*, at 27.  The Li Defendants conceded and agreed long ago that FW's filing for bankruptcy would change where FW's claims would be heard, and the scope and nature of the proceedings between the parties.  In fact, Mr. Koosed, counsel for the Li Defendants, admitted that should FW file for bankruptcy, "it will be the Bankruptcy Court not --the AAA/ICDR-- that will determine whether this arbitration goes forward…"  *See*, Exhibit A.  Mr. Koosed went on to admit the encompassing jurisdiction of the Bankruptcy Court in the event of bankruptcy, including that for the arbitration to even move forward at all, "the bankruptcy Court would have to: (i) lift the Bankruptcy Code's automatic stay to permit this arbitration to go forward; and (ii) further approve any arbitrator (and attorneys' fee) expenditures by Frictionless World, LLC…"  (*Id.*)

35.     This is not a case, as the Li Defendants absurdly argue, where the exact same claims have been thoroughly litigated in one forum and then one party seeks to move to a different forum on the eve of trial.  Rather, these proceedings are effectively at the exact same stage given the Li Defendants' proffer of a proposed revised arbitration demand that they have not even submitted in

13

the arbitration, and the fact that no discovery has even begun in the Adversary Proceeding. There will be no duplication of effort, delay or additional cost if the Adversary Proceeding goes forward.

36.     Because FW is not a party to the FOA, never consented to arbitrate its bankruptcy claims, and as set forth below, the FOA itself does not compel arbitration of the claims pled in the Adversary Proceeding, there is no agreement to arbitrate.

     b. <u>Pursuant to Section 4.1(a) of the FOA, the arbitration provision is not "enforceable" after the filing of the bankruptcy case.</u>

37.     When the FOA was negotiated, Banjo, Li and ZL Investment agreed to the representations and warranties set forth in § 4.1. Subsection 4.1(a) provides as follows:

> Each member, and Li, represents and warrants to the other Members, Li, and the Company as follows:
>
>  (a) This Agreement constitutes his, her, or its valid and binding obligation, enforceable against him, her, or it in accordance with its terms, <u>except as enforcement may be limited by bankruptcy</u>, insolvency, moratorium <u>and similar laws affecting the enforcement of creditors' rights generally and by general principles of equity</u>.

*FOA*, at § 4.1 (emphasis added).

38.     Subsection 4.1(a) thus includes an express representation and warranty that the FOA is not "enforceable . . . as limited by bankruptcy. . . and similar laws affecting the enforcement of creditors' rights generally and by general principles of equity." *FOA*, at § 4.1(a). A plain reading of § 4.1(a) supports the conclusion that the parties to the FOA negotiated away its enforceability where it conflicts with the Bankruptcy Code.

39.     The references to the "enforcement of creditors' rights generally" and "general principles of equity" should be given their full force and effect and broadly interpreted as abrogating the enforceability of the arbitration provision in the FOA once a bankruptcy case is filed. "[T]he very purpose of bankruptcy is to modify the rights of debtors and creditors," 1 *Collier*

14

*on Bankruptcy,* ¶ 3.02[2] (15th ed. rev.2005) (quotation omitted), and Congress intended to centralize disputes about a debtor's assets and legal obligations in the bankruptcy courts." *In re White Mountain Mining Co., L.L.C.*, 403 F.3d 164, 169 (4th Cir. 2005). "Arbitration is inconsistent with centralized decision-making because permitting an arbitrator to decide a core issue would make debtor-creditor rights contingent upon an arbitrator's ruling rather than the ruling of the bankruptcy judge assigned to hear the debtor's case." *Id.* at 169-70 (internal quotation omitted). The parties to the FOA agreed that their operating agreement would give way—it would not be "enforceable"—in the event of a bankruptcy filing or where such enforcement would conflict with the "enforcement of creditors' rights generally."

40.     The relief sought by the Li Defendants through the Arbitration Motion directly conflicts with the "very purpose of bankruptcy" in myriad ways and should be rejected by this Court. The Bankruptcy Code limits creditors' rights to enforce claims outside of bankruptcy. The Li Defendants are advocating for continuation of the arbitration in express violation of the limitation that they negotiated into the FOA. Similarly, the Bankruptcy Code confers exclusive jurisdiction on the Bankruptcy Courts over property of the bankruptcy estate, thereby further limiting creditors' rights. The Li Defendants' assertion that all disputes between the parties, including disputes regarding property of the estate such as intellectual property rights and turnover rights, must be heard in the arbitration, likewise runs afoul of this exclusivity provided for in the Bankruptcy Code. There are two defendants—Serena and Frank Li—who are not even parties to the Arbitration. Any impact on FW's ability to litigate claims against these defendants will directly impact FW's creditors (and therefore "creditors' rights"). The limitations on discovery in the Arbitration will similarly impact other creditors because those limitations would likely negatively

15

impact FW's ability to obtain relief with respect to some of the damages caused by the Li Defendants.

41.     In short, the numerous conflicts between the Arbitration and the bankruptcy case, all of which impact the bankruptcy case, are exactly what § 4.1(a) is designed to prevent.  Section 4.1(a) should be applied with full force and effect and such application necessarily means that the Li Defendants cannot carry their burden of proving the parties' agreed to arbitrate the claims pled in the bankruptcy case in the Adversary Proceeding.

42.     The effect of § 4.1(a) cannot be overstated.  If the Court applies § 4.1(a) according to its plain terms, the entire house of cards that is the Arbitration Motion comes tumbling down because the entire motion is premised on the wrong assumption that the FOA requires arbitration.  It does not as § 4.1(a) clearly provides, and thus there is no basis for the relief requested.

> c.     The FOA excepts claims for injunctive relief from arbitration.

43.     FOA § 14.6.1 and 14.6.2 expressly carve out requests for injunctive relief from arbitration.  FOA section 14.6.1 provides as follows:

> Each Member and Li, on his, her, or its own behalf and on behalf of the Company, hereby agrees to submit all controversies, claims and matters of difference arising under or relating to this Agreement or the Company, which cannot be resolved between the Members and Li, to arbitration in accordance with the provisions and procedures set forth herein, except for a suit for injunctive relief, which may be brought in any court in the State of Colorado, United States pursuant to Section 14.6.2.

*FOA*, at § 14.6.1 (emphasis added).

44.     FOA section 14.6.2 provides as follows:

> Exclusive Jurisdiction. Each Member, and Li, on his, her, or its own behalf and on behalf of the Company, hereby submits to the exclusive jurisdiction of the state and federal courts located in the State of Colorado, United States, to seek injunctive relief and to enforce arbitral awards, without regard to and irrespective of any claims of *forum non conveniens,* in respect of all claims arising in connection with the Company, the provisions of this Agreement and all related matters.

*FOA*, at § 14.6.2.

45.     These provisions should be the end of the analysis with respect to at least the claims for relief seeking injunctive relief.  There is no doubt that FW seeks injunctive relief in the Adversary Proceeding.  The First Claim for Relief seeks turnover pursuant to 11 U.S.C. § 542(a). Section 542 turnover claims are claims for injunctive relief.  *In re Hall*, 502 B.R. 650, 657 (Bankr. D. Col. 2014) (Section 542 "provides an express statutory basis for a bankruptcy court to enter an injunctive order compelling turnover of identified property on the possession of a third party"). The Second Claim for Relief expressly seeks a permanent injunction.  In the Third and Fourth Claims for Relief, FW seeks declaratory relief that the automatic stay imposed by § 362(a) applies to the arbitration.  The automatic stay, and extensions or modification thereof are an injunction. *In re Gruntz*, 202 F.3d 1074, 1082 (9th Cir. 2000) ("The automatic stay is an injunction issuing from the authority of the bankruptcy court . . . .") (*citing Celotex Corp.*, 514 U.S. 313 (1995)); *In re Panther Mountain Land Development, LLC*. 686 F.3d 916, 926 (8th Cir. 2012) (extending the stay under § 105 is an injunction).  With respect to each of these claims, the Bankruptcy Court has "exclusive jurisdiction."

46.     Based upon the plain language of the FOA, the Li Defendants cannot carry their burden of proving that the parties agreed to arbitrate claims for injunctive relief.  The Arbitration Motion must be denied for this additional reason as to the first four claims for relief.

> d.     <u>The FOA's arbitration provision is a narrow provision that does not encompass any of the claims for relief pled in the Adversary Proceeding.</u>

47.     On its face, the arbitration clause does not apply to the issues raised by FW in the Adversary Proceeding.  Section 14.6.1 is a "narrow" arbitration provision not entitled to deference. As stated above, the liberal policy favoring arbitration under the FAA <u>does not apply</u> "when

considering narrow arbitration clauses." *Chelsea Family Pharm.*, 567 F.3d at 1197. Thus, "under a narrow arbitration clause, a dispute is subject to arbitration *only if it relates to an issue that is on its face within the purview of the clause*." *Id*. (Emphasis added). So, "a dispute is not subject to arbitration if it involves matters that are "collateral" to those covered by the clause." *Id*. When considering narrow arbitration clauses, the liberal federal policy favoring arbitration "does not create a presumption of arbitrability because the policy favoring arbitration "does not have the strong effect ... that it would have if we were construing a broad arbitration clause." *Id*.

48.     Here, the arbitration provision is a narrow provision. It does not provide for the arbitration of all disputes between the parties. Rather, § 14.6.1 only address disputes regarding the FOA or Frictionless, LLC. As previously stated, the provision expressly excepts injunctive relief from its ambit. The provision also clarifies what constitutes disputes regarding the FOA and Frictionless, LLC by defining controversies as "(a) all questions relating to the interpretation or breach of this Agreement, (b) all questions relating to any representations, negotiations and other proceedings leading to the execution of this Agreement, the formation of the Company, or the issuance of Membership Interests." *FOA*, at § 14.6.1.

49.     None of the claims for relief pled in the Complaint relate to either of these limitations. Many of the claims are core bankruptcy claims. The remaining claims are tort and contract claims that relate to the Li Defendants conduct in breaching purchase order contracts and deliberately attempting to put FW out of business. They do not concern breach of the FOA. <u>There is not a single claim for relief in the Adversary Proceeding relating to the interpretation or breach of the FOA</u>.

50.     Thus, even if the Court determined that the FOA applied to FW and that arbitration was permissible despite the clear mandate of § 4.1(a), the Li Defendants would still be unable to

carry their burden on the issue of consent because none of the claims for relief pled in the Adversary Proceeding are within the scope of the FOA arbitration provision.  For this additional reason, the Arbitration Motion should be denied.

        *iii.*    **The Bankruptcy Court must make all decisions regarding arbitrability.**

51.    The issue of who decides arbitrability is inextricably linked to the threshold determination of whether FW consented to arbitration.

52.    The Li Defendants argue that under *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S.Ct. 524 (2019), the question of arbitrability must be decided by the arbitrators because § 14.6.1 of the FOA delegates that responsibility to the arbitrators.  The argument is based upon the false conclusion that FW is a party to the FOA, which it is not.  Because FW is not a party to the FOA, § 14.6.1 is inapplicable.  It follows that the determination of arbitrability rests solely with this Court.

53.    The Li Defendants' argument also mischaracterizes both *Henry Schein* and § 14.6.1.  In *Henry Schein*, the Supreme Court "express[ed] no view about whether the contract at issue" in the case "in fact delegated the arbitrability question to an arbitrator."  139 S.Ct. at 531.  Rather, the Court overruled an exception to the arbitrability analysis (the "wholly groundless" exception) while, at the same time, it re-affirmed the precedent that is critical to the present dispute: a court "should not assume that the parties agreed to arbitrate arbitrability unless there is <u>clear and unmistakable evidence</u> that they did so."  *Id.*

54.    Here, the evidence is to the contrary.  First, as stated, FW is not a party to the FOA.

55.    Second, § 14.6.1 and 14.6.2 expressly carve out requests for injunctive relief from the arbitrators' jurisdiction.  Section 14.6.2 states, in two separate places, that "state and federal courts located in the State of Colorado" have <u>exclusive jurisdiction</u> over requests for injunctive

19

relief.  As previously discussed, there is no doubt that FW seeks injunctive relief in the Adversary Proceeding.  With respect to each of the first four claims for relief, the Bankruptcy Court thus has "exclusive jurisdiction" over the arbitrability decision.

56.     Third, as discussed above, § 4.1(a) of the FOA provides that the Agreement is binding "except as enforcement may be limited by bankruptcy . . . and similar laws affecting the enforcement of creditors' rights generally and be general principles of equity."   Given the Bankruptcy Court's exclusive jurisdiction over property of the estate, the injunctive relief sought, and the Li Defendants' concerted effort to interfere with FW's reorganization efforts and other "creditors' right generally" by secreting the litigation off to a private arbitration, application of § 4.1(a) requires leaving the arbitrability decision in the Bankruptcy Court.

57.     Fourth, the reference to the arbitrability decision in the FOA is, at best, ambiguous. Section 14.6.1 describes the "controversies" that are subject to arbitration as follows:

> (a) all questions relating to the interpretation or breach of this Agreement, (b) all questions relating to any representations, negotiations and other proceedings leading to the execution of this Agreement, the formation of the Company, or the issuance of Membership Interests, and (c) all questions as to whether the right to arbitrate any such question exists.

*FOA*, at § 14.6.1.  Subsection (c) references arbitrability but by limiting its scope to "such questions", the only questions an arbitrator has any power to decide are those set forth in subparts (a) and (b): "questions relating to relating to the interpretation or breach of this Agreement" and "questions relating to any representations, negotiations and other proceedings leading to the execution of this Agreement, the formation of the Company, or the issuance of Membership Interests."  These questions have nothing to do with any of the claims pled by FW in the Adversary Proceeding.  Accordingly, there is nothing "clear and unmistakable" about arbitrability in the FOA.

58.     For these reasons, the question of arbitrability lies with the Bankruptcy Court.  The assertion that the AAA rules somehow militate a contrary result is not supported by the rules themselves, which do not give exclusive jurisdiction over arbitrability decisions to arbitrators; rather, the rules confer "the power to rule" on arbitrarily questions, not the exclusive power.  *See* R-7(a).  The Li Defendants arguments regarding who decides arbitrability should be rejected.

> **C.     The Court should conclude that the parties' disputes are not arbitrable because arbitration of the parties' disputes inherently conflicts with the purpose of the Bankruptcy Code in this case.**

59.     As stated, the arbitration determination is a two-step inquiry.  The Court must first determine whether the parties consented to arbitrate the disputes.  For the reasons discussed above, the Court should find no such consent and deny the Arbitration Motion.  However, if the Court determines that there was consent to arbitrate some of the claims, it must then analyze the second issue: whether a statute or policy renders the claims nonarbitrable.

> **i.     The *McMahon* test gives the Court discretion to deny the Li Defendants' request for arbitration regardless of whether claims are core or non-core.**

60.     Although "the Federal Arbitration Act requires courts to enforce covered arbitration agreements according to their terms, the FAA is not the only statute on the books and its mandate may be overridden by a contrary congressional mandate."  *In re Henry v. Educ. Fin. Servs*., 941 F.3d 147 (5th Cir. 2019).  A bankruptcy court always retains discretion to deny arbitration of core proceedings that implicate bankruptcy issues.  *See*, *In re Bethlehem Steel Corp*., 390 B.R. 784, 793 (S.D.N.Y. 2008).  *See also In re Henry*, 941 F.3d at 147 (quotations omitted) (bankruptcy court may decline enforcement of arbitration agreements based on "the power of a bankruptcy court to enforce its own orders").  To be sure, "there will be occasions where a dispute involving both the Bankruptcy Code and the Arbitration Act presents a conflict of near polar extremes: bankruptcy

policy exerts an inexorable pull towards centralization while arbitration policy advocates a decentralized approach towards dispute resolution." *Id.* (quotations and citations omitted). "Core bankruptcy proceedings implicate more pressing bankruptcy concerns." *Id.* at 794. Thus, if a severe conflict is found between the goals of bankruptcy and arbitration, "then the court can properly conclude that, with respect to the particular Code provision involved, Congress intended to override the Arbitration Act's general policy favoring enforcement of arbitration agreements." *Id. See also In re EPD Inves. Co. LLC*, 821 F.3d at 1149 (9th Cir. 2016) (enforcing arbitration agreement will conflict with bankruptcy code).

61.     When determining whether a statute overrides the FAA's mandate to enforce arbitration agreements according to their terms, courts apply the test from *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987). In *McMahon*, the Supreme Court held that the FAA's mandate to enforce arbitration agreements "may be overridden by a contrary congressional command." *Id.* at 226. The party opposing enforcement of an arbitration provision must establish a contrary congressional command, or Congress' intent to create an exception to the FAA's mandate. Such intent may be established in one of three ways: (1) the statute's text, (2) the statute's legislative history, or (3) the existence of an "inherent conflict between arbitration and the statute's underlying purpose." *Id.* at 227 (internal citations omitted).

62.     Circuit courts widely acknowledge that the Bankruptcy Code does not mention the FAA, nor does the Bankruptcy Code's legislative history. Likewise, the inverse is true for the FAA. Accordingly, the analysis turns on the third consideration: the existence of an "inherent conflict between arbitration and the statute's underlying purpose." *See generally Touchstone Health*, 572 B.R. at 273-76 (discussing *McMahon* test in the context of bankruptcy cases).

63.     Generally speaking, core claims present an inherent conflict.  It is well established that it is within a Bankruptcy Court's discretion to deny a request for arbitration of core claims.  In *White Mountain Mining*, the Fourth Circuit Court of Appeals affirmed the bankruptcy court and district court's denial of a motion to compel arbitration because the proceeding would have seriously interfered with the debtor's efforts to reorganize.  403 F.3d at 170.  The owner of the debtor in *White Mountain* commenced an adversary proceeding for a determination that $10.6 million he gave to the debtor was a loan and not a capital contribution.  *Id.* at 167.  A third party that had acquired an interest in the debtor sought to compel arbitration pursuant to an arbitration agreement.  *Id.*  The claim was a core claim pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(A) and covered by the arbitration agreement.  *Id.* at 169.

64.     With respect to core claims, the *White Mountain* court held that the FAA must yield to the Bankruptcy Code under the third *McMahon* consideration.  "[C]ore-issue jurisdiction reveals a congressional intent to choose those courts in exclusive preference to all other adjudicate bodies, including boards of arbitration, to decide core claims."  *Id.* (*citing In re Summerfield Pine Manor,* 219 B.R. 637, 638 (BAP 1st Cir. 1998) ("Clearly the Bankruptcy Court . . . cannot abstain from the administration of the bankruptcy case, leaving [an arbitrator] to determine core matters. They are matters that arise exclusively under the Bankruptcy Code and related jurisdictional statutes establish jurisdiction in the district court and in the Bankruptcy Court, its delegate.")).

65.     In addition, Congress' intent to create an exception to FAA's mandate for bankruptcy cases is heightened in chapter 11 cases:

> Centralization of disputes concerning a debtor's legal obligations is especially critical in chapter 11 cases . . . To protect reorganizing debtors and their creditors from piecemeal litigation, the bankruptcy laws "centralize all disputes concerning [a debtor's legal obligations] so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *In re: Ionosphere Clubs, Inc.,* 922 F.2d 984, 989 (2d Cir.1990).

23

*White Mountain*, 403 F.3d at 169-170.

66.     Applying *McMahon*, and similar reasoning as *White Mountain*, circuit courts routinely deny arbitration of core claims.  *See In re Thorpe Insulation Co.*, 671 F.3d 1011, 1022 (9th Cir. 2012) (insurer's breach of contract of pre-bankruptcy settlement agreement raised questions that went to the "heart of section 524(g) and the management of an asbestos-related bankruptcy court" that should be resolved by a bankruptcy judge and not an arbitrator); *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 110 (2nd Cir. 2006) (bankruptcy judge has discretion to resolve arbitrable claims in bankruptcy court when they are core claims that are integral to bankruptcy court's ability to preserve and equitably distribute assets or where arbitration would substantially interfer with debtor's efforts to reorganize); *In re Mintze*, 434 F.3d 222, 231 (3rd Cir. 2006) (nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceedings and whether the arbitration will conflict with the purposes of the Bankruptcy Code).

67.     Importantly, a non-core claim is not subject to arbitration simply because it is non-core, because the core/non-core distinction does not affect whether a bankruptcy court has the discretion to deny enforcement of an arbitration agreement.  *Mintze*, 434 F.3d at 229 (internal citations omitted).  To the contrary, the bankruptcy court still has the discretion to deny enforcement of an arbitration agreement where it involves non-core claims that implicate more pressing bankruptcy concerns.  *See In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2nd Cir. 1999).

68.     Defendants heavily rely on Judge McNamara's rejection in *Touchstone Home Health* of this interpretation of the core/non-core distinction.  However, Judge McNamara's reasoning in that case is flawed because his honor converted a bankruptcy court's discretionary authority to compel arbitration of non-core claims, into a *mandatory* obligation to do the same.

24

*See*, *Touchstone*, 572 B.R. at 274 (citation omitted) (asserting that noncore claims "must be arbitrated if the requirements of the FAA are met").  Nationwide courts have condemned the approach Judge McNamara applied in *Touchstone* because "noncore matters should not, *a priori*, be channeled into arbitration without benefit of an inherent-conflict analysis…" *Payton*, 399 B.R. at 362 (emphasis in original).  In other words, each court should still analyze whether arbitrating non-core claims implicates important bankruptcy considerations such as consolidating proceedings, adjusting the debtor-creditor relationship, the claims allowance process and allowing a debtor to formulate and propose a plan of organization. *See id.* at 362; *In re Eber*, 687 F.3d 1123, 1130-31 (9th Cir. 2012); and *In re Erwin*, 2018 WL 1614160, at *1, 12 (E.D.N.C.  Mar. 30, 2018).  This approach is entirely consistent with the Supreme Court's mandate in *McMahon* and, as explained below, in *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612 (2018).

69.     Defendants' argument that *Epic* precludes arbitration is a gross oversimplification of the Court's analysis there.   To be certain, *Epic* involved a pronouncement of the FAA's applicability to a provision of the National Labor Relations Act (NLRA), which guarantees workers the right to organize and engage in collective bargaining efforts. *Id.* at 1624.  However, the Supreme Court gave no indication that it intended its decision in *Epic* to reach the Bankruptcy Code, nor did it overrule *McMahon*.   In contrast to what the Li Defendants assert, the Court in *Epic* engaged in a near-identical analysis as that of the circuit courts regarding *McMahon*, only choosing to rest its decision on the basis that a court should find a "clear and manifest" congressional intent for yielding the FAA's arbitration mandates to that of the Bankruptcy Code. *Epic*, 138 S.Ct. at 1623-24.

70.     In other words, the *McMahon* and *Epic* tests are the same with different labels in their applications.   As Justice Gorsuch remarked in *Epic*, "[t]elling, too, is the fact that when

Congress wants to mandate a particular dispute resolution procedure it knows exactly how to do so." *Epic*, 138 S.Ct. at 1626.  Thus, Congress' intent is clear and manifest that bankruptcy courts should: (a) protect reorganized debtors from piecemeal litigation; (b) be the sole forum to adjust creditor-debtor relationships; and (c) exclusively prefer the Bankruptcy Court to all other judicial bodies for core claims and non-core claims that implicate pressing bankruptcy concerns.

71.   As applied here, compelling arbitration presents a direct conflict with the purposes of the Bankruptcy Code because doing so will usurp this Court's exclusive authority to adjudicate FW's core claims and non-core claims that implicate core interests.  Further, it is contrary to the Bankruptcy Code's policy of centralizing disputes and will result in inconsistent adjudications, making it impossible for FW to propose a plan of reorganization, and for the Court to fulfill its role of adjusting creditor-debtor relationships.

ii.   **Application of the *McMahon/Epic* test to FW's claims demonstrates that arbitration of FW's claims is grossly improper.**

72.   The Li Defendants attempt to cast all of FW's claims for relief in the Adversary Proceeding as state law claims "dressed up in an illusory Bankruptcy Code wrapper." *See Memorandum*, at 39.  The Li Defendants base this assertion on the unremarkable fact that the events giving rise to the claims occurred pre-petition.  This is of little surprise given that the Adversary Proceeding was commenced just nine days after the bankruptcy filing.  It is also a meaningless distinction.  By definition, all avoidance causes of actions and claims objections are based upon pre-petition acts.  Further, claims of a debtor-in-possession do not exist in a vacuum and are instead inextricably intertwined with the debtor's attempt to structure, propose, and obtain approval for a plan of reorganization, which naturally relate to pre-petition facts and circumstances.  *In re Thorpe*, 671 F.3d at 1017.  Also, when the Bankruptcy Code provides the *right* upon which the remedy rests, the proceeding is core regardless of when the facts supporting

the claim arose.  *In re Kaiser*, 833 F.2d 1574, 1582 (2nd Cir. 1983).

73.     The *McMahon/Epic* test applies to the claims for relief pled in the Adversary

Proceeding as follows:

a.     **First and Second Claims for Relief** – Turnover of Property of the Estate pursuant to 11 U.S.C. § 542(a) and Preliminary Injunction.  These claims seek to require Defendants to turn over certain intellectual property and products that are property of the estate and to cease wrongfully using FW's intellectual property.

The Li Defendants disingenuously assert that "Frictionless LLC's and CIU's legal right to use the Debtors' intellectual property itself turns on Section 9.1 of the LLC Agreement."  *Memorandum*, at 39.  Taking that representation at face value, the Court may be left with the impression that Frictionless, LLC and CIU have unfettered, unconditional perpetual use of the intellectual property.  The Li Defendant's intentional misrepresentations on this could not be more obvious.  To the contrary, Section 9.1 of the FOA is subject to Section 4.4's non-competition restrictions.  In other words, the Li Defendants may not use the intellectual property to compete with FW.  Rather, FW's intellectual property can only be used *in conjunction with the business venture set forth in the FOA and only so long as Mr. Banjo is a member*.

Notably, while Mr. Banjo may have a cognizable claim under the FOA for this breach, FW's claim is an independent tort claim because FW is not a party to the FOA and, as between the Li Defendants and FW, the Li Defendants' use of FW's intellectual property is simply without authorization.  FW's First and Second Claims for Relief thus have nothing to do with the FOA and cannot be deemed subject to the arbitration provision therein or an "illusory" bankruptcy claim.  These are specific claims for recovery and protection of property of the bankruptcy estate.

Turnover claims are unquestionably core claims under 28 U.S.C. § 157(2)(A) and (E) because they implicate serious bankruptcy policies and the Court is given wide discretion to deny a request for arbitration in that instance. In particular, FW's permanent injunction claim is related to the turnover claim.  In effect, once the property is turned over, the permanent injunction protects FW by enjoining the Li Defendants from further use of FW's intellectual property.  These claims go to the heart of FW's ability to propose an effective reorganization and the Bankruptcy Court's exclusive jurisdiction over property of FW's estate.

b.     **Third and Fourth Claims for Relief** – Declaratory Relief that the Automatic Stay applies to the Arbitration and Permanent Injunction.  Both claims are interrelated in that they seek a declaration that the automatic stay applies to the Arbitration and for the imposition of such stay. Claim seeking enforcement of the automatic stay are core claims under 28 U.S.C. §§ 157(b)(2)(A), (G) and (O) because enforcement of the automatic stay concerns administration of the estate and debtor-creditor

relations. The automatic stay is a central and exclusive creature of the Bankruptcy Code. Extending the stay to the Arbitration furthers the important bankruptcy policy of centralized resolution of disputes because it will reduce FW's administrative expenses by allowing FW to focus its efforts on the Adversary Proceeding rather than litigating both the Arbitration and the Adversary Proceeding. Further, extending the stay to the Arbitration avoids inconsistent adjudications that will interfere with FW's ability to formulate and propose a plan of reorganization.

c. **Fifth and Ninth through Fourteenth Claims for Relief** – The Fifth Claim for Relief is an objection to Frictionless LLC's disputed, unliquidated, and contingent claim, and the Ninth through Fourteenth Claims for Relief are claims against various of the Li Defendants and Frank and Serena Li for claims arising under state law. The Li Defendants are of the mistaken belief that the claims arise independently from bankruptcy law but their supposition is a clear misstatement of the law.

Despite *Touchstone's* broad, and incorrect pronouncement regarding non-core claims, the court in *Touchstone* still analyzed whether arbitrating the non-core claims would result in a conflict with important bankruptcy policies. Further, the court in *Touchstone* was particularly leery of the debtor's motives because the bankruptcy case was filed on the <u>eve of trial</u> in the arbitration, which had been continued several times due to the debtor's allegedly fraudulent conduct in the arbitration proceeding. *Id.* at 264. These facts are not at all applicable to FW.

The other cases the Li Defendants cite do not support their argument. Courts do not simply allow arbitration because the claim arises independently of bankruptcy law. Instead, courts regularly analyze whether substantial bankruptcy interests will be implicated if arbitration is permitted. *See, e.g. In re Nu-Kote Holding, Inc.*, 257 B.R. 855, 865 (Bankr. M.D. Tenn. 2001) (allowing arbitration of prepetition breach of contract claims where no substantial bankruptcy interests existed to overcome arbitration agreement).

Claims Nine through Fourteen are non-core claims that are transformed into core claims given the context of how they are asserted. "'An objection to claim is classified as a core proceeding even though, in another context, the litigation in question might be related" because allowing the claim will affect the dividend to other creditors. *In re Thorpe*, 671 F.3d at 1021 (*citing* 1 Collier on Bankruptcy ¶ 3.02[3][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.2011)); *see also* 28 U.S.C. § 157(b)(2)(C). When a debtor asserts a claim against a creditor in addition to objecting to the creditor's claim, even if the claims against the creditor are state law claims, the claims become constitutionally core claims based on their necessity to resolving the proof of claim and their ability to directly reduce or recoup the amount claimed. *Moses v. CashCall, Inc.*, 781 F.3d 63, 70 (4th Cir. 2015). Thus, a substantial bankruptcy interest is implicated and must be preserved by eschewing arbitration.

Here, the Li Defendants' claims will have a significant impact on FW's creditor body as a whole because FW seeks the disallowance of the largest general unsecured claim and the recovery of tens of millions of dollars. Allowing these claims to unfold in a foreign forum, without the oversight of creditors and this Court, is in direct contravention to the Bankruptcy Code's policies of centralized resolution of disputes and oversight of the claims administration process. The Court cannot simply delegate its administration of this case to a panel of private arbitrators as urged by the Li Defendants.

Finally, since FW possesses claims that are clearly not arbitrable and not subject to the *McMahon/Epic* test, such as the First through Fourth and the Sixth through Eighth Claims for Relief, there is a heightened risk of inconsistent adjudications, which will frustrate FW's ability to propose a reorganization plan. It would even make it impossible for the Court to clearly define FW's creditors' rights and claims, a function that squarely rests with the Bankruptcy Court. For instance, if the Court rules that FW will be irreparably harmed by the Li Defendants' continued use of its intellectual property, and the arbitration panel somehow rules in favor of CIU on its breach of contract claims, both rulings will be tantamount to irreconcilable judgments that go to the value and use of FW's assets, as well as the dividend to creditors. Due to the nature and scope of the various claims, there are countless combinations of inconsistent rulings on competing claims that may render administration of the estate nearly impossible unless all of FW's claims are heard in this Adversary Proceeding. Accordingly, even if the Court determines that Claims Nine thorough Fourteen are non-core, the presence of other non-arbitrable claims that directly bear on resolution of the non-core claims implicate serious bankruptcy policies of consolidating disputes, efficient estate administration, and creditor certainty throughout the plan process. These claims should therefore be litigated in the Adversary Proceeding.

d. **Sixth, Seventh and Eight Claims for Relief** – These are § 510(c) equitable subordination and § 548 fraudulent conveyance claims in which FW seeks to subordinate Frictionless LLC's disputed, unliquidated and contingent claims in the amount of approximately $12 million and recover over $10 million in transfers.

These claims are not subject to any arbitration agreement. The claims are not premised on the FOA. The equitable subordination claim is unique to the bankruptcy process and therefore outside the scope of any pre-petition arbitration agreement. *See*, *In re Transport Assoc., Inc.*, 263 B.R. 531, 535-536 (Bankr. W.D. Ky. 2001). The § 548 claims are constructive fraudulent conveyance claims that arose within one year of the bankruptcy filing based upon specific acts that took place in late 2018 and 2019, not in connection with FOA. Section 548 claims are claims under the Bankruptcy Code that are not subject to arbitration agreements. *See In re Craig*, 545 B.R. 47, 54 (D. Colo. 2015) (arbitration clause did not apply to § 548 claim). Avoidance claims are thus not arbitrable. *Id.* Even if the Court concludes otherwise, they are unquestionably core claims under 28 U.S.C. § 157(H)

29

that seek to significantly augment the estate for the benefit of creditors. Consequently, denying arbitration will advance important bankruptcy policies.[1]

### iii.    The *Touchstone* factors also weigh against arbitration.

74.    Should the Court decide to apply the *Touchstone* factors, it will also conclude that

its factors weigh against arbitration.   The factors are addressed as follows:

a.    *Whether parties have entered into an arbitration agreement?*

FW agreed to submit claims to arbitration pre-petition, but it is not a party to an arbitration agreement.  The arbitration provision that it is not a party to is a narrow one that does not include claims for injunctive relief and is not enforceable in bankruptcy.  This factor weighs against compelling arbitration.

b.    *Whether an arbitration proceeding was started before bankruptcy?*

The Arbitration was started before the bankruptcy.  However, the Arbitration remains in its infancy.  The Li Defendants seek to assert an entirely new amended arbitration demand if the parties are compelled to arbitrate, thereby putting that matter back to square one.  There has been no discovery, no depositions, and no subpoenas of any measure have resulted from the arbitration. This factor weighs against compelling arbitration.

c.    *If an arbitration was started, whether the arbitration has progressed to the point where the parties are prepared for a final hearing?*

As discussed above, the Arbitration remains in its initial stages. No substantive developments of any kind have occurred in the Arbitration. The parties are not prepared for final hearing.  This factor weighs against compelling arbitration.

d.    *If an arbitration was started, whether the arbitrator has specialized knowledge concerning the disputed issues?*

There is nothing specialized about the claims in the Arbitration.  They are typical claims that arise when a business venture sours.  The three members of the arbitration panel, while they possess great resumes, are much less qualified than this Court to handle the bankruptcy claims.

The Li Defendants' assertion of an underlying international nature of the case is a

---

[1] The Li Defendants suggestion that the two fraudulent conveyance claims for relief fail to state a claim because Mr. Banjo was on both sides of the transactions is based upon a deliberate misreading of the allegations.  Mr. Banjo was fraudulently induced by the Li Defendants into authorizing the transactions at issue.  Moreover, all necessary elements are pled in both claims: FW did not receive reasonably equivalent value in exchange for the transfers and the transfers rendered FW insolvent.  *See Complaint*, ¶¶ 140-166.

red herring. More so, it is false. The claims asserted in the Adversary Proceeding are bankruptcy and state law claims. The claims currently asserted in the Arbitration are state law claims that could be asserted in any Colorado court of competent jurisdiction. The claims do not arise out of, or relate to, international laws in any way. This factor weighs against compelling arbitration.

e. *Whether the issue to be arbitrated is core or noncore?*

Unlike the *Touchstone* case that involved a discrete non-core claim, this case involves a panoply of interrelated claims, many of which are core. Issues on their face that appear to be non-core (*i.e.* state court claims) are transformed into core issues in the claims adjudication process. This factor weighs against compelling arbitration.

f. *Whether the arbitration would result in partial or complete resolution of the underlying dispute?*

Because FW's claims include non-arbitrable claims, the Arbitration will only result in a partial resolution of the underlying dispute. This factor weighs against compelling arbitration.

g. *Whether an arbitration would interfere with the bankruptcy case?*

The claims in the Adversary Proceeding go to the heart of the claims allowance process, seek to recover over $10 million for creditors, seek turnover of estate property and protection of estate intellectual property. If the Adversary Proceeding is stayed and FW is unable to prosecute these claims, the arbitration would unquestionably interfere with the bankruptcy case. This factor weighs against compelling arbitration.

h. *Whether the interests of judicial economy and expeditious and economical determination of the dispute would be served by arbitration?*

Allowing the Arbitration to go forward is contrary to notions of judicial economy and an economical determination of the litigation between the parties. As discussed above, there are numerous FW claims that are not subject to arbitration. Litigating different claims in two forums regarding some of the same facts and circumstances is a textbook example of judicial inefficiency. This factor weighs against compelling arbitration.

i. *Whether equitable considerations suggest the issue should be resolved by arbitration or in the Court?*

Defendants aim to turn the Bankruptcy Code on its head. The fact that FW agreed to arbitrate a limited number of claims in the Arbitration does not override the important bankruptcy policy of centralizing disputes into a single forum to

harmonize creditors' interests.  This factor weighs against arbitration.

75.     Based upon these facts as applied to any of the potential tests, the Court should conclude that the parties' disputes are not arbitrable because arbitration of the parties' disputes inherently conflicts with the purpose of the Bankruptcy Code.  Thus, if the Court reaches this issue as to some of the claims for relief, the Arbitration Motion should still be denied.

**D.     There is no basis for lifting the automatic stay to permit the arbitration to go forward against FW and the stay should be extended to Dan Banjo.**

**i.     Each of the applicable *Curtis* factors weigh in FW's favor.**

76.     11 U.S.C § 362(a) operates as an automatic stay of, as relevant to the relief requested herein (1), the continuation of a "judicial, administrative or other proceeding against the debtor that was or could have been commenced" pre-petition and (2) "any act to obtain possession of property of the estate or of property from the estate or to exercised control over property of the estate."  *Id*.  Without question, the automatic stay applies to all claims asserted against FW in the Arbitration.

77.     In the District of Colorado, when relief is sought to proceed with litigation pending prior to the bankruptcy filing, the bankruptcy court typically applies the "*Curtis* factors" to determine whether cause under § 363(d)(1) for such relief exists.  *See In re Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984).

78.     Application of the *Curtis* factors is difficult in this case because of the various possible rulings on other pending issues.  For example, if the Court rules that no claims are arbitrable (because FW is not a party to the FOA, § 4.1(a) renders the arbitration provision unenforceable, the claims are not within the scope of the arbitration provision in the FOA, or the Court determines that arbitration of any of the claims pled in the Adversary Proceeding conflicts with the Bankruptcy Code), the request to lift stay must be denied as to FW.  There is no basis

32

whatsoever to permit an arbitration of causes of action that the Court has determined are not arbitrable.

79. If the Court determines that only some of the claims in the Adversary Proceeding are not arbitrable (for example the core claims and injunctive relief claims), the *Curtis* factor test must be applied. Similarly, even if the Court determined that all of the claims pled against the Li Defendants must be arbitrated, the Court still must apply the *Curtis* factors because FW's claims against Frank and Serena Li are not arbitrable. FW thus analyzes the applicable *Curtis* factors as they would be applied to one of these two scenarios:

    a. *Whether the relief will result in a partial or complete resolution of the issues.*

        Assuming that either (a) injunctive relief and core claims stay in the Bankruptcy Court, and other claims are arbitrated or (b) all claims against the Li Defendants are arbitrated and none of the claims against Frank and Serena Li are arbitrated, lifting the automatic stay will result in piecemeal litigation and skyrocketing administrative expenses for FW because it would have to participate in litigation on two fronts. In contrast, the Li Defendants' claims may easily be litigated before this Court as counterclaims. This factor weighs against granting relief from the automatic stay.

    b. *The lack of any connection with or interference with the bankruptcy case.*

        The claims in the Adversary Proceeding go to the heart of the claims allowance process, seek to recover over $10 million for creditors, eliminate or subordinate the largest scheduled unsecured claim and protect significant intellectual property rights, all of which will be central to FW's plan. The Li Defendants' argument to the contrary that all of the claims "have no connection to the postpetition circumstances of the Debtor's bankruptcy case" is disingenuous. *Memorandum*, at 47. The Arbitration unquestionably is connected to this case and will interfere with FW's ability to administer the estate. This factor weighs against granting relief from the automatic stay.

    c. *Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases.*

        There is nothing specialized about the claims in the Arbitration as they amount to typical claims that arise when a business venture sours. The arbitration panel is much less qualified to handle the bankruptcy issues raised by FW's claims than this Court. The claims in the Arbitration contain no distinctive or complicated

component to them and may be asserted in any Colorado court.  This factor weighs against lifting the automatic stay.

d. *Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties*.

Litigating the claims in the Arbitration will prejudice the interests of other creditors and interested parties.  Allowance and/or equitable subordination of Frictionless, LLC's claim will have a direct and substantial impact on the distributions to other creditors in this case.  Further, if there are inconsistent adjudications, FW may be faced with a scenario where it cannot propose a plan of reorganization due to inconsistent treatments of claims.  This will obviously have a significant impact on creditors' interests.  In addition, the Arbitration is not a public forum where creditors may observe the case to evaluate how it will affect the claims administration process, plan confirmation and potential dividends.  This factor weighs against granting relief from the automatic stay.

e. *Whether the judgment claim arising from the foreign action is subject to equitable subordination under Section 510(c)*.

FW has asserted an equitable subordination claim in the Adversary Proceeding.  This Court has exclusive jurisdiction to hear such claim.  This factor weighs against granting relief from the automatic stay.

f. *The interest of judicial economy and the expeditious and economical determination of litigation for the parties*.

Allowing the Arbitration to proceed is contrary to notions of judicial economy and an economical determination of the litigation between the parties.  Under any scenario, the Adversary Proceeding must go forward as to Frank and Serena Li.  Litigating claims in two forums involving similar facts and circumstances is a textbook example of judicial inefficiency.  This factor weighs against granting relief from the automatic stay.

g. *Whether the foreign proceedings have progressed to the point where the parties are prepared for trial*.

The Li Defendants are proposing to submit an amended arbitration demand if stay relief is granted.  Discovery has not even commenced in the Arbitration.  This factor weighs against granting relief from the automatic stay.

h. *The impact of the stay on the parties and the "balance of hurt."*

The only harm articulated by the Li Defendants is that the parties agreed to arbitrate certain claims.  That is not a harm.  When FW filed for bankruptcy, the Arbitration was, and remains, in its infancy.  The parties have not engaged in any discovery

and FW asserted only counterclaims in there, none of which concerned specific bankruptcy issues. If the Arbitration goes forward, however, FW would (a) be required to pay attorneys' fees in two cases, (b) face the prospect of inconsistent adjudications, and (c) suffer interference with its ability to propose a plan of reorganization and adjust debtor-creditor rights. Relief from the automatic stay would be prejudicial to FW and the entire creditor body. This factor weighs against granting relief from the automatic stay.

80.     Each of the applicable factors thus weighs against lifting the stay. Overlaying the *Curtis* factors, moreover, "it must be borne in mind that the process of determining the allowance of claims is of basic importance to the administration of a bankruptcy estate." *Curtis*, 40 B.R. 795 at 800-801 (*citing Gardner v. New Jersey,* 329 U.S. 565, 573–74 (1947); *Lesser v. Gray,* 236 U.S. 70, 74 (1915) ("a bankruptcy court in which an estate is being administered has full power to inquire into the validity of any alleged debt or obligation of the bankruptcy upon which a claim or demand against the estate is based. This is essential to the performance of the duties imposed upon it."); *United States Fid. & Guar. Co. v. Bray,* 225 U.S. 205, 217 (1915) ("[T]he jurisdiction of the bankruptcy courts in all 'proceedings in bankruptcy' is intended to be exclusive of all other courts, and that such proceedings include, among others, all matters of administration, such as the allowance, rejection and reconsideration of claims....")).

81.     The purpose of the Adversary Proceeding is to resolve disputes between FW and all Defendants, resolution of which will result in the allowance or disallowance of claims, the setoff of claims, equitable subordination, recovery of money for the estate, recovery and preservation of valuable intellectual property, and numerous injunctions. These matters go to the heart of policies supporting the Bankruptcy Code, and FW's efforts to administer the estate. To grant relief from the automatic stay will usurp the Court's central role in this process and seriously interfere with FW's reorganization efforts. The motion seeking stay relief should be denied.

**ii.      The Court should continue the stay to protect important property interests of the estate.**

82.     The automatic stay also applies to any counterclaims Dan Banjo could assert against the Li Defendants that are duplicative of counterclaims that could have been asserted by FW.  Such efforts by Banjo would be the equivalent of exercising control over property of the estate.  For example, if Banjo succeeded in obtaining a judgment against Defendants before FW obtains a judgment on the same cause(s) of action, Banjo would have the ability to perfect that interest and/or collect prior to FW thereby reducing or impairing FW's chance of recovery.  *See, e.g. In re Prudential Lines Inc.*, 928 F.2d 565, 574 (2d Cir. 1991) ("where a non-debtor's action with respect to an interest that is intertwined with that of a bankrupt debtor would have the legal effect of diminishing or eliminating property of the bankrupt estate, such action is barred by the automatic stay"). Because the stay applies to Banjo's ability to assert counterclaims, the Court should continue the stay.

83.     At a preliminary hearing in this case, counsel for the Li Defendants asserted that Mr. Banjo's pursuit of these personal claims to the exclusion of FW would demonstrate an irreconcilable conflict between him and the estate and raise concerns regarding his ability to act as a fiduciary in this case.  This argument totally misses the mark.  The concern here is that Mr. Banjo should not be forced into a position that may give rise to conflict when it is unnecessary.  In other words, the Li Defendants should not be able to manufacture a situation that creates a conflict between the CEO of the Debtor and then say "Gotcha!" and accuse the CEO of misdeeds.  The stay should remain in effect to prevent the Li Defendants from such gamesmanship.

### iii.   The "unusual situation" before the Court warrants extending the stay to Banjo.

84.     Compelling only Banjo to arbitration is both inequitable and inconsistent with the goals of bankruptcy, which is to centralize "resolution of purely bankruptcy issues, the need to

protect creditors and reorganizing debtors from piecemeal litigation and the undisputed power of the bankruptcy court to enforce its own orders." *In re Anderson*, 553 B.R. 221, 230 (S.D. N.Y. 2016). To be sure, as detailed at length above, the FOA that references arbitration is between solely Banjo, Li and ZL Investment. But "while arbitration agreements are to be rigorously enforced, bankruptcy too represents a fundamental public policy." *Moses*, 781 F.3d at 72 (emphasis added). Accordingly, an inherent conflict may exist where the same set of facts will be at issue in the bankruptcy and in arbitration, creating "potentially different outcomes were the arbitrator and the Court to rule differently." *In re Roth*, 594 B.R. 672, 677 (Bankr. N.D. Ind. 2018). Such "dual forum litigation would be inefficient, costly, and time consuming." *Id*. *See also In re Jorge*, 568 B.R. 25, 32 (Bankr. N.D. Ohio 2017) (same).

> a.  <u>Similar Cases Have Warranted a Stay in Favor of a Co-Defendant like Banjo.</u>

85.  The 10th Circuit has recognized that 11 U.S.C. § 105 authorizes courts to enjoin proceedings against non-debtor co-defendants:

> It is hornbook law that "[a]ctions and conduct excepted from the automatic stay may be subject to specific injunctive relief under § 105(a)." 2 Collier on Bankruptcy par. 105.02 at 105-6 (15th ed. 1990). Collier observes that "[s]ection 105(a) has been widely utilized in attempts to enjoin court proceedings against nondebtor parties that allegedly will have an impact on the debtor's bankruptcy case," and comments that such attempts require "case by case decisions as to whether any particular action excepted from the automatic stay will result in sufficient harm or interference with the bankruptcy case to warrant the issuance of a specific injunction." *Id.* at 105-7 to -9.

*In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 599 (10th Cir. 1990).

86.  When staying proceedings against non-debtors, the 10th Circuit applies the "unusual situations" test as established by *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986). *See Western Real Estate*, 922 F.2d at 599 (adopting and applying *A.H. Robins* test); *Oklahoma Federated Gold and Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 141-142 (10th Cir.

1994) (same).

87.     The *A.H. Robins* court analyzed the purpose of § 362 in developing the "unusual situations" test.   The purpose of § 362 is three-fold: first, it "protect[s] the debtor from the uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts"; second, it precludes "one creditor from pursuing a remedy to the disadvantage of other creditors"; and third, it provides debtor's executives with a respite to enable them to formulate a plan of reorganization.   *A.H. Robins Co., Inc.*, 788 F.2d at 998.   The court went on to remark that "the stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another."   *Id.* (internal citation omitted).   With this purpose as a backdrop, the *A.H. Robins* court concluded that the "unusual situation":

> arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.

*Id.* at 999.

88.     *A.H. Robins* provides a clear example of a situation where refusing to impose the stay upon a suit against a non-debtor "would defeat the very purpose and intent of [§ 362]."   *Id.* Such a situation is when the debtor, like FW here, has indemnified Banjo – the non-debtor.   *See id.*   As a result of FW's indemnification of Banjo, a judgment against Banjo is in effect a judgment against FW.   Consequently, the Arbitration squarely fits into the *A.H. Robins* test and should therefore be stayed.

89.     *A.H. Robins* has also been adopted and applied by the District of Colorado.   *See Robert W. Thomas & Anne McDonald Thomas Revocable Tr. v. Inland Pac. Colorado, LLC*, 2013 WL 708493, at *2 (D. Colo. Feb. 26, 2013) (stating that the "automatic stay can be extended to

the debtor's co-defendants if the continued litigation would impact the bankruptcy proceeding and/or the purposes of the automatic stay provision). *See also Bass v. PJCOMN Acquisition Corp.*, 2011 WL 5417083, at *2 (D. Colo. Nov. 8, 2011) (purpose of automatic stay is to "ensure that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts. . . [A]lthough non-bankruptcy courts may issue orders that are consistent with 11 U.S.C. § 362, such an order may be rendered void if it is later determined by the bankruptcy court that the order violates the automatic stay. *Id.*

90.     The dispute in *Robert W. Thomas* centered on whether the automatic stay provision of § 362 should extend to the debtor's non-bankrupt president who was alleged to have used the debtor as a means of appropriating approximately $32 million for his own benefit.  *Robert W. Thomas*, 2013 WL 708493, at *1.  The court applied the unusual situation exception to extend the stay to the president because it found that the claims asserted against the president "may adversely impact the bankruptcy proceeding and the assets of" the debtor and thus impact the debtor's reorganization.  *Id.* at *3.   The court further found that the stay was crucial because the claims in the bankruptcy forum involved "essentially the same facts and same witnesses" as the other forum the president was being sued in.  *Id.*  Even more, the witnesses would be "identical, and the same documents and evidence will be used to prove each of the claims."  *Id.*  Consequently, allowing the claims against the president to proceed "would appear to frustrate the purposes of the automatic stay provision" since it would subject the debtor "to a scramble for its assets."  *Id.*

91.     The same determination was at issue in *In re North Star Contracting Corp.*, 125 B.R. 368, 370 (S.D.N.Y. 1991).  There, the issue was whether a state court action against the non-bankrupt president of the debtor could proceed, where the debtor had declared bankruptcy and was the only party ostensibly protected by the automatic provisions of § 362.  *Id.*  The court held that

an identity of interests existed between the debtor and its president, such that the state court action against the president would significantly affect the reorganization efforts of the debtor. *Id.* at 371. For that reason, it held that the automatic stay provision of §362 applied to stay the state court action against the debtor's president. *Id.  See also Matter of S.I. Acquisition, Inc*. 817 F.2d 1142, 1154 (5th Cir. 1987) (suit against debtor's non-bankrupt officers was stayed because allowing suit to move forward "abridges the general policy of giving the debtor and its control persons the opportunity to reorganize its finances" since they would be actively involved in litigation on two fronts); and *Seybolt v. Bio-Energy of Lincoln, Inc*., 38 B.R. 123, 126-27 (Bankr. D. Mass. 1984) (claims against sole partner of general partnership significantly affected general partnership's bankruptcy estate such that bankruptcy court properly exercised jurisdiction over those claims)

92.     Banjo is the CEO and sole owner of FW.  As a result, rulings and determinations against FW and Banjo have the potential to be inseparable in the arbitration, and such is *sine qua non* of the type of "unusual situation" that necessitates denying the Li Defendants' efforts to also compel arbitration against Banjo.  ZL Investment initiated the arbitration by claiming that Banjo breached the FOA by operating FW as the front-facing company for Frictionless, LLC.  In response, FW and Banjo assert that, contrary to ZL Investment's allegations, the Li Defendants have worked side by side with Banjo and FW for seven years, since 2012 and since before Frictionless, LLC ever existed, taking advantage of FW's expertise and worldwide popularity in the manufacture and distribution of professional-grade farm equipment to bolster their desire for relevancy in the US Market.  In support of that position, FW and Banjo point to thousands of communications between FW, Banjo, and the Li Defendants, multi-million-dollar transactions between them, yearly visits by the Li's to FW's offices and Banjo's home, and the Li Defendants' admissions in writing of the vital role FW has played in the parties' joint venture over seven years.

93.     ZL Investment's arbitration demand rests entirely on its claims of breach of the FOA against Banjo while he was working as the CEO of FW during the joint venture. The remedy it seeks from these claims is directed at monies it alleges were earned by FW, making FW and Banjo inextricably intertwined in the Arbitration (although FW is not a signer of the FOA). Therefore, any judgment against Banjo in the Arbitration is in fact synonymous with a judgment against FW's assets in the bankruptcy estate – which is a direct violation of § 362's automatic stay provision.

> b.      The Arbitration Must Be Stayed to Avoid Conflicting Adjudications and to Avoid the Arbitration Tribunal from Supplanting the Jurisdiction and Authority of the Bankruptcy Court.

94.     The legal authorities cited above compel the sole conclusion that the Arbitration must be stayed pending the resolution of FW's bankruptcy. Banjo is FW's sole founder, CEO, and member and FW has indemnified Banjo. Much like *Robert W. Thomas*, ZL Investment alleges that Banjo inserted FW into the joint venture as a middleman and used FW to capture revenues and profits to which the Li Defendants were rightfully entitled. Comparatively, FW alleges in the Adversary Proceeding that FW "operated in good faith to increase sales and jointly achieve the parties' goals," while the Li Defendants: (a) caused "Banjo to sign a long-term Loan Agreement on the behalf of FW"; and (b) "urged FW to take on millions of dollars in additional liability" and simultaneously conspired "to halt all shipments to FW…" *Complaint*, at ¶¶ 70, 76, and 78.

95.     The facts at issue in the Arbitration involve multiple claims that implicate core bankruptcy issues and similar information will be used to prove FW's claims against the Li Defendants in bankruptcy. More importantly, the issues of liability, amount of damages, and assets to satisfy those liabilities will be central and are so intertwined with the bankruptcy that separation of the two forums is not feasible in this instance.

96.     Further, much like the cases where courts have applied the unusual situation exception, a judgment against Banjo in the Arbitration will be certain to result in inconsistent and/or conflicting adjudications, as Banjo is the 100% owner and CEO of FW and ZL Investment in effect alleges a conspiracy between Banjo and FW to defraud ZL Investments.  Therefore, much like *In re North Star Contracting Corp.*, a separate arbitration pertaining to Banjo will amount to (1) a duplicative proceeding that will interfere with FW's ability to protect it creditors and its reorganization efforts due to its obligation to indemnify Banjo; and (2) be likely to result in inconsistent and/or conflicting adjudications, raise the prospect of collateral estoppel, and prejudice FW's ability to object to certain parties' claims against it.  Such an outcome will foil FW's ability to reorganize and formulate a plan that is fair to all creditors.  Further, allowing the Li Defendants to continue to prosecute their claims against Banjo will significantly deplete property of the bankruptcy estate.  Pursuant to the indemnification provision, FW will be obligated to pay attorneys' fees in connection with both the Arbitration Action and this adversary proceeding.  In addition, FW would have to pay one-half of the fees of the three arbitrators who jointly cost $1,750 *per hour*.  These duplicative costs would unnecessarily deplete property of FW's bankruptcy estate and therefore negatively impact its creditors' interests.  For all of these reasons, the state should be extended to Banjo.

### E.     The TRO was validly entered and FW will suffer irreparable harm absent the Court's enjoinment of the Arbitration.

#### i.     Legal Standard for Injunctive Relief in the Face of a Motion to Compel Arbitration

97.     "A party seeking a preliminary injunction bears the burden of showing: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) [that] the threatened injury outweighs the harm that the preliminary injunction may

cause the opposing party; and (4) [that] the injunction, if issued, will not adversely affect the public interest." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1255 (10th Cir. 2003) (citation omitted).

98.    The Tenth Circuit no longer applies a "modified test" for determining preliminary injunctive relief, but the court may nonetheless presume irreparable harm under the appropriate circumstances. *See, e.g. Dine Citizens Against Ruining our Environment v. Jewell*, 839 F.3d 1276 (10th Cir. 2016); *First West. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (describing appropriate circumstances for presuming irreparable harm). In the end, demonstration of irreparable harm is the "single most important prerequisite for obtaining a preliminary injunction…" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

99.    A preliminary injunction to enjoin arbitration proceedings will be granted if the moving party meets the requirements for preliminary injunctive relief. *See Martin/Martin v. Kling Stubbins, Inc*., 2019 WL 2357303, at *1, 2 (D. Colo. June 4, 2019) (entering injunction and enjoining arbitration); and *Ingram Micro Inc. v. Signeo Int'l, Ltd*., 2014 WL 3721197, at *1, (C.D. Ca. July 22, 2014) (same).

100.    The Li Defendants ask the Court to dissolve the presently existing TRO and deny FW's preliminary injunction claims on the assertion that FW cannot demonstrate a likelihood of success in staying the arbitration, and that FW cannot demonstrate irreparable harm as a result of having to litigate its claims via arbitration. *See Memorandum*, at 54-56. FW is requesting that the Court enjoin the Li Defendants from prosecuting the Arbitration, as their doing so would bring irreparable injury to FW by forcing FW to: (a) litigate in two forums; (b) indemnify Banjo; (c) face the significant possibility of conflicting rulings against it and Banjo in the Arbitration and other forums; and (d) suffer potential effects of collateral estoppel against FW, thereby causing

direct injury to its creditors, should any judgment be entered against Banjo in the Arbitration. As shown below, compelling FW to arbitrate its claims will essentially destroy/wipe out the company – precisely the result the Li Defendants are trying to obtain.

ii.    **FW has a substantial likelihood of success on the merits.**

101.    Although FW's Complaint includes a number of claims for relief, "it only needs to demonstrate likelihood of success on one relevant claim" to secure the entry of a preliminary injunction against the Li Defendants. *Martin/Martin*, 2019 WL 2357303, at *1, 2. *See also Roda Drilling Co. v. Siegal*, 2008 WL 4056229, at *1, 5 (N.D. Okla. Aug. 11, 2008) ("plaintiffs are not required to establish a likelihood of success on every one of their claims for a preliminary injunction to issue").

102.    FW can easily demonstrate that the circumstances here compel the conclusion that it will likely prevail against the Li Defendants on the issue of arbitrability. *See, e.g. MZM Constr. Co., Inc. v. N.J. Bldg. Laborers' Statewide Benefit Funds*, 2019 WL 3812889, at *1, (D. N.J. Aug. 14, 2019) (court is called upon to assess likelihood of success factor on a PI-arbitration motion only as "to the likelihood that the claims were arbitrable").

103.    The question of arbitrability is for the courts. As previously discussed, unless there is "clear and unmistakable evidence" that the parties agreed to arbitrate arbitrability, the question is to be decided by the Court, not the arbitrator. *Henry Schein*, 139 S.Ct. at 531; *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Undeniably, "courts (rather than arbitrators) must evaluate the threshold question of whether the parties consented to submit a particular dispute to arbitration." *Commc'n Workers of Am. v. Avaya, Inc.*, 693 F.3d 1295, 1300 (10th Cir. 2012). And where a court incorporates by reference an agreement to arbitrate, the terms of such incorporation "must be clear that the parties to the agreement had knowledge of and

assented to the incorporated terms" for an arbitration agreement to even be effective. *Martin/Martin*, 2019 WL 2357303, at *2.

104.    As demonstrated throughout this response, the claims asserted in the Adversary Proceeding are not subject to the arbitration agreement because the Adversary Proceeding states no claims arising from the FOA.  Further, even relying on the FOA's arbitration provision, the Li Defendants conveniently sidestep the FOA's mandatory and enforceable language that the agreement is extremely narrow in its application and does not apply once a bankruptcy is filed. The arbitration provision also mandates that suits for injunctive relief be submitted exclusively to state and federal courts in the State of Colorado and states that the parties explicitly waived contesting the jurisdiction "of the state and federal courts located in the State of Colorado…" *FOA*, at § 14.6.1 and § 14.6.2.

105.    The documents the Li Defendants proffer as evidence of FW's purported agreement to arbitrate ZL Investment's arbitration demand demonstrate no evidence of any agreement to arbitrate the claims filed by FW against multiple defendants in the Adversary Proceeding.  Further, FW's pre-petition agreement to arbitrate the limited claims filed in the arbitration demand is not enforceable here, given the vastly different nature of the multiple bankruptcy borne claims FW has filed in the Adversary Proceeding.  As Tenth Circuit precedent demands, unless Defendants can "clearly and unmistakably" agreed that FW agreed to arbitrate the bankruptcy claims in the Adversary Proceeding, Defendants' arguments that the arbitration agreement is so broad as to encompass FW's bankruptcy claims fall flat.  *Wakaya Perfection, LLC v. Youngevity International, Inc.*, 910 F.3d 1118, 1128 (10th Cir. 2018), *citing AT&T Techs., Inc.*, 475 U.S. at 649.  Since FW never agreed to arbitrate those claims, FW has met its burden of showing that it will prevail against the Defendants on the issue of arbitrability.

### iii.   The threat of irreparable injury to FW resulting from any continued prosecution of the Arbitration is real, present, and continuing.

106.    Irreparable injury "occurs if the district court cannot remedy the injury following a final determination on the merits." *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (quotations omitted).  "Forcing a party to submit to arbitration, when it did not agree to do so, constitutes *per se irreparable harm*." *Ingram Micro Inc.*, 2014 WL 3721197, at *5 (emphasis added); *see also Martin/Martin*, 2019 WL 2357303, at *2 ("courts have found that, where the dispute is not subject to arbitration, requiring a party to nonetheless arbitrate would cause that party irreparable harm"). In this instance, participation in a costly arbitration that would result in irreparable harm to FW creates the basis for a preliminary injunction, especially as the ability to conduct necessary discovery, the arbitrability of the relevant issues, and the enforceability of the arbitration agreement are all in serious doubt.  *See, e.g. Morgan Stanley & Co. Inc. v. Seghers*, 2010 WL 3952851, at *1, 6 (S.D.N.Y. Oct. 8, 2010).

107.    The District of Colorado in *Martin/Martin* enjoined an arbitration proceeding in favor of litigating in court on the basis that requiring the movant to arbitrate a non-arbitrable issue equaled irreparable harm.  *See*, *Martin/Martin*, 2019 WL 2357303, at *2.   Similarly, in *Morgan Stanley*, the plaintiff there argued that it would suffer irreparable injury were it to expend time and resources defending itself in an arbitration that the defendant sought to compel.  2010 WL 3952851, at *5-6.  The court held that the plaintiff satisfactorily demonstrated irreparable harm because there was no guarantee that it would recover the attorneys' fees it would have to spend in arbitration, even if it prevailed there.  *Id*. at *6.   Under the same rationale, the court in *Oeschger v. GeneThera, Inc*., 395 F.Supp.3d 345, 356-57 (D. Vt. 2019) enjoined all proceedings in a Colorado arbitration, because the movant in that case would have suffered irreparable financial harm "if he were improperly forced to litigate in an arbitral forum."  *Id*. at 357.

46

108.     The injury that FW would suffer in the matter at hand were it forced to arbitrate the claims in the Adversary Proceeding is precisely the same type of irreparable injury that the courts in *Martin/Martin, Morgan Stanley*, and *GeneThera* encountered and addressed by denying said requests.   As detailed above, the arbitration Defendants' press for Arbitration would cost an astonishing $1,750 per hour to deliberate.   Just litigating the motion for emergency injunction – with <u>one</u> emergency arbitrator and no hearing – cost over $22,000 in arbiter fees.   Litigating this entire matter with three arbitrators at $1,750 per hour, which will involve motion practice and a hearing, is certain to cost hundreds of thousands of dollars in arbitrator fees.   Further, FW fully expects to encounter discovery disputes due to the Li Defendants failing to respond to production, just as Frank and Serena Li are currently dodging service of process in the Adversary Proceeding.   The AAA has no enforcement mechanism to deal with such issues but will charge $1,750 per hour should any time be spent addressing them with the arbitrators.   The Li Defendants fully understand the cataclysmic damage engaging in an ineffective, expensive and unenforceable Arbitration would cause FW's reorganization efforts.

109.     Contrary to the Li Defendants' absurd arguments that FW's litigation of its bankruptcy claims will amount to "forum shopping," the Arbitration has never been —and can never be— the proper forum to litigate core bankruptcy matters as those espoused in FW's Adversary Proceeding.   FW's bankruptcy claims are not subject to the Arbitration and compelling it to arbitrate such claims in such a nonsensical fashion would wreak irreconcilable harm on FW, destroy its ability to restructure and directly injure its creditors.   Arbitration will also serve as an expensive and time-consuming distraction because as explained earlier, Banjo is the CEO of FW and is guiding its reorganization efforts.   The Li Defendants are fully aware of these facts and are seeking exact these results via their voluminous Arbitration Motion.

iv.   **The balance of equities favor staying the Arbitration in place of the Adversary Proceeding.**

110.   "When considering the balance of harms, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Dobson v. Sebelius*, 38 F.Supp.3d 1245, 1258 (D. Colo. 2014) (citation omitted). Still, the balance of harms tips in the movant's favor if the movant demonstrates that the injury to it will outweigh that to the opposing party. *See*, *Colo. Wild Inc. v. Forest Serv.*, 523 F.Supp.2d 1213, 1222 (D. Colo. 2007); and *Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1021 (10th Cir. 2018) (injunction proper where defendant's continued actions would undermine and destroy movant's business and contractual relationships with others).

111.   One core purpose of the Bankruptcy Code, which is to allow a debtor like FW an orderly, efficient, and effective reorganization, will be eviscerated as it relates to FW should it be compelled to arbitrate its current claims.  And if the Arbitration is enjoined only as to FW, the company will suffer significant, irreparable, and continuing harm given that it must indemnify Banjo and will be certain to encounter conflicting claims and legal decisions between the two forums.   The Li Defendants cite no legitimate legal basis for enjoining the Arbitration, a completely separate action filed in bankruptcy by FW.  Further, they cite no real or credible injury should the Court enjoin the Arbitration. In addition, it is the Li Defendants' tortious actions against FW that compelled FW to file for bankruptcy in the first place, because CIU's failure to ship products to FW has and continues to cost FW millions of dollars in undelivered orders and lost business relationships.

112.   As well, the Li Defendants have completely eroded FW's ability to generate new business.  FW lacks the inventory to entice any potential new retailers as a direct result of CIU's failure to ship.  In similar fashion, the Li Defendants have intentionally destroyed FW's carefully

cultivated decade-long relationship with multiple large American retailers, and a failure to enjoin the Arbitration will further cripple FW's ability to reorganize, given the incredible expense and time it would have to invest in the Arbitration whether on behalf of itself, or on CEO Banjo's behalf.  It is clear beyond cavil that should an injunction enjoining the Arbitration not issue, FW and consequently its creditors will suffer great harm, while there is no evidence that Defendants will suffer *any* harm by virtue of litigating against FW in the Adversary Proceeding.

**v.    Staying the Arbitration is not averse to public interest under any interpretation.**

113.    Finally, the party moving for an injunction "has the burden of demonstrating that the injunction, if issued, is not adverse to the public interest." *Fish*, 840 F.3d 710.  Where there is no indication that the proposed injunctive relief would be adverse to the public interest, it is properly entered. *Stratera, Inc. v. Henrickson*, 2009 WL 2169235, at *1, 4 (D. Colo. July 17, 2009).  Granting a stay of arbitration in favor of the public forum that a court process allows does not adversely affect the public interest. *See*, *e.g. Martin/Martin*, 2019 WL 2357303, at *3.

114.    There is absolutely no discernible public interest that the public will be adversely affected by the Court's stay of the Arbitration.   To the contrary, there is heightened public interest in FW's staying the Arbitration and conducting reorganization efforts, given that it for years employed over 80 Colorado citizens and enjoyed a strong relationship with retailers like Lowes, Home Depot and Walmart before having to abruptly lay off 85% of its workforce as a direct result of the Li Defendants' tortious actions.   Furthermore, the Li Defendants are in possession of millions of dollars of FW inventory, which CIU assembled using patented designs received from FW.  FW should be the party to reap the benefits of any sale of such inventory, but on reasonable information and belief, CIU is now selling said patented products to FW competitors, without license or permission.  Colorado has a significant public interest in the ability of a home-grown

49

company like FW to successfully administer its bankruptcy estate, reorganize its affairs, and take action to collect damages in order to enjoin infringing actions, pay off its debts and reorganize. Arbitration will severely cripple FW's ability to do all of these things. As such, it is directly in the public interest for the Court to continue the stay of the arbitration.

115.    For all of these reasons, FW meets its burden of showing (a) a substantial likelihood of prevailing on the merits, (b) irreparable harm unless the injunction is issued, (c) that the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party, and (d) that the injunction, if issued, will not adversely affect the public interest.  Accordingly, the Court should grant FW's motion for preliminary injunction.

## III.    <u>CONCLUSION</u>

116.    The FOA arbitration provision deals with disputes between the members of Frictionless, LLC and disputes over the interpretation, application and breach of the FOA.  FW is not a party to the FOA and none of the claims pled in the Adversary Proceeding are arbitrable under a plain reading of the provision.  The FOA even provides that the arbitration provision is not enforceable in bankruptcy.  Nevertheless, the Li Defendants believe that FW should be compelled to privately arbitrate all of its claims against them—even bankruptcy claims that did not exist when the arbitration was commenced—because FW consented to participate in the Arbitration pre-petition.

117.    The Li Defendants desire this result because it will be more expensive for FW, it will enable the disputes to be litigated outside of the watchful eyes of the Bankruptcy Court and creditors, and it will limit the relief available to FW, both procedurally and substantively.  Each of these goals directly conflict with the chapter 11 process.  The Li Defendants' tactics are part of a broader effort to destroy FW before any tribunal can adjudicate FW's claims and conclusively

establish the Li Defendants' bad acts.  The Li Defendants are trying to make this Court an instrument of their anticompetitive and destructive scheme and the Court should soundly reject such efforts.

118.    The Li Defendants cannot point to any legal or factual basis for compelling FW to arbitrate its claims.  Even if they could establish some basis, under the applicable tests, all factors weigh against compelling arbitration of any of the claims for relief.  The factor tests also weigh against relief from stay and in favor of enjoining the Li Defendants from pursuing the Arbitration against FW and against Dan Banjo. The Arbitration Motion should be denied and the Injunction Motion should be granted.

DATED this 22nd day of November, 2019.

Respectfully submitted,

WADSWORTH GARBER WARNER CONRARDY, P.C.

*/s/ David V. Wadsworth*
David V. Wadsworth, #32066
Aaron J. Conrardy, #40030
2580 West Main Street, Suite 200
Littleton, Colorado 80120
303-296-1999 / 303-296-7600 FAX
dwadsworth@wgwc-law.com
aconrardy@wgwc-legal.com

THOMAS P. HOWARD, LLC

*/s/Thomas P. Howard*
Thomas P. Howard, #31684
Olayinka L. Hamza, #44523
842 W. South Boulder Rd., Ste. 100
Louisville, CO  80027
303-665-9845 / 303-665-9847 FAX
thoward@thowardlaw.com
ohamza@thowardlaw.com

*Attorneys for Frictionless Word, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of November, 2019, true and correct copies of the foregoing **FRICTIONLESS WORLD, LLC'S (1) RESPONSE IN OPPOSITION TO LI DEFENDANTS' (A) MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW ARBITRATION TO PROCEED, (B) MOTION TO COMPEL THE DEBTOR TO ARBITRATE PURSUANT TO FEDERAL ARBITRATION ACT, AND (C) MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) OR STAY ADVERSARY PROCEEDING PENDING ARBITRATION AND (2) REPLY TO THE LI DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** was served via CM/ECF and email on the following:

Peter Cal
pcal@shermanhoward.com

Eric Johnson
ejohnson@shermanhoward.com

Brian Koosed
briankoosed@klgates.com

Robert T. Honeywell
Robert.Honeywell@klgates.com

Mingus (Serena) Li
limingsu@live.cn

Jun (Frank) Li

07frankli@163.com

Office of the U.S. Trustee
USTPRegion19.DV.ECF@usdoj.gov

Alan K. Motes
Alan.Motes@usdoj.gov

Kevin S. Neiman
kevin@ksnpc.com

Debra Piazza
dpiazza@montgomerylittle.com

Nathan G. Osborn
nosborn@montgomerylittle.com


*/s/ David V. Wadsworth*
WADSWORTH GARBER WARNER CONRARDY, P.C.