IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | Case No. 19-18459 MER |
| | ) | |
| Frictionless World, LLC | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| Frictionless World, LLC, | ) | |
| | ) | Adversary Proceeding No. 19-01282 MER |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Frictionless, LLC; Changzhou Inter Universal | ) | |
| Machine & Equipment Co., Ltd.; Li Zhixiang; | ) | |
| Changzhou Zhong Lian Investment Co., Ltd.; | ) | |
| Serena Li; and Frank Li, | ) | |
| | ) | |
| Defendants. | ) | |

**ARBITRATION PARTICIPANTS' CONSOLIDATED REPLY
MEMORANDUM IN FURTHER:**

**(A) SUPPORT OF THEIR MOTIONS TO COMPEL THE DEBTOR TO ARBITRATE
PURSUANT TO THE FEDERAL ARBITRATION ACT,
FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW ARBITRATION
TO PROCEED, AND TO DISMISS UNDER FED. R. CIV. P. 12(b)(1),
OR STAY, ADVERSARY PROCEEDING PENDING
ARBITRATION;**

**AND**

**(B) OPPOSITION TO THE DEBTOR'S MOTION FOR PRELIMINARY INJUNCTION
STAYING THE ARBITRATION IN FAVOR OF THE ADVERSARY PROCEEDING
AND EXTENDING THE AUTOMATIC STAY TO THE DEBTOR'S PRINCIPAL,
DANIEL BANJO**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT .............................................................................................................................6

I.    The Debtor Nowhere Disputes Its Multiple Agreements to Arbitrate; Its Arguments Linking Arbitrability to the LLC Agreement are Therefore Misplaced. ..........6

    A.    The Debtor's Submission Agreement Alone Reflects a Valid and Binding Agreement to Arbitrate the Parties' Disputes. ..........................................................7

    B.    The Tribunal's Procedural Order No. 2 Expressly Memorialized the Debtor's Agreement to Arbitrate All Disputes. ....................................................11

    C.    The Debtor's Conduct Throughout the Arbitration Manifested its Valid and Binding Agreement to Arbitrate the Parties' Disputes. ................................13

    D.    The Debtor's Argument that It is Not a Party to the LLC Agreement is an Irrelevant Distraction, and Its Other Arguments Based on the LLC Agreement Are Wrong. ..........................................................................................14

        1.    The Debtor Is Not a Party to the LLC Agreement, But It Agreed to Arbitrate Pursuant to the LLC Agreement's Arbitration Clause ... . ....15

        2.    The Debtor Misstates the Actual Text of the LLC Agreement's Broad Arbitration Provisions and Improperly Requests this Court to Decide Arbitrability, a Task Binding Precedent Reserves to the Tribunal. ..................................................................................................16

        3.    The Debtor's Reliance on the Injunctive Relief Provisions in Section 14.6.1 of the LLC Agreement is Another Irrelevant Distraction. ..................................................................................................18

        4.    The Debtor's Reliance on the Enforceability Representation and Warranty in Section 4.1(a) of the LLC Agreement as a Supposed "Bankruptcy Out" for Arbitration Makes No Sense. ..............................23

        5.    The Debtor's Claim that Estoppel Does Not Bind It to Arbitrate Under Section 14.6.1 of the LLC Agreement is Contradicted by the Debtor's Own Complaint and Opposition. ........................................24

II.    Allowing the Arbitration to Proceed, as Required by the FAA, Does Not Inherently Conflict with the Bankruptcy Code's Text or its Underlying Purpose. ...........28

    A.    In *Touchstone,* Judge McNamara Accurately Delineated the Applicable Law Requiring Arbitration in this Case. ..............................................................29

B. The Debtor Concedes its Pre-Petition State Law Claims are Non-Core Claims; Those Claims Must be Arbitrated...............................................32

C. The Debtor's Purported Bankruptcy Claims Are Merely Procedurally Core and Their Substance is Non-Core; Thus, they are Arbitrable and Should Be Resolved in the Arbitration. ............................................................34

 1. Courts Have Repeatedly Compelled Arbitration of Each of the Debtor's Purported Bankruptcy Claims................................... 35

 2. The Debtor's Claims 1 and 2—Seeking Turnover of Alleged Estate Property—Arise out of the LLC Agreement and Must be Arbitrated. ............................................................................... 36

 3. The Debtor's Claims 5 and 6 to Disallow or Subordinate Frictionless, LLC's Creditor Claim Depend on the Outcome of the Debtor's Pre-Petition State Law Claims that Must be Arbitrated. ............................................................................... 39

 4. The Debtor's Claims 7 and 8 for the Avoidance of Allegedly Constructive Fraudulent Transfers Also Depend on the Debtor's Pre-Petition State Law Claims that Must be Arbitrated........................... 43

III. Allowing the Arbitration to Proceed Will Be More Efficient and Cost-Effective for the Debtor and Its Creditors, Facilitating the Prompt Administration of the Debtor's Estate.....................................................................................................45

IV. The Automatic Stay Must Be Lifted to Allow the Arbitration to Proceed. ......................49

V. Because the Debtor Must be Compelled to Arbitrate, there is No Legal or Logical Basis for Extending the Automatic Stay to Banjo and Giving a Non-Debtor the Protection to Which the Debtor Isn't Entitled. ................................................................50

VI. Because the Court Must Compel the Parties to Arbitrate their Dispute, There is No Basis for Enjoining the Arbitration.......................................................................54

CONCLUSION......................................................................................................................58

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*A.H. Robins Co., Inc. v. Piccinin*,
  788 F.2d 994 (4th Cir.1986) ................................................................. 49–50, 52

*Abry Partners V, L.P., v. F & W Acquisition LLC*,
  891 A.2d 1032 (Del. Ch. 2006) ................................................................. 23

*Awuah v. Coverall N. Am., Inc.*,
  554 F.3d 7 (1st Cir. 2009) ........................................................................ 21

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) ................................................................. 21

*Broadfoot v. United Furniture Indus., Inc. (In re Nationwide Warehouse & Storage, LLC)*,
  Bankruptcy No. 01–86600, 2005 WL 6487199 (Bankr. N.D. Ga. July 14, 2005) ................ 10

*Chelsea Family Pharmacy, PLLC v. Medco Health Sols.*,
  567 F.3d 1191 (10th Cir. 2009) ............................................................... 18

*Cibro Petroleum Prods., Inc. v. City of Albany (In re Winimo Realty Corp.)*,
  270 B.R. 108 (S.D.N.Y. 2002) .................................................... 34, 37, 43

*Colo. Wild Inc. v. Forest Serv.*,
  523 F.Supp.2d 1213 (D. Colo. 2007) ..................................................... 55

*Connolly v. City of Houston (In re Western Integrated Networks, LLC)*,
  329 B.R. 334 (Bankr. D. Colo. 2005) .............................................. 20, 36

*Contec Corp. v. Remote Sol.*,
  398 F.3d 205 (2d Cir. 2005) ..................................................................... 21

*Dominion Video Satellite v. Echostar Satellite Corp.*,
  356 F.3d 1256 (10th Cir. 2004) ............................................................... 54

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ............................................................................. 27

*Gilmer v. Interstate/Johnson Lane Corp.*,
  500 U.S. 20 (1991) ........................................................................................ 47

*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 (1989) ........................................................................................ 42

*Gripe v. City of Enid, Okla.*,
  312 F.3d 1184 (10th Cir. 2002) ..................................................................... 9

*Harvey v. Darden Rest., Inc.*,
  No. 1:14CV258, 2015 WL 1474946, (M.D.N.C. Mar. 31, 2015) ......................... 10

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  885 F.2d 1149 (3d Cir. 1989) ........................................................................ 29

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,
  139 S.Ct. 524 (2019) ................................................................................. 7, 33

*Husky Ventures, Inc. v. B55 Invs., Ltd.*,
  911 F.3d 1000 (10th Cir. 2018) ..................................................................... 56

*In re Argon Credit, LLC*,
  No. 16-39654, 2018 WL 4562542 (Bankr. N.D. Ill. Sept. 21, 2018) ................. 48

*In re Andrew Velez Constr.*,
  373 B.R. 262 (Bankr. S.D.N.Y. 2007) ............................................................. 36

*In re Arbitration between Halcot Navigation Ltd. P'ship & Stolt-Nielsen Transp. Grp.*,
  491 F. Supp. 2d 413 (S.D.N.Y. 2007) ............................................................. 14

*In re Barker*,
  510 B.R. 771 (Bankr. W.D.N.C. 2014) ....................................................... 35, 39

*In re BFW Liquidation, LLC*,
  459 B.R. 757 (Bankr. N.D. Ala. 2011) ............................................................ 41

*In re Bidermann Indus. U.S.A., Inc.*,
  200 B.R. 779 (Bankr. S.D.N.Y. 1996) ............................................................. 50

*In re Cardali*,
   Bankruptcy No. 10–11185 (SHL), 2010 WL 4791801 (Bankr. S.D.N.Y. Nov. 18,
   2010) ........................................................................................................... *passim*

*In re Cotton Yarn Antitrust Litig.*,
   505 F.3d 274 (4th Cir. 2007) ............................................................................. 55

*In re Craig*,
   545 B.R. 47 (D. Colo. 2015).............................................................................. 43

*In re D.E. Frey Grp., Inc.*,
   387 B.R. 799 (D. Colo. 2008)............................................................................ 41

*In re Elec. Mach. Enters., Inc.*,
   479 F.3d 791 (11th Cir. 2007) ....................................................................... 28–29

*In re EPD Inv. Co., LLC*,
   No. CV 13-08768 SJO, 2014 WL 12597148 (C.D. Cal. Aug. 29, 2014), *aff'd,* 821
   F.3d 1146 (9th Cir. 2016) ................................................................................. 40

*In re Gandy*,
   299 F.3d 489 (5th Cir. 2002) ............................................................................. 29

*In re Hagerstown Fiber Ltd. P'ship*,
   277 B.R. 181 (Bankr. S.D.N.Y. 2002) ...................................................... 30, 43–44

*In re Harrelson*,
   537 B.R. 16 (Bankr. M.D. Ala. 2015) ................................................ 31, 34–35, 43

*In re I.E. Liquidation, Inc.*,
   Bankruptcy No. 06–62179, 2009 WL 1586706 (Bankr. N.D. Ohio Mar. 18, 2009) ............ 38

*In re Lehman Bros., Holdings, Inc.*,
   452 B.R. 31 (Bankr. S.D.N.Y. 2011) ................................................................. 22

*In re Nat'l Gypsum Co.*,
   118 F.3d 1056 (5th Cir. 1997) ..................................................................... 31, 34

*In re N. Star Contracting Corp.*,
   125 B.R. 368 (S.D.N.Y. 1991) .................................................................... 49, 52

*In re QA3 Fin. Corp.*,
    466 B.R. 142 (Bankr. D. Neb. 2012) ................................................................. 51

*In re Rarities Grp., Inc.*,
    434 B.R. 1 (D. Mass. 2010) ........................................................... 34–35, 39–40

*In re Singer Co. N.V.*,
    No. 00 CIV. 6793 LTS, 2001 WL 984678 (S.D.N.Y. Aug. 27, 2001) ........................... 32, 37

*In re S.W. Bach & Co.*,
    425 B.R. 78 (Bankr. S.D.N.Y. 2010) ................................................................. 38

*In re Thorpe Insulation Co.*,
    671 F.3d 1011 (9th Cir. 2012) ....................................................................... 29

*In re Tomberlin*,
    Case No. 16–10168–DHW, 2017 WL 410337 (Bankr. M.D. Ala. Jan. 30, 2017) ......... *passim*

*In re Touchstone Home Health LLC*,
    572 B.R. 255 (Bankr. D. Colo. 2017) ........................................................... *passim*

*In re Transp. Assocs.., Inc.*,
    263 B.R. 531 (Bankr. W.D. Ky. 2001) ......................................................... 34, 39–40, 55

*In re Trevino*,
    599 B.R. 526 (Bankr. S.D. Tex. 2019) ............................................................. 34

*In re U.S. Lines, Inc.*,
    197 F.3d 631 (2d Cir. 1999)........................................................................ 37

*Let's Go Aero, Inc. v. Cequent Performance Prods., Inc.*,
    78 F. Supp. 3d. 1363 (D. Colo. 2015)............................................................... 17

*Martin/Martin, Inc. v. Kling Stubbins, Inc.*,
    No. 19-cv-01233-RM-KLM, 2019 WL 2357303 (D. Colo. June 4, 2019)................... 54, 57

*Mayo v. Dean Witter Reynolds, Inc.*,
    258 F. Supp. 2d 1097 (N.D. Cal. 2003) ............................................................. 10

*Mazel v. Lovelace Health Sys., Inc.*, (*In re Infinity Home Health Care, LLC*),
    Case No. 16-10062-j7, 2018 WL 5310659 (Bankr. D.N.M. Oct. 25, 2018) .................. 20, 36

*MBNA Am. Bank, N.A. v. Hill*,
    436 F.3d 104 (2d Cir. 2006) ........................................................................................ 29, 48

*Moses v. Cashcall, Inc.*,
    781 F.3d 63 (4th Cir. 2015) ......................................................................................... 29, 32

*MZM Constr. Co., Inc. v. N.J. Bldg. Laborers' Statewide Benefit Funds*,
    Civ. No. 18-16328-KM-MAH, 2019 WL 3812889 (D. N.J. Aug. 14, 2019), *appeal
    filed*, Docket No. 19-3102 (Sept. 18, 2019) ................................................................ 53–54

*Newmont U.S.A. Ltd. v. Ins. Co. of N. Am.*,
    615 F.3d 1268 (10th Cir. 2010) ........................................................................................ 17

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ............................................................................................................ 44

*P&P Indus., Inc. v. Sutter Corp.*,
    179 F.3d 861 (10th Cir. 1999) .......................................................................................... 17

*Robert W. Thomas & Anne McDonald Thomas Revocable Tr. v. Inland Pac. Colo.*, LLC,
    11-CV-03333-WYD-KLM, 2013 WL 708493 (D. Colo. Feb. 26, 2013) ........................... 49

*Santich v. VCG Holding Corp.*,
    443 P.3d 62 (Colo. 2019) .................................................................................................. 13

*St. Charles v. Sherman & Howard L.L.C.*,
    No. 14-CV-03416-RM-CBS, 2015 WL 1887758 (D. Colo. Apr. 24, 2015) ........................ 48

*Stern v. Marshall*,
    564 U.S. 462 (2011) .......................................................................................................... 44

*Stone v Theatrical Inv. Corp.*,
    64 F.Supp.3d 527 (S.D.N.Y. 2014) .................................................................................... 20

*Timegate Studios, Inc. v. Southpeak Interactive LLC*,
    713 F.3d 797 (5th Cir. 2013) ............................................................................................ 20

*Traderight Sec., Inc. v. Kirschman*,
   No. 10 C 2042, 2011 WL 614090 (N.D. Ill. Feb. 15, 2011) .................................................. 11

*Utah Licensed Beverage Ass'n v. Leavitt*,
   256 F.3d 1061 (10th Cir. 2001) ........................................................................................... 52

*Watkins v. Duke Med. Ctr.*,
   No. 1:13CV1007, 2014 WL 4442936 (M.D.N.C. Sept. 9, 2014), *aff'd,* 592 F. App'x
   226 (4th Cir. 2015)................................................................................................................ 14

*Waveland Capital Partners, LLC v. Tommerup*,
   840 F. Supp. 2d 1243 (D. Mont. 2012) ................................................................................ 10

**Statutes**

Fed. R. Bankr. P. 9019(c)  ...................................................................................................... 35, 41

1.      The Arbitration Participants[1] respectfully submit this consolidated reply memorandum in further:  (a) support of their motion, under the FAA, to compel the Debtor to honor its arbitration agreement in the pending Arbitration; (b) support of their motion, pursuant to 11 U.S.C. §§ 105 and 362(d)(1), for relief from the Automatic Stay to allow the Arbitration to proceed; (c) support of their motion, pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(1), to dismiss this Adversary Proceeding or, in the alternative, stay it pending the Arbitration's outcome; and (d) opposition to the Debtor's Injunction Motion extending the scope of the Automatic Stay to protect the Debtor's CEO and sole owner, Daniel Banjo.

**PRELIMINARY STATEMENT**

2.      In their Opening Brief, the Arbitration Participants showed that the legally dispositive question here is whether the Parties have a binding agreement to arbitrate their disputes. The Opening Brief and related exhibits demonstrate that the Parties have multiple, express, written, and binding agreements to arbitrate the disputes raised in this Adversary Proceeding.

3.      In its Opposition, the Debtor contradicts its earlier positions in this case that have now become inconvenient, and simply ignores its many agreements to arbitrate.  For example, in its Injunction Motion, the Debtor argued that it "was not a party to an arbitration agreement with the" Arbitration Participants [Docket No. 4, at ¶ 12] (the "Injunction Motion"), but now the Debtor concedes that it does, in fact, have a "pre-petition agreement to arbitrate" with them.  *See* Debtor's Opposition Brief [Docket No. 26] (the "Opposition," or "Opp."), ¶¶ 23, 33, 74(a), 105.  But in a feat of twisted logic, the Debtor simultaneously explains that it "agreed to submit claims to

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Arbitration Participants' Consolidated Memorandum of Law, dated November 1, 2019.  *See* Adversary Proceeding Docket No. 22 (the "Opening Brief").

arbitration pre-petition, but it is not a party to an arbitration agreement."  Opp., ¶ 74(a).  The Arbitration Participants cannot fathom a guess as to what that means.

4.       As another example, the Debtor now asserts that there is but "slight factual overlap between the claims for relief pled in the Adversary Proceeding and the counterclaims [that the Debtor] asserted [] in the Arbitration."  *See* Opp., ¶¶ 11, 31.  The Debtor may have forgotten that it argued only a month ago in its Injunction Motion that:

> The facts and circumstances giving rise to [the Debtor]'s claims in this [A]dversary [P]roceeding are **nearly identical** to the counterclaims [the Debtor] and Banjo **would have asserted in the Arbitration.**
>
> [T]he facts and circumstances of this [A]dversary [P]roceeding and the Arbitration [] are **nearly identical**.
>
> Banjo and FW both have claims against Defendants arising out of **the same facts and circumstances** . . . .

Injunction Motion, ¶¶ 14, 28, 34(e), respectively (emphasis added); *compare also* Opp., ¶ 13 ("[T]here is a **significant overlap** between the claims being raised by [the Debtor] in the Adversary Proceeding and the claims that would be raised by Banjo in the [A]rbitration.") (emphasis added).

5.       The Debtor's other failed strategy—that of ignoring or minimizing damning facts and conduct—is highlighted in its responses to the evidence showing the Debtor repeatedly and broadly agreed to arbitrate its disputes with the Arbitration Participants.  For example:

> a.       <u>Opening Brief, ¶ 14</u>:  In its Arbitration Counterclaims filed in May 2019, the Debtor expressly offered to arbitrate the Parties' disputes, stating that it "**will agree to have this heard [] by the AAA pursuant to this [LLC] Agreement if [CIU] also agrees to have the claims against it heard under this [LLC] Agreement.**"  Koosed Dec., Ex. 3, ¶ 17 (emphasis added).

The Debtor's Opposition:  The Debtor nowhere disputes that it made this offer to CIU.  Instead, it claims that this "consent" was just a "limited agreement to have the [Arbitration Demand filed by Z.L. Investment] heard."  *See* Opp., ¶¶ 10, 29.  But this ignores that the Debtor's "consent" to the Arbitration was made ***offensively***, in connection with the Debtor asserting ***its own Arbitration Counterclaims***, including against CIU which, like the Debtor, had not previously agreed to arbitrate.[2]

b.   Opening Brief, ¶ 15:  In writing on May 13, 2019, CIU "accepted [the Debtor]'s proposal that **CIU and [the Debtor] jointly consent to arbitration before the AAA.**"  *See* Koosed Dec., Ex. 7 (emphasis added).

The Debtor's Opposition:  The Debtor nowhere acknowledges that CIU accepted the Debtor's offer to arbitrate.

c.   Opening Brief, ¶¶ 17-19:  The Debtor sought injunctive relief against the Arbitration Participants ***in the Arbitration*** in June 2019.  *See* Koosed Dec., Ex. 9.  In connection with the Debtor's Emergency Arbitration Motion, the Emergency Arbitrator appointed to hear it ordered that "[a]ll [P]arties shall file a submission agreement **submitting all claims and disputes to arbitration**."  *See id.* at Ex. 12, p. 1 (emphasis added).

The Debtor's Opposition:  The Debtor completely ignores the Emergency Arbitrator's Procedural Order.

d.   Opening Brief, ¶ 20:  As required by the Emergency Arbitrator's Procedural Order, Banjo and the Debtor filed their Submission Agreement on June 24, 2019.  In that Submission Agreement, the Debtor and Banjo:  (i) agreed to "binding arbitration"; and (ii) chose the AAA Commercial Arbitration Rules as the "Rules Selected" for the Arbitration.  *See* Koosed Dec., Ex. 13.

---

[2]      As demonstrated in the Opening Brief, the Debtor based its Arbitration Counterclaims on the same events as its claims in the Adversary Proceeding.  *See* Opening Brief, ¶¶ 64–72.

<u>The Debtor's Opposition:</u>  The Debtor does not dispute that it signed the Submission Agreement.  Instead, it discounts the Submission Agreement as an "AAA dispute resolution form that was not countersigned by the [Arbitration Participants]."  Opp., ¶ 10.  But the Debtor ignores that each of the Arbitration Participants filed their ***own*** Submission Agreements as counterparts to the Debtor's and Banjo's (*i.e.*, all Parties signed and submitted the same form, just through different counterparts), and nowhere acknowledges its express choice of the AAA's Commercial Arbitration Rules as the "Selected Rules" in the Arbitration.  Koosed Dec., Ex. 1, and Ex. C-1 thereto, p. 23.

e.  <u>Opening Brief, ¶ 24</u>:  When she denied the Debtor's Emergency Arbitration Motion, the Emergency Arbitrator expressly found "[a]ll parties filed submission agreements with the [AAA] submitting this dispute to arbitration."  *See* Koosed Dec., Ex. 17, ¶ 7.

<u>The Debtor's Opposition:</u>  The Debtor completely ignores the Emergency Arbitrator's finding.

f.  <u>Opening Brief, ¶¶ 26-28</u>:  In early September 2019, less than one month before the Petition Date and after the Debtor had retained bankruptcy counsel, the Debtor and Banjo confirmed to the Tribunal, through counsel, that they had agreed to arbitrate their disputes with the Arbitration Participants.  The Tribunal then memorialized this in its Procedural Order No. 2, stating that "**[t]he Parties stated no challenge and no intent to challenge the formation, existence, or validity of the arbitration agreement**."  *See* Koosed Dec., Ex. 21 (emphasis added).

<u>The Debtor's Opposition:</u>  The Debtor completely ignores its agreement and admissions with respect to the Tribunal and Procedural Order No. 2.

6.     The Debtor's Opposition doesn't identify a single fact, or even an argument—nothing but silence—to rebut the Debtor's repeated express agreements to arbitrate the Parties' disputes in the Arbitration.  The undisputed evidence shows that, at every step of the way from May 8, 2019 until the Petition Date, the Debtor affirmatively agreed—several times in writing, and consistently by its actions—to arbitrate its disputes with the Arbitration Participants.

7.     Beyond ignoring the facts—and without any actual evidence to rely upon—the Debtor's most frequent tactic in its Opposition is that of the "strawman"; the Debtor spends twelve pages in the Opposition protesting the arbitration provisions in the LLC Agreement, while ignoring its many *other* agreements to arbitrate and its nearly six-month long participation in the Arbitration.

8.     In the process, the Debtor repeatedly ignores and misstates the law.  Most notably, the Debtor asks this Court to contradict the virtually unanimous consensus, including among the Circuit Courts, that non-core claims must be arbitrated because arbitrating them does not conflict with the Bankruptcy Code.  As every one of those Courts has found, there is no discretion on this point.  Similarly, arbitration is mandated where a claim is labeled core but also does not present an inherent conflict with the Bankruptcy Code.  Further, in its relentless pursuit of forum-shopping and misguided attempt to protect Banjo, the Debtor improperly attacks Judge McNamara's cogent and compelling analysis on these issues in *Touchstone*.

9.     The Debtor's evasion and strawmen can't change its past conduct and agreements, and the history of the Parties' dispute.  Nor do they permit any result beyond the only one mandated by the FAA and controlling precedent:  the Debtor must be compelled to arbitrate in accordance with its many agreements, the Automatic Stay must be lifted, and the Arbitration should be allowed to proceed swiftly, just as it was right up until the Petition Date.

## ARGUMENT

I.      **The Debtor Nowhere Disputes Its Multiple Agreements to Arbitrate; Its Arguments Linking Arbitrability to the LLC Agreement are Therefore Misplaced.**

10.      In their Opening Brief, the Arbitration Participants identified four independent bases showing that the Debtor had agreed to arbitrate its disputes with them:

- The Debtor's written offer to arbitrate, made to CIU as part of the Debtor's Arbitration Counterclaims, which CIU subsequently accepted in writing. *See* Opening Brief, ¶¶ 14–15.

- The Debtor's written Submission Agreement, which it made pursuant to the Emergency Arbitrator's Procedural Order as a condition to having its Emergency Arbitration Motion heard by the AAA. *See* Opening Brief, ¶¶ 19–20, 91.

- The Debtor's conduct, which consisted of nearly six months of continuous participation in the Arbitration without objection, including the Debtor's direct representations to the Arbitration Tribunal, through counsel, that: (i) it had agreed to arbitrate; (ii) it had no objection to arbitrating the Parties' disputes; and (iii) all claims and all necessary parties had been joined in the Arbitration, all of which was memorialized by the Tribunal in Procedural Order No. 2. *See* Opening Brief, ¶¶ 87–93.

- Estoppel, because the Debtor's Complaint in this Adversary Proceeding seeks to enforce certain rights the Debtor claims to have under the LLC Agreement, while simultaneously disavowing the obligation to arbitrate set forth in Section 14.6.1 of that LLC Agreement. *See* Opening Brief, ¶¶ 102–06.

11.      In response, the Debtor largely ignores the second ground (its Submission Agreement) and completely ignores the third ground (Procedural Order No. 2 and its repeated conduct throughout the Arbitration). As set forth below, each of these grounds is sufficient, standing alone, to find that the Parties have a valid agreement to arbitrate here; taken together, that conclusion is not reasonably subject to dispute. *See infra*, ¶¶ 10–58.

- 6 -

12.     Instead, in the Opposition, the Debtor tries to restrict the Court's vision to the LLC Agreement.  Specifically, the Debtor claims that:  (a) it is not a party to the LLC Agreement and thus cannot be forced to arbitrate pursuant to that Agreement's arbitration clause (*see* Opp., ¶¶ 33-36); (b) Section 4.1(a) of the LLC Agreement "renders the [LLC Agreement's] arbitration provision unenforceable" (*see* Opp., ¶¶ 37-42, 78); (c) the LLC Agreement's arbitration clause does not apply to requests for injunctive relief (*see* Opp., ¶¶ 43-46); and (d) the LLC Agreement's arbitration clause is a "narrow" one that does not encompass the Debtor's claims in this Adversary Proceeding (*see* Opp., ¶¶ 47-50).  According to the Debtor, the Bankruptcy Court must decide issues of arbitrability and its claims in the Adversary Proceeding aren't subject to arbitration, notwithstanding the Supreme Court's recent decision in *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S.Ct. 524 (2019).  *See* Opp., ¶¶ 51-58.

13.     Each of the Debtor's arguments is wrong on the facts, the law, or both.  Further, the Debtor's arguments are red herrings given the undisputed facts concerning the Debtor's many express agreements to arbitrate and its conduct in the Arbitration.

A.     The Debtor's Submission Agreement Alone Reflects a Valid and Binding Agreement to Arbitrate the Parties' Disputes.

14.     Initially, the Debtor does not dispute that it signed and filed the Submission Agreement in the Arbitration.  *See* Opp., ¶ 10; *see also* Koosed Dec., Ex. 13.  This is what that Submission Agreement says, with highlights in yellow for emphasis:



**International Centre
for Dispute Resolution**

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
*The International Division of the American Arbitration Association*

**SUBMISSION TO DISPUTE RESOLUTION**

The named parties hereby submit the following dispute for resolution, under the rules of the International Centre for Dispute Resolution.

**Rules Selected:**
☐ International Dispute Resolution Procedures
☒ Commercial Arbitration Rules and Mediation Procedures (AAA)
☐ Procedures for Cases under the UNCITRAL Arbitration Rules
☐ Other (please specify) _____

**Procedure Selected:**
☒ Binding Arbitration         ☐ Early Neutral Evaluation
☐ Fact-Finding              ☐ Mediation
☐ Mini-Trial                ☐ Other (please specify) _____

**Nature of Dispute (attach additional sheets if necessary):** Breach of contract; Breach of fiduciary duty; Breach of LLC Agreement, among others
Claimant and its affiliates' wanton breach of the multiple agreements with Respondents continues to cause millions of dollars in damages to Respondents.

**Amount of Monetary Claim or Nature of Non-Monetary Claim:** Over $5 million and still to be determined

**Type of Business: Claimant** _____    **Respondent** Manufacture and Distribution of farm and agricultural equipment.

**Place of Hearing:** Telephonic _____

We agree that, if arbitration is selected, we will abide by and perform any award rendered hereunder and that a judgment may be entered on the award.

*To be completed and signed by all parties*

| | |
|---|---|
| DANIEL BANJO, individually and derivatively on behalf of Frictionless, LLC | **FRICTIONLESS WORLD, LLC** |
| Name of Party | Name of Party |
| 1100 West 120th Ave, Suite #600 | 1100 West 120th Ave, Suite #600 |
| Address | Address |
| Westminster, CO 80234 | Westminster, CO 80234 |
| City, State/Province, Country, Post Code | City, State/Province, Country, Post Code |
| 720-287-5182 | 720-287-5182 |
| Telephone            Facsimile | Telephone            Facsimile |
| Thomas P. Howard | Thomas P. Howard |
| Name of Party's Attorney or Representative | Name of Party's Attorney or Representative |
| Thomas P. Howard LLC | Thomas P. Howard LLC |
| Name of Firm (if applicable) | Name of Firm (if applicable) |
| 842 W. South Boulder Rd, Ste 100 | 842 W. South Boulder Rd, Ste 100 |
| Address | Address |
| Louisville, CO 80027 | Louisville, CO 80027 |
| City, State/Province, Country, Post Code | City, State/Province, Country, Post Code |
| 303-665-9845          303-665-9847 | 303-665-9845          303-665-9847 |
| Telephone            Facsimile | Telephone            Facsimile |
| Signed† (may be signed by a representative) | Signed† (may be signed by a representative) |
| Attorney | Attorney |
| Title                     Date | Title                     Date |

† *Signatures of all parties are required.*

*Please file two signed copies and the non-refundable filing fee with the ICDR at Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043 email: casefiling@adr.org.*

*For additional information, please contact us at 1.888.855.9575 or +1 212 484 4181 or visit our website at www.icdr.org.*

15.     As its text makes clear, the Submission Agreement is just that:  an agreement by "[t]he named parties"—the Debtor and Banjo—to "submit the following dispute for resolution." *See* Koosed Dec., Ex. 13.  In the Submission Agreement, the Debtor describes the "Nature of Dispute" very broadly as follows:  "Breach of contract. Breach of fiduciary duty. Breach of LLC Agreement, **among others**."  *Id.* (emphasis added).  The Submission Agreement further reflects that the "Procedure Selected" by the Debtor and Banjo was "binding arbitration" and that the "Rules Selected" by them were the AAA's "Commercial Arbitration Rules."  *See id.*

16.     The Emergency Arbitrator's Order on this point is crystal-clear:  the first thing she required "[a]ll [P]arties" to do in connection with the Debtor's Emergency Motion was to "file a submission agreement submitting all claims and disputes to arbitration."  *See id.* at Ex. 12, p. 1.

17.     The Debtor, through its counsel, timely complied with that Order, and thereby agreed to "submit[] all claims and disputes to arbitration."[3]  Indeed, the order denying the Debtor's Emergency Arbitration Motion states in pertinent part:

> [O]n June 24, 2019, **all parties filed submission agreements with the [AAA] submitting this dispute to arbitration.**

*See* Koosed Dec., Ex. 17, ¶ 7 (emphasis added).

---

[3]     The Debtor is bound by the conduct of its Arbitration counsel (Mr. Howard, the Debtor's same special counsel as in this Adversary Proceeding) as a matter of law:

> Those who act through agents are customarily bound by their agents' mistakes.  **It is no different when the agent is an attorney. When an attorney drafting a contract omits an important clause, the client who signs the contract is bound.**  When a trial attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences.  (It should be noted, however, that the mistreated client is not totally without a remedy.  There may be a meritorious malpractice claim against the attorney.)

*Gripe v. City of Enid, Okla.*, 312 F.3d 1184, 1189 (10th Cir. 2002) (emphasis added).

18.     The Debtor never objected to the Emergency Arbitrator's findings confirming its agreement to arbitrate.  Rather, the Debtor proceeded full-speed ahead in the Arbitration, until it filed its bankruptcy petition and this Adversary Proceeding.

19.     Without any countervailing evidence, the Debtor attempts to downplay its Submission Agreement as a "form that was not countersigned by the [Arbitration Participants]." Opp., ¶ 10.  This argument fails on both the facts and the law.

20.     On the facts, the Arbitration Participants did not "countersign[]" the Debtor's Submission Agreement because each of the Arbitration Participants signed and filed *their own* counterpart Submission Agreements with the AAA.  *See* Koosed Dec., Ex. 24.  The Debtor knows this because:  (a) its counsel was copied on the email in which the Arbitration Participants filed their Submission Agreements; and (b) those Agreements were included as part of the Arbitration Participants' current motions.  *See id.*  The Debtor apparently hopes that, by ignoring that the Submission Agreements were signed via counterparts, the Court will too.[4]

21.     On the law, courts nationwide have repeatedly held that "form" submission agreements like the Debtor's Submission Agreement are valid and binding, and require a party to arbitrate.  *See, e.g., Waveland Capital Partners, LLC v. Tommerup*, 840 F. Supp. 2d 1243, 1246 & n.1 (D. Mont. 2012) (finding form FINRA Submission Agreement, which parties must sign at the outset of a FINRA arbitration, was a binding arbitration agreement); *Mayo v. Dean Witter Reynolds, Inc.*, 258 F. Supp. 2d 1097, 1105 (N.D. Cal. 2003) ("An executed [NYSE Uniform Submission Agreement] is a valid, binding agreement."); *Harvey v. Darden Rest., Inc.*, No.

---

[4]     It's poor form, to say the least, to try to pull the wool over the eyes of the Court.  *See generally Broadfoot v. United Furniture Indus., Inc. (In re Nationwide Warehouse & Storage, LLC),* Bankruptcy No. 01–86600, 2005 WL 6487199, at *14 (Bankr. N.D. Ga. July 14, 2005) ("The game of 'hiding the ball' or 'catch me if you can' cannot be played with the courts.").

1:14CV258, 2015 WL 1474946, at *2–3 (M.D.N.C. Mar. 31, 2015) (finding that signing a Dispute

Resolution Process acknowledgement form was valid evidence of agreement to arbitrate);

*Traderight Sec., Inc. v. Kirschman*, No. 10 C 2042, 2011 WL 614090, at *3 (N.D. Ill. Feb. 15,

2011) (compelling party to participate in a FINRA arbitration because it "explicitly agreed to

arbitrate those claims by executing the [FINRA Uniform Submission Agreements]").

22.    The Debtor's June 24, 2019 Submission Agreement, in and of itself, is a valid and

binding agreement to arbitrate the Parties' disputes.  For this reason alone, the Debtor's Opposition

fails.[5]

B.    The Tribunal's Procedural Order No. 2 Expressly Memorialized the Debtor's Agreement to Arbitrate All Disputes.

23.    Lost in the sound and fury of the Debtor's Opposition is its silence about the

Arbitration Tribunal's Procedural Order No. 2, dated **September 9, 2019**—entered three weeks

before the Debtor's Chapter 11 filing on September 30.  That Order memorialized in old-fashioned

---

[5]    The Debtor's contention—that, "at the time [it] agreed to arbitrate pursuant to the AAA rules it necessarily only agreed to arbitrate the issues it then believed existed," Opp. at ¶ 34— misses the mark.  When it signed its Submission Agreement on June 24, 2019, the Debtor had ceased receiving shipments from CIU and was therefore aware of all of the following actual or potential claims it now asserts in this Adversary Proceeding, among others:  (a) all of its Pre-Petition State Law Claims asserting various torts and breaches of contract, many of which themselves formed the underlying legal and factual bases for the Debtor's Emergency Arbitration Motion that led the Debtor to sign the Submission Agreement; (b) whether Banjo was "fraudulently induced" in the Spring of 2019 into making the Transfers and incurring the Obligation that form the basis for the Debtor's current constructive fraudulent transfer claims; and (c) whether Arbitration Participants Frictionless, LLC and CIU had a right to use the Debtor's intellectual property under the LLC Agreement.

At the time it signed the Submission Agreement, then, the Debtor knew (or should have known) that the Parties' Arbitration was intended to resolve all of these issues.  The Debtor's subsequent change of heart on its preferred venue for resolving the Parties' disputes cannot alter or revoke its binding agreement to resolve those disputes in the Arbitration.

Further, the Debtor again agreed to arbitrate all disputes with the Arbitration Participants in September 2019, after it had already retained bankruptcy counsel.  *See infra,* ¶¶ 23–25.

hard copy the Debtor's explicit agreements to arbitrate and its representations to the Tribunal that all of its claims, and all necessary parties to those claims, were joined in the Arbitration. *See* Koosed Dec., Ex. 21.

24.     The key provisions of Procedural Order No. 2 were as follows:

> *The Tribunal hereby confirms the agreements of the Parties at the preliminary hearing and/or orders as follows:*
>
> 1.     **Hearing**:
>
>> *The Parties agreed* that the final hearing . . . in this Arbitration . . . should be scheduled for July 13-17, 2020 . . . .
>
> 2.     **Arbitration Agreement**:
>
>> The applicable arbitration agreement in this matter is § 14.6 of the [LLC] Agreement.
>
> 3.     **Applicable Law**:
>
>> The laws of the State of Colorado . . . apply in this matter. *With respect to procedural matters, the Federal Arbitration Act, Colorado Revised Uniform Arbitration Act, and AAA Rules apply* . . . .
>
> 4.     **Parties/Changes of Claims/Related Proceedings**:
>
>> *The Parties confirmed that all necessary parties are already named herein* and that they do not intend to seek leave to join additional necessary parties in these proceedings . . . .
>
> 5.     **Jurisdiction/Arbitrability**:
>
>> *The Parties stated no challenge and no intent to challenge the formation, existence, or validity of the arbitration agreement, the jurisdiction of the Tribunal, or the arbitrability of any claim, defense, or counterclaim* . . . .

*Id.* at pp. 1-3 (bold emphasis in original; emphasis that is both italicized and underlined added).

25.     Suffice it to say, the Debtor never made a peep—not in the Arbitration, and not in its Opposition—that Procedural Order No. 2 was anything other than an accurate memorialization of its agreement to arbitrate.

- 12 -

C.   The Debtor's Conduct Throughout the Arbitration Manifested its Valid and Binding Agreement to Arbitrate the Parties' Disputes.

26.   In their Opening Brief, the Arbitration Participants established that, in addition to the Debtor's express written agreement to arbitrate its disputes with them, the Debtor further assumed the obligation to arbitrate through its conduct in the Arbitration. *See* Opening Brief, ¶¶ 96-101 (citing cases). Specifically, the Arbitration Participants noted that, for nearly six months, the Debtor participated in every step of the Arbitration without once objecting to resolving the Parties' disputes in that Arbitration. *See* Opening Brief, ¶ 99.

27.   To avoid these facts, the Debtor dissembles, claiming it "agreed to only one thing – to have the [Arbitration Demand] heard under the AAA Rules." Opp., ¶ 29. But the Debtor ignores the other relief it affirmatively sought in the Arbitration, including:

- The Debtor's Counterclaims against Z.L. Investment;

- The Debtor's Third-Party Claims against Mr. Li and CIU, thereby adding, through the Debtor's conduct, two new parties to the Arbitration;

- The Debtor's filing of the Emergency Arbitration Motion, by which it expressly invoked the AAA's Commercial Rules and the "grounds for injunctive relief" under Section 14.6 of the LLC Agreement to seek affirmative injunctive relief from CIU in the Arbitration;

- The Debtor's appointment of its own chosen arbitrator to the Tribunal;

- The Debtor's agreement, with the Arbitration Participants, on a procedural schedule for the Arbitration, which included a number of specific items requested by the Debtor. *See* Koosed Dec., Ex. 22 (letter to the Tribunal noting that the Arbitration Participants only anticipate taking up to four depositions, but agreeing to allow the Debtor and Banjo to take up to eight depositions at their counsel's request).[6]

---

[6]   For this reason alone, the Debtor's repeated contention that discovery in the Arbitration is "limited" misses the mark. *See infra,* ¶¶ 110–14.

- 13 -

28.     Contrary to the Debtor's current claims, its participation in the Arbitration was far from a mere defensive exercise.  It actively asserted claims against the Arbitration Participants, sought injunctive relief from the AAA through the Emergency Arbitration Motion, and requested concessions on discovery and trial procedure that the Arbitration Participants granted.  This conduct, too, standing alone, is sufficient to find that the Debtor agreed to arbitrate the Parties' disputes as a matter of law.  *See* Opening Brief, ¶ 100 (collecting cases); *see also In re Arbitration between Halcot Navigation Ltd. P'ship & Stolt-Nielsen Transp. Grp.*, 491 F. Supp. 2d 413, 417–19 (S.D.N.Y. 2007) (respondent waived right to object to arbitrate where it had voluntarily participated in arbitration, without specifically objecting to arbitrability); *Watkins v. Duke Med. Ctr.*, No. 1:13-CV-1007, 2014 WL 4442936, at *4 (M.D.N.C. Sept. 9, 2014), *aff'd*, 592 F. App'x 226 (4th Cir. 2015) (plaintiff's voluntary submission of an arbitration demand through a hospital's dispute resolution process, as well as to the AAA, created a binding agreement to arbitrate).

D.     <u>The Debtor's Argument that It is Not a Party to the LLC Agreement is an Irrelevant Distraction, and Its Other Arguments Based on the LLC Agreement Are Wrong.</u>

29.     Because it cannot meaningfully dispute either the facts or the law surrounding its Submission Agreement, its agreement manifested in Procedural Order No. 2, and its continuous participation in the Arbitration for nearly six months, the Debtor takes the time-honored approach of simply ignoring the facts and law in favor of a strawman argument.  Specifically, the Debtor attempts to distract the Court by repeatedly emphasizing that it "is not a party to" the LLC Agreement for Frictionless, LLC; thus, the Debtor contends, "there is no arbitration 'agreement' for the Court to analyze."  *See* Opp., ¶¶ 9, 13, 14, 23, 27–30.  This argument is another red herring because it ignores the Debtor's multiple, **other** agreements to arbitrate, any of which is independently sufficient to prove the Debtor's agreement to arbitrate the Parties' disputes.  And, as detailed below, the Debtor's repeated refrain that it "is not a party to" the LLC Agreement

- 14 -

misses the point; *i.e.*, since its claims rely on the LLC Agreement, the Debtor is bound by its arbitration clause.

      1.     *The Debtor Is Not a Party to the LLC Agreement, But It Agreed to Arbitrate Pursuant to the LLC Agreement's Arbitration Clause*

30.     Initially, the Debtor's argument that it is not a party to the LLC Agreement is a sleight of hand.  To be sure, the Debtor is right that it did not sign and was not a party to the LLC Agreement itself.  But, again, the Debtor is not being completely candid about what it agreed to, as it wrote during the Arbitration:

> [The Debtor], although mentioned in the [LLC] Agreement, is not a party to the same.  [The Debtor] will agree to have this heard under by [sic] the AAA pursuant to this [LLC] Agreement if counterclaim defendant Changzhou Inter Universal, Machine & Equipment Co., Ltd. ("CIU") also agrees to have the claims against it heard under this [LLC] Agreement.  Should CIU refuse to appear in this forum than [sic] [the Debtor] will refuse the same.

*See* Koosed Dec., Ex. 3, ¶ 17.

31.     The Debtor's own words speak for themselves:  the Debtor confirmed that it is not a party to the LLC Agreement, but it nevertheless offered to arbitrate the Parties' disputes "pursuant to" the LLC Agreement's arbitration provisions, if Arbitration Participant CIU would do so as well.  *See id.*  CIU then accepted in writing the Debtor's proposal to arbitrate "pursuant to" the LLC Agreement's arbitration provisions.  Koosed Dec., Ex. 7.  As shown above, the Debtor later confirmed its agreement to arbitrate its disputes with the Arbitration Participants in its Submission Agreement and as memorialized in the Tribunal's Procedural Order No. 2.  *Supra*, ¶¶ 14–25.

32.     In short, the Debtor's repeated refrain that it is "not a party" to the LLC Agreement is irrelevant because the Debtor expressly agreed to arbitrate "pursuant to" the LLC Agreement's arbitration provisions.

2.      *The Debtor Misstates the Actual Text of the LLC Agreement's Broad Arbitration Provisions and Improperly Requests this Court to Decide Arbitrability, a Task Binding Precedent Reserves to the Tribunal.*

33.      The Debtor's specious arguments don't end with its claim that it is not a party to the LLC Agreement; rather, they extend to the text and scope of the arbitration agreement set forth in Section 14.6 of the LLC Agreement.   Specifically, the Debtor claims, in conclusory fashion, that:  (a) "Section 14.6.1 [of the LLC Agreement] is a 'narrow' arbitration provision not entitled to deference"; and (b) "the liberal policy favoring arbitration under the FAA does not apply when considering narrow arbitration clauses."  Opp., ¶ 47.  The Debtor is wrong on both the facts and the law.

34.      *First*, on the facts, the Debtor fails to quote the full text of Section 14.6.1 of the LLC Agreement.  Instead, the Debtor tells the Court that Section 14.6.1 "does not provide for the arbitration of all disputes between the parties," but rather limits the disputes to be arbitrated "by defining controversies" as encompassing only certain discrete items identified in subsections (a) and (b) of Section 14.6.1.  Opp., ¶ 48.

35.      The problem for the Debtor is this is not what Section 14.6.1 of the LLC Agreement says.  The full text of Section 14.6.1 provides as follows:

> 14.6.1. <u>Arbitration</u>.  Each Member [Banjo and Z.L. Investment] and [Mr.] Li, on his, her, or its own behalf and on behalf of the Company, **hereby agrees to submit all controversies, claims and matters of difference arising under or relating to this Agreement or the Company**, which cannot be resolved between the Members and Li, **to arbitration** in accordance with the provisions and procedures set forth herein, except for a suit for injunctive relief, which may be brought in any court in the State of Colorado, United States, pursuant to Section 14.6.2.  **Without limiting the generality of the foregoing, the following shall be considered controversies for this purpose:** (a) all questions relating to the interpretation or breach of this [LLC] Agreement, (b) all questions relating to any representations, negotiations and other proceedings leading to the execution of this Agreement, the formation of the Company, or the

- 16 -

issuance of Membership Interests, and (c) all questions as to whether the right to arbitrate any such question exists.  Notwithstanding the foregoing, each Member, Li, and the Manager shall have the right to seek and obtain such temporary or preliminary injunctive relief from a court of competent jurisdiction to which it may be entitled pending a final determination by arbitration of the dispute to which such relief relates.

Koosed Dec., Ex. 1, and Ex. C-1 thereto, pp. 22-23 (emphasis added).

36.     Contrary to the Debtor's partial quote, this provision plainly provides for the arbitration of "all controversies, claims and matters of difference" between the parties, whether "arising under *or relating to* this [LLC] Agreement *or* the Company [Arbitration Participant Frictionless, LLC]."  *Id.* (emphasis added).  Indeed, the only way that the Debtor can claim the provision limits the "controversies" to be arbitrated to those identified in sub-parts (a) and (b) above is by *omitting* from its Opposition the introductory clause to those sub-parts, which states, "Without limiting the generality of the foregoing."

37.     *Second*, on the law, the Debtor is simply wrong that Section 14.6.1's arbitration clause is a "narrow" one.  Opp., ¶ 47.  The Tenth Circuit has repeatedly held that arbitration provisions like Section 14.6.1, which refer all disputes "arising out of or relating to" an agreement or transaction to arbitration are "broad" arbitration clauses entitled to a presumption of arbitrability under the FAA.  *See, e.g., P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) ("The parties' arbitration clause provides that '[a]ny controversy, claim, or breach *arising out of or relating to* this Agreement' shall be arbitrable.  The Supreme Court has noted that such an arbitration clause, not limited to questions of contractual interpretation, is a 'broad' one.") (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967)) (emphasis in original); *Newmont U.S.A. Ltd. v. Ins. Co. of N. Am.*, 615 F.3d 1268, 1274-75 (10th Cir. 2010) ("Looking to the plain language of the arbitration provision . . ., including its use of the phrase 'arising out of,' we have little trouble determining that it is a broad provision."); *Let's Go Aero, Inc. v. Cequent*

- 17 -

*Performance Prods., Inc.*, 78 F. Supp. 3d, 1363, 1375 (D. Colo. 2015) (holding "the arbitration clause is broad" because it refers any claim that "aris[es] from or relat[es] to the [Settlement] Agreement" to arbitration).

38.     *Third*, and also on the law, the Debtor's argument—that "the liberal policy favoring arbitration under the FAA does not apply when considering narrow arbitration clauses"—simply misstates the law.  *See* Opp., ¶¶ 26, 47.  The Debtor relies on *Chelsea Family Pharmacy, PLLC v. Medco Health Sols.*, 567 F.3d 1191 (10th Cir. 2009), for this proposition.  *See id.*  But the Tenth Circuit actually reached the opposite conclusion in that case:  "But **even narrow arbitration clauses must be interpreted under the 'liberal federal policy favoring arbitration agreements.'**"  *Chelsea Family*, 567 F.3d at 1197 (emphasis added).

39.     Because they ignore Section 14.6.1's plain language, as well as controlling Tenth Circuit law, the Debtor's efforts to "narrow" the broad arbitration agreement in Section 14.6.1 of the LLC Agreement must be rejected.  Further, any disputes over the scope of Section 14.6.1's arbitration agreement are reserved to the Tribunal, consistent with the Supreme Court's recent decision in *Henry Schein*.  *See* Opening Brief, ¶¶ 107–13.

> 3.     *The Debtor's Reliance on the Injunctive Relief Provisions in Section 14.6.1 of the LLC Agreement is Another Irrelevant Distraction.*

40.     The Debtor argues that Section 14.6.1 "excepts claims for injunctive relief from arbitration."  Opp., ¶¶ 15, 32.  Thus, the Debtor contends, four of its Purported Bankruptcy Claims that allegedly seek injunctive relief—Claims 1 and 2, seeking turnover of estate property and a related injunction, and Claims 3 and 4 seeking to enjoin the Arbitration and extend the Automatic Stay to Banjo—cannot be arbitrated.  *See* Opp., ¶¶ 32, 43-46.  Again, the Debtor's argument fails and is just another red herring.

41.     Initially, the Debtor effectively concedes that the bulk of its claims—ten out of the fourteen claims alleged in its Complaint—seek money damages, nothing more.  Those claims are therefore arbitrable regardless of the scope of Section 14.6.1's provisions for injunctive relief.

42.     Further, and as noted in the Opening Brief, Claims 3 and 4 in the Adversary Proceeding will be moot once this Court resolves the Parties' pending motions.  *See* Opening Brief, ¶¶ 70, 131(a) n.9.[7]  Thus, the Debtor's argument that its claims for injunctive relief give it a "get out of jail free" card from the Arbitration is another red herring, because that argument only remotely relates to, at best, the Debtor's turnover and injunctive claims related to intellectual property, in Claims 1 and 2.  Even as to those two, however, the Debtor's argument fails.

43.     *First,* although the Debtor's turnover claims are arbitrable consistent with applicable precedent (*see infra*, ¶¶ 73(a), 75–83), the Arbitration Participants' right to use the Debtor's intellectual property (the subject of Claims 1 and 2) is itself a subject of the Parties' underlying dispute:  that use right is specifically set forth in Article 9 of the LLC Agreement, the interpretation of which is necessary to resolve Claims 1 and 2.  *See* Opening Brief, ¶ 69.  Claim 1

---

[7]     The Arbitration Participants never disputed that the Automatic Stay applies to their claims against the Debtor.  Indeed, as the email correspondence that the Debtor attached as Exhibit A to its Opposition shows, the Arbitration Participants' counsel advised the AAA—in August 2019, more than a month before the Petition Date—that any bankruptcy filing by the Debtor would mean that this Court would have to decide whether to lift the Stay and allow the Arbitration to proceed.  *See* Opp., Ex. A.  This simple acknowledgment of the reality of the initial application of the Automatic Stay is a far cry from the Debtor's claim that the Arbitration Participants "conceded" that, if the Debtor filed for bankruptcy, the entirety of the Parties' dispute in the Arbitration would be transferred to this Court for final resolution. *See* Opp., ¶ 34.  Nothing in the cited email suggests, let alone actually says, what the Debtor claims.

        Simply put, asserting a claim for injunctive relief to re-state what Section 362(a) automatically provides does not, and cannot, overcome an arbitration agreement.  Otherwise, a debtor would always be able to defeat an arbitration agreement through the artifice of asserting a claim for declaratory and injunctive relief that the Automatic Stay applies.  That isn't the law, as the abundance of cases compelling arbitration in the wake of a debtor's bankruptcy filing make clear.  *See generally* Opening Brief, ¶¶ 78-141.

of the Complaint does not appear to request injunctive relief; in any event, the Arbitration Participants note they are not currently engaged in "the importation, sale, distribution to retailers and/or licensing of infringing products in the U.S." that the Debtor apparently seeks to enjoin in Claim 2.  *See* Complaint, ¶ 113.  The Arbitration Participants are willing to stipulate to an appropriate injunction Order to that effect, subject and without prejudice to any rights or defenses they may have in the Arbitration and, if not dismissed, in this Adversary Proceeding.  Assuming such a stipulation is reached, the Debtor's claims for injunctive relief in Claim 2—and perhaps its related turnover relief sought in Claim 1 of its Complaint—would be moot.

44.    *Second*, in the event the Debtor is not willing to so stipulate, the Debtor ignores that by signing the Submission Agreement and choosing the AAA's Commercial Arbitration Rules as the "Rules Selected" for the Arbitration, the Debtor entered into an independently enforceable arbitration agreement.  *Supra*, ¶¶ 14–22.  And, lest there be any doubt, injunctive relief is available in the Arbitration, as the Debtor itself confirmed by seeking an injunction there.  *See, e.g., Stone v. Theatrical Inv. Corp.*, 64 F. Supp. 3d 527, 541 (S.D.N.Y. 2014) ("It is well established that, for example, arbitrators may award injunctive relief."); *see also Timegate Studios, Inc. v. Southpeak Interactive LLC*, 713 F.3d 797 (5th Cir. 2013) (affirming confirmation of an arbitral award that included injunctive relief).[8]

---

[8]    Thus, the Debtor's supposed interpretation of Section 14.6.1—that its inclusion of a request for injunctive relief means that all of its claims are not arbitrable—is belied by its own conduct. Despite its contention that injunctive relief is available only in court, the Debtor chose to seek temporary injunctive relief *in the Arbitration* by filing its Emergency Arbitration Motion.  Indeed, the Debtor even cited Section 14.6.1's provisions on injunctive relief in filing that Arbitration Motion.  *See* Koosed Dec., Ex. 1, and Ex. C-1 thereto, p. 23; *see also* Koosed Dec., Ex. 9, pp. 18-19 (header entitled "Grounds for Injunctive Relief Under the Arbitration Agreement"). Considering its past conduct to seek an injunction in the Arbitration, it is to say the least curious that the Debtor now claims that injunctive relief is "except[ed]" from the Parties' arbitration agreement.  *See* Opp., ¶ 32.

45.     *Third*, Claims 1 and 2 are not really turnover claims at all.  Rather, they are declaratory judgment/breach of contract claims asserting that Arbitration Participants CIU and Frictionless, LLC do not have the right, under the LLC Agreement, to use the Debtor's intellectual property.  *See, e.g., Connolly v. City of Houston (In re Western Integrated Networks, LLC),* 329 B.R. 334, 342 (Bankr. D. Colo. 2005) (Romero, J.) (disputed contract claims are not appropriate for turnover proceedings); *Mazel v. Lovelace Health Sys., Inc. (In re Infinity Home Health Care, LLC),* Case No. 16-10062-j7, 2018 WL 5310659, * 2 (Bankr. D.N.M. Oct. 25, 2018) ("It is not appropriate to bring a turnover action on an unliquidated claim for breach of contract."); *In re Cardali*, No. 10-11185 SHL, 2010 WL 4791801, at *11 (Bankr. S.D.N.Y. Nov. 18, 2010) ("Debtor's reliance on section 542 is facially problematic because that section provides only for the turnover of undisputed debts, and the alleged debt here is clearly disputed . . . Despite its bankruptcy gloss, count 6 [for turnover of property] appears to be nothing more than an attempt to recover some or all of the same disputed money sought in counts 1 through 5 [claims for fraudulent conveyance and disallowance of claim]."); *In re Tomberlin*, No. 16-10168-DHW, 2017 WL 410337, at *3 (Bankr. M.D. Ala. Jan. 30, 2017) ("Turnover proceedings are not to be used to liquidate disputed contract claims.").

46.     *Fourth,* the final sentence of Section 14.6.1 of the LLC Agreement limits the injunctive relief that "may be sought" in court to "temporary or preliminary injunctive relief . . . pending a final determination by arbitration of the dispute to which such relief relates."  *See* Koosed Dec., Ex. 1, and Ex. C-1 thereto, p. 23.  In other words, the kinds of permanent injunctions sought by the Debtor's turnover claims here are not excepted from arbitration under Section 14.6.1 and can only be sought and issued in the Arbitration.

47.     *Fifth*, and finally, this Court cannot decide whether the Debtor's claims for injunctive relief are excepted from the Arbitration without first deciding whether the Parties' various arbitration agreements delegated questions of arbitrability to the Tribunal.  *See* Opening Brief, ¶¶ 107–13.  The Parties clearly did by repeatedly affirming that the Arbitration would be governed by the AAA's Commercial Arbitration Rules.  *See* Koosed Dec., Ex. 13 (Submission Agreement); *id.* at Ex. 1, and Ex. C-1 thereto, p. 23 (Section 14.6.3 of the LLC Agreement); *id.* at Ex. 21, p. 1–3 (Procedural Order No. 2, confirming same).

48.     It is settled law in this Circuit that "incorporation of the AAA Rules provides clear and unmistakable evidence that the parties intended to delegate matters of arbitrability to the arbitrator."  *See* Opening Brief, ¶ 111 (citing cases).  Indeed, "[v]irtually every circuit to have considered the issue" has now so held.  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also Awuah v. Coverall N. Am., Inc.,* 554 F.3d 7, 11 (1st Cir. 2009) (same); *Contec Corp. v. Remote Sol.,* 398 F.3d 205, 208 (2d Cir. 2005) (same).

49.     The Debtor simply ignores that the Submission Agreement and LLC Agreement both expressly incorporate the AAA's Commercial Arbitration Rules, and that the Debtor's Arbitration counsel agreed that those Rules governed the Arbitration, as reflected in the Tribunal's Orders.  While the Debtor may close its eyes to the facts and law establishing that the Parties' selection of the AAA's Rules "clearly and unmistakably" delegates any issues of arbitrability— including whether claims for injunctive relief must be arbitrated—to the Tribunal, this Court cannot do so.

4.  *The Debtor's Reliance on the Enforceability Representation and Warranty in Section 4.1(a) of the LLC Agreement as a Supposed "Bankruptcy Out" for Arbitration Makes No Sense.*

50.  The Debtor next concocts an argument out of thin air, claiming the parties to the LLC Agreement agreed, in Section 4.1(a), to "abrogat[e] the enforceability of the [] arbitration provision . . . once a bankruptcy case is filed." *See* Opp., ¶¶ 37-42.  This argument has no merit.

51.  *First*, as already demonstrated, the Debtor agreed to arbitrate several times irrespective of the LLC Agreement.  *Supra*, ¶¶ 14–32.

52.  *Second,* Section 4.1(a) does not mean what the Debtor claims.  Section 4.1(a) simply acknowledges that the Bankruptcy Code in limited circumstances expressly overrides contractual terms.  For example, *ipso facto* clauses are unenforceable in bankruptcy.  *See In re Lehman Bros., Holdings, Inc.*, 452 B.R. 31, 38–39 (Bankr. S.D.N.Y. 2011) (noting that "clauses that [seek] to modify the relationships of contracting parties due to the filing of a bankruptcy petition, — so-called ipso facto clauses . . . are now unenforceable in bankruptcy").  The language that the Debtor points to (quoted in full at Opposition, ¶ 37) is merely a standard, general, recital of a time-honored exception set forth in a closing opinion on enforceability of an agreement, providing relief to the opining attorney based on the vicissitudes of a bankruptcy case.  *See Legal Opinion Accord*, American Bar Association, Section of Business Law, § 12 (1991) (reprinted at 47 *The Business Lawyer,* No. 1 (Nov. 1991)).  Indeed, the provision isn't linked to arbitration, or anything else in the LLC Agreement that would (according to the Debtor) be invalidated in bankruptcy, as evidenced by its appearance in the "General Representations and Warranties" section of the LLC Agreement.  Further, as courts uniformly agree, the Bankruptcy Code does not even mention the FAA, so Section 4.1(a) can't be read to preclude all arbitration in the event of a bankruptcy filing.

53.    *Third*, this provision is a representation and warranty that merely "define[s] what information the [parties] relied upon in deciding to execute the [LLC] Agreement." *Abry Partners V, L.P., v. F & W Acquisition LLC*, 891 A.2d 1032, 1041 (Del. Ch. 2006).  It does not certify that a bankruptcy will never occur or state what Z.L. Investment, Banjo, and Mr. Li agree will happen to the LLC Agreement in case of bankruptcy.  It merely states the LLC Agreement "may be limited by" bankruptcy.  This statement of present fact that Z.L. Investment, Banjo, and Mr. Li made to each other in 2013 cannot be read to effectively rescind the LLC Agreement six years later.

54.    *Fourth*, the Debtor's argument—that the LLC Agreement gives it a blanket "bankruptcy out" from arbitration—conflicts with its repeated statement that it is "not a party to" the LLC Agreement.  The Debtor is indeed right that it is a non-party to the LLC Agreement, as noted above (*see supra*, ¶¶ 29–32).  But the bankruptcy of such a non-party cannot render unenforceable a contract between *other* parties who did *not* file for bankruptcy.

5.    *The Debtor's Claim that Estoppel Does Not Bind It to Arbitrate Under Section 14.6.1 of the LLC Agreement is Contradicted by the Debtor's Own Complaint and Opposition.*

55.    In their Opening Brief, the Arbitration Participants proved that the Debtor is estopped from denying that it is bound to the arbitration agreement in Section 14.6.1 of the LLC Agreement.  That is because the Debtor's claims in this Adversary Proceeding depend on the LLC Agreement—specifically, the Debtor's foundational claim that the Alleged Operating Plan was part of the LLC Agreement.  *See* Opening Brief, ¶¶ 102-106.

56.    In its Opposition, the Debtor claims that the Arbitration should give way to the Adversary Proceeding because the latter does not "relat[e] to the terms of the [LLC Agreement], its breach, or its enforcement."  Opp., ¶¶ 11, 13, 15, 31, 49.  This is demonstrably untrue, as even a cursory review of the Debtor's Complaint makes clear:

| Debtor's Claim in Its Opposition | Debtor's Contradictory Statements in its Complaint |
|---|---|
| "[T]here is <u>not a single claim</u> for relief in the Adversary Proceeding relating to the terms of the [LLC Agreement], its breach, or its enforcement."  Opp., ¶ 31 (emphasis in original); *see also id.* at ¶¶ 11, 13, 49 (substantially the same assertion). | • "Schedule B to the [LLC] Agreement, repeatedly referenced in the same, provides a detailed description of how the joint venture [between the Arbitration Participants, Banjo, and purportedly the Debtor] operated."  Complaint, p. 1.<br><br>• The LLC Agreement is Exhibit 1 to the Debtor's Complaint.  *See* Complaint, Ex. 1.<br><br>• "This multi-tiered operating concept, with [Arbitration Participant] CIU in the center protected by two other companies [the Debtor and Arbitration Participant Frictionless LLC], was detailed and made explicit in the [LLC Agreement] that the parties executed on April 11, 2013."  Complaint, ¶ 39.<br><br>• "Pursuant to the [LLC Agreement,], Schedule B, CIU manufactures products in response to purchase orders issued by [the Debtor] through the pass-through company Frictionless, LLC."  Complaint, ¶ 55; *see also id.* at ¶¶ 47-54, 56-59 (providing paragraph-by-paragraph summary and quotation of key provisions of the LLC Agreement).<br><br>• "***Schedule B of The [LLC Agreement] Explicitly Identifies [the Debtor]'s Role in the Expanded Joint Venture.***"  Complaint, p. 18 (Debtor's section header) (emphasis in original).<br><br>• "[***The Debtor] and CIU Conduct Business in Accordance with Schedule B of the [LLC Agreement].***"  *Id.*, p. 19 (Debtor's section header) (emphasis in original).<br><br>• "Per the terms of the [LLC Agreement] and Section 2.5 of the [LLC Agreement]'s Schedule B, CIU continued conducting business directly with [Debtor] on a nearly daily basis."  Complaint, ¶ 64.<br><br>• "Pursuant to the [LLC Agreement], [the Debtor] absorbed all risks associated with the joint venture."  Complaint, ¶ 67. |

- 25 -

- *"Defendants Act in Repeated Breach of the [LLC Agreement], Intentionally Defraud [the Debtor] and Halt Product Delivery to [the Debtor], Causing Irreconcilable Injury to the Same*."  Complaint, p. 21 (Debtor's section header) (emphasis in original).

- "[T]he Li Defendants sent nearly 400 separate shipments of CIU products to direct competitors of Frictionless LLC and [the Debtor] . . . these shipments . . . **constitute a direct violation of the [LLC Agreement]**. Upon information and belief, CIU never ceased shipping products to companies directly competing with Frictionless LLC and [the Debtor]."  Complaint, ¶ 71 (italicized emphasis in original; bold emphasis added).

- "The [LLC Agreement] requires that '[d]uring the period before and during any arbitration... the Parties shall continue to fulfill their duties under this Agreement.' . . . **By breaching the purchase orders and failing to ship immediately after filing this action, the Li Defendants intentionally acted in direct breach of the [LLC Agreement].**"  Complaint, ¶ 92 (emphasis added).

- "Pursuant to the [LLC Agreement], CIU was provided a limited license by [the Debtor] to use [the Debtor's] patents."  Complaint, ¶ 93.[9]

- Debtor's First Claim for Turnover:  Seeking turnover of "[p]roducts assembled by CIU . . . using [the Debtor's] patented product designs," which the Debtor elsewhere acknowledges CIU had a license to do under the LLC Agreement.  *See* Complaint, ¶¶ 108(a)-(c); *see also id.* at ¶ 93.

- Debtor's Second Claim for Turnover:  Seeking to enjoin the Arbitration Participants from using "intellectual property . . . **and violating the non-competition covenant in the [LLC Agreement]**."  *Id.* at ¶¶ 112-113.

- Debtor's Ninth Claim for Breach of Contract and Tenth Claim for Breach of the Implied Covenant of Good Faith:  Claiming the Debtor was "a third-party beneficiary

---

[9]    Because the Debtor was not a party to the LLC Agreement, presumably this refers to Banjo granting such a license to CIU on the Debtor's behalf, because Banjo controls the Debtor.

|  | on all [] purchase orders [between Frictionless and CIU] . . . as reflected in the [LLC Agreement]" and alleging breach of the implied covenant based on same. *Id.* at ¶¶ 170, 185.<br><br>• Debtor's Eleventh Claim for Fraud and Twelfth Claim for Negligent Misrepresentation:  Both alleging that the Defendants had "a duty to speak the truth" to the Debtor because the Defendants were "co-operators in a joint business venture with [the Debtor]"—a joint venture that, under the Debtor's own theory, arose under the Alleged Operating Plan to the LLC Agreement. Complaint, ¶¶ 203, 224; *see also id.* at pp. 1, 18, 21.<br><br>• Debtor's Fourteenth Claim for Unjust Enrichment: Alleging that the Defendants "**agreed to be bound by certain agreements governing their relationship with [the Debtor] and Banjo**," and that the Defendants were unjustly enriched when they "**refused to perform their obligations under the agreements**."  Complaint, ¶¶ 243, 244, 246 (emphasis added).  The only possible agreement referenced here is the LLC Agreement and the supposedly attached Alleged Operating Plan.<br><br>• Debtor's Prayer for Relief:  Seeking "attorneys' fees and costs" from the Arbitration Participants "as mandated under the LLC Agreement."  Complaint, p. 48. |
|---|---|

57.     As this chart demonstrates, the Debtor cannot credibly deny that its claims relate

to, and in many instances turn on, the interpretation of the LLC Agreement and the rights and

obligations therein.  Nor can the Debtor credibly deny that its Complaint expressly alleges multiple

breaches of that Agreement.  Indeed, the Debtor's Opposition—while simultaneously arguing that

this Adversary Proceeding does not "concern[] the application, interpretation, or breach of the"

LLC Agreement (Opp., ¶ 11)—*admits* that its turnover claims depend on the scope of the LLC

Agreement's intellectual property and non-compete provisions. *See* Opp., ¶ 73(a) (citing Sections

9.1 and 4.4, respectively).

58.     Simply put, the Debtor's entire theory of the case, whether in the Arbitration or in this Adversary Proceeding, is that the Arbitration Participants knew, since 2013, about the Debtor's role in the Frictionless, LLC joint venture, **because of the Alleged Operating Plan that the Debtor contends was attached to the LLC Agreement** and thereby formed a part of that Agreement.  The Debtor cannot wish all of this away merely by repeatedly stating the opposite of what it alleged in its Complaint.

## II.     Allowing the Arbitration to Proceed, as Required by the FAA, Does Not Inherently Conflict with the Bankruptcy Code's Text or its Underlying Purpose.

59.     In their Opening Brief, the Arbitration Participants established that the Bankruptcy Code's text and legislative history say nothing to override the firm federal policy favoring arbitration embodied in the FAA, let alone reflect the "clear and manifest" intent to supersede the FAA required under the Supreme Court's pronouncement in *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1617 (2018).  *See* Opening Brief, ¶¶ 114–23.  Following the framework of Judge McNamara's decision in *Touchstone,* the Arbitration Participants further showed that there is no inherent conflict between the Arbitration and the Debtor's bankruptcy case here, so Arbitration must be compelled.  *Id*.

60.     In response, the Debtor claims that arbitrating *any* of its claims asserted in its Complaint—even its Pre-Petition State Law Claims that have no tie to bankruptcy whatsoever—presents a "direct conflict with the purposes of the Bankruptcy Code." *See* Opp., ¶ 71.  The Debtor is wrong, its claimed conflicts with the Bankruptcy Code are imaginary and contrary to overwhelming case law (including from this Court), and the Arbitration must be allowed to proceed as the FAA mandates.

A.    In *Touchstone*, Judge McNamara Accurately Delineated the Applicable Law Requiring Arbitration in this Case.

61.    The correct analytical framework for determining whether there is an inherent conflict between the Arbitration and the Bankruptcy Code is set out, carefully and thoroughly, in Judge McNamara's decision in *Touchstone*.[10]  *See In re Touchstone Home Health LLC*, 572 B.R. 255 (Bankr. D. Colo. 2017).  The Debtor criticizes Judge McNamara's reasoning as "flawed" because it "converted a bankruptcy court's discretionary authority to compel arbitration of non-core claims, into a *mandatory* obligation."  *See* Opp., ¶ 68.  The problem for the Debtor is Judge McNamara got it right.  That is exactly the state of the law.  *See Touchstone*, 572 B.R. at 274.

62.    Specifically, the Court's role is to determine whether there is a conflict between the strong Congressional policy favoring arbitration—reflected in the FAA—and any contrary dictate in the Bankruptcy Code.  As Judge McNamara noted, the "core/non-core distinction" is "relevant" to this analysis because "noncore proceedings . . . are unlikely to present a conflict sufficient to override by implication the [FAA's] presumption in favor of arbitration."  *See id.* (citing *In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999)).  Consistent with the vast majority of courts, Judge McNamara identified no conflict between the FAA and the Bankruptcy Code with respect to non-core proceedings.  *See Touchstone*, 572 B.R. at 274 ("Because they are unlikely to present a conflict with the Bankruptcy Code's underlying purposes, "[i]t is generally accepted that a bankruptcy court has *no discretion* to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings . . . .")  (citation omitted) (emphasis in original).  This is black-letter law, as many of the Debtor's cases acknowledge.  *See, e.g., MBNA Am. Bank, N.A. v. Hill*,

---

[10]    It is the Debtor's burden to demonstrate a conflict between the FAA and bankruptcy.  *See, e.g., Touchstone*, 572 B.R. at 276; *In re Elec. Mach. Enters., Inc.*, 479 F.3d 791, 798-99 (11th Cir. 2007).  Here, the Debtor doesn't meet its burden.

436 F.3d 104, 108 (2d Cir. 2006) (cited by Debtor); *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156 (3d Cir. 1989); *Moses v. Cashcall, Inc.*, 781 F.3d 63, 83 (4th Cir. 2015) (cited by Debtor); *In re Gandy*, 299 F.3d 489, 495 (5th Cir. 2002); *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1020–21 (9th Cir. 2012) (cited by Debtor); *Elec. Mach.,* 479 F.3d at 796.  Simply put, non-core claims have to be arbitrated if the FAA's requirements are met, and the Debtor does not dispute those requirements are met here.  *See Touchstone*, 572 B.R. at 574.

63.     But the analysis does not end once non-core claims are safely filtered out for arbitration.  *Touchstone* identified a second level of analysis that a Court must undertake to determine whether proceedings superficially labeled as "core" bankruptcy matters inherently conflict with the FAA; if not, they, too, must be arbitrated.  Judge McNamara correctly noted that "rather than merely relying on the labels 'core' and 'noncore,' it makes most sense to focus on 'the underlying nature of the proceeding, *i.e.,* whether the proceeding derives exclusively from provisions of the Bankruptcy Code . . . .'" *Touchstone*, 572 B.R. at 275 (citing *In re Nat'l Gypsum Co.*, 118 F.3d 1056, 1067 (5th Cir. 1997)).

64.     As one bankruptcy court described this analysis:

> Determining whether a sufficiently severe conflict exists between the Bankruptcy Code and the FAA to deny the request to arbitrate **requires a particularized inquiry into the nature of the claim** and the facts of the specific bankruptcy.  A court must determine **whether the underlying dispute concerns rights created under the Bankruptcy Code or non-Bankruptcy Code issues derivative of the debtor's pre-petition business activities**.  In the former situation, the bankruptcy court has discretion to refuse arbitration, but in the latter it does not.

*In re Cardali*, Bankruptcy No. 10–11185 (SHL), 2010 WL 4791801, at *8 (Bankr. S.D.N.Y. Nov. 18, 2010) (citations omitted) (emphasis added).

65.     In this context, Judge McNamara noted that bankruptcy courts have generally analyzed "core" claims arising under the Bankruptcy Code by distinguishing between those that are "substantively core" and those that are "procedurally core." *See Touchstone*, 572 B.R. at 275-76.  As one of the cases relied upon by Judge McNamara put it:

> If the matter is core, the bankruptcy court must still examine the nature and reason for its "coreness."  **Many proceedings are procedurally core**; they are garden-variety pre-petition contract disputes dubbed core because of how the dispute arises or gets resolved.  **Objections to proofs of claim and counterclaims asserted by the estate . . . exemplify this type of matter.  The arbitration of a procedurally core dispute rarely conflicts with any policy of the Bankruptcy Code** unless the resolution of the dispute fundamentally and directly affects a core bankruptcy function.
>
> Other proceedings are core for substantive reasons; they are not based on the parties' pre-petition relationship, and involve rights created under the Bankruptcy Code. . . . it is more likely that arbitration [of these substantively core claims] will conflict with the policy of the Bankruptcy Code that created the right in dispute.  The bankruptcy court enjoys much greater discretion to refuse to compel the arbitration of this type of dispute.

*In re Hagerstown Fiber Ltd. P'ship*, 277 B.R. 181, 203 (Bankr. S.D.N.Y. 2002) (emphasis added).

66.     These principles guided Judge McNamara in *Touchstone* and should also guide the Court's analysis here.   Indeed, no court has criticized any portion of Judge McNamara's *Touchstone* decision, let alone characterized it as "flawed" as the Debtor does in its Opposition. *See* Opp., ¶ 68.  Simply put, Judge McNamara was right, and application of the *Touchstone* principles here requires an order compelling Arbitration of the Debtor's Claims in this Adversary Proceeding.

B.    The Debtor Concedes its Pre-Petition State Law Claims are Non-Core Claims; Those Claims Must be Arbitrated.

67.    In their Opening Brief, the Arbitration Participants established that the Court must compel arbitration of the Debtor's Pre-Petition State Law Claims, which assert various torts and breaches of contract under Colorado law. *See* Opening Brief, ¶¶ 63-74, 127-141.

68.    In response, the Debtor concedes that these Claims "aris[e] under state law" and are "non-core claims." Opp., ¶ 73(c). This should end the inquiry. Nevertheless, the Debtor contends its "non-core claims [] are transformed into core claims given the context of how they are asserted." *Id.*[11] The Debtor is conjuring nonexistent law out of thin air.

69.    Indeed, this is the exact opposite of what every court has held in analyzing these issues: where the Debtor argues that form prevails over substance, the law is that the underlying nature of claims prevails over the label a party gives them. *See, e.g., Touchstone*, 572 B.R. at 275; *In re Harrelson*, 537 B.R. 16, 24 (Bankr. M.D. Ala. 2015) ("[T]he label a party attaches to a claim does not require the court to wear blinders as to that claim's true substance.") (quotation and citation omitted); *Nat'l Gypsum Co.*, 118 F.3d at 1067 ("[N]onenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, *i.e.,* whether the proceeding derives exclusively from the provisions of the Bankruptcy Code . . . ."); *In re Tomberlin*, Case No. 16–10168–DHW, 2017 WL 410337, at *3 (Bankr. M.D. Ala. Jan. 30, 2017) (compelling arbitration of Section 548 claim because its "*true substance . . . is essentially an extension of the breach of contract claim*") (emphasis in original).

---

[11]    The Debtor's efforts to distinguish *Touchstone* focus on the fact that the arbitration in that case was "on the eve of trial" before the debtor filed for bankruptcy. *See* Opp., ¶¶ 8, 73(c). The question of how far an arbitration has proceeded before bankruptcy could only affect the bankruptcy court's exercise of its discretion in compelling arbitration—but that exercise is irrelevant to the Debtor's non-core Pre-Petition State Law Claims, as to which the Court has no discretion to refuse arbitration under the uniform law articulated by Judge McNamara.

70.    The Debtor's assertion of Pre-Petition State Law Claims in the context of an Adversary Proceeding does not change the fact that those non-core claims arise under state law, derive exclusively from the Parties' pre-petition conduct, and were being ***arbitrated pre-petition*** in the Arbitration.  Therefore, the Court has no discretion other than to compel arbitration of the Pre-Petition State Law Claims, and the Debtor's Injunction Motion as to them must be denied.[12]

---

[12]    The Debtor makes several other arguments in passing as to why its Pre-Petition State Law Claims should not be arbitrated, including that their resolution "will have a significant impact on [the Debtor]'s creditor body," that there is a chance of "inconsistent judgments," and that there is need for creditor "oversight."  *See* Opp., ¶ 73(c).  Each misses the mark.

*First*, the Debtor cites no case law supporting the proposition that a non-core claim subject to arbitration can somehow become non-arbitrable by virtue of these concerns.  *See id.*

*Second*, the Debtor similarly identifies no ***actual*** conflict between allowing the Arbitration to proceed and these concerns.  Instead, it rests on conclusory assertions without any explanation.

*Third*, just because a recovery may benefit the Debtor's estate does not render even a "core" claim non-arbitrable.  *See Cardali*, 2010 WL 4791801, at *11 ("[I]t cannot be that all proceedings involving property of the estate are core; such an approach would create an exception to *Marathon* that would swallow the rule.") (citing *U.S. Lines*, 197 F.3d at 637).

*Fourth*, the Debtor's repeated concern about "inconsistent judgments" is illusory.  Initially, allowing the Arbitration to proceed would reduce any such risk in the first instance by allowing the Parties' disputes to be resolved in the most efficient, centralized, and cost-effective way possible, thereby paving the way for the Debtor to propose a plan of reorganization quickly by resolving the largest claims asserted by and against the Debtor.  *See* Opening Brief, ¶¶ 134–36; *see also infra*, ¶¶ 101–14.  Further, "[t]he risk of inconsistent adjudications is not unique to bankruptcy and does not frame an inherent conflict between Bankruptcy Code and FAA policy." *In re Singer Co. N.V.*, No. 00 CIV. 6793 LTS, 2001 WL 984678, at *6 (S.D.N.Y. Aug. 27, 2001). Finally, as one of the Debtor's own cases notes, it is black letter law that "arbitration proceedings will not necessarily have a preclusive effect on subsequent federal-court proceedings."  *Moses*, 781 F.3d at 86 (finding such a concern is "speculative at best" and noting "courts may directly and effectively protect federal interests by determining the preclusive effect to be given to an arbitration") (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985)).

*Fifth*, one of the great benefits of arbitration is its flexibility.  To the extent the Court or the Debtor have concerns about "oversight," the Parties control the confidentiality of the Arbitration. The Arbitration Participants certainly have no objection to providing this Court and the Debtor's creditors with transparency about the Arbitration, in the form of regular status reports or some other mechanism that might be helpful to the Court or stakeholders in the Debtor's bankruptcy case.  The Arbitration Participants further doubt that the Tribunal would have any objections to such transparency either.

C.    The Debtor's Purported Bankruptcy Claims Are Merely Procedurally Core and Their Substance is Non-Core; Thus, They are Arbitrable and Should Be Resolved in the Arbitration.

71.    In their Opening Brief, the Arbitration Participants established that the Tribunal must decide the arbitrability of the Debtor's Purported Bankruptcy Claims in this Adversary Proceeding under the Supreme Court's binding precedent in *Henry Schein*. *See* Opening Brief, ¶¶ 107–13. And they further showed that each of those Purported Bankruptcy Claims arose out of the Parties' same pre-petition disputes as the Pre-Petition State Law Claims and should therefore be arbitrated. *See id.* at ¶¶ 63–74, 127–141.

72.    In its Opposition, the Debtor asserts a variety of arguments as to these Purported Bankruptcy Claims: (a) they are all core claims, *see* Opp., ¶ 73; (b) the turnover claims seek "recovery and protection of property of the bankruptcy estate," have "nothing to do with" the LLC Agreement, and are therefore not arbitrable, *see* Opp., ¶ 73(a); (c) the Fifth Claim for Claim Disallowance "become[s] constitutionally core based on [its] necessity to resolving [Frictionless'] proof of claim," *see* Opp., ¶ 73(c); and (d) the Sixth, Seventh, and Eighth Claims are "unique to the bankruptcy process" and "not arbitrable." *See* Opp., ¶ 73(d).[13] Taken in turn, each of these arguments fails. Looking past the labels the Debtor gave its Purported Bankruptcy Claims reveals that substantially all issues are properly part of the Parties' Arbitration.

---

[13]    As previously noted, the Debtor's Claims 3 and 4 in the Adversary Proceeding seek the same relief that the Debtor seeks in its Injunction Motion. Those Purported Bankruptcy Claims will therefore be moot once the Court rules. *See* Opening Brief, ¶¶ 70, 131. There is thus no need to address those Claims further. *See also supra*, ¶ 42 & n.7. That said, the Arbitration Participants note that at least one bankruptcy court decision—issued in the wake of the Supreme Court's ruling in *Epic*—compelled arbitration of a claim for willful violation of the Automatic Stay. *See In re Trevino*, 599 B.R. 526, 545-49 (Bankr. S.D. Tex. 2019) (noting, among other things, that "the streamlined procedures of arbitration do not entail any consequential restriction on substantive rights, and there is no reason to assume that arbitrators will not follow the Bankruptcy Code").

1.   *Courts Have Repeatedly Compelled Arbitration of Each of the Debtor's Purported Bankruptcy Claims.*

73.   Courts nationwide have compelled arbitration of every single one of the types of bankruptcy claims that the Debtor asserts here:

a)   <u>Turnover of Alleged Estate Property</u>:  *See, e.g., In re Rarities Grp., Inc.*, 434 B.R. 1, 11 (D. Mass. 2010); *Tomberlin*, 2017 WL 410337, at \*3–4; *Harrelson*, 537 B.R. at 25–26; *Cardali*, 2010 WL 4791801, at \*11–12.

b)   <u>Claim Objection</u>:  *See, e.g., Nat'l Gypsum*, 118 F.3d at 1068 (collecting cases); *Touchstone*, 572 B.R. at 278–79 (collecting even more cases); *Cardali*, 2010 WL 4791801, at \*10–11; *In re Transp. Assocs.., Inc.*, 263 B.R. 531, 534–35 (Bankr. W.D. Ky. 2001) (relied on by Debtor).

c)   <u>Equitable Subordination</u>:  *See, e.g., Rarities Grp.*, 434 B.R. at 11.

d)   <u>Fraudulent Transfer</u>:  *Rarities Grp.*, 434 B.R. at 11; *Cibro Petroleum Prods., Inc. v. City of Albany* (*In re Winimo Realty Corp.*), 270 B.R. 108, 124 (S.D.N.Y. 2002); *Tomberlin*, 2017 WL 410337, at \*3; *Harrelson*, 537 B.R. at 26–27; *Cardali*, 2010 WL 4791801, at \*8–9.

74.   The Debtor is thus wrong in making yet another conclusory assertion that certain of its Purported Bankruptcy Claims are "not arbitrable."  *See* Opp., ¶ 73(d).  Indeed, the Debtor's argument is completely at odds with Bankruptcy Rule 9019(c), which expressly ***allows*** "any controversy affecting the estate . . . to be submitted to final and binding arbitration" on consent of the parties.  *See* Fed. R. Bankr. P. 9019(c); *see also In re Barker*, 510 B.R. 771, 778 (Bankr. W.D.N.C. 2014) ("Even if a matter is constitutionally core, a bankruptcy court possesses broad discretion to grant a motion to compel arbitration if there is a written agreement to arbitrate and if doing so would be helpful to the court and would assist the bankruptcy court in exercising its bankruptcy jurisdiction.") (citing Rule 9019(c)).

2. *The Debtor's Claims 1 and 2—Seeking Turnover of Alleged Estate Property—Arise out of the LLC Agreement and Must be Arbitrated.*

75.     In their Opening Brief, the Arbitration Participants established that Claims 1 and 2 of the Debtor's Complaint—seeking turnover of, and a permanent injunction on, the alleged use of the Debtor's intellectual property as estate property under Section 542(a) of the Bankruptcy Code—must be arbitrated because they turn on the scope of the Arbitration Participants' right to use the Debtor's intellectual property under the LLC Agreement. *See* Opening Brief, ¶¶ 69, 131.[14]

76.     In response, the Debtor contends that these Purported Bankruptcy Claims "have nothing to do with" the LLC Agreement, "are specific claims for recovery and property of [estate] property," and "go to the heart of [the Debtor's ability to propose an effective reorganization." Opp., at ¶ 73(a).  Again, the Debtor's arguments are speculative, unsupported, and legally wrong.

77.     *First*, many courts have compelled arbitration of turnover claims.  *See, e.g., Cardali*, 2010 WL 4791801, at *12 ("Given the underlying nature of the parties' disagreements and their disputed nature, nothing in [debtor's turnover claim] raises a unique bankruptcy issue that counsels against proceeding with the pending arbitration."); *Rarities Grp.*, 434 B.R. at 11; *Tomberlin*, 2017 WL 410337, at *3–4; *Harrelson*, 537 B.R. at 25–26.  Notably, the Debtor doesn't cite a single case supporting its position that Claims 1 and 2 cannot be arbitrated.  Opp., ¶ 73(a).

---

[14]     The Arbitration Participants do not dispute that the Debtor owns its intellectual property and may sell it subject to this Court's approval under 11 U.S.C. § 363, subject to any continuing rights of the Arbitration Participants to use that intellectual property under Article 9 of the LLC Agreement, as the Debtor acknowledges. *See, e.g.*, Complaint, ¶ 93; *see also* Opening Brief, ¶ 69. Subject and without prejudice to their rights in the Arbitration and, if not dismissed, this Adversary Proceeding, the Arbitration Participants are willing to stipulate to the relief that the Debtor apparently seeks in Claim 2 of its Complaint—and perhaps also to the relief sought in Claim 1, upon clarification from the Debtor as to the exact nature of that relief—which would thus resolve the Debtor's intellectual property/turnover claims in full.  Failing that, however, the Arbitration Participants' right to use the Debtor's intellectual property is derived from Article 9 of the LLC Agreement and thus any dispute over those rights must be arbitrated in the Arbitration under Section 14.6 of that Agreement. *Supra*, ¶¶ 78–83.

78.     *Second,* Section 542's turnover remedy is inapplicable where, as here, the claim is disputed (assuming the Debtor does not agree to a stipulation with the Arbitration Participants resolving its turnover claims).  Instead, "Congress envisioned the turnover provision of 11 U.S.C. 542 to apply to tangible property and money ***due to the debtor without dispute*** which are fully matured and payable on demand."  *Tomberlin*, 2017 WL 410337, at *3 (compelling arbitration of turnover claim) (emphasis added); *see also In re Western Integrated Networks, LLC*, 329 B.R. at 342 (disputed contract claims are not appropriate for  turnover proceedings); *In re Infinity Home Health Care, LLC*, 2018 WL 5310659, * 2 ("It is not appropriate to bring a turnover action on an unliquidated claim for breach of contract."); *In re Andrew Velez Constr.*, 373 B.R. 262, 273 (Bankr. S.D.N.Y. 2007) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute. . . . Because a disputed debt is not property that the trustee can use, sell or, lease, § 542(a) is inapplicable.").

79.     *Third,* the Debtor's turnover claims arise out of the LLC Agreement, notwithstanding the Debtor's conclusory assertions otherwise.  Indeed, in the very same paragraph of its Opposition, the Debtor simultaneously claims that:  (a) its turnover claims "have nothing to do with" the LLC Agreement; and (b) Arbitration Participant CIU "may not use the [Debtor's] intellectual property to compete with [the Debtor]" because of the "non-competition restrictions in Section 4.4" of that same LLC Agreement.  *See* Opp., ¶ 73(a) (second paragraph).

80.     The Debtor cannot have it both ways, by claiming that the Arbitration Participants must turn over the Debtor's intellectual property because it "can only be used in conjunction with the business venture set forth in the [LLC Agreement]," while also arguing that the LLC Agreement is irrelevant to the Debtor's turnover claims.  *See id.*  By the Debtor's own argument, its turnover claims depend on the interpretation of the LLC Agreement's intellectual property

(Sections 9.1 and 9.3) and non-competition (Section 4.4) provisions, as limited by Colorado law. *See id.* These interpretive tasks are reserved for the Tribunal under the LLC Agreement and the applicable AAA Rules. *See supra*, ¶¶ 47–49; *see also* Opening Brief, ¶¶ 131–32.

81. *Third,* the Debtor makes the incorrect conclusory assertion that its turnover claims are "core." *See* Opp., ¶ 73(a) (fourth paragraph). "But a dispute arising from a pre-petition contract [like the LLC Agreement here] will usually not be rendered core simply because the cause of action could only arise post-petition." *U.S. Lines*, 197 F.3d at 638.

82. Ultimately, the Debtor's "core" label does not answer the question whether arbitrating the Debtor's turnover claims conflicts with the Bankruptcy Code. All the Debtor can offer is another conclusory plea that its turnover claims "go to the heart" of the Debtor's "ability to propose an effective reorganization and the Bankruptcy Code's exclusive jurisdiction over property of [the Debtor's] estate." *See* Opp., ¶ 73(a) (fourth paragraph). This is insufficient to show a conflict with the FAA. *See, e.g., Winimo Realty*, 270 B.R. at 124 (reversing bankruptcy court and compelling arbitration in part because "[n]owhere did the Bankruptcy Court explain *how* arbitration . . . would adversely affect the administration of [debtor]'s estate or conflict with Bankruptcy Code policy") (emphasis in original); *In re Singer Co., N.V.*, 2001 WL 984678, at *6 ("[T]here is no Code requirement that all issues relating to a debtor's activities be adjudicated in the Bankruptcy Court. The risk of inconsistent adjudications is not unique to bankruptcy and does not frame an inherent conflict between Bankruptcy Code and FAA policy.").

83. Thus, far from being non-arbitrable, the Debtor's turnover claims are a perfect fit for arbitration where, as here, the Debtor disputes whether the Arbitration Participants are permitted to use the Debtor's intellectual property under the LLC Agreement.

3.    *The Debtor's Claims 5 and 6 to Disallow or Subordinate Frictionless, LLC's Creditor Claim Depend on the Outcome of the Debtor's Pre-Petition State Law Claims that Must be Arbitrated.*

84.    In their Opening Brief, the Arbitration Participants showed the Debtor's Fifth and Sixth Claims—to disallow or equitably subordinate Frictionless LLC's claim, respectively—should also be arbitrated because their outcome depends on whether the Debtor prevails on its non-core, Pre-Petition State Law Claims, which must be arbitrated.  *See* Opening Brief, ¶¶ 71, 131(b).

85.    In its Opposition, the Debtor nowhere disputes that its claim objection and equitable subordination claims depend on its Pre-Petition State Law Claims.  This alone is fatal to the Debtor's position, because even if its Fifth and Sixth Claims are "core" proceedings, they do not stand on their own; instead, "[t]he validity of [creditor-defendant]'s proof of claim will almost certainly turn entirely on the facts that will be litigated in the claims and counterclaims . . . that [the parties] will bring against one another in [another forum].  Few legal issues and even fewer factual issues appear likely to stand between the resolution of that non-core proceeding and the matter of allowing or disallowing [creditor-defendant]'s claim against the estate." *Cardali*, 2010 WL 4791801, at *10 (quoting *In re I.E. Liquidation, Inc.*, Bankruptcy No. 06–62179, 2009 WL 1586706, at *8 (Bankr. N.D. Ohio Mar. 18, 2009)).

86.    Instead, the Debtor contends that:  (a) its objection to Frictionless LLC's anticipated creditor claim is a "core" proceeding; (b) its equitable subordination claim is also a "core" claim "unique to the bankruptcy process" and not "subject to any arbitration agreement"; and (c) arbitrating these "core" claims would be "in direct contravention to the Bankruptcy Code's policies of centralized resolution" due to "a heightened risk of inconsistent adjudications."  *See* Opp., ¶¶ 73(c), 73(d).  Each of these arguments fails.

- 39 -

87.     *First*, *Touchstone* held that a claim objection (as the Debtor asserts in its Claim 5 here) based on pre-petition conduct (alleged torts and breaches of contract here) is merely a "procedurally core" claim.  *Touchstone*, 572 B.R. at 275-76.  As Judge McNamara noted, courts have repeatedly found that "the claims allowance process is the perfect 'core' candidate for arbitration" and that granting relief from the Automatic Stay to allow claims liquidation through arbitration is "the majority approach across the country."  *Touchstone*, 572 B.R. at 278-79 (quoting *In re BFW Liquidation, LLC*, 459 B.R. 757, 778 (Bankr. N.D. Ala. 2011)); *see also In re Transp. Assocs., Inc.*, 263 B.R. at 535 (relied on by Debtor).

88.     *Touchstone* and the "majority approach" show that there is no inherent conflict between the Arbitration and the Bankruptcy Code with respect to the Debtor's claim objection. Absent a conflict, Frictionless, LLC's claim can be liquidated in light of the Debtor's objections and Pre-Petition State Law Claims in the Arbitration, at which point this Court can determine, based on the Tribunal's findings and the detailed record, the proper treatment of that claim.  *Cf. Barker*, 510 B.R. at 782 (referring claim for violation of Automatic Stay to arbitrator to "determine the facts concerning this claim, after which the matter will return to this court for application of the Bankruptcy Code to this particular cause of action").[15]

89.     *Second*, the Debtor's contention that its Sixth Claim for equitable subordination is somehow "unique" and non-arbitrable is incorrect.  Opp., ¶ 73(d).  Where, as here, an equitable subordination claim is based on prepetition transactions and contracts that the parties have agreed to arbitrate, that claim is properly subject to arbitration.  *See In re Rarities Grp., Inc.*, 434 B.R. 1

---

[15]     Additionally, CIU and Z.L. Investment will file proofs of claim against the Debtor by the impending proof of claim deadline of December 12, 2019.  At that point, the Debtor will presumably object to those claims and/or seek their equitable subordination, as it has with Frictionless, LLC.  At the very least, such actions will further multiply proceedings in this Court, whereas they could all be centralized for liquidation in the Arbitration.

(D. Mass. 2010). In *Rarities*, the District Court reversed a bankruptcy court's decision and

compelled arbitration of various claims, including one for equitable subordination, holding:

> Trustee is bringing claims based, for the most part, on prepetition
> transactions and contracts . . . Sorting out the business and property
> disputes underlying the adversary proceedings will be focused on
> the parties' respective rights and obligations under their pre-
> bankruptcy commercial relationship. ***While some of the claims
> invoke remedies explicitly made available by the Bankruptcy Code,
> there is nothing in the record that would suggest that the goals of
> the Code would be jeopardized by permitting the claims to be
> resolved in arbitration.***

434 B.R. at 10-11 (emphasis added).

90.     The Debtor's own cases further acknowledge that equitable subordination claims

may be arbitrated, even though the Debtor conspicuously avoids citing them in that section of the

Opposition. *See In re EPD Inv. Co., LLC*, No. CV 13-08768 SJO, 2014 WL 12597148, at *5 (C.D.

Cal. Aug. 29, 2014), *aff'd*, 821 F.3d 1146 (9th Cir. 2016) (cited by Debtor at Opp., ¶ 60) (holding

that "a pre-petition arbitration agreement can bind the trustee or debtor-in-possession to arbitrate

disallowance and equitable subordination claims under some conditions").[16]

91.     *Third*, the Debtor's generalized assertions that arbitrating these "procedurally core"

claims would run afoul of "the Bankruptcy Code's policies of centralized resolution" and create

"a heightened risk of inconsistent adjudications" are empty and have been rejected by other courts,

including Judge McNamara. *See* Opp., ¶ 73(c).

---

[16]     Indeed, even the one case relied upon by the Debtor for its equitable subordination
argument (*Transp. Assocs., Inc.*, 263 B.R. at 535-36, *see* Opp., ¶ 73(d)) stayed the debtor's
equitable subordination claim pending the outcome of an arbitration that would first determine the
amount of the creditor's claim. Accordingly, even if this Court were to determine that the Debtor's
Sixth Claim for equitable subordination is not subject to the Debtor's multiple agreements to
arbitrate, this Court can, and should, stay this claim in the Adversary Proceeding to allow the
Tribunal to first determine the amount of Frictionless' claim and develop the record that would
allow this Court to decide the Debtor's equitable subordination claim quickly and efficiently.

92.    Initially, the Debtor nowhere specifies *how* compelling the Arbitration to proceed would result in these purported conflicts.  Addressing the identical argument in *Touchstone*, Judge McNamara noted:

> Permitting liquidation of proofs of claim through arbitration is similar—except that **the reason for favoring arbitration is even stronger than the rationale supporting deference to pending federal and state litigation.**  That is because, as in this case, the parties contractually agreed to arbitration prior to bankruptcy.  And, federal law strongly favors arbitration.  **It is true that allowing arbitration goes against the general principle of centralization in bankruptcy cases.  However, there is no express bankruptcy prohibition against allowing arbitration.**   Indeed, Section 362(d)(1) provides a ready mechanism for permitting arbitration to proceed if warranted under the circumstances.  **The U.S. Supreme Court has confirmed on multiple occasions that arbitration is generally a prompt, efficient, and fair mechanism for dispute resolution**. . . . **Thus, claims liquidation arbitration supports the objectives of the bankruptcy system rather than conflicting with them because it provides a mechanism for quick, economical, and fair dispute resolution.**

*Touchstone*, 572 B.R. at 277 (emphasis added); *see also BFW Liquidation*, 459 B.R. at 778 ("Arbitration is more or less designed to be a summary proceeding as is the claims allowance process in bankruptcy."); *see also* Fed. R. Bankr. P. 9019(c) (permitting any matter affecting the estate to be sent to binding arbitration).

93.    Numerous other courts have reached the same conclusion.  *See, e.g.*, *In re D.E. Frey Grp., Inc.*, 387 B.R. 799, 806 (D. Colo. 2008) ("Enforcing an arbitration clause does not jeopardize the policy underlying the Bankruptcy Code's preference for centralization of disputes concerning the bankruptcy estate, even in core civil proceedings."); *Cardali*, 2010 WL 4791801, at *10 ("The risk of inconsistent adjudications is not unique to bankruptcy and does not frame an inherent conflict between Bankruptcy Code and FAA policy.").

94. Accordingly, the Debtor's Fifth and Sixth Claims relating to Frictionless, LLC's creditor claim can, should, and in fact must be arbitrated. At a minimum, the Tribunal must be permitted to make all fact findings as to the Parties' pre-petition relationship and all factual and legal conclusions on the Debtor's underlying Pre-Petition State Law Claims affecting Frictionless, LLC's creditor claim, after which this Court can determine, based on the Tribunal's findings, the proper priority and treatment to be given to that claim.

4. *The Debtor's Claims 7 and 8 for the Avoidance of Allegedly Constructive Fraudulent Transfers Also Depend on the Debtor's Pre-Petition State Law Claims that Must be Arbitrated.*

95. The Arbitration Participants established in their Opening Brief that the Debtor's Seventh and Eighth Claims, for the avoidance of the Debtor's Obligation and Transfers to Frictionless, LLC as constructive fraudulent transfers, also must be arbitrated because they arise wholly out of the Parties' pre-petition relationship. *See* Opening Brief, ¶¶ 72, 131(c).

96. In response, the Debtor contends that: (a) "Section 548 claims are claims under the Bankruptcy Code that are not subject to arbitration agreements"; and (b) its constructive fraudulent transfer claims "seek to significantly augment the estate for the benefit of creditors," so "denying arbitration will advance important bankruptcy policies." Opp., ¶¶ 30, 73(d). Both arguments fail.

97. *First*, as the Supreme Court noted, fraudulent transfer claims "are quintessentially suits at common law" that "resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate." *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 55 (1989).

98. This is certainly the case here, because the Debtor admits that its constructive fraudulent transfer claims are based on a single theory: that "Mr. Banjo was fraudulently induced by [the Arbitration Participants] into authorizing the transactions at issue." *See* Opp., ¶ 73(d) n.1. And this is further confirmed by the Debtor's Seventh and Eighth Claims, whose only substantive

factual allegations turn on a purported "fraudulent scheme," and alleged breaches of contract, by the Arbitration Participants.  *See* Complaint, ¶¶ 144, 147, 151, 152, 157, 160, 161 (each alleging fraudulent conduct); *see also id.* at ¶¶ 148, 149, 159 (each alleging "extremely poor quality" goods or similar).  Because the Debtor's fraudulent conveyance claims depend on the Parties' underlying dispute, the Debtor cannot fairly claim they are "not the subject of an arbitration agreement."

99.     *Second*, the fact that the Debtor's constructive fraudulent transfer claims arise out of the Parties' pre-petition disputes that are *already* the subject of the Arbitration refutes the notion of any conflict with the Bankruptcy Code.  Bankruptcy courts have repeatedly held that where, as here, the "true substance" of fraudulent transfer claims "is essentially an extension of [a] breach of contract claim" or other common law claim, these are merely "procedurally core" claims.  *See Tomberlin*, 2017 WL 410337 at *3 (compelling arbitration of fraudulent conveyance claims).  Accordingly, compelling their arbitration does not conflict with the Bankruptcy Code as a matter of law.  *See id.*; *Winimo Realty,* 270 B.R. at 124 (compelling arbitration of fraudulent transfer claims); *Harrelson*, 537 B.R. at 26–27 (same); *Cardali*, 2010 WL 479180, at *8–9 (same).[17]  Indeed, the contracts that purportedly led to the Transfers that the Debtor seeks to avoid in its

---

[17]     The Debtor's reliance on *In re Craig*, 545 B.R. 47 (D. Colo. 2015), is misplaced.  In *Craig,* the court emphasized that the Section 548 claim was in no way based on allegations of a breach of contract, but rather a true claim for fraudulent transfer.  *Id.* at 52.

Further, many courts have rejected the Debtor's argument that, merely because its constructive fraud claims will "augment the estate," "denying arbitration will advance important bankruptcy policies" (*see* Opp., ¶ 73(d)).  *See, e.g., In re Kiskaden*, 571 B.R. 226, 236 (Bankr. E.D. Ky. 2017) (compelling arbitration of claims that "seek only to 'augment the estate' by recovering damages for Debtor'") (quoting *Stern v. Marshall*, 564 U.S. 462, 499 (2011)); *Tomberlin*, 2017 WL 410337, at *3 (finding fraudulent transfer claim based on breach of contract "more nearly resemble[d] contract claims brought by a bankrupt corporation to augment the bankruptcy estate" and so arbitration did not present an inherent conflict with Bankruptcy Code) (quotations omitted); *Cardali*, 2010 WL 4791801, at *8 (same); *Winimo Realty Corp.*, 270 B.R. at 124, n.12 (same).

- 44 -

Eighth Claim here expressly said "these agreements are in accordance or supersede any requirements in any operating agreement for Frictionless," *i.e.*, they purport to either comport with, or modify, the LLC Agreement.  *See* Complaint, ¶¶ 76, 156 & Exs. 45-46 thereto.

100.    For these reasons, the Debtor's constructive fraudulent transfer claims must be arbitrated.  In any event, this Court can, and should, stay the litigation of these claims in the Adversary Proceeding pending resolution of the Arbitration, which will resolve the factual and legal issues underlying those claims.  *See Hagerstown Fiber Ltd. P'ship*, 277 B.R. at 207-08 (staying fraudulent transfer claims pending arbitration because they were "contractual in nature" and "the arbitration may contribute to the[ir] resolution").

## III.    Allowing the Arbitration to Proceed Will Be More Efficient and Cost-Effective for the Debtor and Its Creditors, Facilitating the Prompt Administration of the Debtor's Estate

101.    In an effort to create a conflict between the Arbitration and the Bankruptcy Code, the Debtor recites the same generalized list of Bankruptcy Code policies that other debtors have uttered—and courts have rejected—in failed efforts to fend off agreed-upon arbitration.  None of these policies presents a conflict in this case; instead, compelling the Arbitration to proceed as to all Parties will further each of the policies that the Debtor touts:

102.    Centralization of Disputes (Debtor's Opp., ¶¶ 73(b), 73(c), 74(i), 84, 87, 89): Among other courts, Judge McNamara expressly rejected this factor as a purported reason to deny arbitration.  *See Touchstone*, 572 B.R. at 277 (quoted at ¶ 92, *supra*).

103.    The Supreme Court has repeatedly held that centralization must give way to other constitutional commands.  *See, e.g., Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982); *Stern v. Marshall*, 564 U.S. 462, 501 (2011).  Indeed, if centralization were the main goal of the Bankruptcy Code, there would be no basis for ever lifting the Automatic Stay

to allow a state-court or other pending litigation involving the Debtor to proceed, as commonly occurs.  This is doubly so in the case of arbitration, where the FAA reflects a Congressional purpose more potent than any policy favoring claim liquidation in pending state court proceedings.  *See Touchstone*, 572 B.R. at 277 (noting the FAA's policy of enforcing arbitration agreements "is even stronger than the rationale supporting deference to pending federal and state litigation").

104.    Here, allowing the Arbitration to proceed will promote the goal of centralizing the Parties' disputes, because the Arbitration is the only venue where all of those disputes can be resolved.  *See* Opening Brief, ¶¶ 131–32.  In contrast, under the Debtor's proposed approach the Parties would:  (a) first litigate this Adversary Proceeding against the Arbitration Participants; (b) then litigate in the District Court against Mingsu Li and Jun Li, who are not creditors of the Debtor, have no claims against the Debtor, and have moved to withdraw the reference to this Court in an abundance of caution to protect their rights to a jury trial, while reserving all rights, including with respect to their ability to object to lack of service of process and lack of personal jurisdiction [Docket No. 28]; and (c) only at the end proceed with the Arbitration against Banjo.  This delay as to Banjo is the height of irony, because (i) unlike Mingsu Li and Jun Li, who are not necessary parties to this dispute as the Debtor's Arbitration counsel previously advised the Tribunal, Banjo is a necessary party to this dispute; (ii) Banjo indisputably agreed to arbitrate; (iii) the Arbitration Participants have separate breach of contract claims against him that cannot be brought against the Debtor and cannot be asserted in this Adversary Proceeding because there is no supplemental bankruptcy jurisdiction; and (iv) he is the only party whose attorneys' fees and expenses the Debtor claims it is obligated to pay.

105.    Thus, the Debtor proposes three separate actions, in three separate forums, with the Debtor—and, by extension, its creditors—on the hook for paying the Debtor's fees and costs in

- 46 -

each one. Instead, in the Arbitration all of the necessary Parties' disputes will be resolved substantively in one action, with a few remaining claims administration issues left for this Court on a fully-developed record, and the District Court litigation against Mingsu Li and Jun Li left for later, if even necessary. The Arbitration is thus a far more centralized method of resolving the Parties' disputes.

106.    Risk of Inconsistent Judgments (Opp., ¶¶ 13, 71, 79, 96): This is not a real risk and cannot create a conflict with the Bankruptcy Code. *Supra*, ¶¶ 82, 91-93, n.12. Further, the risk of such inconsistencies will be reduced by centralizing the Parties' disputes in the Arbitration, which will undoubtedly conclude before any judgment in this Court or the District Court (and any subsequent appeals) might have a chance to create hypothetical inconsistencies.

107.    Efficient Administration of the Estate and Preserving Cash for the Debtor's Creditors (Opp., ¶¶ 73(b), 73(c), 73(d), 74(a), 74(b), 74(g), 79(b), 79(d), 80, 81, 114): Judge McNamara swept away this bogey-man as well:

> Instead, the Debtor focuses on time and expense (and the resulting impact on reorganization). While the Court accepts the Debtor's proffer that the Arbitration process has been expensive before the bankruptcy, **there is no competent evidence to suggest that completion of the Arbitration will take longer or be more expensive than resolution by this Court.** The Debtor offers only conjecture rather than common sense, for it stands to reason that completion of the Arbitration likely could be concluded more quickly, efficiently, and cheaply than starting from scratch again in this Court. **Final resolution also would be expedited through arbitration since appellate rights are quite limited. If this Court adjudicated the [creditor's] Claim and the losing side exercised all available appeals, the final result could take years.** The Court determines that prompt and conclusive arbitration of the Claim likely would facilitate the bankruptcy process, including reorganization, rather than impede it. Thus, arbitration of the Claim is mandatory because no inherent conflict has been shown.

*Touchstone*, 572 B.R. at 280-81 (emphasis added).

108.    The Debtor nowhere explains ***how*** allowing the Arbitration to proceed will interfere with this Court's efficient administration of the Debtor's estate.  Contrary to the Debtor's claims, allowing the Arbitration to proceed will enable this Court to administer the estate in a more prompt, cost-effective manner than the Debtor's proposal that the Parties first litigate in this Adversary Proceeding, then the Debtor litigates against Mingsu Li and Jun Li in the District Court (with attendant appeal rights and potential discovery litigation in both cases), and then the Arbitration proceeds with the Arbitration Participants and Banjo.

109.    As the Debtor's counsel effectively admitted at the November 27 conference before this Court—by acknowledging that even *starting* discovery in this Adversary Proceeding will likely take "six months"—the Debtor's proposed trifurcated litigation/arbitration scenario will take years to complete and would be more costly.  By contrast, the Arbitration trial is scheduled for July 2020 in Denver, far quicker than any trial in this Court is likely to occur.  And even if the Arbitration hearing were slightly delayed due to the Debtor's bankruptcy filing, it will surely conclude before the end of 2020.

110.    <u>Alleged Limitations of Arbitration (Opp., ¶¶ 40, 106, 108)</u>:  At various points, the Debtor contends that the Arbitration is not an effective venue for addressing garden-variety issues such as discovery disputes.  Once again, the Debtor fails to explain what discovery it needs that it won't obtain in the Arbitration.  Regardless, these concerns are unfounded.

111.    During the Arbitration, the Parties heavily negotiated—and the Tribunal approved—customized discovery and trial procedures that allow the Debtor robust discovery while ensuring the Arbitration would be more streamlined than a normal federal court litigation.  *See* Koosed Dec., Ex. 22.  This included granting the Debtor's Arbitration counsel's requests for substantial depositions, including as to third-party witnesses.  *See id.*

- 48 -

112.    Similarly, the Tribunal has the ability to compel discovery:  the Parties agreed to a substantial discovery dispute mechanism and, under the AAA's Commercial Arbitration Rules, the Tribunal has the power to issue necessary enforcement orders, including drawing adverse inferences, excluding evidence, etc.  *See* Koosed Dec., Ex. 22; *id.* at Ex. 10, p. 20 (AAA Rule 23(d) and 23(e), respectively).  In essence, the Tribunal has the same ability to police discovery disputes as does this Court.  The Arbitration's streamlined discovery process also furthers bankruptcy goals by providing time and cost savings, which benefit all Parties, including the Debtor and its creditors.  *See supra*, ¶¶ 107–09.

113.    Finally, courts have routinely rejected discovery-based arguments as a basis to deny arbitration.  *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) (rejecting complaint about arbitration discovery, noting that a party "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration") (quotation and citation omitted); *St. Charles v. Sherman & Howard L.L.C.*, No. 14-CV-03416-RM-CBS, 2015 WL 1887758, at *6 (D. Colo. Apr. 24, 2015) (holding that the fact that discovery under AAA's Commercial Arbitration Rules is less extensive than discovery under FRCP is not enough to invalidate an arbitration agreement).

114.    In sum, the most efficient and quickest way for the Debtor to maximize a return to creditors is to allow the Arbitration to proceed and the Parties' disputes to be resolved, fully and finally, in 2020, not long thereafter.

**IV.    The Automatic Stay Must Be Lifted to Allow the Arbitration to Proceed.**

115.    Because the Debtor has failed to establish that arbitrating the Parties' dispute inherently conflicts with the Bankruptcy Code, "the Court must order arbitration under the FAA." *Touchstone*, 572 B.R. at 281.  It necessarily follows that the Court must lift the Automatic Stay to

allow the Arbitration to proceed.  Indeed, these issues are one and the same; when faced with claims that present no inherent conflict, the court both lacks discretion to refuse to compel arbitration of those claims, and also "**has no discretion to continue staying the arbitration.**"  *In re Argon Credit, LLC*, No. 16-39654, 2018 WL 4562542, at *4 (Bankr. N.D. Ill. Sept. 21, 2018) (emphasis added); *see MBNA*, 436 F.3d at 108 (describing claims that pose no inherent conflict as ones that courts "**must send directly to arbitration**") (emphasis added).  As Judge McNamara noted in *Touchstone*, the requirement to compel arbitration of claims constitutes sufficient "cause" to lift the Automatic Stay under Section 362(d)(1).  *Touchstone*, 572 B.R. at 283.

**V.    Because the Debtor Must be Compelled to Arbitrate, there is No Legal or Logical Basis for Extending the Automatic Stay to Banjo and Giving a Non-Debtor the Protection to Which the Debtor Is Not Entitled.**

116.    Because the Court must compel arbitration of the Debtor's Claims, there is no justification for insulating Banjo from that Arbitration.  In addition, even when Banjo is considered in isolation, the Debtor has not proven that this case presents an "unusual situation" justifying an extension of the Automatic Stay to him.

117.    At bottom, the Debtor contends the required "unusual situation" exists here for two reasons.

a)      The Debtor has an identity of interests with Banjo, such that a judgment against Banjo would be "in effect a judgment against [the Debtor]" because (a) the Debtor has an obligation to indemnify Banjo; and (b) all of the claims asserted by the Arbitration Participants in the Arbitration against Banjo "rest[] entirely on [] claims of breach of the [LLC Agreement] against Banjo while he was working as the CEO of [the Debtor] during the joint venture." *See* Opp., ¶¶ 88, 93.

b)      Allowing the Arbitration to proceed against Banjo could adversely affect the Debtor's ability to reorganize.  The Debtor principally relies on three cases— *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994 (4th Cir.1986), *Robert W. Thomas & Anne McDonald Thomas Revocable Tr. v. Inland Pac.*

*Colo, LLC*, 11-CV-03333-WYD-KLM, 2013 WL 708493 (D. Colo. Feb. 26, 2013), and *In re N. Star Contracting Corp.*, 125 B.R. 368 (S.D.N.Y. 1991)—to argue that "similar cases have warranted a Stay in favor of a co-defendant like Banjo." *See* Opp., ¶¶ 86-93.

118.    Both of these arguments fail on the law and the facts.

119.    *First*, none of the cases cited by the Debtor involved agreements to arbitrate, only whether to lift stays to allow litigation in court. Therefore, none of these courts balanced the FAA's strong arbitration policies with the purposes of the Bankruptcy Code. As noted by Judge McNamara, the policy of enforcing arbitration agreements "is even stronger than the rationale supporting deference to pending federal and state litigation." *Touchstone*, 572 B.R. at 277.

120.    *Second*, all of the cases cited by the Debtor involved the debtor and its principals seeking a stay of *all* proceedings; restated, none of those cases involved a debtor trying to forum-shop by moving the litigation into the bankruptcy court and going forward there. Indeed, the irony lies in the Debtor's proposed scenario here, where the ***only*** Party getting a stay would be Banjo; all of the other Parties would have to proceed with their disputes, but in this Adversary Proceeding instead of the Arbitration.

121.    *Third*, *A.H. Robins*, does not support the Debtor's argument that a purported indemnification obligation constitutes unusual circumstances. Subsequent case law has limited the narrow *Robins* exception, holding that "'unusual circumstances' exist where the claim clearly arises out of the defendant's actions in his capacity as the debtor's officer, and he is ***undisputedly entitled to indemnity***. Conversely, unusual circumstances do not exist where the debtor's insider is independently liable, ***the right to indemnity is not absolute***, and the continuation of the suit will not interfere with the bankruptcy." *In re Bidermann Indus. U.S.A., Inc.*, 200 B.R. 779, 784 (Bankr. S.D.N.Y. 1996) (emphasis added). Banjo fails to meet these requirements.

- 51 -

122.     As noted in the Opening Brief, Colorado law precludes indemnifying a party for damages resulting from intentional or willful wrongful acts.  *See* Opening Brief, ¶ 154 (citing cases).  Because the Arbitration Participants' claims in the Arbitration include numerous allegations of fraud and other willful misconduct by Banjo, the Debtor may well be precluded from indemnifying Banjo.  *Id.*  Under these circumstances, courts have held that the right to indemnity is not "absolute" and, therefore, does not support the extension of the Automatic Stay.  *Bidermann*, 200 B.R. at 784–85 (where, under Delaware law, debtor's president would have to show he acted in good faith and in the best interest of the company, his right to indemnification was not absolute).

123.     *Fourth*, the mere recitation of a possible indemnification claim by the Debtor's controlling person is an insufficient basis for giving him the extraordinary protection of the Automatic Stay.  Instead, Banjo's recourse is the same as that of every other general unsecured creditor:  file a claim and share and share alike.  The court in *In re QA3 Fin. Corp.*, 466 B.R. 142, 146-47 (Bankr. D. Neb. 2012), so held.  There, the principal of a debtor-securities broker/dealer sought protection of the debtor's Automatic Stay to shield him from a FINRA securities arbitration. The court allowed all claims against the principal not based on an agency theory—*i.e.*, all claims against the principal individually—to go forward, as follows:

> The debtor is arguing that the indemnification provision does indeed place it in a position, at this time, to be adversely affected by the arbitrations.  That argument, in this bankruptcy case, is premature.  The respondents likely expect the debtor to pay for their defense at the FINRA hearings under the terms of the indemnification agreement, but whether that is in fact a duty of the debtor remains to be determined and depends in large part on whether the basis for the FINRA claims fits within the scope of the indemnity provision.  **The individuals can provide their own defense and seek reimbursement from the debtor by filing a proof of claim.**
>                                        * * *
> Second, any indemnification claims based on arbitration findings or judgments against the respondents may be claims against the bankruptcy estate.  At best, they would be unsecured claims, which would be dealt with

> in the distribution scheme proposed by the debtor in its plan and would be
> subject to challenge in the claims allowance and plan confirmation process.

466 B.R. at 146-47 (emphasis added).   The same principles apply to the Debtor's indemnity

arguments as to Banjo.[18]

124.    *Fifth*, none of the Debtor's cases supports its contention that arbitrating the claims

against Banjo would create a significant, adverse effect on the Debtor's reorganization.  In *Robins*,

the debtor was faced with thousands of Dalkon Shield-related lawsuits from consumers worldwide

that had the potential to deplete the debtor's resources and insurance. 788 F.2d at 1011–12.  In

contrast, the Parties' dispute is an isolated event that will be resolved either in the Arbitration or,

alternatively, in this Adversary Proceeding, and then the Arbitration.

125.    In *North Star*, similarly, the bankruptcy court found the debtor's president was the

"principal player in the corporation's reorganization process."  *N. Star Contracting*, 125 B.R. at

371.  Here, by contrast, the Debtor has retained an investment banker and financial advisor to

conduct its sale process.   And, in any event, the Debtor seeks to litigate the Parties' dispute

regardless of forum, whether in this Court or the Arbitration.  Thus, the Parties' dispute will be

decided *somewhere*, and Banjo will be a major player in that dispute no matter what.[19]

126.    Finally, the Debtor's conclusory assertion that there is an "identity of interest" here

simply because Banjo was the Debtor's CEO at the time of his breaches and other fraudulent

---

[18]    Indeed, Banjo's potential prepetition claim for indemnification puts to rest any frivolous
contention that he might be able to have his legal fees and expenses paid through an advancement
by the Debtor during bankruptcy as might have otherwise occurred if he were a named beneficiary
of a directors and officers insurance policy under a third-party insurer.  He must pay his expenses
(or an allocated share of expenses for any shared counsel with the Debtor) himself.

[19]    The Debtor also inexplicably cites to *North Star* to support a contention that arbitrating
claims with Banjo could result in inconsistent judgments and issues of collateral estoppel.  *See*
Opp., ¶ 96.  The court in *North Star* did not even discuss such issues, let alone base its decision to
extend the Stay on them.

actions is of no avail. The Opening Brief showed that numerous courts within and beyond the Tenth Circuit have held the Automatic Stay cannot be extended to non-debtors where, as here, the non-debtor is independently liable on claims asserted by the creditor/plaintiff. *See* Opening Brief, ¶ 158.[20]

## VI. Because the Court Must Compel the Parties to Arbitrate their Dispute, There is No Basis for Enjoining the Arbitration.

127. The Parties agree on the standard for injunctive relief, namely that the Debtor bears the high burden of demonstrating, among other things, (a) a substantial likelihood of prevailing on the merits; (b) that it will suffer irreparable injury if the injunction is denied; (c) that the threatened injury to itself outweighs the injury that the Arbitration Participants will suffer under the injunction; and (d) that the injunction would not be adverse to the public interest. *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1065-66 (10th Cir. 2001). As discussed in detail in the Opening Brief, the Debtor cannot establish *any* of these factors, let alone all of them. *See* Opening Brief, ¶¶ 163–70.

128. As an initial matter, the Debtor seeks a preliminary injunction to extend the Automatic Stay to Banjo. For purposes of the preliminary injunction, the question is whether Banjo agreed to arbitrate. Even the Debtor concedes he did. *See* Opp., ¶ 13.

129. *First*, and most importantly, the Debtor does not come close to demonstrating a likelihood of success on the merits here. As described above and throughout the Opening Brief, the FAA mandates that the Parties' dispute be arbitrated, because the Debtor, Banjo, and the

---

20 This further distinguishes this case from the court's decision in *North Star*. There, the court emphasized that the state court action had been "commenced solely to circumvent the automatic stay" and that the plaintiff opposing extension of the Stay did not have a "bona fide separate cause of action against" the debtor's president. *N. Star Contracting*, 125 B.R. at 371.

Arbitration Participants agreed to arbitrate their dispute.  *Supra*, ¶¶ 10–58.  Moreover, the Court

has no discretion other than to compel arbitration of the Debtor's non-core Pre-Petition State Law

Claims.  *Supra*, ¶¶ 62, 67–70.

130.     The Debtor mistakenly relies upon *MZM Constr. Co., Inc. v. N.J. Bldg. Laborers'*

*Statewide Benefit Funds*, Civ. No. 18-16328-KM-MAH, 2019 WL 3812889 (D. N.J. Aug. 14,

2019), *appeal filed*, Docket No. 19-3102 (Sept. 18, 2019), to support the frivolous conclusion that

"it will likely prevail . . . on the issue of arbitrability."  Opp., ¶ 102.  There, however, the Court

found "substantial evidence" that the party opposing arbitration ***never saw, heard of, or even***

***agreed to*** the underlying arbitration agreement, let alone expressly agreed to arbitrate multiple

times as the Debtor did here.  *Compare MZM Constr.*, 2019 WL 381288, at *5, 14 n.8, *with supra*,

¶¶ 10–28 *and* Opening Brief, ¶¶ 11–32.  Further, the Debtor ignores that controlling precedent

requires the Court to compel arbitration.  *Compare* Opp., ¶ 103, *with supra*, ¶¶ 59–100 *and*

Opening Brief, ¶¶ 114–23.  Simply put, the Debtor is not likely to prevail on the key questions of

arbitrability.

131.     *Second*, the Debtor cannot establish that, without injunctive relief, it will suffer

irreparable harm that is "both certain and great," as required by Tenth Circuit precedent.  *Dominion*

*Video Satellite v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262-63 (10th Cir. 2004) (quotation

and citation omitted).  On the facts, the Debtor has not provided (or even alluded to) any specific

evidence showing how it will be harmed if forced to proceed with the Arbitration instead of

litigating in this Adversary Proceeding.  *Supra*, n.12 & ¶¶ 101–14; *see also Touchstone*, 572 B.R.

at 280-81 ("The Debtor offers only conjecture rather than common sense . . . .").

132.     On the law, the Debtor attempts to circumvent the governing Tenth Circuit standard

by relying on *Martin/Martin, Inc. v. Kling Stubbins, Inc.*, No. 19-cv-01233-RM-KLM, 2019 WL

2357303 (D. Colo. June 4, 2019). But that case merely stands for the well-established proposition that irreparable harm can result from requiring a party to arbitrate "**where the dispute is not subject to arbitration.**" 2019 WL 2357303, at \*2 (emphasis added). For all of the reasons described above and in the Opening Brief, that is not this case here. *Supra*, ¶¶ 10–100; Opening Brief, ¶¶ 11–32, 114–23. Thus, *Martin/Martin* is inapposite.[21] Accordingly, the Debtor has not, and cannot, prove irreparable harm.

133.    *Third*, the Debtor fails to prove any threatened injury that outweighs the injury to the Arbitration Participants if the Injunction Motion were granted and the Arbitration enjoined indefinitely. Specifically, the Arbitration Participants will suffer deprivation of their bargained-for right to arbitrate, and a duplication of expense and effort to restart the litigation in this Court. Further, as demonstrated above, moving forward with the Arbitration will be more efficient than litigating this Adversary Proceeding. *Supra*, ¶¶ 101–14. Thus, the Debtor's complaints about the "incredible expense and time it would have to invest in the Arbitration" are wrong. Opp., ¶ 112.

134.    Moreover, the "case law clearly provides that delay and expense associated with the arbitration itself are insufficient reasons to deny arbitration." *Transp. Assocs., Inc.*, 263 B.R. at 536–37; *see also In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 285 (4th Cir. 2007) ("The possibility that a party to an arbitration clause will be inconvenienced and will incur some extra expense, however, does not necessarily mean that the party cannot effectively vindicate its statutory rights through arbitration."). Indeed, in *Touchstone*, Judge McNamara easily dispensed

---

[21]    Moreover, the court in *Martin/Martin* ordered a "brief" preliminary injunction only until a preliminary hearing could be held to determine whether an agreement to arbitrate existed. 2019 WL 2357303, at \*3. This is distinguishable from this case, where the Debtor seeks to enjoin the Arbitration indefinitely, despite its prior agreement to arbitrate the Parties' disputes.

with the same meritless and illogical contentions of excessive cost and delay attendant to arbitration that the Debtor raises here. *Touchstone*, 572 B.R. at 282-83.

135.    The Debtor's reliance on *Colo. Wild Inc. v. Forest Serv.* and *Husky Ventures, Inc. v. B55 Invs., Ltd.* on the balance of harms is misplaced. Opp., ¶ 110. Neither addresses irreparable injury that allegedly would be caused by the purported delay and expense of arbitration. *Colorado Wild* stands for the unremarkable proposition that damage to the environment can be irreparable, particularly where any injury to the government can be ameliorated through clarifying language in the injunction. 523 F. Supp. 2d 1213, 1222 (D. Colo. 2007). *Husky Ventures*, on the other hand, expressly did not deal with the balance of harms and upheld a permanent injunction that was issued after trial, based on evidence that showed ongoing tortious interference and malicious intent by the parties opposing the injunction that could not be compensated by money. 911 F.3d 1000, 1012-14 (10th Cir. 2018). Those facts are irrelevant to the issue before the Court here, *i.e.*, whether to extend the Automatic Stay to protect Banjo.

136.    *Fourth*, allowing an injunction would be adverse to the public interest because it would violate the explicit federal policy—enshrined in the FAA and decades of Supreme Court precedent—enforcing arbitration agreements according to their terms where, as here, there is no inherent conflict with another Congressional command. *See Epic Systems*, 138 S.Ct. 1612. If the Injunction Motion were granted, arbitration agreements will be less secure and parties will regularly seek to avoid their contractual obligations to arbitrate if they believe a better outcome could be achieved in a different forum, in this case bankruptcy court. This factor weighs especially heavy, given Judge McNamara's strong, repeated disapproval in *Touchstone* of forum-shopping by a debtor seeking to escape arbitration. *See* 572 B.R. at 264-65, 280, 283.

137.    The Debtor fails to even address these concerns, and instead claims in conclusory fashion that the Arbitration would prevent the Debtor from reorganizing through bankruptcy.  *See* Opp., ¶ 114.  This is hollow rhetoric.  In fact, the Arbitration would not impair the Debtor's ability to successfully go through its bankruptcy case, but rather would expedite the proceeding by promptly and efficiently resolving some of the most critical issues in it.  *Supra*, ¶¶ 101–14.

138.    The Debtor's misleading citation to *Martin/Martin* implies that courts can stay arbitration in favor of a court proceeding in the name of public interest.  Opp., ¶ 113.  But, as noted, the court in *Martin/Martin* simply found that the public interest was not harmed by staying an arbitration where the party seeking arbitration could not point to an actual agreement to arbitrate.  2019 WL 2357303, at *3.  That is not this case.  Here, the public interest would clearly be harmed by failing to enforce the Parties' multiple, valid, and binding agreements to arbitrate.

139.    For all these reasons, the Debtor has failed to meet its burden of establishing any of the factors necessary for a preliminary injunction.  The Debtor's Injunction Motion should therefore be denied and the existing TRO should be dissolved.

## **CONCLUSION**

140.    Arbitration Participant Frictionless, LLC is the largest scheduled creditor of the Debtor.  It, like the rest of the Arbitration Participants, wants to see the Debtor maximize the value of its estate and has no interest in preventing the Debtor from fully availing itself of its rights under the Bankruptcy Code.  Likewise, the Arbitration Participants are not trying to prevent the Debtor from bringing its various Claims against them; the Arbitration Participants want the Parties' dispute resolved as quickly and cost-effectively as possible.  The only question is where that should occur.

- 58 -

141.    The Parties all agreed to resolve their dispute in the Arbitration, and the FAA mandates enforcement of that agreement.  At a minimum, this Court has no discretion but to compel the Arbitration to proceed as to the Debtor's non-core Pre-Petition State Law Claims.  The Tribunal can decide those non-core Claims and also must decide whether the Purported Bankruptcy Claims are within the scope of the Parties' arbitration agreements, consistent with AAA Rules.  If they are, the Tribunal can decide them.  If they are not, the Tribunal can still decide the factual underpinnings that will ultimately dictate the outcome on substantially all of the Debtor's Purported Bankruptcy Claims, after which the Parties can return to this Court for this Court's handling of those Claims, if necessary.

142.    Accordingly, for all these reasons, the Arbitration Participants respectfully request that this Court (a) grant their motion to compel the Debtor to continue arbitrating the Arbitration under the FAA, including the Debtor's Claims set forth in the Complaint in this Adversary Proceeding; (b) grant the Arbitration Participants relief from the Automatic Stay to allow the Arbitration to proceed against the Debtor; (c) deny the Debtor's Injunction Motion and dissolve the TRO precluding the Arbitration from going forward against the Debtor and Banjo; (d) dismiss or, at a minimum, stay the Adversary Proceeding indefinitely pending the Tribunal's issuance of an award in the Arbitration, at which point this Court can administer in the Debtor's bankruptcy case any claims determined in the Tribunal's award; and (e) grant such other and further relief as the Court deems just and proper.

DATED:  December 2, 2019.

SHERMAN & HOWARD L.L.C.

*s/ Eric E. Johnson*_____
Peter A. Cal
Eric E. Johnson
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Telephone:  (303) 297-2900
Facsimile:  (303) 298-0940
E-mail:  pcal@shermanhoward.com
         ejohnson@shermanhoward.com


K&L GATES LLP

*s/ Brian D. Koosed*_____
Brian D. Koosed
Robert T. Honeywell
1601 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 778-9204
Facsimile:  (202) 778-9100
E-mail:  Brian.Koosed@klgates.com
         Robert.Honeywell@klgates.com

**Attorneys for Frictionless, LLC, Changzhou Zhong Lian Investment Co. Ltd., and Changzhou Inter Universal Machine & Equipment Co., Ltd.**

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2019, I electronically filed the foregoing **ARBITRATION PARTICIPANTS' CONSOLIDATED REPLY MEMORANDUM OF LAW IN FURTHER:  (A) SUPPORT OF THEIR MOTIONS TO COMPEL THE DEBTOR TO ARBITRATE PURSUANT TO THE FEDERAL ARBITRATION ACT, FOR RELIEF FROM THE AUTOMATIC STAY TO ALLOW ARBITRATION TO PROCEED, AND TO DISMISS UNDER FED. R. CIV. P. 12(b)(1), OR STAY, ADVERSARY PROCEEDING PENDING ARBITRATION; AND (B) OPPOSITION TO THE DEBTOR'S MOTION FOR PRELIMINARY INJUNCTION STAYING THE ARBITRATION IN FAVOR OF THE ADVERSARY PROCEEDING AND EXTENDING THE AUTOMATIC STAY TO THE DEBTOR'S PRINCIPAL, DANIEL BANJO** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

| | |
|---|---|
| Aaron J. Conrardy, Esq. | Thomas P. Howard, Esq. |
| David Wadsworth, Esq. | Olayinka L. Hamza, Esq. |
| David Warner, Esq. | thoward@thowardlaw.com |
| aconrardy@wgwc-law.com | ohamza@thowardlaw.com |
| dwadsworth@wgwc-law.com | |
| dwarner@wgwc-law.com | |
| | |
| Kevin S. Neiman, Esq. | Debra Piazza, Esq. |
| kevin@ksnpc.com | dpiazza@montgomerylittle.com |
| | |
| Nathan G. Osborn, Esq. | Alan K. Motes, Esq. |
| nosborn@montgomerylittle.com | Alan.Motes@usdoj.gov |
| | |
| U.S. Trustee | Jiangang Ou |
| USTPRegion19.DV.ECF@usdoj.gov | jou@nguyen-chen.com |
| | |
| Risa Lynn Wolf-Smith, Esq. | Stephen M. Packman, Esq. |
| RWolf@hollandhart.com | spackman@archerlaw.com |

*s/ Roberta Neal*